09:39:10   1        **UNITED STATES DISTRICT COURT**
           **SOUTHERN DISTRICT OF FLORIDA**
09:39:10   2           **MIAMI DIVISION**
         **CASE NO.  18-60256-CR-JEM**

09:39:10   3

09:39:10   4  **UNITED STATES OF AMERICA,**

09:39:10   5       Plaintiff,

09:39:10   6   vs.

09:39:10   7             Miami, Florida
              September 23, 2019
09:39:10   8  **JOSEPH ISAIAH WOODSON, JR.,**  Pages 1-180

09:39:10   9       Defendant.
   _____

09:39:10   10        **TRANSCRIPT OF JURY TRIAL**
09:39:10   11           <u>**DAY 2**</u>
     **BEFORE THE HONORABLE JOSE E. MARTINEZ**
09:39:10   12      **UNITED STATES DISTRICT JUDGE**

09:39:10   13

09:39:10   14  **APPEARANCES:**

09:39:10   15  **FOR THE PLAINTIFF:**   *United States Attorney's Office*
            **BY:  JODI ANTON,  A.U.S.A.**
09:39:10   16         **BY:  FRANCIS VIAMONTES, A.U.S.A.**
         500 East Broward Boulevard
09:39:10   17         Suite 700
         Fort Lauderdale, Florida 33394

09:39:10   18

09:39:10   19  **FOR THE DEFENDANT:**   *Federal Public Defender's Office*
         **BY:  ANTHONY J. NATALE, A.F.P.D.**
09:39:10   20         **BY:  CLEA D.T. WEISS, A.F.P.D.**
         **BY:  KATHLEEN E. MOLLISON, A.F.P.D.**
09:39:10   21         150 West Flagler Street
         Suite 1700
09:39:10   22         Miami, Florida 33130

09:39:10   23

09:39:10   24  **REPORTED BY:**    **DAWN M. SAVINO, RPR**
         **Official Court Stenographer**
         400 N. Miami Avenue, 10S03
09:39:10   25         Miami, Florida  33128
         Telephone:  305-523-5598

09:46:34  1           (Court called to order)

09:46:34  2           COURT SECURITY OFFICER:  Case number

09:46:39  3   18-60256-criminal-Martinez, United States of America versus

09:46:42  4   Joseph Isaiah Woodson, Junior.

09:46:45  5           Counsel, please state your appearance.

09:46:46  6           MS. ANTON:  Good morning, Your Honor.  Jodi Anton on

09:46:48  7   behalf of the United States.

09:46:50  8           THE COURT:  Ms. Anton.

09:46:51  9           MS. VIAMONTES:  Good morning, Your Honor.  Francis

09:46:55 10   Viamontes on behalf of the United States and Special Agent Lee

09:46:57 11   Bieber at counsel table.

09:46:59 12           THE COURT:  Good morning.

09:47:00 13           MS. MOLLISON:  Good morning, Judge.  Clea Weiss from

09:47:04 14   the Federal Public Defender's Office on behalf of Mr. Woodson

09:47:05 15   along with --

09:47:07 16           MS. MOLLISON:  Good morning, Your Honor.  Kate Mollison

09:47:07 17   also on behalf of Mr. Woodson.

09:47:10 18           MR. NATALE:  Good morning, Your Honor.  Anthony Natale

09:47:12 19   from the Federal Public Defender's Office on behalf of

09:47:18 20   Mr. Woodson who is present and Michelle Moldonado who is our

09:47:19 21   paralegal.

09:47:20 22           THE COURT:  Good morning.  All right.  You need to have

09:47:22 23   an ex-parte hearing?

09:47:23 24           MR. NATALE:  Yes, Judge.

09:47:28 25           THE COURT:  Okay.  Got to ask everybody else to leave.

09:47:56   1          (Government counsel exited courtroom)

09:47:58   2          THE COURT:  Yes, sir.

09:48:02   3          MR. NATALE:  Your Honor, in the --

09:48:04   4          THE COURT:  Let the record reflect that the only

09:48:07   5   persons present in the courtroom are persons from the Public

09:48:10   6   Defender's Office and my staff.

09:48:13   7          MR. NATALE:  Your Honor, late, very late yesterday

09:48:18   8   afternoon and throughout the evening, we received e-mails from

09:48:25   9   our client who brought to our attention a number of issues which

09:48:31  10   I think he is best able to explain to you and he wants to

09:48:38  11   explain to you, where he has indicated that he does not believe

09:48:45  12   that -- he believes that we have a conflict and that he has lost

09:48:49  13   faith in us and that we would not be zealously representing him.

09:48:53  14   We spoke with him earlier today, thank you for letting us do

09:48:56  15   that, and I note that there's a number of things that he wants

09:48:58  16   to say to you to bring this to your attention.

09:49:03  17          THE COURT:  All right.  You can speak right there.

09:49:07  18   It's easier to speak sitting down.  The microphone is closer.

09:49:08  19          Yes, sir.

09:49:10  20          THE DEFENDANT:  Okay.  You can hear me, right?

09:49:12  21          THE COURT:  Yes, I hear you fine.

09:49:14  22          THE DEFENDANT:  Okay.  I have a couple concerns.  The

09:49:20  23   first one is another captive by the name of Jack Kachkar has

09:49:20  24   been spreading rumors that I am a career pedophile and that he

09:49:21  25   received information pertaining --

09:49:24  1            THE COURT:  I'm sorry.  Wait a second.  Say that again?

09:49:26  2            MR. NATALE:  Say it slower, very slow.

09:49:29  3            THE COURT:  Yeah, speak slowly and clearly.  Another

09:49:30  4   what?

09:49:32  5            THE DEFENDANT:  Another captive named Jack.

09:49:36  6            THE COURT:  Another inmate at the correctional.  Okay?

09:49:39  7            THE DEFENDANT:  FDC, named Jack Kashkar has been

09:49:44  8   spreading rumors that I am a career pedophile, and that he

09:49:49  9   received information pertaining to my case.  His attorney is

09:49:54 10   Michael Caruso, the boss of my attorneys.  I'm aware Kachkar has

09:50:00 11   a large amount of money from fraudulent enterprise he could have

09:50:03 12   bribed Caruso with.  This leads me to believe that the integrity

09:50:06 13   of my case could have been compromised, so I could have snitches

09:50:11 14   on my case and possibly my own legal team sabotaged at the

09:50:12 15   behest of their boss.

09:50:16 16            Another issue I have is that I have not been present

09:50:23 17   for any evidentiary hearings.  This could lead to me having

09:50:27 18   evidence attributed to me that I have never had and now at

09:50:30 19   trial, I see it for the first time but it would be too late.

09:50:32 20            THE COURT:  All right.  Hold on a second.  What

09:50:34 21   evidentiary hearings are you talking about?

09:50:35 22            THE DEFENDANT:  In regards to when the Government

09:50:37 23   showed all the evidence they collected from --

09:50:39 24            THE COURT:  Okay.  That would not be a hearing.  A

09:50:43 25   hearing is something that's in front of me.  I don't recall any

| | | |
|---|---|---|
| 09:50:48 | 1 | matters before me that were evidentiary in nature, but go ahead. |
| 09:50:53 | 2 | Okay.  So you mean at the turning over of the evidence? |
| 09:50:53 | 3 | THE DEFENDANT:  Yeah. |
| 09:50:56 | 4 | THE COURT:  Okay.  All right. |
| 09:50:59 | 5 | THE DEFENDANT:  Then there is the issue of one of my |
| 09:51:02 | 6 | experts being found worthless to my case just yesterday. |
| 09:51:05 | 7 | Originally on Friday, I was told it was simply a scheduling |
| 09:51:09 | 8 | conflict.  This leads me now with a hole in my defense team with |
| 09:51:13 | 9 | no time to find a replacement. |
| 09:51:16 | 10 | THE COURT:  All right.  Is that it? |
| 09:51:17 | 11 | THE DEFENDANT:  Yes. |
| 09:51:20 | 12 | THE COURT:  Well, first of all, as far as tactics are |
| 09:51:24 | 13 | concerned, I can't be second-guessing your attorneys.  I can |
| 09:51:28 | 14 | tell you I'm familiar with two of the three attorneys that are |
| 09:51:32 | 15 | representing you in this case, and they are very good lawyers. |
| 09:51:37 | 16 | They are very capable.  I'm also familiar with Mr. Caruso and |
| 09:51:43 | 17 | I'd have to have a lot more than some inmate told me something |
| 09:51:48 | 18 | that maybe he got it from Michael Caruso.  There is no evidence |
| 09:51:52 | 19 | that Michael Caruso said anything.  First of all, I doubt very |
| 09:51:56 | 20 | much that Michael Caruso has very much to do with this case.  He |
| 09:52:00 | 21 | has his own cases.  He is the head of the office, but really |
| 09:52:04 | 22 | doesn't, I don't think, meddle in individual cases all that |
| 09:52:04 | 23 | much. |
| 09:52:09 | 24 | The bottom line is that there is no basis at this point |
| 09:52:15 | 25 | to believe that anybody has suborned your case by leaking |

09:52:19  1    information to other inmates over at the Federal Correctional

09:52:25  2    Center or Federal Detention Center.  Has it occurred to you that

09:52:28  3    the guy is making this up?  That he's just trying to get to you

09:52:32  4    by making stuff up?  Because I don't think there's any evidence

09:52:33  5    of anything like that.

09:52:36  6             But what is it that you want me to do?

09:52:37  7             THE DEFENDANT:  I just don't want to risk any jailhouse

09:52:41  8    snitches getting on my case when I know I've never spoken to

09:52:42  9    anyone about my case.

09:52:45  10            THE COURT:  Okay.  Well, I don't know that the

09:52:48  11   Government has any plans of calling any jailhouse snitches.  If

09:52:54  12   they do, that's -- you know, clearly it would be interesting to

09:52:58  13   hear what they have to say.  If you say you haven't spoken to

09:53:07  14   them, well then you haven't spoken to them.  I can tell you that

09:53:12  15   I guess it's possible, but in 17 plus years that I've been a

09:53:16  16   federal judge, I have not had one case with a jailhouse snitch

09:53:21  17   in it.  It's not very common.  It happens, but not very often,

09:53:27  18   and the jury will have to determine whether -- let's worry about

09:53:31  19   that if it happens.  I don't think that it's -- it's not likely

09:53:32  20   to happen.  I don't know.

09:53:36  21            Is defense counsel aware of any possibility of

09:53:40  22   jailhouse snitches being used as witnesses in this case?

09:53:41  23            MR. NATALE:  No, Your Honor.

09:53:44  24            THE COURT:  Okay.  I don't -- you know, I think I can

09:53:48  25   understand you're getting anxious as the trial is about to

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED BY COMPUTER

09:53:52  1    begin, but perhaps you're worrying unnecessarily.  I don't think

09:53:58  2    that there's any indication of any of that, and there's

09:54:01  3    certainly no indication that your attorneys have leaked

09:54:03  4    information, your attorneys or anybody else in their offices

09:54:07  5    have leaked information to anybody in the Federal Detention

09:54:14  6    Center.  So I understand your concern.

09:54:18  7             I don't know what specific relief you're asking for at

09:54:21  8    this time.  If it is to replace your lawyers, I will deny that.

09:54:25  9    Your lawyers are very competent, very capable and I think you'll

09:54:29  10   see that they'll do a good job.  You may not agree with

09:54:31  11   everything that they do, but I think they will explain

09:54:34  12   everything and in fact, and eventually you are in fact in charge

09:54:38  13   of your defense.  You tell them what you want and they may

09:54:40  14   disagree with you and try to explain to you why that's not the

09:54:44  15   right way to go, and there are some things they cannot do

09:54:49  16   according to the rules of ethics.  But if they can do it,

09:54:52  17   they'll do what you ask them to do.  But generally, it's been my

09:54:55  18   experience that their recommendation is probably better than

09:55:00  19   your guess as to what the best way is to defend this case.

09:55:04  20             Again, I don't know what the defense strategy is but I

09:55:07  21   can tell you that the lawyers that you have are very capable

09:55:12  22   lawyers.  I'm not aware of any conflict of interest at this time

09:55:15  23   and if that is a motion to replace your lawyers, I will deny

09:55:21  24   that motion because you happen to be represented by some of the

09:55:25  25   most competent lawyers in the district.  I've seen two of them

8

09:55:30  1   in action many times and they are very capable.  They do a very

09:55:36  2   nice job and you'll get your money's worth out of them.  And I

09:55:40  3   don't mean that facetiously.  You will get a good defense from

09:55:45  4   this team that you have representing you, which is more than the

09:55:47  5   people that are usually -- usually there's one public defender

09:55:52  6   per defendant.  In this case you have three public defenders,

09:55:59  7   one of whom is so white-haired, he's the most experienced that I

09:56:01  8   know of in the Public Defender's Office and he is a very capable

09:56:04  9   public defender.  Sometimes to the point of being kind of

09:56:08 10   aggravating, but that's a different problem.

09:56:13 11             Anyway, I don't know what else I can tell you at this

09:56:18 12   point, but speak to them candidly, talk to them, tell them what

09:56:21 13   you want and I am sure they will do their best to try to give

09:56:23 14   you what you want.  All right?

09:56:25 15             We'll have to get started at this point.  We need to

09:56:29 16   get started in this case.  Can we call everyone back in?

09:56:33 17   Counsel, is there any further need?

09:56:33 18             THE DEFENDANT:  Thank you, Your Honor.

09:56:34 19             THE COURT:  Okay.  Thank you, sir.

09:56:36 20             MR. NATALE:  Your Honor, when we call them back in

09:56:40 21   there are two other pretrial, pre-opening matters.

09:56:42 22             THE COURT:  All right.

09:56:57 23             (Government counsel re-entered courtroom)

09:57:23 24             THE COURT:  All right, sir.  Mr. Natale, everyone is

09:57:25 25   back in the courtroom, all parties are represented.

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

09:57:27   1          Tell me what you want to talk about.

09:57:32   2          MR. NATALE:  Your Honor, the first one is on invoking

09:57:38   3   the rule on witnesses.  We are asking it to be invoked.  The

09:57:41   4   prosecutor said they want one of their witnesses to be here

09:57:45   5   during the testimony of, I guess, all of the witnesses or at

09:57:49   6   least some of the witnesses.  We object to that because the

09:57:56   7   notice we received for this person was that he did an analysis

09:58:02   8   of our client's phone and that he would be testifying to what

09:58:06   9   was the subject matters, what he found, what he didn't find and

09:58:07  10   all of that.

09:58:11  11          Now, it appears that they want him to be sitting here

09:58:18  12   listening to what the witnesses say so that he can then, I guess

09:58:22  13   in real time, because he had his computer hooked up.

09:58:25  14          THE COURT:  Who is this witness?

09:58:27  15          MS. ANTON:  Judge, it's Government's witness Eric

09:58:31  16   Deborja.  He is an expert witness from the FBI with the

09:58:33  17   technical analysis unit.

09:58:36  18          MR. NATALE:  He did technical analysis, and in essence

09:58:40  19   if he's present, they want him then to, potentially based on

09:58:42  20   what he hears from --

09:58:47  21          THE COURT:  I don't know what he's going to do but if

09:58:52  22   his -- what is his testimony going to be, if you know?

09:58:54  23          MS. ANTON:  Judge, his testimony is that he did the

09:58:56  24   analysis, part of the analysis on one of the Defendant's

09:59:00  25   telephones and we provided defense counsel with a very thorough

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED BY COMPUTER

09:59:06  1    report and multiple exhibits that he's made.  He is an expert

09:59:10  2    witness.  Under the Rule of Sequestration 615, he's subject to

09:59:13  3    be in the courtroom with the Court's permission under subsection

09:59:14  4    C.

09:59:19  5             I think what's important here is not what the

09:59:22  6    Government intends to ask him, but it's how the defense is

09:59:26  7    prejudiced.  And he's written a report that says what his

09:59:30  8    technical findings are.  Now, he's an expert so we could ask him

09:59:32  9    a hypothetical question, we could ask him a hypothetical about

09:59:38  10   whatever any witness said.  Having him in the courtroom obviates

09:59:41  11   the need for having to ask him a hypothetical question depending

09:59:47  12   on how these witnesses testify that they sent technical messages

09:59:50  13   through the internet to the Defendant.

09:59:52  14            MR. NATALE:  Well Your Honor, if he's already analyzed

09:59:58  15   completely our client's phone, so what we know that he's looked

10:00:04  16   at is the phone in its entirety, there is everything and

10:00:10  17   anything he would be testifying to.  The witnesses are not

10:00:14  18   automatically allowed to be in.  They're normally allowed when

10:00:19  19   it relates to one expert listening to another expert.

10:00:24  20            What the Government is alluding to now is that if the

10:00:29  21   witnesses say something that maybe they never said before or

10:00:38  22   that -- or something else, that he is now going to adjust his

10:00:45  23   testimony in order to comply with that.  But we have no idea

10:00:48  24   what that's going to be.  Our understanding was that the only

10:00:51  25   thing that he's going to testify to is this is what I found on

10:00:52    1    the phone.

10:00:55    2         Now as far as hypotheticals, the hypotheticals that any

10:01:00    3    witness can ask have to be limited to their area of expertise.

10:01:05    4    His area of expertise is computer analysis.

10:01:07    5         THE COURT:  Yeah, but he doesn't pretend to have any

10:01:11    6    knowledge of the facts as they happen.  I think that he's

10:01:13    7    permitted to stay in the courtroom.  I'll permit him to stay.

10:01:18    8    If I find that his testimony is such that could be influenced by

10:01:21    9    stuff that he heard, then I will preclude that testimony.

10:01:22   10    That's all.

10:01:25   11         MR. NATALE:  Your Honor, how will we know whether he --

10:01:29   12    we have his report, but if he says anything that isn't in the

10:01:32   13    report, then we have to assume that it's based on something that

10:01:33   14    he heard in the courtroom.

10:01:34   15         THE COURT:  I don't think that's a valid assumption.

10:01:37   16    But that's -- you know, you can argue that, but I don't think

10:01:41   17    it's a valid assumption.  We'll see.  Maybe it is, maybe it

10:01:42   18    isn't.

10:01:44   19         MR. NATALE:  It says that the prosecutor is going to

10:01:47   20    say well, did you hear witness X say this, this and this.  Did

10:01:50   21    you find anything to support that.  Well, that's clearly based

10:01:53   22    on what a witness heard.

10:01:56   23         THE COURT:  But it's not influenced by what was -- you

10:02:01   24    know, he didn't change his testimony as a result of what he

10:02:04   25    heard.  That's what it's supposed to prevent, people coming in

```
10:02:09   1    and tailoring their testimony based on oh yes, well, I couldn't
10:02:12   2    really see the light because of the sun.  That's what he's
10:02:15   3    really designed to avoid.  I don't think it's designed to avoid
10:02:19   4    this.  I think this is the exclusion under C which is, I think,
10:02:23   5    admissible.  I mean, I think it's permissible for him to be in
10:02:25   6    the courtroom.  I will deny your motion.
10:02:26   7             What else you got?
10:02:29   8             MR. NATALE:  The last thing is that unfortunately when
10:02:35   9    the one of the jurors was coming in, Rocky was being worked by
10:02:38  10    all of the prosecutors, one of the agents.
10:02:41  11             THE COURT:  Yeah, I don't understand that at all.  I
10:02:44  12    thought we made it very clear to come in through Judge Bloom's
10:02:48  13    courtroom to avoid being out there, and I don't understand how
10:02:51  14    that could possibly have been misunderstood.  But what's the big
10:02:53  15    deal?  They saw a dog.
10:02:54  16             MR. NATALE:  Well Judge, I understand that and that's
10:02:58  17    why what I'm saying is that if there was a reason for it, we
10:03:02  18    should abide by it and they can maybe sit on another floor.  I
10:03:03  19    just don't see --
10:03:05  20             THE COURT:  Okay.  I think they figured it out.  I
10:03:08  21    don't think that they're going to do that anymore.  I'm not
10:03:12  22    happy about it, but I don't think it's a big deal.
10:03:13  23             MR. NATALE:  So long as that --
10:03:15  24             THE COURT:  If it's not repetitive.
10:03:17  25             MR. NATALE:  If it's not going to be repeated.
```

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED BY COMPUTER

10:03:18  1          THE COURT:  Well, I hope it isn't.

10:03:21  2          MS. WEISS:  Judge, it won't be and just for the record,

10:03:25  3  defense counsel was with the gaggle of prosecutors who alleges

10:03:28  4  were with the dog.  We were walking to Judge Bloom with defense

10:03:31  5  counsel to show them the conference area, and one of the jurors

10:03:35  6  did happen to come up.  But the therapy dog was not with the

10:03:37  7  prosecutors, it was behind with its handler.

10:03:40  8          THE COURT:  Okay.  I don't really see any problem.

10:03:44  9  okay.  Next?  Ready?  Can we call the jury in please?

10:03:45  10          MR. NATALE:  Yes, Your Honor.

10:03:48  11          THE COURT:  Please bring the jury.

10:03:50  12          MS. VIAMONTES:  Your Honor, may I use a lapel mic?

10:03:53  13          THE COURT:  No.  Either be there or here and if you're

10:03:57  14  walking between them, shut up.

10:04:01  15          (Jury in at 10:03 a.m.)

10:05:23  16          THE COURT:  Please stay up because we're going the

10:05:27  17  swear the jurors now.  Please swear the jurors.

10:05:30  18          COURTROOM DEPUTY:  Please stand, raise your right hand.

10:05:36  19          (Jury sworn)

10:05:43  20          THE COURT:  Please be seated.

10:05:50  21          Members of the jury, you've now been sworn as the jury

10:05:53  22  to try this case.  I'd like to give you some preliminary

10:05:55  23  instructions at this time.

10:05:58  24          By your verdict, you will decide the disputed issues of

10:06:02  25  fact.  I will decide all questions of law that arise during the

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED BY COMPUTER

10:06:07  1    trial.  And before you retire to deliberate together and decide

10:06:11  2    the case at the end of the trial, I will instruct you again on

10:06:16  3    the rules of law that you must follow and apply in reaching your

10:06:17  4    decision.

10:06:20  5         Because you will be called upon to decide the facts of

10:06:24  6    the case, you should give careful attention to the testimony and

10:06:27  7    evidence presented for your consideration during the trial.  But

10:06:31  8    you must keep an open mind and should not form or certainly not

10:06:34  9    state any opinion about the case one way or the other until

10:06:37  10   you've heard all of the evidence and have had the benefit of the

10:06:40  11   closing arguments of the lawyers as well as my instructions to

10:06:43  12   you on the applicable law.

10:06:47  13        During the trial you must not discuss the case in any

10:06:51  14   manner among yourselves or with anyone else.  I don't want

10:06:55  15   anyone getting on the internet and say "oh boy, I heard a real

10:06:57  16   interesting argument this morning", or "the judge was brilliant

10:07:00  17   when he instructed me this morning".  I don't want to hear any

10:07:02  18   of that because anybody can look on the internet and look for

10:07:04  19   stuff.  Please do not do that.

10:07:07  20        You must not permit anyone to attempt to discuss it

10:07:10  21   with you or in your presence.  And insofar as the lawyers are

10:07:13  22   concerned, as well as any others whom you may come to recognize

10:07:17  23   as having some connection with the case, you are instructed that

10:07:20  24   to avoid even the appearance of impropriety, you should have no

10:07:24  25   conversation whatsoever with those persons while you're serving

|  | |
|---|---|
| 10:07:25 | 1 |
| 10:07:29 | 2 |
| 10:07:34 | 3 |
| 10:07:36 | 4 |
| 10:07:38 | 5 |
| 10:07:42 | 6 |
| 10:07:44 | 7 |
| 10:07:48 | 8 |
| 10:07:52 | 9 |
| 10:07:56 | 10 |
| 10:08:00 | 11 |
| 10:08:01 | 12 |
| 10:08:05 | 13 |
| 10:08:07 | 14 |
| 10:08:11 | 15 |
| 10:08:15 | 16 |
| 10:08:18 | 17 |
| 10:08:21 | 18 |
| 10:08:24 | 19 |
| 10:08:28 | 20 |
| 10:08:31 | 21 |
| 10:08:35 | 22 |
| 10:08:39 | 23 |
| 10:08:42 | 24 |
| 10:08:46 | 25 |

on the jury.

Please use the restrooms located in the jury room.

You, as jurors, must decide this case based solely on the evidence presented here within the four walls of this courtroom.  This means that during the trial you must not conduct any independent research about this case; about the matters in the case; about the individuals or corporations involved in the case.  In other words, you should not consult dictionaries or reference materials; you should not search the internet, websites, blogs, or use any other electronic tools to obtain information about this case or to help you decide this case.

Please do not try to find out information from any source outside the confines of this courtroom.

Until you retire to deliberate, you may not discuss the case with anyone, even your fellow jurors.  After you retire to deliberate, you may begin discussing the case with your fellow jurors, but don't discuss the case with anyone else until you have returned a verdict and the case is at an end.

I hope that for all of you this case is interesting and noteworthy.  I know that many of you use cellphones, Blackberries, the internet, other tools of technology.  You must also not talk to anybody about this case or use these tools to communicate electronically about the case.  This includes your family and your friends.  You may not communicate with anyone

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED BY COMPUTER

10:08:51  1    about the case on your cellphone, through e-mail, Blackberry,

10:08:58  2    iPhone, text messages, on Twitter, through any blog or website

10:09:03  3    including but not limited to Facebook, My Space, Linked In, You

10:09:06  4    Tube or anything else that's been invented since yesterday.

10:09:10  5         You must also avoid reading any newspaper articles that

10:09:13  6    might be published about the case now that the trial has begun.

10:09:18  7    And you must also avoid listening to or observing any broadcast

10:09:21  8    news program -- well, you know, I'm not going to tell you you

10:09:26  9    can't watch the news.  I don't watch the news because it's so

10:09:28  10   glum.  They never talk about good things.  But if you're

10:09:32  11   watching a news program, local news program, and you hear

10:09:37  12   somebody say something about "federal criminal case", do

10:09:39  13   whatever you used to do when you were a kid and you didn't want

10:09:44  14   to hear anything.  Put your fingers in your ears and go la, la,

10:09:46  15   la, la or whatever, walk out of the courtroom *(sic)*, come back

10:09:48  16   in 30 seconds because that's as long as they ever spend on

10:09:52  17   anything, and tell me about it the next day and I bet you we'll

10:09:55  18   find out that it had nothing to do with this case.  But just

10:10:00  19   avoid it.  But if you want to watch the news, if you want to get

10:10:02  20   down, that's your business.  I'm not telling you not to watch

10:10:02  21   it.

10:10:05  22        The reason for these cautions, of course, lies in the

10:10:08  23   fact that it will be your duty to decide this case only on the

10:10:11  24   basis of the testimony and evidence presented during the trial

10:10:13  25   without consideration of any other matters whatsoever.

10:10:17  1          From time to time during the trial I may be called upon
10:10:21  2     to make a ruling of law on motions or objections made by the
10:10:24  3     lawyers.  You should not infer or conclude from any ruling I may
10:10:31  4     make that I have any opinion on the merits of the case favoring
10:10:34  5     one side or the other, I absolutely do not.  And if I sustain an
10:10:38  6     objection to a question that goes unanswered by the witness, you
10:10:41  7     should not speculate on what answer might have been given, nor
10:10:44  8     should you draw any inference or conclusions from the question
10:10:44  9     itself.
10:10:47  10          During the trial it may be necessary for me to confer
10:10:50  11    with the lawyers from time to time out of your hearing
10:10:52  12    concerning questions of law or procedure that require
10:10:55  13    consideration by the court alone.  On some occasions, you'll be
10:10:57  14    excused from the courtroom as a convenience because it's kind of
10:11:02  15    a pain to be over here talking for a long time and you guys are
10:11:07  16    sitting there twiddling your thumbs.  I'll try to limit these
10:11:10  17    interruptions as much as possible, but I hope you remember at
10:11:13  18    all times the importance of the matter that are you here to
10:11:16  19    determine, and I hope you're patient even though the case may
10:11:20  20    seem to go slowly.  I will do everything I can to move it along.
10:11:23  21    I will be nasty to both sides, although frankly I like the
10:11:26  22    lawyers on both sides equally, they're very nice people.
10:11:29  23          In that regard we expect the case to last a week or a
10:11:33  24    week and a half, but I'll make every effort to expedite the
10:11:35  25    trial as much as possible.

| | | |
|---|---|---|
| 10:11:36 | 1 | Now in order that might better understand at the |
| 10:11:37 | 2 | beginning of the case the nature of the decisions you'll be |
| 10:11:41 | 3 | asked to make, and how you should go about making them, I would |
| 10:11:42 | 4 | like to give you some preliminary instructions at this time |
| 10:11:47 | 5 | concerning some of the rules of law that may apply.  Of course |
| 10:11:49 | 6 | these instructions I give you now will not cover all of the |
| 10:11:53 | 7 | rules of law because we don't know what the evidence is going to |
| 10:11:55 | 8 | be yet.  As I stated before, I will instruct you fully at the |
| 10:11:58 | 9 | end of the trial just before you retire to deliberate upon your |
| 10:12:01 | 10 | verdict, and I'll probably restate at that time some of the |
| 10:12:05 | 11 | rules I want to tell you about now.  In any event, you should |
| 10:12:08 | 12 | not single out any one instruction alone as stating the law. |
| 10:12:11 | 13 | But I hope that you consider all of the instructions as a whole, |
| 10:12:17 | 14 | Presumption of innocence.  An indictment in a criminal |
| 10:12:21 | 15 | case is merely the accusatory paper which states the charge or |
| 10:12:25 | 16 | charges to be determined at the trial, but it is not evidence |
| 10:12:29 | 17 | against the Defendant or anyone else.  Indeed, the Defendant has |
| 10:12:32 | 18 | entered a plea of not guilty and is presumed by the law to be |
| 10:12:36 | 19 | innocent.  The Government has the burden of proving a Defendant |
| 10:12:39 | 20 | guilty beyond a reasonable doubt, and if it fails to do so, you |
| 10:12:43 | 21 | must find that Defendant not guilty.  Proof beyond a reasonable |
| 10:12:48 | 22 | doubt is proof of such a convincing character that you would be |
| 10:12:51 | 23 | willing to rely and act upon it without hesitation in the most |
| 10:12:53 | 24 | important of your own affairs. |
| 10:12:55 | 25 | The order of proof and the Defendant's right not to |

10:12:58    1    testify.  Because the Government has the burden of proof, it

10:13:01    2    will go forward and present its testimony and evidence first.

10:13:05    3    After the Government finishes or rests what we call its case in

10:13:09    4    chief, the Defendant may call witnesses and present evidence if

10:13:12    5    he wishes to do so.  However, you will remember that the law

10:13:16    6    does not require a Defendant to prove his innocence or produce

10:13:20    7    any evidence at all, and no inference whatsoever may be drawn

10:13:23    8    from the election of a Defendant not to testify in the event he

10:13:24    9    should so elect.

10:13:28    10        The credibility of the witnesses.  As you listen to the

10:13:31    11   witnesses and to the testimony, you should remember that you

10:13:35    12   will be the sole judges of the credibility or believability of

10:13:39    13   each witness and the weight to be given to his or her testimony.

10:13:43    14   In deciding whether you believe or disbelieve any witness, you

10:13:46    15   should consider his or her relationship to the Government or to

10:13:50    16   the Defendant; the interest, if any, of the witness in the

10:13:54    17   outcome of the case; his or her manner of testifying; the

10:13:56    18   opportunity of the witness to observe or acquire knowledge

10:14:01    19   concerning the facts about which he or she testified; the

10:14:06    20   candor, fairness and intelligence of the witness, and the extent

10:14:10    21   to which the witness has been supported or contradicted by other

10:14:14    22   credible evidence.  You may, in short, accept or reject the

10:14:16    23   testimony of any witness in whole or in part.

10:14:20    24        You'll notice that the official court stenographer is

10:14:25    25   making a complete stenographic of record of all that is said

10:14:27  1    during the trial, including the testimony of the witnesses, in

10:14:30  2    case it should be necessary at a future day to prepare printed

10:14:33  3    transcripts of any portion of the trial proceedings.  These

10:14:37  4    transcripts however are not easy to do, and we don't do them

10:14:41  5    simultaneous.  We got a rough copy, but I don't want to give a

10:14:45  6    rough copy.  So if you ask for -- these transcripts, if prepared

10:14:49  7    at all, will not be printed in sufficient time or appropriate

10:14:52  8    form for your review during your deliberations.  Don't expect to

10:14:58  9    receive any transcripts.  You'll be required to rely upon your

10:15:02  10   own individual and collective memory concerning what the

10:15:03  11   testimony was.

10:15:04  12        On the other hand, any papers and other tangible

10:15:08  13   exhibits received in evidence during the trial will be available

10:15:12  14   to you during your deliberations.  On some occasions during the

10:15:14  15   trial, exhibits may be handed to you for brief inspection there

10:15:18  16   in the jury box.  You just hand them down and look at them.  On

10:15:23  17   other occasions, they will not be shown to you, but don't be

10:15:27  18   concerned because as I said, you'll get to see and inspect the

10:15:31  19   evidence at the end of the case, all of the exhibits that were

10:15:34  20   received in evidence.  You have these monitors in front of you.

10:15:37  21   A lot of the stuff will be shown to you on the monitor and

10:15:39  22   you'll be able to see it there.

10:15:42  23        A question sometimes arises as to whether individual

10:15:44  24   members of the jury will be permitted to take notes during the

10:15:47  25   trial.  The desire to take notes is perfectly natural,

10:15:51  1   especially for those of you who are accustomed to making notes

10:15:55  2   because of your schooling or the nature of your work.  It is

10:15:59  3   requested, however, that jurors not take notes during the trial.

10:16:02  4   One of the reasons for having a large number of you is to gain

10:16:06  5   the advantage of your several individual memories concerning the

10:16:09  6   testimony presented before you.  And while some of you might

10:16:12  7   feel comfortable taking notes, other members of the jury may not

10:16:16  8   have the skill or experience in note-taking and may not wish to

10:16:20  9   do so, and we don't want to turn this into a note-taking contest

10:16:23  10  where somebody says wait a minute, look at my note, they're

10:16:26  11  perfect.  There are footnotes, there's headnotes, they're

10:16:30  12  lettered and numbered, so my memory must be right.  No.  All of

10:16:34  13  you have the right to have your memory, and you bring it up and

10:16:39  14  maybe you'll jog somebody else's memory or vice versa.  Maybe

10:16:42  15  what they say will jog your memory.  Keep an open mind.

10:16:45  16        Six counts are charged in this case.  The indictment

10:16:49  17  charges the Defendant, Joseph Isaiah Woodson, Junior, with six

10:16:54  18  separate crimes called counts.  Each count has a number.  Counts

10:16:58  19  1 through 3.  Count 1 charges the Defendant with producing child

10:17:03  20  pornography as it relates to Victim 1.  Count 2 charges the

10:17:06  21  Defendant with producing child pornography as it relates to

10:17:09  22  Victim 2.  Count 3 charges the Defendant with producing child

10:17:16  23  pornography as it relates to Victim 3.  All three counts allege

10:17:22  24  violations of Title 18, United States Code Section 2251(a) and

10:17:23  25  2251(e).

10:17:28  1              It is a federal crime for any person to employ, use,

10:17:34  2     persuade, induce, entice or coerce a minor to engage in sexually

10:17:38  3     explicit conduct for the purpose of producing a visual depiction

10:17:42  4     of the conduct if the person knows or has reason to know that

10:17:46  5     the visual depiction will be transported in interstate or

10:17:49  6     foreign commerce, or mailed, or the visual depiction was

10:17:53  7     produced using materials that have been mailed, shipped, or

10:17:57  8     transported in interstate or foreign commerce by any means

10:18:01  9     including by computer; or the visual depiction has even about

10:18:05  10    transported in interstate or foreign commerce, or mailed.

10:18:08  11             The Defendant can be found guilty of this crime only if

10:18:10  12    all of the following facts are proved beyond a reasonable doubt:

10:18:15  13             One, an actual minor, that is a real person who was

10:18:18  14    less than 18 years old, was depicted.

