```
09:12:37  1                UNITED STATES DISTRICT COURT
09:12:37  2               SOUTHERN DISTRICT OF FLORIDA
                                  MIAMI DIVISION
09:12:37  2             CASE NO.  18-60256-CR-JEM
09:12:37  3

09:12:37  4      UNITED STATES OF AMERICA,

09:12:37  5                    Plaintiff,

09:12:37  6           vs.

09:12:37  7                                        Miami, Florida
                                                   September 25, 2019
09:12:37  8      JOSEPH ISAIAH WOODSON, JR.,       Pages 1-85

09:12:37  9                    Defendant.
09:12:37 10      _____

09:12:37 10                    TRANSCRIPT OF JURY TRIAL
09:12:37 11                    DAY 4 - A.M. SESSION
                          BEFORE THE HONORABLE JOSE E. MARTINEZ
09:12:37 12                 UNITED STATES DISTRICT JUDGE
09:12:37 13

09:12:37 13      APPEARANCES:
09:12:37 14
                 FOR THE PLAINTIFF:
09:12:37 15                         United States Attorney's Office
                                    BY:  JODI ANTON,  A.U.S.A.
09:12:37 16                         BY:  FRANCIS VIAMONTES, A.U.S.A.
                                    500 East Broward Boulevard
09:12:37 17                         Suite 700
                                    Fort Lauderdale, Florida 33394
09:12:37 18
                 FOR THE DEFENDANT:
09:12:37 19                         Federal Public Defender's Office
                                    BY:  ANTHONY J. NATALE, A.F.P.D.
09:12:37 20                         BY:  CLEA D.T. WEISS, A.F.P.D.
                                    BY:  KATHLEEN E. MOLLISON, A.F.P.D.
09:12:37 21                         150 West Flagler Street
                                    Suite 1700
09:12:37 22                         Miami, Florida 33130

09:12:37 23      REPORTED BY:       DAWN M. SAVINO, RPR
                                    Official Court Stenographer
09:12:37 24                         400 N. Miami Avenue, 10S03
                                    Miami, Florida  33128
09:12:37 25                         Telephone:  305-523-5598
```

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED BY COMPUTER

2

| | | |
|---|---|---|
| 09:12:41 | 1 | P-R-O-C-E-E-D-I-N-G-S |
| 09:31:29 | 2 | (Jury in at 9:31 a.m.) |
| 09:33:05 | 3 | (Court called to order) |
| 09:33:13 | 4 | THE COURT:  Be seated, please. |
| 09:33:15 | 5 | COURTROOM DEPUTY:  Case number |
| 09:33:20 | 6 | 18-60256-criminal-Martinez, United States of America versus |
| 09:33:24 | 7 | Joseph Isaiah Woodson, Junior. |
| 09:33:24 | 8 | Counsel, please state your appearance. |
| 09:33:26 | 9 | MS. ANTON:  Good morning, Your Honor.  Jodi Anton on |
| 09:33:28 | 10 | behalf of the United States. |
| 09:33:29 | 11 | MS. VIAMONTES:  Good morning, Your Honor.  Francis |
| 09:33:31 | 12 | Viamontes on behalf of the United States, and Lee Bieber at |
| 09:33:33 | 13 | couldn't table. |
| 09:33:33 | 14 | THE COURT:  Good morning. |
| 09:33:35 | 15 | MS. WEISS:  Good morning, Your Honor.  Clea Weiss from |
| 09:33:38 | 16 | the Federal Public Defender's Office on behalf of Mr. Woodson. |
| 09:33:38 | 17 | THE COURT:  Ms. Weiss. |
| 09:33:40 | 18 | MS. MOLLISON:  Good morning, Your Honor.  Kate Mollison |
| 09:33:43 | 19 | on behalf of Mr. Woodson. |
| 09:33:43 | 20 | THE COURT:  Ms. Mollison. |
| 09:33:45 | 21 | MR. NATALE:  Good morning, Your Honor.  Anthony Natale |
| 09:33:48 | 22 | from the Federal Public Defender's Office on behalf of |
| 09:33:50 | 23 | Mr. Woodson, and Mr. Woodson is present here in court. |
| 09:33:51 | 24 | THE COURT:  Good morning. |
| 09:33:53 | 25 | All right.  Are we ready to go? |

| | | |
|---|---|---|
| 09:33:53 | 1 | MS. ANTON:  Yes, Your Honor. |
| 09:33:55 | 2 | THE COURT:  All right.  Good morning, ladies and |
| 09:33:57 | 3 | gentlemen.  I trust that you had a good evening. |
| 09:33:59 | 4 | Sir, you're reminded you're still under oath.  All |
| 09:34:02 | 5 | right.  You may proceed. |
| 09:34:04 | 6 | MS. ANTON:  Thank you. |
| 09:34:08 | 7 | THE COURT:  Everything is working now? |
| 09:34:08 | 8 | MS. ANTON:  Yes, Your Honor. |
| 09:34:09 | 9 | THE COURT:  Good. |
| 09:34:09 | 10 | CONTINUED DIRECT EXAMINATION |
| 09:34:09 | 11 | BY MS. ANTON: |
| 09:34:13 | 12 | Q.  Mr. Deborja, good morning. |
| 09:34:13 | 13 | A.  Good morning. |
| 09:34:16 | 14 | Q.  When we left off yesterday before we rested for the evening, |
| 09:34:21 | 15 | you had just started to talk about the dark web and the Tor |
| 09:34:23 | 16 | network.  Do you remember that? |
| 09:34:23 | 17 | A.  Yes. |
| 09:34:27 | 18 | Q.  I want to talk to you about the dark web and a couple other |
| 09:34:31 | 19 | definitions of some things we've been talking about throughout |
| 09:34:34 | 20 | the course of your testimony.  Okay.  So why don't we start |
| 09:34:37 | 21 | first with the dark web and you explaining to the jury what the |
| 09:34:41 | 22 | dark web is and how someone would go about accessing this dark |
| 09:34:42 | 23 | web. |
| 09:34:45 | 24 | A.  So the dark web is another way for you -- |
| 09:34:48 | 25 | THE COURT:  You've gotten away from the microphones. |

09:34:53  1     Pull the microphones closer or get over -- move to the middle of

09:34:54  2     them and speak loudly please.

09:34:56  3               THE WITNESS:  Okay.  This better?

09:34:57  4               THE COURT:  Much better.

09:34:59  5               THE WITNESS:  Okay.  So the dark web is another way for

09:35:04  6     you to get online and access services that you normally wouldn't

09:35:09  7     be able to if you're just doing normal browsing activity.  If

09:35:14  8     you do normal browsing activity such as going to Amazon.com, you

09:35:18  9     know, those servers are on the internet, they're publicly

09:35:21  10    accessible and you can easily get to it.

09:35:24  11              The dark web is basically an underground internet that

09:35:30  12    rides on top of the internet, and the way you get to it is

09:35:35  13    through a client that enters into the series of servers that

09:35:42  14    will gain you access into this dark web, and these servers that

09:35:48  15    are part of this dark web infrastructure can have hidden

09:35:51  16    services where you can shop for stuff like child pornography,

09:35:57  17    stolen credit card numbers, services for doing illegal

09:36:02  18    activities like hackers selling code or whatnot.  These are

09:36:05  19    services that you wouldn't be able to find just by going on the

09:36:09  20    regular internet.  So you would need a client to go and access

09:36:16  21    the dark web.  So Orbot is one way you can access the dark web.

09:36:21  22              So what you could do is use, say, a browser like Chrome

09:36:26  23    and tell your Chrome browser to go through Orbot and connect you

09:36:30  24    to the dark web.  And then once you're in there, you can

09:36:35  25    actually access special websites that only work on the dark web

09:36:39  1    that will give you access to some of the services that I talked

09:36:39  2    about earlier.

09:36:42  3         But one of the other things you can do is you can use

09:36:49  4    the dark web to anonymize your IP address, right.  So if I'm in

09:36:53  5    Virginia and I'm using Chrome, and I'm browsing on the regular

09:36:59  6    internet, law enforcement can see in logs that I'm browsing

09:37:05  7    using an IP address from Virginia.  But if I go through the dark

09:37:10  8    web using my Chrome browser, I can make it so that I can pop out

09:37:15  9    of some other country through a series of servers.  So I'll go

09:37:20 10    in, I'll enter the dark web through the entry mode and then it

09:37:23 11    can pop me around through different servers around the world.

09:37:27 12    So from, say, a server in the United States, it can go to

09:37:35 13    Canada, a server in Canada, then pop over to a server in Germany

09:37:38 14    and then the final mode it could be a server in Romania.

09:37:43 15         And if I use Chrome to surf, or I can even use a text

09:37:47 16    messaging application like Kik.  If I use Kik to use the dark

09:37:52 17    web and I pop out of Romania and I start talking to somebody in

09:37:58 18    Florida, if you go and subpoena those logs from Kik, it will

09:38:01 19    show that the victim was communicating -- chatting with somebody

09:38:04 20    from Romania based on the IP addresses.

09:38:04 21    BY MS. ANTON:

09:38:07 22    Q.  Okay.  So are you saying that there's some type of, you

09:38:14 23    know, secret underground internet that you need a special

09:38:18 24    browser in order to get to?

09:38:23 25    A.  You need actually a special client that allows your browser

09:38:25  1    to go and access the dark web.

09:38:28  2    Q.  When you say "client", what do you mean by client?

09:38:32  3    A.  It's something -- it's a tool that's going to connect you to

09:38:36  4    this infrastructure.  You can't just tell Google Chrome or

09:38:42  5    Internet Explorer or Firefox to just say take me to the dark

09:38:47  6    web.  So you need leverage to get access into the dark web.

09:38:49  7    Q.  And when you examined the Note 3 that belonged to the

09:38:53  8    Defendant, did you find evidence that there was this client and

09:38:57  9    a way to get into the dark web on his cellphone?

09:39:02  10   A.  Yes.  What I noted in some of those snapshot -- screenshots

09:39:11  11   at the top was an icon for the Tor or the Orbot application.  So

09:39:15  12   if you see in the screen, the arrow is actually pointing to that

09:39:21  13   Orbot icon.  So that's letting you know that Orbot is running on

09:39:23  14   that phone.

09:39:26  15   Q.  And Orbot would be the special client that you talked about

09:39:29  16   needing to get yourself to the dark web?

09:39:29  17   A.  Correct.

09:39:35  18   Q.  Okay.  So we've talked about a lot of different terminology.

09:39:38  19   You mentioned the words "hacking" and "intrusion".  So let's

09:39:42  20   just -- if you wouldn't mind, please tell the ladies and

09:39:45  21   gentlemen of the jury what do you mean when you say the word

09:39:45  22   "hacking".  What is hacking?

09:39:52  23   A.  Hacking is when you do a -- it's a malicious type of

09:39:59  24   activity where you go and try to exploit a victim for personal

09:40:07  25   gain.  So in terms of hacking, it's a digital method of tricking

| | | |
|---|---|---|
| 09:40:10 | 1 | the user, potentially, of clicking on a malicious website by |
| 09:40:15 | 2 | sending them an e-mail, or a hacker can go hack into the system |
| 09:40:22 | 3 | by doing a penetration test just remotely.  The victim may not |
| 09:40:27 | 4 | even know that it's being done.  So it's just a way for the |
| 09:40:32 | 5 | hacker to exploit a victim using digital media. |
| 09:40:35 | 6 | Q.  You also mentioned "intrusion".  When you say "intrusion", |
| 09:40:36 | 7 | what do you mean by that? |
| 09:40:40 | 8 | A.  That means a successful entry into a victim's system. |
| 09:40:44 | 9 | Q.  Okay.  So if you had a hacker who got in, you would say that |
| 09:40:46 | 10 | was intrusion into that system. |
| 09:40:50 | 11 | A.  Right.  That's one -- that's unwarranted access into the |
| 09:40:52 | 12 | victim's system. |
| 09:40:55 | 13 | Q.  Okay.  And what about the term "malware"?  What does that |
| 09:40:56 | 14 | mean? |
| 09:41:02 | 15 | A.  Malware is a general term for a piece of code or a program |
| 09:41:08 | 16 | that has some malicious functionality in it.  So that when you |
| 09:41:13 | 17 | install malware in somebody's system, it's doing something |
| 09:41:18 | 18 | that's going to benefit the attacker; say, give the attacker |
| 09:41:23 | 19 | remote access to that person's system any time he wants.  That's |
| 09:41:26 | 20 | an example of one piece of malware.  Or malware can be something |
| 09:41:32 | 21 | that will spread from one system to another to another, like a |
| 09:41:34 | 22 | worm.  That's an example of a worm type of malware. |
| 09:41:39 | 23 | Q.  Okay.  And in your capacity as a forensic analyst with the |
| 09:41:45 | 24 | FBI's technical analysis unit, do you regularly analyze data and |
| 09:41:50 | 25 | devices for signs of hacking intrusion and malware? |

```
09:41:59   1    A.  Yes.  I have analyzed hundreds of systems, both work station
09:42:06   2    systems, server systems, laptop systems, mobile phone systems,
09:42:09   3    tablets, you name it.  And in the majority of the devices that
09:42:14   4    would come in, somebody has already taken an image of the
09:42:18   5    devices, already have some type of compromise on them.  So I'm
09:42:23   6    very adept at going in and doing the intrusion analysis and
09:42:26   7    finding what happened.  A many times, a lot of those systems
09:42:30   8    actually do have a compromise and we find the malware and we go
09:42:32   9    and answer those questions how did it get there, when did it get
09:42:36  10    there; we get the malware, figure out what it does.
09:42:39  11    Q.  So you spend your days looking for these types of signs of
09:42:43  12    hacking intrusion and malware and you oftentimes find it; is
09:42:44  13    that true?
09:42:44  14    A.  That is correct.
09:42:48  15    Q.  Okay.  But are you just as good at analyzing electronics and
09:42:52  16    media for signs of these things and determining that they're not
09:42:52  17    there?
09:42:55  18    A.  Yes.  There have been several instances where we get a
09:42:59  19    request to analyze a piece of media and there's nothing there,
09:43:03  20    and we have given no findings reports and said there's nothing
09:43:03  21    here.
09:43:07  22    Q.  And you do that -- do you do that in all types of cases like
09:43:12  23    terrorism cases, violent crimes, child pornography, just across
09:43:15  24    the board, all different kind of crimes?
09:43:18  25    A.  All different types of crimes, criminal and
```

09:43:19  1   counterterrorism, yes.

09:43:24  2   Q.  And the Federal Bureau of Investigation depends on your

09:43:28  3   technical analysis unit to support that kind of work and that's

09:43:29  4   what you do there?

09:43:30  5   A.  Yes.

09:43:32  6   Q.  So based on all of the evidence that you reviewed in this

09:43:39  7   case consisting of the Defendant's Note 3 and S8, were you able

09:43:43  8   to render an expert opinion based on your training and expertise

09:43:47  9   as to whether there were any signs of hacking on those devices?

09:43:55  10  A.  After analyzing the Note 3 and the S8, I didn't find any

09:43:58  11  indications that there was any compromise to the phone or any

09:44:01  12  kind of remote access intrusion installed on the phone.

09:44:06  13  Q.  Okay.  Did you find any signs of intrusion whatsoever?

09:44:07  14  A.  I did not.

09:44:09  15  Q.  Okay.  Did you find any malware?

09:44:10  16  A.  I did not.

09:44:13  17  Q.  Okay.  Now, you mentioned remote access.  So can you explain

09:44:16  18  to the ladies and gentlemen of the jury what is remote access

09:44:19  19  and how would that work on the cellphone?

09:44:25  20  A.  Remote access, a remote access intrusion is a program that

09:44:30  21  gets installed on a victim's machine that will connect back to

09:44:34  22  the attacker system.  And it lets that attacker connect through

09:44:41  23  that remote access Trojan to essentially have a foothold into

09:44:45  24  the system and perform different functions and commands.  Like

09:44:51  25  it could steal files; he can delete files; he can, you know, do

09:44:55  1   a whole range of nefarious activities.

09:44:59  2   Q.  Okay.  Would that be somewhat similar to if you were working

09:45:05  3   for a corporation and your company had an IT department and they

09:45:09  4   said to you we need to remote access into your desk station so

09:45:14  5   we can see what the problem is with what you're working on?

09:45:17  6   A.  Yes.  That would be a legitimate use of a remote access

09:45:20  7   tool.  That wouldn't be a Trojan because that's something that's

09:45:22  8   authorized to be installed on your phone.

09:45:26  9   Q.  Did you find in the Defendant's two phones any evidence

09:45:31  10  whatsoever that anyone had installed this kind of remote Trojan

09:45:33  11  software on his phone?

09:45:34  12  A.  I did not.

09:45:39  13  Q.  Okay.  Did you find any incidents on either one of those

09:45:44  14  phones where a link was received that would be a link to

09:45:47  15  allowing this type of Trojan Horse in?

09:45:48  16  A.  I did not.

09:45:54  17  Q.  Okay.  Now, we were going through Government's Exhibit 45,

09:45:59  18  43, and we were discussing the different things that you found

09:46:05  19  inside the Note 3.  You testified that you found evidence of

09:46:09  20  several applications like Skype and Instagram and Snapchat.