10:18:23  15             Two, the Defendant employed, used, persuaded, induced,

10:18:27  16    enticed or coerced the minor to engage in sexually explicit

10:18:32  17    conduct for the purpose of producing a visual depiction, that is

10:18:34  18    a videotape of the conduct.

10:18:38  19             Three:  Either A, the Defendant knew or had reason to

10:18:42  20    know that the visual depiction, that is the videotape, would be

10:18:46  21    mailed or transported in interstate or foreign commerce; or B,

10:18:49  22    the visual depiction, that is the videotape, was produced using

10:18:53  23    materials that had been mailed, shipped or transported in

10:18:56  24    interstate or foreign commerce by any means including by

10:19:02  25    computer; or C, the visual depiction, that is the tape, was

10:19:06  1   mailed or actually transported in interstate or foreign

10:19:06  2   commerce.

10:19:08  3           While the Government must prove that a purpose of the

10:19:14  4   sexually explicit conduct was to produce a visual depiction, it

10:19:17  5   need not be the Defendant's only or dominant purpose.

10:19:22  6           Count 4.  Count 4 charges the Defendant with knowingly

10:19:25  7   distributing child pornography in violation of Title 18 United

10:19:32  8   States Code Section 2252 (a)(2) and 2252(b)(1).  It is a federal

10:19:36  9   crime to knowingly receive or distribute any visual depiction

10:19:40  10  that has been shipped or transported in interstate or foreign

10:19:45  11  commerce by any means, including by computer, when the visual

10:19:48  12  depiction was produced by using a minor engaging in sexually

10:19:52  13  explicit conduct and depicts that conduct.

10:19:55  14          The Defendant can be found guilty of this crime only if

10:19:57  15  all the following facts are proved beyond a reasonable doubt:

10:20:02  16          One, the Defendant knowingly distributed a visual

10:20:03  17  depiction.

10:20:07  18          Two, the depiction was shipped or transported in

10:20:11  19  interstate or foreign commerce by any means, including computer.

10:20:15  20          Three, producing the visual depiction involved using a

10:20:18  21  minor engage in sexually explicit conduct.

10:20:22  22          Four, the depiction is of a minor engaged in sexually

10:20:23  23  explicit conduct.

10:20:27  24          And five, the Defendant knew that at least one

10:20:31  25  performer in the visual depiction was a minor and knew that the

10:20:35  1    depiction showed the minor engaged in sexually explicit conduct.

10:20:38  2         Count 5 charges the Defendant with knowingly sending

10:20:45  3    extortionate interstate communications to Victim 4 in which the

10:20:49  4    Defendant threatened to injure the reputation of Victim 1 if

10:20:55  5    Victim 4 refused to send sexually explicit images of herself to

10:20:58  6    the Defendant on or about November 27, 2018 in Broward County,

10:21:01  7    Florida, in violation of Title 18 United States Code Section

10:21:03  8    875(d).

10:21:09  9         It is a federal crime to knowingly send in interstate

10:21:14  10   commerce an extortionate communication.  The Defendant can be

10:21:17  11   found guilty of this crime only if all the following facts are

10:21:18  12   proved beyond a reasonable doubt:

10:21:22  13        One, the Defendant knowingly sent a message in

10:21:25  14   interstate commerce containing a true threat to damage the

10:21:31  15   reputation of another; and two, the Defendant did so with the

10:21:35  16   intent to extort money or something else of value to the

10:21:36  17   testify.

10:21:41  18        Count 6.  Count 6 charges the Defendant with conspiracy

10:21:45  19   to send extortionate interstate communications in violation of

10:21:51  20   Title 18 United States Code Section 371.  It is a separate

10:21:53  21   federal crime for anyone to conspire or agree with someone else

10:21:57  22   to do something that would be another federal crime if it was

10:22:01  23   actually carried out.  A conspiracy is an agreement by two or

10:22:04  24   more people to commit an unlawful act.  In other words, it's a

10:22:10  25   kind of a partnership for criminal purposes.  Every member of a

10:22:14  1   conspiracy becomes the agent or partner of every other member.

10:22:16  2   The Defendant can be found guilty of this crime only if all of

10:22:18  3   the following facts are proved beyond a reasonable doubt:

10:22:22  4           One; two or more persons in some way agreed to try to

10:22:24  5   accomplish a shared and unlawful plan.

10:22:28  6           Two, the Defendant knew the unlawful purpose of the

10:22:30  7   plan and willfully joined in it.

10:22:33  8           Three, during the conspiracy, one of the conspirators

10:22:38  9   knowingly engaged in at least one overt act as described in the

10:22:42 10   indictment; and four, the overt act was committed at or about

10:22:46 11   the time alleged and with the purpose of carrying out or

10:22:48 12   accomplishing some object of the conspiracy.

10:22:51 13           Now we'll begin the trial at this time by affording the

10:22:54 14   lawyers for each side an opportunity to make an opening

10:22:57 15   statement to you in which they may explain the issues in the

10:23:01 16   case and summarize the facts they expect the evidence will show.

10:23:04 17   After all the testimony and evidence has been presented, the

10:23:07 18   lawyers will then be given another opportunity to address you at

10:23:10 19   the end of the trial and make their summations or final

10:23:11 20   arguments in the case.

10:23:14 21           Now you'll notice even the different terminology:

10:23:17 22   Opening statement, closing argument.  In this one, they're not

10:23:21 23   supposed to be arguing to you why you should do something.  In

10:23:23 24   this case they should be telling what they expect the evidence

10:23:26 25   will be and perhaps the theory of their case.

10:23:28  1          The statements that the lawyers make now, as well as

10:23:32  2     the arguments they present to you at the end of the trial, are

10:23:35  3     not to be considered by you as either as evidence in the case

10:23:39  4     which comes only from the witnesses and the exhibits, or as your

10:23:41  5     instruction on the law which comes from here.  Nevertheless,

10:23:46  6     these statements or arguments are intended to help you

10:23:50  7     understand the evidence as it comes in, the issues or disputes

10:23:52  8     you will be called upon to decide, as well as the positions

10:23:55  9     taken by both sides.

10:23:57  10          So I ask that you now give the lawyers your close

10:24:00  11     attention as I recognize them in turn for the purpose of making

10:24:02  12     an opening statement.

10:24:06  13          Government?  You may proceed.

10:24:08  14          MS. VIAMONTES:  Thank you, Your Honor.

10:24:31  15          It's all fun and games until someone gets hurt.  We've

10:24:34  16     all heard this phrase, but the Defendant took this phrase and

10:24:41  17     gave it a new meaning.  The Defendant played vile and sadistic

10:24:49  18     games.  He played vile and sadistic games online, but his games

10:24:54  19     were not limited to game consoles like Xbox, PlayStation, or

10:25:00  20     Nintendo Switch.  His games crossed into the real word where he

10:25:08  21     toyed with real life little girls.  With every click of his

10:25:17  22     phone, he, Joseph Isaiah Woodson, Junior, attempted to satisfy

10:25:26  23     his perverse desires, his perverse fetishes, where he's a master

10:25:29  24     and little girls are his sex slaves, and that's what the

10:25:30  25     evidence will show today.

10:25:34  1         The evidence will show this week that this wasn't a

10:25:41  2    game and it wasn't fun.  These were real live children.  Real

10:25:45  3    live children.  As you will see on your screen, B.F., we'll call

10:25:51  4    her B.F. during this trial.  B.F. was 12 years old, she was in

10:25:55  5    7th grade.  And she was a typical 7th grade girl, enjoyed going

10:26:02  6    to school, tried to get good grades, enjoyed playing and talking

10:26:05  7    to her friends after school, and she was on social media like

10:26:09  8    many children are these days.  And one of the social media

10:26:14  9    applications that she used was Snapchat, and we'll talk about

10:26:18  10   Snapchat just a little bit later and how it works.

10:26:23  11        B.F. will tell you that on or about November 13, 2017,

10:26:28  12   an old friend of hers from elementary school, she thought,

10:26:31  13   reached out to her, Barbara.  And this person claiming to be

10:26:39  14   Barbara asked B.F. for the password to her Snapchat account.

10:26:44  15   And as adults, you might sit there and think that's crazy.  You

10:26:48  16   don't give passwords out.  And you'll learn during this trial

10:26:52  17   that children do, and it was commonplace for children to give

10:26:53  18   their Snapchat accounts to people that they believed were their

10:26:56  19   friends.  They did it for various reasons.  And B.F. will tell

10:27:01  20   you when Barbara asked for her Snapchat account, B.F. tells her

10:27:03  21   this person claiming to be Barbara claims to her she needs to

10:27:07  22   access B.F.'s account to be to communicate with someone that was

10:27:10  23   B.F.'s friend through that app, that she didn't have access to.

10:27:13  24   So she didn't think anything of it, and gave it to her.

10:27:15  25        But you know what?  Within minutes, the Defendant

10:27:22  1    changed the password to B.F.'s Snapchat account, locked her out

10:27:27  2    and then communicates with her.  And on that very day, November

10:27:34  3    13th, this Defendant, Joseph Isaiah Woodson, Junior took B.F.'s

10:27:39  4    innocence.  He did so by forcing her to create pornography

10:27:47  5    images of herself.  He had her write vile and degrading things

10:27:56  6    on her body such as "whore", "slut", "cum", because she wanted

10:28:00  7    her Snapchat account back and he would refuse to give it until

10:28:01  8    she created images.

10:28:05  9            And you'll learn through the testimony that he did this

10:28:10  10   very systemically.  He knew these kids valued their Snapchat

10:28:14  11   account.  He knew that if he asked for a very explicit image up

10:28:19  12   front, probably wouldn't get it.  So he would ask for a more

10:28:22  13   innocuous one.  One where the girl is just with -- her picture

10:28:26  14   with her face, her tongue sticking out.  Then he would proceed

10:28:30  15   to ask them to take off the shirt.  Then it was the bra.  Then

10:28:34  16   it was performing sexual acts.  Then it was writing degrading

10:28:38  17   things on their body.  And with each picture, he had more and

10:28:43  18   more leverage, you'll learn, and he used this leverage to

10:28:47  19   threaten them.  And he would tell these 12-year-old girls that

10:28:51  20   if you didn't -- if they didn't create the next picture, it

10:28:54  21   would be out there for everyone to see.  All their friends, all

10:28:56  22   their family members that were also on Snapchat.

10:29:00  23           But ladies and gentlemen of the jury, it didn't end.

10:29:07  24   Unfortunately, it didn't end with B.F.  The Defendant did this

10:29:13  25   to numerous girls throughout South Florida and around the

10:29:19   1    country. You will hear from many of these girls during this

10:29:22   2    trial, from all the girls pictured here on the screen you will

10:29:24   3    hear from and a couple others.

10:29:29   4          And how did the Defendant do this. He did this from

10:29:34   5    the secrecy of his own bedroom, laying there in his bed, hiding

10:29:42   6    behind his cellphone and hiding behind a tape that he had placed

10:29:48   7    to cover the forward-facing camera of his phone. Hiding in his

10:29:50   8    room, hiding behind that tape, hiding behind his phone, he was

10:29:53   9    able to manipulate and coerce these children to create these

10:29:59 10    images to satisfy his desires.

10:30:06 11          Now, let's talk about some of the apps that he used in

10:30:09 12    the social media and how he went about doing this. Okay. One

10:30:13 13    of the apps you'll hear about a lot was Snapchat. Snapchat,

10:30:16 14    you'll learn from the children, because they're the best to

10:30:20 15    explain this, right, is very popular amongst pre-teens and

10:30:25 16    teens. And why? Why did it become so popular? Snapchat allows

10:30:31 17    its users to develop a network of friends, okay, where they can

10:30:35 18    send short videos to each other. They could also place a time

10:30:39 19    limit on how long that video is available or viewable by the

10:30:44 20    receiving person. So that became very popular among kids. They

10:30:48 21    can send a silly video to a friend, and it's only viewable for

10:30:52 22    15 seconds and then it's gone, so they thought, right? So

10:30:57 23    that's why -- one of the reasons why Snapchat is popular amongst

10:31:00 24    kids. It's an app on the phone, and uses the internet for

10:31:04 25    people to communicate. You invite friends, tell your family

10:31:08    1    members, your friends, "oh this is my Snapchat user name", and

10:31:10    2    they add you on and now they're a contact, if you will, in that

10:31:13    3    application.  And you can message them and you can send them

10:31:18    4    videos.  And as you message and post things on your friends'

10:31:22    5    pages, they call it the story, it creates a history, a story, if

10:31:23    6    you will.

10:31:26    7          There's another feature in Snapchat that the kids also

10:31:29    8    loved, and the Defendant knew this and took advantage of this,

10:31:35    9    and that is a streak.  When a user sends a video to another

10:31:39    10   user, a friend, and the friend replies with the video, they do

10:31:42    11   that for a consecutive amount of days, that's a streak.  So

10:31:46    12   after three consecutive days of sending each other a quick hello

10:31:50    13   video, now you have a streak with that person.  And each day

10:31:55    14   that you maintain that back and forth, the streak goes higher

10:32:01    15   and your number gets higher.  And 12, 13 and 14-year-old girls

10:32:04    16   place value in that, because we know that a lot of people place

10:32:07    17   value in their image in social media, and the Defendant knew

10:32:08    18   that.

10:32:11    19         So they didn't want to lose the access to their

10:32:14    20   Snapchat accounts because then they would lose their streaks.

10:32:18    21   Okay.  That's also one of the ways that the Defendant gained

10:32:22    22   access to these Snapchat accounts.  Why?  When children are

10:32:27    23   disciplined by their parents, many times our leverage now over

10:32:30    24   kids is "I'll take your phone away", right?  So the kids don't

10:32:34    25   have access to Snapchat when their phone is taken away.  They

10:32:39  1    share those passwords with their friends in order to keep the

10:32:42  2    streaks alive.  So while they're, you know, on punishment, while

10:32:45  3    they're grounded, their friends can maintain their streaks.  And

10:32:49  4    the Defendant knew this, took advantage of it and knew that his

10:32:53  5    were willing to share those passwords.

10:32:58  6         But the Defendant didn't stop there.  He started by --

10:33:02  7    once he had access to one child's Snapchat account, he took over

10:33:06  8    and assumed the identity, if you will, of that child, pretending

10:33:10  9    to be that child, reached out to one of her friends.  Asked for

10:33:14  10   the password, lock them out, and then sends them a text message.

10:33:18  11   How does he do that.  In Snapchat, the kids, in their home

10:33:24  12   screen, if you will, where their user name is, many of them have

10:33:27  13   their real name and their phone number.  So he would look at

10:33:30  14   their phone number and send them a text and say "if you want

10:33:37  15   your Snapchat account, hit me up on Kik or TextNow".  You'll

10:33:41  16   hear about Kik or TextNow, these are texting applications.

10:33:42  17   They're similar to the text -- regular SMS texts you have on

10:33:45  18   your phone, but they use the internet instead.  And your phone

10:33:49  19   company doesn't keep a record of them, so a little more private

10:33:51  20   than just the regular text messages.

10:33:54  21        So he would then move them over to Kik.  He used

10:33:57  22   Instagram as well on many of these children.  Infiltrated their

10:34:01  23   Instagram accounts just like he did Snapchat.  Some of the kids,

10:34:04  24   when they got off of Snapchat, he went and found them on

10:34:05  25   Instagram.

| | | |
|---|---|---|
| 10:34:09 | 1 | But the Defendant didn't stop there.  He used Skype |
| 10:34:12 | 2 | with some of the kids, you'll hear from one in particular during |
| 10:34:18 | 3 | this trial, that he had her produce the images live.  He used |
| 10:34:22 | 4 | Skype, which is a video chatting website, where you can |
| 10:34:25 | 5 | conference, video conference with other people.  Similar to |
| 10:34:28 | 6 | FaceTime if you will, but it's used across other devices, not |
| 10:34:36 | 7 | just Apple.  And while the children were complying with his |
| 10:34:42 | 8 | coercive demands, the Defendant took screen captures and created |
| 10:34:45 | 9 | and memorialized this abuse. |
| 10:34:48 | 10 | Why?  Why did he do this?  Because he wasn't stopping |
| 10:34:54 | 11 | there.  He then uploaded those images to Dropbox.  Ladies and |
| 10:34:59 | 12 | gentlemen of the jury, what is Dropbox.  Well, you'll learn |
| 10:35:02 | 13 | during this trial that Dropbox is a cloud storage that allows |
| 10:35:07 | 14 | users to put large volumes of data in the cloud and share it |
| 10:35:11 | 15 | with others.  Okay.  So if a file is too large to send to e-mail |
| 10:35:15 | 16 | to somebody, you can upload it to Dropbox, send a link and the |
| 10:35:21 | 17 | person can access it in Dropbox with the appropriate link or |
| 10:35:25 | 18 | password.  And the Defendant used Dropbox to upload this |
| 10:35:29 | 19 | collection that he was creating of these children.  And you'll |
| 10:35:33 | 20 | see that his Dropbox account, he was the administrator of those |
| 10:35:39 | 21 | accounts.  You'll see that he categorized his collection and |
| 10:35:42 | 22 | you'll see the victims names there.  And you'll see these images |
| 10:35:47 | 23 | that he created or he had them create to satisfy his desires. |
| 10:35:50 | 24 | Now let's talk about one of the other children you'll |
| 10:35:56 | 25 | hear from.  You'll hear from E.M.  E.M. had just started 9th |

10:36:00   1   grade, just started high school, excited to be in high school,

10:36:04   2   excited to be in a Magnet Program at her school.  She loved

10:36:09   3   using Snapchat.  In fact, she had like 100,000 points because of

10:36:13   4   her streaks, and she took great pride in that.  And then one day

10:36:22   5   in November 2017, E.M. gets a message from someone back from

10:36:27   6   middle school and the person reaches out to her and asks her for

10:36:31   7   her password and she thought okay, no problem.  Sends the

10:36:37   8   password, just like we heard B.F. did, just like B.F. did, and

10:36:41   9   within minutes she's locked out, and the Defendant is then

10:36:45   10   coercing her to create images.  And she'll tell you that because

10:36:50   11   she wanted her Snapchat account back, for a while she complied

10:36:54   12   until she realized nothing I do is going to satisfy that person.

10:37:01   13   So she stopped and she told her parents.  You'll hear that the

10:37:09   14   images she created were pornographic, and you'll hear how he

10:37:13   15   threatened to upload them on to Snapchat and social media for

10:37:17   16   all her friends to see.

10:37:25   17          You'll hear from M.K.  M.K. was also 14 years old.  She

10:37:31   18   had just started high school.  You'll hear from M.K. how the

10:37:40   19   Defendant made her circle -- grab a marker, draw on herself,

10:37:45   20   write circles on herself around her nipples.  Write things such

10:37:49   21   as "sex slave" on her breasts, "slut", "whore".

10:37:57   22          And some of these children were -- the conduct stopped

10:38:02   23   within a day because they told someone.  But others such as

10:38:07   24   M.K., it didn't stop within a day.  It started in November 2017

10:38:12   25   and when she deleted accounts and closed out accounts and she

| | |
|---|---|
| 10:38:16 | 1 |
| 10:38:22 | 2 |
| 10:38:28 | 3 |
| 10:38:32 | 4 |
| 10:38:38 | 5 |
| 10:38:44 | 6 |
| 10:38:53 | 7 |
| 10:39:00 | 8 |
| 10:39:04 | 9 |
| 10:39:05 | 10 |

thought it was over, and then two months later in January 2018 he resurfaces and comes back and reminds her he has these images.  These are some of the things the Defendant said to M.K. to force her to create these images.  "Tell me M.K., you want this to get worse? By the way, I screenshotted all of your followers so going private doesn't stop me. Should I send all I got to everyone you know?  I own you.  You're not free."  Those are the messages he sent to a 14-year-old girl so that he could satisfy his desire of being a master and them being his sex slaves.

You'll hear from B.O.  B.O. was 12 year old.  7th grade.  B.O. was born in the Philippines, she was adopted by an American family, lived there, grew up in the Philippines for a while and had recently moved to the US with her family.  She will tell you that she had just recently been allowed to use Snapchat because when they moved here, she wanted to stay in contact with her friends and family back in the Philippines, and Snapchat meant a great deal to her because with some people, it was the only way she could communicate with them back home, because it's expensive to call back home.  And these are some of the things that you will hear -- you will see the Defendant told B.O. who was just 12 years old.  Do it for longer.  I want to take a good look.  With B.O. he used Skype.  He has her disrobe live for him to watch, and you'll see the screen captures that were captured and recovered from the Defendant's devices.

10:40:19  1    "Slowly take off your clothes and throw them on the floor."

10:40:23  2    When she's reluctant to do this, he tells her "yes, you can,

10:40:26  3    don't play or I'll post on your story."  And of course, she

10:40:31  4    didn't want all her friends in the Philippines, all her friends

10:40:38  5    here to see her naked on Snapchat, so throughout that night,

10:40:42  6    November 14, 2017, she continued to comply.  And ultimately he

10:40:48  7    got her to send close-up images of her vagina.  He instructed

10:40:53  8    her on where to put the camera, to go to the bathroom, get the

10:40:57  9    camera closer and he took a screen capture of her vagina.  "You

10:41:02  10   do it or I'll put your story for everyone to see."

10:41:09  11        You'll also hear from A.C.  A.C. lives in Central

10:41:19  12   Florida, and you'll hear that A.C. was extorted for over a year.

10:41:22  13   And you'll learn during this trial that the Defendant

10:41:27  14   communicated with his co-conspirators about A.C. where they talk

10:41:31  15   about A.C., how she's back online, how to get back with her, and

10:41:33  16   get her to create more images.

10:41:45  17        Then you'll hear from C.J.  Let's talk a bit about C.J.

10:41:51  18   C.J. was 15 years old when this started, and he kept her up one

10:41:56  19   night all night long.  All night long.  She initially thought

10:42:01  20   that it was an old friend reaching out to her.  Gave the

10:42:06  21   password.  And then gets a message with an image of herself, an

10:42:12  22   already explicit image of herself sent back to her.  And

10:42:16  23   throughout the night, the Defendant keeps her up, continuing to

10:42:22  24   ratchet up one step further, one step further, one step further.

10:42:27  25   You'll learn how he told her it wouldn't stop until she obeyed.

10:42:27   1          (Video playing)

10:42:37   2          MS. VIAMONTES:  He tells her -- she says "I'm sorry,

10:42:41   3   master", because he tells her to.  He's the master and she's a

10:42:46   4   sex slave.  He gets her to produce videos such as this.  He

10:42:51   5   tries to get her to molest her little brother, and at that point

10:42:57   6   she completely refuses.  He then has her instead pee, urinate,

10:43:04   7   into a cup and drink it and videotape that and send it to him.

10:43:10   8   And she did.  To not molest her little brother, she drank her

10:43:13   9   own urine, videotaped it, sent it to him and you'll

10:43:16  10   unfortunately have to see that video.

10:43:20  11          These are some of the things that the Defendant told C.

10:43:26  12   J.  "Should I send all I got to everyone you know?  Five pics

10:43:33  13   stop this.  You only have to do five pics before I spread the

10:43:40  14   vid to everyone in school.  I'll make your life hell until you

10:43:40  15   do what I command.  How many people do you want to see you

10:43:42  16   drinking your own pee.  You're going to be exposed as a pee

10:43:51  17   whore.  You die, I don't care.  I want pics or I won't stop.  It

10:43:57  18   won't end until you do what I want or die.  Make your choice."

10:44:03  19   Those are that Defendant's words, Joseph Isaiah Woodson, Junior.

10:44:08  20          Now, let's talk about how law enforcement was able to

10:44:13  21   identify and put this Defendant behind those words and behind

10:44:17  22   those threats and behind the production of child pornography.

10:44:22  23   Well, some of the children when they're Snapchat accounts were

10:44:27  24   logged into from a new location, Snapchat sends them an e-mail

10:44:30  25   and this is an example of one of the e-mails received.  This was

| | |
|---|---|
| 10:44:35 | 1 |
| 10:44:40 | 2 |
| 10:44:45 | 3 |
| 10:44:49 | 4 |
| 10:44:53 | 5 |
| 10:44:57 | 6 |

1  from E.M, and E.M. receives this e-mail letting her know that

2  her Snapchat account, November 25, 2017 was logged into from a

3  new location in Ashburn, Virginia with an IP address.  Well,

4  that IP address -- law enforcement subpoenaed and did their

5  research, and that IP address goes back to the Defendant's home

6  in Ashburn, Virginia.

7       And they paid him a visit.  They went to his home after

8  securing a search warrant, after getting complaints from several

9  locations throughout the country; Virginia, South Florida.  Law

10  enforcement coming together, getting the FBI involved and

11  realizing oh, we're all looking after the same person, let's

12  work together.  They executed a search warrant at the

13  Defendant's home back in January 2018.

14       And what did they find.  They found in his room a lot

15  of media.  Gaming consoles, they found a Samsung Edge 7 phone on

16  the bed.  But what did they find inside, stuffed inside a pillow

17  case was this Samsung Galaxy Note 3.  And why is that important?

18  Because we know that a Samsung Galaxy Note 3 was what was used

19  to log out, to login to the account when he took over the

20  accounts.  So they go to his home, execute the search warrant,

21  this phone is hidden inside a pillow case.  They take the phone.

22  What does the phone have on it?  You'll see that tape that I

23  mentioned earlier covering the forward-facing camera.

24       Then that day in January 2018, during the execution of

25  the search warrant, they asked to speak with the Defendant and

10:46:35  1    he speaks with them, voluntarily speaks with them, and they

10:46:41  2    begin to ask him about his phones.  He asks whether all the

10:46:45  3    phones are going to be seized.  They say well, we'll see.  Let's

10:46:49  4    talk first.  They ask him what phone he has and he says he has a

10:46:55  5    Samsung 7 Edge.  Okay.  Well, at this point they -- the phone

10:46:58  6    isn't yet recovered, it's still in the pillow case.  He starts

10:47:03  7    first talking about the 7.  Then they're like well, do you have

10:47:08  8    another phone?  Reluctantly, after first not being forthcoming

10:47:11  9    about it, mentions he has this Note 3 but says oh, it's a backup

10:47:17  10   phone.  It's a backup phone in case my 7 breaks.  Okay.  Well,

10:47:20  11   can you give us the password for it.  And then the phone comes

10:47:23  12   out, they're meeting outside the house, they're talking in one

10:47:29  13   of the police cars outside.  One officer brings the phone out,

10:47:32  14   says oh, can you give us the password for the phone.  I don't

10:47:37  15   know the password.  If I needed to use it, I would have to do a

10:47:39  16   factory reset.  I don't know the password.

10:47:44  17          Well, as the conversation continues and they tell him

10:47:48  18   listen, we know that's not true, he eventually gives -- he does

10:47:54  19   give the password and then eventually when they tell him listen,

10:47:57  20   we're pretty sure it's you, there's some stuff going on online

10:48:02  21   that's not so kosher.  Then he's like yeah, I know why you're

10:48:05  22   here, because of the images on my phone.  And he admits to

10:48:11  23   talking to B.O, who he knew as B.O, the first child that you saw

10:48:16  24   with the bunny ears, who he took her innocence from on November

10:48:20  25   13, 2017.  Took her innocence from.  He admits to talking to

10:48:21   1     her.

10:48:26   2              Admits to talking to her friend K.L., remembers K.L. as

10:48:28   3     an account.

10:48:33   4              And he's asked well, how many -- how do you do this?

10:48:38   5     And he says it.  I take over an account and once I have one

10:48:42   6     account, I pose as that friend.  I ask them for the password,

10:48:45   7     they give it to me.  He confirms all this and he confirms doing

10:48:52   8     it on this Note 3.  He mentions his co-conspirator in Ireland or

10:48:57   9     England and tries to push the blame on him, but you'll learn

10:49:02   10    that there's zero evidence, zero evidence that this Defendant

10:49:05   11    was coerced by anyone.

10:49:15   12             He admits to keeping these pics.  He admits to having

10:49:21   13    these kids take pornographic, sexually explicit images.  He

10:49:24   14    admits to that during his statement.

10:49:28   15             Then law enforcement continues investigating him.  They

10:49:32   16    leave him out.  They take his devices, and they leave him out to

10:49:36   17    look into some of the things he has said.  And for a few months,

10:49:39   18    you'll learn for a few months these girls weren't contacted.

10:49:44   19    For three to four months, the Defendant lays low.  But once he

10:49:49   20    realizes hey, I'm out here, they came, they took my devices,

10:49:54   21    they must have bought my story.  What does he do.  Gets a new

10:50:01   22    phone.  Because he still had those perverse desires.  He gets a

10:50:08   23    Samsung S8 phone.  And what does he do with that device?  He

10:50:13   24    begins to contact the same kids again.  Some of the same kids

10:50:20   25    again, and some new ones.  Back to the same sadistic games.

40

| | | |
|---|---|---|
| 10:50:28 | 1 | From the two devices on the Defendant's phones, this is |
| 10:50:32 | 2 | the evidence we found.  We found the victims' contacts, we found |
| 10:50:37 | 3 | the Kik accounts where he's talking with them, multiple Kik |
| 10:50:42 | 4 | accounts.  The Kik messages with the kids'. The Instagram, |
| 10:50:49 | 5 | Tulyn20 which he used to contact the kids with.  The Dropbox |
| 10:50:53 | 6 | folders with all the victims' names in it.  Snapchat accounts |
| 10:50:55 | 7 | that he used. |
| 10:50:58 | 8 | We found evidence that he used the dark web.  Okay. |
| 10:51:04 | 9 | You'll learn a little bit about the dark web during this trial. |
| 10:51:07 | 10 | The Tor network.  That he had an app on his phone Orbot, to |
| 10:51:07 | 11 | access the dark web. |
| 10:51:13 | 12 | We found communications between him and his |
| 10:51:16 | 13 | co-conspirator in Ireland.  And you'll get to see those |
| 10:51:17 | 14 | communications. |
| 10:51:21 | 15 | We found Google searches where the Defendant is looking |
| 10:51:24 | 16 | for child pornography. |
| 10:51:30 | 17 | And what's just as important is what we didn't find on |
| 10:51:35 | 18 | his phones.  We didn't find any threats to the Defendant. |
| 10:51:40 | 19 | You'll learn from an expert, FBI expert we're calling, that |
| 10:51:46 | 20 | these phones were analyzed at the technical analysis unit in |
| 10:51:50 | 21 | Virginia at headquarters.  And there was zero evidence of |
| 10:51:54 | 22 | threats to the Defendant.  Zero evidence of malware and viruses |
| 10:51:57 | 23 | where someone can take over your phone.  Zero evidence of |
| 10:52:03 | 24 | hacking or any signs that the co-conspirator or anyone has |
| 10:52:05 | 25 | threatened this Defendant. |

10:52:09  1        The Judge went over the charges already, so I won't

10:52:12  2   spend too much time on that.  But as the Judge mentioned, we

10:52:18  3   have three counts for production of child pornography, one per

10:52:23  4   victim, those three victims who reside in South Florida.  Then

10:52:28  5   Count 4 is for distributing child pornography in South Florida.

10:52:30  6        You'll hear during this trial that with many of the

10:52:35  7   children, he threatened to release their images and with some he

10:52:42  8   did.  And for example B.F. who you will hear from today, her

10:52:45  9   images got released, when she stopped complying.  He posted them

10:52:51  10  on K.L.'s Snapchat account, her best friend, who you'll hear

10:52:57  11  from first this morning.  On November 14, 2017, he posted those

10:53:03  12  nude images with that little girl, with writing all over her

10:53:08  13  body, all over her face, calling her a whore, calling her a

10:53:12  14  slut.  That's child pornography, and he distributed it via

10:53:20  15  Snapchat on these kids' accounts for all her schoolmates to see.

10:53:26  16       Counts 5 and 6 revolve around the extortion.  Count 5

10:53:33  17  is for sending extortionary threats to Victim 1 and you heard

10:53:33  18  the judge mention for something of value.  Well, the thing of

10:53:35  19  value that you'll hear from in this case, it's not money.  It's

10:53:38  20  something much more valuable to the Defendant, it's those

10:53:42  21  images.  Those still pictures and those videos of child

10:53:45  22  pornography.  That's the thing of value that he was extorting

10:53:46  23  them for.

10:53:51  24       And Count 6 is for conspiring to do that with his

10:53:57  25  co-conspirator in Ireland, with others, and against not only

10:54:00   1    children here in South Florida, but children that you'll hear

10:54:01   2    from from other parts of the country.

10:54:15   3            It just didn't stop for the Defendant.  These games of

10:54:19   4    his involved real live children.  These real live children and

10:54:27   5    others.  And at the conclusion of this case, we're going to ask

10:54:32   6    you to return the only just verdicts in this case.  My

10:54:35   7    co-counsel will get up here in closing arguments and explain to

10:54:39   8    you how we proved each and every element of this case, and we're

10:54:41   9    confident that you will find the only just verdicts and those

10:54:47   10   are verdicts of guilty as to each and every one of the six

10:54:49   11   counts regarding these children.

10:54:50   12           Thank you.

10:54:59   13           THE COURT:  Thank you, ma'am.  You may proceed.

10:55:16   14           MS. WEISS:  This is a case about what people do when

10:55:20   15   they're scared.  There's no question in this case that Joseph

10:55:24   16   had images of the teenagers on his phone.  There's no question

10:55:31   17   that in 2017 and 2018 he did send messages to them.  We don't

10:55:36   18   dispute that the IP addresses beginning in 70.106, that those

10:55:41   19   were IP addresses that he used.  We don't dispute that the Note

10:55:47   20   3 or the S8 Plus phones were his phones.  And we don't dispute

10:55:52   21   that he logged into these teenagers Snapchat accounts.  In fact,

10:55:56   22   very little of the evidence in this case is disputed.  This is

10:55:58   23   not the kind of case where you have to analyze the evidence and

10:56:03   24   determine if something happened or not.  Okay.  It happened.  It

10:56:09   25   happened, and Joseph deeply regrets it.  He's sorry.  It hurts

10:56:15   1    all of us to see what happened to the teenagers in this case.

10:56:21   2         The evidence here presents a different question for you

10:56:26   3    as jurors to consider.  That is, why did Joseph do this.  You're

10:56:30   4    going to learn that Joseph was contacted by an anonymous person

10:56:36   5    on Kik messenger.  This person told Joseph "I know you live in

10:56:42   6    Ashburn, Virginia".  Now, Joseph did initially did what many

10:56:47   7    people would do, he ignored that message.  But the person kept

10:56:52   8    messaging him again day after day saying "I know you live in

10:56:56   9    Ashburn, Virginia", and eventually he messaged him saying "I

10:57:01   10   know your IP address".  Joseph didn't know who was messaging him

10:57:08   11   and he didn't know why he was being targeted.  He was scared.

10:57:11   12   He had been getting daily messages from somebody telling them "I

10:57:16   13   know where you live".  He didn't know whether it was safe to

10:57:19   14   just keep ignoring the messages that he was getting on Kik

10:57:24   15   messenger.  He was afraid that his family home would be swatted.

10:57:26   16        And if you don't know what swatting is, you're going to

10:57:31   17   learn from experts that swatting is when somebody makes a false

10:57:33   18   report to law enforcement.  All right.  They call 911 and they

10:57:40   19   say something like someone is being held in a house.  Law

10:57:43   20   enforcement responds, they send a heavily armed team of officers

10:57:46   21   that get into that house, ready to run into the house and deal

10:57:50   22   with the threat that's been reported.  You're going to learn how

10:57:54   23   common swatting is among the community of people who play video

10:57:57   24   games online.  That's Joseph's community.