09:46:14  21  Specifically though, I want to talk to you about what you found

09:46:19  22  in terms of Skype conversations on the Defendant's Note 3, and

09:46:28  23  what you illustrated on Page 13 of your exhibit.  It's up on the

09:46:30  24  screen in front of us for the jury to see.  Could you describe

09:46:34  25  for us what that is and where you found it?

09:46:37  1    A.  Yes.  This is a Skype conversation that was found on the

09:46:41  2    Note 3 device where the device owner was apparently chatting

09:46:49  3    with a victim and was all sextortion in nature.

09:46:53  4    Q.  When you say the device owner, is that Skype user Ilee_me?

09:47:00  5    A.  In this particular table, yes.

09:47:02  6    Q.  Okay.  Did you see evidence in the Defendant's phone of

09:47:06  7    multiple names for Skype user names?

09:47:07  8    A.  Yes.

09:47:11  9    Q.  Okay.  And in this conversation, did you note that the

09:47:18  10   Defendant using this Skype user name Ilee_me was chatting with

09:47:22  11   someone listed here as ***************?

09:47:23  12   A.  Yes.

09:47:24  13   Q.  And that was in April of 2017?

09:47:25  14   A.  Yes.

09:47:31  15   Q.  And you testified that these chats were regarding sextortion

09:47:36  16   acts.  Did you specifically find chats with the Defendant and

09:47:43  17   this *********** where *********** was asked to draw on her

09:47:43  18   body?

09:47:47  19   A.  Yes.  You could see that highlighted in yellow.

09:47:50  20   Q.  Was she asked to draw circles around her nipples?

09:47:52  21   A.  Yes.

09:47:58  22   Q.  And did that chat continue back on to Page 14 with same

09:48:01  23   ***********?

09:48:01  24   A.  Yes.

09:48:04  25   Q.  Okay.  Was she specifically asked by the Defendant using

```
09:48:13   1    Ilee_me on Skype to write "cum" on her right boob and "slut" on
09:48:14   2    her left?
09:48:15   3    A.  Yes.
09:48:21   4    Q.  Did you also note about halfway down the page that the
09:48:26   5    Defendant asked her to write "okay now, write owned by Michael"?
09:48:27   6    A.  Yes.
09:48:33   7    Q.  Did you find evidence in this Note 3 of user attribution
09:48:42   8    like forensic evidence of who's this phone is?
09:48:48   9    A.  I did not see this user account, the Ilee_me.  I did not see
09:48:52   10   a profile written to the phone in the file system for this user
09:48:52   11   account.
09:48:55   12   Q.  But this was a user account that was on the Defendant's
09:49:07   13   phone in the Skype app as his user.  If you need me to go back a
09:49:08   14   page to refer to --
09:49:12   15   A.  Yes.  This.
09:49:12   16   Q.  I'm sorry.
09:49:17   17   A.  This was found because there was a profile called
09:49:22   18   ~~~~~~~~~~~ in the Skype folder on the Note 3 device.
09:49:28   19   Q.  Okay.  So in the course of that conversation with
09:49:35   20   ~~~~~~~~~~~, do you find evidence that user name on Skype
09:49:40   21   Ilee_me says to ~~~~~~~~~~~ "I'm going to add you on a different
09:49:40   22   Skype"?
09:49:40   23   A.  Yes.
09:49:45   24   Q.  And then do you see the name swainmarc being used as a user
09:49:45   25   ID?
```

| | | |
|---|---|---|
| 09:49:46 | 1 | A.  Yes. |
| 09:49:49 | 2 | Q.  And were you able to resolve back, like where did swainmarc |
| 09:49:53 | 3 | come from and whose user ID is that? |
| 09:49:57 | 4 | A.  Swainmarc was another Skype user account that was on the |
| 09:49:58 | 5 | Note 3 device. |
| 09:50:03 | 6 | Q.  Okay.  So it's possible to have many different user names on |
| 09:50:07 | 7 | Skype on one device? |
| 09:50:11 | 8 | A.  Yes.  You can have -- whenever you login using a specific |
| 09:50:15 | 9 | Skype user ID, it creates a profile folder for that user ID, and |
| 09:50:21 | 10 | so there was a profile folder for swainmarc on the Note 3. |
| 09:50:26 | 11 | Q.  And I'm going to go back several pages because there were |
| 09:50:34 | 12 | also Skype profiles for darkchaos22, Brentbeeby and the other |
| 09:50:35 | 13 | three listed below it? |
| 09:50:36 | 14 | A.  Yes. |
| 09:50:38 | 15 | Q.  And does that mean that the Defendant or someone using that |
| 09:50:41 | 16 | phone that belonged to the Defendant created those Skype profile |
| 09:50:42 | 17 | user names? |
| 09:50:44 | 18 | A.  Yes. |
| 09:50:51 | 19 | Q.  Okay.  And now once you see the swainmarc user name come up, |
| 09:50:55 | 20 | does that swainmarc continue in the conversation with |
| 09:50:59 | 21 | ********** as was directed in the chats? |
| 09:50:59 | 22 | A.  Yes. |
| 09:51:05 | 23 | Q.  And was ********** directed to create a new Snapchat |
| 09:51:07 | 24 | account? |
| 09:51:09 | 25 | A.  Yes. |

09:51:13  1    Q.  And requested to send photographs?

09:51:16  2    A.  Yes.

09:51:24  3    Q.  And is that what you captured here in your exhibit, the

09:51:24  4    chats?

09:51:31  5    A.  Yes.  So the victim was trying to send some pictures to, I

09:51:37  6    guess, the device owner, it wasn't working.  So the attacker

09:51:44  7    instructed ********** to create a Snapchat account as a way to

09:51:49  8    send that file to the attacker.

09:52:01  9    Q.  Okay.  And when you see this conversation where swainmarc is

09:52:05  10   asking ********** to send pictures, did you ultimately find

09:52:09  11   evidence of those pictures being sent on the Note 3 phone?

09:52:10  12   A.  Yes.

09:52:13  13   Q.  Okay.  And do you recall where you found those pictures?

09:52:25  14   A.  They were within a sub folder in the Skype profile for

09:52:26  15   **********.

09:52:29  16   Q.  And in order for those pictures to get into that folder,

09:52:33  17   what did the user have to do when they were received?  Did they

09:52:38  18   automatically default save there or did the user have to do

09:52:39  19   something to save them?

09:52:47  20   A.  The application saves them to that directory when the image

09:52:51  21   is actually sent out from the application to the recipient.

09:52:55  22   Q.  And in this chat, did you find evidence that the Defendant

09:53:00  23   or the swainmarc user ID in the Defendant's Note 3 said to

09:53:05  24   ********** "I told you to obey, now make a new snap and shut

09:53:08  25   the fuck up before I make you wish you did"?

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

09:53:09   1    A.  Yes.

09:53:20   2    Q.  Okay.  And on Page 18, what did you delineate in your

09:53:25   3    diagram on Page 18 of your report, of your exhibit?

09:53:43   4    A.  So as part of this conversation with **********, the -- I'm

09:53:47   5    just going backwards a little bit -- the attacker managed to

09:53:53   6    take over **********'s account and now had ********** --

09:53:56   7    control of **********'s Skype account.  And after that

09:54:03   8    happened, the attacker now can posture **********, started

09:54:08   9    sending images out to somebody and those images that were sent

09:54:13   10   out are what you see here in this table.

09:54:17   11   Q.  Now you keep saying "the attacker".  So we know that the

09:54:20   12   attacker relates back to that swainmarc Skype user profile,

09:54:22   13   correct?

09:54:22   14   A.  Yes.

09:54:27   15   Q.  And you know that the swainmarc user profile on Skype is one

09:54:31   16   of the profiles in the Note 3 phone that belonged to the

09:54:32   17   Defendant.

09:54:34   18   A.  It is.

09:54:49   19   Q.  I'm going to skip over -- I want to talk to you about

09:54:58   20   specifically on Page 26 of your exhibit referring again to

09:55:05   21   **********.  Did you see that messages were sent from the

09:55:08   22   Defendant's device to ********** saying things like "you can't

09:55:09   23   run"?

09:55:16   24   A.  Yes.  The imposter **********, because the account was

09:55:21   25   taken over, sent a message to the victim.  In this case, the

09:55:25  1    victim, when she lost her ********** account or realized that

09:55:30  2    her ********** account got taken over, she created another

09:55:35  3    Skype account named **********.  And the imposter **********

09:55:44  4    realized that she did this and sent a contact request, wanted

09:55:48  5    the victim to add ********** as a contact.  And when you do

09:55:53  6    that, you can actually send a short message prior to -- you

09:55:57  7    know, along with the connection request and the message that was

09:56:03  8    sent along with this connection request was "can't run".

09:56:13  9    Q.  Okay.  And so did you make a chart showing for the jury

09:56:18  10   evidence that you found of Skype chats showing that the

09:56:23  11   Defendant had complete control of the victim's Snapchat account?

09:56:23  12   A.  I did.

09:56:27  13   Q.  And is that what we're looking at on Page 27 which is on the

09:56:28  14   ELMO right now?

09:56:47  15   A.  Oh yes, yes.  This is showing -- illustrating that the

09:56:51  16   device owner had complete control over the victim's Snapchat

09:56:52  17   account, yes.

09:56:58  18   Q.  Okay.  And was there a message in there saying "lick your

09:57:00  19   boobs or I'm snapping your brother"?

09:57:01  20   A.  Yes.

09:57:12  21   Q.  Okay.  Now, if I move on in your exhibit, specifically now

09:57:24  22   talking about page -- I'm sorry, Page 31.  Okay.  Directing your

09:57:28  23   attention to that, you created a table here which shows some

09:57:32  24   additional Skype chats between swainmarc, who we previously

09:57:35  25   spoke about, and another user ID that we haven't mentioned yet

09:57:43  1   which is *******************.   Is that what Table 21 illustrates?

09:57:44  2   A.   Yes.

09:57:50  3   Q.   And is Table 21 an actual chat that you found on the Note 3

09:57:54  4   phone between the Defendant and ******************.

09:57:54  5   A.   Yes.

09:57:59  6   Q.   And how does a Skype chat potentially differ from like a

09:58:01  7   Snapchat?  What's the main difference between the two in terms

09:58:03  8   of video abilities?

09:58:12  9   A.   One thing you can do with Skype is you can have a Skype

09:58:18  10  video chat with someone else and at the same time, send text

09:58:18  11  messages.

09:58:23  12  Q.   Okay.  So what is a video chat?  Just explain that to the

09:58:25  13  jury.

09:58:31  14  A.   You need -- each person in the conversation needs a camera,

09:58:36  15  and so it's like a telephone call except you're making a video

09:58:42  16  call using the camera.  So each party in the video chat can see

09:58:45  17  each other in real time.

09:58:48  18  Q.   Okay.  So is this like the equivalent of FaceTime on an

09:58:48  19  Apple phone?

09:58:49  20  A.   Yes.

09:58:53  21  Q.   Okay.  So if two people don't have Apple phones, you could

09:58:56  22  install Skype and then have a video telephone call between

09:58:57  23  people?

09:58:57  24  A.   Yes.

09:59:02  25  Q.   Okay.  And is that what you saw evidence of here in Table

09:59:04  1    21, a video call?

09:59:04  2    A.  Yes.

09:59:08  3    Q.  Okay.  And in this video call, is the Defendant using

09:59:16  4    swainmarc user ID asking user ****************** to turn on your

09:59:16  5    cam?

09:59:16  6    A.  Yes.

09:59:21  7    Q.  Okay.  And the only way on that Skype call that you could

09:59:25  8    actually see the other person is if you have a camera and your

09:59:27  9    camera is exposed, right?

09:59:27  10   A.  Yes.

09:59:31  11   Q.  So if hypothetically there were a piece of tape or something

09:59:34  12   covering the camera on the phone, one party would be blocked

09:59:37  13   from seeing the other party?

09:59:37  14   A.  Correct.

09:59:43  15   Q.  Okay.  Now, in this conversation which is a video call with

09:59:49  16   text messages, did you find evidence of the Defendant asking

09:59:53  17   ****************** to disrobe and show her body to him on the

09:59:53  18   camera?

09:59:56  19   A.  Yes.

10:00:01  20   Q.  Okay.  And did he direct her in exactly what to do in terms

10:00:05  21   of what items of clothing to take off?

10:00:06  22   A.  Yes.

10:00:20  23   Q.  And this was recovered from the Defendant's Note 3 and

10:00:25  24   occurred on what date, according to your analysis?

10:00:28  25   A.  November 11, 2017.

10:00:33   1    Q.  Okay.  And here we have on Page 35, the conversation is

10:00:38   2    continuing.  And is the Defendant instructing ******************

10:00:46   3    on things to do such as "in front of the cam, spread your legs

10:00:49   4    so cam is in between your legs"?

10:00:49   5    A.  Yes.

10:00:51   6    Q.  And "spread your legs and aim at your vagina"?

10:00:53   7    A.  Yes.

10:00:56   8    Q.  And "do what I say before I post on your story"?

10:00:57   9    A.  Yes.

10:01:02   10   Q.  And then does he tell her to get back on SC.

10:01:02   11   A.  Yes.

10:01:05   12   Q.  And what is SC?

10:01:10   13   A.  That's like the acronym for Snapchat.

10:01:23   14   Q.  Okay.  And you see here on Page 36 that you have contact

10:01:27   15   information in a box on the top left-hand corner.  And what does

10:01:29   16   that indicate?

10:01:37   17   A.  That indicates that the swainmarc account had

10:01:42   18   ****************** as a contact.

10:01:46   19   Q.  Okay.  So that was added into the contacts of the phone.

10:01:48   20   A.  Yes.

10:01:52   21   Q.  Okay.  And if we go back through the course of that

10:01:59   22   conversation with ************, did you observe -- let me go

10:02:05   23   back to the page that it's on -- specific requests from the

10:02:10   24   Defendant for her to do things such as -- I'm sorry, I wrote on

10:02:16   25   your screen, "insert a brush into her vagina and twist her

10:02:16  1    nipples"?

10:02:17  2    A.  I recall, yes.

10:02:24  3    Q.  Okay.  And ultimately in your analysis of that phone that

10:02:29  4    belonged to the Defendant, did you find screenshots of someone

10:02:34  5    who later became known to you as ******************?

10:02:35  6    A.  Yes.

10:02:38  7    Q.  And how do you know when you look at the phone and do your

10:02:41  8    analysis that they're screenshots, those pictures?

10:02:49  9    A.  By the name of the file for that image file.  So if you look

10:02:55  10   in this table before you, the file name begins with screenshot

10:02:59  11   and then the date that the screenshot was taken.  So that is the

10:03:03  12   naming convention for a screenshot file that is created with the

10:03:05  13   phone.

10:03:10  14   Q.  Okay.  And since you testified that this was live video

10:03:16  15   Skype call, would that mean that the Defendant was taking

10:03:21  16   pictures and screenshotting his phone as the victim was doing

10:03:22  17   what he commanded?

10:03:24  18   A.  Yes.

10:03:28  19   Q.  Okay.  And based upon your knowledge of Skype, would there

10:03:32  20   be any way for the person on the other end who was talking or

10:03:37  21   disrobing or doing whatever activity to know that the other

10:03:39  22   person they're communicating with is screenshotting?

10:03:45  23   A.  Not unless the person screenshotting is telling that person

10:03:46  24   that he's doing that.

10:03:57  25   Q.  Okay.  Did you find evidence in the Defendant's phone also

10:04:01  1     of the application TextNow?

10:04:02  2     A.  Yes.

10:04:06  3     Q.  And what is the application TextNow, how does it work?

10:04:09  4     A.  That's another messaging application that you can download

10:04:14  5     on like the Play Store.  It basically gives you another phone

10:04:19  6     number as opposed to the real phone number assigned to your

10:04:24  7     phone from, say, like Verizon, and with the TextNow application,

10:04:29  8     you can use that to send text messages to people.

10:04:33  9     Q.  Okay.  So if hypothetically I have my phone number assigned

10:04:37  10    to my iPhone and I wanted to call you but I didn't want you to

10:04:40  11    know what my phone number was, I could use this app to get a

10:04:42  12    totally different phone number?

10:04:43  13    A.  Yes, you can.

10:04:46  14    Q.  And can I change the phone number on TextNow if I didn't

10:04:47  15    like the one it gave me?

10:04:48  16    A.  Yes.

10:04:52  17    Q.  And does the user of TextNow get to pick like what area code

10:04:55  18    they want to be in or anything about the number?

10:04:56  19    A.  Yes.

10:04:58  20    Q.  Okay.  And can they change it at any time?

10:05:00  21    A.  They can change it at any time.

10:05:03  22    Q.  Okay.  And so you found evidence of this app being installed

10:05:08  23    on the Defendant's phone.  Did you also find evidence on the

10:05:14  24    Defendant's phone of TextNow contact with B.O.?

10:05:16  25    A.  Yes.

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

10:05:21  1    Q.  And that B.O. is the ＊＊＊＊＊＊＊＊＊＊＊＊ that you found evidence of

10:05:22  2  a Skype call, right?