10:58:01   25        You'll learn that Joseph played computer games online

| | |
|---|---|
| 10:58:06 | 1 |
| 10:58:10 | 2 |
| 10:58:14 | 3 |
| 10:58:16 | 4 |
| 10:58:22 | 5 |
| 10:58:26 | 6 |
| 10:58:30 | 7 |
| 10:58:34 | 8 |
| 10:58:38 | 9 |
| 10:58:42 | 10 |
| 10:58:48 | 11 |
| 10:58:53 | 12 |
| 10:58:56 | 13 |
| 10:58:58 | 14 |
| 10:59:02 | 15 |
| 10:59:07 | 16 |
| 10:59:10 | 17 |
| 10:59:14 | 18 |
| 10:59:18 | 19 |
| 10:59:24 | 20 |
| 10:59:27 | 21 |
| 10:59:31 | 22 |
| 10:59:37 | 23 |
| 10:59:39 | 24 |
| 10:59:45 | 25 |

up to eight hours every day.  Since he was a teenager, that's his one and only hobby.  He doesn't play sports, doesn't hang out at friends' houses, his friends are online and he plays computer games with them online.

Joseph streamed his games on a website called Twitch. That means that people can watch him live while he's playing games.  At any given moment there would be dozens of people from around the world watching him play.  And you're going to learn about the culture of these online gamers who stream their games on Twitch.  You're going to learn why swatting is particularly common in that community.  You'll learn that people have died when SWAT teams arrive at their houses, and you'll learn that some of the people who do this, who call in a false report to law enforcement, some of them have been prosecuted.  They're in jail because swatting is extremely dangerous.

This is exactly what Joseph feared that this man who was messaging him repeatedly telling him he had his IP address and that he knew where he lived, that that man could swat him or he could put his information, Joseph's information out on the websites' messaging boards, anonymous websites that hackers used and that somebody else would call in the SWAT, somebody could get bragging rights for doing that because that's not uncommon in this online world either.  Joseph was afraid for himself.  He was afraid for his family.

Now, you might ask yourself well, if he was afraid, why

10:59:48  1    wouldn't he call the police and report this threat, report this

10:59:52  2    person who was messaging him repeatedly.  But you're going to

10:59:55  3    learn why Joseph felt that calling the police wouldn't have done

11:00:01  4    him any good.  He'll explain how the police were called to his

11:00:06  5    house numerous times when his mother's boyfriend was violent and

11:00:10  6    threatened to shoot their family.  Took a long, long time before

11:00:14  7    the police ever came and took his mother's boyfriend's guns

11:00:19  8    away.  Joseph grew up poor and he knew the police wouldn't have

11:00:23  9    taken him seriously and wouldn't have taken this threat

11:00:27  10   seriously.  So fearing what this person who was messaging him

11:00:31  11   would do, Joseph finally messaged back and he asked "what do you

11:00:35  12   want?"  That's how this all started.

11:00:39  13         You're going to learn who this person was who messaged

11:00:42  14   him.  His name is Matthew Johnstone.  He lives in Ireland.

11:00:48  15   Joseph told the police about Matthew the very first time he

11:00:52  16   spoke to the police.  They didn't believe him.  They said it was

11:00:58  17   ridiculous.  But Matt Johnstone is real and you'll see evidence

11:01:03  18   about Matt in this case.  You're going to learn that Matt

11:01:07  19   started by asking Joseph to do some small things, some seemingly

11:01:13  20   innocuous things.  That escalated to Matt starting to force

11:01:16  21   Joseph to contact girls and to tell them to get on Kik

11:01:22  22   messenger.  You'll see Matt's instructions to Joseph in the

11:01:30  23   evidence in this case.  The way he would use Joseph as a puppet.

11:01:37  24         On this excerpt from the chat, some of the names are

11:01:41  25   blacked out.  That's to protect people's identity. The Bozy11

| | |
|---|---|
| 11:01:48 1 | user name, that's Matthew Johnstone in Ireland.  The MVLex3 |
| 11:01:55 2 | name, that's Joseph.  Matt would say to Joseph "text so and so, |
| 11:02:10 3 | say Kik now, don't make me force you".  Happened over and over |
| 11:02:15 4 | again with Matthew Johnstone telling Joseph what to do.  He'd |
| 11:02:19 5 | say "need you to text so and so right now.  She's been missing |
| 11:02:26 6 | in action a few days.  Text and say I don't care what you're |
| 11:02:30 7 | doing.  Get on Kik.  If you don't, I make a Facebook for your |
| 11:02:36 8 | slut side.  Get on now.  You have five minutes".  Joseph had to |
| 11:02:39 9 | copy and paste these messages and to send them to the girls that |
| 11:02:47 10 | Matthew Johnstone instructed him to send them to.  He had to do |
| 11:02:52 11 | what Matt told him to, or else Matt could have swatted him, |
| 11:02:56 12 | could have sent a police force to his family home.  He would |
| 11:03:00 13 | take over girls' accounts and he would tell them to get on Kik |
| 11:03:04 14 | messenger to chat with Matt.  Matt would talk to the girls |
| 11:03:06 15 | directly, and what you'll see in the evidence in this case is |
| 11:03:11 16 | that Matt would make the girls use screen names like Matt's |
| 11:03:17 17 | whore or Matt's slut.  Matt would tell the girls what to do.  He |
| 11:03:22 18 | would make them write his name on their bodies.  You'll see this |
| 11:03:27 19 | in this case, one teenager was forced to write Matt's pussy on |
| 11:03:31 20 | her body because that's what Matt wanted. |
| 11:03:38 21 | The evidence will show you that after Matt got the |
| 11:03:43 22 | imagery from these girls, he would send it to Joseph and have |
| 11:03:51 23 | Joseph save it online in a Dropbox account.  Matt had read-only |
| 11:03:55 24 | access to that Dropbox account, which means that Matt could view |
| 11:03:59 25 | the images in the video but he couldn't upload things, he |

| | | |
|---|---|---|
| 11:04:02 | 1 | couldn't delete things, he couldn't modify what was in the |
| 11:04:05 | 2 | Dropbox.  He had read-only access.  This is how Matthew |
| 11:04:11 | 3 | Johnstone attempted to insulate himself from criminal charges by |
| 11:04:14 | 4 | making someone else responsible for storing these illegal images |
| 11:04:20 | 5 | and videos, by making Joseph do it.  Matt had Joseph save some |
| 11:04:25 | 6 | other things in the Dropbox as well like hacked information from |
| 11:04:26 | 7 | celebrities. |
| 11:04:30 | 8 | Now, Matt not only gave Joseph the images to upload, |
| 11:04:34 | 9 | but he also told Joseph what to do with the Dropbox account.  He |
| 11:04:48 | 10 | instructed him -- Matt would tell Joseph who to upload videos of |
| 11:04:56 | 11 | on Dropbox.  He would tell him delete a few folders.  He would |
| 11:04:59 | 12 | give him instructions about which folders to delete in the |
| 11:05:03 | 13 | Dropbox account, and talked about re-uploading new sets of |
| 11:05:10 | 14 | images.  Matthew Johnstone was in control of the Dropbox, it was |
| 11:05:13 | 15 | just Joseph who had to do the clicking and the moving and the |
| 11:05:15 | 16 | actual work. |
| 11:05:19 | 17 | Now, Joseph understood how harmful what he was doing |
| 11:05:26 | 18 | was.  He knew it was illegal.  That actually added to his fear |
| 11:05:30 | 19 | because Matthew Johnstone, who knew he lived in Ashburn, |
| 11:05:32 | 20 | Virginia, could have called the police on him, could have |
| 11:05:37 | 21 | reported him and conversely at the time this is going on, Joseph |
| 11:05:41 | 22 | knows nothing about Matt Johnstone, doesn't know his name. |
| 11:05:43 | 23 | Doesn't know who he is. |
| 11:05:47 | 24 | So as the Government presents evidence in this case, |
| 11:05:52 | 25 | remember that very little of the evidence is actually disputed. |

11:05:58  1   The question here is why did Joseph do this.  Did he do this

11:06:01  2   because this is something he wanted to do?  Or did he do this

11:06:05  3   because Matt Johnstone was making him do this.

11:06:08  4            And I ask you to listen to all of what happened in this

11:06:14  5   case, to listen to Joseph's story.  It's not a typical story

11:06:20  6   because Joseph is not a typical person.  See, Joseph has autism.

11:06:26  7   Autism affects the way he thinks, it affects the way he behaves,

11:06:31  8   it affects how he understands other people and other peoples'

11:06:36  9   emotions.  It affects the way he himself displays emotions.  And

11:06:40  10  you're going to learn that autism has a genetic component to it

11:06:44  11  and that in Joseph's family, all five of his other siblings have

11:06:49  12  autism or other developmental issues.  Two of his younger

11:06:54  13  sisters are institutionalized because their autism is so severe

11:06:58  14  that they cannot speak.  Joseph and his brothers are higher

11:07:02  15  functioning, they're not institutionalized.  But Joseph spent

11:07:07  16  nearly all of elementary school in special education, he never

11:07:09  17  received any behavioral therapy for autism.

11:07:12  18           Now, Joseph made choices that you yourself might not

11:07:18  19  have made had you been threatened in the same way he was. That's

11:07:21  20  because Joseph's autism made him uniquely vulnerable to be

11:07:26  21  coerced into committing someone else's crime.

11:07:29  22           So I ask you to listen to Joseph's story, to learn what

11:07:35  23  swatting is, to learn what it's like in the online world that he

11:07:39  24  lived in, and I think if you listen to his story very carefully,

11:07:43  25  you'll see that he didn't want to do this, but he was under

11:07:47  1    Matthew Johnstone's control doing everything that Matt told him
11:07:54  2    to do.  The victims in this case were threatened and coerced
11:07:59  3    into doing humiliating and degrading things and taking photos
11:08:04  4    and videos of it.  Joseph was threatened and coerced into
11:08:09  5    committing a crime and Matthew Johnstone is the one that made
11:08:14  6    this all happen.  The reasons behind our actions matter.
11:08:19  7            I ask you to pay attention to the reasons Joseph did
11:08:23  8    what he did, and I think if you do, you'll find that the right
11:08:26  9    verdict in this case is one of not guilty.
11:08:28  10           Thank you.
11:08:29  11           THE COURT:  Thank you very much.  All right, ladies and
11:08:33  12    gentlemen.  We're going to take our morning break now.  About 10
11:08:38  13    minutes, maybe 15.  We were here from 9:30 on.  I apologize we
11:08:40  14    had to keep you in the jury room, we had some legal matters to
11:08:44  15    deal with.  But we'll be ready to go in about 10 or 15 minutes.
11:08:48  16    Please go on into the jury room and we'll see you shortly.
11:08:52  17           COURT SECURITY OFFICER:  All rise for the jury.
11:08:55  18           (Jury out at 11:08 a.m.)
11:09:35  19           THE COURT:  Please be seated.  Let's talk logistics,
11:09:39  20    whenever I know for sure that the door is closed.  Okay.  I
11:09:41  21    heard the door.
11:09:47  22           First witness in the courtroom?  Okay.  Will you have
11:09:50  23    -- your second witness is not in the courtroom, correct?  Will
11:09:53  24    not be or how are you going to do that?
11:09:55  25           MS. ANTON:  Judge, today we believe that both of the

| | | |
|---|---|---|
| 11:09:57 | 1 | minor children will be in the courtroom. |
| 11:10:02 | 2 | THE COURT:  Okay.  You don't need special time to set |
| 11:10:03 | 3 | anything up? |
| 11:10:04 | 4 | MS. ANTON:  Not this morning. |
| 11:10:06 | 5 | THE COURT:  Okay.  Then let's take our short break and |
| 11:10:10 | 6 | then we'll be ready to go in about eight or nine minutes.  All |
| 11:10:11 | 7 | right? |
| 11:10:16 | 8 | COURT SECURITY OFFICER:  All rise. |
| 11:10:17 | 9 | (Brief recess) |
| 11:21:49 | 10 | (Jury in at 11:21 a.m.) |
| 11:22:13 | 11 | COURTROOM DEPUTY:  Your Honor, all parties and counsel |
| 11:22:13 | 12 | are present. |
| 11:22:14 | 13 | THE COURT:  Thank you.  Please be seated. |
| 11:22:17 | 14 | Please call your first witness. |
| 11:22:19 | 15 | MS. VIAMONTES:  Your Honor, the United States calls |
| 11:22:21 | 16 | K.L. |
| 11:22:35 | 17 | THE COURT:  Please come forward.  There's a little ramp |
| 11:22:38 | 18 | there.  Be careful.  Don't know why there's a ramp there, but |
| 11:22:39 | 19 | there's a ramp there. |
| 11:22:42 | 20 | Please remain standing and when you reach the chair, |
| 11:22:49 | 21 | raise your right hand. |
| 11:22:49 | 22 | K.L., GOVERNMENT WITNESS, SWORN. |
| 11:22:51 | 23 | THE COURT:  Please be seated.  Get as close to the |
| 11:22:53 | 24 | microphone as you can, speak loudly, tell us your name and spell |
| 11:22:55 | 25 | it. |

| | | |
|---|---|---|
| 11:23:01 | 1 | THE WITNESS:  My name is K.L. (name spelled) |
| 11:23:03 | 2 | THE COURT:  All right.  You may proceed. |
| 11:23:04 | 3 | MS. VIAMONTES:  Thank you, Your Honor. |
| 11:23:04 | 4 | DIRECT EXAMINATION |
| 11:23:04 | 5 | BY MS. VIAMONTES: |
| 11:23:06 | 6 | Q.  Good morning K.L.  How are you? |
| 11:23:08 | 7 | A.  I'm good.  How are you? |
| 11:23:09 | 8 | Q.  Good. |
| 11:23:11 | 9 | Can you please introduce yourself to the members of the |
| 11:23:12 | 10 | jury? |
| 11:23:13 | 11 | A.  I'm K.L. |
| 11:23:15 | 12 | Q.  How old are you? |
| 11:23:17 | 13 | A.  I'm 14. |
| 11:23:21 | 14 | Q.  And whereabouts do you live?  Don't give us your exact |
| 11:23:23 | 15 | address, but where in town do you live? |
| 11:23:25 | 16 | A.  Like around Pembroke Pines. |
| 11:23:27 | 17 | Q.  What grade are you in? |
| 11:23:28 | 18 | A.  I'm in 9th grade. |
| 11:23:30 | 19 | Q.  And do you have a best friend? |
| 11:23:31 | 20 | A.  Yes. |
| 11:23:32 | 21 | Q.  What's her first name? |
| 11:23:33 | 22 | A.  B. |
| 11:23:38 | 23 | Q.  Okay.  And is her last initial F.? |
| 11:23:39 | 24 | A.  Yes. |
| 11:23:41 | 25 | Q.  So is it okay if we call her B.F. today? |

11:23:42  1    A.  Yes.

11:23:45  2    Q.  And she's your best friend, so it's perfect, right?

11:23:45  3    A.  Yes.

11:23:51  4    Q.  Okay.  So let me take you back to November of 2017.  Your

11:23:55  5    birthday is in November, right?

11:23:55  6    A.  Yes.

11:23:58  7    Q.  And do you remember November 2017?

11:24:02  8    A.  Yes, part of it.

11:24:03  9    Q.  What grade were you in?

11:24:05  10   A.  I was in 7th grade.

11:24:07  11   Q.  All right.  And when is your birthday?

11:24:09  12   A.  November 11th.

11:24:16  13   Q.  Okay.  Do you remember something odd and bad happening

11:24:19  14   shortly after your birthday that involved your best friend?

11:24:20  15   A.  Yes.

11:24:25  16   Q.  Okay.  How did you first become aware that something was off

11:24:27  17   or wrong?

11:24:32  18   A.  I tried logging into my Snapchat account and I was logged

11:24:33  19   out.

11:24:38  20   Q.  Okay.  So let's talk about Snapchat.  You're familiar with

11:24:39  21   Snapchat?

11:24:40  22   A.  Yes.

11:24:44  23   Q.  Can you explain to the members of the jury what Snapchat is?

11:24:48  24   A.  It's an app where you can communicate with your friends and

11:24:53  25   you can upload stuff for them to see and can you send them

11:24:55  1    messages and stuff.

11:24:59  2    Q.   And you mentioned it's an app.  Is that something that's on

11:24:59  3    your cellphone?

11:25:01  4    A.   Yeah, an app on your cellphone.

11:25:04  5    Q.   And in 7th grade did you have a cellphone?

11:25:05  6    A.   Yes.

11:25:08  7    Q.   And did your parents let you have Snapchat?

11:25:09  8    A.   Yes.

11:25:12  9    Q.   Did most kids in 7th grade have Snapchat?

11:25:14 10    A.   Yes.

11:25:17 11    Q.   And what did you primarily use it for, Snapchat?

11:25:24 12    A.   Mostly just to like talk to my friends or post things.

11:25:26 13    Q.   So you don't pick up the phone anymore and have a

11:25:29 14    conversation with your friends; you do it through Snapchat?

11:25:31 15    A.   Depends.

11:25:37 16    Q.   Okay.  Was your best friend, B.F., was she one of your

11:25:38 17    friends on Snapchat?

11:25:39 18    A.   Yes.

11:25:45 19    Q.   Okay.  Now, you mentioned that on or about November 14,

11:25:50 20    2017, you went to get into your Snapchat and you were logged

11:25:51 21    out?

11:25:52 22    A.   Yes.

11:25:56 23    Q.   Tell us about it.  Tell us a little bit more about that.

11:25:58 24    Where were you when you noticed that?

11:26:03 25    A.   I was in the car.  It was in the morning, and I went to like

| | | |
|---|---|---|
| 11:26:07 | 1 | look at my phone, like just open it like normally, and I -- it |
| 11:26:13 | 2 | told me to like -- the login page, and usually it like keeps you |
| 11:26:15 | 3 | logged in, so I thought it was weird. |
| 11:26:18 | 4 | Q.  Okay.  So let's talk about that.  You mentioned normally |
| 11:26:24 | 5 | when your account, Snapchat account, is being used on that |
| 11:26:26 | 6 | phone, you don't have to login each time, right? |
| 11:26:27 | 7 | A.  Yes. |
| 11:26:29 | 8 | Q.  So it stays open and active on your phone. |
| 11:26:30 | 9 | A.  Yes. |
| 11:26:33 | 10 | Q.  So you went to use it because I'm sure you probably did that |
| 11:26:35 | 11 | a hundred times a day at least, right? |
| 11:26:36 | 12 | A.  Uh-huh. |
| 11:26:37 | 13 | Q.  Is that a yes? |
| 11:26:38 | 14 | A.  I guess. |
| 11:26:39 | 15 | Q.  Okay. |
| 11:26:41 | 16 | THE COURT:  Uh-huh and huh-uh are spelled very |
| 11:26:44 | 17 | similarly, so you have to verbalize your answer.  You have to |
| 11:26:47 | 18 | say yes or no instead of uh-huh. |
| 11:26:49 | 19 | THE WITNESS:  Okay.  Yes. |
| 11:26:49 | 20 | BY MS. VIAMONTES: |
| 11:26:51 | 21 | Q.  So if you say that, I'll just remind you.  Okay? |
| 11:26:52 | 22 | A.  Okay. |
| 11:26:55 | 23 | Q.  So you went to check your Snapchat account and the login |
| 11:26:59 | 24 | screen comes out.  Okay.  Did you try to put in your login? |
| 11:27:03 | 25 | A.  Yes, I tried putting in my password and user name. |

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED BY COMPUTER

```
11:27:06   1    Q.  I couldn't hear you.  Can you repeat that?
11:27:10   2    A.  I tried putting in my user name and password and it didn't
11:27:11   3    work.
11:27:13   4    Q.  It didn't work.  Okay.  When you noticed it didn't work,
11:27:14   5    what did you do?
11:27:17   6    A.  Well, I tried it a couple times and when it kept on not
11:27:22   7    working, I told my dad that like oh, it isn't working.  Like I
11:27:25   8    didn't know what was going on.  So I had him e-mail Snapchat.
11:27:30   9    Q.  Okay.  And you had your father e-mail Snapchat to let them
11:27:32   10   know that your account wasn't working right?
11:27:34   11   A.  Yeah.
11:27:36   12   Q.  Did you do that immediately as you realized that you were
11:27:38   13   logged out?
11:27:42   14   A.  I told him as soon as I was logged out.  I don't know when
11:27:43   15   exactly he sent the e-mail.
11:27:48   16   Q.  Okay.  When you were checking your phone, where physically
11:27:50   17   were you?
11:27:52   18   A.  When I was checking my phone, I was in the car.
11:27:55   19   Q.  You were in your car.  And was your dad in the car also?
11:27:55   20   A.  Yes.
11:27:57   21   Q.  And where were you going?
11:28:00   22   A.  To drop my sisters off at school.
11:28:03   23   Q.  Okay.  Drop your sisters off.  And then was he going to drop
11:28:05   24   you off at school as well?
11:28:06   25   A.  At the bus stop, yes.
```

| | | |
|---|---|---|
| 11:28:10 | 1 | Q.  Okay.  Now, later that morning before school you're logged |
| 11:28:14 | 2 | out of your Snapchat account.  Do you learn of anything else? |
| 11:28:17 | 3 | A.  No. |
| 11:28:20 | 4 | Q.  Okay.  Eventually you get to school, right? |
| 11:28:21 | 5 | A.  Yes. |
| 11:28:24 | 6 | Q.  That morning, November 14th.  And -- |
| 11:28:29 | 7 | A.  No.  I think that was before November 14th I first found out |
| 11:28:30 | 8 | I was logged out. |
| 11:28:34 | 9 | Q.  Now, when you get to school after you're logged out of your |
| 11:28:39 | 10 | Snapchat account, do other kids, other friends at school, start |
| 11:28:41 | 11 | talking to you and asking you about Snapchat? |
| 11:28:46 | 12 | A.  I don't remember. |
| 11:28:49 | 13 | MS. VIAMONTES:  Permission to approach, Your Honor? |
| 11:28:51 | 14 | THE COURT:  You may. |
| 11:29:04 | 15 | MS. VIAMONTES:  For the record, I'm approaching with |
| 11:29:10 | 16 | what's been premarked as Government's Exhibits 1 and 2. |
| 11:29:15 | 17 | THE COURT:  All right. |
| 11:29:27 | 18 | MS. VIAMONTES:  May I inquire from here, Your Honor? |
| 11:29:28 | 19 | THE COURT:  You may if you're going to use the ELMO. |
| 11:29:29 | 20 | If not, use the lectern. |
| 11:29:33 | 21 | MS. VIAMONTES:  I'm just going to grab those exhibits |
| 11:29:34 | 22 | in a second. |
| 11:29:35 | 23 | THE COURT:  Okay.  Go ahead. |
| 11:29:35 | 24 | BY MS. VIAMONTES: |
| 11:29:40 | 25 | Q.  K.L., I've handed you what's been premarked as Government's |

| | | |
|---|---|---|
| 11:29:40 | 1 | Exhibit 1.  Do you recognize it? |
| 11:29:41 | 2 | A.  Yes. |
| 11:29:41 | 3 | Q.  What is it? |
| 11:29:45 | 4 | A.  It's the e-mail that was sent to my phone about my account. |
| 11:29:48 | 5 | Q.  Okay.  And is that the e-mail from Snapchat? |
| 11:29:49 | 6 | A.  Yes. |
| 11:29:52 | 7 | Q.  And is that e-mail letting you know that your account had |
| 11:29:54 | 8 | been logged in to at a different location? |
| 11:29:54 | 9 | A.  Yes. |
| 11:29:57 | 10 | Q.  And is that e-mail in the same or substantially the same |
| 11:30:00 | 11 | condition it was in when you forwarded it to law enforcement for |
| 11:30:01 | 12 | this case? |
| 11:30:02 | 13 | A.  Yes. |
| 11:30:03 | 14 | MS. VIAMONTES:  Your Honor, at this time the Government |
| 11:30:05 | 15 | moves Government's 1 into evidence. |
| 11:30:07 | 16 | MR. NATALE:  No objection. |
| 11:30:08 | 17 | THE COURT:  Without objection, Government's 1 is |
| 11:30:11 | 18 | admitted in evidence. |
| 11:30:11 | 19 | (Government's Exhibit 1 in evidence) |
| 11:30:12 | 20 | MS. VIAMONTES:  Permission to approach and publish, |
| 11:30:12 | 21 | Your Honor? |
| 11:30:15 | 22 | THE COURT:  You may. |
| 11:30:49 | 23 | COURT SECURITY OFFICER:  It's not working, Your Honor. |
| 11:30:50 | 24 | THE COURT:  What did you do to my ELMO? |
| 11:30:55 | 25 | MS. VIAMONTES:  I didn't break it.  I promise. |

11:30:59  1          THE COURT:  Wanda, get IT up here please.  I don't know

11:31:05  2   what the problem is.  My grandchildren are not in town, so I

11:31:07  3   can't fix it.

11:31:09  4          MS. VIAMONTES:  Your Honor, permission to have the

11:31:11  5   court security officers pass this out and publish it?

11:31:14  6          THE COURT:  You can just hand it to the first person in

11:31:16  7   there.

11:31:16  8      BY MS. VIAMONTES:

11:31:35  9   Q.  K.L., as the jurors are looking at that e-mail, did that

11:31:39  10  e-mail tell you of a different location where your account had

11:31:40  11  been logged in to?

11:31:41  12  A.  Yes.

11:31:43  13  Q.  Do you remember where that was?

11:31:44  14  A.  Virginia.

11:31:47  15  Q.  And did it have an IP address?

11:31:51  16  A.  Maybe.  I don't remember.

11:31:56  17  Q.  Okay.  Now, after you realized that your account had been

11:32:02  18  taken over from someone else, did something happen on your

11:32:05  19  account?  Were pictures posted on your account by somebody else?

11:32:06  20  A.  Yes.

11:32:10  21  Q.  And what kind of pictures were posted on your account?

11:32:10  22  A.  Nude pictures.

11:32:13  23  Q.  Okay.  Nude pictures of whom?

11:32:15  24  A.  Of my friend, B.F.

11:32:17  25  Q.  Okay.  Your best friend?

11:32:18   1    A.   Yes.

11:32:21   2    Q.   And you didn't post those pictures, did you?

11:32:28   3    A.   No, I did not.

11:32:31   4    Q.   After those pictures were posted on your account, were you

11:32:31   5    able to see them?

11:32:35   6    A.   Yes.  I looked through my friend's account.

11:32:38   7    Q.   Okay.  So through a friend's account, you were able to

11:32:39   8    login?

11:32:40   9    A.   Yes.

11:32:41   10   Q.   On your friend's Snapchat account?

11:32:42   11   A.   Yes.

11:32:46   12   Q.   And were you able to view your Snapchat account that had

11:32:47   13   been taken over?

11:32:48   14   A.   Yes.

11:32:52   15   Q.   And what did you see?

11:32:54   16   A.   I saw her pictures.

11:33:00   17   Q.   Okay.  Had you ever seen those pictures before?

11:33:02   18   A.   No.

11:33:06   19   Q.   And were those pictures you had on your account?

11:33:08   20   A.   No.

11:33:18   21   Q.   Now, we talked a little bit about Snapchat and how it works.

11:33:25   22   Are you familiar with a feature within Snapchat where you can

11:33:27   23   accumulate streaks?

11:33:28   24   A.   Yes.

11:33:32   25   Q.   Can you describe to the members of the jury, and for those

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

```
11:33:35   1    of us who don't use Snapchat, what streaks are?
11:33:38   2    A.  Okay.  So basically the point of it is to like get -- like
11:33:42   3    every day you could send your friend like a picture, and they
11:33:45   4    can send a picture back to you.  And then every day that you do
11:33:50   5    that, like, you get a number.  And as the days go on, like, it
11:33:54   6    has to be days in a row where you send a picture and they send
11:33:58   7    one back, so you just try to get your number higher.  If that
11:33:58   8    makes sense.
11:34:05   9    Q.  Okay.  So let's say you didn't login to Snapchat for more
11:34:09  10    than 24 hours.  Could you continue with your streaks?
11:34:11  11    A.  No, you would lose them.
11:34:14  12    Q.  Okay.  Now, back when you were 12 years old a couple years
11:34:18  13    ago when you were in 7th grade when this was happening, were
11:34:20  14    there ever times that your parent took your phone away?
11:34:21  15    A.  Yes.
11:34:24  16    Q.  Is that the way that they keep you disciplined?
11:34:24  17    A.  Yes.
11:34:27  18    Q.  All right.  So when they would take your phone away, could
11:34:30  19    you keep those streaks alive?
11:34:30  20    A.  No.
11:34:33  21    Q.  All right.  Did you and other clever kids find a way to keep
11:34:38  22    your streaks alive even when your parents took your phone?
11:34:38  23    A.  Yes.
11:34:39  24    Q.  How did you do that?
11:34:42  25    A.  You could give your password to your friend and they could
```

11:34:44   1    login and do it for you.

11:34:46   2    Q.  Okay.  Was that pretty common?

11:34:46   3    A.  Yes.

11:34:47   4    Q.  For kids to do that?

11:34:48   5    A.  Uh-huh.

11:34:51   6    Q.  Okay.  Uh-huh --

11:34:53   7         THE COURT:  Does uh-huh mean yes?

11:34:54   8         THE WITNESS:  Yes.  Oh, sorry.

11:34:55   9         THE COURT:  No, that's all right.

11:34:55  10       BY MS. VIAMONTES:

11:35:02  11    Q.  Had you shared your password with B.F. or other friends?

11:35:04  12    A.  Yes.

11:35:10  13    Q.  Now, I've handed you what's been premarked as Government's

11:35:14  14    Exhibit 2.  Can you take it out of the sleeve and just quickly

11:35:26  15    look through those?  Just look through them quickly, and that's

11:35:30  16    a composite exhibit with eight pictures; is that correct, K.L.?

11:35:35  17    Now, Government's Exhibit 2, A through H I believe, do you

11:35:36  18    recognize those?

11:35:37  19    A.  Yes.

11:35:38  20    Q.  What are they?

11:35:41  21    A.  They're pictures of my friend.

11:35:43  22    Q.  And are those the pictures that you saw of your friend,

11:35:48  23    B.F., posted on your Snapchat story after your account was taken

11:35:49  24    over by someone?

11:35:50  25    A.  Yes.

| | | |
|---|---|---|
| 11:35:55 | 1 | Q.  And are those pictures in the same or -- the same condition |
| 11:35:57 | 2 | as when you saw them back in November 2017? |
| 11:35:59 | 3 | A.  Yes, I think so. |
| 11:36:03 | 4 | Q.  They accurately show what you saw on your Snapchat story? |
| 11:36:04 | 5 | A.  Yes. |
| 11:36:05 | 6 | MS. VIAMONTES:  Your Honor, at this time the Government |
| 11:36:09 | 7 | moves Government's Composite Exhibit 2 A through H into |
| 11:36:10 | 8 | evidence. |
| 11:36:11 | 9 | THE COURT:  Without objection? |
| 11:36:16 | 10 | MS. MOLLISON:  No objection, Your Honor. |
| 11:36:19 | 11 | THE COURT:  2 A through H is admitted in evidence. |
| 11:36:19 | 12 | (Government's Exhibits 2 A-H in evidence) |
| 11:36:21 | 13 | MS. VIAMONTES:  Permission to approach and publish? |
| 11:36:24 | 14 | THE COURT:  Hold on a second, you may be able to put it |
| 11:36:34 | 15 | on the ELMO.  Rumor has it he knows what he's doing.  Just take |
| 11:36:47 | 16 | a short break in place and we'll just stand by for a second |
| 11:36:59 | 17 | please.  There's nothing to any of the monitors.  I'd kind of |
| 11:37:03 | 18 | like you guys to check this out. |
| 11:37:04 | 19 | (Discussion off the record) |
| 11:37:15 | 20 | THE COURT:  Wasn't me because I don't know what an HDMI |
| 11:37:20 | 21 | cable is.  Go get it and when you come back, just sneak in and |
| 11:37:23 | 22 | do it.  All right.  We're not going to be able to use that until |
| 11:37:26 | 23 | he comes back with a new cable, so you'll have to publish it |
| 11:37:28 | 24 | otherwise. |
| 11:37:46 | 25 | MS. VIAMONTES:  Okay.  Permission to publish Your |

```
11:37:46   1    Honor.
11:37:49   2              THE COURT:  You may.
11:39:16   3              (Government's Exhibits 2 A-H published to jury)
11:42:57   4              THE COURT:  Okay.  Let's go.  They can multitask.  Do
11:42:59   5    something else.
11:43:01   6              MS. VIAMONTES:  No further questions, Your Honor.
11:43:08   7              THE COURT:  Very well.  Cross?  Just so we don't have
11:43:12   8    any misunderstanding in the future, I almost made this Mr.
11:43:16   9    Natale's witness because he's the one that objected first.  One
11:43:18   10   lawyer, one witness.  Okay?
11:43:19   11             MR. NATALE:  I apologize.
11:43:23   12             THE COURT:  It's okay.  No problem.  I'm not being hard
11:43:27   13   nosed, I'm just telling you that that's the rules.
11:43:28   14             Go ahead
11:43:28   15                         CROSS-EXAMINATION
11:43:28   16   BY MS. MOLLISON:
11:43:32   17   Q.  Hi K.L., my name is Kate.  I just have a couple questions
11:43:32   18   for you.
11:43:35   19             K.L., how many times have you spoken to either the
11:43:38   20   prosecutors or the agents in this case?
11:43:39   21   A.  Like twice, I think.
11:43:42   22   Q.  Twice?  Did they ever record any of those conversations that
11:43:45   23   you had with them?
11:43:48   24   A.  I'm not sure.
11:43:51   25   Q.  Do you know if they ever gave you copies of any of the
```

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED BY COMPUTER

11:43:53  1    statements that you had made to them?

11:43:55  2    A.  I don't know.  Sorry.

11:43:59  3    Q.  No problem.  I know you said your best friend is B.F., so

11:44:03  4    I'm sure you've been in touch with her over the past few years.

11:44:05  5    A.  Yes.

11:44:08  6    Q.  Have you had any contact with any of the other young women

11:44:10  7    who were involved in this case?

11:44:11  8    A.  No.

11:44:14  9    Q.  Do you go to school with any of them?

11:44:15  10   A.  I don't think so.

11:44:18  11   Q.  Have you learned or have you been told what happened to the

11:44:21  12   other young women in this case?

11:44:23  13   A.  No.

11:44:25  14   Q.  Do you know if any of them are going to be testifying here

11:44:25  15   today?

11:44:29  16   A.  I think they will.

11:44:31  17   Q.  What makes you think that?

11:44:34  18   A.  Well, I think my friend is testifying today, so I don't

11:44:35  19   know.

11:44:38  20   Q.  Do you know about anyone else?

11:44:39  21   A.  I don't know.

11:45:15  22   Q.  Okay.  K.L., is it right that you don't know how someone got

11:45:17  23   your password to the Snapchat account?

11:45:19  24   A.  I have an idea, but I'm not completely sure.

11:45:20  25   Q.  And what's that idea?