10:05:23  3    A.  Yes.

10:05:25  4    Q.  And what was the conversation on TextNow that you found in

10:05:30  5  the phone?  Was the Defendant advising or demanding that ＊＊＊＊

10:05:33  6  ＊＊＊＊＊ get on a different application?

10:05:37  7    A.  Yes, demanding that B.O. get on Snapchat.

10:05:43  8    Q.  Okay.  And if she didn't get on Snapchat, did the Defendant

10:05:45  9  threaten to post something on her story?

10:05:45  10    A.  Yes.

10:05:47  11    Q.  And what date was that sent?

10:05:51  12    A.  Looks like a day after the initial Skype conversation.  So

10:05:54  13  November 12, 2017.

10:06:03  14    Q.  Okay.  So when we move to Page 38, you have some search

10:06:08  15  terms here for the Samsung Galaxy S8.  This a different phone

10:06:10  16  than the Note 3; is that correct?

10:06:10  17    A.  Yes.

10:06:14  18    Q.  So did you run the same type of word search to preliminarily

10:06:18  19  find out if there were any signs of coercion in the phone?

10:06:19  20    A.  Yes.

10:06:21  21    Q.  Okay.  And are some of those words that you searched for

10:06:22  22  listed here?

10:06:23  23    A.  Yes.

10:06:27  24    Q.  Okay.  And you found no indication of those in terms of

10:06:28  25  coercion.

10:06:29    1    A.  No.

10:06:45    2    Q.  Okay.  Now, did you find on the S8 more photographs of young

10:06:47    3    girls with writing on their bodes?

10:06:48    4    A.  I did.

10:06:53    5    Q.  And did that writing say "sex slave" written across their

10:06:54    6    breasts?

10:06:57    7    A.  Yes.

10:07:01    8    Q.  Okay.  And is that what you evidenced in your Table 26?

10:07:01    9    A.  Correct.

10:07:05   10    Q.  And that was actually an Instagram video clip that you found

10:07:07   11    on the S8 phone, right?

10:07:07   12    A.  Yes.

10:07:13   13    Q.  Okay.  And speaking about Instagram on the S8 phone, were

10:07:17   14    you able to find a user ID for the Instagram user?

10:07:18   15    A.  Yes.

10:07:21   16    Q.  And what was that?

10:07:22   17    A.  Tuylin20.

10:07:27   18    Q.  Is that indicated in the chart that's right above there,

10:07:28   19    tuylin20?

10:07:38   20    A.  That is a -- that is the Instagram account tuylin20 that was

10:07:41   21    seen in a screenshot that was found on the S8 device.

10:07:44   22    Q.  Okay.  So not only was the Instagram account installed on

10:07:49   23    that device, but there was this screenshot on the device as

10:07:49   24    well?

10:07:52   25    A.  Yes, there is a screenshot, there was -- from a Verizon

| | | |
|---|---|---|
| 10:07:59 | 1 | phone though, so there is the distinction.  Sorry. |
| 10:08:03 | 2 | Q.  I'm going to try to zoom in to see if we can see this a |
| 10:08:11 | 3 | little bit better.  On Page 41 in your Figure 20, what is that a |
| 10:08:12 | 4 | screenshot of? |
| 10:08:16 | 5 | A.  That's a screenshot of the S8 device showing the application |
| 10:08:21 | 6 | list and pointing at the Instagram application icon. |
| 10:08:25 | 7 | Q.  Okay.  So on this S8 device, all of these apps were |
| 10:08:27 | 8 | installed on that phone. |
| 10:08:28 | 9 | A.  Correct. |
| 10:08:34 | 10 | Q.  Okay.  And when you clicked on the Instagram app in that |
| 10:08:40 | 11 | device, is Figure 21 what came up? |
| 10:08:43 | 12 | A.  That's initially what you see, yes. |
| 10:08:56 | 13 | Q.  And does Figure 22, Instagram, indicate who the Instagram |
| 10:08:58 | 14 | user was on that phone? |
| 10:08:58 | 15 | A.  Yes. |
| 10:09:00 | 16 | Q.  And is it again tuylin20? |
| 10:09:02 | 17 | A.  Yes. |
| 10:09:06 | 18 | Q.  And are there, in fact, Instagram albums that you found in |
| 10:09:09 | 19 | the gallery of the S8 phone? |
| 10:09:11 | 20 | A.  Yes. |
| 10:09:14 | 21 | Q.  Okay.  So that's actually a gallery of pictures that's |
| 10:09:19 | 22 | within the app and not on the phone's camera roll; is that |
| 10:09:19 | 23 | correct? |
| 10:09:25 | 24 | A.  Those are albums that are created by Instagram whenever the |
| 10:09:31 | 25 | Instagram user downloads images or videos from Instagram. |

| | | |
|---|---|---|
| 10:09:46 | 1 | Q.  And Table 27 -- can't see it there.  Table 27, you're |
| 10:09:49 | 2 | indicating some of the other notable applications that were on |
| 10:09:50 | 3 | the device; is that correct? |
| 10:09:54 | 4 | A.  Yes.  These are the notable social media-type applications |
| 10:09:55 | 5 | that were installed. |
| 10:10:01 | 6 | Q.  So that S8 phone had Instagram, Skype, TextNow.  And what's |
| 10:10:02 | 7 | second line? |
| 10:10:07 | 8 | A.  Talked about TextNow as is another application that can give |
| 10:10:16 | 9 | you another phone number to send text messages.  2ndLine is |
| 10:10:20 | 10 | actually another application made by the same company or authors |
| 10:10:24 | 11 | of TextNow that also gives you the ability to get another phone |
| 10:10:31 | 12 | number.  So if you're using TextNow and 2ndLine, you could |
| 10:10:34 | 13 | potentially have two different numbers to use. |
| 10:10:37 | 14 | Q.  So that would be two different numbers in addition to your |
| 10:10:38 | 15 | real number, right? |
| 10:10:38 | 16 | A.  Correct. |
| 10:10:41 | 17 | Q.  So that one phone could have three different numbers |
| 10:10:42 | 18 | emanating from it? |
| 10:10:43 | 19 | A.  Yes. |
| 10:10:49 | 20 | Q.  Okay.  Now, did you find evidence in the form of a Kik |
| 10:10:57 | 21 | message on that Galaxy S8 from user ID princess? |
| 10:10:58 | 22 | A.  Yes. |
| 10:11:03 | 23 | Q.  And was that Kik message from princess sent to the Galaxy S8 |
| 10:11:06 | 24 | phone user on September 24, 2018? |
| 10:11:07 | 25 | A.  Yes. |

```
10:11:13   1    Q.  And is that what's captured in Figure 24 on Page 43 of this
10:11:13   2    exhibit?
10:11:14   3    A.  Yes.
10:11:21   4    Q.  So did princess send a message to the user of that phone
10:11:26   5    saying, "hi.  It's been a while.  Yoww.  What's up man.  Are you
10:11:32   6    still playing?  I tried to get back, but Kik is dead for nudes
10:11:35   7    and IDK" -- is that I don't know?
10:11:36   8    A.  Yes.
10:11:41   9    Q.  And "I don't know how else to get it that fast.  I miss that
10:11:42   10   shit".
10:11:43   11   A.  Yes, that's what's there.
10:11:47   12   Q.  That was recovered from the Kik account that belonged to
10:11:48   13   that S8 phone, right?
10:11:50   14   A.  Yes.
10:12:00   15   Q.  And in that phone you also found Skype, but the Skype user
10:12:06   16   ID in that phone was different than in the Note 3, wasn't it?
10:12:06   17   A.  Yes.
10:12:09   18   Q.  How was it different?  What was it set to?
10:12:16   19   A.  It appeared it was set to someone -- that female name,
10:12:25   20   display name of ***** ***** with a user ID of *********.
10:12:29   21   Q.  Okay.  It looks like there's something over the area where a
10:12:30   22   profile picture would be.
10:12:35   23   A.  Yes.  I was covering up an illicit photo.
10:12:39   24   Q.  I'm sorry.  Covering up an illicit photo?
10:12:40   25   A.  Yes.
```

10:12:41  1   Q.  Was it a photo of a female?

10:12:42  2   A.  It was.

10:12:48  3   Q.  Okay.  So the Skype user ID on the S8 phone was set to ~~*****~~

10:12:51  4   ~~*****~~ with a picture of a girl.

10:12:54  5   A.  Yes.  It was a picture of a girl that was topless.

10:12:55  6   Q.  Okay.

10:12:56  7   A.  Exposing her breasts.

10:13:06  8   Q.  Now, did you find pictures of some of the same girls on the

10:13:08  9   Note 3 as you did on the S8?

10:13:10  10  A.  I did.

10:13:24  11  Q.  Okay.  So let's talk about these searches that you looked

10:13:34  12  for for jail bait.  Table 29 evidences Google Chrome searches

10:13:37  13  for material containing quote, unquote, jail bait.  Are you

10:13:41  14  familiar with that terminology as it relates to child

10:13:41  15  pornography?

10:13:41  16  A.  Yes.

10:13:44  17  Q.  Can you explain to the jury what it means and how you know

10:13:46  18  that?

10:13:52  19  A.  Jail bait is a term given to a young female that is under

10:13:58  20  the age of consent that dresses, acts and appears like someone

10:14:04  21  that is above the age of consent, and implication with that is

10:14:07  22  that an adult can find that person sexually attractive.

10:14:13  23  Q.  Okay.  And so did you find evidence in that S8 phone of a

10:14:17  24  Google search for items containing jail bait?

10:14:23  25  A.  Yes.  Within the Google Chrome browser, I found evidence of

| | | |
|---|---|---|
| 10:14:32 | 1 | the use of PasteBin to search for jail bait type of material. |
| 10:14:36 | 2 | Q.   And did several things come up in January of 2018? |
| 10:14:40 | 3 | A.   Yes.   There were a couple searches for jail bait. |
| 10:14:53 | 4 | Q.   Okay.   Now, did you also run searches on both of those |
| 10:15:00 | 5 | phones, and right now speaking specifically about the S8 phone, |
| 10:15:04 | 6 | did you find that the user had searched for material containing |
| 10:15:07 | 7 | child pornography which is commonly referred to as CP? |
| 10:15:08 | 8 | A.   Yes. |
| 10:15:11 | 9 | Q.   Can you explain to the jury what you found? |
| 10:15:20 | 10 | A.   The same type of searches for child porn were found using |
| 10:15:27 | 11 | PasteBin to try to find material where you can find child |
| 10:15:32 | 12 | pornography.   So what PasteBin is is a place where people can |
| 10:15:38 | 13 | actually just post text messages or text data for just online |
| 10:15:42 | 14 | storage or even public access for people.   Sometimes people put |
| 10:15:47 | 15 | -- software developers might put code up there, but what some |
| 10:15:54 | 16 | other people might do is put links to child pornography that are |
| 10:16:01 | 17 | hosted on the dark web, Tor.   So dark web links on PasteBin.   So |
| 10:16:07 | 18 | when you -- if you do a search for CP on PasteBin, you may come |
| 10:16:10 | 19 | across the dark web links that can give you access to a |
| 10:16:17 | 20 | repository of CP.   So if you're looking at the items highlighted |
| 10:16:22 | 21 | in yellow on your screen, you see at the end of the highlighting |
| 10:16:31 | 22 | CP in lower case, but before that you see the words *(sic)* T-O-R, |
| 10:16:37 | 23 | that's a reference for Tor which is basically finding child |
| 10:16:44 | 24 | pornography on the dark web and hopefully, you know, if you find |
| 10:16:49 | 25 | some links that he could go use and go surfing in the dark web |

10:16:51  1   to try to find child pornography.

10:16:55  2   Q.  Okay.  So does the table that you indicated on here in Table

10:17:00  3   30, does that indicate that the user of that phone was searching

10:17:03  4   in Google Chrome for child pornography?

10:17:04  5   A.  Yes.

10:17:07  6   Q.  And were they specifically coming up with these searches in

10:17:11  7   November of 2017 and December of 2017?

10:17:13  8   A.  Yes.

10:17:18  9   Q.  Okay.  And you can see some of the web page titles.  Was one

10:17:23 10   of them trading CP on Dropbox, you first or no deal, boys only,

10:17:30 11   under 15.  Dropbox, parenthesis kid PasteBin.com?

10:17:30 12   A.  Yes.

10:17:33 13   Q.  Is that one of the web pages that the user who was searching

10:17:40 14   for went to or that popped up, maybe that's a better term, that

10:17:41 15   came up in his search?

10:17:41 16   A.  Yes.

10:17:45 17   Q.  Okay.  And was there also a website CP the young stuff on

10:17:46 18   PasteBin?

10:17:50 19   A.  Yes.  And that would be the title for that web page.

10:17:55 20   Q.  And then we see here CP videos of boys and girls and it says

10:18:00 21   Tor.  Is that what you referred to as the onion router for the

10:18:00 22   dark web?

10:18:01 23   A.  Yes.

10:18:09 24   Q.  Now, you found those searches on that Galaxy S8 phone.  Did

10:18:16 25   you find any searches looking for how to find help if I'm being

10:18:17  1   extorted?

10:18:18  2   A.  No.

10:18:27  3   Q.  Okay.  On the S8 phone, the Dropbox app was installed as

10:18:29  4   well; is that true?

10:18:30  5   A.  Yes.

10:18:34  6   Q.  Okay.  And were you able to look in the Dropbox application

10:18:36  7   that was installed on that phone?

10:18:36  8   A.  Yes.

10:18:40  9   Q.  And when you click on the Dropbox app and you go into the

10:18:44  10  Dropbox app, did you find some folders in there that contained

10:18:45  11  child pornography?

10:18:52  12  A.  I looked at the file system and I found folders under

10:19:00  13  Dropbox indicating a visit to a site, a Dropbox site, containing

10:19:06  14  child pornography was accessed.

10:19:15  15  Q.  Okay.  In that S8 phone, did you find pictures or

10:19:21  16  screenshots, I should say, of text messaging between someone

10:19:25  17  named A.G. and the Defendant?

10:19:26  18  A.  Yes.

10:19:33  19  Q.  Okay.  And did you find a text message that's up on screen

10:19:39  20  now where A.G. is asking to "please delete them", and the

10:19:44  21  Defendant is saying "listen now tell me your password to Kik".

10:19:47  22  Is that's what's in front of you on the screen?

10:19:47  23  A.  Yes.

10:19:50  24  Q.  On Page 50?

10:19:51  25  A.  That's correct.

10:19:57  1    Q.   Does he further say to A.G. "you don't ask questions, you

10:20:00  2    just obey.  Now tell me".

10:20:01  3    A.   Yes.

10:20:05  4    Q.   Okay.  And A.G. actually has a picture in her user ID that

10:20:11  5    was a screenshot on the S8 phone that the Defendant had right?

10:20:13  6    A.   Yes.

10:20:24  7    Q.   Did you find another screenshot on the Defendant's S8 phone

10:20:27  8    under *******?

10:20:28  9    A.   I did.

10:20:31  10   Q.   Okay.  And is that what I have up on the ELMO in front of

10:20:32  11   you now?

10:20:33  12   A.   Yes.

10:20:38  13   Q.   And was there a user name displayed on ********* text

10:20:39  14   messages?

10:20:45  15   A.   The display name is "Matt's slut".

10:20:49  16   Q.   And in this screenshot that was on the S8 phone taken by the

10:20:55  17   Defendant, was the Defendant asking for Facebook and Instagram

10:20:56  18   user IDs?

10:20:58  19   A.   Yes.

10:21:04  20   Q.   And do you see that someone named S.M. actually provided

10:21:06  21   those to the Defendant?

10:21:06  22   A.   Yes.

10:21:16  23   Q.   The Defendant?  I'm sorry.  And there's another screenshot

10:21:19  24   where this conversation is continuing, right?

10:21:20  25   A.   Correct.

| | | |
|---|---|---|
| 10:21:25 | 1 | Q. So a screenshot means that that device was receiving these |
| 10:21:32 | 2 | text messages from someone named Matt's slut and screenshotting |
| 10:21:34 | 3 | them to save them; is that correct? |
| 10:21:36 | 4 | A. That is correct. |
| 10:21:45 | 5 | Q. Okay. And you found -- did you find evidence in that S8 |
| 10:21:50 | 6 | phone that would show whose phone it was? |
| 10:21:51 | 7 | A. Yes. |
| 10:21:56 | 8 | Q. Okay. And is that what's on the ELMO now in front of you in |
| 10:22:01 | 9 | a text message with someone who was called "Rivv" inside that |
| 10:22:02 | 10 | phone? |
| 10:22:04 | 11 | A. Yes. |
| 10:22:07 | 12 | Q. And is the person who is sending that identified as Joseph |
| 10:22:12 | 13 | with an address of 21767 Ascot Court? |
| 10:22:22 | 14 | A. Yes. I believe this is on the Note 3 device. |
| 10:22:26 | 15 | Q. The Note 3? Okay. |
| 10:22:29 | 16 | A. One thing -- can I mention one thing? |
| 10:22:32 | 17 | Q. Is it about the conversation we just spoke about? |
| 10:22:34 | 18 | A. The screenshots of the -- |
| 10:22:36 | 19 | Q. Yes. Going back to the screenshot page. |
| 10:22:47 | 20 | A. Yes. The snap account. I just also want to mention that if |
| 10:22:54 | 21 | you look at the top, that little onion icon, Tor Orbot was |
| 10:22:55 | 22 | running on that phone as well. |
| 10:22:58 | 23 | Q. So this tool bar up here actually gives you a lot of |
| 10:23:01 | 24 | information about things that are running on the status of the |
| 10:23:01 | 25 | phone? |

10:23:06   1    A.  Yes.  It can give you applications that are running or it

10:23:11   2    can flash a notification that says somebody sent you a text

10:23:16   3    message.  Like if somebody sent you a Kik instant message, the

10:23:21   4    Kik icon would pop up on the top.