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

| | | |
|---|---|---|
| 11:45:27 | 1 | A.  I think that I had given my password to B.F. like previously |
| 11:45:33 | 2 | and then they found it like in our messages. |
| 11:45:36 | 3 | MS. MOLLISON:  No further questions, Your Honor. |
| 11:45:39 | 4 | THE COURT:  Redirect? |
| 11:45:41 | 5 | MS. VIAMONTES:  No redirect, Your Honor.  Thank you. |
| 11:45:43 | 6 | THE COURT:  All right.  Thank you, Miss.  You are |
| 11:45:44 | 7 | excused.  Thank you very much. |
| 11:45:55 | 8 | Call your next witness please. |
| 11:45:56 | 9 | MS. VIAMONTES:  At this time, the United States calls |
| 11:45:57 | 10 | B.F. |
| 11:46:21 | 11 | Your Honor, for the court reporter and for the Court, |
| 11:46:23 | 12 | B.F. is Victim 2. |
| 11:46:27 | 13 | THE COURT:  Very well.  We're making progress.  We got |
| 11:46:27 | 14 | lights. |
| 11:46:50 | 15 | When you reach the chair, please remain standing and |
| 11:47:02 | 16 | raise your right hand. |
| 11:47:02 | 17 | B.F., GOVERNMENT WITNESS, SWORN. |
| 11:47:09 | 18 | THE COURT:  Hold on a second please.  Perfect.  Works. |
| 11:47:12 | 19 | Are all your monitors working?  Okay.  Thank you.  You may |
| 11:47:13 | 20 | proceed. |
| 11:47:17 | 21 | MS. VIAMONTES:  Thank you, Your Honor.  You can sit |
| 11:47:17 | 22 | down. |
| 11:47:20 | 23 | THE COURT:  I'm sorry.  I can't see her so I didn't |
| 11:47:25 | 24 | know she was still standing.  I apologize. |
| 11:47:25 | 25 | DIRECT EXAMINATION |

```
11:47:25   1        BY MS. VIAMONTES:
11:47:28   2   Q.   Good morning, B.F.  Could you please introduce yourself to
11:47:29   3   the members of the jury?
11:47:31   4   A.   Hi, I'm B.F.
11:47:31   5   Q.   How old are you B.F.?
11:47:33   6   A.   I'm 14.
11:47:37   7   Q.   And is your last initial F?
11:47:37   8   A.   Yes.
11:47:39   9   Q.   Is it okay if I call you B.F. or B.F.?
11:47:40  10   A.   Yes.
11:47:45  11   Q.   Okay.  What's your date of birth?
11:47:49  12   A.   05-06-2005.
11:47:50  13   Q.   And do you go to school?
11:47:51  14   A.   Yes.
11:47:52  15   Q.   What grade are you in now?
11:47:54  16   A.   I'm in 9th grade.
11:48:00  17   Q.   What are some of the things you like to do, B.F., on your
11:48:01  18   spare time?
11:48:03  19   A.   Talk to my friends.
11:48:08  20   Q.   Okay.  And do you use social media to talk to your friends?
11:48:08  21   A.   No.
11:48:10  22   Q.   Not anymore?
11:48:10  23   A.   No.
11:48:20  24   Q.   Okay.  Let me direct your attention now to November of 2017.
11:48:26  25   Okay?  So just under two years ago.  What grade were you in back
```

11:48:26    1    then?

11:48:28    2    A.   7th grade.

11:48:31    3    Q.   And you would have been 12 years old in November 2017; is

11:48:32    4    that right?

11:48:33    5    A.   Yes.

11:48:35    6    Q.   Did you have a cellphone?

11:48:37    7    A.   Yes.

11:48:40    8    Q.   And did you use your phone to play games?

11:48:41    9    A.   Yes.

11:48:43   10    Q.   Did you use it to communicate with friends?

11:48:44   11    A.   Yes.

11:48:48   12    Q.   How would you communicate with friends?  What are some of

11:48:48   13    the ways that you used?

11:48:50   14    A.   Snapchat.

11:48:53   15    Q.   Okay.  Would you also text with friends?

11:48:54   16    A.   Yes.

11:48:58   17    Q.   Do kids still talk, voice call as well?

11:48:58   18    A.   Yes.

11:49:00   19    Q.   Not so much?

11:49:01   20    A.   FaceTime.

11:49:05   21    Q.   Okay.  So you mentioned you used Snapchat.  Can you explain

11:49:08   22    that briefly to the jury what that is?

11:49:13   23    A.   So it's like a social media app and you can send pictures,

11:49:21   24    send videos, like text on it too.

11:49:25   25    Q.   And when you're using Snapchat, do you create or do you have

11:49:28   1   people that you accept to be your friends on Snapchat?

11:49:30   2   A.   Yes.

11:49:33   3   Q.   Could you -- if you choose to, could your Snapchat account

11:49:35   4   be public for everyone to see?

11:49:37   5   A.   Yes.

11:49:40   6   Q.   Was yours public for everyone to see?

11:49:41   7   A.   Uh-huh.

11:49:44   8   Q.   Or was it limited to your circle of friends?

11:49:48   9   A.   It was to the people I added.

11:49:49   10   Q.   Okay.

11:49:50   11   A.   As friends.

11:49:52   12   Q.   So the people you had either friended or accepted their

11:49:53   13   friend requests?

11:49:54   14   A.   Yes.

11:50:01   15   Q.   Okay.   Now, back in November, on or about November 14th of

11:50:07   16   2017, do you remember getting a friend request from an old

11:50:08   17   friend named Barbara?

11:50:09   18   A.   Yes.

11:50:12   19   Q.   And tell the members of the jury about that, when you got

11:50:15   20   that friend request.   Tell us what happened?

11:50:20   21   A.   So I had gotten a notification that I had received a friend

11:50:24   22   request from a girl named Barbara which I had known from

11:50:31   23   elementary school.   We weren't, like, close, we were -- but like

11:50:36   24   we talked and we had common friends so I added her back.

11:50:36   25   Q.   Okay.

```
11:50:37   1    A.  On Snapchat.

11:50:41   2    Q.  So did you and Barbara go to the same elementary school?

11:50:41   3    A.  Yes.

11:50:43   4    Q.  And were you at the same middle school?

11:50:44   5    A.  No.

11:50:47   6    Q.  Okay.  So had you grown apart a little bit?

11:50:47   7    A.  Yes.

11:50:52   8    Q.  When you get this friend request from Barbara, did it make

11:50:55   9    you happy, were you hoping to reconnect with her?

11:50:56  10    A.  Yes.

11:50:58  11    Q.  All right.  So did you accept that friend request?

11:50:59  12    A.  Yes.

11:51:05  13    Q.  Okay.  After you accepted a friend request from somebody

11:51:07  14    that you thought was Barbara, what happened?

11:51:14  15    A.  She messaged me.

11:51:16  16    Q.  Okay.  And what did it say?

11:51:19  17    A.  Like hi.

11:51:21  18    Q.  All right.  And did you communicate with this person?

11:51:22  19    A.  Yes.

11:51:24  20    Q.  And what do you say back?

11:51:26  21    A.  Like hi.

11:51:33  22    Q.  Okay.  And at some point, do you realize that there is a

11:51:36  23    problem now with your account?

11:51:44  24    A.  Yes.  So she had asked me to login to my Snapchat account so

11:51:46  25    that she could talk to somebody.
```

| | | |
|---|---|---|
| 11:51:49 | 1 | Q. Okay. And did you let her do that? |
| 11:51:49 | 2 | A. Yes. |
| 11:51:53 | 3 | Q. Okay. So you thought it was Barbara. After she you say |
| 11:51:56 | 4 | hello to each other, she asked you for permission to login as |
| 11:51:57 | 5 | you. |
| 11:51:58 | 6 | A. Yes. |
| 11:52:03 | 7 | Q. And did you think twice before you -- before giving your |
| 11:52:05 | 8 | password out, or no? |
| 11:52:08 | 9 | A. No, because that was just like something that girls and, |
| 11:52:11 | 10 | like, their friends would do, like, often. Just, like, give |
| 11:52:15 | 11 | people their password to, like, login. Like, it was very common |
| 11:52:16 | 12 | to do that. |
| 11:52:18 | 13 | Q. Wasn't a big deal, right? |
| 11:52:18 | 14 | A. Yeah. |
| 11:52:22 | 15 | Q. Okay. So you give this person that you believe is Barbara |
| 11:52:27 | 16 | your password. And does anything happen after that to your |
| 11:52:29 | 17 | account? |
| 11:52:36 | 18 | A. Yes. She logs in and then I got a text from a random |
| 11:52:37 | 19 | number. |
| 11:52:39 | 20 | Q. And what did that text say? |
| 11:52:43 | 21 | A. It was like, you're not getting your Snapchat back. |
| 11:52:46 | 22 | Q. It said -- could you repeat that? |
| 11:52:50 | 23 | A. It said you're not getting your Snapchat back; like, you're |
| 11:52:53 | 24 | not going to get logged in again. |
| 11:52:56 | 25 | Q. Okay. Did you want your Snapchat back? |

11:52:57  1   A.  Yes.

11:53:03  2   Q.  Did you have streaks with anyone at that time with friends?

11:53:05  3   A.  Yes.

11:53:07  4   Q.  And describe briefly to the members of the jury those

11:53:12  5   streaks and if they had any significance or importance to you.

11:53:17  6   A.  So streaks are when you send, like, pictures back and forth

11:53:23  7   to your friends, like, every single day.  So, like, every new

11:53:26  8   day the streak, like, goes up.

11:53:31  9   Q.  And if you lost the streak, would that matter to you?

11:53:41  10  A.  So, yeah.  So back then, like, or now still, like, people

11:53:46  11  will, like, keep up with their streak and even, like, let people

11:53:50  12  login to their Snapchat if they were, like, going away or their

11:53:56  13  phone was being taken.  Like, hey can you log into my snap so I

11:53:58  14  can keep my streaks up.

11:54:02  15  Q.  With teenagers, was that an important thing having those

11:54:02  16  streaks up?

11:54:03  17  A.  Yes.

11:54:08  18  Q.  Now, when this person posing as Barbara tells you you're not

11:54:16  19  getting your Snapchat account back, what do you think?  Does

11:54:17  20  anything go through your mind?

11:54:21  21  A.  I was, like -- I started getting, like, scared.  I was like,

11:54:24  22  what do you mean I'm not getting my snap back.

11:54:29  23  Q.  Now, in your Snapchat account, in your settings, was your

11:54:34  24  phone number there?  The actual phone number for your phone?

11:54:34  25  A.  Yes.

11:54:41   1   Q.  Okay.  Does this person then begin to text you?

11:54:42   2   A.  Yes.

11:54:47   3   Q.  And what do those texts initially say or ask you to do?

11:54:55   4   A.  So they were, like, you're not getting your snap back.  And

11:55:00   5   I was like, why?  Like, give me my snap back.  And they were

11:55:06   6   like, trying to get me to give them "my eyes only" password.

11:55:10   7   Q.  Let's talk about that.  Snapchat has a lot of cool features,

11:55:11   8   right?

11:55:11   9   A.  Yes.

11:55:15   10  Q.  And one of them, is it for "my eyes only"?

11:55:16   11  A.  Yes.

11:55:19   12  Q.  Can you describe what that is to the members of the jury?

11:55:24   13  A.  So "my eyes only" is like, so you have your pictures and

11:55:29   14  snap like the ones you save.  And then you have another, like,

11:55:33   15  section where it's, like, only for you.  And in order to get to

11:55:36   16  that section, you have to put in another password.

11:55:41   17  Q.  So let's say you took a silly picture.

11:55:42   18  A.  Uh-huh.

11:55:45   19  Q.  That maybe is a little embarrassing.  You don't want

11:55:49   20  everybody to see, but you want to save it because it's funny to

11:55:51   21  you.  Is that somewhere where you can put it?

11:55:52   22  A.  Yes.

11:55:55   23  Q.  And then Snapchat keeps that in that folder for you?

11:55:56   24  A.  Yes.

11:55:59   25  Q.  So now this person starts texting you and asks you for your

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

| | | |
|---|---|---|
| 11:56:05 | 1 | "my eyes only" password.  Do you give it? |
| 11:56:05 | 2 | A.  Eventually, yes. |
| 11:56:11 | 3 | Q.  Okay.  You said eventually.  What does that person begin |
| 11:56:16 | 4 | doing to get you to give that for "my eyes only" password? |
| 11:56:21 | 5 | A.  Saying like oh, you'll get your snap back if you give it to |
| 11:56:26 | 6 | me.  A lot of like back and forth being, like, no, yes, give it |
| 11:56:27 | 7 | to me. |
| 11:56:32 | 8 | Q.  Okay.  At first you believe that this person is going to |
| 11:56:34 | 9 | give you your snap account back? |
| 11:56:36 | 10 | A.  Yes. |
| 11:56:43 | 11 | Q.  And what application were you using to communicate with this |
| 11:56:45 | 12 | person? |
| 11:56:48 | 13 | A.  iMessage. |
| 11:56:58 | 14 | Q.  Now, in order to get your snap account back, did this person |
| 11:57:00 | 15 | ask you to send any pictures? |
| 11:57:03 | 16 | A.  Yes. |
| 11:57:07 | 17 | Q.  And did you want to send this person pictures? |
| 11:57:09 | 18 | A.  No. |
| 11:57:13 | 19 | Q.  Why didn't you -- did you eventually take pictures and send |
| 11:57:14 | 20 | them? |
| 11:57:14 | 21 | A.  Yes. |
| 11:57:16 | 22 | Q.  And why did you do that? |
| 11:57:18 | 23 | A.  Because I felt forced. |
| 11:57:22 | 24 | Q.  Okay. |
| 11:57:25 | 25 |         MS. VIAMONTES:  Permission to approach, Your Honor? |

| | | |
|---|---|---|
| 11:57:26 | 1 | THE COURT:  You may. |
| 11:57:28 | 2 | MS. VIAMONTES:  For the record, I'll be approaching |
| 11:57:35 | 3 | with Government's premarked 3 A through Z that have previously |
| 11:57:36 | 4 | been shown to defense counsel. |
| 11:57:39 | 5 | THE COURT:  A through Z as in zebra? |
| 11:57:41 | 6 | MS. VIAMONTES:  Correct. |
| 11:57:56 | 7 | THE COURT:  Okay.  Okay.  Go get them back. |
| 11:57:58 | 8 | MS. VIAMONTES:  Permission to approach, Your Honor? |
| 11:58:01 | 9 | THE COURT:  You may. |
| 11:58:01 | 10 | BY MS. VIAMONTES: |
| 11:58:18 | 11 | Q.  B.F., I've handed you Government's 3 A through Z for |
| 11:58:19 | 12 | identification.  Do you recognize those? |
| 11:58:20 | 13 | A.  Yes. |
| 11:58:22 | 14 | Q.  Could you just look through them and make sure?  You've had |
| 11:58:24 | 15 | a chance to look at those before, right? |
| 11:58:25 | 16 | A.  Yes. |
| 11:58:59 | 17 | Q.  Could you just quickly look through them?  B.F., what are |
| 11:59:00 | 18 | Government's A through Z? |
| 11:59:05 | 19 | A.  Pictures of me. |
| 11:59:07 | 20 | Q.  Do those pictures accurately show the jury the pictures that |
| 11:59:12 | 21 | you felt forced to create back in November of 2017? |
| 11:59:13 | 22 | A.  Yes. |
| 11:59:14 | 23 | MS. VIAMONTES:  Your Honor, at this time the Government |
| 11:59:18 | 24 | moves 3 A through Z into evidence. |
| 11:59:21 | 25 | MS. WEISS:  No objection. |

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED BY COMPUTER

| | | |
|---|---|---|
| 11:59:23 | 1 | THE COURT:  Without objection, admitted in evidence, 3 |
| 11:59:26 | 2 | A through Z. |
| 11:59:28 | 3 | (Government's Exhibits 3 A-Z in evidence) |
| 11:59:38 | 4 | MS. VIAMONTES:  Permission to publish, Your Honor. |
| 11:59:38 | 5 | THE COURT:  You may. |
| 11:59:38 | 6 | BY MS. VIAMONTES: |
| 11:59:43 | 7 | Q.  I'm going to put on the ELMO right now, 3 A.  All right, |
| 11:59:44 | 8 | B.F.? |
| 11:59:45 | 9 | A.  Okay. |
| 11:59:51 | 10 | Q.  Now 3 A, we see in this picture of you some cartoon like |
| 11:59:54 | 11 | features.  Can you describe what that is? |
| 11:59:56 | 12 | A.  They are Snapchat filters. |
| 11:59:59 | 13 | Q.  Okay.  Can you tell the members of the jury what the |
| 12:00:00 | 14 | Snapchat filters are? |
| 12:00:04 | 15 | A.  So you basically, like, put your face into, like, the camera |
| 12:00:08 | 16 | and then, like, little, like, animations, like, the dog you see, |
| 12:00:11 | 17 | that comes up on your face. |
| 12:00:13 | 18 | Q.  You can make a lot of funny things with Snapchat, right? |
| 12:00:16 | 19 | With this filter, with different filters? |
| 12:00:17 | 20 | A.  Yes. |
| 12:00:19 | 21 | Q.  Now, I'm not going to publish the other ones right now. |
| 12:00:21 | 22 | Okay? |
| 12:00:21 | 23 | A.  Okay. |
| 12:00:27 | 24 | Q.  But behind 3 A are there pictures of you nude? |
| 12:00:28 | 25 | A.  Yes. |

```
12:00:35   1    Q.  Let's talk about some of those things, okay?
12:00:37   2    A.  Okay.
12:00:42   3    Q.  Now, you mentioned that this person, you were speaking with
12:00:46   4    this person through iMessage.  You had an iPhone, right?
12:00:47   5    A.  Yes.
12:00:50   6    Q.  So on your end, were you just using your regular texting
12:00:50   7    app?
12:00:51   8    A.  Yes.
12:00:53   9    Q.  You don't know what kind of phone the other person had, do
12:00:54  10    you?
12:00:55  11    A.  No.
12:01:00  12    Q.  Okay.  So you weren't using like Kik or some other app?
12:01:00  13    A.  No.
12:01:05  14    Q.  All right.  So as you're -- as this person is communicating
12:01:09  15    with you, what type of pictures does the person begin to ask you
12:01:12  16    to make?
12:01:13  17    A.  Naked pictures.
12:01:18  18    Q.  Okay.  And does the person give you direction about
12:01:19  19    specifically --
12:01:20  20    A.  Yes.
12:01:22  21    Q.  -- what the person wanted?
12:01:22  22    A.  Yes.
12:01:26  23    Q.  And did the person ask you to do anything in those pictures
12:01:28  24    or to take for those pictures?
12:01:30  25    A.  Yes.
```

| | |
|---|---|
| 12:01:32 | 1 |
| 12:01:32 | 2 |
| 12:01:39 | 3 |
| 12:01:47 | 4 |
| 12:01:50 | 5 |
| 12:01:56 | 6 |
| 12:01:57 | 7 |
| 12:02:14 | 8 |
| 12:02:18 | 9 |
| 12:02:18 | 10 |
| 12:02:18 | 11 |
| 12:02:19 | 12 |
| 12:02:27 | 13 |
| 12:02:29 | 14 |
| 12:02:30 | 15 |
| 12:02:31 | 16 |
| 12:02:33 | 17 |
| 12:02:37 | 18 |
| 12:02:40 | 19 |
| 12:02:41 | 20 |
| 12:02:43 | 21 |
| 12:02:44 | 22 |
| 12:02:47 | 23 |
| 12:02:47 | 24 |
| 12:02:50 | 25 |

Q.  Tell the members of the jury what that person asked you to do.

A.  So like everything I do in these pictures, they were, like, directed.  Like, this person, like, asked me to put, like, words on myself.

Q.  And can you tell the members of the jury some of those things you had to put on yourself?

A.  Uh-huh.  Whore, sex slave, cum, ho.

Q.  Did the person tell you how to write these words on your body?

A.  Yes.

Q.  What did the person say?

A.  He told me, like, where to put the words.  Like, he was, like, get a marker.

Q.  And were you able to find a marker?

A.  Yes.

Q.  What did you find?

A.  A red Crayola marker.

Q.  And did you follow this person's demands?

A.  Yes.

Q.  And write those things on yourself?

A.  Yes.

Q.  Did you write across your chest at times?

A.  Yes.

Q.  Okay.  And did you write on your face?

```
12:02:52   1    A.  Yes.

12:03:00   2    Q.  B.F., did you want to write these things on your body?

12:03:01   3    A.  No.

12:03:02   4    Q.  Did you want to take these pictures?

12:03:09   5    A.  Sorry.  No.

12:03:17   6    Q.  Did you try to do something to get this person to stop

12:03:20   7    bothering you or to distract him?

12:03:23   8    A.  Can you repeat that?

12:03:26   9    Q.  Do you remember doing anything to get this person to lay

12:03:33  10    off, to stop bothering you or to distract him?

12:03:40  11    A.  Like after?  I did after.

12:03:42  12    Q.  Correct.  After you took the pictures.

12:03:43  13    A.  Yes.

12:03:45  14    Q.  You wanted it to stop, right?

12:03:45  15    A.  Yes.

12:03:49  16    Q.  And what did you do to try to get it to stop?

12:03:59  17    A.  So the day after, the morning after, he was -- the person

12:04:04  18    was like oh, you're going to send more.  And so I said no

12:04:14  19    because he had given me my Snapchat back, so I said no.  And I

12:04:23  20    was making excuses for not sending more.  I was saying I was at

12:04:28  21    the doctor's office and saying I was getting my phone taken

12:04:33  22    away.  So, yeah.

12:04:41  23    Q.  Now, this person that asked you for more, did the person

12:04:43  24    just accept your excuses and go away?

12:04:44  25    A.  No.
```

12:04:49   1   Q.  Was the person making any threats about what he or she may

12:04:50   2   do with those pictures?

12:04:51   3   A.  Yes.

12:04:52   4   Q.  What sort of threats?

12:04:57   5   A.  Like if you don't send more, I'm going to post the pictures.

12:05:03   6   Q.  Okay.  And when you say "post the pictures", for some of us

12:05:07   7   that might not use social media, what does that mean, to post a

12:05:09   8   picture?

12:05:17   9   A.  To post a picture means to like put in it a public place.

12:05:18  10   Q.  On the internet?

12:05:19  11   A.  On the internet.  Yes.

12:05:25  12   Q.  Okay.  And posting it on Snapchat, right?

12:05:26  13   A.  Yes.

12:05:35  14   Q.  Did you learn that your pictures in fact did get posted on

12:05:36  15   Snapchat?

12:05:37  16   A.  Yes.

12:05:39  17   Q.  And do you know where they were posted?

12:05:45  18   A.  On a girl K.L.'s account.

12:05:46  19   Q.  And is K.L. your friend?

12:05:48  20   A.  Yes.

12:05:55  21   Q.  How -- what happened after these pictures were posted of you

12:05:58  22   on K.L.'s account?  Did you tell your parents?

12:05:59  23   A.  Yes.

12:06:03  24   Q.  And why did you tell your parents?

12:06:06  25   A.  Because I didn't want the pictures to be there.

| | | |
|---|---|---|
| 12:06:09 | 1 | Q.  Okay.  Did you go to school that day when the pictures were |
| 12:06:10 | 2 | posted? |
| 12:06:14 | 3 | A.  No. |
| 12:06:21 | 4 | Q.  When those pictures were posted on K.L.'s account, do you |
| 12:06:25 | 5 | know whether other friends of yours are also friends of K.L.'s |
| 12:06:27 | 6 | and saw them? |
| 12:06:27 | 7 | A.  Yes. |
| 12:06:32 | 8 | Q.  And were a lot of kids in your school her friends? |
| 12:06:33 | 9 | A.  Yes. |
| 12:06:44 | 10 | Q.  Do you know if other friends besides K.L. also saw your |
| 12:06:44 | 11 | pictures? |
| 12:06:46 | 12 | A.  Yes. |
| 12:06:51 | 13 | Q.  Now, once you told your parents, did you go to the police? |
| 12:06:52 | 14 | A.  Yes. |
| 12:07:21 | 15 | Q.  Now, you mentioned at the very beginning of your testimony |
| 12:07:25 | 16 | that you live in Pembroke Pines.  Okay?  This courthouse is far |
| 12:07:27 | 17 | from Pembroke Pines, right? |
| 12:07:28 | 18 | A.  Yes. |
| 12:07:31 | 19 | Q.  Is Pembroke Pines in Broward County, Florida? |
| 12:07:31 | 20 | A.  Yes. |
| 12:07:37 | 21 | Q.  And B.F., when you're taking these pictures and this person |
| 12:07:40 | 22 | is asking you for pictures, where were you? |
| 12:07:43 | 23 | A.  In my bedroom. |
| 12:07:48 | 24 | Q.  Okay.  What time of day was it? |
| 12:07:50 | 25 | A.  Late at night. |

12:07:51  1    Q.  Repeat that?

12:07:52  2    A.  Late at night.

12:07:58  3    Q.  Late at night?  And how long did that take, from when the

12:08:04  4    person first began speaking to you until you were able to stop

12:08:06  5    communicating with the person that day?

12:08:08  6    A.  A couple of hours.

12:08:19  7    Q.  Okay.  And how did you comply with those demands to take the

12:08:21  8    pictures?  What did you use to take the pictures?

12:08:23  9    A.  My phone.

12:08:24  10   Q.  Your cellphone?

12:08:26  11   A.  Yes.

12:08:31  12   Q.  And how did you send those pictures to the person demanding

12:08:32  13   them?

12:08:34  14   A.  Through Snapchat.

12:08:40  15   Q.  So if he had your Snapchat, how is it that you were able to

12:08:42  16   send him the pictures?

12:08:48  17   A.  They told me to make a new Snapchat account.

12:08:52  18   Q.  Okay.  And did you do that?  Did you make a new Snapchat

12:08:53  19   account?

12:08:53  20   A.  Yes.

12:08:57  21   Q.  Okay.  Had the person asked you to download any other

12:08:58  22   messaging apps?

12:09:00  23   A.  Yes.

12:09:05  24   Q.  And when the person had asked you first to download other

12:09:07  25   messaging apps, what did you respond with?

```
12:09:08   1    A.  No.
12:09:14   2    Q.  Why?  What did you tell the person as to why you couldn't
12:09:21   3    download other messaging apps?
12:09:24   4    A.  Because my parents would get a notification.
12:09:29   5    Q.  So once you told this person I can't download Kik or another
12:09:32   6    messaging app, that person told you to download another Snapchat
12:09:33   7    account?
12:09:33   8    A.  Yes.
12:09:35   9    Q.  And you complied with that?
12:09:35  10    A.  Yes.
12:09:40  11    Q.  And through theirs, were you able to send the messages?
12:09:42  12    A.  Yes.
12:09:51  13         MS. VIAMONTES:  No further questions, Your Honor.
12:09:53  14    Permission to publish after the witness has been excused.
12:09:56  15         THE COURT:  All right.  Cross?
12:09:56  16                     CROSS-EXAMINATION
12:10:00  17    BY MS. WEISS:
12:10:09  18    Q.  Good morning.  My name is Clea and I know it's difficult to
12:10:12  19    be here in court.  If any of the questions I ask make you
12:10:17  20    uncomfortable, will you tell me?  If you're uncomfortable?
12:10:18  21    A.  Oh, yes.
12:10:23  22    Q.  Okay.  So in November 2017, your Snapchat was taken over
12:10:28  23    after you were sort of tricked into giving out your password to
12:10:31  24    somebody you thought was an old friend, right?
12:10:31  25    A.  Yes.
```

12:10:35  1    Q.   You started getting text messages in iMessage from the

12:10:37  2    person who took over your account.

12:10:39  3    A.   Yes.

12:10:44  4    Q.   And they asked you to talk on Kik messenger, right?

12:10:44  5    A.   Yes.

12:10:46  6    Q.   And you told them no.

12:10:47  7    A.   Yes.

12:10:50  8    Q.   You said like your parents would get a notification if you

12:10:52  9    downloaded a new app, right?

12:10:53  10   A.   Yes.

12:10:58  11   Q.   That wasn't actually true though, right?  That your parents

12:11:00  12   would get a notification?

12:11:01  13   A.   Yes, it was false.

12:11:05  14   Q.   But you told them that because you didn't want to download

12:11:06  15   Kik.

12:11:06  16   A.   Yes.

12:11:10  17   Q.   So you never had to download that app, right?

12:11:11  18   A.   Correct.

12:11:15  19   Q.   So then the person asked to you send nude images in order to

12:11:18  20   get your Snapchat back.

12:11:20  21   A.   Yes.

12:11:25  22   Q.   So you created a second Snapchat account in order to be able

12:11:27  23   to send images, right?

12:11:28  24   A.   Yes.

12:11:31  25   Q.   And you did that because you wanted your original Snapchat

```
12:11:33   1    account back.

12:11:34   2    A.  Yes.

12:11:35   3    Q.  It was important to you.

12:11:37   4    A.  Yes.

12:11:43   5    Q.  And ultimately you complied with what the person was asking

12:11:47   6    you and you did send images?

12:11:48   7    A.  Yes.

12:11:52   8    Q.  And then you actually got your Snapchat, your original

12:11:54   9    Snapchat account back, right?

12:11:55  10    A.  Yes.

12:12:01  11    Q.  After you got your Snapchat account back, that same person

12:12:03  12    contacted you again, right?

12:12:04  13    A.  Yes.

12:12:07  14    Q.  And that's when you went to your mom.

12:12:08  15    A.  Yes.

12:12:15  16    Q.  Was there anything stopping you from going to your mom

12:12:18  17    before you sent those images?

12:12:28  18    A.  Like, fear.

12:12:29  19    Q.  I'm sorry.  Can you say that again?

12:12:31  20    A.  Like, fear.

12:12:34  21    Q.  Fear, yeah.  So you chose to do the images instead of

12:12:37  22    talking to your mom about it.

12:12:39  23    A.  Yes.

12:12:46  24    Q.  And you chose to take images instead of just creating a new

12:12:49  25    account on Snapchat and telling your friends that you had a new
```

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED BY COMPUTER

| | | |
|---|---|---|
| 12:12:54 | 1 | user name. |
| 12:12:55 | 2 | A.  Yes. |
| 12:13:03 | 3 | Q.  Now, after you told your mom, you stopped communicating with |
| 12:13:05 | 4 | the person who was messaging you, right? |
| 12:13:07 | 5 | A.  Yes. |
| 12:13:14 | 6 | Q.  And then after that, the next day you went to the police. |
| 12:13:17 | 7 | A.  The same day. |
| 12:13:23 | 8 | Q.  Same day.  Now, in total you've spoken to the police, in |
| 12:13:29 | 9 | like a long interview with police, three times, right? |
| 12:13:34 | 10 | A.  I'm not sure. |
| 12:13:51 | 11 | MS. WEISS:  Thank you.  No further questions. |
| 12:13:53 | 12 | MS. VIAMONTES:  Briefly, Judge. |
| 12:13:55 | 13 | REDIRECT EXAMINATION |
| 12:13:56 | 14 | BY MS. VIAMONTES: |
| 12:14:03 | 15 | Q.  B.F., defense counsel asked you about your choice in taking |
| 12:14:10 | 16 | these pictures.  Did you choose, did you want to take those |
| 12:14:10 | 17 | pictures? |
| 12:14:12 | 18 | A.  No. |
| 12:14:14 | 19 | Q.  What's the only reason you took those pictures? |
| 12:14:18 | 20 | A.  Because I was scared. |
| 12:14:20 | 21 | Q.  Who were you afraid of? |
| 12:14:23 | 22 | A.  The person asking me to take the pictures. |
| 12:14:28 | 23 | Q.  And is that why you also created a new Snapchat account, |
| 12:14:30 | 24 | because of your fear of that person? |
| 12:14:31 | 25 | A.  Yes. |

| | | |
|---|---|---|
| 12:14:34 | 1 | Q.  Do you remember the user name of the new Snapchat account? |
| 12:14:39 | 2 | A.  ******** ****. |
| 12:14:44 | 3 | Q.  And what was your original Snapchat account user name? |
| 12:14:47 | 4 | A.  **** **** ****. |
| 12:14:50 | 5 | MS. VIAMONTES:  Nothing further, Your Honor. |
| 12:14:52 | 6 | THE COURT:  All right.  Thank you, Miss.  You are |
| 12:14:52 | 7 | excused. |
| 12:14:59 | 8 | Why don't we break until quarter of 2.  That gives us |
| 12:15:02 | 9 | an hour and a half. |
| 12:15:03 | 10 | Ladies and gentlemen of the jury, you're reminded that |
| 12:15:07 | 11 | you're not to discuss the case with anyone or permit anyone to |
| 12:15:09 | 12 | discuss the case with you.  It's a nice day, you don't have to |
| 12:15:12 | 13 | stay in the building.  But if you want to stay in the building, |
| 12:15:15 | 14 | there is food on the 7th floor, at least that's what they call |
| 12:15:16 | 15 | it. |
| 12:15:18 | 16 | On the other hand, across the street is Miami-Dade |
| 12:15:22 | 17 | College.  Where there's kids, there's food always.  And on |
| 12:15:26 | 18 | Flagler Street there are -- excuse me.  There are all sorts of |
| 12:15:32 | 19 | places to eat.  There's Italian places, Greek places, Jamaican |
| 12:15:36 | 20 | places, everything.  Walk around, learn a little bit about |
| 12:15:39 | 21 | downtown.  I think you'll find it interesting. |
| 12:15:42 | 22 | You're reminded not to discuss the case with anyone. |
| 12:15:45 | 23 | Don't read or listen to anything touching on the case.  Don't do |
| 12:15:48 | 24 | any research or make any investigation.  Also, do not have any |
| 12:15:52 | 25 | contact with the attorneys, parties or witnesses in the case. |

12:15:55  1    Finally, remember do not form any opinion about the case until

12:15:58  2    all the evidence is in.  We're moving along pretty quickly so

12:16:01  3    we'll see if we can get this done quickly.

12:16:04  4         When you go, please leave.  I'm going to keep everybody

12:16:06  5    in the courtroom for a couple minutes so you can get off the

12:16:10  6    floor and then disperse out into the field and I'll see you at

12:16:13  7    quarter of 2.  All right?

12:16:16  8         COURT SECURITY OFFICER:  All rise for the jury.

12:16:20  9         (Jury out at 12:16 p.m.)

12:16:55  10        THE COURT:  Can we get an agreement on the record that

12:16:58  11   whenever any of the victims' names are mentioned in open court,

12:17:03  12   the court reporter should substitute for them initials?

12:17:03  13        MR. NATALE:  Yes.

12:17:04  14        MS. ANTON:  Yes, Your Honor.

12:17:06  15        THE COURT:  Both sides agree to that?  Okay.  Then

12:17:07  16   that's done.

12:17:10  17        All right.  We'll see you at quarter of 2.  Please

12:17:13  18   don't leave the courtroom for about a minute or two minutes.

12:17:16  19   Give them time to get off the floor.  All right?  We'll be in

12:17:18  20   recess.

12:17:37  21        MS. VIAMONTES:  Your Honor, where would you like

12:17:39  22   exhibits that are admitted into evidence to be held?

12:17:40  23        THE COURT:  I don't care.

12:17:41  24        MS. VIAMONTES:  Is it okay if it's up here?

12:17:44  25        THE COURT:  I would say put them up here where Wanda --

```
12:17:49   1    in front of where Wanda is, right here on the bar.
12:17:50   2              MS. VIAMONTES:  On the bar.
12:17:51   3              THE COURT:  Yeah.
12:17:53   4              MS. VIAMONTES:  Thank you.
12:18:00   5              (Lunch recess)
13:48:54   6              (Jury in at 1:48 p.m.)
13:49:11   7              COURT SECURITY OFFICER:  All rise for the jury.
13:50:28   8              THE COURT:  Be seated please.  Can I see the lawyers
13:50:36   9    sidebar for just a second please?  Promise it won't take more
13:50:40  10    than 10 seconds.  Maybe more, but not much.
13:50:40  11              (SIDEBAR CONFERENCE:
13:50:47  12              THE COURT:  Just got a letter from the employer of
13:50:53  13    Number 3, Itza Osejo.  Some food distribution company in Coral
13:50:57  14    Gables that says I understand that she's been summonsed for jury
13:51:01  15    duty and could you please excuse her because this is a real busy
13:51:07  16    time and it's a real -- so I'm having Wanda write back and say
13:51:10  17    no, she hasn't been summonsed for a jury, she has been selected
13:51:14  18    for a jury and she's been seated on a jury and we've already
13:51:17  19    started the trial, and it would be a tremendous inconvenience to
13:51:19  20    dismiss her at this point.
13:51:23  21              MR. NATALE:  Isn't there the local rule that says --
13:51:26  22              THE COURT:  I don't know how many employees they have.
13:51:30  23    Doesn't look like a real -- well, based on this moron's letter,
13:51:34  24    doesn't look like a real big outfit.  So anyway, I wanted you to
13:51:38  25    be aware of this.  Number 3, it's Osejo.
```

13:51:39  1          (END OF SIDEBAR)

13:51:47  2          THE COURT:  You may proceed.

13:51:54  3          MS. ANTON:  Thank you, Your Honor.  The Government

13:52:01  4  would seek to publish 3 A through Z prior to the next witness.

13:52:04  5          THE COURT:  Go ahead.  Everybody's monitors working?