10:23:24   5    Q.  And going back to the most recent chats which you said were

10:23:29   6    found on the Note 3 between someone who is identified in the

10:23:34   7    chats as me and Rivv, did you find this conversation that's up

10:23:36   8    on the screen?

10:23:37   9    A.  Yes.

10:23:40   10   Q.  And what is this conversation?

10:23:43   11   A.  It appeared to be conversation between the Defendant and a

10:23:48   12   coworker named Rivv, the contents of which dealt with

10:23:54   13   scheduling, work shifts at a restaurant that they both worked

10:23:59   14   at.  Nothing malicious in nature was found in that conversation.

10:24:10   15   Q.  Okay.  Did you find any thumbnail images showing user

10:24:13   16   identification on the phone?

10:24:17   17   A.  This is a screenshot or image that I found on the Note 3

10:24:24   18   device, the older phone.  It has the likeness of the Defendant.

10:24:29   19   This was the only image of the Defendant that I found on that

10:24:30   20   phone.

10:24:35   21   Q.  Okay.  And in terms of, you know, knowing whose phone that

10:24:40   22   is, sometimes when you have a device and you go to purchase

10:24:45   23   something on Amazon or fill out a form asking for your personal

10:24:49   24   information, sometimes does the phone actually remember that and

10:24:52   25   start to input your information for you?

10:24:53  1    A.  Yes, it can.

10:24:57  2    Q.  And is that what you have evidenced here in the Google

10:25:00  3    Chrome auto fill data?

10:25:04  4    A.  Yes.  So this is auto fill data.  So like if you had to go

10:25:07  5    register online for an account, say Target or whatever, and you

10:25:12  6    previously signed up somewhere else for an account, Google can

10:25:18  7    remember the information you used last time.  So if the device

10:25:23  8    owner had wanted to create a new account, say at Walmart.com,

10:25:27  9    and it's going to ask for your name, your address, phone number,

10:25:32  10   this type of information will start auto filling.  So it's

10:25:38  11   asking for your first name and you start typing in J-O, it will

10:25:44  12   automatically pre-fill based on the auto fill data there.

10:25:49  13   Q.  Okay.  Now, you had mentioned earlier when we were talking

10:25:57  14   about the dark web, you had mentioned Orbot and that being a way

10:26:01  15   to get into the dark web.  Did you create a series of slides or

10:26:05  16   images that would help the jury understand what you were talking

10:26:09  17   about in terms of anonymizing your IP address?

10:26:10  18   A.  Yes.

10:26:12  19   Q.  Would that help you further explain it to the jury?

10:26:13  20   A.  Yes.

10:26:19  21   Q.  I would like to show Government's 45 for identification.

10:26:21  22        MR. NATALE:  May I see it?

10:26:48  23        THE COURT:  Okay.  This is what I want to avoid.  I'd

10:26:51  24   like you to give him the stuff beforehand so that if you offer

10:26:54  25   it, they know what you're offering and they know.  If it's

10:26:57  1   different, I'll deal with it.  But if it's --

10:27:01  2            MR. NATALE:  You never provided that to us.  When?

10:27:05  3            THE COURT:  Okay.  Well, you guys work it out.  Do we

10:27:08  4   need to take a break?

10:27:10  5            MS. ANTON:  They have no objection to Government's 45

10:27:12  6   and 44 as I understand it.

10:27:16  7            THE COURT:  44 and 45 without objection?  Are admitted

10:27:16  8   in evidence.

10:27:16  9            (Government's Exhibits 44 & 45 in evidence)

10:27:16  10           BY MS. ANTON:

10:27:29  11  Q.  I put Government's 45 up on the screen.  Is that the Orbot

10:27:33  12  app icon that you were talking about that looks like an onion?

10:27:36  13  A.  Yes, that would be Orbot running on the phone.

10:27:39  14  Q.  And is this how it would look if you went to put it on an

10:27:40  15  Android phone?

10:27:43  16  A.  Yes, you would see an application icon for that app.

10:27:48  17  Q.  Okay.  And when you open up the Orbot app on an Android

10:27:50  18  phone, is this how it would look?

10:27:51  19  A.  Yes.

10:27:54  20  Q.  And would it give you the option of selecting what country

10:27:58  21  you'd like to appear from as you've indicated with a red arrow?

10:28:03  22  A.  Yes.  The left arrow there is an actual drop-down which

10:28:08  23  allows you to select which country you want to essentially pop

10:28:14  24  out of.  If you use Tor.  Orbot to access the Tor network.

10:28:19  25  Q.  Okay.  On the bottom it says Tor enabled apps on the bottom

10:28:24  1   of that screenshot.  Does this Orbot app allow the user to pick

10:28:29  2   which apps they want to have this Orbot apply to?

10:28:30  3   A.  Yes.

10:28:33  4   Q.  So I could have it work on my Snapchat, but not on my

10:28:33  5   Instagram.

10:28:35  6   A.  Correct.

10:28:44  7   Q.  And is this a list of countries that you're able to choose

10:28:44  8   from?

10:28:46  9   A.  Yes.

10:28:53  10  Q.  You mentioned certain apps can be selected.  And you have

10:28:58  11  VPN mode in a rectangle.  Could you explain that to the jury?

10:29:03  12  A.  Yes.  This is when you're using Orbot, this is where you get

10:29:08  13  to pick a la carte which applications you wanted to always go

10:29:12  14  through Orbot.  And this screenshot here, I've selected four

10:29:17  15  applications:  Chrome browser, Instagram, Skype and Snapchat.

10:29:21  16  So every time the user uses those applications, Orbot is

10:29:27  17  running.  Those communications, the IP address of where they

10:29:30  18  originated from are going to be obfuscated.  They're not going

10:29:33  19  to show that if I was in Virginia, that any communications

10:29:37  20  originated from Virginia if you went and got those logs from

10:29:39  21  those companies.

10:29:46  22  Q.  Okay.  And the last thing that you have in terms of the IP

10:29:53  23  location, can you explain what this is with the Chrome browser?

10:29:57  24  A.  Yes.  So in the previous slides what I had done was selected

10:30:04  25  Romania in Orbot.  I wanted to pop out of Romania.  So after you

10:30:09  1    do that, I used my Chrome browser, which was also configured to

10:30:16  2    use Orbot.  I went to a website that can -- you can go to and

10:30:21  3    will tell you what your IP address is.  So in this example,

10:30:28  4    IPlocation.com, it said essentially hello, okay, your IP address

10:30:37  5    is 193.169.145.66, and it will proceed to tell you where that IP

10:30:42  6    address is located.  And in this example, it's in Romania which

10:30:44  7    is the one I chose in Orbot.

10:30:48  8    Q.  So in this example that you have, you can put an IP address

10:30:52  9    and it will give you the option of knowing what country, region

10:30:57  10   or city.  But does it give you the information of what specific

10:31:01  11   building or residence that IP address is coming from?

10:31:03  12   A.  No, it does not.

10:31:15  13   Q.  Showing you now Government's 44.  When we were talking about

10:31:21  14   Dropbox, did you create a Dropbox image to explain to the jury

10:31:27  15   how you saw the Dropbox accounts or the Dropbox account in the

10:31:30  16   S8 and S3 *(sic)* phone?

10:31:32  17   A.  No, this is not Dropbox

10:31:35  18   Q.  Oh, I'm sorry.  This is the media pictures.  Is that

10:31:36  19   correct?

10:31:41  20   A.  Yes.  These are the albums that the Note 3 device owner

10:31:47  21   would see if he went to the gallery.  He would see all of these.

10:31:50  22   Most of the albums listed here.  He would have actually seen

10:31:55  23   about approximately 70 different albums.

10:31:58  24   Q.  And so in the phone there were specific albums that you

10:32:01  25   located with these specific names?

10:32:03   1   A.  Yes.

10:32:05   2   Q.  Are these names that you gave to them or are these names

10:32:07   3   that were already there?

10:32:12   4   A.  These album names were already there.

10:32:15   5   Q.  Okay.  So you didn't make these album names up?

10:32:16   6   A.  No.

10:32:19   7   Q.  Okay.  And were you able to click on these folders and

10:32:22   8   observe what was inside of these albums?

10:32:24   9   A.  Yes.

10:32:27  10   Q.  And what was inside of those albums?

10:32:32  11   A.  Inside all those albums, you know, each of the album names

10:32:42  12   apparently had the name of the victim and images of that victim,

10:32:49  13   I would assume like sextortion images.  So a lot of nude

10:32:52  14   pictures and some pictures with them naked with writing on them.

10:32:59  15   Q.  Okay.  Did you also look at Dropbox?

10:33:05  16   A.  Yes, I looked at the Dropbox folder on the Note 3.

10:33:09  17   Q.  And how is the Dropbox folder on the Note 3 organized?

10:33:17  18   A.  There's a series of folders underneath Dropbox, and in one

10:33:21  19   of the folders, one of the sub folders, there was one named

10:33:24  20   "yep" and under that there were these sub folders with

10:33:28  21   apparently names of females.

10:33:31  22   Q.  Okay.  And this was the Dropbox account that was on the

10:33:32  23   phone.

10:33:32  24   A.  Yes.

10:33:38  25   Q.  Okay.  And when you located those female names in the

10:33:41  1    Dropbox account in folders, were you able to click on the

10:33:44  2    folders and see what was inside of it?

10:33:45  3    A.  Yes.

10:33:50  4    Q.  And what did you find inside the folders of female names on

10:33:52  5    the Dropbox account?

10:33:56  6    A.  They appeared to be linked to the some of -- the albums that

10:33:59  7    were in the previous screenshot.

10:34:06  8         MS. ANTON:  One moment, please, Judge.

10:34:08  9         THE COURT:  Yes.

10:34:08  10        BY MS. ANTON:

10:34:28  11   Q.  Mr. Deborja, we were talking about the Orbot app and the

10:34:36  12   VPN.  What is a VPN and how does that work?

10:34:42  13   A.  VPN is a virtual private network, so it's a way for you --

10:34:49  14   just like Orbot, to go through a different service provider

10:34:53  15   where the traffic between you and that service provider, that

10:34:58  16   VPN provider is all encrypted.  And you go to their server but

10:35:00  17   then you also -- you pop out of one of those servers and

10:35:08  18   essentially, you will also obfuscate your IP address.

10:35:12  19   Q.  And would you have to turn that on or have it running if you

10:35:17  20   wanted to do a search or send a message and obscure your IP

10:35:18  21   address?

10:35:20  22   A.  Yes.

10:35:25  23   Q.  So if hypothetically say I sent a message but I forgot to

10:35:30  24   turn it on, or I didn't select that app, like I didn't select

10:35:35  25   Snapchat and I sent a message, would my true IP address show?

10:35:39   1   A.  It would.

10:35:41   2            MS. ANTON:  Thank you.  I have no further questions.

10:35:44   3            THE COURT:  Cross?

10:35:44   4                          CROSS-EXAMINATION

10:35:49   5       BY MR. NATALE:

10:35:53   6   Q.  Sir, is the correct pronunciation of your last name Deborja?

10:35:56   7   A.  Deborja, yes.

10:36:01   8   Q.  I'd like to see the last two exhibits.

10:36:08   9            MR. NATALE:  May I approach the ELMO, Your Honor?

10:36:10  10            THE COURT:  You may.

10:36:10  11            MR. NATALE:

10:36:19  12   Q.  Government's Exhibit 45, this was not something that you

10:36:27  13   found on the Galaxy 8 or the Note 3.

10:36:30  14            THE COURT:  Is that a question?

10:36:31  15            MR. NATALE:  Yes.

10:36:31  16            MR. NATALE:

10:36:33  17   Q.  Was it?

10:36:35  18            THE COURT:  Now it's a question.

10:36:35  19       BY MR. NATALE:

10:36:37  20   Q.  Was it?

10:36:40  21   A.  It was no longer installed on the Note 3; however, it was

10:36:44  22   installed and running on the S8.

10:36:51  23   Q.  So when you looked at the S8, you actually saw this sheet

10:36:56  24   that we have here in Government's Exhibit 45 exactly as it's

10:36:57  25   depicted here.

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

10:37:00  1    A.  No, that is not a screenshot of either of the phones, from

10:37:02  2    either of the phones.

10:37:03  3    Q.  Okay.  So --

10:37:05  4    A.  This is for demonstration purposes.

10:37:11  5    Q.  Okay.  So what we're looking at here was something that was

10:37:17  6    created, not something that you lifted from the phone.

10:37:21  7    A.  No.  This is to illustrate how to use Orbot.

10:37:27  8    Q.  Okay.  And you got that off the phone or did you get it from

10:37:30  9    some other source?

10:37:33  10   A.  Did I get what?

10:37:37  11   Q.  Well, this image.  It has here, it says Orbot app icon on

10:37:45  12   Android phone.  So what we see on this page you could take the

10:37:50  13   phone, either the iPhone -- I mean, either the S8 or the

10:37:55  14   notebook and show us exactly this same exact image that we see

10:37:58  15   in Government 45.

10:38:01  16   A.  I'm not following you.

10:38:08  17   Q.  Sir, this is a demonstrative, right?  A demonstrative means

10:38:14  18   that it's to demonstrate what you are testifying about, right?

10:38:15  19   A.  Okay.

10:38:22  20   Q.  Now, this was created to show and explain to the jury how

10:38:28  21   the Orbot app works on an Android phone.

10:38:32  22   A.  It would be the same way if you had it on an iPhone as well.

10:38:33  23   Q.  Okay.

10:38:34  24   A.  So this is --

10:38:39  25   Q.  Android or iPhone, this whole exhibit was created by you to

10:38:50  1   explain how Orbot works on an Android phone or an iPhone, right?

10:38:53  2   A.  The concept would be the same.

10:38:58  3   Q.  I'm asking you, you created this exhibit, Exhibit 45?

10:38:58  4   A.  Yes.

10:39:06  5   Q.  And you created this exhibit in order to explain how the

10:39:09  6   Orbot app works.

10:39:10  7   A.  Correct.

10:39:20  8   Q.  Okay.  And you created it to show the jury that if someone

10:39:25  9   tried to install Orbot, what it would look like on their phone,

10:39:25 10   right?

10:39:26 11   A.  Yes.

10:39:31 12   Q.  Okay.  And so the second page would show that if anybody

10:39:38 13   tried to install Orbot, they would see what was on here, right?

10:39:44 14   A.  Not exactly that image for demonstration purposes.  I

10:39:47 15   selected Romania and I selected those four apps down there and

10:39:53 16   if they had a fresh install, then you wouldn't see those apps

10:39:57 17   down there, Instagram, Snapchat.

10:40:01 18   Q.  So the image that we're looking at here was created by you.

10:40:03 19   This is what you selected.

10:40:04 20   A.  Correct.

10:40:10 21   Q.  Okay.  So this image didn't come off the phones you were

10:40:11 22   analyzing.

10:40:12 23   A.  No, they didn't.