13:52:13  6  Better the other way.

13:52:20  7          (Exhibits published)

13:53:45  8          MS. ANTON:  The Government now calls its next witness

13:54:18  9  which is Detective Kevin Bartechko.

13:54:23  10          THE COURT:  When you get to the chair, please remain

13:54:30  11  standing raise your right hand.

13:54:30  12          KEVIN BARTECHKO, GOVERNMENT WITNESS, SWORN.

13:54:31  13          THE COURT:  Please be seated.  Get as close to the

13:54:34  14  microphone as you can, pull the chair up, the microphone back,

13:54:38  15  speak loudly, tell us your name and spell it please.

13:54:43  16          THE WITNESS:  Kevin Bartechko, B-A-R-T-E-C-H-K-O.

13:54:44  17          THE COURT:  You may proceed, ma'am.

13:54:46  18          MS. ANTON:  Thank you.

13:54:46  19                      DIRECT EXAMINATION

13:54:46  20      BY MS. ANTON:

13:54:46  21  Q.  Good afternoon?

13:54:47  22  A.  Good afternoon.

13:54:50  23  Q.  Would you please formally introduce yourself to the ladies

13:54:52  24  and gentlemen of our jury?

13:54:56  25  A.  I'm Officer Kevin Bartechko from Fairfax City, Virginia.

90

```
13:54:58   1    Q.  And which police department do you work for?

13:55:03   2    A.  City of Fairfax, Virginia.

13:55:03   3    Q.  Okay.  Welcome to South Florida.

13:55:05   4         How long have you been with the city of Fairfax?

13:55:08   5    A.  I've worked for the city of Fairfax for seven years.

13:55:11   6    Q.  Back in 2017, were you working for the city of Fairfax?

13:55:12   7    A.  Yes, I was.

13:55:15   8    Q.  And as a detective in 2017 with Fairfax City Police

13:55:18   9    Department, what did your regular duties consist of?

13:55:20   10   A.  I was a detective assigned to the criminal investigations

13:55:22   11   division.

13:55:26   12   Q.  And as a detective in that division, did you handle a wide

13:55:26   13   variety of cases?

13:55:28   14   A.  Yes, I did.

13:55:33   15   Q.  Okay.  And did you, back then, become involved with an

13:55:36   16   investigation into a child exploitation case?

13:55:36   17   A.  Yes, I did.

13:55:39   18   Q.  And was that in December of 2017?

13:55:40   19   A.  Yes, ma'am.

13:55:45   20   Q.  Okay.  Could you tell the ladies and gentlemen of our jury

13:55:49   21   how you became involved in that case and what you did in regards

13:55:50   22   to that case?

13:55:54   23   A.  The case was involving a Snapchat exploitation case, was

13:55:57   24   referred to the criminal investigation division.  I picked it up

13:56:01   25   and it was formally assigned to me to start the investigation
```

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED BY COMPUTER

13:56:03   1   into the Snapchat infiltration.

13:56:07   2   Q.   Okay.   This Snapchat infiltration case, did it also involve

13:56:08   3   a minor?

13:56:09   4   A.   Yes, ma'am.

13:56:12   5   Q.   And did you become the lead detective, so to speak, on that

13:56:13   6   case?

13:56:13   7   A.   Yes, I did.

13:56:17   8   Q.   Okay.   And did you have the occasion to meet with the minor

13:56:19   9   and the parents of that minor?

13:56:19   10   A.   Yes, I did.

13:56:20   11   Q.   Was it a female?

13:56:21   12   A.   Yes.

13:56:23   13   Q.   Okay.   This was back in Fairfax?

13:56:24   14   A.   Yes, ma'am.

13:56:27   15   Q.   Okay.   And did they come into the police department

13:56:30   16   complaining that a Snapchat account had been hacked?

13:56:30   17   A.   Yes.

13:56:32   18   Q.   And when they responded to the police department, did they

13:56:35   19   bring with them any type of e-mail that they received from

13:56:36   20   Snapchat?

13:56:36   21   A.   Yes, they did.

13:56:38   22   Q.   What was that e-mail?

13:56:41   23   A.   It was an e-mail saying that their account or the account,

13:56:44   24   the girl's account, had been accessed from a Galaxy Note 3

13:56:49   25   located roughly in the area of Ashburn, Virginia and provided an

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED BY COMPUTER

13:56:51  1   IP address.

13:56:54  2   Q.  In terms of that Snapchat infiltration, was the demand for

13:56:56  3   the girl to produce nude photographs?

13:56:57  4   A.  Yes.

13:57:01  5   Q.  Okay.  And I'm going to show you what's been, I believe by

13:57:04  6   stipulation, 88?  Entered --

13:57:06  7        MS. ANTON:  The Government would offer 88 into evidence

13:57:09  8   without an objection from the defense, I believe.

13:57:11  9        MR. NATALE:  No objection.

13:57:13  10       MS. ANTON:  Permission to approach?

13:57:15  11       THE COURT:  You may.  Without objection?

13:57:18  12       MR. NATALE:  That's correct.  No objection.

13:57:19  13       MS. ANTON:  And I'll move it into evidence, Your Honor,

13:57:21  14   and request to publish instead of approaching.

13:57:22  15       THE COURT:  I'm sorry?

13:57:25  16       MS. ANTON:  I'll move it into evidence and ask

13:57:28  17   permission to publish rather than approaching.

13:57:30  18       THE COURT:  88?  You may publish.  Admitted in evidence

13:57:31  19   without objection.

13:57:31  20       (Government's Exhibit 88 in evidence)

13:57:31  21    BY MS. ANTON:

13:57:44  22   Q.  Okay.  Detective Bartechko, is this Exhibit 88, is this a

13:57:48  23   copy of the e-mail that the juvenile brought into the police

13:57:50  24   department in regards to the case you're talking about?

13:57:51  25   A.  Yes, ma'am.

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

13:57:55  1    Q.  Okay.  And do you know what that e-mail is and how it gets

13:57:56  2    generated?

13:57:59  3    A.  To my knowledge, it's sent from Snapchat if the account is

13:58:05  4    accessed on an IP address that's not known to Snapchat to be the

13:58:08  5    regular IP address to access that account.

13:58:11  6    Q.  Okay.  So as the detective on the case, once this girl comes

13:58:15  7    in and tells you what had happened and you have received a copy

13:58:19  8    of this e-mail, what were you able to do with the information

13:58:20  9    contained within this e-mail?

13:58:26  10   A.  I was able to obtain that the IP address belonged to

13:58:32  11   Verizon, court paperwork to get the account information from

13:58:33  12   Verizon.

13:58:36  13   Q.  Was that a court order that you had to to do Verizon?

13:58:37  14   A.  Yes, ma'am.

13:58:42  15   Q.  And you were able to do a search on the open source internet

13:58:49  16   to determine that this IP address, which is 70.106.225.162,

13:58:51  17   belonged to Verizon?

13:58:51  18   A.  Yes, ma'am.

13:58:54  19   Q.  But you're not able to do a search on the open internet to

13:58:58  20   determine the address of that IP address, are you?

13:59:00  21   A.  Not to my knowledge.

13:59:02  22   Q.  Can you explain to the jury what an IP address is?

13:59:07  23   A.  The IP address is internet protocol address.  It's assigned

13:59:11  24   by the provider to an account holder.  It's sort of like

13:59:16  25   assigning an address to a house, for -- essentially.

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED BY COMPUTER

13:59:21   1    Q.   Okay.  So -- excuse me.  Once you looked up that IP address

13:59:27   2    number and determined it was Verizon, did you have to send legal

13:59:31   3    process to Verizon in order to get the subscriber who actually

13:59:34   4    owns that IP address?

13:59:34   5    A.   Yes, ma'am.

13:59:38   6    Q.   Did you receive reciprocal documents from Verizon telling

13:59:42   7    you what address that IP address was registered to?

13:59:43   8    A.   Yes, I did.

13:59:45   9         MS. ANTON:  At this time, I'd like to move Government's

13:59:45   10   24.

13:59:46   11        MR. NATALE:  No objection.

13:59:48   12        MS. ANTON:  I'd like to move Government's 24 into

13:59:49   13   evidence.

13:59:51   14        THE COURT:  Without objection, 24 is admitted in

13:59:52   15   evidence.

13:59:52   16        (Government's Exhibit 24 in evidence)

13:59:55   17        MS. ANTON:  Permission to publish?

13:59:58   18        THE COURT:  You may.

13:59:59   19   BY MS. ANTON:

14:00:06   20   Q.   Detective, I'm putting up on the ELMO what's in evidence now

14:00:10   21   as Government's Exhibit 24.  Is this the legal process that you

14:00:12   22   sent to Verizon?

14:00:17   23   A.   That looks like the return documents from the legal process.

14:00:23   24   Q.   Okay.  So now I'm going to flip the page of Government's

14:00:27   25   Exhibit 24 and let this focus for a second.  Can you see that on

14:00:28   1   your screen, Detective?

14:00:29   2   A.  Yes, ma'am.

14:00:32   3   Q.  In this return from Verizon -- so that's their response,

14:00:34   4   right, to your legal process?

14:00:34   5   A.  Correct.

14:00:38   6   Q.  Did they tell you the address that that IP address is

14:00:39   7   registered to?

14:00:43   8   A.  Yes, ma'am.  It's -- looks like six lines down under

14:00:44   9   customer information there has the address.

14:00:47   10   Q.  And for customer information, does it say the customer name

14:00:48   11   is Jerry Browning?

14:00:49   12   A.  Correct.

14:00:50   13   Q.  And does it list an address?

14:00:51   14   A.  Yes, it does.

14:00:53   15   Q.  And what is that address?

14:00:59   16   A.  21767 Ascot Court in Ashburn, Virginia.

14:01:03   17   Q.  Once you have this information regarding the IP address and

14:01:06   18   a physical address in Ashburn, Virginia, what's the next thing

14:01:09   19   that you do in order to move forward in your case?

14:01:14   20   A.  I began writing a search warrant for that address to try to

14:01:16   21   obtain the evidence in the case.

14:01:19   22   Q.  Okay.  Is that search warrant based upon the probable cause

14:01:22   23   and evidence from your investigation?

14:01:24   24   A.  Yes, ma'am.

14:01:26   25        MS. ANTON:  At this time, the Government moves Exhibit

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

14:01:27  1    4 into evidence.

14:01:27  2              MR. NATALE:  No objection.

14:01:30  3              THE COURT:  Without objection, Exhibit 4 is admitted in

14:01:31  4    evidence.

14:01:32  5              MS. ANTON:  Permission to publish, Your Honor?

14:01:34  6              THE COURT:  You may.

14:01:34  7              (Government's Exhibit 4 in evidence)

14:01:34  8       BY MS. ANTON:

14:01:39  9    Q.  Okay, Detective.  I have up on the ELMO Government's Exhibit

14:01:43  10   4.  Is this a copy of the search warrant that you just testified

14:01:43  11   that you wrote?

14:01:44  12   A.  Yes, ma'am.

14:01:50  13   Q.  Is that for the address of 2167 Ascot Court in Virginia?

14:01:53  14   A.  21767 Ascot Court.

14:01:54  15   Q.  I apologize.  Did I misspeak?

14:01:58  16              Is that within your jurisdiction there in Fairfax?

14:01:58  17   A.  No, ma'am.

14:02:00  18   Q.  Okay.  So in order to get this search warrant executed to

14:02:03  19   serve it on the house, what did you have to do?

14:02:05  20   A.  I had to work with detectives from Louden County Sheriff's

14:02:09  21   Office which is where Ashburn, Virginia falls.

14:02:13  22   Q.  Okay.  And so once you filled out your search warrant, did

14:02:16  23   you have to take it to a judge in Virginia to get it signed in

14:02:18  24   order to get permission to go to that house?

14:02:21  25   A.  It went before a magistrate in Fairfax.

14:02:31   1    Q.   Okay.  Okay.  So once you now have a search warrant in hand

14:02:36   2    for that address, and you have the facts of your case and the

14:02:39   3    evidence that you've developed, what's the next thing that law

14:02:42   4    enforcement does up there in Fairfax?

14:02:47   5    A.   I coordinated with Detective Oksanen from Louden County

14:02:51   6    Sheriff's Office to coordinate how we were going to go about

14:02:51   7    serving the search warrant and conducting the search.

14:02:54   8    Q.   And did you have to coordinate with that other detective

14:02:57   9    because he was with the county sheriff and you were with a local

14:02:58   10   city?

14:02:58   11   A.   Yes, ma'am.

14:03:01   12   Q.   Okay.  So it was for jurisdictional purposes that you all

14:03:02   13   work together?

14:03:02   14   A.   Yes, ma'am.

14:03:05   15   Q.   Okay.  So when did you decide that the search warrant would

14:03:07   16   be executed?  Do you recall the date?

14:03:10   17   A.   Yes, it was January 26, 2018.

14:03:14   18   Q.   Okay.  And before you execute the search warrant, can you

14:03:17   19   describe for the jury what types of items were you looking for

14:03:19   20   in the search?

14:03:22   21   A.   Electronics.  Specifically, we were obviously looking for

14:03:25   22   the Galaxy Note 3 that that e-mail indicated to.  We were

14:03:28   23   looking for any electronics that might have been used in the

14:03:33   24   commission of the case.  Potential for other things we were

14:03:38   25   looking for would be storage options like hard drives, SD cards,

14:03:40   1    that sort of thing.  Records, documents anything that might have
14:03:44   2    been printed out.  And also, all the digital evidence contained
14:03:49   3    within all of the digital items, the phones, the storage
14:03:50   4    devices, et cetera.
14:03:52   5    Q.  Okay.  So at that point, is it fair to say that you were
14:03:56   6    looking for all of those types of electronics in the residence,
14:04:00   7    but you didn't yet have a subject of who you were looking for.
14:04:00   8    A.  That's correct.
14:04:05   9    Q.  Okay.  So that morning of the 26th, did you and the other
14:04:08   10   members of law enforcement meet and go over your operational
14:04:11   11   plan and discuss how you would execute this search warrant?
14:04:11   12   A.  Yes, ma'am.
14:04:15   13   Q.  Okay.  And could you briefly describe for us how the search
14:04:15   14   warrant was executed?
14:04:20   15   A.  The Louden County Sheriff's Office entered the residence.
14:04:26   16   They made the residence safe for the rest of us to go in.  I
14:04:29   17   went in with the rest of the detectives to explain why we were
14:04:31   18   there and to basically get the search started.
14:04:35   19   Q.  Okay.  And did you guys go early in the morning to that
14:04:35   20   residence?
14:04:36   21   A.  Yes, ma'am.
14:04:39   22   Q.  Did you know before you went there how many people lived
14:04:41   23   there or who lived there?
14:04:42   24   A.  No, ma'am.
14:04:46   25   Q.  Okay.  Did the information you got from Verizon just give

14:04:47   1   you one name?

14:04:47   2   A.  Yes.

14:04:49   3   Q.  And was that Mr. Browning?

14:04:49   4   A.  Yes.

14:04:53   5   Q.  And did you determine that he lived in that residence?

14:04:56   6   A.  Yeah.  We assumed he lived in that residence just based off

14:05:00   7   of the vehicles outside had the tags that came back to

14:05:03   8   Mr. Browning and also the Verizon account information.

14:05:06   9   Q.  Okay.  So when law enforcement went into the house that

14:05:09  10   morning, how many people were inside that residence?

14:05:09  11   A.  Four.

14:05:12  12   Q.  And who was it?

14:05:16  13   A.  Joseph Woodson, Brandon Woodson and then his mother and

14:05:18  14   sister.  I'm sorry, I can't remember their names.

14:05:21  15   Q.  So there were four occupants of that house?

14:05:21  16   A.  Yes, ma'am.

14:05:24  17   Q.  And what did law enforcement do when you first arrived with

14:05:26  18   the search warrant to make it safe?

14:05:30  19   A.  They would have just went through to, we say clear the

14:05:33  20   residence, just to make sure that there's no threats to the

14:05:37  21   detectives that are going into conduct the search.  They bring

14:05:40  22   everybody from the residence to one central location so that

14:05:43  23   way, they can safely conduct the rest of the search of the

14:05:48  24   residence and then we can adequately brief everybody all at one

14:05:48  25   time.

14:05:50  1    Q.  So is everybody put in one area of the house?

14:05:51  2    A.  Yes.

14:05:55  3    Q.  And are the occupants of the house told that they're free to

14:05:57  4    leave and they're not under arrest?

14:05:58  5    A.  To my knowledge, yeah.

14:06:01  6    Q.  So you were going in with a search warrant, not an arrest

14:06:03  7    warrant to arrest anybody; is that correct?

14:06:04  8    A.  That's correct.

14:06:07  9    Q.  So once you had the four occupants of the house together in

14:06:11 10    one room, tell us what happened in terms of did you talk to them

14:06:13 11    and how did you proceed.

14:06:17 12    A.  We split up so other detectives were to conduct the actual

14:06:22 13    search.  Myself and Detective Oksanen from Louden County Sheriff

14:06:25 14    were going to be interviewing people inside the house to see if

14:06:27 15    we could determine who might be a suspect.

14:06:30 16    Q.  Okay.  So in addition to taking any electronics that you saw

14:06:34 17    in the house, specifically looking for that Note 3 phone, was

14:06:38 18    another one of your goals to determine who may have been the

14:06:39 19    person behind that phone?

14:06:39 20    A.  Yes.

14:06:42 21    Q.  Okay.  And do you recall who you interviewed first?

14:06:43 22    A.  Yes, Brandon Woodson.

14:06:47 23    Q.  Okay.  Where do you do those interviews since the house is

14:06:48 24    being searched?

14:06:53 25    A.  We try to go to as private of an area as we can whenever we

14:06:56  1   do interviews.  In this case, we went out to Detective Oksanen's

14:07:01  2   van.  It was -- because it was January, it was cold and the

14:07:05  3   house was a townhouse, kind of tough to actually get a private

14:07:07  4   area to do the interview, so we figured that was probably the

14:07:12  5   most private and yet most comfortable way to conduct the

14:07:12  6   interview.

14:07:14  7   Q.  Did you want to interview all four of those people together

14:07:15  8   or separately?

14:07:16  9   A.  Separately.

14:07:19  10  Q.  Why is that?

14:07:24  11  A.  Make sure nobody is able to bounce stories off each other

14:07:28  12  and corroborate stores.  Also, that way, if somebody feels more

14:07:31  13  comfortable not telling us things in front of family members or

14:07:34  14  that sort of thing, it's a little bit more comfortable maybe for

14:07:35  15  them.

14:07:38  16  Q.  Okay.  So you said that they were walked outside to

14:07:39  17  Detective Oksanen's van?

14:07:40  18  A.  Yes, ma'am.

14:07:43  19  Q.  Is that like a marked police van or was it a regular

14:07:44  20  minivan?

14:07:49  21  A.  As I recall, it was just a fairly standard looking minivan.

14:07:51  22  No police markings on it.

14:07:54  23  Q.  And how are you and Detective Oksanen, who you were with,

14:07:56  24  how are you guys dressed when you're doing the interviews with

14:07:58  25  the people in the car?

14:08:00   1    A.  I was in a coat and khaki pants.

14:08:03   2    Q.  And how about Detective Oksanen?

14:08:07   3    A.  I don't recall exactly what he was wearing, but he wasn't in

14:08:10   4    a standard police uniform or anything like that.  No vests or

14:08:11   5    anything like that as I recall.

14:08:14   6    Q.  Okay.  When you walk each of the occupants out to the car,

14:08:18   7    did you walk them out willingly or were they in handcuffs?  Can

14:08:19   8    you explain how that happened?

14:08:23   9    A.  Nobody was in handcuffs.  We walked them out, I guess,

14:08:26   10   willingly.  Nobody was in handcuffs or anything like that,

14:08:27   11   escorted or anything.

14:08:29   12   Q.  Okay.  And so the first person you said you interviewed was

14:08:31   13   who?

14:08:31   14   A.  Brandon Woodson.

14:08:38   15   Q.  And do you know who Brandon Woodson is in regards to Joseph

14:08:38   16   Woodson?

14:08:39   17   A.  His brother.

14:08:43   18   Q.  Do you know if it's an older or younger brother?

14:08:43   19   A.  I don't recall.

14:08:46   20   Q.  So you walked Brandon Woodson out to the car and had a

14:08:48   21   conversation with him in the minivan?

14:08:48   22   A.  Yes, ma'am.

14:08:51   23   Q.  Okay.  You said this was in January in Virginia.

14:08:52   24   A.  Yes.

14:08:57   25   Q.  So we don't know what that's like down here, but it was

| | | |
|---|---|---|
| 14:08:58 | 1 | probably pretty cold? |
| 14:09:01 | 2 | A.  It was pretty cold that day as I recall. |
| 14:09:04 | 3 | Q.  So you were able to speak comfortably in the minivan with |
| 14:09:06 | 4 | the heat on? |
| 14:09:06 | 5 | A.  Yes. |
| 14:09:07 | 6 | Q.  Did you have audio too? |
| 14:09:08 | 7 | A.  Yes, we did. |
| 14:09:10 | 8 | Q.  So you were able to record everything that these people |
| 14:09:11 | 9 | would tell you? |
| 14:09:12 | 10 | A.  Yes. |
| 14:09:14 | 11 | Q.  Okay.  And so you had a conversation with Brandon Woodson? |
| 14:09:15 | 12 | A.  Yes. |
| 14:09:17 | 13 | Q.  And after that conversation, what did you do? |
| 14:09:22 | 14 | A.  We determined from talking to Brandon that he wasn't our |
| 14:09:26 | 15 | suspect.  So we escorted him back into the house or let him go |
| 14:09:30 | 16 | back in the house and asked to speak to Joseph. |
| 14:09:32 | 17 | Q.  How did you determine that Brandon Woodson wasn't your |
| 14:09:35 | 18 | suspect? |
| 14:09:38 | 19 | A.  He didn't seem to have any knowledge of anything related to |
| 14:09:42 | 20 | Snapchat or any electronic -- he seemed like he didn't have that |
| 14:09:47 | 21 | -- he had no idea what we were talking about.  We were asking |
| 14:09:50 | 22 | him some of the questions to kind of get into the interview.  He |
| 14:09:53 | 23 | didn't have any knowledge.  He allowed us to look at the phones, |
| 14:09:58 | 24 | he had none of the apps, the Snapchat app or anything on his |
| 14:09:58 | 25 | phone. |

14:10:01   1    Q.  So were you going through a process of trying to rule out

14:10:03   2    people who you thought potentially didn't have any involvement?

14:10:04   3    A.  Yes, ma'am.

14:10:05   4    Q.  And did you rule out Brandon Woodson?

14:10:06   5    A.  Yes.

14:10:09   6    Q.  Okay.  So can you tell the jury who the next person is that

14:10:11   7    you brought out to the car to have a conversation with?

14:10:12   8    A.  Joseph Woodson.

14:10:16   9    Q.  Okay.  And were you with the other detective when you walked

14:10:17  10    from the house to the car?

14:10:18  11    A.  Yes.

14:10:21  12    Q.  And was Joseph Woodson in handcuffs when you walked to the

14:10:22  13    car?

14:10:22  14    A.  No, ma'am.

14:10:26  15    Q.  Were you having an informal conversation with him on the way

14:10:26  16    to the car?

14:10:26  17    A.  Yes.

14:10:29  18    Q.  Okay.  Do you remember what the subject was about?

14:10:31  19    A.  About video games as I remember.

14:10:34  20    Q.  Okay.  And did you walk him to that same minivan that you

14:10:36  21    explained you walked Brandon to?

14:10:37  22    A.  Yes, ma'am.

14:10:40  23    Q.  Okay.  And did you sit in the car with Joseph Woodson and

14:10:43  24    have a conversation about the facts of your case?

14:10:44  25    A.  Yes, I did.

14:10:47  1    Q.  And how long do you think you stayed in the car with him

14:10:48  2    for?

14:10:50  3    A.  Approximately an hour.  Maybe.

14:10:54  4    Q.  And did you ask him a series of questions while in the car?

14:10:55  5    A.  Yes.

14:10:58  6    Q.  Okay.  You were with Detective Oksanen in the car; is that

14:10:58  7    correct?

14:10:59  8    A.  Yes, ma'am.

14:11:01  9    Q.  Who was sitting in the front seat and can you tell us where

14:11:03  10   everybody was sitting in that car?

14:11:07  11   A.  Detective Oksanen was in the front driver's seat.  Joseph

14:11:10  12   Woodson was in the front passenger's seat and I was seated

14:11:13  13   behind Detective Oksanen in the rear of the van.

14:11:15  14   Q.  Who had the recording device?

14:11:16  15   A.  Detective Oksanen did.

14:11:21  16   Q.  Okay.  And did Joseph Woodson seem to understand the

14:11:23  17   questions that you all were asking him?

14:11:24  18   A.  Seemed to me he did, yes.

14:11:28  19   Q.  Okay.  Did you ever hear him say that he didn't understand

14:11:31  20   or know what you were talking about?

14:11:32  21   A.  Not that I recall, no.

14:11:35  22   Q.  Was he able to easily communicate with you?

14:11:36  23   A.  Seemed like it to me, yes.

14:11:39  24   Q.  Did he seem knowledgeable about games when you all were

14:11:40  25   talking about gaming?

| | | |
|---|---|---|
| 14:11:42 | 1 | A.   Fairly knowledgeable, yeah. |
| 14:11:46 | 2 | Q.   Okay.  And throughout the conversation in the car, which |
| 14:11:48 | 3 | lasted about an hour you said, he wasn't in handcuffs or |
| 14:11:50 | 4 | restrained at all, was he? |
| 14:11:51 | 5 | A.   No, ma'am. |
| 14:11:53 | 6 | Q.   Was he told that he could leave the car? |
| 14:11:54 | 7 | A.   As I recall, yeah. |
| 14:11:56 | 8 | Q.   So he wasn't under arrest? |
| 14:11:56 | 9 | A.   No. |
| 14:12:01 | 10 | Q.   And you heard everything that he said during that hour? |
| 14:12:01 | 11 | A.   Yes. |
| 14:12:03 | 12 | Q.   And the statement was recorded, right? |
| 14:12:04 | 13 | A.   Yes, ma'am. |
| 14:12:07 | 14 | Q.   Okay.  And after you finished talking to him that day, you |
| 14:12:09 | 15 | guys didn't arrest him, did you? |
| 14:12:10 | 16 | A.   No, ma'am. |
| 14:12:12 | 17 | Q.   So what happened after he got out of the car? |
| 14:12:17 | 18 | A.   We got out of the car, went back inside the residence.  We |
| 14:12:20 | 19 | finished up our search.  At that point we had the Galaxy Note 3 |
| 14:12:24 | 20 | and some other electronic devices.  We gave them copies of the |
| 14:12:27 | 21 | search warrant and all that and that was it. |
| 14:12:31 | 22 | Q.   Okay.  Did you mention that you had the Galaxy Note 3? |
| 14:12:31 | 23 | A.   Yes, ma'am. |
| 14:12:33 | 24 | Q.   Is that a cellular telephone? |
| 14:12:33 | 25 | A.   Yes. |

14:12:36  1    Q.  Is that a phone that was found in the search of the

14:12:38  2    residence?

14:12:38  3    A.  Yes, ma'am.

14:12:40  4    Q.  Do you know where that phone was found?

14:12:45  5    A.  I was informed that it was found in a pillow case in a room

14:12:46  6    in the residence, yes.

14:12:49  7    Q.  And did you have that phone with you in the car as you were

14:12:51  8    talking to Joseph Woodson?

14:12:52  9    A.  Yes.

14:12:54  10   Q.  Okay.  Did you guys ask him about the phone?

14:12:54  11   A.  Yes.

14:12:58  12   Q.  Okay.  And did you tell him why you were there and what kind

14:13:00  13   of case you were investigating?

14:13:01  14   A.  Yes, we did.

14:13:04  15   Q.  And did Mr. Woodson admit to you that he knew why you were

14:13:05  16   there?

14:13:06  17   A.  Yes.

14:13:11  18   Q.  Okay.  And did you discuss different apps on the phones?

14:13:16  19   A.  Yeah, we discussed couple different apps, yeah.

14:13:18  20   Q.  But it was all recorded that conversation.

14:13:18  21   A.  Yes, ma'am.

14:13:22  22   Q.  Okay.  And as far as the Note 3, did Mr. Woodson say that

14:13:23  23   that was his phone?

14:13:23  24   A.  Yes.

14:13:26  25   Q.  Okay.  And ultimately were you able to get the password to

| | | |
|---|---|---|
| 14:13:27 | 1 | that phone? |
| 14:13:28 | 2 | A.  Yes. |
| 14:13:29 | 3 | Q.  And were you able to go into that phone? |
| 14:13:30 | 4 | A.  Yes. |
| 14:13:32 | 5 | Q.  Okay.  So you guys looked at the phone that day when you |
| 14:13:33 | 6 | were in the car. |
| 14:13:33 | 7 | A.  Yes. |
| 14:13:36 | 8 | Q.  Okay.  But did you give the phone back to him? |
| 14:13:36 | 9 | A.  No. |
| 14:13:37 | 10 | Q.  And why not? |
| 14:13:40 | 11 | A.  Because it was evidence in our case.  It was -- we seized it |
| 14:13:45 | 12 | for evidence and analysis. |
| 14:13:51 | 13 | Q.  Okay.  Was everyone also in the house interviewed? |
| 14:13:54 | 14 | A.  Not by myself or Detective Oksanen, no. |
| 14:13:57 | 15 | Q.  So you just interviewed Joseph Woodson and his brother |
| 14:13:57 | 16 | Brandon Woodson? |
| 14:13:58 | 17 | A.  Yes, ma'am. |
| 14:14:01 | 18 | Q.  And did you assist with the search after you finished the |
| 14:14:01 | 19 | interviews? |
| 14:14:04 | 20 | A.  No, we were pretty much done with the search once -- the |
| 14:14:07 | 21 | other detectives, rather, were done with the search by the time |
| 14:14:11 | 22 | I was done interviewing Mr. Woodson. |
| 14:14:14 | 23 | Q.  And did you assist with processing the house inside in any |
| 14:14:15 | 24 | way? |
| 14:14:16 | 25 | A.  Not really, no. |

```
14:14:19  1    Q.  Okay.  So is it fair to say the way that your operational
14:14:22  2    plan was set up, is some people -- some officers were
14:14:26  3    interviewers and some officers were in the house searching?
14:14:27  4    A.  Yes, ma'am.
14:14:28  5    Q.  Were there a lot of officers there searching?
14:14:35  6    A.  Yes, ma'am.  Four or five, roughly.  Approximately.  I don't
14:14:35  7    remember exactly.
14:14:39  8    Q.  Okay.  And after the search, everything that was seized was
14:14:41  9    impounded into evidence; is that correct?
14:14:44 10    A.  Yes, ma'am.
14:14:49 11         MS. ANTON:  One second please.  All right, Detective
14:14:54 12    Bartechko.  I have no further questions for you.
14:14:55 13         THE COURT:  Cross-examination.
14:14:55 14                        CROSS-EXAMINATION
14:14:55 15    BY MR. NATALE:
14:15:17 16    Q.  Detective Bartechko, you're in the Fairfax City Police
14:15:18 17    Department.
14:15:19 18    A.  Yes, sir.
14:15:21 19    Q.  And you've been there for over seven years?
14:15:25 20    A.  Not quite seven years.  Will be seven years in January.
14:15:26 21    Q.  Were you there in 2014?
14:15:28 22    A.  Yes.
14:15:34 23    Q.  And you're aware that there were certain instances that
14:15:44 24    occurred in 2014 and at other times involving swatting
14:15:47 25    instances; isn't that correct?
```

14:15:48  1    A.  I've heard of this.

14:15:50  2         MS. ANTON:  I'll object to beyond the scope of direct.

14:15:53  3         THE COURT:  It is.  Call him as your own witness if you

14:15:55  4    want to get into that area.

14:15:57  5         MR. NATALE:  Then Your Honor, may I call him as my own

14:15:58  6    witness on direct now?

14:16:02  7         THE COURT:  Okay.  Let me just explain to the jury that

14:16:05  8    it isn't really his turn to call a witness.  However, rather

14:16:09  9    than keep him around for three, two, three, four days, he's

14:16:12  10   calling him as his witness right now because it is not in

14:16:17  11   cross-examination, this is more like it's his witness.

14:16:18  12        You go ahead.

14:16:18  13   BY MR. NATALE:

14:16:22  14   Q.  Detective, have you ever heard of the term "swatting"?

14:16:23  15   A.  Yes, sir.

14:16:28  16   Q.  And would you tell the jury what swatting means?

14:16:31  17   A.  As far as I understand it, it's when somebody calls the

14:16:37  18   police and alleges a crime occurring that's serious enough to

14:16:41  19   warrant a SWAT Team responding to a residence and entering a

14:16:42  20   residence.

14:16:47  21   Q.  And are you aware that in your very city and in Fairfax

14:16:49  22   County, there has been such incidents?

14:16:50  23   A.  Yes.

14:16:53  24   Q.  And in fact, there have been newspaper articles about it

14:16:57  25   where the police chief actually made comments about it?

14:17:02   1   A.  I don't recall if my specific police chief did.  Fairfax

14:17:06   2   County Police Chief may have, but I work for the city of

14:17:08   3   Fairfax.  I don't recall that, sir.

14:17:12   4   Q.  You know these situations can be very dangerous?

14:17:13   5   A.  Of course.

14:17:17   6   Q.  And in fact, there's actually been deaths that resulted from

14:17:19   7   people who were swatted?

14:17:20   8   A.  Yes, sir.

14:17:23   9   Q.  And these are innocent people that are just in their house,

14:17:26   10  someone calls, the SWAT Team shows up and because of the

14:17:29   11  tenseness of the situation, there have been circumstances where

14:17:31   12  people have been killed?

14:17:33   13  A.  Yes, sir.

14:17:38   14  Q.  It's a very real phenomena, isn't it?

14:17:40   15  A.  Seems that way, sir.

14:17:43   16  Q.  Now, you also had conversations with Joseph about the

14:17:47   17  gaming, about online games and stuff?

14:17:51   18  A.  We talked briefly about a couple of video games.  I don't

14:17:54   19  remember exactly if they were online games or anything.

14:17:55   20  Q.  Are you familiar with those games?

14:17:57   21  A.  I'm familiar with one of them.

14:17:59   22  Q.  Which one?

14:17:59   23  A.  Skyrim.

14:18:02   24  Q.  Are you familiar with -- have you played them?  Are you

14:18:04   25  familiar with the people that play those games and the

14:18:08  1    atmosphere in which they're played?

14:18:11  2    A.  I'm sorry, I don't understand what you mean by that.

14:18:13  3    Q.  Have you ever played that game the, one that you're

14:18:14  4    aware of?

14:18:14  5    A.  Yes, sir.

14:18:15  6    Q.  Is that online?

14:18:16  7    A.  No.

14:18:19  8    Q.  Now, when you talked to him about the -- he mentioned to you

14:18:25  9    that he did a lot of gaming activity, didn't he?

14:18:26  10   A.  As I recall yeah.

14:18:30  11   Q.  And in fact, the computers that were seized actually did

14:18:35  12   contain things about gaming and playing online games, correct?

14:18:38  13   A.  I was advised that by the detective that conducted it.

14:18:57  14   Q.  Okay.  Now, when you went to the house the -- all four

14:19:01  15   people, Joseph's brother, Joseph, his mom and his sister were

14:19:03  16   all in the house, right?

14:19:03  17   A.  Yes.

14:19:11  18   Q.  And his sister was very emotionally upset, wasn't she?

14:19:14  19   A.  I was told she was, sir.  I honestly don't recall.

14:19:18  20   Q.  Okay.  And from what you were told, she was very upset and

14:19:20  21   that Joseph had to calm her down, right?

14:19:21  22   A.  I was told that, yes.

14:19:25  23   Q.  And that you later learned that she suffers from certain

14:19:26  24   emotional --

14:19:30  25           MS. ANTON:  Objection.  Hearsay, Judge.