10:40:20 24   Q.  Okay.  Let's look at the next page.  The image we see here

10:40:24 25   was something that you created, right?

```
10:40:24    1    A.  Yes.

10:40:29    2    Q.  It is not something that was on any of the phones that you

10:40:34    3    examined, that image, the exact image?

10:40:35    4    A.  That exact image, yes.

10:40:36    5    Q.  It was not.

10:40:38    6    A.  No.

10:40:47    7    Q.  Next page is also another image that you created.

10:40:48    8    A.  Yes.

10:40:53    9    Q.  And it says VPN mode.  Right?

10:40:53   10    A.  Yes.

10:40:58   11    Q.  Now, VPN, it's not illegal to have VPNs, is it?

10:41:00   12    A.  No, it is not.

10:41:05   13    Q.  In fact, isn't it true that a lot of businesses and even

10:41:08   14    government agencies have VPNs?

10:41:09   15    A.  Yes.

10:41:11   16    Q.  I'm sorry?

10:41:12   17    A.  Yes.

10:41:19   18    Q.  So they have them and they have them so their employees can

10:41:24   19    communicate with one another in a secure way, right?

10:41:25   20    A.  Correct.

10:41:30   21    Q.  And in fact, you've probably even worked in businesses that

10:41:32   22    have had VPNs, right?

10:41:33   23    A.  Yes.

10:41:37   24    Q.  Wasn't doing anything illegal with it, were you?

10:41:41   25    A.  No, because I'm using it for legitimate business purposes.
```

| | | |
|---|---|---|
| 10:41:45 | 1 | Q.  Exactly.  So it's capable of being used for legitimate |
| 10:41:50 | 2 | business purposes, and that it isn't only to access the dark web |
| 10:41:53 | 3 | or any of that other stuff, right? |
| 10:41:54 | 4 | A.  Correct. |
| 10:42:04 | 5 | Q.  Next page.  Again, this is something you created.  Right? |
| 10:42:05 | 6 | A.  Yes. |
| 10:42:13 | 7 | Q.  And you're aware that on some of these IP location sites, |
| 10:42:22 | 8 | they give you the latitude and longitude, right, of the IP |
| 10:42:23 | 9 | address? |
| 10:42:24 | 10 | A.  Some do. |
| 10:42:29 | 11 | Q.  Okay.  And some do.  And the ones that give you the latitude |
| 10:42:32 | 12 | and longitude, that is like where you have the map that shows |
| 10:42:34 | 13 | you exactly where it's located? |
| 10:42:35 | 14 | A.  Yes. |
| 10:42:40 | 15 | Q.  Okay.  And when you know the latitude and longitude, you can |
| 10:42:47 | 16 | put that into Google map and actually see that physical area, |
| 10:42:49 | 17 | right? |
| 10:42:50 | 18 | A.  You could. |
| 10:42:55 | 19 | Q.  Okay.  And when you see that physical area, you can zoom in |
| 10:43:00 | 20 | on Google and find out what address that was, right? |
| 10:43:05 | 21 | A.  Correct.  You see lat and long in this example here, but |
| 10:43:09 | 22 | it's not a very accurate and precise location. |
| 10:43:16 | 23 | Q.  Well, but what I'm asking you is simply you can go on, you |
| 10:43:22 | 24 | know, Google maps, put in the latitude and longitude, and you |
| 10:43:28 | 25 | can then have a satellite image of that location, right?  You |

10:43:33  1   can then zoom in and get a street view, right?

10:43:37  2   A.  Well, those numbers there that would probably give you just

10:43:39  3   the city.

10:43:46  4   Q.  Well, latitude and longitude does not only is also minutes

10:43:47  5   and seconds, right?

10:43:48  6   A.  Yeah.

10:43:52  7   Q.  So the longer that is, the more precise the location is?

10:43:52  8   A.  Correct.

10:43:56  9   Q.  In fact, that's how we do -- well, back in the old days

10:43:59 10   that's how we used to do navigation, right?  When we didn't have

10:44:00 11   GPS.

10:44:01 12   A.  Okay.

10:44:08 13   Q.  Now, so you would agree that by using the latitude and

10:44:13 14   longitude and using other commercially available apps, you can

10:44:22 15   find the physical location of an IP address, right?

10:44:27 16   A.  Just a general location where that IP address is.

10:44:31 17   Q.  Well, and then you can zoom in and get a good sense of it,

10:44:32 18   right?

10:44:35 19   A.  You can zoom in, but there would be nothing specific to zoom

10:44:35 20   in on.

10:44:44 21   Q.  So when you zoom in on Google maps, right, you don't see

10:44:51 22   trees and houses and things?  Isn't that what you see?

10:44:53 23   A.  You can see that depending on the view.

10:44:58 24   Q.  Well, and so when you get closer and closer, you can even

10:45:00 25   have a street view, right?

10:45:06   1      A.   Yes, you'll probably see many streets.

10:45:12   2      Q.   Okay.  Depends on how precise your latitude and longitude

10:45:13   3      is, right?

10:45:14   4      A.   Right.

10:45:18   5      Q.   Okay.  The more precise it is, the more accurate you would

10:45:20   6      actually be able to see the house.

10:45:21   7      A.   Correct.

10:45:34   8      Q.   Now, the last page is something you created.

10:45:35   9      A.   Yes.

10:45:46   10     Q.   And what it shows is that if someone is using a Tor network,

10:45:54   11     that they can start from one place, it goes through a whole

10:45:57   12     bunch of computers, right?  And servers, and bounces around and

10:46:02   13     up and down and all over and then it connects to one of the

10:46:04   14     standard servers, right?

10:46:05   15     A.   Correct.

10:46:09   16     Q.   And then it goes to a target, right?

10:46:10   17     A.   Yes.

10:46:18   18     Q.   And if the target looks at where this was coming from,

10:46:22   19     that's where it could come from like when you pick Romania or

10:46:25   20     something like that.

10:46:30   21     A.   With those applications, Skype, Instagram and Snapchat,

10:46:33   22     you're not going to see where that guy's coming from.

10:46:33   23     Q.   Okay.

10:46:37   24     A.   That's why you have to go through those companies and

10:46:40   25     subpoena for their logs.

| | | |
|---|---|---|
| 10:46:44 | 1 | Q.  So there is no way that anyone would be able -- you're |
| 10:46:48 | 2 | saying that there's no way that anyone would be able to know the |
| 10:46:54 | 3 | IP address if they went through the Tor network. |
| 10:46:58 | 4 | A.  Not their true IP address, no. |
| 10:47:02 | 5 | Q.  But if they didn't go through the Tor network, you could |
| 10:47:05 | 6 | know their true IP address, right? |
| 10:47:09 | 7 | A.  Yes, that would be logged in the social media servers. |
| 10:47:17 | 8 | Q.  Exactly.  And in this case, the IP address that was used by |
| 10:47:26 | 9 | Joseph was the real IP address where he really lived, right? |
| 10:47:28 | 10 | A.  In some instances, yes. |
| 10:47:35 | 11 | Q.  Well, we know that, and I'm going to go through your report, |
| 10:47:42 | 12 | but we know that a whole lot of times it went right to his |
| 10:47:45 | 13 | house. |
| 10:47:48 | 14 | A.  Correct.  That could have been explained for a number of |
| 10:47:48 | 15 | reasons. |
| 10:47:50 | 16 | Q.  Right.  You can come up with a whole lot of explanations as |
| 10:47:55 | 17 | to what could have happened, right?  But, sir, you're testifying |
| 10:48:00 | 18 | under oath as to the truth, right?  The whole truth and nothing |
| 10:48:01 | 19 | but the truth, right? |
| 10:48:01 | 20 | A.  Uh-huh. |
| 10:48:07 | 21 | Q.  And you would be -- you wouldn't want to speculate on |
| 10:48:12 | 22 | something you don't really know, would you? |
| 10:48:13 | 23 | A.  Right. |
| 10:48:16 | 24 | Q.  That wouldn't be fair, would it? |
| 10:48:17 | 25 | A.  No. |

10:48:23  1    Q.  In fact sir, you pride yourself that you're somewhat of a

10:48:26  2    scientist or a specialist, that the only thing you're going to

10:48:33  3    testify to is what you see and what is actually there, right?

10:48:38  4    A.  I am.

10:48:39  5    Q.  Or --

10:48:42  6    A.  If I see a suspicious application on someone's device, I'm

10:48:44  7    going to put that in my report.

10:48:45  8    Q.  Right.

10:48:46  9    A.  Yes.

10:48:52  10   Q.  And that but in reality, there's certain things that people

10:48:58  11   may assume but may not always be accurate, right?

10:49:00  12   A.  That is correct.

10:49:18  13   Q.  Okay.  So that's 43.

10:49:20  14        I'd like to now show you what has been marked as

10:49:33  15   Government's Exhibit 43 and it's in evidence.  You've obviously

10:49:35  16   seen this document before?

10:49:36  17   A.  Yes.

10:49:44  18   Q.  And when did you prepare this document that's 43 pages?

10:49:48  19        THE COURT:  It's 49 pages.

10:49:52  20        MR. NATALE:  Excuse me.  Oh, it's Exhibit 43.  I'm

10:49:54  21   sorry.  It's 49 pages.  Thank you, Judge.

10:49:57  22        THE COURT:  Close.

10:50:00  23        THE WITNESS:  I don't know the exact date.

10:50:00  24      BY MR. NATALE:

10:50:08  25   Q.  Okay.  But it's 49 pages, right?

| | | |
|---|---|---|
| 10:50:11 | 1 | A.  That one is, yes. |
| 10:50:23 | 2 | Q.  That one is 49 pages.  Okay.  Now, also attached -- okay. |
| 10:50:27 | 3 | So now I'd like to show you what has been marked as Defense |
| 10:50:31 | 4 | Exhibit A for identification. |
| 10:50:46 | 5 |       THE COURT:  Not in evidence.  Dawn, shut off the other |
| 10:50:47 | 6 | monitors. |
| 10:50:59 | 7 |       (Counsel conferring) |
| 10:51:03 | 8 |       MR. NATALE:  Your Honor, I have to approach the witness |
| 10:51:05 | 9 | with this.  This is for identification purposes only. |
| 10:51:07 | 10 |       THE COURT:  You can do it through there.  I've shut off |
| 10:51:09 | 11 | all the other monitors. |
| 10:51:09 | 12 |       MR. NATALE:  Okay. |
| 10:51:09 | 13 |     BY MR. NATALE: |
| 10:51:15 | 14 | Q.  I'd like to show you what is marked as Defense Exhibit A. |
| 10:51:18 | 15 | And I'm going to go through each page of it with you to make |
| 10:51:28 | 16 | sure that -- to see if you recognize this.  Do you recognize the |
| 10:51:29 | 17 | first page? |
| 10:51:31 | 18 | A.  Yes. |
| 10:51:33 | 19 | Q.  Do you recognize the second page? |
| 10:51:35 | 20 | A.  Yes. |
| 10:51:45 | 21 | Q.  First page on the bottom says Page 1 of 58, correct? |
| 10:51:48 | 22 |       THE COURT:  Can't see it.  There. |
| 10:51:48 | 23 |       MR. NATALE: |
| 10:51:49 | 24 | Q.  There you go. |
| 10:51:49 | 25 | A.  Yes. |

10:51:54   1    Q.   And this report was generated when?

10:51:58   2    A.   In June of this year.

10:52:07   3    Q.   Now, let's go to Page 2.  Do you recognize that?

10:52:08   4    A.   Yes.

10:52:13   5    Q.   Do you recognize Page 3?

10:52:14   6    A.   Yes.

10:52:19   7    Q.   Do you recognize Page 4?

10:52:20   8    A.   Yes.

10:52:24   9    Q.   Do you recognize Page 5?

10:52:26  10    A.   Yes.

10:52:31  11    Q.   Do you recognize Page 6?

10:52:34  12    A.   Yes.

10:52:35  13    Q.   Can you see it?

10:52:35  14    A.   Yes.

10:52:45  15    Q.   Okay.  Now, this would be -- what I'm showing you is things

10:52:50  16    that would be a report that you gave to the Government, right?

10:52:50  17    A.   Yes.

10:52:52  18    Q.   Okay.

10:52:55  19             THE COURT:  I think he is the Government.

10:52:58  20             MR. NATALE:  That you gave to the prosecutors.  I'm

10:52:59  21    sorry.

10:53:00  22             THE COURT:  Okay.

10:53:00  23         BY MR. NATALE:

10:53:01  24    Q.   Page 7?

10:53:03  25    A.   Yes.

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

10:53:06  1    Q.  Page 8?

10:53:07  2    A.  Yes.

10:53:13  3            MR. NATALE:  And Your Honor, I think it would be easier

10:53:16  4    if I could show it to him.  We could get through it faster.

10:53:20  5            THE COURT:  Go ahead.  Take a look at it, see if you

10:53:22  6    recognize it.

10:53:29  7        BY MR. NATALE:

10:53:33  8    Q.  I would like you to look at each and every page to see if

10:53:39  9    you can identify that as the report which you wrote and sent to

10:53:41 10    the prosecutors.

10:53:56 11    A.  It appears so.

10:53:57 12    Q.  Is that a yes?

10:53:59 13    A.  Yes.

10:54:02 14            MR. NATALE:  Your Honor, may I approach?

10:54:04 15            THE COURT:  You may.  Once you get permission to a

10:54:07 16    approach, you can keep approaching.

10:54:07 17        BY MR. NATALE:

10:54:10 18    Q.  I'd now like to show you what is Government's Exhibit 43 and

10:54:17 19    I'd like to look -- have you look through that document.  Are

10:54:22 20    those two documents the exact same?

10:54:27 21    A.  No, they're not the exact same.

10:54:36 22    Q.  The Defense Exhibit A has more pages, right?

10:54:38 23    A.  Yes.

10:54:46 24    Q.  And in Government's Exhibit 43, there are things that are

10:54:51 25    attached to it which were not part of your original report,

10:54:59  1    right?  Look at the last couple of pages.

10:55:18  2    A.  Correct.  Okay.

10:55:25  3    Q.  All right.  Well, the last couple of pages of 43,

10:55:31  4    Government's 43, are not included in your report which is

10:55:34  5    Defense Exhibit A, are they?

10:55:38  6    A.  No, they're not in that report.

10:56:11  7    Q.  Now, as it relates to Government's Exhibit 43, these pages

10:56:19  8    that you were shown on direct are not in your original report,

10:56:23  9    are they?

10:56:30  10   A.  No, these are additional findings from the phones.

10:56:39  11   Q.  And these were all added at some other time that you don't

10:56:42  12   remember, right?

10:56:47  13   A.  This would be after the Exhibit A report.

10:56:49  14   Q.  Okay.

10:56:58  15            THE COURT:  You know, the auto focus can't keep up with

10:57:03  16   you if you keep moving it.  This is -- which is this?  This is

10:57:04  17   43?

10:57:05  18            MR. NATALE:  This is 43.

10:57:07  19            THE COURT:  All right.  That's in evidence.

10:57:10  20            MR. NATALE:  That's in evidence.

10:57:10  21        BY MR. NATALE:

10:57:25  22   Q.  And you were shown on direct these pages with Joseph and

10:57:27  23   R-I-V-V, right?

10:57:29  24   A.  Yes.

10:57:40  25   Q.  Is it your testimony that these relate to sextortion, like

|          |    |                                                                        |
|----------|----|------------------------------------------------------------------------|
| 10:57:45 | 1  | extorting minors for sexual images?                                    |
| 10:57:51 | 2  | A.  No.  There was -- no, the content of this communication did        |
| 10:57:54 | 3  | not include any sextortion.                                            |
| 10:58:05 | 4  | Q.  In fact, it appears to people's work schedule, right?              |
| 10:58:09 | 5  | A.  Yes.  So that is actually the initial chat found on the            |
| 10:58:14 | 6  | phone when the device owner first started using the phone.  The        |
| 10:58:18 | 7  | last time the phone was used for chatting was in March of 2016         |
| 10:58:26 | 8  | and there was no further SMS messaging being conducted on that         |
| 10:58:29 | 9  | phone using his real phone number.                                     |
| 10:58:35 | 10 | Q.  And it says "I will talk to you when I see you, I can't take        |
| 10:58:39 | 11 | different availability from you every week, and weekends is            |
| 10:58:43 | 12 | important to be available or at least a shift that you can             |
| 10:58:49 | 13 | work".  And then me "it's not every week a guy who works nights        |
| 10:58:52 | 14 | got another job, so I'm working all day Saturdays here".               |
| 10:58:57 | 15 | This involves the owner of the phone talking about                     |
| 10:58:59 | 16 | their work schedule with somebody else, right?                         |
| 10:59:00 | 17 | A.  That's correct.                                                    |
| 10:59:29 | 18 | Q.  Okay.  And -- okay.  Now I'd like --                               |
| 10:59:36 | 19 | MR. NATALE:  Your Honor, I would ask to move Defense                   |
| 10:59:37 | 20 | Exhibit A into evidence.                                               |
| 10:59:39 | 21 | MS. ANTON:  Judge, I have no objection if he wants to                  |
| 10:59:40 | 22 | move it into evidence.                                                 |
| 10:59:43 | 23 | THE COURT:  Defense Exhibit A I don't have.                           |
| 10:59:46 | 24 | MS. ANTON:  I think we have an A already, Judge.                       |
| 10:59:47 | 25 | THE COURT:  I thought we did.                                          |

10:59:49  1          MR. NATALE:  It was never entered or shown.  So this

10:59:50  2  would be the first exhibit.

10:59:52  3          THE COURT:  Okay.  But if you mark it as A, then it's A

10:59:56  4  and if you referred to it, I don't have an exhibit list so I

10:59:57  5  can't --

11:00:00  6          MR. NATALE:  Then Your Honor, I think we were in A, B

11:00:01  7  so this would be C.

11:00:05  8          THE COURT:  Okay.  Again, as soon as you give me a

11:00:08  9  list, I'll permit it in evidence, but you got to give me a list

11:00:14 10  so I can keep track.  I admit it.  You give me the lists.  C

11:00:38 11  will be admitted in evidence without objection, but you've got

11:00:41 12  to give me a list.

11:00:42 13          MR. NATALE:  Yes, Your Honor.  And we would ask the

11:00:45 14  record to reflect when I was referring to Defense Exhibit A it

11:00:48 15  should have been Defense Exhibit C.

11:00:51 16          THE COURT:  You mean right now.  Just now.

11:00:52 17          MR. NATALE:  Just now.

11:00:53 18          THE COURT:  Not when you were referring to Exhibit A

11:00:56 19  when you referred to Exhibit A.

11:00:57 20          MR. NATALE:  That's correct.

11:01:00 21          THE COURT:  Yeah, that's very clear.  I got it.