14:19:33   1          THE COURT:  I'll sustain that objection.  Does appear

14:19:33   2    to be hearsay.

14:19:33   3          BY MR. NATALE:

14:19:37   4    Q.  Let me ask you this, sir:  As part of your investigation,

14:19:43   5    once you knew that Joseph was the person who did this, did you

14:19:48   6    conduct any other investigation into his background at all?

14:19:49   7    A.  His background as far as --

14:19:51   8    Q.  Anything.

14:19:54   9    A.  I did a criminal background check on him.  That's about it

14:19:55  10    sir.

14:19:56  11    Q.   Nothing there, right?

14:19:58  12    A.  Not that I remember, no.

14:20:00  13    Q.  What about school records, anything like that?

14:20:02  14    A.  No, I don't have access to that kind of thing.

14:20:06  15    Q.  Okay.  Well, you could have subpoenaed that, correct?

14:20:08  16    A.  Yes, I could have.

14:20:10  17    Q.  Okay.

14:20:19  18          MR. NATALE:  Your Honor, may I have a moment?

14:20:22  19          THE COURT:  Yes, sir.

14:20:22  20          BY MR. NATALE:

14:20:41  21    Q.  So it's clear that before you left the residence, it was

14:20:46  22    clear to you that Joseph had admitted to doing this stuff,

14:20:47  23    right?

14:20:48  24    A.  Yes, sir.

14:20:50  25    Q.  In fact, it's in a recorded conversation.

14:20:51   1    A.  Yes, sir.

14:20:58   2    Q.  So at that point, you had independent information about a

14:21:00   3    crime that had occurred, right?

14:21:01   4    A.  Yes, sir.

14:21:04   5    Q.  And you had someone admitting that the crime occurred,

14:21:05   6    right?

14:21:06   7    A.  Yes, sir.

14:21:10   8    Q.  And you'd agree it's an extremely serious crime?

14:21:10   9    A.  I would agree.

14:21:17  10    Q.  And it's -- but you didn't arrest him at that point, did

14:21:18  11    you?

14:21:19  12    A.  No, sir.

14:21:24  13    Q.  For whatever reason, you chose not to arrest him, right?

14:21:26  14    A.  We chose not to arrest him, that's correct.

14:21:32  15    Q.  And did you ever try to prohibit him from getting another

14:21:33  16    phone or doing anything else?

14:21:35  17    A.  No, sir.

14:21:41  18    Q.  Weren't you concerned for other people?

14:21:42  19    A.  Of course.

14:21:44  20    Q.  But yet you didn't arrest him.

14:21:49  21    A.  We were -- we had to finish our investigation, conduct a

14:21:54  22    forensic analysis of the electronic devices.  We still had

14:21:56  23    further steps to take in the investigation.

14:21:59  24    Q.  Well, did you think that he was lying to you when he

14:22:01  25    admitted that he did these things?

14:22:02   1    A.  Well, not necessarily, no.

14:22:06   2    Q.  And he also told you about the Irish guy, right?

14:22:07   3    A.  Yes.

14:22:09   4    Q.  And in the beginning, you guys didn't really believe that,

14:22:10   5    did you?

14:22:13   6    A.  I wouldn't say I didn't believe it.  I take everybody's

14:22:14   7    claim seriously.

14:22:17   8    Q.  And in fact, it was proven to be true.

14:22:20   9    A.  That there was another person in Ireland that he was working

14:22:21   10   with or --

14:22:22   11   Q.  Yes.

14:22:23   12   A.  Yes.

14:22:29   13   Q.  Yeah.  Did you make the decision not to arrest him at that

14:22:29   14   time?

14:22:32   15   A.  No, sir.  It's not my jurisdiction.  I couldn't make an

14:22:33   16   arrest in that jurisdiction anyway.

14:22:36   17   Q.  So that would have been the other detective that was with

14:22:36   18   you?

14:22:39   19   A.  I'm not going to speak to the other detective.

14:22:42   20   Q.  But he would have had jurisdiction.

14:22:42   21   A.  That's correct.

14:22:46   22   Q.  Did you discuss with him at all about arresting him?

14:22:48   23   A.  No sir, we did not.

14:22:56   24        MR. NATALE:  I have no further questions.

14:22:58   25        THE COURT:  Redirect.

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

| | | |
|---|---|---|
| 14:22:59 | 1 | MS. ANTON:  Thank you. |
| 14:23:02 | 2 | THE COURT:  And cross.  I guess. |
| 14:23:04 | 3 | MS. ANTON:  I'll have to figure that one out. |
| 14:23:04 | 4 | REDIRECT EXAMINATION |
| 14:23:04 | 5 | BY MS. ANTON: |
| 14:23:07 | 6 | Q.  Detective Bartechko, defense counsel asked you about |
| 14:23:09 | 7 | swatting.  Right?  On his direct examination? |
| 14:23:10 | 8 | A.  Yes, ma'am. |
| 14:23:13 | 9 | Q.  And you said that that's a real thing, right? |
| 14:23:14 | 10 | A.  As far as I'm aware, yeah. |
| 14:23:17 | 11 | Q.  But child exploitation is a real thing too, right? |
| 14:23:18 | 12 | A.  Yes, ma'am. |
| 14:23:21 | 13 | Q.  So is extortion, right? |
| 14:23:21 | 14 | A.  Yes, ma'am. |
| 14:23:22 | 15 | Q.  And those are all crimes? |
| 14:23:23 | 16 | A.  Yes, ma'am. |
| 14:23:26 | 17 | Q.  Crimes that people are arrested for and charged with? |
| 14:23:26 | 18 | A.  Yes, ma'am. |
| 14:23:31 | 19 | Q.  Now, you weren't working this case alone as the only police |
| 14:23:32 | 20 | department involved; is that correct? |
| 14:23:33 | 21 | A.  That's correct. |
| 14:23:36 | 22 | Q.  This was a broader investigation with the next county over |
| 14:23:38 | 23 | which was Louden County? |
| 14:23:39 | 24 | A.  Right. |
| 14:23:40 | 25 | Q.  In addition to the FBI. |

```
14:23:40   1    A.  Right.
14:23:43   2    Q.  And you were working this because it wasn't just the one
14:23:45   3    complaint that you had; is that correct?
14:23:45   4    A.  That's correct.
14:23:49   5    Q.  Detective Oksanen had his own issues as well that he was
14:23:50   6    investigating.
14:23:50   7    A.  That's correct.
14:23:54   8    Q.  Okay.  And your job as a police officer is to conduct a
14:23:57   9    thorough investigation into a case, isn't it?
14:23:57  10    A.  Of course.
14:24:01  11    Q.  Okay.  So is it fair to say that you don't arrest everybody
14:24:05  12    who you come into contact with and do an interview with?
14:24:08  13    A.  Not immediately, no.  That's correct, yeah.
14:24:10  14    Q.  Even if the person admits it, correct?
14:24:10  15    A.  Correct.
14:24:12  16    Q.  And why is that?
14:24:16  17    A.  We still have other pieces to put into the puzzle.  We have
14:24:19  18    more investigation to do.  He made a claim about the person from
14:24:22  19    Ireland, we had to investigate into that and get into the phones
14:24:25  20    and do the analysis into that to see if his claims were
14:24:26  21    accurate.
14:24:28  22    Q.  And you did all that and it took you some time, right?
14:24:31  23    A.  I didn't personally do the analysis, no ma'am.  Another
14:24:33  24    detective at my agency did though.
14:24:37  25    Q.  Right.  So I guess when I say you, that was inartful.  I
```

| | | |
|---|---|---|
| 14:24:39 | 1 | mean law enforcement did that. |
| 14:24:39 | 2 | A.  Yes, ma'am.  I'm sorry. |
| 14:24:43 | 3 | Q.  We both can't talk at the same time because I know Dawn, the |
| 14:24:44 | 4 | court reporter, will be upset at us. |
| 14:24:48 | 5 | THE COURT:  She never gets upset.  She's very skilled. |
| 14:24:48 | 6 | BY MS. ANTON: |
| 14:24:51 | 7 | Q.  So law enforcement, working together, was trying to build a |
| 14:24:52 | 8 | case; is that correct? |
| 14:24:53 | 9 | A.  Yes, ma'am. |
| 14:24:58 | 10 | Q.  Okay.  So because you didn't arrest him that day doesn't |
| 14:25:01 | 11 | mean that you didn't believe that you could have arrested him, |
| 14:25:01 | 12 | right? |
| 14:25:02 | 13 | A.  No, ma'am. |
| 14:25:13 | 14 | Q.  Okay.  Now, defense counsel had asked you about other people |
| 14:25:17 | 15 | in the residence, specifically a sister. |
| 14:25:17 | 16 | A.  Yes, ma'am. |
| 14:25:20 | 17 | Q.  Did you witness anything that was going on with the sister? |
| 14:25:21 | 18 | A.  Not really, no. |
| 14:25:24 | 19 | Q.  When you got to the residence and there were four people in |
| 14:25:30 | 20 | it, were all four of them seated in a somewhat calm fashion? |
| 14:25:32 | 21 | A.  As I recall, yeah. |
| 14:25:36 | 22 | MS. ANTON:  I have no further questions.  Thank you. |
| 14:25:37 | 23 | MR. NATALE:  Brief redirect? |
| 14:25:39 | 24 | THE COURT:  Yeah, if it's on that, yeah, you can.  It's |
| 14:25:43 | 25 | -- actually, yeah, go ahead.  That's -- |

<pre>
14:25:43   1                    RE-CROSS EXAMINATION
14:25:43   2        BY MR. NATALE:
14:25:48   3   Q.  It took you nine months to do that investigation.  Correct?
14:25:52   4   It was nine months from when you first went to the house.
14:25:54   5            THE COURT:  If this is redirect, you're not leading.
14:25:56   6            MR. NATALE:  Okay.
14:25:56   7        BY MR. NATALE:
14:25:59   8   Q.  Then when was he finally arrested?
14:26:02   9   A.  I wasn't present for the arrest, but I believe it was
14:26:03  10   sometime in September of that year.
14:26:06  11   Q.  And the search that you were present for was in January?
14:26:07  12   A.  Yes, sir.
14:26:10  13   Q.  Be approximately nine months?
14:26:12  14   A.  Give or take, yeah.
14:26:12  15            MR. NATALE:  No further questions.
14:26:14  16            THE COURT:  Thank you, sir.  Are you excused.
14:26:21  17            Please call your next witness.
14:26:22  18            MS. VIAMONTES:  At this time, the United States calls
14:26:26  19   Detective Ben Smith.
14:26:43  20            THE COURT:  Okay.  We'll take a short break.  Have your
14:26:47  21   witness ready on the stand.  We'll take a short recess, ladies
14:26:49  22   and gentlemen.  Go on into the jury room.
14:26:51  23            COURT SECURITY OFFICER:  All rise for the jury.
14:26:54  24            THE COURT:  Wasn't my call.  One of you guys has to use
14:26:55  25   the restroom.
</pre>

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED BY COMPUTER

```
14:26:59   1              (Jury out at 2:26 p.m.)
14:27:35   2              THE COURT:  You all can be seated.
14:27:42   3              (In-place recess)
14:28:35   4              MS. ANTON:  Your Honor, do you mind?  We're just
14:28:38   5     testing the audio to make sure there are no problems.  Is that
14:28:40   6     all right?
14:28:44   7              MS. MOLLISON:  Judge, our TV isn't working.  Can we
14:28:46   8     call IT to see if we can fix it?
14:28:49   9              THE COURT:  Sure.  Wanda, can you come up and see if
14:28:53   10    you can fix the monitor that is the closest to me on the defense
14:30:40   11    table?  Wanda is everywhere.  She can --
14:31:28   12             MR. NATALE:  No objection.
14:33:09   13             (In-place recess)
14:35:50   14             THE COURT:  While we're waiting, I'm going to have
14:35:54   15    Wanda fined out from Juror Number 3 the nature of her job, how
14:35:57   16    big they are, make sure that they are required to keep her.  If
14:36:02   17    they're not, I'm certainly not going to, you know, tempt fate by
14:36:07   18    thumbing my nose at them and having them fire her and there's
14:36:09   19    nothing we can do about it.  So I'll find that out before we
14:36:26   20    send out the nasty gram.  I actually appointed a lawyer for a
14:36:32   21    juror that got fired and they got her goodly sum.
14:36:33   22             MR. NATALE:  They should.
14:36:56   23             THE COURT:  Yeah.  Can you check again?  I guess we're
14:37:03   24    not having anymore breaks today.  Cross your legs and smile.
14:37:11   25    Bring them in please.
```

| | | |
|---|---|---|
| 14:37:14 | 1 | COURT SECURITY OFFICER:  All rise for the jury. |
| 14:37:23 | 2 | (Jury in at 2:37 p.m.) |
| 14:38:01 | 3 | THE COURT:  Be seated please.  All right, sir.  Please |
| 14:38:10 | 4 | remain standing and raise your right hand. |
| 14:38:10 | 5 | BENJAMIN SMITH, GOVERNMENT WITNESS, SWORN. |
| 14:38:13 | 6 | THE COURT:  Sir, please tell us your name and spell it. |
| 14:38:18 | 7 | THE WITNESS:  Name is Benjamin Smith.  B-E-N-J-A-M-I-N, |
| 14:38:22 | 8 | S-M-I-T-H. |
| 14:38:23 | 9 | THE COURT:  You may proceed. |
| 14:38:24 | 10 | MS. VIAMONTES:  Thank you, Your Honor. |
| 14:38:24 | 11 | DIRECT EXAMINATION |
| 14:38:24 | 12 | BY MS. VIAMONTES: |
| 14:38:27 | 13 | Q.  Detective Smith, can you please introduce yourself to the |
| 14:38:30 | 14 | members of the jury, tell them where you work and in what |
| 14:38:31 | 15 | capacity? |
| 14:38:35 | 16 | A.  Yes.  My name is Benjamin Smith.  I'm a detective for the |
| 14:38:37 | 17 | city of Fairfax Police Department which is a small jurisdiction |
| 14:38:42 | 18 | in Fairfax, Virginia just outside of D.C.  I'm a detective |
| 14:38:46 | 19 | currently assigned to terrorism right now. |
| 14:38:47 | 20 | Q.  How big is your department? |
| 14:38:51 | 21 | A.  We're about 65 sworn officers total.  There's about seven |
| 14:38:52 | 22 | detectives. |
| 14:38:58 | 23 | Q.  And where is Fairfax, Virginia in reference to Louden |
| 14:38:59 | 24 | County? |
| 14:39:04 | 25 | A.  The Fairfax City is inside of Fairfax County.  We're two |

14:39:08  1    separate jurisdictions.  And Fairfax County abuts Louden County.

14:39:11  2    Louden County is to the west of Fairfax County.

14:39:14  3    Q.  How long have you been employed with Fairfax City Police

14:39:14  4    Department?

14:39:17  5    A.  Seven years.

14:39:21  6    Q.  Can you please explain to the members of the jury how you

14:39:26  7    became involved in the investigation which led to this trial?

14:39:29  8    A.  Yes.  Since we're a somewhat smaller department, there's

14:39:33  9    only a few detectives.  We all help out on basically every big

14:39:36  10   case that we get.  So Detective Bartechko was the lead detective

14:39:39  11   on this case.  He developed enough probable cause to get a

14:39:43  12   search warrant and because that's labor intensive, we all got

14:39:46  13   enlisted to help with that.

14:39:52  14   Q.  And were you asked to participate in the execution of a

14:39:52  15   search warrant?

14:39:53  16   A.  I was, yes.

14:39:56  17   Q.  Was that on January 26, 2018?

14:39:56  18   A.  Yes, it was.

14:40:00  19   Q.  Before execution of the search warrant, do all the

14:40:04  20   detectives and all the officers taking part meet at a briefing?

14:40:05  21   A.  Yes.

14:40:09  22   Q.  And are you advised of the nature of the investigation

14:40:10  23   generally?

14:40:11  24   A.  Yes.

14:40:15  25   Q.  And are you assigned particular roles for that operation?

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED BY COMPUTER

| | | |
|---|---|---|
| 14:40:16 | 1 | A.  We are, yes. |
| 14:40:19 | 2 | Q.  And what was your particular role on January 26, 2018? |
| 14:40:23 | 3 | A.  My role was to take photographs, help conduct the actual |
| 14:40:26 | 4 | search of the residence and then package up anything pursuant to |
| 14:40:29 | 5 | the search warrant we may have found that would be evidence. |
| 14:40:34 | 6 | Q.  Now, since you're participating in the search and |
| 14:40:39 | 7 | documenting the scene, are you advised of what items you're |
| 14:40:41 | 8 | looking for during the search? |
| 14:40:45 | 9 | A.  Yes, at the briefing, and it's all itemized in the search |
| 14:40:45 | 10 | warrant text itself. |
| 14:40:48 | 11 | Q.  And did you know which items in particular you're looking |
| 14:40:50 | 12 | for for this search? |
| 14:40:54 | 13 | A.  We knew we were looking for anything electronic that could |
| 14:40:58 | 14 | store data on it so whether it's computer, cellphone, memory |
| 14:40:59 | 15 | cards, et cetera. |
| 14:41:01 | 16 | Q.  And do you remember any particular type of cellphones you |
| 14:41:03 | 17 | were looking for? |
| 14:41:07 | 18 | A.  We were just looking for cellphones in general from what I |
| 14:41:08 | 19 | knew. |
| 14:41:13 | 20 | Q.  Now, what time did you all meet to go out and execute the |
| 14:41:13 | 21 | search warrant? |
| 14:41:17 | 22 | A.  I couldn't give you the exact time.  I remember it was early |
| 14:41:21 | 23 | morning.  We wanted to get there first thing in the morning. |
| 14:41:25 | 24 | Q.  The search warrant was executed early that morning the 26th? |
| 14:41:25 | 25 | A.  Yes, it was. |

| | | |
|---|---|---|
| 14:41:33 | 1 | Q.  Did you respond with other officers to 21767 Ascot Court in |
| 14:41:34 | 2 | Ashburn, Virginia? |
| 14:41:34 | 3 | A.  Yes. |
| 14:41:37 | 4 | Q.  Is Ashburn within the city of Fairfax? |
| 14:41:40 | 5 | A.  No, it's not.  It's in Louden County. |
| 14:41:47 | 6 | Q.  Upon responding, were you part of the initial group that |
| 14:41:50 | 7 | knocked on the door and spoke with the occupants? |
| 14:41:51 | 8 | A.  I was not. |
| 14:41:52 | 9 | Q.  So you entered afterward? |
| 14:41:54 | 10 | A.  Yes. |
| 14:41:57 | 11 | Q.  When you entered, did you see how many occupants were in the |
| 14:41:58 | 12 | room, in the dwelling? |
| 14:42:02 | 13 | A.  Yes, there were approximately four or five occupants that |
| 14:42:02 | 14 | were there. |
| 14:42:04 | 15 | Q.  And where were they? |
| 14:42:06 | 16 | A.  They were all seated in the living room. |
| 14:42:10 | 17 | Q.  So at this point, other officers had gathered them in the |
| 14:42:10 | 18 | living room? |
| 14:42:11 | 19 | A.  Correct, yes. |
| 14:42:13 | 20 | Q.  And what did you begin to do once you entered? |
| 14:42:16 | 21 | A.  So from there, it's our standard practice so we make |
| 14:42:21 | 22 | sure everything stays organized, to label each room.  We have a |
| 14:42:25 | 23 | large number, one, two, three, et cetera that we put in a sheet |
| 14:42:28 | 24 | protector, then we tape that to the wall of every room.  That |
| 14:42:32 | 25 | way when we take pictures and when we document what we find, we |

14:42:32    1      can say we found room one, two, three, et cetera.  So we went

14:42:34    2      through first and did that.  And then we went through and I

14:42:38    3      photographed every single room the way it was when we got there,

14:42:45    4      just to establish kind of a base of what we saw.

14:42:46    5               MS. VIAMONTES:  Your Honor, at this time the Government

14:42:48    6      moves Government's exhibits 5 through 18 which have been

14:42:51    7      provided to defense counsel and they have no objection.

14:42:52    8               MR. NATALE:  No objection, Your Honor.

14:42:55    9               THE COURT:  Without objection, 5 through 18 are

14:42:58    10     admitted in evidence.

14:42:59    11              MS. VIAMONTES:  Permission to publish, Your Honor?

14:43:02    12              THE COURT:  You may.

14:43:02    13              (Government's Exhibits 5-18 in evidence)

14:43:02    14          BY MS. VIAMONTES:

14:43:10    15     Q.   Detective Smith, I'm placing on the ELMO what has been

14:43:12    16     entered into evidence as Government's Exhibit 5.  Do you

14:43:13    17     recognize Government's Exhibit 5?

14:43:16    18     A.   Yes, that's the front of the residence.

14:43:21    19     Q.   I'm placing on the ELMO now Government's Exhibit 6 in

14:43:27    20     evidence.  Can you describe to the members of the jury what

14:43:29    21     they're seeing in Government's Exhibit 6.

14:43:32    22              THE COURT:  You just turned the auto focus off.  I

14:43:36    23     don't think you wanted --

14:43:38    24              MS. VIAMONTES:  Let me take it out of the sleeve.  It's

14:43:40    25     probably the glare.

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED BY COMPUTER

14:43:40   1          BY MS. VIAMONTES:

14:43:44   2     Q.   What's depicted in Government's Exhibit 6?

14:43:48   3     A.   So that's the kitchen on the main level of the townhouse.

14:43:55   4     Q.   How many levels were in this townhouse?

14:43:57   5     A.   I believe there were three.

14:44:06   6     Q.   Now publishing on the ELMO Government's Exhibit 7.  And can

14:44:11   7     you explain to the members of the jury what's depicted in 7?

14:44:14   8     A.   Yes.  This is the living room area where we had everyone

14:44:15   9     seated.

14:44:25  10     Q.   There we go.  Now, you mentioned that once you went in, you

14:44:27  11     labeled the different rooms?

14:44:28  12     A.   Correct.

14:44:36  13     Q.   And did you identify bedrooms that were of interest?

14:44:36  14     A.   Yes.

14:44:37  15     Q.   For the search?

14:44:38  16     A.   Yes.

14:44:56  17     Q.   Now, I'm placing on the ELMO Government's Exhibit 16 in

14:45:01  18     evidence.  Can you explain to the members of the jury what's

14:45:03  19     depicted in Government's Exhibit 16?

14:45:07  20     A.   Yes.  So this is a before-shot, if you will, before we start

14:45:11  21     our search of the -- of one of the bedrooms inside the house

14:45:13  22     that's just off the kitchen.

14:45:17  23     Q.   And do you know if this was the Defendant's bedroom?

14:45:20  24     A.   Yes.  At the time I didn't, but we later learned that this

14:45:22  25     was the Defendant's bedroom.

14:45:32  1    Q.  Now, I'm placing on the ELMO Government's Exhibit 17.  Is

14:45:36  2    this also a picture of that same bedroom?

14:45:39  3    A.  This is the same bedroom looking from the doorway into the

14:45:40  4    room.

14:45:40  5    Q.  All right.  So you first take pictures to document how the

14:45:40  6    scene is when you arrive?

14:45:40  7    A.  Correct.

14:45:41  8    Q.  Then you begin your search?

14:45:42  9    A.  Correct.

14:45:46 10    Q.  As you're searching for electronics and you start clearing

14:45:47 11    items, what do you do with them?

14:45:51 12    A.  So we -- in order to have a place where we can kind of

14:45:54 13    separate what's been searched and what hasn't, we used the

14:45:58 14    mattress as a staging area.  So the first thing we do is we

14:46:01 15    clean off and search the bed so we just have a bare mattress.

14:46:03 16    And as we go through the room, we take items and place them on

14:46:05 17    the mattress that have been searched.

14:46:08 18    Q.  And in that bedroom, the bedroom you've identified as the

14:46:11 19    Defendant's, were there a lot of electronic items?

14:46:12 20    A.  There were, yes.

14:46:14 21    Q.  Can you remember some of them?

14:46:18 22    A.  There was a computer that looked pretty high-end from my

14:46:21 23    experience.  There were some cellphones.  There were -- there's

14:46:25 24    a hard drive.  There were some memory USB cards or USB sticks.

14:46:28 25    Q.  Were there gaming consoles as well?

| | | |
|---|---|---|
| 14:46:30 | 1 | A.  Yes, I believe there was a PlayStation. |
| 14:46:36 | 2 | Q.  Now placing on the ELMO Government's Exhibit 18 in evidence. |
| 14:46:39 | 3 | And what does that depict? |
| 14:46:43 | 4 | A.  So this is just after we describe -- where we do the process |
| 14:46:46 | 5 | with the mattress that I described.  Actually, in one of the |
| 14:46:49 | 6 | previous photos, you can see the pillow was moved back and the |
| 14:46:52 | 7 | phone peeking out from under it. |
| 14:46:55 | 8 | Q.  Okay.  And you're referring to Government's Exhibit 16? |
| 14:47:00 | 9 | A.  Yes, ma'am.  It's a little hard to see, but the left bottom |
| 14:47:03 | 10 | corner of the pillow you can see a rectangular object poking out |
| 14:47:03 | 11 | from underneath that pillow. |
| 14:47:06 | 12 | Q.  You can touch on your screen and the jurors will be able to |
| 14:47:09 | 13 | see.  You can actually right on that. |
| 14:47:13 | 14 | A.  I covered it up with the tab, but it's in that blue circle. |
| 14:47:19 | 15 | Q.  Okay.  Now, once you moved those items around to search the |
| 14:47:23 | 16 | bed, what did you see?  What's depicted here in the center of |
| 14:47:25 | 17 | Government's Exhibit 18? |
| 14:47:30 | 18 | A.  So that is a Samsung Galaxy phone and that was the one that |
| 14:47:33 | 19 | was just under the pillow.  So as we moved the pillow, we saw |
| 14:47:36 | 20 | there was something that's in the search warrant that we're |
| 14:47:39 | 21 | looking for, so we took a picture to document and then we would |
| 14:47:40 | 22 | have collected that into evidence. |
| 14:47:43 | 23 | Q.  Was that a Galaxy S7? |
| 14:47:44 | 24 | A.  Yes. |
| 14:47:48 | 25 | Q.  Now, as you began to remove items from the bed to search the |

14:47:49   1   bed, did you remove the pillows?

14:47:53   2   A.   So we did.  We started with the pillows, did a brief

14:47:57   3   pat-down of them and then put them aside.  And I noticed as I

14:48:02   4   moved one of the pillows and put it aside, I heard a clunk sound

14:48:05   5   against the wall, which of course was not the sound a pillow

14:48:08   6   makes when it hits the wall.  So I searched that pillow more

14:48:12   7   carefully.  Looked inside the pillow case and saw there was a

14:48:13   8   cellphone in there, which I took out.

14:48:17   9   Q.   Now, I'm placing on the ELMO Government's Exhibit 9 in

14:48:20   10   evidence.  And what's depicted in Government's Exhibit 9?

14:48:25   11   A.   That is the Samsung Galaxy Note 3 that we found inside the

14:48:26   12   pillow case I just described.

14:48:31   13   Q.   Okay.  And in this photograph, do we see the phone and the

14:48:33   14   case taken off?

14:48:34   15   A.   Yes, correct.

14:48:36   16   Q.   All right.  Now, I'm placing on the ELMO Government's

14:48:40   17   Exhibit 8.  And what's depicted in Government's Exhibit 8?

14:48:44   18   A.   This is the front of the case which also had some red tape.

14:48:47   19   When the phone was in the case, when it was found in the pillow,

14:48:52   20   that red tape covers the front facing-camera of the phone.

14:49:13   21   Q.   I'm placing on the ELMO Government's Exhibit 15 in evidence.

14:49:15   22   What does this picture show?

14:49:18   23   A.   This is the wall directly opposite from the door of the

14:49:22   24   bedroom if you walk straight in.  This is a desk that had some

14:49:25   25   computer equipment on it, then the dresser and it also a jar of

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED BY COMPUTER

| | | |
|---|---|---|
| 14:49:27 | 1 | the coconut oil there you can see. |
| 14:49:34 | 2 | Q.  Now, is this dresser and computer stand in the same bedroom |
| 14:49:37 | 3 | where you found the Galaxy Note 3? |
| 14:49:41 | 4 | A.  Yes, just at the foot of that bed. |
| 14:49:49 | 5 | Q.  Now I'm placing on the ELMO Government's Exhibit 12.  What |
| 14:49:51 | 6 | does this photograph show? |
| 14:49:54 | 7 | A.  So this is during the course of the search.  You'll see the |
| 14:49:56 | 8 | items have been moved to the mattress to indicate we've searched |
| 14:50:00 | 9 | them.  This is just taking a step back from that prior photo. |
| 14:50:06 | 10 | Q.  And Government's Exhibit 13, does that depict the similar |
| 14:50:06 | 11 | seen? |
| 14:50:08 | 12 | A.  It does, yes. |
| 14:50:10 | 13 | Q.  That same computer desk and dresser? |
| 14:50:14 | 14 | A.  Correct, yes.  And the number on the wall and the coconut |
| 14:50:16 | 15 | oil on the dresser. |
| 14:50:20 | 16 | Q.  Was this area a kitchen where this coconut oil is? |
| 14:50:22 | 17 | A.  No, this is just a bedroom. |
| 14:50:28 | 18 | Q.  Now, I'm placing on the ELMO Government's Exhibit 14. |
| 14:50:31 | 19 | What's depicted in Government's Exhibit 14? |
| 14:50:34 | 20 | A.  This is a wallet and identification card for the Defendant |
| 14:50:35 | 21 | that was found inside that bedroom. |
| 14:50:50 | 22 | Q.  And on that identification -- you said this was found in |
| 14:50:51 | 23 | that bedroom? |
| 14:50:51 | 24 | A.  Yes. |
| 14:50:54 | 25 | Q.  Okay.  And whose identification is it? |

14:50:57  1    A.  That's the -- what we later learned was the Defendant's

14:50:59  2    identification, Joseph Woodson.

14:51:01  3    Q.  Joseph Woodson, Junior?

14:51:02  4    A.  Yes, correct.

14:51:04  5    Q.  And does it show his address?

14:51:05  6    A.  It does, yes.

14:51:08  7    Q.  Is that the same location where you were executing the

14:51:08  8    search warrant?

14:51:09  9    A.  It is, yes.

14:51:13  10   Q.  And does it show the date of birth at May 18, 1989?

14:51:15  11   A.  It does.

14:51:19  12   Q.  Did you interact with any of the occupants of that townhouse

14:51:21  13   while you were there?

14:51:23  14   A.  No.  My job was just to search the home.

14:51:30  15   Q.  Okay.  When you found the Galaxy Note 3 inside the pillow

14:51:33  16   case, what did you do with it?

14:51:37  17   A.  So since we had some of the brief facts of the case and knew

14:51:42  18   kind of what we were looking for, that raised some suspicion the

14:51:45  19   way it was packaged so to speak and where we found it.  So we

14:51:48  20   called Detective Bartechko who we knew was conducting interviews

14:51:50  21   because we thought it might be helpful to his interviews.

14:51:53  22   Q.  All right.  What did you find suspicious about that Note 3

14:51:56  23   that led you to believe I should take this out to the

14:51:58  24   interviewer outside?

14:52:01  25   A.  There were a number of things.  First, that there was a

| | | |
|---|---|---|
| 14:52:03 | 1 | cellphone that was already in the bed which isn't that unusual, |
| 14:52:06 | 2 | but the fact that there's a second cellphone in bed and that |
| 14:52:10 | 3 | it's also inside of a pillow case, not a typical place to store |
| 14:52:13 | 4 | a cellphone in my experience.  And also that the front-facing |
| 14:52:17 | 5 | camera was covered with tape, that's not something we see very |
| 14:52:17 | 6 | often. |
| 14:52:23 | 7 | Q.  Now, placing on the ELMO Government's Exhibit 10.  And is |
| 14:52:32 | 8 | this another picture of the Galaxy S7 Edge that you found in |
| 14:52:33 | 9 | that room? |
| 14:52:34 | 10 | A.  Yes. |
| 14:52:36 | 11 | Q.  That's the one that was just laying on the bed? |
| 14:52:37 | 12 | A.  Just under the pillow, yes. |
| 14:52:42 | 13 | Q.  Okay.  Government's Exhibit 11.  Is that the front of that |
| 14:52:43 | 14 | same phone? |
| 14:52:46 | 15 | A.  Correct.  Yes. |
| 14:52:59 | 16 | MS. VIAMONTES:  No further questions, Your Honor. |
| 14:52:59 | 17 | THE COURT:  Cross? |
| 14:53:00 | 18 | MR. NATALE:  No cross. |
| 14:53:03 | 19 | THE COURT:  Thank you, Detective.  You are excused. |
| 14:53:03 | 20 | THE WITNESS:  Thank you. |
| 14:53:05 | 21 | THE COURT:  Call your next witness please. |
| 14:53:07 | 22 | MS. ANTON:  The Government calls Detective Justin |
| 14:53:09 | 23 | Oksanen. |
| 14:53:24 | 24 | THE COURT:  Okay. |
| 14:53:44 | 25 | COURT SECURITY OFFICER:  He's in the bathroom. |

14:53:46  1          THE COURT:  Everybody goes to the bathroom except me

14:53:50  2    and I'm the oldest guy in the building.

14:54:33  3          Yes, sir.  When you reach the chair, please remain

14:54:35  4    standing and raise your right hand

14:54:35  5          JUSTIN OKSANEN, GOVERNMENT WITNESS, SWORN.

14:54:43  6          THE COURT:  Please be seated.  Get as close to the

14:54:46  7    microphone as you can, speak loudly, tell us your name and spell

14:54:49  8    it.

14:54:58  9          THE WITNESS:  My name is Justin J-U-S-T-I-N.  My last

14:55:02  10   name is Oksanen, O-K-S-A-N-E-N.

14:55:05  11          THE COURT:  All right.  You may proceed.

14:55:05  12          MS. ANTON:  Thank you, Judge.

14:55:05  13                         DIRECT EXAMINATION

14:55:05  14     BY MS. ANTON:

14:55:06  15   Q.  Good afternoon.

14:55:07  16   A.  Good afternoon.

14:55:10  17   Q.  Would you please formally introduce yourself to the ladies

14:55:10  18   and gentlemen of the jury.

14:55:12  19          THE COURT:  He just told them who he was.  What do they

14:55:16  20   need to know?  His shoe size?

14:55:17  21          MS. ANTON:  I don't think we want to know your shoe

14:55:20  22   size, but we would like to know where you work, how long have

14:55:21  23   you worked there.

14:55:23  24          THE COURT:  What do you do for a living?