11:01:00 22          (Defense Exhibit C in evidence)

11:01:00 23      BY MR. NATALE:

11:01:25 24  Q.  I'd like to turn to Page 8 in Exhibit C.  And when you look

11:01:37 25  at the top of the page in Table 2, it says when different apps

11:01:43   1   were installed, correct?  Table 2?

11:01:52   2   A.  Yes.  That's an indication of when they were installed on

11:01:57   3   the phone.  At least that date, yes.

11:02:01   4   Q.  And this is all your report, right?

11:02:01   5   A.  Yes.

11:02:09   6   Q.  All right.  Now, I'd like you to go down where it says --

11:02:12   7         THE COURT:  Mr. Natale, if you wave your hands in front

11:02:15   8   of the ELMO, it messes up the focus.  And if I get dizzy and

11:02:19   9   fall out of my chair, I'm holding you personally responsible

11:02:25   10   okay?  Don't do that.  You can point at stuff, but don't go up

11:02:27   11   and down with your hand.

11:02:29   12         MR. NATALE:  If you know my ethnic background, I talk

11:02:32   13   too much with my hands.  I'm going to try to be better.

11:02:33   14         THE COURT:  Well, I listen too much with my eyes, but

11:02:35   15   go.

11:02:35   16     BY MR. NATALE:

11:02:42   17   Q.  It says -- would you read that section, sir?

11:02:47   18         THE COURT:  Are you talking about 4.1.4.1.?

11:02:48   19         MR. NATALE:  Yes.

11:02:51   20         THE COURT:  Kik messenger.  Read it.

11:02:52   21         THE WITNESS:  Although the Kik messenger application

11:02:57   22   was reportedly installed on October 3, 2016, the earliest Kik

11:03:04   23   chats were only from January 4, 2018.  It appeared the device

11:03:10   24   owner deleted all their Kik chat accounts along with any old

11:03:11   25   chat conversations and created a newer profile using the

| | | |
|---|---|---|
| 11:03:17 | 1 | MVLEX3_V61 in early January 2018. |
| 11:03:20 | 2 | THE COURT:  Where does it say early? |
| 11:03:22 | 3 | THE WITNESS:  Oh, in January 2018. |
| 11:03:24 | 4 | THE COURT:  Read it accurately if you're going to read |
| 11:03:26 | 5 | it, please. |
| 11:03:27 | 6 | BY MR. NATALE: |
| 11:03:33 | 7 | Q.  So you saw that the -- it was installed in 2016, but there |
| 11:03:41 | 8 | was nothing that you were able to retrieve on it until, I think, |
| 11:03:46 | 9 | it was January 4, 2018, right? |
| 11:03:47 | 10 | A.  Right. |
| 11:03:55 | 11 | Q.  And you're assuming that what happened was that the |
| 11:03:59 | 12 | everything regarding the older one was deleted, right? |
| 11:04:00 | 13 | A.  Correct. |
| 11:04:08 | 14 | Q.  Okay.  Now, in your analysis of the phone, did it show that |
| 11:04:11 | 15 | they were deleted? |
| 11:04:17 | 16 | A.  It didn't, but I saw artifacts on the phone indicating that |
| 11:04:21 | 17 | there was another Kik account on there previously. |
| 11:04:26 | 18 | Q.  My question to you, sir, is when you did your in-depth |
| 11:04:31 | 19 | analysis, did anything show up to say that the owner of the |
| 11:04:33 | 20 | phone actually deleted that? |
| 11:04:35 | 21 | A.  No. |
| 11:04:51 | 22 | Q.  Now, I'd like you to go to Page 9.  And at the top of the |
| 11:04:55 | 23 | page in your report, you say the following excerpt, and you have |
| 11:05:04 | 24 | data, back slash Kik Android, and it goes on and it says |
| 11:05:15 | 25 | connected with boyz11_CD6 as early as October 16, 2017; is that |

11:05:16  1    correct?

11:05:17  2    A.   Yes.

11:05:26  3    Q.   And you have come to learn that the B-O-Z-Y 11 was somebody

11:05:33  4    who was residing in Ireland, or at least that's where his IP

11:05:34  5    address came up.

11:05:36  6    A.   Yes.

11:05:44  7    Q.   And you're aware that when Mr. Woodson gave his statement,

11:05:47  8    he mentioned a person in Ireland, right?

11:05:49  9    A.   Yes.

11:05:53  10   Q.   And that would document that.  Based on what you actually

11:05:55  11   saw with your own eyes.

11:05:57  12   A.   Yes.

11:05:59  13   Q.   I'm sorry.  I didn't hear you.

11:06:01  14   A.   Yes.

11:06:09  15   Q.   Now, I'd like you to go down to -- in the same section, but

11:06:14  16   where I'm pointing my finger.  And this is on Page 9 where it

11:06:17  17   says there was -- and would you read that to the jury loudly and

11:06:19  18   clearly.

11:06:28  19   A.   There was an indication in a Kik journal file that the two

11:06:35  20   users may have had a video chat on January 26, 2018.  However,

11:06:49  21   this was found in data Kik.Android databases event.DB-journal.

11:06:55  22   Q.   And that would be a contact again with, for lack of a better

11:06:57  23   term, the Irish guy.

11:06:58  24   A.   Yes.

11:07:04  25   Q.   Now below that, below Figure 2, would you read that

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED BY COMPUTER

| | | |
|---|---|---|
| 11:07:06 | 1 | paragraph. |
| 11:07:14 | 2 | A.   The device owner and bozy11_CD6 were observed exchanging |
| 11:07:18 | 3 | messages with each other over 300 times between January 4, 2018 |
| 11:07:22 | 4 | and January 25, 2018.  The substance of the chats was |
| 11:07:28 | 5 | sextortion, but there were no indications from the chats the |
| 11:07:32 | 6 | device owner was being coerced to engage the sextortion |
| 11:07:38 | 7 | activities with bozy11_CD6. |
| 11:07:46 | 8 | Q.   But you don't know what was said prior to January 4, 2018. |
| 11:07:51 | 9 | Right? |
| 11:07:53 | 10 | A.   Correct. |
| 11:08:17 | 11 | Q.   Okay.  Showing you what is now Page 12 of Defense Exhibit C |
| 11:08:21 | 12 | which is your report.  Now, there are certain areas that are |
| 11:08:24 | 13 | blacked out.  That was blacked out by you, correct? |
| 11:08:26 | 14 | A.   No. |
| 11:08:27 | 15 | Q.   Who blacked that out? |
| 11:08:29 | 16 | A.   Those are redactions. |
| 11:08:32 | 17 | Q.   Who is redacted? |
| 11:08:33 | 18 | A.   Who did? |
| 11:08:34 | 19 | Q.   Who did the redacting of it? |
| 11:08:36 | 20 | A.   Legal counsel. |
| 11:08:38 | 21 | Q.   Okay.  So someone over there, right? |
| 11:08:38 | 22 | A.   Yes. |
| 11:08:43 | 23 | Q.   Okay.  And that would be to sort of protect the identity of |
| 11:08:45 | 24 | people and things like that? |
| 11:08:46 | 25 | A.   Yes. |

| | | |
|---|---|---|
| 11:08:51 | 1 | Q.  All right.  Now, underneath that block of redaction, could |
| 11:08:56 | 2 | you read what that says? |
| 11:09:01 | 3 | A.  Can you point to it please?  The figure below shows the |
| 11:09:06 | 4 | device owner created the Instagram user redacted on June 27, |
| 11:09:16 | 5 | 2017 using one of his other e-mail accounts D.pickles3@AOL.com. |
| 11:09:24 | 6 | This was found in data Android.e-mail databases, e-mail |
| 11:09:26 | 7 | provider.dv. |
| 11:09:33 | 8 | Q.  And that would indicate to you that there were other e-mails |
| 11:09:40 | 9 | that the owner was using, correct or capable of using. |
| 11:09:44 | 10 | A.  Yes, he appeared to have many e-mail addresses that he used. |
| 11:09:51 | 11 | Q.  Okay.  Now, I want you to look at Page 13 where it says |
| 11:09:59 | 12 | 4.1.6 Snapchat.  We've already talked a bunch about Snapchat. |
| 11:10:04 | 13 | What does your report tell us in where I'm pointing?  That |
| 11:10:04 | 14 | paragraph. |
| 11:10:13 | 15 | A.  That's showing that the device owner was using. |
| 11:10:14 | 16 | Q.  Could you read it, sir? |
| 11:10:17 | 17 | A.  Oh, okay.  An e-mail from Snapchat showed that the device |
| 11:10:22 | 18 | owner had used a Snapchat account named cherry.tiger linked to |
| 11:10:28 | 19 | the D.pickles3@aol.com e-mail address. |
| 11:10:34 | 20 | On June 27, 2017, someone from Ireland using an IP |
| 11:10:39 | 21 | address 78.17.77.206 logged into this account from an iPhone 6 |
| 11:10:46 | 22 | device.  This was found in datacom.android.e-mail databases |
| 11:10:50 | 23 | e-mail provider.db. |
| 11:10:53 | 24 | Q.  Now, that's what you found when you did your expert analysis |
| 11:10:59 | 25 | of the phone, that someone using an iPhone 6 -- and you put down |

| | | |
|---|---|---|
| 11:11:07 | 1 | from Ireland, had logged into that account, right? |
| 11:11:08 | 2 | A.   Correct. |
| 11:11:16 | 3 | Q.   Okay.  Now, I'd like you to now go down to where I'm |
| 11:11:18 | 4 | pointing and read that paragraph. |
| 11:11:21 | 5 | A.   Another e-mail from Snapchat showed that the device owner |
| 11:11:26 | 6 | had used a Snapchat account named, redacted, linked to the |
| 11:11:31 | 7 | brentbeeby0@gmail.com e-mail address on January 21, 2018. |
| 11:11:41 | 8 | Someone from Ireland using IP address 213.202.618.190 logged |
| 11:11:48 | 9 | into this account from a Samsung Galaxy 7 Edge device.  This was |
| 11:11:50 | 10 | found in datacom.google.android.gm databases mail |
| 11:11:56 | 11 | store.brentbeeby0@gmail.com.db. |
| 11:12:02 | 12 | Q.   So to be clear, your analysis showed that it was a Galaxy |
| 11:12:05 | 13 | S7, correct? |
| 11:12:06 | 14 | A.   In that particular one, yes. |
| 11:12:13 | 15 | Q.   All right.  Now, Mr. Woodson had a Note 3, right? |
| 11:12:14 | 16 | A.   Yes. |
| 11:12:16 | 17 | Q.   And the S8, right? |
| 11:12:18 | 18 | A.   Yes. |
| 11:12:31 | 19 | Q.   This S7 Edge, again, was someone accessing it on a phone |
| 11:12:34 | 20 | different than the iPhone but still from Ireland, right? |
| 11:12:35 | 21 | A.   Correct. |
| 11:13:03 | 22 | Q.   Now, we're looking at Page 14.  In that paragraph, don't you |
| 11:13:07 | 23 | say that this could explain how the device owner claimed that a |
| 11:13:11 | 24 | person in Ireland knew his IP address? |
| 11:13:18 | 25 | A.   Yes. |

| | |
|---|---|
| 11:13:27 | 1 |
| 11:13:32 | 2 |
| 11:13:37 | 3 |
| 11:13:42 | 4 |
| 11:13:46 | 5 |
| 11:13:52 | 6 |
| 11:13:57 | 7 |
| 11:14:02 | 8 |
| 11:14:05 | 9 |
| 11:14:10 | 10 |
| 11:14:18 | 11 |
| 11:14:24 | 12 |
| 11:14:26 | 13 |
| 11:14:27 | 14 |
| 11:14:27 | 15 |
| 11:14:29 | 16 |
| 11:14:32 | 17 |
| 11:14:37 | 18 |
| 11:14:44 | 19 |
| 11:14:49 | 20 |
| 11:14:51 | 21 |
| 11:14:55 | 22 |
| 11:14:59 | 23 |
| 11:15:00 | 24 |
| 11:15:14 | 25 |

Q.  Okay.  Read what your whole analysis said.

A.  The two Snapchat accounts, redacted, may have been victim accounts the Note 3 device owner took over at one point and allowed the person in Ireland to take over later as part of a sextortion operation.  If the device owner was offered to take over a victim Snapchat -- a victim's Snapchat account controlled by the person in Ireland, the person in Ireland would see the same just logged-in e-mail showing the Note 3 device owner's IP address.  This could explain how the device owner claimed the person in Ireland knew his IP address.

Q.  Okay.  Now, the next paragraph you say that the device owner may have uninstalled Snapchat, don't you?

A.  Yeah.

Q.  Okay.

A.  Yes.

Q.  Read what you put in there.

A.  The Snapchat application was no longer installed on the Note 3.  There was a Snapchat directory in media zero on the Note 3 with a last modified date of December 28, 2017.  The most recent image file within this Snapchat directory was created on this date as well.  The device owner may have uninstalled the Snapchat application just after this time.

Q.  So that would have been December of 2017, right?

A.  Yes.

Q.  Now, Page 15, Table 5, it says that it's time stamps of

11:15:22   1   Snapchat screenshots found in the phone that you looked at,

11:15:23   2   right?

11:15:23   3   A.   Yes.

11:15:29   4   Q.   Now, there's a whole lot of them, right?

11:15:30   5   A.   Yes.

11:15:43   6   Q.   Now, those screenshots, those were the day that they were

11:15:48   7   actually put into the phone, right?

11:15:51   8   A.   That's when they were taken.

11:15:53   9   Q.   Yeah.  But the image that's on there doesn't necessarily

11:16:00   10   have occurred on the same day, right?

11:16:04   11   A.   The timestamp of the file.

11:16:09   12   Q.   I understand.  But let me make it simpler.  I send you a

11:16:15   13   picture of my son when he was 12.  I send it to you today.  You

11:16:20   14   take a screenshot of it.  Your phone would say that you took a

11:16:24   15   screenshot of it on today's date and time, right?

11:16:25   16   A.   Yes.

11:16:29   17   Q.   But that doesn't mean that the image I sent you was taken on

11:16:33   18   today's date and time, does it?

11:16:35   19   A.   No.

11:16:41   20   Q.   So the actual images that were there could have been taken

11:16:44   21   at some other time.

11:16:52   22   A.   The items in this table indicate the date that the

11:16:58   23   screenshots were created based on the date imprinted in the file

11:17:00   24   name of those screenshots.

11:17:04   25   Q.   Right.  That's the day that you hit the save button or

| | | |
|---|---|---|
| 11:17:04 | 1 | whatever, right? |
| 11:17:05 | 2 | A.   Yeah. |
| 11:17:11 | 3 | Q.   All right.   But I could take a screenshot of Charles |
| 11:17:17 | 4 | Lindbergh, right?   And it would be today's date, but that |
| 11:17:22 | 5 | doesn't mean I took a picture of Charles Lindbergh today, does |
| 11:17:24 | 6 | it? |
| 11:17:26 | 7 | A.   Okay.   No. |
| 11:17:30 | 8 | Q.   What do you mean okay, no?   He's dead.   He's been dead for a |
| 11:17:32 | 9 | long time.   Right? |
| 11:17:33 | 10 | A.   Right. |
| 11:17:37 | 11 | Q.   So you understand the point I'm trying to make is that the |
| 11:17:37 | 12 | -- |
| 11:17:38 | 13 | THE COURT:   You can argue that point.   Don't argue with |
| 11:17:40 | 14 | him about it. |
| 11:17:43 | 15 | MR. NATALE:   Okay. |
| 11:17:46 | 16 | THE COURT:   Ask questions and get answers. |
| 11:17:46 | 17 | BY MR. NATALE: |
| 11:18:02 | 18 | Q.   Let's look at Page 16.   And on Page 16, Table 6 says that 15 |
| 11:18:11 | 19 | snapshot screenshots were -- had the Sprint logo on it, correct? |
| 11:18:12 | 20 | A.   Yes. |
| 11:18:16 | 21 | Q.   And you meant 15 of all of the ones that were listed in |
| 11:18:22 | 22 | Table 5, right? |
| 11:18:24 | 23 | A.   Correct. |
| 11:18:28 | 24 | Q.   15 of them were from the Sprint -- had the Sprint logo on |
| 11:18:30 | 25 | it, right? |