14:55:25  25          THE WITNESS:  My name is Justin, I am a detective with

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED BY COMPUTER

| | | |
|---|---|---|
| 14:55:29 | 1 | the Louden County Sheriff's Office in Northern Virginia.  It's a |
| 14:55:30 | 2 | jurisdiction. |
| 14:55:31 | 3 | THE COURT:  Ask questions. |
| 14:55:31 | 4 | BY MS. ANTON: |
| 14:55:33 | 5 | Q.  How long have you been there? |
| 14:55:35 | 6 | A.  12 years. |
| 14:55:38 | 7 | Q.  And have you been assigned to the detective bureau for 12 |
| 14:55:39 | 8 | years? |
| 14:55:40 | 9 | A.  No, ma'am. |
| 14:55:41 | 10 | Q.  Where have you been assigned? |
| 14:55:45 | 11 | A.  I started in patrol and then moved eventually into |
| 14:55:45 | 12 | investigations. |
| 14:55:49 | 13 | Q.  Okay.  And how long have you been in criminal |
| 14:55:49 | 14 | investigations? |
| 14:55:52 | 15 | A.  Four and a half years. |
| 14:55:55 | 16 | Q.  Okay.  Are you also on the task force in the criminal |
| 14:55:56 | 17 | investigations unit? |
| 14:55:56 | 18 | A.  Yes, ma'am. |
| 14:55:58 | 19 | Q.  And what task force is that? |
| 14:56:02 | 20 | A.  That would be the -- it's a long one.  Northern Virginia, |
| 14:56:05 | 21 | District of Columbia, Internet Crimes against Children Task |
| 14:56:09 | 22 | Force, otherwise referred to ICAC. |
| 14:56:13 | 23 | Q.  As a detective with ICAC, do you work closely with federal |
| 14:56:13 | 24 | agencies? |
| 14:56:14 | 25 | A.  Yes, ma'am. |

| | | |
|---|---|---|
| 14:56:18 | 1 | Q.  And do you primarily investigate cases involving child |
| 14:56:21 | 2 | exploitation in that task force position? |
| 14:56:22 | 3 | A.  Yes, ma'am. |
| 14:56:25 | 4 | Q.  And in that position, do you receive sometimes cybertips |
| 14:56:29 | 5 | from internet application companies? |
| 14:56:31 | 6 | A.  Yes, ma'am. |
| 14:56:32 | 7 | Q.  Like Snapchat, Kik? |
| 14:56:33 | 8 | A.  That's correct. |
| 14:56:39 | 9 | Q.  Instagram.  Okay.  So back in 2018, were you working in that |
| 14:56:39 | 10 | capacity? |
| 14:56:40 | 11 | A.  Yes, I was. |
| 14:56:44 | 12 | Q.  And did you have an investigation that led you to have some |
| 14:56:47 | 13 | interaction with detectives down here in South Florida? |
| 14:56:47 | 14 | A.  Yes, I did. |
| 14:56:50 | 15 | Q.  Could you tell the ladies and gentlemen of the jury about |
| 14:56:50 | 16 | that? |
| 14:56:57 | 17 | A.  Sure.  My predecessor on the task force left to move on to |
| 14:57:04 | 18 | other things, and he gave me some cybertips that he had received |
| 14:57:08 | 19 | from the National Centers for Missing and Exploited Children |
| 14:57:17 | 20 | that involved a particular IP address.  He had been -- while he |
| 14:57:19 | 21 | was looking into the tip, he had been contacted by detectives |
| 14:57:24 | 22 | here in Florida that had an investigation with the same IP |
| 14:57:25 | 23 | address. |
| 14:57:30 | 24 | Q.  So when you realized that you had the same IP address -- and |
| 14:57:32 | 25 | that's an internet protocol address? |

14:57:33  1    A.  Yes, it is.

14:57:37  2    Q.  When you realized that you had the same IP address that was

14:57:40  3    of interest as some detectives down here in South Florida, did

14:57:42  4    you make contact with them and start to work together?

14:57:43  5    A.  I did.

14:57:46  6    Q.  Okay.  And tell us what happened after you did that.

14:57:52  7    A.  They essentially gave me some information about their case

14:57:58  8    and shared process that had been done to show a physical address

14:58:04  9    that the IP address resolves to.

14:58:09  10   Q.  Were you working also with Fairfax City police?

14:58:09  11   A.  Yes, ma'am.

14:58:12  12   Q.  Kevin -- Detective Kevin Bartechko?

14:58:12  13   A.  Yes, ma'am.

14:58:15  14   Q.  And were you working with Detective Bartechko because he's

14:58:18  15   in the next county over and needed your assistance?

14:58:19  16         THE COURT:  Why were you working with Detective

14:58:23  17   Bartechko?  How about asking that question instead of telling

14:58:26  18   him what he was doing.

14:58:28  19         MS. ANTON:  Sounds good.  Thank you, Judge.

14:58:28  20         BY MS. ANTON:

14:58:30  21   Q.  You can go ahead and answer that question.

14:58:38  22   A.  Okay.  Yes.  I was contacted by Detective Bartechko in

14:58:41  23   reference to an investigation he was working that involved the

14:58:46  24   same IP address as the tips that I had received from my

14:58:50  25   predecessor, Detective Bieber, and from the detectives down in

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED BY COMPUTER

14:58:50  1    Florida.

14:58:56  2         And just so -- there's two counties next to each other;

14:58:59  3    Louden County where I work, Fairfax County is right next to me,

14:59:03  4    and Fairfax City is a jurisdiction inside Fairfax County.  And

14:59:08  5    the IP address was coming back to a residence in Louden.

14:59:11  6    Q.  Did you assist with the search warrant in Fairfax?

14:59:11  7    A.  Yes, ma'am.

14:59:13  8    Q.  In Louden County.

14:59:14  9    A.  Yes, ma'am.

14:59:15  10   Q.  What date was that?

14:59:20  11   A.  That was January 26th of 2018.

14:59:23  12   Q.  And what was your role in assisting with that search

14:59:23  13   warrant?

14:59:29  14   A.  The way that the system works in Virginia is there has to be

14:59:36  15   a -- somebody from Louden County has to execute a warrant that's

14:59:40  16   being executed in Louden County.  So another jurisdiction can

14:59:42  17   obtain that warrant, but it has to be someone that works in

14:59:46  18   Louden, a deputy in Louden that actually serves that paperwork.

14:59:49  19   Q.  Okay.  Did you all meet the morning before the search

14:59:49  20   warrant?

14:59:50  21   A.  Yes, ma'am.

14:59:52  22   Q.  What was your role going to be in executing the search

14:59:52  23   warrant?

15:00:01  24   A.  To assist Detective Bartechko in interviewing.

15:00:04  25   Q.  When you got to the residence that morning, did you conduct

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED BY COMPUTER

15:00:04   1   interviews?

15:00:05   2   A.   Yes, ma'am.

15:00:07   3   Q.   And who did you interview?

15:00:11   4   A.   We interviewed Brandon and Joseph Woodson.

15:00:15   5   Q.   And you say "we".  Who were you with when you were doing the

15:00:15   6   interviews?

15:00:16   7   A.   Detective Bartechko.

15:00:19   8   Q.   And where did those interviews take place?

15:00:25   9   A.   In the -- in my issued vehicle.

15:00:27  10   Q.   What type of vehicle is that?

15:00:34  11   A.   It's a Dodge Caravan or Grand Caravan.  It's a minivan.

15:00:36  12   Q.   Is it unmarked minivan?

15:00:43  13   A.   It is.  It's a standard rental car, minivan that just has

15:00:47  14   some lights installed.  But they're done in kind of an

15:00:51  15   undercover way.  They're not very obvious.  And the little panel

15:00:54  16   for the lights is kind of hidden away on the inside.

15:00:55  17   Q.   And how were you dressed that day?

15:01:03  18   A.   I was wearing tan cargo pants, a black short-sleeved Polo

15:01:11  19   shirt with my sheriff's office badge on the breast, and a winter

15:01:14  20   jacket that's also black in color, has the sheriff's office star

15:01:19  21   and then patches on each shoulder.

15:01:24  22   Q.   And did you ask Brandon and Joseph Woodson if they would

15:01:25  23   voluntarily come to the car with you?

15:01:26  24   A.   Yes.

15:01:28  25   Q.   And did they agree?

| | | |
|---|---|---|
| 15:01:28 | 1 | A.  Yes, they did. |
| 15:01:32 | 2 | Q.  Okay.  And did you have your weapon drawn when you did that? |
| 15:01:33 | 3 | A.  No. |
| 15:01:36 | 4 | Q.  Were they placed in handcuffs? |
| 15:01:37 | 5 | A.  No. |
| 15:01:39 | 6 | Q.  Whose statement did you do first? |
| 15:01:40 | 7 | A.  Brandon Woodson. |
| 15:01:44 | 8 | Q.  Okay.  And did that interview occur with Detective |
| 15:01:44 | 9 | Bartechko? |
| 15:01:45 | 10 | A.  Yes, ma'am. |
| 15:01:48 | 11 | Q.  Were you able to determine whether or not he was going to be |
| 15:01:49 | 12 | a suspect in your investigation? |
| 15:01:52 | 13 | A.  Yes. |
| 15:01:53 | 14 | Q.  Was Brandon a suspect in your investigation? |
| 15:01:54 | 15 | A.  No. |
| 15:01:56 | 16 | Q.  Why is that? |
| 15:02:01 | 17 | A.  He provided us -- he produced his phone when we were in the |
| 15:02:05 | 18 | vehicle, voluntarily unlocked it.  We didn't have -- he denied |
| 15:02:09 | 19 | use of the particular application we were looking for.  It |
| 15:02:13 | 20 | wasn't present on his phone.  So we somewhat quickly ruled him |
| 15:02:16 | 21 | out as the suspect. |
| 15:02:20 | 22 | Q.  Okay.  And did you then walk him back to the house |
| 15:02:20 | 23 | afterwards? |
| 15:02:21 | 24 | A.  Yes, ma'am. |
| 15:02:23 | 25 | Q.  Who was the next person you interviewed? |

| | | |
|---|---|---|
| 15:02:24 | 1 | A.  Joseph Woodson. |
| 15:02:28 | 2 | Q.  And did he walk with you to your minivan voluntarily? |
| 15:02:28 | 3 | A.  Yes, ma'am. |
| 15:02:30 | 4 | Q.  And when you got into the car, where were you seated? |
| 15:02:33 | 5 | A.  I was sitting in the driver's seat. |
| 15:02:36 | 6 | Q.  Where was Joseph Woodson? |
| 15:02:39 | 7 | A.  In the front passenger's seat next to me. |
| 15:02:42 | 8 | Q.  Okay.  Did you have a recording device? |
| 15:02:42 | 9 | A.  Yes, ma'am. |
| 15:02:45 | 10 | Q.  And Detective Bartechko, was he in the car with you? |
| 15:02:46 | 11 | A.  Yes, he was. |
| 15:02:50 | 12 | Q.  Okay.  On the way out of the house to the car, did you have |
| 15:02:53 | 13 | a conversation with the Defendant? |
| 15:02:53 | 14 | A.  I did. |
| 15:02:55 | 15 | Q.  What was that conversation about? |
| 15:03:03 | 16 | A.  We were discussing a video game that had just been released |
| 15:03:07 | 17 | on, like, a mobile system, and we were talking about that on the |
| 15:03:09 | 18 | way to the car. |
| 15:03:12 | 19 | Q.  And did he seem knowledgeable to you about video games? |
| 15:03:13 | 20 | A.  He did. |
| 15:03:15 | 21 | Q.  Are you knowledgeable about video games? |
| 15:03:16 | 22 | A.  I am. |
| 15:03:17 | 23 | Q.  Do you play video games? |
| 15:03:18 | 24 | A.  I do. |
| 15:03:21 | 25 | Q.  And did you know the video game that he was talking about? |

15:03:24   1   A.   Yeah.  As a matter of fact, I think I brought it up to him.

15:03:27   2   Q.   And what video game was that?

15:03:28   3   A.   Skyrim.

15:03:33   4   Q.   And what type of video game is that?

15:03:40   5   A.   It's a first person kind of a -- I'm not really sure how to

15:03:43   6   exactly describe it, but, you know, swords and shields and

15:03:45   7   raiding castles, that kind of stuff.

15:03:49   8   Q.   Okay.  When you turned the recorder on, is that when you got

15:03:50   9   into the car?

15:03:54   10  A.   It was on the way to the car as we were walking to the car.

15:03:58   11  Q.   Okay.  And have you had the opportunity to listen to that

15:04:00   12  recording that was made that day?

15:04:02   13  A.   Yes, I have.

15:04:07   14  Q.   And have you seen --

15:04:10   15       MS. ANTON:  Permission to approach the ELMO at least,

15:04:12   16  Judge, Government's 19?  I believe it will be moved into

15:04:15   17  evidence without objection.

15:04:15   18       MS. MOLLISON:  That's correct, Your Honor.  No

15:04:16   19  objection.

15:04:18   20       THE COURT:  Without objection, 19 is admitted in

15:04:20   21  evidence.

15:04:22   22       MS. ANTON:  At this time, I may as well move 20 in as

15:04:22   23  well.

15:04:24   24       THE COURT:  Okay.  Any objection to 20?

15:04:25   25       MS. MOLLISON:  No objection, Your Honor.

15:04:27   1          THE COURT:  Without objection, 19 and 20 are admitted

15:04:28   2   in evidence.

15:04:28   3          (Government's Exhibits 19 & 20 in evidence)

15:04:28   4       BY MS. ANTON:

15:04:35   5   Q.  Okay.  Detective Oksanen, when you spoke to the Defendant,

15:04:39   6   Mr. Woodson, in the front seat of the car, what did you speak to

15:04:40   7   him about?

15:04:47   8   A.  About the reason we were there for the warrant.

15:04:50   9   Q.  Did you have anything with you in terms of an item that was

15:04:52  10   seized from the search?

15:04:52  11   A.  We did.

15:04:53  12   Q.  What did you have with you?

15:05:03  13   A.  A Samsung Galaxy Note 3 phone, mobile phone.

15:05:05  14   Q.  Did you give that to the Defendant during the course of your

15:05:06  15   conversation?

15:05:06  16   A.  No.

15:05:08  17   Q.  And why not?

15:05:15  18   A.  It's general practice not to hand somebody evidence that

15:05:20  19   could either be destroyed or deleted before we have a chance to

15:05:21  20   examine it.

15:05:24  21   Q.  Okay.  Were you able to speak to the Defendant without a

15:05:25  22   problem?

15:05:25  23   A.  Yes.

15:05:27  24   Q.  Did he appear to understand you?

15:05:29  25   A.  Yes.

15:05:32  1    Q.  Did he ever ask you to stop because he was confused or

15:05:33  2    didn't understand?

15:05:34  3    A.  No.

15:05:37  4    Q.  Okay.  And how long approximately do you think you spoke

15:05:39  5    with him in your car that morning?

15:05:40  6    A.  Approximately an hour.

15:05:43  7    Q.  Okay.

15:05:45  8         MS. ANTON:  At this time the Government would seek to

15:05:48  9    publish Government's 19 and --

15:05:51  10        THE COURT:  Go for it.

15:05:53  11        MS. ANTON:  As well as the transcripts in Government's

15:05:58  12   20, which we have a copy for each juror if the Court would

15:06:00  13   allow.

15:06:04  14        THE COURT:  You have a copy of each of them?

15:06:05  15        MS. ANTON:  We have a copy for the --

15:06:07  16        THE COURT:  Of which one?  Of 19 and 20?

15:06:08  17        MS. ANTON:  Just 20 is the transcript.

15:06:11  18        THE COURT:  Okay.  20.  Okay.

15:06:21  19        Can we have a stipulation that -- are you going to stop

15:06:23  20   and start this in the middle of it?

15:06:24  21        MS. ANTON:  I'm sorry?

15:06:26  22        THE COURT:  Are you going to stop and start it or are

15:06:27  23   you just going to play it all the way through?

15:06:29  24        MS. ANTON:  I'm just going to play it.

15:06:31  25        THE COURT:  Can we have a stipulation that the

144

```
15:06:35   1    transcript itself will substitute for a court reporter writing
15:06:39   2    it down because it's very hard to do with the court reporter.
15:06:40   3              MS. MOLLISON:  No objection, Your Honor.
15:06:42   4              MS. ANTON:  Not from the Government.  That's fine,
15:06:42   5    Judge.
15:06:44   6              THE COURT:  So we have that agreement.  Real hard to do
15:06:47   7    when you're trying to take a transcript because you can't like
15:06:50   8    stop them, because they're not here.
15:06:53   9              Go ahead.  Pass it out please.
15:06:54  10              MS. ANTON:  Thank you, Judge.
15:07:05  11              THE COURT:  Just pass five of them to the front row and
15:07:33  12    nine to the back row.  Pass it on down please.  Just keep one
15:07:37  13    and pass the rest down please.  What are we doing?  One of them
15:07:40  14    looks like it's one sheet of paper.  One of them looks like it's
15:07:43  15    one sheet of paper.  What is that?
15:07:46  16              MS. VIAMONTES:  The thick packet, Your Honor.
15:07:48  17              THE COURT:  They're two different packets?
15:07:49  18              MS. VIAMONTES:  Correct.
15:07:49  19              THE COURT:  They're both transcripts?
15:07:53  20              MS. VIAMONTES:  Yes.  It just continues.
15:08:46  21              THE COURT:  Four short.  Who doesn't have one?  I'd say
15:08:49  22    that's four.
15:09:13  23              MS. ANTON:  Can we switch over to the computer?  Thank
15:09:16  24    you, Dawn.
15:09:32  25              (Government's Exhibit 20 being published to the jury)
```

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED BY COMPUTER

```
15:09:58   1              THE COURT:  Hold it.  Stop.  Stop right there.
15:10:03   2    Somebody wants to say when they get to Page 2 or something like
15:10:08   3    that so that the jury knows where you believe you are in the
15:10:12   4    transcript?  We just start at Page 2, correct?
15:10:12   5              MS. ANTON:  Yes.
15:10:19   6              THE COURT:  Okay.  When you get to the end of this one,
15:10:25   7    say Page 3 and then although they're not numbered, that's very
15:10:27   8    helpful.  The second page.
15:10:30   9              MS. ANTON:  We'll say next page.
15:10:33  10              THE COURT:  Of the fat one.
15:10:38  11              (Government's Exhibit 50 published to jury)
15:12:11  12              MS. ANTON:  Next page.
15:12:18  13              (Government's Exhibit 50 published to jury)
15:13:11  14              MS. ANTON:  Next page.
15:13:18  15              (Government's Exhibit 50 published to jury)
15:14:21  16              MS. ANTON:  Next page.
15:14:25  17              (Government's Exhibit 50 published to jury)
15:17:28  18              MS. ANTON:  Next page.
15:17:33  19              (Government's Exhibit 50 published to jury)
15:18:31  20              MS. ANTON:  Next page.
15:18:36  21              (Government's Exhibit 50 published to jury)
15:20:43  22              MS. ANTON:  Next page.
15:20:48  23              (Government's Exhibit 50 published to jury)
15:22:38  24              MS. ANTON:  Next page.
15:22:44  25              (Government's Exhibit 50 published to jury)
```

| | | |
|---|---|---|
| 15:23:26 | 1 | MS. ANTON:  Next page. |
| 15:23:33 | 2 | (Government's Exhibit 50 published to jury) |
| 15:26:01 | 3 | MS. ANTON:  Next page. |
| 15:26:05 | 4 | (Government's Exhibit 50 published to jury) |
| 15:26:56 | 5 | MS. ANTON:  Next page. |
| 15:27:01 | 6 | (Government's Exhibit 50 published to jury) |
| 15:27:37 | 7 | MS. ANTON:  Next page. |
| 15:27:42 | 8 | (Government's Exhibit 50 published to jury) |
| 15:29:00 | 9 | MS. ANTON:  Next page. |
| 15:29:04 | 10 | (Government's Exhibit 50 published to jury) |
| 15:29:38 | 11 | MS. ANTON:  Next page. |
| 15:29:45 | 12 | (Government's Exhibit 50 published to jury) |
| 15:30:15 | 13 | MS. ANTON:  Next page. |
| 15:30:19 | 14 | (Government's Exhibit 50 published to jury) |
| 15:32:23 | 15 | MS. ANTON:  Next page. |
| 15:32:28 | 16 | (Government's Exhibit 50 published to jury) |
| 15:34:48 | 17 | MS. ANTON:  Next page. |
| 15:34:52 | 18 | (Government's Exhibit 50 published to jury) |
| 15:37:27 | 19 | MS. ANTON:  Next page. |
| 15:37:32 | 20 | (Government's Exhibit 50 published to jury) |
| 15:38:59 | 21 | MS. ANTON:  Next page. |
| 15:39:09 | 22 | (Government's Exhibit 50 published to jury) |
| 15:41:01 | 23 | MS. ANTON:  Next page |
| 15:41:06 | 24 | (Government's Exhibit 50 published to jury) |
| 15:41:42 | 25 | MS. ANTON:  Next page. |

15:41:47   1                    (Government's Exhibit 50 publish to jury)

15:42:54   2                    MS. ANTON:   Next page.

15:42:59   3                    (Government's Exhibit 50 published to jury)

15:45:31   4                    MS. ANTON:   Next page.

15:45:35   5                    (Government's Exhibit 50 published to jury)

15:46:44   6                    MS. ANTON:   Next page.

15:46:50   7                    (Government's Exhibit 50 published to jury)

15:48:00   8                    MS. ANTON:   Next page.

15:48:05   9                    (Government's Exhibit 50 published to jury)

15:51:10   10                    MS. ANTON:   Next page.

15:51:16   11                    (Government Exhibit 50 published to jury)

15:55:59   12                    MS. ANTON:   Next page.

15:56:07   13                    (Government Exhibit 50 published to jury)

16:01:04   14                    MS. ANTON:   Next page.

16:01:13   15                    (Government Exhibit 50 published to jury)

16:02:59   16                    MS. ANTON:   Next page.

16:03:04   17                    (Government's Exhibit 50 published to jury)

16:03:59   18                    (End of exhibit)

16:03:59   19            BY MS. ANTON:

16:04:05   20     Q.   Detective Oksanen, do you have a strategy for going into an

16:04:07   21     interview like this?

16:04:11   22     A.   Sorry.   Sometimes, yeah.

16:04:16   23     Q.   And based on your training as a TFO with the Internet Crimes

16:04:20   24     against Children Task Force, what is or what are some types of

16:04:23   25     strategies that you employ for these type of interviews?

16:04:35  1   A.  I mean, essentially, you know, confronting somebody with

16:04:39  2   what we have, sharing some of the information that brought us to

16:04:45  3   the house or -- excuse me.  You know, explaining why we're

16:04:54  4   there, asking them to explain things to me.  Bluffing.  I mean,

16:05:01  5   there's -- and not -- yeah.  I guess, I don't know names for any

16:05:04  6   of the different techniques.

16:05:07  7   Q.  Well, let me ask you specifically, you said -- we all heard

16:05:12  8   you say in the interview something to the effect of you're not

16:05:17  9   the most horrific or worst dude.  Can you explain what that

16:05:20  10  strategy is when you comment on the types of crimes you're

16:05:20  11  investigating?

16:05:25  12  A.  Yes.  Maybe I do know some of the terms.  Like minimizing

16:05:31  13  something.  If you were to, you know, confront anybody with

16:05:35  14  something and, you know, I don't know, curl your lips at them

16:05:39  15  like they're -- and, you know, reel away from them like they did

16:05:42  16  something so bad, they're probably not going to talk to you.

16:05:44  17  Yeah, minimizing what they did.

16:05:46  18  Q.  Is that what you did in this interview with Mr. Woodson?

16:05:48  19  A.  To a degree, yes.

16:05:51  20  Q.  Do you see the person who you interviewed that day sitting

16:05:52  21  in the courtroom?

16:05:52  22  A.  Yes.

16:05:57  23  Q.  Could you please identify him by an article of clothing?

16:06:01  24  A.  I guess it's like a tan jacket and white shirt sitting over

16:06:03  25  there.

| | | |
|---|---|---|
| 16:06:05 | 1 | MS. ANTON:  Thank you.  If the record could reflect the |
| 16:06:06 | 2 | witness has identified the Defendant. |
| 16:06:07 | 3 | THE COURT:  It may. |
| 16:06:07 | 4 | BY MS. ANTON: |
| 16:06:10 | 5 | Q.  Now, in the interview we heard that you were showing the |
| 16:06:12 | 6 | Defendant a series of photographs. |
| 16:06:13 | 7 | A.  Yes, ma'am. |
| 16:06:18 | 8 | Q.  Did you speak to Detective Adam Granit from Davie PD |
| 16:06:23 | 9 | regarding his cases prior to your interview? |
| 16:06:23 | 10 | A.  Yes, ma'am. |
| 16:06:26 | 11 | Q.  And did he provide you any materials for that interview? |
| 16:06:27 | 12 | A.  He did. |
| 16:06:28 | 13 | Q.  What did he provide you? |
| 16:06:35 | 14 | A.  He provided me with sanitized -- by sanitized, I mean with |
| 16:06:40 | 15 | any nudity cut out, like black boxes over body parts or |
| 16:06:46 | 16 | something like that of images of his victim or a victim in his |
| 16:06:47 | 17 | case. |
| 16:06:50 | 18 | Q.  When you say sanitized, are you referring to child |
| 16:06:50 | 19 | pornography images? |
| 16:06:51 | 20 | A.  Yes, ma'am. |
| 16:06:56 | 21 | Q.  And what was the name the user name of that victim? |
| 16:06:59 | 22 | A.  **** ****. |
| 16:07:04 | 23 | Q.  Okay.  And after you did this interview with the Defendant |
| 16:07:07 | 24 | that day, did your investigation continue? |
| 16:07:07 | 25 | A.  Yes, it did. |

16:07:10  1    Q.  And how did it continue?

16:07:16  2    A.  The items were seized, taken, turned over that day to

16:07:23  3    Fairfax City Police Department, and they extracted data from the

16:07:27  4    phone, some data from another hard drive, and ultimately that

16:07:32  5    information or the contents of those were sent over to the

16:07:37  6    detectives that I had been contacted in Florida.

16:07:40  7    Q.  And did you continue working the case with the detectives

16:07:45  8    and FBI in South Florida until about September?

16:07:48  9    A.  Approximately.  I tried to assist however I could.

16:07:53  10   Q.  Okay.  And in September of 2018, did you assist further in

16:07:55  11   effectuating the arrest of the Defendant?

16:07:56  12   A.  Yes, ma'am.

16:07:58  13   Q.  And could you tell the jury how that happened?

16:08:02  14   A.  The detectives from Florida, namely Granit and Bieber, came

16:08:09  15   up to the D.C. area and they had obtained arrest warrants for

16:08:16  16   Mr. Woodson.  So it being Louden, again, I would be involved

16:08:20  17   with effecting that arrest, and having already knowing who

16:08:28  18   Mr. Woodson is.  So they came up and we met up with a patrol

16:08:32  19   unit, so somebody with a marked car would be present in like a

16:08:34  20   standard uniform, and went to Mr. Woodson's house.

16:08:37  21   Q.  Okay.  Do you recall that date?

16:08:45  22   A.  It would have been September, I want to say 28th.  It was

16:08:47  23   like late, September, mid September.

16:08:51  24   Q.  Okay.  And did you actually go inside the Defendant's

16:08:53  25   residence and effectuate the arrest?

| | | |
|---|---|---|
| 16:08:54 | 1 | A.  Yes, ma'am. |
| 16:08:57 | 2 | Q.  And did he have any electronic devices at that time? |
| 16:08:58 | 3 | A.  Yes. |
| 16:09:01 | 4 | Q.  Could you explain to the jury what you observed? |
| 16:09:09 | 5 | A.  Yes.  He produced a mobile phone and sent a text message on |
| 16:09:15 | 6 | the phone and then threw it onto his bed. |
| 16:09:18 | 7 | Q.  Did you subsequently assist with obtaining a search warrant |
| 16:09:19 | 8 | for that phone? |
| 16:09:20 | 9 | A.  Yes. |
| 16:09:24 | 10 | Q.  And did you subsequently assist with the search of that |
| 16:09:24 | 11 | phone? |
| 16:09:27 | 12 | A.  No, not the search of the phone. |
| 16:09:31 | 13 | Q.  Did you help out the detectives in South Florida in seizing |
| 16:09:32 | 14 | the phone? |
| 16:09:34 | 15 | A.  Yes, ma'am. |
| 16:10:01 | 16 |         MS. ANTON:  Judge, at this time the Government seeks to |
| 16:10:04 | 17 | admit Government's 23 into evidence. |
| 16:10:08 | 18 |         THE COURT:  Okay.  You're skipping 21 and 22? |
| 16:10:10 | 19 |         MS. MOLLISON:  No objection, Your Honor. |
| 16:10:12 | 20 |         MS. ANTON:  As well as 21 and 22. |
| 16:10:15 | 21 |         THE COURT:  You want 21, 22 and 23? |
| 16:10:17 | 22 |         MS. ANTON:  Yes. |
| 16:10:19 | 23 |         THE COURT:  All admitted into evidence without |
| 16:10:20 | 24 | objection. |
| 16:10:21 | 25 |         MS. ANTON:  Permission to publish? |

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

16:10:23   1          THE COURT:  You may.

16:10:28   2          (Government's Exhibits 21-23 in evidence)

16:10:34   3          (Exhibits published)

16:10:34   4      BY MS. ANTON:

16:10:39   5   Q.  Detective, I put on the ELMO what's been entered into

16:10:45   6   evidence as Government's Exhibit 23.  Is this a copy of the

16:10:50   7   search warrant that was done for the Samsung S8 phone?

16:10:51   8   A.  Yes, ma'am.

16:10:52   9   Q.  Is that your signature on the bottom?

16:10:58  10   A.  No, that's the magistrate's signature.  Above it though is

16:11:01  11   my name typed out as the affiant, yeah.

16:11:03  12   Q.  Is this the search warrant that you sought in order to gain

16:11:06  13   possession of the S8 phone that you saw the Defendant throw on

16:11:08  14   the bed when you went to arrest him?

16:11:08  15   A.  Yes, ma'am.

16:11:12  16   Q.  Putting on the ELMO what's been entered into evidence as

16:11:16  17   Government's Exhibit 21.  What is that a picture of?

16:11:23  18   A.  Of the S8 device that was seized pursuant to the previous

16:11:24  19   warrant.

16:11:27  20   Q.  And Government's Exhibit 22?

16:11:30  21   A.  Appears to be the back of the phone.

16:11:35  22   Q.  And was that phone also sent for extraction as well?

16:11:38  23   A.  Yes, that phone was mailed to Detective Granit.

16:11:41  24   Q.  And when you say "extraction", could you just briefly

16:11:46  25   explain to the ladies and gentlemen of our jury what that means?

| | | |
|---|---|---|
| 16:11:49 | 1 | A.  Sure.  So there's essentially two phases of examining a |
| 16:11:53 | 2 | mobile device.  You have to be able to pull the data off of the |
| 16:11:58 | 3 | device and then afterwards parse out that data.  So there's |
| 16:12:02 | 4 | different programs that pull data off of the phone and different |
| 16:12:08 | 5 | programs that parse that data, and some that do both. |
| 16:12:12 | 6 | Q.  Okay.  And so you sent that down to the detectives and FBI |
| 16:12:13 | 7 | in South Florida? |
| 16:12:13 | 8 | A.  Yes, ma'am. |
| 16:12:19 | 9 | Q.  And did that essentially end your assistance with this case? |
| 16:12:25 | 10 | A.  No. |
| 16:12:26 | 11 | Q.  I'm sorry? |
| 16:12:27 | 12 | A.  No. |
| 16:12:29 | 13 | Q.  It didn't.  Okay.  What else did you do? |
| 16:12:38 | 14 | A.  In looking at some of the images on the actual phone, again |
| 16:12:44 | 15 | not necessarily the data or text messages or anything, but in |
| 16:12:48 | 16 | going through the actual images trying to identify any other |
| 16:12:56 | 17 | victims, I found like a screenshot of some kind of conversation |
| 16:13:00 | 18 | with a female's name in it. |
| 16:13:02 | 19 | Q.  Okay.  When you found the screenshot and the conversation in |
| 16:13:06 | 20 | the Defendant's phone, what steps did you take to further |
| 16:13:09 | 21 | identify that person? |
| 16:13:16 | 22 | A.  Fired up Facebook and went into -- searched for the female's |
| 16:13:18 | 23 | name in Facebook. |
| 16:13:19 | 24 | Q.  Do you recall that name? |
| 16:13:22 | 25 | A.  It was A.G., I believe. |

16:13:24   1    Q.  Okay.

16:13:30   2    A.  And then at some point called Detective Granit to say hey

16:13:36   3    this girl, A.G., here's her Facebook page and, you know, sent

16:13:41   4    him a link or whatever, and say she looks a lot like this other

16:13:46   5    girl who had pictures of her in compromising situations on the

16:13:48   6    phone.  So it looked like it was the same person.

16:13:51   7    Q.  Okay.  So when you saw compromising situations, are you

16:13:53   8    talking about child pornography?

16:13:55   9    A.  Yes, ma'am.

16:13:58  10    Q.  Images and videos that were located on the Defendant's

16:13:58  11    phone?

16:13:59  12    A.  Yes, ma'am.

16:14:06  13    Q.  Okay.  So A.G. is someone who you were able to identify

16:14:06  14    using Facebook?

16:14:11  15    A.  Yeah, or at least get a -- I didn't meet with her personally

16:14:15  16    and check her driver's license, but yeah, enough to where

16:14:18  17    detectives had somebody go out to -- or go and speak with her

16:14:19  18    face-to-face.

16:14:22  19    Q.  Okay.  So after you did some preliminary review of the

16:14:26  20    images on the Defendant's phone and gave that information to the

16:14:29  21    detectives in South Florida, did you have any other involvement

16:14:30  22    in the case?

16:14:32  23    A.  No.

16:14:34  24         MS. ANTON:  Thank you, Detective.  I have no further

16:14:36  25    questions.

| | | |
|---|---|---|
| 16:14:37 | 1 | THE COURT:  Cross-examination. |
| 16:14:38 | 2 | CROSS-EXAMINATION |
| 16:14:44 | 3 | BY MS. MOLLISON: |
| 16:14:51 | 4 | Q.  Good afternoon, Detective. |
| 16:14:52 | 5 | A.  Hi. |
| 16:14:56 | 6 | Q.  You testified on direct that you helped to execute the |
| 16:14:58 | 7 | search warrant at Mr. Woodson's house? |
| 16:15:00 | 8 | A.  Yes, ma'am. |
| 16:15:02 | 9 | Q.  When you went there, did you see that his sister had been |
| 16:15:04 | 10 | upset? |
| 16:15:08 | 11 | A.  Yes. |
| 16:15:11 | 12 | Q.  And you learned -- you were told by members of the family |
| 16:15:13 | 13 | that she has some kind of emotional problems? |
| 16:15:16 | 14 | A.  I don't recall being told that, no. |
| 16:15:20 | 15 | Q.  You weren't told any reason for why she was upset? |
| 16:15:22 | 16 | MS. ANTON:  Objection, calls for hearsay. |
| 16:15:23 | 17 | THE COURT:  That is hearsay. |
| 16:15:24 | 18 | MS. MOLLISON:  I'll move on, Your Honor. |
| 16:15:24 | 19 | BY MS. MOLLISON: |
| 16:15:29 | 20 | Q.  Did you learn that Mr. Woodson had similar neurological |
| 16:15:30 | 21 | problems? |
| 16:15:32 | 22 | A.  No. |
| 16:15:37 | 23 | Q.  But before you executed the warrant, you knew what house you |
| 16:15:39 | 24 | were going to. |
| 16:15:39 | 25 | A.  Yes. |

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED BY COMPUTER

16:15:44  1    Q.  And you had done some preliminary investigation as to who

16:15:45  2    was living in that house.

16:15:47  3    A.  Yes.

16:15:50  4    Q.  You tried to find out what you could about the people in

16:15:50  5    that home?

16:15:52  6    A.  Yes.

16:15:56  7    Q.  You knew that one of the tenants was named Jerry Browning?

16:15:56  8    A.  Yes.

16:16:01  9    Q.  And that is the boyfriend of Mr. Woodson's mother.

16:16:01  10   A.  Yes.

16:16:05  11   Q.  Your police department has had other domestic calls to that

16:16:07  12   same residence?

16:16:07  13   A.  Yes, ma'am.

16:16:09  14   Q.  Based on violence by Mr. Browning.

16:16:13  15        MS. ANTON:  I'm going to object to relevance.

16:16:17  16        THE COURT:  What is the relevance?

16:16:18  17        MS. MOLLISON:  I can move on, Judge.

16:16:20  18        THE COURT:  Okay.  So it's not relevant.  Ignore it.

16:16:22  19   Jury will disregard that.

16:16:22  20        BY MS. MOLLISON:

16:16:29  21   Q.  The day that you executed the search warrant, you had called

16:16:33  22   the SWAT Team to accompany you; is that right?

16:16:38  23   A.  Yeah.  I didn't call them the day of the warrant but yes,

16:16:44  24   they were -- a tactical team was requested to execute the search

16:16:45  25   warrant at the residence.

16:16:46 1    Q.  So they came along with you?

16:16:49 2    A.  No, they were there before I was.