|       |    |                                                                      |
|-------|----|----------------------------------------------------------------------|
| 11:18:30 | 1  | A.  Yes. |
| 11:18:35 | 2  | Q.  And Mr. Woodson was using Sprint, correct? |
| 11:18:37 | 3  | A.  Correct. |
| 11:18:50 | 4  | Q.  So out of this entire list, 15 screenshots had the Sprint |
| 11:18:52 | 5  | logo on it.  Right? |
| 11:18:54 | 6  | A.  Correct. |
| 11:18:59 | 7  | Q.  By what you put in your report. |
| 11:19:05 | 8  | A.  Yes.  You could only fit so many application icons at the |
| 11:19:10 | 9  | very top, so it's more likely there are more that actually had |
| 11:19:14 | 10 | that Sprint in there, but it just didn't fit at the very top. |
| 11:19:18 | 11 | Q.  Sir, in your report, you put down that it was Sprint, right? |
| 11:19:19 | 12 | A.  Yes. |
| 11:19:23 | 13 | Q.  You didn't put in your report there could be a whole lot |
| 11:19:26 | 14 | more but it wasn't there, right |
| 11:19:28 | 15 | A.  Correct. |
| 11:19:30 | 16 | Q.  You're adding that now, right? |
| 11:19:34 | 17 | A.  Yes, I'm adding that now. |
| 11:19:39 | 18 | Q.  And you're speculating, right?  Because what you know for |
| 11:19:41 | 19 | sure is that it said Sprint. |
| 11:19:43 | 20 | A.  Yes. |
| 11:19:50 | 21 | Q.  And the other stuff is just you speculating as to what could |
| 11:19:54 | 22 | be, but not what you actually saw on the phone.  Correct? |
| 11:20:01 | 23 | A.  Yeah, and I reported the images that had that Sprint icon at |
| 11:20:04 | 24 | the top. |
| 11:20:07 | 25 | THE COURT:  Why don't we take about a ten minute break. |

| | | |
|---|---|---|
| 11:20:09 | 1 | We'll continue where we are right now. |
| 11:20:11 | 2 | Ladies and gentlemen, have a break for about ten |
| 11:20:15 | 3 | minutes and we'll come back try to finish this witness up.  All |
| 11:20:16 | 4 | right? |
| 11:20:18 | 5 | COURT SECURITY OFFICER:  All rise for the jury. |
| 11:20:21 | 6 | (Jury out at 11:20 a.m.) |
| 11:29:50 | 7 | (Brief recess) |
| 11:29:55 | 8 | (Jury in at 11:29 a.m.) |
| 11:31:56 | 9 | THE COURT:  Be seated please.  You may proceed. |
| 11:31:56 | 10 | BY MR. NATALE: |
| 11:32:02 | 11 | Q.  Sir, looking at Page 15, these were screenshots, right? |
| 11:32:02 | 12 | A.  Yes. |
| 11:32:06 | 13 | Q.  And the screenshots contained images, right? |
| 11:32:06 | 14 | A.  Yes. |
| 11:32:13 | 15 | Q.  And those images have metadata attached to them, don't they? |
| 11:32:13 | 16 | A.  Yes. |
| 11:32:18 | 17 | Q.  And metadata shows you, for lack of a better term, where |
| 11:32:21 | 18 | something came when it was first made and things like that, |
| 11:32:22 | 19 | right? |
| 11:32:24 | 20 | A.  It can. |
| 11:32:32 | 21 | Q.  And did you look at the metadata for every one of those that |
| 11:32:32 | 22 | you listed? |
| 11:32:41 | 23 | A.  I did look and I looked at the creation timestamps of those |
| 11:32:48 | 24 | files, and they were just slightly different.  So yes, I did |
| 11:32:49 | 25 | look at them. |

11:32:54  1    Q.  Well, what I'm getting at is we know there's a difference

11:33:01  2    between when the screenshot was made versus when the image was

11:33:03  3    actually made, correct?

11:33:04  4    A.  Correct.

11:33:12  5    Q.  Okay.  And that the metadata would have or could have when

11:33:19  6    the actual image was made, right?

11:33:23  7    A.  Yes, so these screenshots, when you take them, they end up

11:33:29  8    in a different directory.  When you copy them over to snaps,

11:33:31  9    it's going to get a different timestamp.

11:33:34  10   Q.  I understand that.  But when you take, again, the image that

11:33:41  11   is contained could have been done well before, years before the

11:33:46  12   date that it signifies it was created in the phone, correct?

11:33:51  13   A.  It could but not -- that's not what I found in my analysis.

11:33:58  14   Q.  So you looked at the metadata for all of these?

11:33:58  15   A.  Yes.

11:34:02  16   Q.  Now, one of the things that you mentioned is that when you

11:34:06  17   look at the top of a screenshot, it tells you certain

11:34:07  18   information; is that correct?

11:34:09  19   A.  Yes.

11:34:13  20   Q.  Okay.  I'd like to show what is Defense Exhibit 1.

11:34:17  21          MS. ANTON:  No objection, Judge.

11:34:19  22          THE COURT:  And ask it be admitted into evidence.

11:34:24  23          THE COURT:  No.  How many times do I have to tell you,

11:34:26  24   you get letters, they get numbers.

11:34:29  25          MR. NATALE:  Okay.  It's D 1.

| | | |
|---|---|---|
| 11:34:30 | 1 | THE COURT:  D 1? |
| 11:34:31 | 2 | MR. NATALE:  D one through. |
| 11:34:34 | 3 | THE COURT:  Yeah, D 1 works. |
| 11:34:36 | 4 | MR. NATALE:  Delta 1 through Delta 15. |
| 11:34:37 | 5 | THE COURT:  All right.  D 1. Any objection? |
| 11:34:38 | 6 | MS. ANTON:  No objection. |
| 11:34:40 | 7 | THE COURT:  Without objection, D 1 on my imaginary |
| 11:34:42 | 8 | exhibit list is admitted into evidence. |
| 11:34:42 | 9 | (Defense Exhibit D 1 in evidence) |
| 11:34:47 | 10 | THE COURT:  But by after lunch, you got to have an |
| 11:34:48 | 11 | exhibit list. |
| 11:34:48 | 12 | MR. NATALE:  I will make sure of that, Your Honor. |
| 11:34:51 | 13 | THE COURT:  D 1 is admitted in evidence. |
| 11:34:51 | 14 | BY MR. NATALE: |
| 11:34:57 | 15 | Q.  I'm showing you what is D 1.  These were the types of |
| 11:35:03 | 16 | screenshots that were taken from the phone, the -- I think it |
| 11:35:07 | 17 | was taken from the Note 3? |
| 11:35:08 | 18 | A.  Yes. |
| 11:35:13 | 19 | Q.  Okay.  Now, at the top where you say we get this |
| 11:35:19 | 20 | information, what does it say there? |
| 11:35:25 | 21 | A.  Meteor. |
| 11:35:31 | 22 | Q.  And I'd like you to look at this entire Exhibit D 1 through |
| 11:35:34 | 23 | D 13. |
| 11:35:43 | 24 | THE COURT:  Are you calling each page a different |
| 11:35:45 | 25 | number? |

| | | |
|---|---|---|
| 11:35:47 | 1 | MR. NATALE:  They are numbered D with the number after |
| 11:35:47 | 2 | it. |
| 11:35:49 | 3 | THE COURT:  That's what I'm asking you.  Are you making |
| 11:35:51 | 4 | each page a different exhibit? |
| 11:35:53 | 5 | MR. NATALE:  No, it's all part of the one exhibit. |
| 11:35:56 | 6 | THE COURT:  So it's exhibit D Page 1.  That's what |
| 11:35:58 | 7 | you're saying? |
| 11:35:58 | 8 | MR. NATALE:  Yes. |
| 11:36:03 | 9 | THE COURT:  Page 1 through Page 13, go ahead.  I just |
| 11:36:57 | 10 | didn't want it to look like it was 13 exhibits.  Okay.  I've got |
| 11:37:01 | 11 | D back.  Ask a question. |
| 11:37:01 | 12 | BY MR. NATALE: |
| 11:37:09 | 13 | Q.  Sir, you would agree that all of the pages of Exhibit D 1 |
| 11:37:14 | 14 | through 13 have Meteor on the top of the page, correct? |
| 11:37:15 | 15 | A.  Correct. |
| 11:37:23 | 16 | Q.  And that tells the people what server or what company this |
| 11:37:24 | 17 | went through, right? |
| 11:37:27 | 18 | A.  I'm not familiar with Meteor. |
| 11:37:34 | 19 | Q.  You didn't look up to see what Meteor was? |
| 11:37:36 | 20 | A.  I did not. |
| 11:37:44 | 21 | Q.  So you have no idea whether this is even a US company or a |
| 11:37:46 | 22 | foreign company. |
| 11:37:47 | 23 | A.  No. |
| 11:37:51 | 24 | Q.  So you would agree that it's quite possible that there are |
| 11:37:56 | 25 | US companies or foreign companies that even though you're an |

11:37:59  1    expert in this area, you're unaware of.

11:38:02  2    A.   There are a lot of companies out there, yes.

11:38:09  3    Q.   Okay.  And at this point, you don't know where Meteor is

11:38:11  4    located out of.

11:38:11  5    A.   I don't.

11:38:19  6    Q.   And in looking at that, if someone subpoenaed the records of

11:38:24  7    Meteor like for Kik or Sprint or anything like that, then we

11:38:28  8    would have that information, wouldn't we?

11:38:30  9    A.   I would assume so, yes.

11:38:36  10   Q.   Okay.  And did you ever ask to have that subpoenaed so you

11:38:39  11   would actually know what Meteor is?

11:38:40  12   A.   No.

11:38:46  13   Q.   But you would agree that at least Exhibit D pages 1 through

11:38:55  14   13 came from a Meteor source that you have no idea what it is.

11:38:59  15   A.   I don't know what it is.  To me, it could have been an

11:39:03  16   application that was installed.  I don't know what Meteor is.

11:39:06  17   Q.   Now, could you tell by looking at this whether it's a

11:39:17  18   screenshot from an iPhone or an Android?  It's from an iPhone,

11:39:19  19   isn't it?

11:39:22  20   A.   Okay.  If you say so.

11:39:26  21   Q.   Well, you're the expert.  It's from an iPhone.

11:39:32  22          MS. ANTON:  I'm going to object, if there is a question

11:39:33  23   or a statement pending.

11:39:37  24          THE COURT:  Yeah, you don't do evidence.  You ask.

11:39:37  25          BY MR. NATALE:

11:39:39   1    Q.  Are these screenshots from an iPhone?

11:39:45   2    A.  They may well be.

11:39:47   3    Q.  Do they look like screenshots from an iPhone?

11:39:50   4    A.  It could be, yes.

11:39:53   5    Q.  Okay.

11:40:05   6    A.  You would agree with me that screenshots from an Android or

11:40:09   7    a Samsung that were generated by a Samsung or an Android look

11:40:12   8    different than an iPhone.

11:40:13   9    A.  Correct.

11:40:17   10   Q.  They have different operating systems, don't they?

11:40:20   11   A.  Yes, they do.

11:40:47   12   Q.  Now, I'd like you to look at Page 17, and this is under your

11:40:52   13   section where you're talking about Orbot which is this app that

11:40:57   14   allows you to get to the dark web and camouflages who you are,

11:41:08   15   right?  Tell us what your report says regarding 48 of the last

11:41:12   16   Snapchat screenshots.

11:41:19   17   A.  In looking at some of the -- do you want me to read it?

11:41:21   18   Q.  Yes.  Read it, sir.

11:41:25   19   A.  The last 48 snapshot -- Snapchat screenshots taken between

11:41:36   20   December 8, 2017 and at 9:33:36 and December 25, 2017 at 9:54:12

11:41:40   21   did not show Orbot running in the phone.  The phone's top

11:41:45   22   toolbar Orbot may have been functioning -- may not have been

11:41:49   23   functioning properly during this time or the device owner may

11:41:51   24   have stopped using this application.

11:41:58   25   Q.  But in any event, it wasn't going through Orbot.  Right?

11:42:00  1    A.  It appeared that way, yeah.

11:42:03  2    Q.  Well, that's what you put here, isn't it?

11:42:05  3    A.  For those last screenshots.

11:42:09  4    Q.  For those 48, they weren't going through Orbot?

11:42:12  5    A.  It didn't appear to be.

11:42:20  6    Q.  Because Orbot was either not functioning properly or the

11:42:24  7    device owner may have stopped using this application, right?

11:42:25  8    That's what you said, right?

11:42:26  9    A.  Correct.

11:42:44  10   Q.  Now Page 18, I'd like you to look at Section 4.1.71, and

11:42:52  11   this involves Skype.  And Skype is that way where you can sort

11:42:56  12   of look and see and talk to one another, right?

11:42:56  13   A.  Right.

11:43:23  14   Q.  Now, I'd like you to look at the bottom of Page 18 and read

11:43:30  15   what it says regarding Ilee_me.

11:43:34  16   A.  The Ilee_me user was first seen chatting with redacted on

11:43:46  17   April 15, 2017 from 18:39:10 to 21:21:22 and later on April 17,

11:43:54  18   2017.  The first message sent was from Ilee_me was okay talk

11:43:59  19   here, indicating that this was a --

11:44:00  20   Q.  Top of the page.

11:44:05  21   A.  -- resumption of a prior conversation that occurred through

11:44:10  22   another unidentified chat mechanism.

11:44:18  23   Q.  Okay.  Now, another unidentified chat mechanism means that

11:44:23  24   people could have been talking to someone else as well as what

11:44:26  25   they were doing in this chat, right?

11:44:27  1    A.  Yes.

11:44:34  2    Q.  And from another mechanism, it could have actually had been

11:44:37  3    someone totally different, right?

11:44:39  4    A.  It's possible.

11:44:43  5    Q.  Well, yeah.  Different mechanism, different person.

11:45:00  6         Page 20 on the bottom, these images that you're looking

11:45:08  7    at, someone was told to write Michael on them, right?

11:45:09  8    A.  Yes.

11:45:17  9    Q.  And then Michael certainly is not Joseph's name, right?

11:45:18  10   A.  Right.

11:45:55  11   Q.  Page 21, now on Page 21, regarding Table 9 and Table 10,

11:46:05  12   then you surmise that the owner of the device, that is the Note

11:46:12  13   3, was likely logged into another device besides the Note 3

11:46:20  14   since you can't be logged in to Skype from two devices at the

11:46:21  15   same time, right?

11:46:22  16   A.  Correct.

11:46:28  17   Q.  But that means that someone else could have also logged into

11:46:36  18   the Skype and that would be on a different device, right?

11:46:41  19   A.  That's what it appears on here that there was a different

11:46:46  20   device.  The time stamps were very, very close in nature that it

11:46:49  21   appeared to be the same person.

11:46:51  22   Q.  Well, it would appear to be, but you can't rule out that

11:46:56  23   someone else was also logging in.

11:46:59  24   A.  Okay.  Yeah, correct.

11:47:09  25   Q.  And on Page 23 again of your report, there is another

| | | |
|---|---|---|
| 11:47:18 | 1 | Snapchat where you saw that the young lady was instructed with |
| 11:47:22 | 2 | the words owned by Michael. |
| 11:47:31 | 3 | A.  Can you point to that please?  Yes. |
| 11:48:00 | 4 | Q.  Page 25.  And I'm going to point to you the paragraph that |
| 11:48:13 | 5 | starts with 4.1.7.1.1 of your report.  And in there, you |
| 11:48:23 | 6 | indicate that the scope profile folder being created on this |
| 11:48:27 | 7 | device, it appeared the device owner then sent text messages, |
| 11:48:35 | 8 | hey and hi, to Skype user redacted, whom the victim was observed |
| 11:48:40 | 9 | chatting with prior to the sextortion activity that began on |
| 11:48:47 | 10 | 4-15.  The timestamps for those two messages were 4:17 at 1:21 |
| 11:48:55 | 11 | and 4-17 at 1:47.  So that would indicate that in this |
| 11:49:00 | 12 | particular Skype episode, the person was already Skyping with |
| 11:49:09 | 13 | someone other than the person using the Note 3. |
| 11:49:15 | 14 | A.  The victim was chatting with somebody else. |
| 11:49:18 | 15 | Q.  Other than the person who was using the Note 3. |
| 11:49:21 | 16 | A.  Yes.  And after analyzing that, there was a benign |
| 11:49:27 | 17 | conversation with who appeared to be one of her contacts. |
| 11:49:47 | 18 | Q.  Now, in your report on pages 26 and on to 27 and 28, you |
| 11:49:53 | 19 | indicated certain times that there was pictures of a prior |
| 11:49:58 | 20 | sextortion that was shared, correct? |
| 11:49:59 | 21 | A.  Correct. |
| 11:50:04 | 22 | Q.  And what that means is that there were photographs or images |
| 11:50:10 | 23 | that were not taken at the time of these chats and conversations |
| 11:50:15 | 24 | that they were done sometime before. |
| 11:50:16 | 25 | A.  Yes. |

11:50:29  1    Q.  So wherever we see prior sextortion shared, it was that

11:50:33  2    these were images that were not generated at the time but at

11:50:35  3    some other time.

11:50:36  4    A.  Yes.

11:50:57  5    Q.  Page it the -- it's sort of hard to see, but it looks like

11:51:02  6    it's highlighted.  Can you read that?

11:51:05  7    A.  No, I can't.

11:51:10  8    Q.  Let me see if I can give it to you and you can see it

11:51:15  9    closer.  Maybe it will help you.

11:51:23  10   A.  Okay.  I can read it.

11:51:25  11   Q.  And it says?

11:51:35  12   A.  Likely commenting on sextortion pics with the words owned by

11:51:37  13   Michael written on victim's chest.

11:51:39  14   Q.  And what does it say right here?

11:51:44  15   A.  It says damn Michael's lucky.

11:51:56  16   Q.  So somebody is talking about a Michael.  Right?

11:51:57  17   A.  Yes.

11:52:07  18   Q.  And this is part of a conversation that's going on, right?