16:16:54 3    Q.  And for that same reason that you did a preliminary

16:16:55 4    investigation on the house, it's important for the SWAT Team to

16:16:59 5    know who lives in the house.

16:17:04 6    A.  Correct.  For safety-related reasons, yes.

16:17:06 7    Q.  They are obviously carrying firearms?

16:17:07 8    A.  Yes.

16:17:10 9    Q.  It could create a dangerous situation if you don't know who

16:17:12 10   is involved, who is living there?

16:17:13 11   A.  Right.

16:17:20 12   Q.  After you executed the warrant, you testified on direct that

16:17:25 13   you did some further investigation into Mr. Woodson.

16:17:30 14   A.  Not necessarily into Mr. Woodson.  I mean, as far as looking

16:17:35 15   at the images on the phone, things like that, yes.

16:17:39 16   Q.  Did you run a criminal history check?

16:17:41 17        MS. ANTON:  Objection, relevance.

16:17:43 18        THE COURT:  I'll permit it, but that's it.  Move on.

16:17:46 19   You may answer that question.

16:17:49 20        THE WITNESS:  I don't know.

16:17:54 21     BY MS. MOLLISON:

16:17:59 22   Q.  You conducted an interview with Mr. Woodson that day, we all

16:18:01 23   heard that interview; is that right?

16:18:02 24   A.  Yes, ma'am.

16:18:05 25   Q.  And in that interview, Mr. Woodson admitted to you very

16:18:08   1      straightforwardly that he was involved in this activity.

16:18:09   2      A.   Yes, ma'am.

16:18:11   3      Q.   He told you in the interview that someone was coercing him

16:18:14   4      to engage in this behavior.

16:18:15   5      A.   Yes.

16:18:18   6      Q.   That this other person he thought lives in Ireland.

16:18:18   7      A.   Yes, ma'am.

16:18:21   8      Q.   Based on an IP address?

16:18:22   9      A.   That's correct.

16:18:26   10     Q.   Mr. Woodson told you he was afraid of what that other person

16:18:28   11     would do to him and his family?

16:18:29   12     A.   That's correct.

16:18:34   13     Q.   And you didn't believe Mr. Woodson about the existence of

16:18:35   14     this other person?

16:18:36   15     A.   About what?

16:18:38   16     Q.   The existence of this other person?

16:18:44   17     A.   No, I would say at first, no I didn't.  But as per the

16:18:49   18     interview, towards the end of it, I acknowledged that this

16:18:53   19     person could in fact exist.  I just didn't believe the capacity

16:18:55   20     to which he said he did exist.

16:18:58   21     Q.   So at first you said it sounded ridiculous?

16:18:59   22     A.   Yes.

16:19:02   23     Q.   You thought Mr. Woodson was just making up a flat-out lie.

16:19:02   24     A.   Yes.

16:19:05   25     Q.   But based on your investigation following your conversation

16:19:09  1    with Mr. Woodson, it turned out that the man in Ireland really

16:19:11  2    does exist.

16:19:13  3    A.  In some capacity, yes.

16:19:18  4    Q.  That that person's Ireland IP address was in fact found to

16:19:23  5    have been logging into some of these same accounts.

16:19:25  6    A.  I believe so, yes.

16:19:30  7    Q.  And that individual, someone who is living in Ireland,

16:19:33  8    became a suspect in connection with this case.

16:19:33  9    A.  Yes.

16:19:41  10   Q.  That person's name is Matthew or Matt Johnstone.

16:19:44  11   A.  I don't feel comfortable saying an exact name.  At this

16:19:48  12   point this is work done by the detectives in Florida.  I didn't

16:19:51  13   personally serve search warrants on the Snapchat accounts to see

16:19:56  14   which IP addresses were logging in.  At this point, this is

16:20:02  15   primarily a Florida case and I was assisting Florida so in terms

16:20:05  16   of his exact name, I can't say.  But yes, I was aware that there

16:20:10  17   was somebody in Ireland that was somehow involved.

16:20:13  18   Q.  And that person has since that interview now been

16:20:14  19   identified.

16:20:16  20   A.  I believe so, yes.

16:20:18  21   Q.  And I want to ask you one other question about the

16:20:21  22   interview.  Mr. Woodson told you that it was important that he

16:20:25  23   kept one of his phones because it was his work phone.

16:20:29  24   A.  Right.  And he needed it for his managerial duties or to

16:20:31  25   call his boss or something to that effect.

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED BY COMPUTER

| | | |
|---|---|---|
| 16:20:33 | 1 | Q.  He said he was an assistant manager? |
| 16:20:33 | 2 | A.  Yes, ma'am. |
| 16:20:35 | 3 | Q.  Did you follow-up with his boss? |
| 16:20:36 | 4 | A.  No. |
| 16:20:38 | 5 | Q.  You didn't try to speak to his employer at all? |
| 16:20:39 | 6 | A.  No. |
| 16:20:42 | 7 | Q.  Did you find out where he was working? |
| 16:20:43 | 8 | A.  I believe so. |
| 16:20:46 | 9 | Q.  And where was that? |
| 16:20:50 | 10 | A.  Giant Food grocery store. |
| 16:20:55 | 11 | Q.  After that interview that day and after your search was |
| 16:20:58 | 12 | concluded, you did not arrest Mr. Woodson. |
| 16:21:00 | 13 | A.  No, ma'am. |
| 16:21:03 | 14 | Q.  You let him stay at home that day. |
| 16:21:05 | 15 | A.  Yes. |
| 16:21:09 | 16 | Q.  He went back to his normal life? |
| 16:21:11 | 17 | A.  I couldn't tell you what he did. |
| 16:21:13 | 18 | Q.  You let him keep working? |
| 16:21:15 | 19 | A.  Yes. |
| 16:21:20 | 20 | Q.  And it was not until nine months later that he was arrested. |
| 16:21:21 | 21 | A.  Correct. |
| 16:21:25 | 22 | Q.  During that time you were watching him, I assume? |
| 16:21:26 | 23 | A.  Was I watching Mr. Woodson? |
| 16:21:29 | 24 | Q.  Was there some kind of surveillance on Mr. Woodson? |
| 16:21:30 | 25 | A.  No. |

16:21:32 1   Q.  The department didn't want to check and see what he was

16:21:35 2  doing online in that time period?

16:21:38 3   A.  No.

16:21:40 4   Q.  You weren't concern that Mr. Woodson would continue to

16:21:43 5  engage in this activity?

16:21:45 6        MS. ANTON:  Judge, I'm going to object to

16:21:47 7  argumentative.

16:21:51 8        THE COURT:  I believe it is.  Sustained.

16:21:51 9    BY MS. MOLLISON:

16:21:59 10  Q.  But I just want to be clear, Mr. Woodson, in your view, did

16:22:01 11  give a confession that day.

16:22:02 12  A.  Yes.

16:22:05 13  Q.  Did admit that he was involved in that behavior.

16:22:05 14  A.  Yes.

16:22:11 15  Q.  Did you make the decision not to arrest Mr. Woodson?

16:22:25 16  A.  No, that would have been Detective Bartechko's primary

16:22:33 17  decision.  The identified victim, you know, in Fairfax is -- it

16:22:38 18  was his case essentially, but we may have, you know, consulted

16:22:43 19  each other and decided that we needed to see what was actually

16:22:46 20  on the phone before we would want to arrest him.

16:22:48 21  Q.  But Mr. Woodson was living in your jurisdiction; is that

16:22:50 22  right?  Louden County?

16:22:51 23  A.  Correct.

16:22:53 24  Q.  And he had told you what was on the phone.  There was no

16:22:54 25  question about that.

16:22:54  1    A.  Correct.

16:22:57  2    Q.  So you did have the authority to arrest him if you had

16:22:59  3    wanted to.

16:23:01  4    A.  Yeah.

16:23:06  5    Q.  On the interview, Mr. Woodson discussed the practice of

16:23:07  6    swatting.

16:23:08  7    A.  Yes, ma'am.

16:23:12  8    Q.  It seemed on that interview that you were aware of what

16:23:14  9    swatting was even before Mr. Woodson had raised it?

16:23:16  10   A.  That I was aware?

16:23:18  11   Q.  Of what it is.  What swatting is.

16:23:18  12   A.  Yes.

16:23:21  13   Q.  Because you know swatting has become a problem in police

16:23:22  14   departments nationwide.

16:23:24  15   A.  Yes.  I've heard of it, yes.

16:23:26  16   Q.  Including Northern Virginia.

16:23:33  17   A.  If you're asking me for like a particular, I don't have any

16:23:33  18   direct --

16:23:37  19   Q.  Not any particular incidents, just --

16:23:41  20   A.  I guess in order to answer that, I would have to have in my

16:23:44  21   mind a case in Northern Virginia that where this happened and I

16:23:47  22   don't.  I'm not saying that it hasn't, I just can't personally

16:23:50  23   tell you of a case that's occurred in Northern Virginia that I

16:23:52  24   know of.

16:23:55  25   Q.  You had said on direct that you are knowledgeable about

16:23:56  1    gaming culture?

16:23:58  2    A.  Yes, ma'am.

16:24:03  3    Q.  Are you aware that swatting is a threat that people within

16:24:05  4    this community make towards each other?

16:24:06  5    A.  Yes, ma'am.

16:24:08  6    Q.  It's associated with that culture.

16:24:10  7    A.  Yeah.

16:24:15  8    Q.  And that sometimes that threat can and has materialized.

16:24:15  9    A.  Yes.

16:24:20  10   Q.  And when that threat does materialize, it is, as we said in

16:24:21  11   the beginning, a dangerous situation or could be?

16:24:22  12   A.  Could be, yes.

16:24:25  13   Q.  And that people have been killed in those kind of

16:24:25  14   situations?

16:24:26  15   A.  I believe so, yes.

16:24:30  16   Q.  Even as a result of a hoax call?  A prank call?

16:24:32  17   A.  I believe so.

16:24:35  18        MS. MOLLISON:  Just a moment, Your Honor.

16:24:46  19        Thank you.  No further questions.

16:24:47  20        THE COURT:  Redirect.

16:24:48  21        MS. ANTON:  No redirect, Your Honor.

16:24:50  22        THE COURT:  All right.  Thank you, sir.  You are

16:24:51  23   excused.

16:24:57  24        Do you have any short witnesses?  Maybe 5'2" or 5'3"?

16:25:00  25        MS. ANTON:  The next one is not terribly short, Judge.

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

| | | |
|---|---|---|
| 16:25:03 | 1 | THE COURT:  Okay.  Well, let's call him and get going |
| 16:25:07 | 2 | then.  Come on.  Bring him in. |
| 16:25:09 | 3 | MS. VIAMONTES:  The United States calls Detective Adam |
| 16:25:11 | 4 | Granit. |
| 16:25:20 | 5 | THE COURT:  That's a solid name for a detective. |
| 16:25:39 | 6 | Go for about 15, 16 minutes and we'll break at a |
| 16:25:40 | 7 | quarter of. |
| 16:25:59 | 8 | Yes, sir.  Please come forward.  Please remain standing |
| 16:26:00 | 9 | and raise your right hand. |
| 16:26:00 | 10 | ADAM GRANIT, GOVERNMENT WITNESS, SWORN. |
| 16:26:02 | 11 | THE COURT:  Please be seated.  Get as close to the |
| 16:26:04 | 12 | microphone as you can, tell us your name, speak loudly and spell |
| 16:26:06 | 13 | it please. |
| 16:26:10 | 14 | THE WITNESS:  My name is Adam Granit, G-R-A-N-I-T. |
| 16:26:12 | 15 | THE COURT:  You may proceed, ma'am. |
| 16:26:14 | 16 | MS. VIAMONTES:  Thank you.  Thank you, Your Honor. |
| 16:26:14 | 17 | DIRECT EXAMINATION |
| 16:26:14 | 18 | BY MS. VIAMONTES: |
| 16:26:16 | 19 | Q.  Detective Granit, did you walk in with notes? |
| 16:26:18 | 20 | A.  Yes. |
| 16:26:19 | 21 | MS. VIAMONTES:  May I approach, Your Honor? |
| 16:26:30 | 22 | THE COURT:  You may.  That's his contract.  He's |
| 16:26:34 | 23 | selling his name for a TV show. |
| 16:26:34 | 24 | BY MS. VIAMONTES: |
| 16:26:48 | 25 | Q.  Good afternoon, Detective Granit. |

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED BY COMPUTER

16:26:49  1    A.  Good afternoon.

16:26:51  2    Q.  Can you please tell the members of the jury what you do for

16:26:52  3    a living?

16:26:56  4    A.  I'm a detective with the Davie Police Department in Broward

16:27:00  5    County.  I am assigned to the special victims unit where I

16:27:05  6    handle internet crimes against children and human trafficking.

16:27:09  7    Q.  How long have you been employed with the Davie Police

16:27:09  8    Department?

16:27:13  9    A.  Since 1996.

16:27:15  10   Q.  And how long have you been a detective?

16:27:18  11   A.  Since 2010.

16:27:21  12   Q.  What are your primary responsibilities on the Internet

16:27:25  13   Crimes against Children Task Force with Davie?

16:27:33  14   A.  So we investigate crimes, child exploitation on the internet

16:27:39  15   involving the internet with kids, mainly with kids as victims,

16:27:47  16   and we also handle human trafficking, sex trafficking of minors

16:27:52  17   mainly, but we also handle human trafficking of adults too.

16:27:55  18   Q.  And are you a task force officer with the FBI?

16:27:57  19   A.  Yes, ma'am.

16:28:00  20   Q.  So you're cross-designated, you're with the Town of Davie

16:28:02  21   and with the FBI?

16:28:08  22   A.  I was deputized in 2012 as a Special US Marshal assigned to

16:28:12  23   the FBI as a special agent with the FBI.

16:28:16  24   Q.  Now Detective, let me direct your attention to mid to late

16:28:25  25   November 2017.  Did you receive a complaint from a resident in

| | | |
|---|---|---|
| 16:28:31 | 1 | Davie regarding a Snapchat intrusion on her child's account? |
| 16:28:35 | 2 | A.  Yes, it was in Southwest Ranches.  So Southwest Ranches a |
| 16:28:40 | 3 | neighboring city to the Town of Davie.  The city or the Town of |
| 16:28:43 | 4 | Southwest Ranches contracts with the Davie Police Department for |
| 16:28:44 | 5 | police services. |
| 16:28:50 | 6 | Q.  Now, you received this call from the Town of Southwest |
| 16:28:52 | 7 | Ranches, right? |
| 16:28:52 | 8 | A.  Yes. |
| 16:28:54 | 9 | Q.  And you covered that area, so you responded? |
| 16:28:59 | 10 | A.  It was a delayed call, so I received the report assigned to |
| 16:29:00 | 11 | me. |
| 16:29:03 | 12 | Q.  What does that mean, a delayed call? |
| 16:29:07 | 13 | A.  So what happens is the -- it's like you would call 911 or |
| 16:29:11 | 14 | the nonemergency number to the police, the police would show up. |
| 16:29:14 | 15 | A road patrol officer would take the initial report and then |
| 16:29:21 | 16 | based on the allegations, since this alleged allegation in the |
| 16:29:26 | 17 | report was an internet crimes case involving a child, it would |
| 16:29:30 | 18 | get assigned to me based on my assignment in the police |
| 16:29:30 | 19 | department. |
| 16:29:32 | 20 | Q.  All right.  So correct me if I'm wrong, but you maybe |
| 16:29:35 | 21 | weren't the first person to respond but you followed up; is that |
| 16:29:35 | 22 | right? |
| 16:29:36 | 23 | A.  Correct. |
| 16:29:41 | 24 | Q.  Okay.  So you followed up.  And did you speak with the |
| 16:29:43 | 25 | family of K.L.? |

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED BY COMPUTER

```
16:29:44   1    A.  Yes.

16:29:47   2    Q.  Did you speak with K.L. yourself?

16:29:48   3    A.  Yes.

16:29:53   4    Q.  Did you recover or did you look at any evidence from K.L.'s

16:29:55   5    phone?

16:30:04   6    A.  No.  I received an e-mail from K.L., it was an e-mail from

16:30:08   7    her e-mail account, it was on her phone that she had received in

16:30:12   8    reference to her Snapchat account.  Not a text message or any

16:30:17   9    other data, but just an e-mail that she had received.

16:30:26  10    Q.  Now, did K.L. forward an e-mail that she had on her phone to

16:30:27  11    you?

16:30:27  12    A.  Yes.

16:30:29  13    Q.  And was that e-mail from Snapchat?

16:30:31  14    A.  Yes.

16:31:01  15         THE COURT:  I don't want to be a pain in the neck, but

16:31:03  16    try to have those ready before you start.

16:31:05  17         MS. VIAMONTES:  Yes, sir.  I apologize.  I just thought

16:31:08  18    of it now, that's why.  Permission to approach the ELMO?

16:31:11  19         THE COURT:  You may.

16:31:11  20      BY MS. VIAMONTES:

16:31:14  21    Q.  Detective Granit, I'm placing on the ELMO what has been

16:31:16  22    admitted into evidence as Government's Exhibit 1.  Is this the

16:31:19  23    e-mail that you received from K.L.?

16:31:21  24    A.  Yes, ma'am.

16:31:28  25    Q.  And did this e-mail show you some evidence about the
```

16:31:29   1   complaint she was complaining about?

16:31:30   2   A.   Yes.

16:31:33   3   Q.   And what was the crux of the complaint?

16:31:40   4   A.   What she reported was that her she no longer had access to

16:31:45   5   her Snapchat account.  She had woken up the next morning and she

16:31:49   6   no longer had access to her Snapchat account and that she had

16:31:54   7   checked her e-mail and had received this e-mail from Snapchat

16:31:59   8   letting her know where the login was.

16:32:05   9   Q.   And aside from receiving this e-mail, did you learn whether

16:32:10   10  pictures had been posted to K.L.'s account?

16:32:10   11  A.   Yes.

16:32:15   12  Q.   All right.  Once you got this complaint from the ******

16:32:16   13  family, what did you do?

16:32:24   14  A.   At about the same time, I received a cybertip from the

16:32:28   15  National Centers for Missing and Exploited Children.

16:32:30   16  Q.   Explain to the members of the jury what that means, a

16:32:31   17  cybertip.

16:32:35   18  A.   Certainly.  So the National Centers for Missing and

16:32:39   19  Exploited Children is in Washington, D.C.  It was an

16:32:43   20  organization started by John Walsh, Adam Walsh's father, and

16:32:49   21  it's a congressional mandated organization that basically helps

16:32:56   22  to locate missing children.  But part of their agency also is

16:33:01   23  responsible for handing cyber crimes.  And when they handle

16:33:04   24  them, what happens is there's a federal law that requires all

16:33:09   25  internet service providers, so your Facebooks, Instagram,

16:33:15  1    Snapchat, Google, all your internet service providers are

16:33:20  2    required by federal law to report child exploitation and human

16:33:21  3    trafficking to the National Centers for Missing and Exploited

16:33:27  4    Children.  So they report it and it comes in in the form of a

16:33:31  5    cybertip Based on the IP address, they try to geolocate where

16:33:37  6    that cybertip goes and that gets forwarded to the local

16:33:39  7    jurisdiction for them to investigate.

16:33:44  8    Q.  So you mentioned that you received a cybertip from Snapchat.

16:33:49  9    And once you received this cybertip from Snapchat, what did you

16:33:49  10   do?

16:33:57  11   A.  At that point, I had located a victim in Miramar based on

16:33:58  12   the cybertip and --

16:34:02  13   Q.  Explain to the members of the jury, where is Miramar.

16:34:06  14   A.  Miramar is approximately -- it's in the county of Broward,

16:34:12  15   but it's approximately about 15 minutes south of Southwest

16:34:17  16   Ranches, maybe 20 minutes south of Southwest Ranches.  But it's

16:34:21  17   south of there, not too far.  It's on the southern border of

16:34:22  18   Broward County.

16:34:25  19   Q.  So you located a victim in Miramar; is that correct?

16:34:25  20   A.  Yes.

16:34:26  21   Q.  And what did you do?

16:34:32  22   A.  Made contact with the victim and interviewed the victim

16:34:40  23   about the images that were reported to the National Center in

16:34:41  24   the cybertip.

16:34:42  25   Q.  And what was that child's first name?

16:34:44   1    A.   B.

16:34:48   2    Q.   All right.   And are her initials B.F.?

16:34:48   3    A.   Yes.

16:34:53   4    Q.   And was that related to the same complaint with K.L.?

16:34:54   5    A.   Yes.

16:34:55   6    Q.   Did they know each other?

16:34:59   7    A.   Yes, they were friends in school.

16:35:06   8    Q.   So once you spoke with K.L., and then identified B.F., met

16:35:11   9    with her, did you try and find out who the person was that was

16:35:16   10   hacking and logging into these accounts from Ashburn, Virginia

16:35:19   11   using a Samsung Galaxy Note 3?

16:35:19   12   A.   Yes.

16:35:20   13   Q.   What did you do?

16:35:27   14   A.   I contacted Louden County Sheriff's Office Detective Oksanen

16:35:34   15   and just asked him about the IP address and the location to see

16:35:41   16   what information he could provide to me about that.

16:35:52   17   Q.   Now, with this IP address 70.106.225.162, can you just punch

16:35:55   18   that into Google and get somebody's physical address of their

16:35:55   19   home?

16:35:56   20   A.   No.

16:36:00   21   Q.   What do you have to do in order to determine where that IP

16:36:03   22   address resolves back to physically or geographically?

16:36:08   23   A.   To get the exact location, you would have to send a subpoena

16:36:13   24   or some type of legal process to the owner of the IP which

16:36:19   25   depending on AT&T, Verizon, any of the major companies, whoever

16:36:23  1    owns the IT or leases the IP at that moment, you would have to

16:36:26  2    send them a subpoena or some type of legal process in order to

16:36:27  3    get them to produce records.

16:36:31  4    Q.  And that subpoena is that -- that's legal process?  That's a

16:36:32  5    court order?

16:36:33  6    A.  Yes.

16:36:36  7    Q.  And does the FBI have authority to issue certain types of

16:36:36  8    subpoenas?

16:36:38  9    A.  Yes, we do.

16:36:44  10   Q.  Okay.  Now, even the FBI, do they have some secret swirly

16:36:51  11   stuff that can give them physical access to the address just

16:36:52  12   with the IP address?

16:36:57  13   A.  No, there's public sites that you can use that can geolocate

16:37:02  14   the address.  But it's not accurate.  It's not going to give you

16:37:05  15   the exact address that you're looking for.  It will give you a

16:37:07  16   general location, maybe a city or a county, but not necessarily

16:37:10  17   going to give you the exact location that's needed.

16:37:12  18   Q.  All right.  So for you to get that information, you contact,

16:37:15  19   you said, the service provider; is that right?

16:37:15  20   A.  Yes.

16:37:18  21   Q.  And how do you learn who the service provider is for that IP

16:37:20  22   address?

16:37:24  23   A.  That I was able to look through an open source search on the

16:37:25  24   internet.

16:37:29  25   Q.  So once you do that search, you find out the IP, the service

16:37:31  1    provider and you send them the subpoena?

16:37:32  2    A.  Yes.

16:37:37  3    Q.  All right.  Now, in speaking with the detectives in Louden

16:37:41  4    County in Virginia, did you learn of another ongoing

16:37:43  5    investigation right here in South Florida?

16:37:44  6    A.  Yes.

16:37:47  7    Q.  And what did you learn?

16:37:54  8    A.  In talking to Detective Oksanen, he advised that -- asking

16:37:59  9    me if I was familiar with a city called Plantation, Florida and

16:38:06 10    I told him yes, it's one city to the north of me.  And he said I

16:38:09 11    was also contacted by detective from Plantation Police

16:38:13 12    Department about similar cases.

16:38:19 13    Q.  And do you know Detective Lee Bieber sitting at counsel

16:38:19 14    table?

16:38:20 15    A.  Yes.

16:38:22 16    Q.  You work on the same task force with him?

16:38:25 17    A.  Detective Bieber and I are on the same task force with the

16:38:26 18    FBI.

16:38:29 19    Q.  Okay.  So did you learn that Detective Bieber had also

16:38:33 20    contacted the detectives in Virginia about the same conduct.

16:38:33 21    A.  Yes.

16:38:36 22    Q.  With a different victim?

16:38:37 23    A.  Correct.

16:38:40 24    Q.  At that point, did you reach out to Detective Bieber?

16:38:40 25    A.  Yes.

16:38:44    1    Q.  And what did you guys decide to do?

16:38:49    2    A.  At that point, we realized it wasn't just the small case

16:38:52    3    that I had and it wasn't just the small case that he had, that

16:38:56    4    this was possibly something much larger, and at which point

16:38:58    5    together we began to investigate this case.

16:39:06    6    Q.  Okay.  Now, when you met with victim B.F., were you able to

16:39:11    7    see initially any photographs that were posted of her on

16:39:11    8    Snapchat?

16:39:15    9    A.  Yes, they were provided in the cybertip.

16:39:16   10    Q.  All right.

16:39:21   11         MS. VIAMONTES:  Permission to approach, Your Honor?

16:39:24   12         THE COURT:  You may, but walk quickly, you've got four

16:39:26   13    minutes.

16:39:26   14         BY MS. VIAMONTES:

16:39:30   15    Q.  Detective, I'm publishing on the ELMO what's been entered

16:39:36   16    into evidence as Government's 2 A through H.  Are these the

16:39:39   17    photographs that you got on the cybertip?

16:39:40   18    A.  Yes.

16:39:43   19    Q.  And were these banners across it?

16:39:44   20    A.  Yes.

16:39:49   21    Q.  Now, that cybertip came from where you said?

16:39:51   22    A.  It originated from the National Centers for Missing and

16:39:56   23    Exploited Children which came in through Snapchat.

16:40:02   24    Q.  So Snapchat had reported it to NCMEC?  The National Centers

16:40:04   25    for Missing and Exploited Children?

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED BY COMPUTER

16:40:05  1    A.  Yes.

16:40:15  2    Q.  Now, did you send -- did you draft and send a search warrant

16:40:16  3    later to Instagram?

16:40:17  4    A.  I did.

16:40:19  5    Q.  And why did you do that?

16:40:25  6    A.  In September of 2018, myself and Detective Bieber traveled

16:40:34  7    to Virginia with an arrest warrant for the Defendant.  Upon --

16:40:41  8    prior to executing the arrest warrant, we learned from another

16:40:47  9    victim that she was reached out, a previous victim that we had

16:40:51  10   already investigated, that she was reached out to yet again

16:40:57  11   through an Instagram account.  And during our investigation, we

16:41:01  12   learned that that Instagram account, the IP address matched the

16:41:05  13   same IP address belonging to the Defendant.

16:41:09  14   Q.  Were you in communications with the detectives in Virginia

16:41:13  15   when they executed the first search warrant at the Defendant's

16:41:15  16   home in January 2018?

16:41:16  17   A.  Yes.

16:41:19  18   Q.  And you were aware that he remained -- the Defendant

16:41:21  19   remained out of custody?

16:41:22  20   A.  That's correct.

16:41:26  21   Q.  All right.  Once you became involved in the investigation,

16:41:30  22   then you returned for -- with an arrest warrant; is that right?

16:41:31  23   A.  Correct.  Once we --

16:41:32  24   Q.  In September 2018?

16:41:35  25   A.  Once we received the evidence from Virginia and we were able

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED BY COMPUTER

16:41:38   1   to go through it and establish enough for probable cause to

16:41:41   2   arrest, we went forward with the arrest warrant.

16:41:44   3   Q.  And we'll probably have to talk about that tomorrow, the

16:41:47   4   evidence once you received it and went through it.  But do you

16:41:50   5   see that person here in the courtroom today that you went back

16:41:55   6   up to Virginia to arrest and effectuate an arrest on?

16:41:55   7   A.  Yes.

16:41:59   8   Q.  And can you please point him out and mention an article of

16:42:00   9   clothing he's wearing?

16:42:04   10   A.  He's sitting over here to my left at the counsel table, the

16:42:12   11   gentleman in the beige blouser *(ph)* -- I'm sorry.  Beige.  And

16:42:16   12   he's wearing a white shirt.  He had glasses on, he's rubbing his

16:42:18   13   eye now.

16:42:20   14        MS. VIAMONTES:  Your Honor, if the record would reflect

16:42:23   15   that the witness has positively identified the Defendant

16:42:25   16   Mr. Woodson.

16:42:27   17        THE COURT:  The record may so reflect.

16:42:27   18        BY MS. VIAMONTES:

16:42:30   19   Q.  Now, after the first search warrant was executed in January

16:42:34   20   2018, were the electronics and the devices seized during that

16:42:37   21   search warrant sent down to South Florida?

16:42:38   22   A.  Yes.

16:42:41   23   Q.  And were those extracted for the information contained on

16:42:42   24   them?

16:42:43   25   A.  Yes, they were.

16:42:46  1    Q.  Did you have an opportunity to look through the extractions

16:42:49  2    once they were put into a report?

16:42:50  3    A.  Yes, I did.

16:42:59  4    Q.  And in the evidence recovered, were you able to recover

16:43:06  5    images similar to the NCMEC images you had received about ****

16:43:06  6    ****?

16:43:12  7    A.  Yes.  I recovered images that were almost exact pictures,

16:43:15  8    they didn't have the banners on them.

16:43:19  9    Q.  Okay.  So the similar pictures without the writing added to

16:43:19  10   them?

16:43:20  11   A.  Correct.

16:43:24  12   Q.  And where were those photographs recovered from, what

16:43:24  13   device?

16:43:28  14   A.  The Note 3.

16:43:31  15        THE COURT:  Wait.  There's two kinds of writing on that

16:43:34  16   picture.  Are you talking about printed or are you talking about

16:43:38  17   writing with lipstick or some --

16:43:40  18        MS. VIAMONTES:  That's a good point, Your Honor.  I'll

16:43:42  19   clarify.  May I approach, Your Honor?

16:43:44  20        THE COURT:  You may.

16:43:44  21     BY MS. VIAMONTES:

16:43:49  22   Q.  Now I'm approaching with Government's 3 A through Z.  Okay.

16:43:56  23   I'm placing 3 A on the ELMO.  Do you recognize it?

16:43:57  24   A.  Yes.

16:43:59  25   Q.  And is this one of the photographs that you recovered from

16:44:05  1    the Samsung Note 3 which was seized from the Defendant's

16:44:05  2    bedroom?

16:44:06  3    A.  Yes.

16:44:13  4    Q.  All right.  Now, you mentioned that the photographs on the

16:44:16  5    phone from the extraction didn't have writing on them.  I'm

16:44:20  6    placing on the ELMO Government's Exhibit 2 A.  By the writing,

16:44:23  7    which writing do you mean?

16:44:28  8    A.  On Snapchat you can put a banner, which is a type of

16:44:31  9    writing, on the picture before sending it which is the "I know I

16:44:32  10   taste good" banner.

16:44:35  11   Q.  Okay.

16:44:37  12        THE COURT:  That's what was not on the copy that you

16:44:39  13   seized.  Is that what you're saying?

16:44:40  14        THE WITNESS:  Yes, sir.

16:44:40  15      BY MS. VIAMONTES:

16:44:46  16   Q.  So "I know I taste good" wouldn't be in Exhibit 3 which is

16:44:49  17   from the phone?  Is that what you're saying?  Because these are

16:44:51  18   the ones seized from the phone?

16:44:51  19   A.  Correct.

16:44:58  20   Q.  Okay.  Now, are these the type of photos you saw seized on

16:45:01  21   the Defendant's phone?

16:45:01  22   A.  Yes.

16:45:09  23   Q.  The Note 3?  Okay.  Now, when you went to Virginia to

16:45:15  24   effectuate the Defendant's arrest, did you learn that during his

16:45:20  25   arrest he had a cellphone that he tossed onto his bed?

| | | |
|---|---|---|
| 16:45:20 | 1 | A.  Yes. |
| 16:45:24 | 2 | Q.  And did you want to recover that phone? |
| 16:45:26 | 3 | A.  Yes, we did. |
| 16:45:31 | 4 | Q.  Did you learn or did you continue to receive tips that the |
| 16:45:36 | 5 | same IP address was still contacting victims in this case? |
| 16:45:37 | 6 | A.  Yes, we did. |
| 16:45:39 | 7 | Q.  Up to the Defendant's arrest? |
| 16:45:39 | 8 | A.  Yes. |
| 16:45:43 | 9 | Q.  All right.  Now, based on that information and the fact that |
| 16:45:47 | 10 | he had a new phone, a search warrant was obtained, right? |
| 16:45:47 | 11 | A.  That's correct. |
| 16:45:52 | 12 | Q.  And did you have an opportunity to go through the evidence |
| 16:45:54 | 13 | from that phone? |
| 16:45:55 | 14 | A.  Yes, I did. |
| 16:45:58 | 15 | THE COURT:  Is that a good time to cut? |
| 16:45:59 | 16 | MS. VIAMONTES:  That's fine, Your Honor. |
| 16:46:02 | 17 | THE COURT:  Okay.  We're going to break for the day |
| 16:46:05 | 18 | because I told you we would break about a little bit before |
| 16:46:10 | 19 | 5:00.  And tomorrow morning I have physical therapy at 9 a.m.  I |
| 16:46:13 | 20 | will do my best to get here quickly, but I don't see that |
| 16:46:16 | 21 | there's any way I can get here before 10:00, so I'll ask you to |
| 16:46:18 | 22 | come back at 10:15.  All right? |
| 16:46:22 | 23 | You're reminded you're not to discuss the case with |
| 16:46:24 | 24 | anyone or permit anyone to discuss it with you.  You're going to |
| 16:46:28 | 25 | get so sick of hearing this.  Don't read or listen to anything |

16:46:31  1   touching on the case.  Don't do any research or make any

16:46:34  2   investigation about the case.  Don't have any contact with the

16:46:37  3   attorneys.  Don't form any opinion, which means you can't write

16:46:40  4   about it or talk to somebody about it because you have to form

16:46:44  5   an opinion in order to articulate.

16:46:49  6          We'll see you tomorrow morning at 10:15.  Ms. Osejo,

16:46:53  7   would you please stop and see Wanda, she's going to need to ask

16:46:56  8   you a couple of questions on a letter that we got today.  All

16:46:56  9   right?

16:47:02  10         We'll see you tomorrow morning at 10:15.  Thank you.

16:47:10  11         COURT SECURITY OFFICER:  All rise for the jury.

16:47:14  12         THE COURT:  Leave all the exhibits in front of you.

16:47:19  13         (Jury out at 4:47 p.m.)

16:47:35  14         THE COURT:  All right.  We'll be in recess until 10:15.

16:47:37  15         MR. NATALE:  Your Honor, will the courtroom be locked

16:47:39  16   so we can leave some things here?

16:47:40  17         THE COURT:  The courtroom will be locked until right

16:47:45  18   before 10:15.  The only people that can get in here is my staff

16:47:49  19   and the court security officers.  They're generally trustworthy.

16:47:53  20   My staff, that is.  The court security officer is very

16:47:55  21   trustworthy.

16:48:00  22         MS. WEISS:  Judge, our screen has stopped working.  It

16:48:00  23   only worked for a moment after IT came.

16:48:00  24         THE COURT:  You kept your feet away from the cables?

16:48:03  25         MS. WEISS:  Yes, sir.  We did and it stopped working.

16:48:05  1            THE COURT:  Okay.  I will have Wanda call or Diane,

16:48:09  2     would you please call whoever it was that came up and ask them

16:48:12  3     to come up again?  Or at least he can come up in the morning, as

16:48:16  4     long as it's working by 10:15.  All right?  Thank you.

16:48:16  5            (See Volume 3 for continuation)

16:48:16  6                     C E R T I F I C A T E
16:48:16  7     I certify that the foregoing is a correct transcript from the
                record of proceedings in the above-entitled matter.

16:48:16  8     3/4/2020                /s/ Dawn M. Savino
                Date                    DAWN M. SAVINO, RPR

16:48:16  9

16:48:16  10

          11

          12

          13

          14

          15

          16

          17

          18

          19

          20

          21

          22

          23

          24

          25