11:52:09  19   A.  Yes.

11:52:21  20   Q.  And this guy, this Michael person, has now come up a couple

11:52:30  21   of times.  Was there ever a determination by you whether that

11:52:36  22   Michael person could be somebody other than Mr. Woodson?

11:52:40  23   A.  At the time I didn't know who Michael was, but some of the

11:52:50  24   other investigators may know who that is.

11:53:35  25   Q.  Let's look at Page 43 of your report.  I'd like you to read

| | | |
|---|---|---|
| 11:53:37 | 1 | where I'm pointing. |
| 11:53:44 | 2 | A.  The created column of the images in the table above do not |
| 11:53:48 | 3 | indicate when the images were first made.  They're timestamps of |
| 11:53:54 | 4 | when the images were copied to the snaps and other sub folder. |
| 11:54:02 | 5 | Q.  Okay.  So that's you saying that -- telling the jury pretty |
| 11:54:05 | 6 | much what I was asking you, that there's a difference between an |
| 11:54:11 | 7 | image when it was created and when it was actually stored or -- |
| 11:54:14 | 8 | THE COURT:  So now it's the fourth time we've heard it. |
| 11:54:18 | 9 | Can you move on please? |
| 11:54:24 | 10 | BY MR. NATALE: |
| 11:55:10 | 11 | Q.  Now on Page 51 of your report, and this is now regarding the |
| 11:55:34 | 12 | Samsung 8 and regarding Kik, would you read what it says under |
| 11:55:38 | 13 | 4.2.5, Kik messenger? |
| 11:55:44 | 14 | A.  Kik was installed on September 24, 2008.  The device owner |
| 11:55:54 | 15 | was using the account pyrokenesist_dn9 with a -- in the |
| 11:55:59 | 16 | parentheses it says  that's the display name for Taylor Keenan, |
| 11:56:05 | 17 | which was associated with the e-mail finalobvious12@gmail.com. |
| 11:56:09 | 18 | Only a few chats on this day between the device owner and |
| 11:56:19 | 19 | another user kmngeng_9ii, display name princess, were observed. |
| 11:56:22 | 20 | It appeared princess reached out to the device owner to see if |
| 11:56:25 | 21 | the device owner was still engaged in playing.  The device owner |
| 11:56:29 | 22 | did not appear to respond to this user. |
| 11:56:36 | 23 | Q.  So somebody else is contacting the owner of this device, |
| 11:56:37 | 24 | right? |
| 11:56:38 | 25 | A.  Yes. |

11:56:44   1   Q.   And based on your analysis of it, the person didn't respond

11:56:49   2   at all.   The owner of the device didn't respond.

11:56:52   3   A.   No, it's my understanding that's when the seizure occurred.

11:56:53   4   Q.   I'm sorry?

11:56:55   5   A.   No, he did not.

11:57:02   6   Q.   You wrote the device did not appear to respond to this user?

11:57:04   7   A.   The device owner did not appear to respond.

11:57:08   8   Q.   Now, on Page 53 during direct, I think it was mentioned that

11:57:14   9   there was an individual named ***** *****?

11:57:15   10   A.   *****.

11:57:26   11   Q.   *****.   Sorry.   Her birthday was, excuse me, May 14, 1993?

11:57:29   12   A.   That's what it looked like in the profile setting.

11:57:33   13   Q.   And that would mean she wouldn't be a minor, right?

11:57:35   14   A.   No.   Based on that date.

11:57:40   15   Q.   And did you ever conduct or know of any other investigation

11:57:44   16   that was conducted to determine whether she was a full grown

11:57:46   17   adult above the age?

11:57:49   18   A.   No.

11:58:05   19   Q.   Page 54.   Like you to read in the bottom of your report

11:58:14   20   where you're talking about the screenshots that you found on the

11:58:17   21   S8.   Could you read that to the jury?

11:58:23   22   A.   The following display screenshot shows an interactive chat

11:58:30   23   from August 30, 2018 between redacted and another Skype user

11:58:34   24   TomTom.   It appeared TomTom was from Ireland, had seen the

11:58:39   25   profile picture and made a comment about the female's boobs in

11:58:41   1    the profile picture.

11:58:46   2    Q.  So again, we have someone from Ireland participating in

11:58:51   3    contacting a victim in this case.

11:58:53   4    A.  It appeared so.

11:59:03   5    Q.  Did you ever check that media to see if it's an Irish

11:59:11   6    corporation, that server Meteor, that it's an Irish corporation?

11:59:14   7    A.  I'm not sure what you're talking about.

11:59:23   8    Q.  Okay.  Now, towards the end of your direct, the prosecutor

11:59:31   9    asked you if you knew what jail bait meant.  And you said yes

11:59:34  10    and you gave a definition.  Do you recall that?

11:59:36  11    A.  Yes.

11:59:43  12    Q.  Read to the ladies and gentlemen the definition you put

11:59:47  13    actually put in your report.

11:59:51  14    A.  Okay.  The term jail bait means a female who is under age of

11:59:55  15    consent that dresses, acts and appears as if she were above the

11:59:59  16    age of consent and does nothing to correct that impression.

12:00:01  17    Q.  I'm sorry.  Stop.  What did you say?

12:00:05  18    A.  And does nothing to correct that impression.

12:00:09  19    Q.  You didn't say that on direct, did you?

12:00:12  20    A.  I didn't say the entire thing, no.

12:00:16  21    Q.  Well, you didn't say that "does nothing to correct that

12:00:17  22    impression", did you?

12:00:18  23    A.  No.

12:00:25  24    Q.  Okay.  And then finish the rest.  The implication is that

12:00:28  25    someone above the age of consent may find them sexually

12:00:30   1   attractive, right?

12:00:30   2   A.   Yes.

12:00:35   3   Q.   That's the definition you put in your report.

12:00:35   4   A.   Yes.

12:01:10   5   Q.   Now on Page 58, section 5.3 Dropbox.  And in there you say

12:01:17   6   that there was over 37,000 images from the Dropbox, right?

12:01:18   7   A.   Yes.

12:01:24   8   Q.   And the vast majority were pornographic, right?

12:01:25   9   A.   Yes.

12:01:33   10   Q.   And that indicated that they were obtained by the device

12:01:37   11   owner from a shared Dropbox.

12:01:39   12   A.   Correct.

12:01:44   13   Q.   So the owner being Mr. Woodson, it appears that those images

12:01:50   14   were received from a Dropbox.

12:01:51   15   A.   Yes.

12:01:58   16   Q.   A Dropbox that was somewhere out in cyberspace, right?

12:02:00   17   A.   Correct.

12:02:08   18   Q.   And you didn't determine where that Dropbox was.

12:02:16   19   A.   No, it was shear voluminous.  There's no way I could analyze

12:02:19   20   all the Dropbox folders that were there.

12:02:23   21   Q.   Right.  So it could have been a Dropbox that's set up in

12:02:29   22   another country on another system and anything else that he then

12:02:31   23   downloaded to his phone.

12:02:32   24   A.   Yeah.

12:02:34   25   Q.   Yeah.

```
12:02:41   1    A.  The point being that there was contraband on his phone.
12:02:44   2    Q.  Oh, yeah.  No one is denying that.  But the point I'm making
12:02:51   3    is that that contraband could have been created, produced by
12:02:53   4    other people?
12:02:54   5    A.  Yes.
12:03:08   6    Q.  Okay.  There was also some adult pornography on there,
12:03:09   7    right?
12:03:10   8    A.  Yes.
12:03:11   9    Q.  Okay.
12:03:12   10         MR. NATALE:  May I have a moment?
12:03:15   11         THE COURT:  You may.
12:03:23   12       BY MR. NATALE:
12:03:29   13   Q.  In your activity doing this, you become familiar with the
12:03:31   14   term swatting, correct?
12:03:33   15   A.  Correct.
12:03:41   16   Q.  And you know that to be where someone does something that
12:03:48   17   causes a SWAT Team to go to a home and that some really bad
12:03:50   18   stuff has happened, right?
12:03:50   19   A.  Yes.
12:03:52   20   Q.  On many occasions.
12:03:52   21   A.  Yes.
12:03:55   22   Q.  You probably even worked some of those cases, haven't you?
12:03:55   23   A.  No.
12:03:57   24   Q.  You know people that have.
12:03:59   25   A.  I might have, yeah.
```

```
12:03:59   1    Q.  Yeah?

12:04:00   2    A.  Uh-huh.

12:04:11   3    Q.  So I think people were saying that the only way to get the

12:04:18   4    exact address would be by a court order based on an IP address.

12:04:19   5    Is that --

12:04:22   6    A.  Yes.  That's my understanding, yes.

12:04:24   7    Q.  Or administrative subpoena.

12:04:27   8    A.  Yes.  From IP address, yes.

12:04:36   9    Q.  Well, does that mean that the people that were swatting

12:04:41  10    someone were able to get a court order in order to know the

12:04:42  11    address?

12:04:43  12            MS. ANTON:  Judge, I'm going to object.  This calls for

12:04:45  13    speculation.  How would he know?

12:04:48  14            THE COURT:  It does.  Sustained.

12:05:14  15            Let's go please.

12:05:15  16            MR. NATALE:  No further questions.

12:05:18  17            THE COURT:  Redirect.

12:05:18  18                          REDIRECT EXAMINATION

12:05:18  19        BY MS. ANTON:

12:05:24  20    Q.  When you analyzed both of those phones, did you find any

12:05:26  21    evidence whatsoever of swatting?

12:05:28  22    A.  No, I did not.

12:05:30  23    Q.  Did you find any threat of swatting?

12:05:31  24    A.  No.

12:05:33  25    Q.  Did you find any mention of swatting?
```

```
12:05:35   1    A.  No.

12:05:42   2    Q.  Did you find contact and participation with someone who's

12:05:42   3    allegedly in Ireland?

12:05:43   4    A.  Yes.

12:05:47   5    Q.  And did you find that that person in Ireland was also

12:05:52   6    engaged in the sextortion, as you called it, of underage girls?

12:05:55   7    A.  The person in Ireland?

12:05:55   8    Q.  Yes.

12:05:58   9    A.  Engaged in this?  Based on the chats, it seemed like he was

12:05:59  10    or that person was.

12:06:02  11    Q.  And did you also find evidence in the phone that the

12:06:05  12    Defendant was engaged in this type of activity?

12:06:07  13    A.  Yes.

12:06:13  14    Q.  Did you find any evidence in the phone that anyone

12:06:19  15    threatened, extorted, or attempted to threaten to swat the

12:06:19  16    Defendant?

12:06:22  17    A.  No, I did not.

12:06:28  18    Q.  And lastly, Counsel was asking you again about the IP

12:06:30  19    address and whether or not you could find someone's physical

12:06:34  20    home address from an IP address.  Do you remember that?

12:06:35  21    A.  Yes.

12:06:39  22    Q.  And you were asked questions about Google Earth and whether

12:06:43  23    with a latitude and longitude you could sort of dive down and

12:06:46  24    figure out exactly where that person lived.  Do you recall that?

12:06:47  25    A.  Yes.
```

12:06:50 1    Q.  Is that possible to do with a general latitude and

12:06:53 2    longitude?

12:06:54 3    A.  No, it not.

12:06:58 4    Q.  Okay.  And even assuming that it were possible to do that,

12:07:03 5    if someone lived in a building within residences like an

12:07:06 6    apartment or a townhouse or worked in an office building, would

12:07:10 7    you be able to know exactly where they were or who they were?

12:07:12 8    A.  No.

12:07:12 9            MS. ANTON:  No further questions.

12:07:14 10           THE COURT:  Thank you, sir.  You are excused.

12:07:17 11           Ladies and gentlemen, we're going to break for lunch

12:07:23 12   now.  I told you I had a 1:00.  I had a lunch, but I blew it off

12:07:29 13   so we'll go.  I really do want to try to finish this case.  So

12:07:32 14   as long as we were moving along, I was going to stay.

12:07:36 15           You're reminded not to discuss the case with anyone.

12:07:39 16   Don't read or listen to anything touching on this case in any

12:07:43 17   way.  Don't do any research or make any investigation on your

12:07:46 18   own.  Don't have any contact with the attorneys, parties or

12:07:48 19   witnesses in the case.  Do not form any opinion about this case

12:07:50 20   until all the evidence is in.

12:07:57 21           We'll break until 1:40, an hour and a half, 1:40 by

12:08:00 22   that clock which is almost right for a change.  All right?

12:08:04 23   We'll see you at 1:40.

12:08:14 24           (Jury out at 12:08 p.m.)

12:08:35 25           THE COURT:  We'll be in recess until 1:40.  Please have

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED BY COMPUTER

12:08:38   1       a witness ready to go at that time.

12:08:39   2              MS. MOLLISON:  Your Honor, if we may take up a very

12:08:40   3       brief issue?

12:08:42   4              THE COURT:  Hold on a second please.  Hold on under the

12:08:45   5       jury room is closed.

12:08:51   6              Yes, ma'am.

12:08:53   7              MS. MOLLISON:  There's some discovery relating to one

12:08:55   8       of the victims who we believe will be testifying this afternoon

12:09:00   9       that we need time to review.  We just ask that the prosecution

12:09:03   10      make that available to us over lunch, so that we don't need to

12:09:06   11      take a recess during her testimony today.

12:09:07   12             MS. VIAMONTES:  Judge, if I may, what they're asking

12:09:13   13      for is a victim's extraction of her phone that contains child

12:09:17   14      pornography.  It was made available throughout the litigation of

12:09:21   15      this case.  It was made available at the discovery conference

12:09:25   16      that we had prior to trial, and on the day of our discovery

12:09:30   17      conference, last Thursday I believe, they had to get back to

12:09:32   18      Miami because they had a train ride.  It was made available the

12:09:35   19      following day, they chose not to come.

12:09:38   20             Now, while we're in trial and we need to work with our

12:09:41   21      case agent and we have three children waiting here to testify

12:09:45   22      today, now's when they want for us to make our case agent

12:09:48   23      available to go through this material.  And quite frankly, Your

12:09:51   24      Honor, I think that's unfair.  We made the materials available

12:09:52   25      during the litigation.

12:09:55  1          THE COURT:  What is it you want from them?  You want

12:09:57  2     the material or you want the person to come with it?

12:09:59  3          MS. MOLLISON:  No, no.  We would just like the

12:10:03  4     opportunity to review the phone of Victim 7.

12:10:05  5          THE COURT:  What do you mean "review the phone"?  You

12:10:07  6     want physically the phone?

12:10:08  7          MS. MOLLISON:  No, no.  The phone extraction.  I think

12:10:12  8     it's on the agent's laptop.  We could just look at it.  I know

12:10:14  9     we have to be supervised and we're doing that because there is

12:10:18  10    contraband.  But if we just have an hour over lunch.

12:10:20  11         THE COURT:  I don't think you can make them do that.

12:10:24  12    If they've made it available to you before, I think that's

12:10:27  13    probably within the rules.  I don't think you can make them do

12:10:29  14    that.  If they're willing to do it, it's fine.  If they're not,

12:10:32  15    that's their business too.

12:10:34  16         MS. MOLLISON:  So Your Honor, during the discovery

12:10:37  17    conference we were there all day.  I think the phone was made

12:10:42  18    available to us something like 4 or 5 p.m.  The agents had to

12:10:45  19    leave.  We weren't able to review it that same day.

12:10:47  20         MS. VIAMONTES:  The agents didn't have to leave, we had

12:10:51  21    the whole day set aside and it was made available.  We told them

12:10:53  22    we're available the following day.  Judge, this really puts us

12:10:57  23    in a predicament with us presenting our case in chief.

12:11:01  24         THE COURT:  I know you're trying to prepare your

12:11:02  25    witnesses for this afternoon.  I'm not going to make you do

```
12:11:05   1    that.  Nope.  Got to deal with it.

12:11:06   2             MS. MOLLISON:  Thank you, Your Honor.

12:11:08   3             THE COURT:  Thank you.

12:11:08   4             (Lunch recess)

12:11:08   5             (See Volume 4 - P.M. session for continuation)

12:11:08   6                    C E R T I F I C A T E
12:11:08   7    I certify that the foregoing is a correct transcript from the
                record of proceedings in the above-entitled matter.

12:11:08   8    3/10/2020              /s/ Dawn M. Savino
                Date                   DAWN M. SAVINO, RPR
12:11:08   9

12:11:08  10

12:11:08  11                        I N D E X

12:11:08  12                        WITNESSES

12:11:08  13    ALL WITNESSES:                              PAGE:

12:11:08  14    For Government:

12:11:08  15      Eric Deborja:
                    Continued Direct Examination by Ms. Anton    3:10
12:11:08  16        Cross-Examination by Mr. Natale             40:4
                    Redirect Examination by Ms. Anton          80:18

12:11:08  17                        EXHIBITS

12:11:08  18    NO.:     DESCRIPTION:                       PAGE:

12:11:08  19    For Defense:

12:11:08  20    C         :
                          In Evidence                       54:22
12:11:08  21
                D 1       :
12:11:08  22              In Evidence                       67:9

12:11:08  23    For Government:

12:11:08  24    44 & 45   :
                          In Evidence                       35:9
          25
```

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED BY COMPUTER