UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION
CASE NO.  18-60256-CR-JEM


UNITED STATES OF AMERICA,

                    Plaintiff,

        vs.

                                        Miami, Florida
                                        September 26, 2019
JOSEPH ISAIAH WOODSON, JR.,             Pages 1-228

                    Defendant.
_____

                    TRANSCRIPT OF JURY TRIAL
                          DAY 5
              BEFORE THE HONORABLE JOSE E. MARTINEZ
                    UNITED STATES DISTRICT JUDGE


APPEARANCES:

FOR THE PLAINTIFF:
                        *United States Attorney's Office*
                        BY:  JODI ANTON,  A.U.S.A.
                        BY:  FRANCIS VIAMONTES, A.U.S.A.
                        500 East Broward Boulevard
                        Suite 700
                        Fort Lauderdale, Florida 33394

FOR THE DEFENDANT:
                        *Federal Public Defender's Office*
                        BY:  ANTHONY J. NATALE, A.F.P.D.
                        BY:  CLEA D.T. WEISS, A.F.P.D.
                        BY:  KATHLEEN E. MOLLISON, A.F.P.D.
                        150 West Flagler Street
                        Suite 1700
                        Miami, Florida 33130

REPORTED BY:            DAWN M. SAVINO, RPR
                        Official Court Stenographer
                        400 N. Miami Avenue, 10S03
                        Miami, Florida  33128
                        Telephone:  305-523-5598


PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED BY COMPUTER

| | | |
|---|---|---|
| 09:27:41 | 1 | (Court called to order) |
| 09:29:26 | 2 | COURT SECURITY OFFICER:  All rise for the jury. |
| 09:29:30 | 3 | (Jury in at 9:29 a.m.) |
| 09:31:20 | 4 | COURTROOM DEPUTY:  Case Number |
| 09:31:25 | 5 | 18-60256-criminal-Martinez, United States of America versus |
| 09:31:28 | 6 | Joseph Isaiah Woodson, Junior. |
| 09:31:29 | 7 | Counsel, please state your appearance. |
| 09:31:31 | 8 | MS. ANTON:  Good morning, Your Honor.  Jodi Anton on |
| 09:31:34 | 9 | behalf of the United States. |
| 09:31:34 | 10 | MS. VIAMONTES:  Good morning, Your Honor.  Francis |
| 09:31:38 | 11 | Viamontes on behalf of the United States, and case agent Lee |
| 09:31:38 | 12 | Bieber. |
| 09:31:39 | 13 | THE COURT:  Good morning. |
| 09:31:42 | 14 | MS. WEISS:  Good morning, Judge.  Clea Weiss from the |
| 09:31:45 | 15 | Federal Public Defender's Office on behalf of Mr. Woodson. |
| 09:31:47 | 16 | MS. MOLLISON:  Good morning, Your Honor.  Kate Mollison |
| 09:31:49 | 17 | from the Federal Public Defender's Office also on behalf of Mr. |
| 09:31:49 | 18 | Woodson. |
| 09:31:53 | 19 | MR. NATALE:  Good morning, Your Honor.  Anthony Natale |
| 09:31:53 | 20 | from the Federal Public Defender's Office on behalf of Mr. |
| 09:31:55 | 21 | Woodson, who is present in court. |
| 09:31:56 | 22 | THE COURT:  Good morning.  All right.  Be seated. |
| 09:31:59 | 23 | Are we ready to go? |
| 09:31:59 | 24 | MS. ANTON:  Yes, Your Honor. |
| 09:32:00 | 25 | THE COURT:  Call your next witness please. |

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED BY COMPUTER

09:32:03    1              MS. ANTON:  The United States calls Detective Lee
09:32:14    2       Bieber.
09:32:15    3              THE COURT:  You know the routine.  Please remain
09:32:24    4       standing and raise your right hand.
09:32:24    5              LEE BIEBER, GOVERNMENT WITNESS, SWORN.
09:32:28    6              THE COURT:  Please be seated.  Get as close to
09:32:30    7       microphone as you can, tell us your name and spell it.
09:32:32    8              THE WITNESS:  Good morning.  My name is Detective Lee
09:32:33    9       Bieber.  L-E-E, B-I-E-B-E-R.
09:32:35   10              THE COURT:  You may proceed.
09:32:35   11              MS. ANTON:  Thank you, Your Honor.
09:32:35   12                          DIRECT EXAMINATION
09:32:35   13         BY MS. ANTON:
09:32:41   14       Q.  Good morning, Detective Bieber.  Would you tell the ladies
09:32:42   15       and gentlemen of our jury what police department you work for
09:32:44   16       and how long you've been there?
09:32:48   17       A.  Yes.  Good morning.  My name is Detective Lee Bieber, I work
09:32:50   18       for the Plantation Police Department.  I've been employed with
09:32:55   19       the city of Plantation since 2002.  I've been a law enforcement
09:32:56   20       officer for 17 years now.
09:33:00   21       Q.  And within the city of Plantation Police Department, what
09:33:03   22       division or section are you currently assigned to?
09:33:07   23       A.  So for the last seven years I've been a detective.  For the
09:33:12   24       last five years, I've been strictly child exploitation cases.
09:33:17   25       Q.  And in your capacity as a detective with the city of

09:33:20  1    Plantation Police Department investigating child exploitation

09:33:24  2    cases, are you a member of the task force?

09:33:26  3    A.  Yes.  I'm a member of two task forces.  The first is the

09:33:27  4    Federal Bureau of Investigation Child Exploitation Task Force.

09:33:30  5    My duties involve investigating sexual exploitation to include

09:33:36  6    minor -- sex trafficking of minors, child pornography and online

09:33:36  7    enticement.

09:33:40  8         I'm also involved with the South Florida Internet

09:33:43  9    Crimes Against Children Task Force, which is a national task

09:33:47  10   force that investigates the same thing, but on a national level

09:33:50  11   of the state and federal law enforcement.

09:33:52  12   Q.  So you do you regularly work with local agencies as well as

09:33:56  13   your federal partners?

09:33:57  14   A.  Yes, I do.

09:34:00  15   Q.  Okay.  And in addition to that duty at the Plantation Police

09:34:04  16   Department, do you also have some other duties as a forensic

09:34:06  17   evidence analyst?

09:34:12  18   A.  Yes.  I've been a digital forensic analyst since 2013.  I've

09:34:17  19   taken several courses in the process for certifications,

09:34:23  20   satellite certified examiner, satellite certified operator.

09:34:27  21   I've been certificated as smartphone forensics and cellular

09:34:28  22   technology.

09:34:32  23   Q.  So what does it mean to be a digital forensic examiner?

09:34:33  24   What do you really do?

09:34:38  25   A.  So as a digital examiner, we take electronic devices such as

09:34:42  1   cellphones and we extract the data or do an acquisition on the

09:34:46  2   phone to extract the data, and then we analyze the data from the

09:34:46  3   device.

09:34:49  4   Q.  How many times would you approximate that you've done this

09:34:51  5   over the period of time you've been in that position?

09:34:53  6   A.  I'd say over 300 times.

09:34:58  7   Q.  Okay.  Now, let's talk about what types of cases you

09:35:06  8   specifically investigate.  Do they include cases of child

09:35:07  9   exploitation online?

09:35:08  10  A.  Yes, they do.

09:35:13  11  Q.  And back in January of 2018, did you get involved with an

09:35:15  12  investigation as it pertains to Joseph Woodson?

09:35:16  13  A.  I did.

09:35:20  14  Q.  Can you tell the members of our the jury how it is that the

09:35:22  15  Plantation Police Department and you, as a detective, became

09:35:22  16  involved?

09:35:29  17  A.  Yes.  So in January of 2018, the Plantation Police --

09:35:31  18  actually, let's go back a little bit.

09:35:34  19       Starting in November and December, the Plantation

09:35:37  20  Police Department received numerous complaints from parents and

09:35:40  21  juveniles that their Snapchat accounts have been hacked.  The

09:35:44  22  lead detective at the time realized that there might be a child

09:35:47  23  exploitation case and requested my assistance in looking at the

09:35:51  24  case.  When I realized that it was a child exploitation case, I

09:35:52  25  became the lead investigator.

09:35:55    1    Q.   And what does it mean to be the lead investigator in this
09:35:56    2    type of case?
09:35:59    3    A.   As a lead investigator, it's my responsibility to handle all
09:36:04    4    parts of the case, so I start the investigation.   I take over
09:36:06    5    from the other detective.
09:36:09    6    Q.   Okay.   So when the investigation became yours, can you tell
09:36:13    7    us what are the steps that you took to begin your process.
09:36:16    8    A.   Sure.   So what I did was I reached out to a couple of the
09:36:20    9    victims in the case.   We did an interview with them, strictly
09:36:25   10    E.M. and A.K.   During the interview, we got permission to
09:36:29   11    analyze their phones and extract data to see if there was any
09:36:33   12    evidence that would corroborate what they were telling us.
09:36:37   13    Q.   When you say E.M. and A.K., are those two of the victims who
09:36:39   14    we saw here in this trial?
09:36:41   15    A.   Yes, Victims 4 and 5.
09:36:42   16    Q.   Okay.   So they came to your police department and you
09:36:45   17    interviewed them about what had happened with their Snapchat
09:36:46   18    accounts?
09:36:47   19    A.   Correct.
09:36:50   20    Q.   Okay.   And you mentioned something about they gave you their
09:36:51   21    telephones.
09:36:54   22    A.   Correct.   They gave us consent to do an examination on their
09:36:59   23    devices and we were able to extract the information from them.
09:37:01   24    Q.   Okay.   So that extraction process, is that what you were
09:37:05   25    telling the jury earlier that you're trained in how to use the

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED BY COMPUTER

|          |    |                                                                           |
|----------|----|---------------------------------------------------------------------------|
| 09:37:08 | 1  | different tools in order to get information out of a person's              |
| 09:37:09 | 2  | cellular device?                                                          |
| 09:37:10 | 3  | A.  Yeah, that's correct.                                                  |
| 09:37:12 | 4  | Q.  Okay.  So did you review those extractions?                           |
| 09:37:13 | 5  | A.  I did.                                                                 |
| 09:37:15 | 6  | Q.  And did you find evidence in those extractions that                   |
| 09:37:18 | 7  | corroborated what they were telling you?                                   |
| 09:37:18 | 8  | A.  Yes, I did.                                                            |
| 09:37:21 | 9  | Q.  Okay.  So then what did you do?                                        |
| 09:37:27 | 10 | A.  Once I observed the evidence that there was some evidence to          |
| 09:37:31 | 11 | support what they're telling me, we started looking at the                 |
| 09:37:35 | 12 | accounts.  One of the girls had received text messages in their            |
| 09:37:40 | 13 | phones from a person they did not know, and we wanted to start             |
| 09:37:42 | 14 | sending out subpoenas to these accounts.                                   |
| 09:37:44 | 15 | Q.  And why is it that law enforcement has to send out                     |
| 09:37:45 | 16 | subpoenas?                                                                 |
| 09:37:49 | 17 | A.  Well, in order for the electronic service providers of these          |
| 09:37:53 | 18 | applications to give us information, we have to send some type             |
| 09:37:54 | 19 | of legal process.                                                         |
| 09:37:57 | 20 | Q.  Okay.  So when you say electronic service provider, are you            |
| 09:38:02 | 21 | talking about things like Snapchat and Dropbox and Kik messaging          |
| 09:38:06 | 22 | and all these types of applications you've heard throughout this          |
| 09:38:07 | 23 | trial?                                                                    |
| 09:38:07 | 24 | A.  Yes.                                                                   |
| 09:38:09 | 25 | Q.  Okay.  So you can't just find that information online by              |

09:38:12  1      Googling it up.

09:38:13  2      A.   No, you have to go to the company.

09:38:15  3      Q.   Okay.  So you started doing that process, and what are you

09:38:19  4      trying to determine in sending out these subpoenas and gathering

09:38:20  5      the data?

09:38:23  6      A.   We're trying to find out who was assigned or the registered

09:38:25  7      user of these accounts.

09:38:27  8      Q.   When you say "these accounts", do you mean the accounts that

09:38:31  9      were infiltrating the girls you spoke to's social media?

09:38:35  10     A.   The accounts used to extort these girls and the accounts

09:38:38  11     used to infiltrate the girls as well.

09:38:40  12     Q.   Okay.  And so you sent out some subpoenas and legal process.

09:38:44  13     And when you got the legal process back from those companies,

09:38:46  14     did it advance your investigation and what did you do.

09:38:50  15     A.   Well, it gave us a direction.  For instance, when we got the

09:38:55  16     subpoena return for TextNow, it gave us an e-mail address which

09:38:59  17     was helpful.  It gave us an idea of who may have been using that

09:39:02  18     account, so it's just another lead.  So for the TextNow account,

09:39:06  19     which was a 702 number which was reaching out to the girls, it

09:39:13  20     came back to a dark_chaos254@yahoo.com.  So again, we knew that

09:39:15  21     somehow that phone number or that e-mail address would have been

09:39:17  22     used by the person using that account.

09:39:22  23     Q.   Okay.  And you may not have known it then, but do you know

09:39:25  24     now, after you've investigated this case and have been sitting

09:39:28  25     throughout this trial, why that e-mail address of

09:39:34   1   dark_chaos254@yahoo.com that was attached to the phone number

09:39:37   2   that the girls were receiving texts from, why is that relevant?

09:39:40   3   A.   That's relevant because during the interview with Joseph

09:39:42   4   Woodson when they did the search warrant, he admitted that one

09:39:50   5   of his Yahoo accounts was dark_chaos254@yahoo.com.  He believed

09:39:52   6   at the time that that was the e-mail account that was connected

09:39:54   7   to his Dropbox account.

09:39:57   8   Q.   So law enforcement subsequently got information linking

09:40:02   9   dark_chaos254@yahoo to that TextNow phone number.

09:40:03  10   A.   Correct.

09:40:08  11   Q.   Okay.  So after you did this investigation and met with the

09:40:10  12   two victims, what happened with your investigation?

09:40:14  13   A.   We find out that there are other cases like this that were

09:40:18  14   similar in other jurisdictions.  I was informed that there was a

09:40:21  15   similar case in Virginia, and the lead detective was Detective

09:40:26  16   Kevin Bartechko.  I reached out to Kevin Bartechko, we realized

09:40:29  17   that the IP addresses that were coming back to the girls'

09:40:34  18   Snapchat accounts once the accounts were infiltrated, they were

09:40:37  19   the same, so at which time we started a joint investigation.

09:40:40  20           They also advised that there was a similar case in

09:40:44  21   South Florida to a sister city of ours in Davie, Florida or

09:40:47  22   Miramar, Florida and the lead detective at the time was

09:40:49  23   Detective Adam Granit.

09:40:53  24   Q.   Okay.  So when you reached out to Virginia to speak with

09:40:57  25   them about your case because they both resolved back to the same

09:41:02  1   IP address, it's Virginia who advised you that there was another

09:41:03  2   South Florida connection?

09:41:03  3   A.   That's correct.

09:41:06  4   Q.   And that was Detective Adam Granit from the Davie Police

09:41:06  5   Department?

09:41:08  6   A.   Yes.

09:41:12  7   Q.   And is Detective Granit from Davie Police Department, is he

09:41:15  8   also on your same task force with the FBI working child

09:41:16  9   exploitation cases?

09:41:19  10  A.   Yes.   He's a TFO with the FBI as well.

09:41:23  11  Q.   So at that point, did you and Detective Granit join forces

09:41:26  12  with Virginia to form a unified investigation?

09:41:27  13  A.   Yes.

09:41:27  14  Q.   And work together?

09:41:28  15  A.   Yes.

09:41:30  16  Q.   And so what happened from that point forward?

09:41:34  17  A.   I was advised that Virginia -- the Louden County Sheriff's

09:41:37  18  Office, was going to conduct a search warrant at the residence

09:41:41  19  that they were able to trace the IP addresses back to, which

09:41:45  20  occurred around mid or late January of -- January of 2018.

09:41:49  21  Q.   Okay.   Now, were you present up there in Virginia for the

09:41:49  22  search warrant?

09:41:49  23  A.   I was not.

09:41:52  24  Q.   Okay.   But did you keep in touch with the Virginia

09:41:58  25  detectives, Bartechko and Justin Oksanen, throughout the course

09:41:58  1    of this investigation?

09:42:01  2    A.  Prior to and subsequent to the execution of the search

09:42:01  3    warrant.

09:42:07  4    Q.  Okay.  And so did they ultimately inform you that there were

09:42:10  5    some digital devices and media, cellphones and computers taken

09:42:12  6    from the Defendant's home?

09:42:15  7    A.  Yes, and one of which was a Galaxy Note 3.

09:42:19  8    Q.  And when you saw that it was a Galaxy Note 3 that was taken

09:42:21  9    in the search warrant, did that put any pieces of the puzzle

09:42:23  10   together for you?

09:42:26  11   A.  Yes, it did.  When the girls came in to give their

09:42:29  12   statements, in their phones, one of the girls had a screenshot

09:42:32  13   of her Snapchat account when she got a message saying that her

09:42:37  14   account was logged in by someone from Ashburn, Virginia from an

09:42:40  15   IP address that started with 7-0, and it was from a Samsung Note

09:42:42  16   3.

09:42:46  17   Q.  Okay.  If you need some water sir, go ahead and take a

09:42:49  18   break.  I'll go ahead and ask you the next question in the

09:42:49  19   meanwhile.

09:42:57  20        So when the Note 3 and other devices were taken in the

09:42:59  21   search of the Defendant's home up in Virginia, did you work with

09:43:03  22   the detectives up there to get that evidence sent down here to

09:43:05  23   South Florida?

09:43:08  24   A.  We did.  They did the initial extraction of the devices and

09:43:11  25   then they sent those extractions and the devices down to South

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED BY COMPUTER

```
09:43:12   1    Florida.
09:43:17   2    Q.  Okay.  And so once you got your hands on the devices which
09:43:20   3    are -- is a phone; is what we're talking about?  A Galaxy Note 3
09:43:21   4    phone?
09:43:24   5    A.  It's a Galaxy Note 3 that belonged to the Defendant, and
09:43:28   6    there was a Galaxy S7 that also belonged to Joseph Woodson.
09:43:31   7    Q.  Okay.  So when you got both phones and the extractions from
09:43:33   8    the phones down here in South Florida, did you do your own
09:43:36   9    independent analysis of them?
09:43:37  10    A.  Yes, I did.
09:43:41  11    Q.  And let's just go over some of the things that you were able
09:43:45  12    to locate.  Let's start first with in the Note 3 phone.  Can you
09:43:49  13    tell the members of the jury if you found evidence of child
09:43:51  14    pornography in that phone?
09:43:57  15    A.  Yes, I did.  We found evidence of child pornography in the
09:44:02  16    file system directory of the phone, in the camera roll.  In the
09:44:05  17    camera roll itself were subfolders of girls' names, and in the
09:44:09  18    folders of the girls' names were different images of child
09:44:15  19    pornography, or lewd and lascivious images, or the girls doing
09:44:16  20    sexual acts.
09:44:18  21    Q.  Okay.  So you're saying in the file system of the phone.
09:44:20  22    Was the phone organized in a specific way?
09:44:24  23    A.  No.  So the phone has a file structure to it, so when you
09:44:28  24    look into the camera roll, it will have subfolders in there and
09:44:30  25    you can organize your pictures the way you want it.
```

09:44:34  1    Q.  Okay.  So did the phone -- based on your knowledge and
09:44:37  2    expertise in dealing with evaluation of these types of phones,
09:44:41  3    does the phone automatically categorize pictures into folders
09:44:43  4    with girls' names on it?
09:44:45  5    A.  No.  It's manual.  You have to do it yourself.
09:44:48  6    Q.  So someone would have had to go into the phone and move
09:44:50  7    pictures into specific folders.
09:44:51  8    A.  That's correct.
09:44:53  9    Q.  And then title those folders.
09:44:54  10   A.  Yes.
09:44:56  11   Q.  Okay.  And you found many folders with girls' names on it.
09:44:57  12   A.  Yes, I did.
09:45:00  13   Q.  And you found images of child pornography contained within
09:45:01  14   those folders.
09:45:01  15   A.  Yes.
09:45:07  16   Q.  Okay.  Did you also find any web history of searches like
09:45:10  17   Google searches for child pornography?
09:45:13  18   A.  Yes.  In his Google Chrome history, there were searches for
09:45:19  19   child pornography through Dropbox links and Pastebin.  Some of
09:45:24  20   the keywords were "young".  These are like common terms that we
09:45:27  21   use when we search for any type of child pornography, certain
09:45:33  22   specific terms.  So knowing that, looking into his web history,
09:45:38  23   those keywords were hit on the -- on our search list.
09:45:42  24   Q.  Okay.  So when you say "web history", does that mean every
09:45:48  25   time I go on my phone and look up directions to such and such

09:45:52   1    place, or what I can buy on Amazon, that the phone is storing

09:45:56   2    that in some kind of internal system that perhaps you'll be able

09:45:56   3    to see?

09:45:59   4    A.  Yes.  So your web history is logged.  So as you're going to

09:46:02   5    different pages, it's going to pick that up.

09:46:04   6    Q.  Okay.  So you found evidence in the phone of the user going

09:46:09   7    through and Googling for images of child pornography.

09:46:13   8    A.  Right.  It was searching for like Dropbox links and

09:46:14   9    Pastebin.

09:46:18   10   Q.  Okay.  So you're talking about Dropbox and Pastebin.  Let's

09:46:20   11   talk about those just briefly right now.

09:46:25   12           Are you able to search on Google for a link in Dropbox

09:46:27   13   to find child pornography?

09:46:28   14   A.  Yes.

09:46:30   15   Q.  Can you explain that to the jury?

09:46:33   16   A.  So to go back and explain Dropbox.  Dropbox is a cloud

09:46:37   17   service that gives you the ability to store things online to a

09:46:42   18   remote server.  You can take those links and you can pass those

09:46:48   19   links out or send those links to someone online to share those

09:46:49   20   accounts or a specific folder in your account.

09:46:53   21   Q.  Okay.  Did you also find the Dropbox app installed on that

09:46:53   22   phone?

09:46:54   23   A.  Yes, it was.

09:46:59   24   Q.  And were you able to get any information about user names or

09:47:02   25   e-mail addresses linked to that Dropbox app?

09:47:06  1   A.  Yes.  So the e-mail address that's associated with the

09:47:10  2   account was ksdemise@yahoo.com.

09:47:13  3   Q.  And once you get that information about an e-mail account

09:47:15  4   that's associated with an application that you see physically in

09:47:19  5   the phone, do you have to submit any kind of legal process to

09:47:22  6   the company like Dropbox in order to get all the information

09:47:23  7   from Dropbox?

09:47:27  8   A.  Yes.  So what we did is after we noticed that that e-mail

09:47:31  9   address was being used for the Dropbox account, we executed a

09:47:38  10  search warrant to Dropbox to get the contents of that account's

09:47:38  11  data.

09:47:41  12  Q.  Okay.  Did you also find evidence in that phone pertaining

09:47:43  13  to the Kik application?

09:47:44  14  A.  Yes, I did.

09:47:46  15  Q.  And what did you find?

09:47:54  16  A.  So we found Kik messages basically showing -- of direct

09:48:00  17  messages between Joseph Woodson and juvenile victims demanding

09:48:04  18  pictures of child pornography in an extortionate method.

09:48:09  19  Q.  Okay.  Did you also find Kik messages between the user name

09:48:10  20  -- was it MVLex on Kik?

09:48:16  21  A.  Yes.  So the user name MVLex3 was installed on his phone,

09:48:18  22  and that was the user name that he was using to communicate with

09:48:19  23  the juvenile victims.

09:48:22  24  Q.  And was that also the user name that he was using to

09:48:24  25  communicate with a Bozy11 user ID?

09:48:25   1    A.  Yes, it was.

09:48:31   2    Q.  Okay.  And did you do any investigative research to

09:48:33   3    determine who that person could be?

09:48:33   4    A.  We did.

09:48:36   5    Q.  And why would you want to know who that person was, Bozy11?

09:48:42   6    A.  Because Bozy11 was a person he was partnering with or

09:48:46   7    co-conspiring with to extort these girls for child pornography.

09:48:50   8    Q.  And you were able to make that determination based upon text

09:48:50   9    messages?

09:48:53   10   A.  Between the direct messages between the two.

09:48:57   11   Q.  Okay.  Now, inside of that phone, were you able to look

09:49:02   12   through it and find additional information to start to identify

09:49:04   13   more minor victims?

09:49:07   14   A.  Yeah.  So we were looking at his Kik messages and we

09:49:11   15   realized one, there were phone numbers of some of the victims,

09:49:16   16   as well as images, as well as user names from other accounts.

09:49:21   17   Q.  Okay.  So did you find evidence in the Defendant's Note 3

09:49:29   18   cellular phone pertaining to the two girls, M.K. and A.K., who

09:49:31   19   you had interviewed at the Plantation Police Department?

09:49:35   20   A.  So -- yes.  So we found evidence of E.M. and A.K.

09:49:39   21   Q.  E.M.  I'm sorry.  I misspoke.  E.M.

09:49:42   22   A.  We also found --  we also identified another user who was a

09:49:44   23   local girl in South Florida, which was M.K.

09:49:50   24   Q.  Okay.  So first let's talk about M.K.  You were sitting in

09:49:53   25   this courtroom throughout the trial as the lead case agent.  Did

09:49:55  1    you see M.K. come into the courtroom and testify?

09:49:56  2    A.  I did.

09:49:59  3    Q.  Okay.  And can you tell the members of the jury what

09:50:02  4    evidence you found on the Defendant's phone as it pertained to

09:50:03  5    her?

09:50:08  6    A.  I found direct communications from his TextNow messaging

09:50:13  7    application to the victim, as well as Kik messages, direct

09:50:16  8    messages to her as well.

09:50:20  9    Q.  Did you find any child pornography images of M.K. on the

09:50:21  10   Defendant's phone?

09:50:22  11   A.  I did.

09:50:26  12   Q.  And were those in any particular folder on his phone?

09:50:31  13   A.  Well, they're in the Kik chats, but also yes, they were in a

09:50:32  14   folder with her name on it.

09:50:42  15   Q.  Okay.  All right.  Now, in addition to M.K., you mentioned

09:50:45  16   that you found many other leads in the phone.

09:50:46  17   A.  Yes.

09:50:49  18   Q.  Can you tell the ladies and gentlemen of the jury

09:50:52  19   investigatively, once you have that information, what did it

09:50:54  20   mean to you and what did you do with it?

09:50:58  21   A.  Well, we found additional user names of other victims.  So

09:51:01  22   we sent out leads to try to identify these victims that were out

09:51:05  23   of state and within the state.  With all the information that we

09:51:09  24   found in the phone, we were able to send that out to unit with

09:51:13  25   the FBI to help identify these accounts and these girls, and

09:51:17  1    currently we're up to about 345 accounts and victims.

09:51:22  2    Q.   Okay.  Now, when you say that you're trying to identify

09:51:25  3    these girls, I just want to make sure I understand that the

09:51:32  4    evidence you see in the phone of the Defendant is a picture of a

09:51:36  5    girl who's unidentified with a user name of Snapchat or Kik or

09:51:38  6    some other name?

09:51:42  7    A.   Right.  And we also have profiles of these girls and

09:51:46  8    screenshots of chat messages as well between the victims and

09:51:49  9    either Joseph Woodson or his co-conspirator.

09:51:52  10   Q.   Okay.  But what you don't really have at this point in your

09:51:57  11   investigation is the actual real name, address, telephone number

09:52:01  12   of these girls so that you can go out and knock on their door

09:52:02  13   and make contact with them.

09:52:05  14   A.   No.  We have to go through legal process to help identify

09:52:05  15   them.

09:52:08  16   Q.   Okay.  So the legal process you have to go through, would

09:52:11  17   that be to get a search warrant for that account information?

09:52:12  18   A.   Search warrant, subpoena, yes.

09:52:15  19   Q.   Okay.  Because you can't just call up Snapchat and Kik and

09:52:18  20   tell them hey, this is what I need and they send it right over.

09:52:20  21   A.   No.  They want legal process.

09:52:22  22   Q.   Okay.  And did you do that in this case?

09:52:22  23   A.   Yes, I did.

09:52:28  24   Q.   Okay.  So what else did you find in the Defendant's Note 3

09:52:32  25   phone as it pertains to social media applications.

09:52:35   1    A.   Well, he had several social media applications installed in

09:52:40   2    his phone.  He had Instagram, Skype, Kik, TextNow.  These are

09:52:43   3    some of the applications that he used to extort the child, the

09:52:45   4    children.

09:52:48   5    Q.   And with the Kik application, there was a user name

09:52:50   6    associated with it on his phone, right?

09:52:50   7    A.   That's correct.

09:52:52   8    Q.   And what user name was that?

09:52:53   9    A.   That was MVLex3.

09:52:57   10   Q.   And with the TextNow application, was there a telephone

09:52:58   11   number associated with that?

09:53:01   12   A.   So TextNow you can create phone numbers on a fly.  It's

09:53:05   13   almost like, if you've ever heard the term burner phone, TextNow

09:53:08   14   is kind of like a burner app.  You can create phone numbers and

09:53:12   15   create new phone numbers any time you want.  And you can also do

09:53:13   16   user accounts.

09:53:17   17         So in this circumstance, at the time when he was

09:53:20   18   communicating with the victims in South Florida, he was using a

09:53:25   19   702 number.  However, the text communications or the TextNow

09:53:28   20   communications that were on the phone were consist with the ones

09:53:32   21   that we were finding in the victims' phones.

09:53:36   22   Q.   Okay.  So you found the same phone number in the Defendant's

09:53:40   23   phone as the victims here in South Florida had told you about.

09:53:42   24   A.   Well, we found the communications.  The phone number on the

09:53:45   25   TextNow account had changed at the time that we got the phone.

09:53:47  1    So he was using a different phone number.

09:53:49  2    Q.  Did you serve legal process on TextNow to find out what

09:53:50  3    phone numbers he was using?

09:53:55  4    A.  We did do a subpoena early on which led me back to the

09:53:58  5    dark_chaos254@yahoo.com.

09:54:02  6    Q.  Now, let's talk about screenshots.  You've heard testimony

09:54:05  7    throughout this trial about what a screenshot is, right?

09:54:05  8    A.  Yes.

09:54:08  9    Q.  And you're able to tell by looking at a phone if someone

09:54:13  10   actually took a picture with the camera or screenshotted their

09:54:13  11   screen; is that true?

09:54:14  12   A.  Yes.

09:54:16  13   Q.  Okay.  Did you find screenshots in the Defendant's camera

09:54:17  14   roll?

09:54:20  15   A.  There were screenshots from the Defendant and there were

09:54:23  16   screenshots from other phones that he had stored.

09:54:26  17   Q.  Okay.  Can you explain to the ladies and gentlemen of the

09:54:29  18   jury just a little bit of an overview about what kinds of things

09:54:30  19   you found?

09:54:33  20   A.  Right.  So we found communications, screenshots of chats

09:54:38  21   that occurred between either Joseph Woodson and victims, but

09:54:44  22   also a co-conspirator and other victims, and as well as

09:54:49  23   communications between Woodson and the other co-conspirator.

09:54:52  24   Q.  Okay.  Now, at this point in time, you've mentioned two

09:54:56  25   girls who you interviewed, right?

09:54:56    1    A.   Uh-huh.

09:54:59    2    Q.   How did you learn about the other victims in this case?

09:55:02    3    A.   We learned about the other victims based on the information

09:55:06    4    that we were -- obtained from the Galaxy Note 3.  We went out --

09:55:09    5    once we had -- especially, let's go back to M.K., Victim 1, we

09:55:13    6    were able to identify her.  In one of her chats, she actually

09:55:17    7    listed an address that was in close proximity, then we were able

09:55:21    8    to identify her real address, went out and made contact with the

09:55:23    9    grandmother and her as well.

09:55:28   10    Q.   Okay.  Now, let's talk about after you did your analysis of

09:55:31   11    the phone, which we'll be talking about throughout your

09:55:37   12    testimony, did you send the phones to the FBI Technical Analysis

09:55:42   13    Unit to try to get a deeper dive and some additional

09:55:47   14    technologically advanced information?

09:55:50   15    A.   Yes, we did.  So there are different levels of extraction

09:55:54   16    when it comes to a phone.  There are logical extractions which

09:55:56   17    is the most supported extraction process.  There's file system

09:55:58   18    extraction.  Then you have something called a physical

09:56:02   19    extraction, which is as close to a binary image as you're going

09:56:02   20    to get.

09:56:06   21         So a binary image is an exact duplicate of something.

09:56:11   22    When you talk about computer forensics, you're doing a binary

09:56:14   23    image of one drive to another.  In cellphone forensics, it's not

09:56:18   24    so easy.  So a logical extraction you'll get some things out of

09:56:22   25    it, but not all.  A file system is like taking folders and

09:56:22   1    moving it to one desk to another for storage, and a physical is

09:56:24   2    as close to a binary image as you can.

09:56:28   3            I was not, myself, able to get a full physical

09:56:31   4    extraction out of the phone, so I wanted to see if we could be

09:56:33   5    able to get more evidence out of the phone, as well as prove

09:56:37   6    that there was no malware on the phone.  So we sent it to a

09:56:41   7    specialized unit in the FBI to do a malware analysis on the

09:56:42   8    device.

09:56:47   9    Q.   Okay.  Now, were you made aware by the detectives up in

09:56:50  10    Virginia that when the Defendant spoke to them, that he

09:56:52  11    mentioned that he was hacked?

09:57:01  12    A.   Yes.  So I received the interview that they did, and in the

09:57:06  13    interview, it stated that he said that he was hacked, that he

09:57:10  14    was being extorted himself.  And as an investigator, it's my job

09:57:13  15    to make sure that hey, let's see if this actually happened.  So

09:57:15  16    that's why I asked for the malware analysis.

09:57:19  17    Q.   Okay.  And did you also physically look through the phone

09:57:23  18    when you did your analysis to see if you saw any signs of

09:57:27  19    hacking or malware or coercion of any sort?

09:57:30  20    A.   Well, based on the extraction that I did no, I did not.

09:57:34  21    Q.   Okay.  And in fact, to the contrary, did you find

09:57:37  22    communications in the Defendant's phone that seemed to indicate

09:57:38  23    to you something else?

09:57:39  24    A.   Yes, I did.

09:57:42  25    Q.   And what did those communications indicate to you?

09:57:48  1    A.  It seemed that he was in a partnership with the

09:57:51  2    co-conspirator to solicit these girls and extort them for child

09:57:52  3    pornography.  It wasn't a coercion.

09:57:54  4    Q.  Did it seem to you from reviewing the contents of the

09:57:57  5    Defendant's phone that there may possibly be more than one other

09:57:58  6    person?

09:57:59  7    A.  Possibly, yes.

09:58:03  8    Q.  Okay.  And is that how your investigation continued?

09:58:04  9    A.  That's correct.

09:58:10  10   Q.  Okay.  So when the search warrant was done and you were in

09:58:14  11   communication with the detectives up in Virginia, were you made

09:58:17  12   aware that the Defendant wasn't arrested on that day?

09:58:18  13   A.  I was aware of that, yes.

09:58:23  14   Q.  Okay.  And several months later when your analysis has been

09:58:28  15   underway, right, approximately September of 2018, did you

09:58:31  16   attempt to seek an arrest warrant for the Defendant?

09:58:33  17   A.  Yes.  So we received the data from Virginia in August of

09:58:41  18   2018, excuse me, and we effected the arrest warrant in September

09:58:42  19   of 2018.

09:58:46  20   Q.  Now, did you personally go up to Virginia to assist with the

09:58:46  21   arrest of the Defendant?

09:58:47  22   A.  I did.

09:58:48  23   Q.  Did you go with another detective from down here?

09:58:53  24   A.  Yes.  Detective Adam Granit and I went up together to effect

09:58:54  25   the arrest warrant.

09:58:58   1   Q.  And did you work with the Virginia detectives, Detective

09:59:00   2   Oksanen, who you saw come in here and testify?

09:59:03   3   A.  Yes, from Louden County Sheriff's Office, as well as another

09:59:04   4   FBI agent.

09:59:07   5   Q.  Okay.  And on what date did the Defendant get arrested in

09:59:08   6   Virginia?

09:59:11   7   A.  It was September 24, 2018.

09:59:17   8   Q.  Okay.  And is that date significant to you in terms of one

09:59:20   9   of your victims from Plantation, M.K.?

09:59:23  10   A.  Yes.  While we were in Virginia, I get a call from one of

09:59:27  11   the detectives in Plantation that was helping me with the case

09:59:30  12   at the time, and he said that the Victim 1's grandparent reached

09:59:34  13   out to him and said that she was contacted again that morning.

09:59:37  14   Q.  So M.K. -- you got information that M.K. was contacted the

09:59:39  15   morning of the Defendant's arrest.

09:59:40  16   A.  That's correct.

09:59:44  17   Q.  And was she contacted on an application?

09:59:46  18   A.  She was contacted on Instagram.

09:59:50  19   Q.  And was she able to tell you or screenshot the contact that

09:59:51  20   she had?

09:59:53  21   A.  She did.  She provided a screenshot to law enforcement of

09:59:54  22   the communications.

10:00:00  23   Q.  And what user ID on Instagram or user name was it that was

10:00:02  24   sending her that communication?

10:00:04  25   A.  It was Tulyn20.

```
10:00:08  1    Q.  And through your investigation in this case, did you find
10:00:11  2    out who Tulyn20 belongs to?
10:00:16  3    A.  Yes, Tulyn20 was a user name that was found in Joseph
10:00:20  4    Woodson's Galaxy Note 3 and Galaxy S8.
10:00:24  5    Q.  So Tulyn20 is an Instagram ID that belongs to the Defendant.
10:00:24  6    A.  That's correct.
10:00:27  7    Q.  Okay.  And that day in September when the Defendant was
10:00:30  8    arrested, did he have another telephone?
10:00:33  9    A.  He did.  He had a Galaxy S8 in his room.
10:00:36  10   Q.  Okay.  And did law enforcement get a search warrant to get
10:00:39  11   the Galaxy S8 telephone that he had?
10:00:42  12   A.  Yes, when we realized that he was using the phone to
10:00:46  13   communicate with other minors, we went back and we had --
10:00:49  14   actually I didn't go back, but law enforcement in Virginia went
10:00:52  15   back to the residence and executed a search warrant for the
10:00:52  16   phone.
10:00:56  17   Q.  Okay.  So now the search warrant had happened months before
10:00:58  18   the arrest; is that true?
10:01:03  19   A.  Correct.  So the search warrant occurred January 26, 2018.
10:01:07  20   Q.  And in January of 2018, law enforcement took the S3
10:01:11  21   telephone, an S7 telephone, correct?
10:01:13  22   A.  It was a Note 3 and an S7.
10:01:17  23   Q.  Note 3 and S7.  I am an Apple person.  I got to get the
10:01:18  24   android themes down.
10:01:21  25           Law enforcement took two phones from him back then.
```

10:01:25  1    A.  Well, they actually took three phones.  It was HTC, a Note 3

10:01:28  2    and a Galaxy S7.

10:01:31  3    Q.  So the Defendant had three phones back then.

10:01:31  4    A.  That's correct.

10:01:33  5    Q.  And did you analyze all three of those phones?

10:01:34  6    A.  I did.

10:01:37  7    Q.  And so you told us what you found on the Note 3 already.

10:01:41  8    What did you find on the HTC phone?

10:01:47  9    A.  There wasn't much on the HTC phone.  It was the phone just

10:01:51  10   prior to his Galaxy Note 3.  There was some communications with

10:01:55  11   a person named Katy Curan, but there was no evidence of any

10:01:56  12   coercion at all.

10:02:00  13   Q.  Okay.  You didn't find any child pornography on that phone?

10:02:02  14   A.  No.  No child pornography, no.

10:02:05  15   Q.  And what about the other phone you mentioned, the 7?

10:02:08  16   A.  The S7 was used strictly for work.  There were text

10:02:12  17   messages, communications of people that he was working with.

10:02:17  18   Q.  Okay.  So you found no evidence on the 7 of Snapchat

10:02:19  19   extortion or Kik extortion?

10:02:23  20   A.  Not on the Galaxy S7, no.

10:02:25  21   Q.  Okay.  So there were three phones in his residence, one

10:02:27  22   phone had all of the extortion on it; is that correct?

10:02:28  23   A.  Yes, the Note 3.

10:02:33  24   Q.  Okay.  And then it seemed a separate phone had just everyday

10:02:34  25   life communications with work.

10:02:35   1    A.   Correct.

10:02:40   2    Q.   Okay.   Now, there's what, eight months in between that

10:02:43   3    search warrant and when the Defendant is arrested?

10:02:45   4    A.   Yeah, from January to September.   Correct.

10:02:48   5    Q.   Okay.   And so in that time, did the Defendant get another

10:02:48   6    phone?

10:02:52   7    A.   He got the Galaxy S8 which was in his room at the time that

10:02:54   8    we did the arrest warrant.

10:02:56   9    Q.   And so did you have the ability to get a search warrant as

10:02:59   10   you said and go through that S8 phone?

10:02:59   11   A.   Yes, we did.

10:03:03   12   Q.   Okay.   And tell the ladies and gentlemen of the jury if

10:03:06   13   you're able originally to get into the S8 phone.

10:03:10   14   A.   No.   So the S8 was locked originally.   We were not able to

10:03:14   15   get into it.   We did provide it to a specialized unit within the

10:03:18   16   FBI to identify the passcode, and we were able to open the phone

10:03:20   17   and extract the data from it.

10:03:21   18   Q.   Okay.   So sometimes phones are locked and difficult to get

10:03:22   19   into?

10:03:23   20   A.   Yes, they are.

10:03:28   21   Q.   And does law enforcement have a magical key that opens up

10:03:29   22   every phone?

10:03:31   23   A.   Not every phone, no.

10:03:32   24   Q.   Not yet?

10:03:32   25   A.   Not yet.

10:03:36  1    Q.  Okay.  But as the technology develops, companies and law

10:03:39  2    enforcement working together are able to develop ways to get

10:03:41  3    into cellphones that we --

10:03:44  4    A.  Yes, law enforcement has tools at their disposal to try to

10:03:48  5    identify passcodes or bypass passcodes to get into the devices.

10:03:51  6    Q.  All right.  So once you're able to examine the contents of

10:03:54  7    the Defendant's S8 phone that was taken when he was arrested,

10:04:00  8    did you find child pornography images of M.K. in that phone?

10:04:01  9    A.  I did.

10:04:06  10   Q.  Okay.  And was that image the same as the one that M.K.

10:04:09  11   screenshotted and gave to you that was sent to her the morning

10:04:10  12   he was arrested?

10:04:13  13   A.  That's one -- of those images that were in his phone were

10:04:15  14   consistent with the image that was found on the screenshot or

10:04:18  15   provided to law enforcement of M.K. in that communication from

10:04:19  16   Instagram.

10:04:25  17   Q.  So did you find any evidence in the new phone, the S8, of a

10:04:26  18   Kik account?

10:04:27  19   A.  Yes, I did.

10:04:29  20   Q.  And what Kik account was that?  Do you remember?

10:04:36  21   A.  The user ID was pyrokenesist, it's a little hard to say, and

10:04:43  22   then there was Taylor Keenan was the display name with some

10:04:45  23   emojis in the display name.

10:04:47  24   Q.  Did you also find evidence of the TextNow app?

10:04:49  25   A.  Yes, I did.

10:04:54  1    Q.  And did the TextNow app have the same user ID on the

10:04:55  2    Defendant's new phone as his old phone?

10:05:00  3    A.  Yes.  So the old phone and the new phone both had Brentbeeby

10:05:03  4    as the user name for his TextNow account, and they were

10:05:04  5    consistent with both.

10:05:08  6    Q.  Okay.  Did you also find any other images of child

10:05:10  7    pornography on the new phone, the 8?

10:05:11  8    A.  Yes.

10:05:12  9    Q.  And what did you find?

10:05:18  10   A.  There is a screenshot of a girl with the name Nick on it,

10:05:24  11   and with a -- I believe it was either another Kik account or

10:05:31  12   Snapchat account, Karma16 was the display name on the screenshot

10:05:31  13   of that image.

10:05:34  14   Q.  The image that you found in the latest phone that you took

10:05:38  15   from him that you're saying said Nick on it, was it a naked

10:05:41  16   photo of a young girl with writing on her body?

10:05:43  17   A.  Yes, the name Nick was written on her chest.

10:05:47  18   Q.  And was that photograph similar in nature as it was to the

10:05:51  19   other photograph that you had recovered from the Note 3 phone?

10:05:53  20   A.  They were consistent with other images that we found because

10:05:56  21   the other images, especially in the other phone, had girls with

10:05:59  22   writing all over them with different names.

10:06:02  23   Q.  Okay.  Now, let's talk about some of the other victims in

10:06:06  24   this case that you've heard and seen throughout the course of

10:06:11  25   this trial.  How was law enforcement able to identify them?

10:06:13  1    A.  Identify the girls?

10:06:16  2    Q.  Yes.  You can just pick -- we can pick one of them and let's

10:06:17  3    just start.

10:06:19  4         Let's start with A.C.  Do you remember hearing A.C.'s

10:06:20  5    testimony?

10:06:25  6    A.  So A.C., in the Galaxy Note 3 there was a communication

10:06:30  7    between MVLex3 and Bozy11, which we later identified as a

10:06:34  8    gentleman from Ireland.  In the communications, there was talk

10:06:40  9    about a girl that Bozy11 was currently talking to.  Her name was

10:06:43  10   A.C.  And we -- through our investigation we were able to

10:06:49  11   identify A.C., at which time Detective Granit and I went out up

10:06:51  12   to Orlando to interview her.

10:06:54  13   Q.  Okay.  And did A.C. have a phone that you were able to get

10:06:55  14   anything out of?

10:06:58  15   A.  No, there was nothing in her phone related to -- she

10:07:01  16   actually had gotten rid of the phone that she was communicating

10:07:05  17   with the people with, and it got damaged.  She got a new phone.

10:07:08  18   We did try to do an extraction to see if there was anything in

10:07:11  19   there we could use, and we didn't find any evidence in her

10:07:11  20   phone.

10:07:13  21   Q.  Okay.  And if you could tell the members of the jury how it

10:07:17  22   is that your investigation let you to C.J.

10:07:22  23   A.  So there were communications between MVLex and another

10:07:27  24   account called S---------r, and we -- her name was mentioned in

10:07:35  25   the communications S.M., S.M.  We were able to trace that name

10:07:39  1    to an account that came back to Indiana, at which time we sent

10:07:43  2    out a lead to Indiana to try to make contact with the juvenile.

10:07:46  3    Q.  And ultimately you were able to make contact with the

10:07:47  4    juvenile who was C.J.?

10:07:52  5    A.  Yes.  And we also found out that that there was a report

10:07:55  6    already made in her county for that investigation as well.

10:08:00  7    Q.  Okay.  And some of these victims who law enforcement went

10:08:05  8    out to pay a visit to and to interview them, did you find out

10:08:08  9    that they had not yet told their parents?

10:08:11  10   A.  Yes.  Several victims did not tell their parents.

10:08:15  11   Q.  So many of the times that you went out to investigate, was

10:08:22  12   law enforcement or the FBI the first ones to tell these minors'

10:08:23  13   parents what had been happening?

10:08:26  14   A.  That's correct.  The first time the parents were hearing

10:08:29  15   about it is when Detective Granit and I showed up at the door.

10:08:35  16   Q.  Okay.  How did your investigation lead you to victim A.G.?

10:08:39  17   A.  So victim A.G., there were screenshots of A.G. in the Galaxy

10:08:44  18   Note 3.  We actually had assistance from Detective Justin

10:08:51  19   Oksanen from Virginia.  He was able to, through social media,

10:08:55  20   identify a school that she possibly went to, and we determined

10:09:00  21   from further investigation that in fact it was -- A.G. did go to

10:09:05  22   a high school in Texas and Detective Granit went out there to

10:09:13  23   interview her.

10:09:13  24            COURT SECURITY OFFICER:  Excuse me, Counsel.  Can you

10:09:13  25   get closer to the microphone?

10:09:13   1              THE WITNESS:  Okay.

10:09:13   2          BY MS. ANTON:

10:09:21   3      Q.  Detective Bieber, did you also find Instagram chats in the

10:09:26   4      Defendant's Instagram account between the Defendant and A.G.?

10:09:30   5      A.  Well, no.  So there were communications between -- with the

10:09:36   6      name A.G. on it.  There was an account created with A.G.'s name.

10:09:40   7      Q.  So you found an account that the Defendant had in his phone,

10:09:43   8      communications, using A.G.'s persona.

10:09:46   9      A.  Persona to extort other girls, yes.

10:09:51  10      Q.  And was this concept of using one juvenile to try to extort

10:09:54  11      another juvenile something that you hadn't seen before?

10:09:57  12      A.  No, this was consistent through his phone.  He would use

10:10:03  13      other accounts or personas to solicit or extort other girls.  So

10:10:08  14      when a child would receive a request or a communication from

10:10:13  15      him, it showed the persona of another girl or child.

10:10:18  16      Q.  So because you knew that that was the sort of MO, modus

10:10:22  17      operandi if you will, did it surprise you to learn that some of

10:10:25  18      the victims in this case were friends with each other?

10:10:28  19      A.  Yes.  So he would infiltrate -- once he was able to

10:10:33  20      infiltrate the Snapchat accounts, he would go after the circle

10:10:36  21      of friends within the account, and start attacking the other

10:10:40  22      accounts using the persona of the previous victim.

10:10:45  23      Q.  So it didn't surprise you then when M.K. and A.M. knew each

10:10:45  24      other.

10:10:46  25      A.  No, it did not.

10:10:52   1    Q.   Okay.  So let's talk about the other two we heard from, B.O.

10:10:55   2    and B.F., B. both.

10:11:00   3         How did the investigation reveal that they were victims

10:11:01   4    in this case?

10:11:06   5    A.   For B.F., we found images to support what she was saying

10:11:10   6    about the image that she had provided to the person that was

10:11:16   7    extorting her, and with B.O., we discovered that through -- his

10:11:21   8    Skype account, Skype communications with the juvenile who we

10:11:24   9    later tracked back to a house in South Florida.

10:11:28   10   Q.   So in terms of B.O., she wasn't identified until you were

10:11:30   11   able to look through the Defendant's phone and see that there

10:11:32   12   was a Skype video call?

10:11:38   13   A.   Right.  There were Skype chats between B.O. and Mr. Woodson,

10:11:41   14   and there were images from the Skype chats that were contained

10:11:43   15   within his phone.

10:11:47   16   Q.   Now, let's talk a little bit about Dropbox and Snapchat,

10:11:50   17   because you mentioned finding those applications in the

10:11:55   18   Defendant's phone.  You mentioned that Dropbox is a file sharing

10:11:56   19   application.

10:11:57   20   A.   Yes.

10:12:02   21   Q.   Did you do legal process and serve it on Dropbox to find out

10:12:05   22   more about the Defendant's Dropbox account?

10:12:09   23   A.   We did.  Actually, the first search warrant that we did on

10:12:13   24   Dropbox, we did it on three e-mail addresses, the

10:12:17   25   chaos_demise@yahoo.com, which is the user name for the Dropbox

10:12:20   1    that we found in his Note 3, but during his interview he

10:12:22   2    provided two other names or two other e-mail addresses:

10:12:29   3    dark_chaos19@yahoo.com, and dark_chaos254@yahoo.com, so I

10:12:31   4    submitted legal process for all three.

10:12:33   5    Q.   And is that because the Dropbox accounts are linked to an

10:12:34   6    e-mail address?

10:12:35   7    A.   Yes, they are.

10:12:38   8    Q.   Okay.  So when you did your search warrants for the Dropbox

10:12:40   9    accounts, did you get records back from Dropbox?

10:12:41  10    A.   I did.

10:12:44  11    Q.   And could you tell the ladies and gentlemen of our jury what

10:12:46  12    that told you, what was in there?

10:12:49  13    A.   Right.  So the first thing when I got the returns from

10:12:55  14    Dropbox pursuant to search -- executing the search warrant, was

10:12:59  15    the user information from the account.  There was no accounts

10:13:05  16    connected to the 254 e-mail or the dark_chaos19, it was only

10:13:11  17    linked to the chaos_demise@yahoo.com.  It provided a user ID for

10:13:15  18    the account and they provided a file structure with all the

10:13:16  19    contents within.

10:13:19  20    Q.   And did you create an exhibit to demonstrate that for the

10:13:19  21    jury?

10:13:20  22    A.   I did.

10:13:23  23    Q.   We'll go over that in a moment.  But in general, his Dropbox

10:13:27  24    account, is Dropbox set up so that you can share things with

10:13:29  25    other people?

10:13:32   1    A.  You can set either the account or certain folders to be

10:13:38   2    shared, but in the user account, even though that you set it for

10:13:44   3    sharing, that doesn't mean that people have rights to add,

10:13:46   4    delete or modify any files within.  If they are set to be an

10:13:49   5    administrator, they would be listed on the user information.

10:13:54   6    Q.  So did you find in the Dropbox search warrant return how the

10:13:55   7    Defendant had set up that Dropbox account?

10:13:59   8    A.  So in the route directory of the Defendant's phone there was

10:14:03   9    three folders.  One of them was called "yep", Y-E-P.  That

10:14:07  10    folder was set up to be shared, and what that meant is there

10:14:11  11    were no other users that had access to add, modify or delete,

10:14:14  12    but he did set up that folder for other people to view.

10:14:23  13    Q.  Okay.  And in talking about Dropbox, you mentioned this

10:14:29  14    "yep" folder which you have an exhibit to demonstrate.  But were

10:14:32  15    there many pictures of girls that were child pornography

10:14:33  16    contained within that Dropbox --

10:14:34  17    A.  Yes.

10:14:37  18    Q.  -- folder?  And were they categorized in a certain way?

10:14:41  19    A.  They were categorized the same way that the camera roll in

10:14:45  20    the Galaxy Note 3 was organized, by the names of the victims on

10:14:49  21    each folder and within those folders were pictures of victims

10:14:50  22    that had been extorted.

10:14:52  23    Q.  Now, let's talk a little bit about Snapchat, because you

10:14:57  24    found evidence of extortion through Snapchat on the Note 3; is

10:14:58  25    that correct?

10:15:00  1   A.  On the Note 3 from Snapchat.

10:15:03  2   Q.  Did you find the Snapchat accounts on the Note 3?

10:15:06  3   A.  Yes.  So there were profile images from Snapchat in the

10:15:07  4   phone.

10:15:11  5   Q.  Okay.  So you say profile images from Snapchat in the phone.

10:15:13  6   So let's break that down a little bit, right?

10:15:14  7   A.  Yes.

10:15:17  8   Q.  Where were these images found in the phone?

10:15:23  9   A.  So they were contained in this camera roll with all the

10:15:25  10  child pornography images that were taken from victims that had

10:15:31  11  been extorted.  Their Snapchat profiles were also included in

10:15:34  12  the contents of the phone which is their user names, their real

10:15:37  13  names.  Some of them provided their real phone numbers in the

10:15:40  14  accounts.  So once they had the real phone numbers, anyone who

10:15:43  15  wanted to communicate with these girls can use that information

10:15:44  16  to contact them.

10:15:47  17  Q.  Okay.  And there were screenshots that you found.

10:15:48  18  A.  That's correct.

10:15:51  19  Q.  Okay.  Did you also find something called a snap list

10:15:52  20  somewhere in the phone?

10:15:56  21  A.  So the snap list wasn't found in the phone, the snap list

10:15:57  22  was found in the Dropbox account.

10:16:00  23  Q.  Okay.  So tell us about the snap list which relates to

10:16:02  24  Snapchat, right?  But you found in it the Dropbox app.

10:16:08  25  A.  Yes.  So within the yep folder of the Dropbox account, there

10:16:12  1    was another folder called snap list or list.  In that there was

10:16:18  2    a text file called snap list.  In the folder there was contents

10:16:23  3    of user names from Snapchat, and then there was like a directive

10:16:28  4    about the passwords being used for those accounts.

10:16:32  5    Q.  Okay.  And when you say there was a directive about

10:16:39  6    passwords being used for the accounts, I'll show you an exhibit

10:16:42  7    referencing that, but can you tell the ladies and gentlemen of

10:16:48  8    the jury that after this list of names and passwords, what was

10:16:50  9    that bottom sentence talking about in terms of the user names?

10:16:56  10   A.  It says that the password for these accounts were -- the

10:17:00  11   passwords for these accounts were changed to two different

10:17:05  12   passwords.  I don't recall the passwords offhand, I'll have to

10:17:08  13   look at the exhibit.  But if the accounts were -- if the

10:17:11  14   passwords didn't work, then that means that the accounts were

10:17:13  15   either taken back or they were deleted.

10:17:20  16   Q.  Okay.  Did you find evidence in the phone, in terms of chats

10:17:25  17   back and forth, between MVLex which is the Defendant's Kik name

10:17:30  18   and that Bozy11 as it relates to some of the girls in this case?

10:17:36  19   A.  With MVLex3 and Bozy11 there were direct messages that we

10:17:38  20   spoke about earlier.  There was also a screenshot that I found

10:17:40  21   between the two of them.

10:17:43  22   Q.  Okay.  Now, when you talk about these communications between

10:17:47  23   the two of them, are you talking about MVLex3 and Bozy11?

10:17:47  24   A.  Yes.

10:17:52  25   Q.  And you did legal process on the Bozy11 user name to find

10:17:54   1   out where the IP address was?

10:17:59   2   A.  Yes.  So we sent Kik legal process, and it was determined

10:18:02   3   from the returns that the IP addresses came back to Ireland for

10:18:04   4   Bozy11.

10:18:09   5   Q.  And in terms of your investigation into who the person

10:18:11   6   behind Bozy11 is, is that still ongoing?

10:18:16   7   A.  Yes, there's ongoing investigation.  We are working with the

10:18:18   8   Gardaí from Ireland, which is the law enforcement agency in

10:18:23   9   Ireland, to continue to work this investigation regarding the

10:18:23   10   gentleman from Ireland.

10:18:29   11   Q.  Okay.  And did you find chats between the Defendant and the

10:18:35   12   person in Ireland discussing what victims in this case should be

10:18:36   13   made to do?

10:18:40   14   A.  Yes.  There was communications between January of 2018 where

10:18:44   15   they were discussing how they were going to extort these girls

10:18:46   16   and what methods they were using.

10:18:52   17   Q.  And did you also find chat messages or screenshot of chat

10:18:57   18   messages seeming to indicate that this was a game?

10:19:02   19        MR. NATALE:  Objection, Your Honor.  As far as the

10:19:03   20   testimony, she's leading.

10:19:06   21        THE COURT:  I'm sorry.  It's a combination of things,

10:19:09   22   that she's leading?  Yes, you have been leading all the way but

10:19:13   23   this is the first objection, so I don't spontaneously deal with

10:19:18   24   objections often.  Don't lead, okay?  This is not a young person

10:19:20   25   that you need to lead.  This is a person that supposedly

```
10:19:22   1   experienced.
10:19:24   2               MS. ANTON:  I will ask another question.
10:19:26   3               THE COURT:  Ask questions.
10:19:26   4               MS. ANTON:  Thank you.
10:19:26   5          BY MS. ANTON:
10:19:31   6    Q.  Detective Bieber, what did you find in the phone about
10:19:33   7    playing a game?
10:19:40   8    A.  So I found a screenshot of a group chat, the display name on
10:19:45   9    the group chat was Taylor Keenan.  Taylor Keenan is a display
10:19:48  10    name for Woodson's account, the pyro account.  I can't tell you
10:19:51  11    who the other two people are because they only show icons, but
10:19:57  12    the communications between the two were of -- they were --
10:19:59  13    they're obviously in a partnership.  There was an agreement made
10:20:02  14    about the girls and they were fighting because now they're
10:20:06  15    becoming territorial about the girls that they were talking to.
10:20:08  16    Q.  Okay.  And territorial in what way?
10:20:12  17    A.  They, you know, didn't want each other talking to certain
10:20:16  18    girls or saying hey, this is my girl or don't post those images
10:20:19  19    of her yet.  And then he would go that's too late, I did it
10:20:23  20    already, and one of them would get angry about it.
10:20:32  21               MS. ANTON:  Permission to approach to show Government's
10:20:33  22    56?
10:20:35  23               THE COURT:  You may.
10:20:41  24               MS. ANTON:  61 and 62 which are the extractions of the
10:20:43  25    phones.
```

| | | |
|---|---|---|
| 10:21:02 | 1 | (Counsel conferring) |
| 10:21:05 | 2 | MR. NATALE:  No objection, Your Honor. |
| 10:21:07 | 3 | THE COURT:  Give me the numbers again please? |
| 10:21:13 | 4 | MS. ANTON:  Yes, Judge.  Government's 61, 62 and 56. |
| 10:21:19 | 5 | THE COURT:  Without objection, 61, 62 and 66 A through |
| 10:21:21 | 6 | D *(sic)* is that what that is? |
| 10:21:21 | 7 | MS. ANTON:  Yes. |
| 10:21:25 | 8 | THE COURT:  Admitted in evidence. |
| 10:21:25 | 9 | (Government's 61, 62 & 56 A-B in evidence) |
| 10:21:26 | 10 | MS. ANTON:  Thank you, Your Honor.  May I publish? |
| 10:21:29 | 11 | THE COURT:  You may. |
| 10:21:29 | 12 | BY MS. ANTON: |
| 10:21:49 | 13 | Q.  Detective Bieber, I'm going to show you Government's 56 A |
| 10:21:53 | 14 | and B, 61 and 62 which are in evidence.  Do you know what these |
| 10:21:57 | 15 | Blu-ray discs contain as it relates to the Defendant's |
| 10:21:57 | 16 | cellphones? |
| 10:22:02 | 17 | A.  Yes.  So this Blu-ray contains the binary image from the |
| 10:22:02 | 18 | Galaxy Note 3. |
| 10:22:05 | 19 | Q.  So is this the physical extraction you were talking about |
| 10:22:08 | 20 | that you put -- that you took out of the Defendant's phone and |
| 10:22:09 | 21 | put on a disc? |
| 10:22:13 | 22 | A.  Yes.  This is actually the binary image that was created by |
| 10:22:20 | 23 | EDAU or TAU from the FBI when we did the full extraction. |
| 10:22:29 | 24 | Q.  And showing you Government's 61.  Is that also the physical |
| 10:22:35 | 25 | extraction of the Defendant's Samsung phone?  Do you need me to |

10:22:39  1    move it so you can see the title?

10:22:49  2    A.   Yes.  This one is of the S7.  This is the G935P, which is

10:22:51  3    not the Note 3.

10:23:03  4    Q.   And Government's 62, is this the extraction of the Galaxy S8

10:23:06  5    phone that we're talking about?

10:23:07  6    A.   Yes.

10:23:40  7                 (Counsel conferring)

10:24:06  8                 THE COURT:  I guess I could just go find a wall to

10:24:09  9    pound my head against, but I thought I had said I don't want

10:24:12  10   this sort of delay while the jury is sitting in here.  Show them

10:24:15  11   the stuff the night before, and then if you've changed it,

10:24:18  12   you're in big trouble.  If you haven't changed it, then they can

10:24:21  13   look at their version of it and object or not object.  Is there

10:24:23  14   any objection to whatever the heck it is we're talking about

10:24:25  15   now?

10:24:25  16                 MR. NATALE:  Yes, Your Honor, because it's not the

10:24:27  17   complete extractions.

10:24:29  18                 THE COURT:  Okay.  Under the Rule of Completeness, you

10:24:33  19   think there's something else that should be put in there?

10:24:35  20                 MR. NATALE:  Yes, we think the entire extractions

10:24:36  21   should be put in there.

10:24:39  22                 THE COURT:  Well ladies and gentlemen, if you'll excuse

10:24:42  23   us, we'll talk about this for a couple minutes.

10:24:45  24                 COURT SECURITY OFFICER:  All rise for the jury.

10:24:47  25                 (Jury out at 10:24 a.m.)

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED BY COMPUTER

```
10:24:58   1              THE COURT:  What exhibit number are we talking about?
10:25:02   2              MS. ANTON:  Judge, well first of all, these are exhibit
10:25:04   3    numbers 31 and 35.
10:25:06   4              THE COURT:  Is that what we were talking about just
10:25:07   5    now?
10:25:08   6              MS. ANTON:  Right now, yes.
10:25:09   7              THE COURT:  31 and 35.  Okay.
10:25:13   8              MS. ANTON:  31 and 35.
10:25:25   9              THE COURT:  Be seated please.  Wait until the door
10:25:29  10    closes.  Wait until the door closes.
10:25:31  11              MS. ANTON:  I'm sorry.
10:25:34  12              THE COURT:  Okay.  What is it?
10:25:40  13              MS. ANTON:  Judge, 31 and 35 are pieces of Government's
10:25:46  14    Exhibit 57 which is the entire Snapchat return, which is part of
10:25:50  15    a stipulation that the defense has signed, and I plan on
10:25:54  16    providing it to the Court and entering all of these stipulations
10:25:58  17    into evidence.  So the defense has been shown all of this, Your
10:25:58  18    Honor.
10:26:01  19              THE COURT:  Wait.  67 you're telling me -- you're
10:26:05  20    telling me that 31 and 35 are subsumed in 67?
10:26:08  21              MS. ANTON:  57.  5-7.
10:26:09  22              THE COURT:  57?  5-7?
10:26:10  23              MS. ANTON:  Correct.
10:26:12  24              THE COURT:  And you are going to offer 57?
10:26:13  25              MS. ANTON:  Yes, Judge.
```

10:26:15  1        THE COURT:  Then offer them all at the same time.

10:26:18  2   What's the complaint then?

10:26:19  3        MR. NATALE:  Your Honor, we have no complaint if

10:26:23  4   they're all offered at the same time.  What is happening here is

10:26:31  5   we were told this is stuff that's going to come in, but we were

10:26:34  6   never given -- this is what Exhibit 13 is going to be.  Never

10:26:38  7   said this is what it's going to be as far as what portion of

10:26:38  8   something --

10:26:40  9        THE COURT:  Okay.  Then that's not what I said I wanted

10:26:44  10  you to do.  What I want you to do is to tell them exactly what

10:26:46  11  it is you're going to offer the next day so that they can look

10:26:49  12  at that, if they don't have it, they can ask you for it.  If

10:26:52  13  they do have it, they can review their copy of it.  Do they have

10:26:56  14  a copy of 31?

10:26:59  15       MS. ANTON:  Yes, they should have a copy of 31.

10:27:01  16       THE COURT:  Okay.  Then what's the problem?  Why don't

10:27:04  17  you look at 31 and tell us what -- you know, tell us what your

10:27:06  18  objection is.

10:27:08  19       MR. NATALE:  Judge, they never sent us anything that

10:27:12  20  said this is Exhibit 31.

10:27:13  21       THE COURT:  Okay.

10:27:16  22       MS. ANTON:  Judge, I filed my exhibit list well before

10:27:17  23  this trial started.

10:27:20  24       THE COURT:  I understand, but did you have the pieces

10:27:24  25  of paper that are contained within 31, listed as 31?  Did you

| | |
|---|---|
| 10:27:28 | 1 |
| 10:27:29 | 2 |

show them -- did you have a stamp on those papers saying that it

was 31?

      MS. ANTON:  When the defense team came to the

government's office and spent hours with us, I showed them every

piece of paper and exhibit that I'm going to put in, Judge.  At

that time it didn't have a number on it.

      THE COURT:  I'm not -- I mean, I was a prosecutor.  I'm

very familiar with showing a room full of documents and saying

it's in there.

      MS. ANTON:  No, that's not what we did, Judge.

      THE COURT:  That doesn't work.

      MS. ANTON:  We didn't do that.  We sat with them for

hours and went over with the agent.

      THE COURT:  I understand, but if they don't know that

-- if they don't know what 31 consists of, then they can't very

well make any objection to it when it comes in without reading

the whole thing, and that's what I told you I wanted to avoid.

I don't like juries sitting around twiddling their thumbs, and

they now have spent about ten minutes doing absolutely nothing

when we try to finish.  No wonder you thought this case was

going to take two weeks.  It is not a two week case.  It is a

one week case, maybe.

      Let's see.  What you want is you want -- you don't want

31 in by itself because it is not complete.  Under the Rule of

Completeness, you think other stuff should come in with it.  I

10:28:39   1    do not have any problem with them putting in 57, is that what it

10:28:43   2    was?  5-7?  And the other two, and then you can explain to them.

10:28:48   3    You can go to 57 and argue those aspects of it, but they can

10:28:52   4    emphasize the parts they want to emphasize.  That's fine.  Why

10:28:54   5    don't you do that.  That might be easier.

10:28:56   6          MR. NATALE:  Judge, I have no objection --

10:28:57   7          THE COURT:  Is that a problem?

10:28:59   8          MS. ANTON:  No, Judge.  That's what I thought we were

10:29:00   9    going to do and when we spoke, that was the understanding I had.

10:29:03  10          THE COURT:  Offer it all at the same time.  So his

10:29:07  11    complaint is that 31 is not complete, that there's other stuff.

10:29:10  12    And I can understand that based on the theory that I have seen

10:29:14  13    coming forward for this -- for the defense, but I think they're

10:29:18  14    entitled to argue that and they will have the tools to argue

10:29:20  15    that if you put 57 in there.

10:29:22  16          MS. ANTON:  I was going to put 57 in as well, Judge.

10:29:23  17    It was coming in --

10:29:26  18          THE COURT:  Well, do them all at the same time.  Let's

10:29:30  19    bring the jury back in and we'll do it all at the same time and

10:29:32  20    you'll have no objection with all of them coming in -- Tony?

10:29:37  21    You can bring to the jury's attention that 57 includes more than

10:29:38  22    31.

10:29:39  23          MR. NATALE:  Yes.

10:29:42  24          THE COURT:  Okay.  You can do that during your cross or

10:29:44  25    whoever is crossing.  All right.  Thank you.

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED BY COMPUTER

```
10:29:56   1              I don't like long trials.  Juries don't like long
10:30:00   2     trials.  I don't want people plotting and scheming how to get
10:30:16   3     out of jury duty any more than they already do.  I knew we
10:30:19   4     should have put more bathrooms in that jury room.  Two isn't
10:30:21   5     enough.
10:31:34   6              (Jury in at 10:31 a.m.)
10:32:06   7              THE COURT:  All right.  You may proceed.  Please offer
10:32:09   8     whatever you're going to offer now in the presence of the jury.
10:32:11   9              MS. ANTON:  Thank you, Judge.  At this time, I'd also
10:32:12   10    move 57 into evidence.
10:32:17   11             THE COURT:  57?  Is it 57.  Without objection,
10:32:19   12             MR. NATALE:  That's correct.  No objection to 57.
10:32:19   13             (Government's exhibit 57 in evidence)
10:32:23   14             MS. ANTON:  May I publish, Judge?
10:32:26   15             THE COURT:  You may.
10:32:26   16        BY MS. ANTON:
10:32:28   17    Q.  Detective Bieber, I have on the ELMO Government's 57 which
10:32:31   18    is in evidence.  What are these?
10:32:35   19    A.  These are the Snapchat return records from Snapchat for the
10:32:36   20    accounts listed on the disc.
10:32:40   21    Q.  Okay.  And when you say Snapchat return records, does that
10:32:43   22    mean that these are documents you received from them?
10:32:45   23    A.  That's correct, pursuant to the search warrant.
10:32:49   24    Q.  I'm going to now show you Government's 35.
10:32:55   25             MS. ANTON:  Did 35 get moved into evidence prior to our
```

10:32:58   1    break, Your Honor?  I had forgotten.

10:32:59   2         THE COURT:  Which number?

10:33:01   3         MS. ANTON:  35.  It was marked.

10:33:04   4         THE COURT:  35 is not in evidence.  No.

10:33:04   5         MS. ANTON:  Thank you, Judge.

10:33:07   6         THE COURT:  You offer it?

10:33:10   7         MS. ANTON:  Yes, I would like to offer 31 and 35 into

10:33:10   8    evidence.

10:33:13   9         MR. NATALE:  Your Honor, these are two documents that

10:33:15  10    are extractions from 57.

10:33:18  11         THE COURT:  Okay.  Well, I think they can do that.

10:33:22  12    You'll understand they're not separate, these are parts that

10:33:26  13    have been extracted for whatever her purpose is.  You may go

10:33:29  14    into the rest of 57 if you wish.

10:33:30  15         MR. NATALE:  We will, Your Honor.  Thank you.

10:33:31  16         MS. ANTON:  Thank you, Judge.

10:33:31  17         (Government's Exhibit 31 & 35 in evidence)

10:33:31  18    BY MS. ANTON:

10:33:35  19    Q.  Detective, I'm showing you on the ELMO what has been entered

10:33:44  20    into evidence as Government's 35.  Before we start with the

10:33:50  21    details of Government's 35, where did you get Government's 35,

10:33:53  22    which is an excerpt, where did you get it from?

10:33:57  23    A.  So these are records that were obtained from Snapchat and

10:34:04  24    it's the chat logs and the IP history for the accounts.

10:34:06  25    Q.  Okay.  So when you say records obtained from Snapchat, is

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED BY COMPUTER

| | | |
|---|---|---|
| 10:34:10 | 1 | that Government's 57 which contains the complete records? |
| 10:34:11 | 2 | A.  That's correct. |
| 10:34:16 | 3 | Q.  So 35 that I have on the ELMO now displayed, is that just a |
| 10:34:20 | 4 | part of 57 the entire record? |
| 10:34:24 | 5 | A.  Well, the one that you're showing me now is for the account |
| 10:34:32 | 6 | that's listed on the left hand column which is the X--------X. |
| 10:34:34 | 7 | Q.  I'll let it focus for a second.  Can you see that? |
| 10:34:36 | 8 | A.  Yes. |
| 10:34:39 | 9 | Q.  And that was one of the accounts that was the subject of |
| 10:34:40 | 10 | your search warrant? |
| 10:34:43 | 11 | A.  Correct.  This is the account that belongs to Victim 1. |
| 10:34:44 | 12 | Q.  I'm sorry.  Did you say Victim 1? |
| 10:34:45 | 13 | A.  Yes. |
| 10:34:46 | 14 | Q.  Is that M.K.? |
| 10:34:46 | 15 | A.  Yes. |
| 10:34:51 | 16 | Q.  Okay.  So can you explain to the ladies and gentlemen of our |
| 10:34:57 | 17 | jury what this column and graph chart, what is that? |
| 10:35:01 | 18 | A.  So these are communications and times that the |
| 10:35:04 | 19 | communications and logins occurred.  You'll notice at the top, |
| 10:35:08 | 20 | the top left corner, it provides a user name, then it's |
| 10:35:18 | 21 | X-------X, and then there's a K.T.  So this is actually a |
| 10:35:22 | 22 | communication on the first row of the communications from M. to |
| 10:35:26 | 23 | the other account where she's providing her user name and |
| 10:35:26 | 24 | password. |
| 10:35:30 | 25 | Q.  Okay.  So when you see X--------X in the left corner, is |

10:35:33   1    that the user name that you mentioned for M.K.?

10:35:40   2    A.   Yes.  So the most left column is the account, and then the

10:35:45   3    second column and third column is determining its to and from.

10:35:56   4    So the first row is from M. to K.T. account.

10:35:59   5    Q.   In the center column where we see words, is that the

10:36:00   6    Snapchat communication?

10:36:01   7    A.   Point to where you're --

10:36:03   8    Q.   This center column.

10:36:05   9    A.   Yeah, those are other communications within the account.

10:36:09   10   Q.   Okay.  And what is this column that I've just delineated?

10:36:14   11   The fifth column from the left, what are those numbers?

10:36:18   12   A.   Those are IP addresses that show the login into the account.

10:36:23   13   Q.   Does it also show the time and date of the login and logout?

10:36:24   14   A.   It does.

10:36:28   15   Q.   And do those login addresses represent IP addresses?

10:36:33   16   A.   Yes.  Those are times of login from that IP address.

10:36:41   17   Q.   And in this exhibit, is there a chat between X--------X user

10:36:44   18   ID, and K.M.?

10:36:47   19   A.   Yes.  So once the account was taken over by the person using

10:36:52   20   that IP address, the person now who is in control of the

10:36:57   21   X--------X account is now trying to get user name and passwords

10:37:00   22   from other accounts.

10:37:03   23   Q.   Okay.  And is that delineated in red on this account?

10:37:05   24   A.   Yes, it is.

10:37:13   25   Q.   And where does it begin?

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

| | | |
|---|---|---|
| 10:37:20 | 1 | A.  So if you can, if you're looking at -- so once he logs in, |
| 10:37:26 | 2 | it says login 70 -- it's the third yellow line that says login. |
| 10:37:29 | 3 | At that point he has control of the account. |
| 10:37:31 | 4 | Q.  When you say "he", who are you talking about? |
| 10:37:35 | 5 | A.  Well, first of all, that IP address came back to Woodson's |
| 10:37:39 | 6 | residence.  This is an account that he had taken over from |
| 10:37:41 | 7 | X--------X, the X--------X account. |
| 10:37:45 | 8 | Q.  So is this the communications between the Defendant and |
| 10:37:45 | 9 | X--------X? |
| 10:37:46 | 10 | A.  Yes. |
| 10:37:48 | 11 | Q.  Which is M.K. |
| 10:37:49 | 12 | A.  M.K., correct. |
| 10:37:58 | 13 | Q.  I'm going to show you now Government's 31 in evidence.  What |
| 10:38:04 | 14 | is that?  Is that a Snapchat return? |
| 10:38:07 | 15 | A.  Yes, this is another Snapchat return but this is for |
| 10:38:11 | 16 | *********. |
| 10:38:17 | 17 | Q.  And C-----------9, does that user ID belong to someone whom |
| 10:38:18 | 18 | you've come to know? |
| 10:38:23 | 19 | A.  Yes, that's victim A.K. |
| 10:38:29 | 20 | Q.  And do you also see the login and log out time, it's blurry. |
| 10:38:36 | 21 | The login and log out times for C---------L and her |
| 10:38:39 | 22 | communications with K.M.? |
| 10:38:40 | 23 | A.  Yes. |
| 10:38:43 | 24 | Q.  And does that IP address mean anything to you? |
| 10:38:47 | 25 | A.  That's another IP address used by -- that was resolves back |

10:38:49   1   to Woodson's residence.

10:38:51   2   Q.  When you say resolves back to Woodson's residence --

10:38:56   3   A.  It comes back to.  So when we did serve legal process to

10:38:59   4   Verizon, which is the company for that IP address, the address

10:39:02   5   that got in the returns was Joseph Woodson residence.

10:39:20   6   Q.  Okay.  Now, you mentioned finding a screenshot in the

10:39:28   7   Defendant's phone of victim M.K.  I'd like to approach and show

10:39:50   8   you Government's 39 for identification.

10:39:52   9        MS. ANTON:  Permission to approach, Your Honor?

10:39:54  10        THE COURT:  Yes.

10:39:54  11     BY MS. ANTON:

10:40:04  12   Q.  Detective Bieber, can you take a look at Government's 39 and

10:40:06  13   tell me if you recognize it?

10:40:06  14   A.  I do.

10:40:07  15   Q.  How do you recognize it?

10:40:13  16   A.  This is the Snapchat account belonging to X--------X, which

10:40:15  17   is M.K.  This is the profile for her account.

10:40:17  18   Q.  Is that a screenshot of her profile?

10:40:18  19   A.  Yes, it is.

10:40:20  20   Q.  And where did you get that screenshot from?

10:40:24  21   A.  It was from Woodson's Samsung Galaxy Note 3.

10:40:25  22   Q.  And is that a copy of it?

10:40:26  23   A.  Yes.

10:40:28  24   Q.  Is that in the same or similar condition to the way it

10:40:30  25   looked when it was in the Defendant's phone?

```
10:40:32   1    A.  Yes.
10:40:35   2           MS. ANTON:  At this time, the Government moves 35 into
10:40:37   3    evidence.
10:40:39   4           THE COURT:  35 is in evidence.
10:40:41   5           MS. ANTON:  I'm sorry, Judge.  It was 39.
10:40:43   6           THE COURT:  39 is not yet.  Objection?
10:40:45   7           MR. NATALE:  No objection.
10:40:47   8           THE COURT:  No objection, 39 is admitted in evidence.
10:40:49   9           (Government's Exhibit 39 in evidence)
10:40:49   10       BY MS. ANTON:
10:40:55   11   Q.  Detective Bieber, I'm publishing Government's 39 which is in
10:41:00   12   evidence.  Can you tell us what we see in this exhibit?
10:41:05   13   A.  The user name for her account, which is two emojis; her user
10:41:10   14   ID for the Snapchat account.  A birthday that she had put in
10:41:15   15   there and mobile number which does come back to her.  That is
10:41:16   16   her mobile number.
10:41:20   17   Q.  Okay.  This is a screenshot of something, correct?
10:41:22   18   A.  It's a screenshot of her Snapchat profile.
10:41:25   19   Q.  And you found -- where did you find this?
10:41:29   20   A.  That was in his Galaxy Note 3.
10:41:54   21   Q.  Now, in addition to that screenshot from the Note 3, you
10:41:57   22   testified that you found many other victims screenshots in the
10:41:58   23   Defendant's Note 3.
10:41:59   24   A.  That's correct.
10:42:05   25   Q.  Okay.  Showing you what's been marked for identification as
```

| | | |
|---|---|---|
| 10:42:11 | 1 | Government's 71 and 72 which I'll show defense counsel. |
| 10:42:38 | 2 | MS. ANTON:  At this time the Government would move 71 |
| 10:42:42 | 3 | and 72 into evidence. |
| 10:42:43 | 4 | THE COURT:  Any objection? |
| 10:42:44 | 5 | MR. NATALE:  No objection. |
| 10:42:46 | 6 | THE COURT:  Without objection, 71 and 72 are admitted |
| 10:42:48 | 7 | in evidence. |
| 10:42:49 | 8 | (Government's Exhibit 71 & 72 in evidence) |
| 10:42:52 | 9 | MS. ANTON:  Thank you, Judge. |
| 10:42:52 | 10 | BY MS. ANTON: |
| 10:42:57 | 11 | Q.  Detective Bieber, I have on the ELMO Government's Exhibit 71 |
| 10:43:02 | 12 | which is in evidence.  What is Government's 71? |
| 10:43:09 | 13 | A.  So this is a screenshot from the Samsung Galaxy Note 3. |
| 10:43:15 | 14 | You'll see on the bottom it says source which is SM-9900P, that |
| 10:43:19 | 15 | is the model number for that device.  This is a profile, |
| 10:43:26 | 16 | Snapchat profile of one of our victims, ██████████████.  And |
| 10:43:32 | 17 | then a phone number for her as well. |
| 10:43:39 | 18 | Q.  Now that Exhibit number 71 contains several pages.  What are |
| 10:43:46 | 19 | the remainder of the pages in Government's Exhibit 71? |
| 10:43:49 | 20 | A.  There are several of them there that are victims of accounts |
| 10:43:53 | 21 | that had been taken over and also of victims that we have |
| 10:43:55 | 22 | identified. |
| 10:44:01 | 23 | Q.  And is one of those K.L. and B.R.? |
| 10:44:07 | 24 | A.  Yes.  B.R. is B.F, the victim. |
| 10:44:15 | 25 | Q.  I'm going to put on the ELMO Government's Exhibit 72.  Now |

| | | |
|---|---|---|
| 10:44:18 | 1 | you testified that you recovered many screenshots of Snapchat |
| 10:44:23 | 2 | accounts located in the Defendant's Note 3 phone. |
| 10:44:24 | 3 | A.  Yes. |
| 10:44:30 | 4 | Q.  This is an exhibit consisting of a number of pages.  Are |
| 10:44:34 | 5 | those the screenshots of the Snapchat accounts that you found in |
| 10:44:36 | 6 | the Note 3 phone? |
| 10:44:40 | 7 | A.  These were screenshots, yes, that were contained in the |
| 10:44:43 | 8 | Woodson's Samsung Galaxy Note 3. |
| 10:44:48 | 9 | Q.  And does each page of Government's Exhibit 71 represent |
| 10:44:51 | 10 | multiple screenshots of multiple Snapchat accounts? |
| 10:44:53 | 11 | A.  Yes. |
| 10:45:58 | 12 | MS. ANTON:  Judge, without objection, the Government |
| 10:46:01 | 13 | would like to move in Government's 50. |
| 10:46:03 | 14 | THE COURT:  Is that 50? |
| 10:46:04 | 15 | MS. ANTON:  50. |
| 10:46:04 | 16 | THE COURT:  Yes. |
| 10:46:09 | 17 | MS. ANTON:  55, 59 -- |
| 10:46:13 | 18 | THE COURT:  55 is already in. |
| 10:46:14 | 19 | MS. ANTON:  Okay. |
| 10:46:15 | 20 | THE COURT:  59? |
| 10:46:16 | 21 | MS. ANTON:  59. |
| 10:46:18 | 22 | THE COURT:  That's already in too.  You want it in |
| 10:46:19 | 23 | twice? |
| 10:46:22 | 24 | MS. ANTON:  Yes, I'd like it in twice, please. |
| 10:46:24 | 25 | THE COURT:  Okay.  No. |

```
10:46:24   1            MS. ANTON:  67.
10:46:28   2            THE COURT:  That one is not in.  Okay.
10:46:31   3            MS. ANTON:  49 and 73.
10:46:36   4            THE COURT:  Okay.  All right.  Without objection?
10:46:36   5            MR. NATALE:  That's correct.
10:46:42   6            THE COURT:  49, 50, did you say 57?  No.  57.
10:46:44   7            MS. ANTON:  67.
10:46:50   8            THE COURT:  67.  Yeah.  67 are admitted in evidence.
10:46:50   9            (Government's Exhibits 49, 50 & 67 in evidence)
10:46:55  10            MS. ANTON:  Thank you, Judge.  Permission to publish.
10:46:58  11            THE COURT:  You may.
10:46:58  12        BY MS. ANTON:
10:47:05  13    Q.  All right, Detective Bieber.  Government's 50 on the ELMO.
10:47:07  14    Could you tell the ladies and gentlemen of the jury what
10:47:09  15    Government's 50 is?
10:47:15  16    A.  Yes.  This is from the Samsung Galaxy Note 3.  This was from
10:47:22  17    his contacts from TextNow for our victim B.O., her contact
10:47:23  18    information and phone number.
10:47:24  19    Q.  When you say "his", who are you referring to?
10:47:32  20    A.  This is from Woodson's Samsung Galaxy Note 3.  This is a
10:47:38  21    text that B.O. had received and also deleted.  The text says get
10:47:43  22    on Snapchat now or you'll be posted on story.
10:47:49  23    Q.  Okay.  And you mentioned that you found evidence of many
10:47:53  24    victims' contacts in the Defendant's phone.  So to that end, I'm
10:48:04  25    going to number for you Government'S 67.  Can you see what
```

```
10:48:05   1    Government's 67 is?
10:48:06   2    A.   I do.
10:48:08   3    Q.   What is Government's 67?
10:48:11   4    A.   So these are contacts that were found within the Galaxy Note
10:48:15   5    3 of victims' contact information.
10:48:20   6    Q.   And how would a contact get into the Defendant's phone?
10:48:24   7    A.   He either manually puts it into his phone or an application
10:48:28   8    that he's using.  So if you go back to the second page, it will
10:48:35   9    say MVLex3 contacts, so this was from his Kik contacts list.
10:48:47  10    Q.   Government's 49 is on the ELMO now.  What is that?
10:48:52  11    A.   More contacts of victims, in this case it was B.O.
10:48:55  12    Q.   And where was that found?
10:49:00  13    A.   This was the Samsung Galaxy Note 3.
10:49:29  14    Q.   Government's Exhibit 73.  What is Government's Exhibit 73?
10:49:33  15    A.   So this is, again, from Joseph Woodson's Samsung Galaxy Note
10:49:39  16    3.  If you go back to the first page, it actually shows the name
10:49:43  17    of the juvenile, E.M. and her contact phone number.
10:49:44  18    Q.   And is that a victim in this case?
10:49:45  19    A.   Yes.
10:49:49  20    Q.   And what does Page 2 of that exhibit show?
10:49:54  21    A.   It shows the juvenile A.K., her phone number.
10:49:55  22    Q.   Is that a victim in this case?
10:49:57  23    A.   Yes.
10:50:01  24    Q.   And what does the next page show?
10:50:05  25    A.   It shows our victim S.M. and her phone number, contact phone
```

10:50:06   1    number.

10:50:13   2    Q.   And where is this information located?

10:50:17   3    A.   It was contained within his contacts of his phone.

10:50:24   4    Q.   I'm putting on Government's 55 which is already in evidence,

10:50:27   5    which appears to be a screenshot.

10:50:27   6    A.   Yes.

10:50:30   7    Q.   Where did you find that screenshot?

10:50:35   8    A.   So originally I found the screenshot in Kik messenger, it

10:50:41   9    was between MVLex3 and Bozy11.  Bozy11 had mentioned that he had

10:50:46   10   gotten the victim A.C. back online and sent him a screenshot of

10:50:50   11   the communication to Mr. Woodson using MVLex3.

10:50:54   12   Q.   Okay.  So let me make sure I understand that.  So you found

10:50:57   13   this screenshot in the Defendant's phone.

10:50:57   14   A.   Yes, I did.

10:51:02   15   Q.   Okay.  And this screenshot, was it part of a conversation?

10:51:04   16   A.   Yes.  It was part of a conversation in Kik.

10:51:06   17   Q.   And it was part of a conversation in Kik between the

10:51:08   18   Defendant and who?

10:51:11   19   A.   And Bozy11, which is another co-conspirator.

10:51:15   20   Q.   Okay.  And what was the substance of that conversation that

10:51:16   21   you read in text message?

10:51:18   22   A.   The conversation, not the screenshot?

10:51:19   23   Q.   Not the screenshot.

10:51:22   24   A.   So they were talking about different girls, that they were

10:51:26   25   talking about extorting children and they were discussing who

| | | |
|---|---|---|
| 10:51:28 | 1 | they had online. |
| 10:51:32 | 2 | Q.   Okay.   And was A.C. someone that they mentioned was online? |
| 10:51:33 | 3 | A.   Yes. |
| 10:51:41 | 4 | Q.   Now we talked about victim A.G.   Do you remember that? |
| 10:51:42 | 5 | A.   Yes. |
| 10:51:45 | 6 | Q.   Okay.   And you found -- you testified that you found some |
| 10:51:52 | 7 | evidence on the Defendant's Instagram account regarding A.G. |
| 10:51:58 | 8 | I'm going to put on Government's 59.   Is this an extraction |
| 10:52:02 | 9 | report from the phone belonging to the Defendant that pertains |
| 10:52:04 | 10 | to Instagram account of A.G.? |
| 10:52:09 | 11 | A.   Yes, this is from Woodson's Samsung Galaxy Note 3.   This is |
| 10:52:14 | 12 | from his Instagram app, and this is where he uses -- he creates |
| 10:52:19 | 13 | an account, A.G., to communicate and extort other victims. |
| 10:52:27 | 14 | Q.   And does Exhibit 59 have 21 pages? |
| 10:52:31 | 15 | A.   You'll have to turn.   I can't see. |
| 10:52:40 | 16 | Q.   It's blurry.   Let me stop moving it so it's not so blurry. |
| 10:52:42 | 17 | A.   Is that the last page? |
| 10:52:43 | 18 | Q.   That's the last page. |
| 10:52:46 | 19 | A.   Then it is 21 pages. |
| 10:52:49 | 20 | Q.   In those 21 pages, what is the communication and what is |
| 10:52:53 | 21 | going on with the Defendant using A.G.'s account? |
| 10:52:57 | 22 | A.   So he -- one of his MOs is that he'll create a new account |
| 10:53:00 | 23 | with the user name of a victim and to solicit or extort other |
| 10:53:03 | 24 | victims, and that's -- in this case that's what he's doing. |
| 10:53:04 | 25 | Q.   Okay. |

10:53:08  1    A.  It's not a communication with A.G., it's an account that he

10:53:15  2    created in A.G.'s name using it as a display name.

10:54:41  3    Q.  Detective, while defense counsel is looking at the exhibits,

10:54:46  4    you mentioned that you found evidence of Instagram in the

10:54:48  5    Defendant's Note 3.

10:54:49  6    A.  Yes.

10:54:54  7    Q.  Okay.  Did you find any evidence of the Defendant sharing

10:54:57  8    child pornography as it pertains to the victims in this case

10:54:58  9    through Instagram?

10:55:02  10   A.  Yes.  So with the communications or direct messages between

10:55:09  11   MVLex3, which is Joseph Woodson's account, and Bozy11, there is

10:55:11  12   an exchange of child pornography.

10:55:16  13   Q.  Did you also find evidence in the phone of any Instagram

10:55:20  14   sharing of child pornography in the Defendant's behalf with

10:55:21  15   other user names?

10:55:24  16   A.  Yes.

10:55:29  17            MR. NATALE:  No objection to those.

10:55:29  18        BY MS. ANTON:

10:55:39  19   Q.  Did you find evidence of the Defendant sharing victim M.K.'s

10:55:42  20   pornographic images that he extorted from her on Instagram?

10:55:49  21   A.  Correct.  So using the Tulyn20 persona, and it's important

10:55:54  22   to know that the user name on the account was K.K., so his

10:55:58  23   persona was another female.  Using that, he would send images to

10:56:02  24   other people or other accounts with this persona of the victim

10:56:06  25   M.K. in order to try to get the victim to re-contact him.

| | | |
|---|---|---|
| 10:56:08 | 1 | MS. ANTON:  Okay.  I'd like to move at this time |
| 10:56:11 | 2 | Government's 78 into evidence without objection, I believe. |
| 10:56:11 | 3 | MR. NATALE:  No objection. |
| 10:56:13 | 4 | THE COURT:  Without objection, 78 is admitted in |
| 10:56:15 | 5 | evidence. |
| 10:56:16 | 6 | MS. ANTON:  Permission to publish, Your Honor? |
| 10:56:19 | 7 | THE COURT:  You may. |
| 10:56:19 | 8 | BY MS. ANTON: |
| 10:56:23 | 9 | Q.  Detective Bieber, I have on the ELMO Government's 78 in |
| 10:56:27 | 10 | evidence.  What is Government's 78? |
| 10:56:32 | 11 | A.  This is from the Tulyn20 account.  This is an image of the |
| 10:56:40 | 12 | victim M.K. and it's being sent to the names listed in the |
| 10:56:42 | 13 | display names. |
| 10:56:47 | 14 | Q.  In this display names area, we see what looks like number, |
| 10:56:51 | 15 | maybe phone numbers and several names? |
| 10:56:53 | 16 | A.  It says number of participants, five. |
| 10:56:54 | 17 | Q.  What does that mean? |
| 10:56:57 | 18 | A.  That means that five people are getting these images. |
| 10:57:00 | 19 | Q.  Does it tell you which account is sending these image out? |
| 10:57:09 | 20 | A.  Yes.  It's -- this is local user Tulyn20. |
| 10:57:14 | 21 | Q.  Okay.  So are these Instagram messages that Tulyn20 sent out |
| 10:57:17 | 22 | to those users listed in the display names? |
| 10:57:18 | 23 | A.  Yes. |
| 10:57:22 | 24 | Q.  And do those Instagram messages contained child pornography |
| 10:57:27 | 25 | that M.K. was forced to produce? |

| | | |
|---|---|---|
| 10:57:31 | 1 | A.  Right.  So he -- the produced images were being |
| 10:57:36 | 2 | re-distributed through Instagram. |
| 10:57:49 | 3 | Q.  And Government's Exhibit 78 is -- there several other users |
| 10:57:51 | 4 | listed in the display names? |
| 10:57:54 | 5 | A.  Yes.  It says five participant. |
| 10:57:58 | 6 | Q.  And are those different than the ones listed on the first |
| 10:57:59 | 7 | couple pages? |
| 10:58:00 | 8 | A.  Yes. |
| 10:58:06 | 9 | Q.  Okay.  So is Government's Exhibit 78 a compilation of all of |
| 10:58:10 | 10 | the times that the Defendant's Instagram account, Tulyn20, |
| 10:58:15 | 11 | distributed the images of M.K. via Instagram? |
| 10:58:16 | 12 | A.  Yes. |
| 10:58:24 | 13 | Q.  Did you find evidence from the Defendant's Instagram account |
| 10:58:28 | 14 | that he distributed images of C.J.? |
| 10:58:28 | 15 | A.  Yes. |
| 10:58:29 | 16 | Q.  Through Instagram? |
| 10:58:34 | 17 | A.  Yes.  He distributed the images to other Instagram users of |
| 10:58:39 | 18 | pictures that were contained within his phone. |
| 10:58:44 | 19 | Q.  On the ELMO I have Government's 80 in evidence.  What is |
| 10:58:46 | 20 | Government's 80? |
| 10:58:53 | 21 | A.  So this is a picture of S.M., and the local user or the |
| 10:58:56 | 22 | person who was sending out the images is Tulyn20. |
| 10:59:02 | 23 | Q.  Okay.  And is Government's 80 an exhibit containing multiple |
| 10:59:06 | 24 | pages and instances of times where the Defendant using Tulyn20 |
| 10:59:12 | 25 | sent C.J.'s image out to other users on Instagram? |

10:59:14   1    A. Yes.

10:59:24   2    Q. And those display names are all indicated up at the top of

10:59:26   3    the exhibit?

10:59:28   4    A. Yes.

10:59:38   5    Q. It also contains on the exhibit a date of 1-7-2018. Would

10:59:41   6    that be the date that the file was sent out?

10:59:45   7    A. So the first date is when the first message was sent out and

10:59:49   8    then the last one would be when the last message was sent out.

10:59:52   9    Q. Okay. So we're looking at -- here it says number of

10:59:57   10    messages 148, beginning on January 7th of 2018 and continuing

11:00:00   11    through 7-10-2018?

11:00:02   12    A. Correct.

11:00:30   13    Q. And you mentioned on the S8 phone, the Galaxy that was taken

11:00:34   14    after the Defendant was arrested, that you also found child

11:00:35   15    pornography pertaining to M.K.

11:00:36   16    A. Yes.

11:00:43   17    Q. Okay. I have on the ELMO Government's Exhibit 40. Can you

11:00:46   18    explain to the ladies and gentlemen of the jury what the

11:00:49   19    extraction in Government's 40 shows.

11:00:54   20    A. So these were images that were contained within the Joseph

11:01:01   21    Woodson's Galaxy S8. These are images that M.K. previously sent

11:01:07   22    to Woodson in another exchange which was still contained, and

11:01:11   23    one of these images were used -- were sent back to the victim

11:01:15   24    through Instagram on the date of his arrest.

11:01:24   25    Q. And while we're talking about M.K. on Instagram, I'd like to

```
11:01:36   1   show you Government's Exhibit 81.  Is her user ID ******?
11:01:36   2   A.  Yes.
11:01:38   3   Q.  And what is Government's Exhibit 81?
11:01:44   4   A.  So this is a communication -- it's an exact replica or
11:01:47   5   communication of the chats -- I just made it a little more
11:01:54   6   easier to read -- of the Tuylin20 communicating with M.K.
11:02:00   7   Q.  And throughout the course of these chats, is Tuylin20, the
11:02:04   8   Instagram account belonging to the Defendant, extorting M.K. to
11:02:06   9   send child pornography?
11:02:11  10   A.  Yes.  This is the account that was in both his Samsung S8
11:02:14  11   and Note 3.
11:02:22  12   Q.  Moving to the last page, actually Page 4 of six of your chat
11:02:30  13   log summary in Government's 81, do you see the arrow on the
11:02:31  14   bottom of the exhibit?
11:02:32  15   A.  Yes, I do.
11:02:38  16   Q.  Okay.  And when was this message sent to M.K.?
11:02:44  17   A.  So this was September 24, 2018.  This is when these messages
11:02:50  18   were occurring.  When that image was sent, remember it's in UTC
11:02:53  19   time so there's a little bit of a difference of time.  But it
11:03:00  20   was sent from the IP address 70106236159.  Okay I show friends
11:03:03  21   is the same text communication that was in the screenshot
11:03:05  22   provided by M.K.
11:03:09  23   Q.  Why is that date, September 24, 2018, important to you in
11:03:10  24   terms of this case?
11:03:13  25   A.  Because that was the date of his arrest.
```

11:03:18  1    Q.  So this text message on Instagram was sent out before the

11:03:20  2    Defendant was arrested on that date.

11:03:21  3    A.  Yes.

11:04:02  4    Q.  Detective Bieber, when you're doing your extraction or

11:04:06  5    analysis on the Defendant's phones using the tools that you rely

11:04:11  6    upon to do that, are you able to extract a chart if you will of

11:04:15  7    all the accounts that are associated with that phone?

11:04:21  8    A.  Yes.  So user accounts that are logged into is within the

11:04:22  9    extraction.

11:04:23  10   Q.  And did you do that in this case?

11:04:23  11   A.  Yes.

11:04:26  12   Q.  Did you do that to the Note 3 phone?

11:04:31  13   A.  I did it to Note 3 and the S8.

11:04:44  14         MR. NATALE:  I have no objection to 82.

11:04:47  15         MS. ANTON:  At this time, the Government would move

11:04:49  16   into evidence Government's Exhibit 82.

11:04:50  17         THE COURT:  Without objection, 82 is admitted in

11:04:51  18   evidence.

11:04:53  19         (Government's Exhibit 82 in evidence)

11:04:53  20   BY MS. ANTON:

11:04:59  21   Q.  Is Government's 82 the chart that you were just speaking of

11:05:01  22   all the user accounts associated with the phone?

11:05:02  23   A.  Correct.

11:05:03  24   Q.  Which phone are you talking about in this case?

11:05:08  25   A.  This one was from the Samsung Galaxy Note 3.

11:05:13   1     Q.   Okay.  I'm going to zoom in because these are fairly small.

11:05:19   2          Whose user name is associated with Dropbox in the

11:05:20   3     Defendant's Note 3 phone?

11:05:27   4     A.   The user name is the e-mail address chaos_demise@yahoo.com.

11:05:31   5     Q.   Did you find evidence of MVLex3 being used on this phone?

11:05:32   6     A.   Yes.

11:05:36   7     Q.   Did you also find evidence of swainmarc being used in Skype?

11:05:41   8     A.   Yes.  If you go to the other pages, you'll see where the

11:05:47   9     actual accounts are.

11:05:53   10    Q.   Well, you've highlighted some of them on Government's 82,

11:05:58   11    Line 32.

11:06:08   12    A.   I'm just waiting for it to come into focus.

11:06:09   13    Q.   I know.

11:06:15   14    A.   So MVLex3 is the -- for the Kik account, with the account

11:06:19   15    name or display name of Miss Boss, and the source is Kik

11:06:20   16    Messenger.

11:06:23   17    Q.   Okay.  And what was the associated with -- what user name

11:06:27   18    was associated with the Defendant's TextNow account?

11:06:34   19    A.   The TextNow account was brentbeeby0@gmail.com.

11:06:41   20    Q.   And with his Instagram account?

11:07:09   21    A.   The Instagram account, the user name is Tuylin20.

11:07:44   22    Q.   Detective, when you got the results of the exhibit which

11:07:47   23    told you what the Defendant's user names were for all of those

11:07:50   24    different platforms, did you serve legal process on all of those

11:07:52   25    different companies in order to get the information associated

| | | |
|---|---|---|
| 11:07:54 | 1 | with that account? |
| 11:07:58 | 2 | A.  Yes.  We served search warrants on Instagram and Dropbox. |
| 11:08:03 | 3 | Q.  Okay.  And did you also serve legal process on Kik to try to |
| 11:08:04 | 4 | get information from Kik? |
| 11:08:06 | 5 | A.  We did subpoenas for Kik. |
| 11:08:09 | 6 | Q.  Okay.  Can you explain to the ladies and gentlemen of the |
| 11:08:12 | 7 | jury, we've heard a little bit about Kik and how it works, but |
| 11:08:15 | 8 | what information are you able to get from the company Kik? |
| 11:08:20 | 9 | A.  So the way Kik works is that information or direct messages |
| 11:08:25 | 10 | are sent from one phone to another.  It's not stored on Kik's |
| 11:08:30 | 11 | remote servers, so you can never get the messages from them. |
| 11:08:33 | 12 | What they will provide you with legal process or a subpoena is |
| 11:08:37 | 13 | the user information that's provided when they register, and IP |
| 11:08:40 | 14 | addresses and times of login. |
| 11:08:43 | 15 | Q.  So you can't get the content -- is it true that you can't |
| 11:08:44 | 16 | get the content from Kik? |
| 11:08:49 | 17 | A.  You can't get the content from Kik. |
| 11:08:56 | 18 | MS. ANTON:  At this time, the Government will move |
| 11:09:04 | 19 | Government's 68, 74 and 75 into evidence. |
| 11:09:05 | 20 | MS. WEISS:  No objection. |
| 11:09:09 | 21 | THE COURT:  Without objection 68, 74 and what? |
| 11:09:09 | 22 | MS. ANTON:  75. |
| 11:09:11 | 23 | THE COURT:  And 75 are admitted in evidence. |
| 11:09:12 | 24 | (Government's Exhibits 68, 74 & 75 in evidence) |
| 11:09:17 | 25 | MS. ANTON:  Thank you, Judge.  I also will move |

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED BY COMPUTER

11:09:19  1       Government's 86 A and B into evidence.

11:09:20  2              MR. NATALE:  No objection.

11:09:23  3              THE COURT:  Without objection, 86 A and B are also

11:09:24  4       admitted in evidence.

11:09:24  5              (Government's Exhibit's 86 A & B in evidence)

11:09:25  6              MS. ANTON:  And permission to publish.

11:09:28  7              THE COURT:  You may.

11:09:28  8          BY MS. ANTON:

11:09:37  9       Q.  Okay.  Detective Bieber, you mentioned that you served legal

11:09:44  10      process on Kik.  I'm going to show you Government's 68.  Do you

11:09:49  11      see Government's 68?

11:09:50  12      A.  Yes.

11:09:52  13      Q.  Is that legal process that you sent to Kik?

11:09:54  14      A.  This is the return from Kik.

11:09:58  15      Q.  Okay.  So the return from Kik means that the information Kik

11:09:59  16      gave you back?

11:09:59  17      A.  Correct.

11:10:03  18      Q.  Okay.  And for what account was that?  What user name?

11:10:07  19      A.  This was for Joseph Woodson's pyro account.

11:10:09  20      Q.  I'm sorry.  What did you say?

11:10:12  21      A.  The pyrokenesist.

11:10:14  22      Q.  Is that where my finger is pointing?

11:10:15  23      A.  Yes.

11:10:17  24      Q.  P-Y-R-O?

11:10:18  25      A.  Yes.

11:10:20   1   Q.  Pyrokenesist.  So that is an account that the Defendant was

11:10:21   2   using on Kik.

11:10:34   3   A.  Yes. Can you go back to that one real quick?   So the first

11:10:38   4   and last name, if you'll notice will say Taylor Keenan and the

11:10:43   5   words prior to that are actually emojis, the words that

11:10:43   6   represent the emojis.

11:10:46   7   Q.  Are you talking about here?  Taylor Keenan?

11:10:47   8   A.  Yes.

11:10:49   9   Q.  Okay.  And it says see no evil.  You're saying and those are

11:10:50   10  emojis?

11:10:54   11  A.  Right.  So that would be used as his display name for this

11:10:54   12  account.

11:11:07   13  Q.  Okay.  Government's Exhibit 74.  Did you also do legal

11:11:10   14  process -- serve legal process on Kik for user name

11:11:12   15  Scottishstyle100?

11:11:13   16  A.  I did.

11:11:18   17  Q.  And what did those results indicate to you?

11:11:21   18  A.  In this page, it shows his user name as Scottishstyle100,

11:11:24   19  and his first and last name that he provided to the system.

11:11:29   20  Q.  Does it also indicate to you where that user might be?

11:11:40   21  A.  Yes, but you'd have to flip the page.  Okay.  So on this, is

11:11:41   22  there a third page?  I'm sorry?

11:11:44   23  Q.  Yes.

11:11:51   24  A.  You see on the third page it says IP address 78198118, those

11:11:54   25  IP addresses come back to Ireland.

11:12:12    1    Q.   Okay.  And Government's 75, is that the return of legal

11:12:15    2    process to Kik as it pertains to user name Bozy11?

11:12:17    3    A.   Yes, it is.

11:12:25    4    Q.   And do you know where that one resolves back to also?

11:12:28    5    A.   Yeah, if you flip the pages I'll show.

11:12:37    6    Q.   Do you see the IP addresses?

11:12:41    7    A.   Yeah, those IP addresses came back to Ireland.

11:12:48    8    Q.   Okay.  And I'm going to show you Government's 86 A and B on

11:12:53    9    the ELMO.  You sent legal process to Dropbox and received

11:12:54   10    Dropbox records?

11:12:57   11    A.   Yes.  We actually sent two search warrants to Dropbox and

11:12:58   12    these are the returns for both.

11:13:04   13    Q.   Okay.  Now, these discs contain a voluminous amount of

11:13:06   14    information; is that true?

11:13:07   15    A.   That's correct.

11:13:39   16         THE COURT:  Why don't we take our morning break at this

11:13:41   17    point.  Ladies and gentlemen, you got a break, but we didn't so

11:13:44   18    take about a ten minute break at this point, come back out and

11:13:54   19    we'll go until lunch time.  All right?

11:14:00   20         COURT SECURITY OFFICER:  All rise for the jury.

11:14:03   21         (Jury out at 11:14 a.m.)

11:14:15   22         MS. MOLLISON:  Judge, is it possible we can get IT back

11:14:19   23    up here?  Our monitor is off again.  We didn't kick it.

11:14:22   24         THE COURT:  Sure.  Yes, of course.  Wanda, please get

11:14:24   25    IT up.  The monitor is off again.

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED BY COMPUTER

```
11:14:27   1              MS. MOLLISON:  Thanks, Judge.
11:14:40   2              THE COURT:  All right.  Please be seated.  Ten minutes.
11:14:40   3              (Brief recess)
11:26:24   4              (Jury in at 11:26 a.m.)
11:27:37   5              THE COURT:  Please be seated.
11:27:41   6              COURTROOM DEPUTY:  Your Honor, all parties and counsel
11:27:44   7    are present.
11:27:45   8              THE COURT:  You may proceed.
11:27:45   9              MS. ANTON:  Thank you, Your Honor.
11:27:45  10         BY MS. ANTON:
11:27:55  11    Q.  Detective Bieber, we had talked about the Instagram direct
11:28:01  12    shares exhibits.  Did the Defendant send or post images of
11:28:06  13    victim M.K. through Snapchat for people in South Florida to
11:28:07  14    receive?
11:28:08  15    A.  Through Snapchat?
11:28:13  16    Q.  Yes.  Or Instagram.  I apologize.
11:28:14  17    A.  Instagram, yes.
11:28:17  18    Q.  I was thinking Instagram, but I said Snapchat.  Yes?
11:28:17  19    A.  Yes.
11:28:19  20    Q.  And people here in South Florida have Instagram.
11:28:21  21    A.  Yes.
11:28:25  22    Q.  Okay.  Did he send pictures of victim B.F. through her best
11:28:28  23    friend K.L.'s account, through the internet?
11:28:30  24    A.  There was one image of B.F., yes.
11:28:34  25    Q.  And those images traveled through the internet and used the
```

11:28:35  1   computer; is that correct?

11:28:38  2   A.  Yeah.  They -- when you send a message, yes, it does travel

11:28:41  3   through the internet or network.

11:28:43  4         MS. ANTON:  Okay.  And I'm going to move into evidence

11:28:50  5   Government's 79 and 48 without objection I believe.

11:28:51  6         MR. NATALE:  Without objection.

11:28:54  7         THE COURT:  79 and 48 are admitted in evidence without

11:28:54  8   objection.

11:28:54  9         (Government's Exhibits 79 & 48 in evidence)

11:28:54  10  BY MS. ANTON:

11:28:58  11  Q.  Government's Exhibit 79, what is it?

11:29:04  12  A.  So this is a direct message from user Tuylin20 to the

11:29:09  13  recipients, there's four participants in this, and it's a

11:29:12  14  picture of B.F.

11:29:16  15  Q.  When we say that they were shared through Instagram for

11:29:20  16  other users, is this the type of sharing we're talking about?

11:29:22  17  A.  Yes.

11:29:24  18  Q.  And just circling back, because I don't think I went over

11:29:31  19  this one with you, Government's 48, what's depicted in that?

11:29:33  20  A.  I can't see it.  There we go.

11:29:34  21        THE COURT:  If you slide it in on the bottom, you're

11:29:38  22  raising it up and down, you're going to give my auto focus a

11:29:42  23  nervous breakdown.  That's the problem.  It's trying to focus at

11:29:45  24  the different levels that you put it in.  Just slide it in at

11:29:47  25  the bottom and it won't do that.

11:29:48  1          MS. ANTON:  Sure.

11:29:50  2          THE WITNESS:  So this is a communication from the

11:29:54  3  Samsung Note 3, not the communication, but this is a some

11:29:59  4  contact information for B.O. through Skype and the Skype user

11:30:00  5  name.

11:30:00  6      BY MS. ANTON:

11:30:02  7  Q.  And this was taken from where?

11:30:04  8  A.  From the Note 3.

11:30:17  9  Q.  Okay.  Did you do, as part of your investigation, subpoenas

11:30:23 10  to Verizon to determine internet service provider information?

11:30:24 11  A.  Yes.

11:30:31 12          MS. ANTON:  Okay.  Government's 68 -- Government's 66

11:30:36 13  A, B, C and D I'd like to move into evidence, Judge.  I don't

11:30:38 14  believe there's an objection.

11:30:40 15          MR. NATALE:  No objection.

11:30:45 16          THE COURT:  68 A B, C and D?

11:30:47 17          MS. ANTON:  66 A through D.

11:30:50 18          THE COURT:  I thought you said 68.  66 A through D --

11:30:54 19  you want it in again.  It's already in evidence.  No, I'm sorry.

11:30:58 20  I guess it was talked about but not offered.

11:30:58 21          MS. ANTON:  Yes.

11:31:01 22          THE COURT:  9-26, it's coming in.

11:31:01 23          MS. ANTON:  Thank you, Judge.

11:31:02 24          THE COURT:  It's in.

11:31:02 25          (Government's Exhibits 66 A-D in evidence)

11:31:05  1            MS. ANTON:  Sliding it in through the bottom of the

11:31:05  2       ELMO.

11:31:08  3            THE COURT:  See how that works?  It's amazing.

11:31:08  4       BY MS. ANTON:

11:31:14  5       Q.  Detective Bieber, I have on the screen 66 A in evidence.

11:31:16  6       Could you explain to the jury what this is?

11:31:26  7       A.  So this is a Verizon return for search value 70.106.240.200.

11:31:28  8       Q.  What is that?  What are those numbers?

11:31:29  9       A.  That's an IP address.

11:31:32  10      Q.  Where is it on the document?  You can circle your screen and

11:31:33  11      touch it.

11:31:37  12      A.  Oh, okay.  So do you want me to circle the IP address?

11:31:43  13      Q.  Yes, please.  Okay.  And that IP address is held by Verizon?

11:31:46  14      A.  Correct.  So that's the search criteria that we provided

11:31:50  15      them in the subpoena.

11:31:51  16      Q.  And where did it come back to?

11:31:57  17      A.  It came back to 21767 Ascot Court, Ashburn, Virginia.

11:31:59  18      Q.  And is that where the Defendant lived?

11:32:00  19      A.  Yes.

11:32:02  20      Q.  How many IP addresses came back to that physical address of

11:32:05  21      2167 (sic) Ascot Court?

11:32:06  22      A.  Should be four.

11:32:17  23      Q.  Okay.  Showing you Government's 66 B.  What is that?

11:32:20  24      A.  This is another IP address that came back to his residence,

11:32:26  25      the 70.106.208.211.

| | | |
|---|---|---|
| 11:32:30 | 1 | Q.  Government's 66 C.  Is that the third IP address? |
| 11:32:34 | 2 | A.  Yes, this one was for the search value as you see at the |
| 11:32:40 | 3 | second line, 70.106.236.159. |
| 11:32:44 | 4 | Q.  And finally Government's 66 D, is that the fourth IP address |
| 11:32:46 | 5 | that came back to that residence where the Defendant lived? |
| 11:32:52 | 6 | A.  Yes.  This one would be 70.106.225.162. |
| 11:32:55 | 7 | Q.  So can you explain to the ladies and gentlemen of our jury |
| 11:32:57 | 8 | how and why it is that sometimes you have more than one IP |
| 11:33:00 | 9 | address coming back to the same residence? |
| 11:33:04 | 10 | A.  So with IP addresses and routers, the IP addresses are |
| 11:33:09 | 11 | dynamic, which means you can only have the IP address leased for |
| 11:33:14 | 12 | a certain period of time.  In the returns, you'll see that these |
| 11:33:17 | 13 | IP addresses were started at a certain time and ended at a |
| 11:33:21 | 14 | certain time.  So that would give why on the returns we would |
| 11:33:23 | 15 | see a different IP addresses. |
| 11:33:27 | 16 | Q.  Okay.  Going back now to Dropbox because that's where we had |
| 11:33:30 | 17 | left off before the break, I believe.  Did you do a search |
| 11:33:34 | 18 | warrant and send it to Dropbox? |
| 11:33:35 | 19 | A.  Yes. |
| 11:33:37 | 20 | MS. ANTON:  Government moves Government's 58 into |
| 11:33:38 | 21 | evidence. |
| 11:33:39 | 22 | MR. NATALE:  No objection. |
| 11:33:40 | 23 | THE COURT:  68? |
| 11:33:42 | 24 | MS. ANTON:  58. |
| 11:33:44 | 25 | THE COURT:  58.  All right.  58 is admitted in evidence |

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED BY COMPUTER

```
11:33:45   1    with no objection.
11:33:46   2            (Government's Exhibit 58 in evidence)
11:33:47   3            MS. ANTON:  Thank you, Judge.
11:33:47   4        BY MS. ANTON:
11:33:54   5    Q.  Is Government's 58 the search warrant that you did for
11:33:55   6    Dropbox?
11:33:57   7    A.  Yes, this is the first search warrant.
11:34:00   8    Q.  Okay.  And that's what led to those discs that were the
11:34:01   9    returns from Dropbox?
11:34:02  10    A.  Yes.
11:34:08  11    Q.  Now, did you analyze the Dropbox records that you received
11:34:10  12    from the company?
11:34:10  13    A.  Yes, I did.
11:34:15  14    Q.  And did you put together a summary chart to help show the
11:34:21  15    jury and aid them in understanding what the documentation was
11:34:23  16    that you got back?
11:34:24  17    A.  Yes.
11:34:26  18            MS. ANTON:  Government moves in 90.
11:34:27  19            MR. NATALE:  No objection.
11:34:30  20            THE COURT:  Without objection, 90 is admitted in
11:34:33  21    evidence.  I don't have a 90, but I'll put it in here.
11:34:35  22            MS. ANTON:  Late addition.
11:34:35  23            (Government's Exhibit 90 in evidence)
11:34:35  24        BY MS. ANTON:
11:34:41  25    Q.  I have Government's 90 up on the ELMO.  Is this the document
```

11:34:42  1    that you created, Detective Bieber?

11:34:46  2    A.  I did.  It's the Dropbox user ID, which is a number and the

11:34:49  3    e-mail associated to the account which is chaos_demise@yahoo.

11:34:51  4    com.

11:34:57  5    Q.  And chaos_demise@yahoo.com is an account that belongs to

11:34:58  6    whom?

11:34:58  7    A.  Joseph Woodson.

11:35:07  8    Q.  So let's talk about your exhibit.  So when you got the

11:35:09  9    records from Dropbox, were they voluminous?

11:35:10  10   A.  Yes.

11:35:16  11   Q.  Okay.  And in order to help us understand what it is that

11:35:21  12   was received from Dropbox, did you create this document to show

11:35:24  13   us what the user accounts were and what the timestamps were on

11:35:25  14   it?

11:35:28  15   A.  Yes.  So this is a screenshot that I actually created from

11:35:32  16   his user information to show the information that I received

11:35:35  17   from Dropbox regarding the owner of the account.

11:35:39  18   Q.  And does it have authentication information and mobile

11:35:40  19   information?

11:35:40  20   A.  Yes.

11:35:42  21   Q.  And does it indicate a carrier?

11:35:43  22   A.  Yes, Sprint.

11:35:46  23   Q.  And is that consistent with the carrier that the Defendant

11:35:47  24   had?

11:35:50  25   A.  Sprint, and the model of the phone is consistent with the

11:35:58   1      Samsung Note 3.  The SM900P is Samsung Note 3.

11:35:59   2      Q.   How about the IP address?

11:36:02   3      A.   The IP address as we showed with the records comes back to

11:36:04   4      Joseph Woodson's residence.

11:36:07   5      Q.   Does it also have a joined date?

11:36:12   6      A.   Yes, it's June 16, 2016.

11:36:18   7      Q.   Okay.  Now, when you went into the Dropbox user account

11:36:24   8      information that was discovered in his Note 3, are there some

11:36:25   9      device logs there?

11:36:28   10     A.   So one of the exhibits that you had up before with the user

11:36:34   11     accounts, this was the user account that was in the Note 3.

11:36:40   12     Q.   Okay.  Now, explain to the jury, if you wouldn't mind

11:36:46   13     please, how the Dropbox application was organized and set up by

11:36:48   14     the user, the Defendant?

11:36:52   15     A.   Okay.  So in your computer you have like a root directory

11:36:55   16     where you have all your folders, then you have subfolders.  The

11:36:59   17     same thing is with the Dropbox account.  Here this is the root

11:37:03   18     directory of the user's account, he had three folders listed in

11:37:08   19     the root directory file for this user ID:  L.C., trade vids and

11:37:10   20     yep.

11:37:13   21     Q.   So within each of those folders, are there additional

11:37:15   22     folders or files?

11:37:16   23     A.   There are subfolders.

11:37:22   24     Q.   Okay.  And does this next page show what you saw when you

11:37:24   25     opened up the L.C. file?

11:37:28   1    A.   Right.   The L.C. file contained three smaller folders or

11:37:32   2    subfolders, and I'm just demonstrating here that in the

11:37:34   3    subfolders there are additional subfolders.

11:37:37   4    Q.   And what was contained in those additional subfolders?

11:37:44   5    A.   In each folder I believe this contained adult pornography.

11:37:47   6    Q.   And are there names listed on the right-hand column?

11:37:48   7    A.   Yes.

11:37:52   8    Q.   Some of those seem to be celebrity names.

11:37:53   9    A.   Yes.

11:38:00  10    Q.   And is this slide demonstrating what you found in the second

11:38:05  11    "fappening 2.0" folder of the L.C. file?

11:38:10  12    A.   Yes.   So these are the subfolders from the "fappening 2.0".

11:38:16  13    Again, it's adult pornography.

11:38:18  14    Q.   And in the miscellaneous leaks folder?

11:38:19  15    A.   Same thing.

11:38:23  16    Q.   Now, what happened when you went into the trade vids folder?

11:38:24  17    What did you see?

11:38:27  18    A.   There were several images or videos that were child

11:38:30  19    pornography, not related to the extortion.

11:38:33  20    Q.   Okay.   When you say child pornography not related to the

11:38:36  21    extortion, what does that mean?

11:38:40  22    A.   It means that these images were not shared through the

11:38:44  23    method of extortion.   These were just images that are traded

11:38:50  24    online or collected online.   These are younger girls than the 12

11:38:52  25    to 15 years of age.

11:38:56   1    Q.   So are these preexisting known images of child pornography?

11:38:59   2    A.   There's a few, yes.

11:39:04   3    Q.   And in subfolder two, you have an arrow down here to several

11:39:07   4    links.  Can you explain what particularly that is?

11:39:11   5    A.   So there's -- in two, there's actually three videos and then

11:39:18   6    two subfolders.  One folder was displayed, the display name is

11:39:20   7    "young fuck", and then the other one is "vids".

11:39:24   8    Q.   What was contained in the folder called "young fuck"?

11:39:27   9    A.   There was, I believe, one or two videos of child

11:39:28  10    pornography.

11:39:31  11    Q.   Okay.  And these images that you've created down at the

11:39:35  12    bottom, do those represent the videos of child pornography that

11:39:37  13    you found inside of that folder?

11:39:38  14    A.   Yes.

11:39:47  15    Q.   Okay.  Now, when you went into the Defendant's Dropbox

11:39:51  16    account and you clicked on "trade vids" and the subfolder "dad

11:39:55  17    times daughter", what did you find?

11:39:58  18    A.   Same thing.  Some of the girls in this were age difficult,

11:40:02  19    but they were one of two of very young girls.

11:40:05  20    Q.   When you say age difficult in terms of child pornography,

11:40:07  21    what are you talking about?

11:40:13  22    A.   So some girls are -- they are young, but it can't be

11:40:18  23    determined whether they're under the age of 18 so therefore

11:40:22  24    considered age difficult because you can't categorize them.

11:40:25  25    Q.   Did you find evidence in that "dad times daughter" folder of

| | | |
|---|---|---|
| 11:40:30 | 1 | child pornography of prepubescent children under the age of 12? |
| 11:40:30 | 2 | A.  Yes. |
| 11:40:31 | 3 | Q.  Yes? |
| 11:40:32 | 4 | A.  Yes. |
| 11:40:44 | 5 | Q.  What is this, Detective Bieber? |
| 11:40:49 | 6 | A.  So in the yep folder, that was the third folder in the root |
| 11:40:53 | 7 | directory, these are subfolders contained within that folder and |
| 11:40:57 | 8 | these are names of extorted victims. |
| 11:41:00 | 9 | Q.  So within the "yep" folder of the Defendant's Dropbox |
| 11:41:08 | 10 | account, you were able to find this list of names. |
| 11:41:09 | 11 | A.  Yes. |
| 11:41:11 | 12 | Q.  Are those all female names? |
| 11:41:11 | 13 | A.  Yes, they are. |
| 11:41:16 | 14 | Q.  Seemingly?  And does this list go on? |
| 11:41:22 | 15 | A.  Yeah, that's just a continuation of the first list.  So at |
| 11:41:25 | 16 | some point it drops off and then repeats on the second page. |
| 11:41:27 | 17 | Q.  And is this list in any particular order? |
| 11:41:30 | 18 | A.  This is the order that was as it was listed in the Dropbox |
| 11:41:30 | 19 | account. |
| 11:41:33 | 20 | Q.  Okay.  Does it appear to be alphabetical? |
| 11:41:36 | 21 | A.  Yes. |
| 11:41:42 | 22 | Q.  And so when you click on each of these folders as you did, |
| 11:41:46 | 23 | what did you observe inside each one of them? |
| 11:41:51 | 24 | A.  Each one had one particular girl doing sexual acts or posing |
| 11:41:54 | 25 | in a lewd and lascivious manner. |

11:42:02  1    Q.  So when you clicked on the folder for A., what did you find

11:42:02  2    inside there?

11:42:06  3    A.  In that folder would be images pertaining to that victim.

11:42:09  4    Q.  And did you, in fact, find -- some of the victims in this

11:42:14  5    case, did you find their images in folders in the Dropbox

11:42:14  6    account?

11:42:19  7    A.  Yes, specifically M., the M. folder, that was M.K.

11:42:23  8    Q.  Is that what I'm delineating here with my finger, M.?

11:42:24  9    A.  Yes.

11:42:29  10   Q.  And in M.K.'s folder, you found the pictures that she was

11:42:30  11   forced to take?

11:42:33  12   A.  Pictures and videos, yes.

11:42:39  13   Q.  And did you attempt to illustrate that in your Government's

11:42:46  14   Exhibit 90 by including thumbnails of some of these images?

11:42:47  15   A.  Yes, I did.

11:42:55  16   Q.  Okay.  And are M.'s images contained in there?

11:43:01  17   A.  So that is M.K.  That is A.C.

11:43:04  18   Q.  When you say "that is", you mean all of these thumbnail

11:43:05  19   images --

11:43:11  20   A.  Right.  So these images portray Victim 7.

11:43:24  21   Q.  Okay.  And in the Dropbox account, did you find something

11:43:28  22   that was entitled a snap list?

11:43:33  23   A.  Yes.  So if you go back to the previous piece of paper --

11:43:35  24   Q.  The images?

11:43:41  25   A.  Yeah.  Contained in the subfolders there's a text file named

11:43:46  1   snap list.  When you open up the snap list, you see a list of

11:43:48  2   Snapchat accounts or user IDs.

11:43:52  3   Q.  And is that what I have up on the screen now?

11:43:53  4   A.  Yes.

11:44:05  5   Q.  And on the second page of the snap list, what does it say?

11:44:09  6   A.  It says passwords are either fuck slut 90 or 100, unless you

11:44:14  7   changed or ACC was taken back or deleted.  ACC means account.

11:44:18  8   Q.  Okay.  So when you say snap list, do you know what this is

11:44:21  9   and what it's referring to?

11:44:24  10  A.  It's referring to Snapchat accounts.

11:44:27  11  Q.  But you didn't name this snap list, did you?

11:44:30  12  A.  No, this was contained within the Dropbox account.

11:44:40  13  Q.  Okay.  All right.  Now, let's talk about the Samsung Galaxy

11:44:45  14  S8 phone that was taken after the Defendant was arrested.

11:44:50  15       MS. ANTON:  I'd like to move in Government's 70 and 77.

11:44:52  16  I don't believe there's an objection to either one.

11:44:53  17       MR. NATALE:  No objection.

11:44:59  18       THE COURT:  Thank you for letting me know.  70 and 77

11:45:00  19  are admitted in evidence.

11:45:01  20       (Government's Exhibits 70 & 77 in evidence)

11:45:01  21  BY MS. ANTON:

11:45:12  22  Q.  Detective Bieber, I have Government's 77 up on the ELMO.  Is

11:45:17  23  that an extraction report from the S8 phone that was taken after

11:45:18  24  the Defendant was arrested?

11:45:20  25  A.  Yes, it was.

11:45:27  1   Q.  Did you find this photo on the Defendant's phone after he

11:45:28  2   was arrested?

11:45:30  3   A.  Yes.

11:45:36  4   Q.  And is there writing on the photo?

11:45:42  5   A.  There's the bar across the picture, who wanna see N.

11:45:45  6   Q.  Did you see a name?  I'm sorry.  I didn't hear you.

11:45:50  7   A.  Yeah, so the name written across her chest is Nick.

11:46:03  8   Q.  Now, you analyzed the Defendant's Note 3 phone and were able

11:46:09  9   to analyze conversations that you saw occurring between MVLex,

11:46:11  10  the Defendant, and Bozy11.

11:46:16  11  A.  It was MVLex3 and Bozy11, yes.

11:46:24  12  Q.  MVLex3 and Bozy11.  And you created a summary chart of those

11:46:29  13  conversations to make it easier to explain?  Did you create --

11:46:30  14  let me rephrase it.  Inartful.

11:46:33  15       Did you make a summary chart of those conversations in

11:46:36  16  order to help the jury understand --

11:46:36  17  A.  Yes.

11:46:37  18  Q.  -- what they were?

11:46:41  19  A.  Yeah, there was the actual extraction of those

11:46:44  20  communications and then there was a summary chart.

11:46:47  21  Q.  Okay.  So when you made your chart, you made it based upon

11:46:49  22  what you actually got out of the phone.

11:46:49  23  A.  Correct.

11:46:51  24       MS. ANTON:  Government would like to move 60 into

11:46:54  25  evidence.  I don't believe there's an objection.

```
11:46:55   1              THE COURT:  60?
11:46:56   2              MS. ANTON:  60.
11:46:57   3              MR. NATALE:  No objection.
11:47:00   4              THE COURT:  Without objection, admitted in evidence.
11:47:00   5              (Government's Exhibit 60 in evidence)
11:47:02   6              MS. ANTON:  Thank you, Judge.  May I publish?
11:47:03   7              THE COURT:  You may.
11:47:03   8          BY MS. ANTON:
11:47:11   9      Q.  I have on the ELMO Government's Exhibit 60.  Is this the
11:47:12  10      chart you created?
11:47:12  11      A.  Yes, it is.
11:47:18  12      Q.  And what time period is captured in the conversations
11:47:22  13      between the MVLex3, the Defendant's Kik account, and Bozy11?
11:47:28  14      A.  The chat messages occur between January 3, 2018 to January
11:47:30  15      24, 2018.
11:47:35  16      Q.  And where did you get these text messages from?
11:47:39  17      A.  These are from Woodson's Samsung Galaxy Note 3.
11:47:41  18      Q.  Now let's talk about the conversation from January 3rd,
11:47:48  19      okay?  On January 3rd, does the Defendant send a message to
11:47:54  20      Bozy11 saying hey, looks like T. got banned?
11:47:54  21      A.  Yes.
11:47:58  22      Q.  Does that name T., does that mean anything to you in terms
11:47:58  23      of the investigation?
11:48:07  24      A.  So he had a Kik account remnants on his Note 3, T.S.  It was
11:48:13  25      an account that he was using to extort juveniles in Plantation.
```

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED BY COMPUTER

11:48:17  1   Q.  Okay.  So in this conversation, the Defendant tells Bozy11

11:48:26  2   that T. got banned, and Bozy11 says yes.  And MVLex calls the

11:48:28  3   other person Scott.  Do you see that?

11:48:28  4   A.  Yes, I do.

11:48:31  5   Q.  Okay.  And then the Defendant says anything you sent in the

11:48:37  6   last nine hours I didn't get.  And Bozy11 says I haven't sent

11:48:40  7   anything.  A. account -- is ACC account?

11:48:41  8   A.  Yes.

11:48:47  9   Q.  A. account is gone.  K. also dipped.  What are you working

11:48:50  10  on.  And what does the Defendant reply?

11:48:56  11  A.  MVLex3 replies just got home going to try Snapchat or SC

11:48:57  12  again.

11:49:02  13  Q.  Does Bozy11 say your IP probably banned dude.  Tried chat

11:49:03  14  log.

11:49:04  15  A.  He goes "'aight".

11:49:09  16  Q.  Or alternatively you can work on S.G.

11:49:13  17  A.  MVLex responds on Kik, question mark.

11:49:17  18  Q.  Okay.  And Bozy11 says you're going to have to text her with

11:49:20  19  some SS of her social media.

11:49:23  20  A.  He responds done.

11:49:30  21  Q.  And then does Bozy11 ask the Defendant MVLex what do you

11:49:32  22  want D. to do?

11:49:38  23  A.  MVLex responds -- MVLex3 responds make her deep throat

11:49:38  24  something.

11:49:42  25  Q.  Okay.  So in this conversation as one of the ones that you

11:49:47  1    extracted from the Defendant's phone, did you observe any signs

11:49:49  2    of threats or coercion?

11:49:50  3    A.   No.

11:49:54  4    Q.   Okay.  And going now to the conversation that occurred on

11:50:02  5    January 7th of 2018.  Did Bozy11 -- which relates back to an IP

11:50:03  6    address in Ireland; is that correct?

11:50:05  7    A.   Yes.

11:50:10  8    Q.   Okay.  Did he communicate with the Defendant again?

11:50:10  9    A.   Yes.

11:50:14  10   Q.   And this time was it about A.C.?

11:50:18  11   A.   Yes.  So it's important to note that when he refers to A.,

11:50:22  12   it says don't say pink mirror or black or white.  In his

11:50:26  13   contacts, he actually has A.C. listed as A.W.

11:50:33  14   Q.   Okay.  So does the Defendant ask Bozy11, who is new girl?

11:50:34  15   A.   Yes.

11:50:40  16   Q.   And Bozy11 replies A.  Don't save pink mirror or black and

11:50:42  17   white.  And MVLex says okay?

11:50:43  18   A.   Yes.

11:50:47  19   Q.   And here do you see Bozy11 talking to the Defendant saying

11:50:53  20   K., I., remember my eyes code?  Feel like it was 3757 or

11:50:55  21   something to that pattern?

11:50:56  22   A.   Yes.

11:50:58  23   Q.   And what does MVLex respond?

11:51:04  24   A.   MVLex3 responds try 1,000.  I usually changed it, otherwise

11:51:06  25   I don't know.  IDK.

11:51:09  1   Q.  So based on what you have investigated with this case, what

11:51:10  2   are they referring to?

11:51:12  3   A.  They're talking about either accounts that had taken over

11:51:15  4   that don't work anymore, and they're talking about girls that

11:51:17  5   they are extorting for child pornography.

11:51:24  6   Q.  Okay.  And does Bozy11 say Scott, send me back picks of A.

11:51:26  7   asap.  Get burner.

11:51:31  8   A.  MVLex3 responds any recommendations need to be cheap and

11:51:32  9   fast.

11:51:38  10  Q.  And when Bozy11 responds Motorola, got pretty good cheap at

11:51:42  11  the moment, ATM.  What are they talking about?  What's a burner?

11:51:45  12  A.  It appears that he needs to get a burner phone.

11:51:48  13  Q.  And so they have this conversation about a burner phone.

11:51:49  14  A.  Yes.

11:51:57  15  Q.  Does MVLex, the Defendant, MVLex3 then say to Bozy11 yo, do

11:51:59  16  you remember S.?

11:52:06  17  A.  Yes, and I put a little note next to it saying S. is

11:52:09  18  referring to S.M., Victim 6.

11:52:12  19  Q.  So the note that we see here in red, that's your writing?

11:52:15  20  A.  That's my writing, correct.

11:52:18  21  Q.  All right.  Then the conversation continues into the next

11:52:20  22  day January 8th.

11:52:21  23  A.  Correct.

11:52:24  24  Q.  And what does Bozy11 ask the Defendant?

11:52:28  25  A.  Yep, S.M. Why?

11:52:33  1    Q.  And does the Defendant say she made a new Kik.  I tried

11:52:38  2    BMing, but no go.  And Bozy11 asks what's the user?  The

11:52:43  3    Defendant replies S---------r.  And then what does Bozy11 say?

11:52:48  4    A.  Bozy11 responds S, stay active, I'm going to get A. on Kik,

11:52:51  5    referring to A.C., Victim 7.

11:52:55  6    Q.  So Bozy11 in this conversation refers to MVLex3, who we know

11:52:57  7    is the Defendant, as "S".

11:52:58  8    A.  Yes.

11:53:01  9    Q.  And earlier, you see him referring to the Defendant as

11:53:01  10   Scott.

11:53:02  11   A.  Yes.

11:53:09  12   Q.  And you see the Defendant referring to Bozy11 as Scott.

11:53:12  13   A.  Yeah, they keep calling each other Scott.

11:53:19  14   Q.  Okay.  So at the end of Page 1 on January 8th, Bozy11 tells

11:53:25  15   the Defendant stay active, I'm going to get A. on Kik.  The

11:53:35  16   Defendant says K.  And then what does Bozy11 tell him?

11:53:40  17   A.  Bozy11 says she's coming, user name is M-------------e.

11:53:46  18   Don't message yet.  Got her blowing facial and fucking her ex

11:53:46  19   this weekend.

11:53:48  20   Q.  The Defendant says nice, right?

11:53:49  21   A.  Yes.

11:53:54  22   Q.  And then he says, Bozy11, G. is also back on Kik.

11:53:59  23   G--------O.  Don't message yet.  Soon though.

11:54:01  24          What does the Defendant write back?

11:54:03  25   A.  Not yet.  I will before I go to bed.

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED BY COMPUTER

11:54:04   1   Q.  Right here.

11:54:07   2   A.  MVLex3?  KK.

11:54:08   3   Q.  KK.  What does that mean?

11:54:08   4   A.  Okay.

11:54:15   5   Q.  Okay.  And then Bozy11 asked you uploaded all of A. and you

11:54:18   6   have referring to A.C.  So what did that mean to you when you

11:54:20   7   read this?

11:54:24   8   A.  He was uploading images from to his Dropbox account.  That's

11:54:25   9   what's referring to.

11:54:26   10  Q.  Okay.  And images of who?

11:54:31   11  A.  Of A.C.  Of Victim 6.  I'm sorry, Victim 7.

11:54:35   12  Q.  Victim 7.  A.C.  Is that the one he just said he's got her

11:54:35   13  online right now?

11:54:37   14  A.  Yes.

11:54:41   15  Q.  So Bozy11 asks the Defendant did you upload all of A.?  And

11:54:44   16  then the Defendant says not yet, I will before I go to bed.

11:54:45   17  Right?

11:54:47   18      And the conversation now continues for the next day or

11:54:51   19  two, from January 9th to January 10th, right?

11:54:55   20      The next communication in the phone that you observe is

11:55:02   21  Bozy11 saying this is live.  RN is right now; is that correct?

11:55:03   22  A.  That's correct.

11:55:07   23  Q.  This is live RN if you want to sit tight and enjoy.

11:55:12   24      What -- before we get on to what the Defendant says,

11:55:14   25  what does that mean, this is live right now?

11:55:18  1   A.  He's communicating with her at that moment.

11:55:22  2   Q.  Okay.  And the Defendant says I only got a few before I head

11:55:28  3   out.  Trying to save stuff you sent last night so I can upload.

11:55:32  4        What does Bozy11 reply back?

11:55:37  5   A.  ALR, all right.  Well, A. is fucked here, so referring to

11:55:38  6   A.C.

11:55:42  7   Q.  And he says all good.  And the Defendant tells him most of

11:55:45  8   it's uploaded now.  Bozy11 asks what do you think.  And what

11:55:48  9   does the Defendant MVLex3 respond?

11:55:51  10  A.  She's going to be a fun whore.

11:55:56  11  Q.  Does Bozy11 tell him you'll like what she's going to do

11:55:58  12  right now if you have a spare minute?

11:56:02  13  A.  He responds leaving now, I'll be back in about 12 hours.

11:56:07  14  Q.  So is Bozy11 trying to tell the Defendant that he should

11:56:08  15  stick around and see what's going to happen?

11:56:09  16  A.  Yes.

11:56:15  17  Q.  And the Defendant says to him you should literally wait --

11:56:18  18  I'm sorry.  I'm leaving now, I'll be back in 12 hours.

11:56:21  19  A.  Yes.  That's his response.

11:56:27  20  Q.  Okay.  And Bozy11 says you should literally wait two

11:56:31  21  minutes.  Like?  Upload vids of A., referring to victim A.C.

11:56:32  22  A.  Correct.

11:56:40  23  Q.  Okay.  Does Bozy11 tell MVLex delete a few folder SS, S.,

11:56:47  24  R., J., D.W.  If you want to re-upload someone else, make sure

11:56:49  25  it's a good set?

11:56:51   1    A.  And he responds KK.

11:56:54   2    Q.  KK.  And is KK kind of a cute way of responding back "okay"?

11:56:55   3    A.  Yes.

11:57:01   4    Q.  All right.  So what is Bozy11 telling MVLex3 to do there?

11:57:03   5    To upload it where?

11:57:06   6    A.  Well, they're referred to -- they upload the images to the

11:57:11   7    Dropbox.  Joseph Woodson had administrative rights to the

11:57:13   8    Dropbox account, so he's the only one that could add, modify or

11:57:15   9    delete files.

11:57:19  10    Q.  Okay.  Did Bozy11 threaten the Defendant to upload those?

11:57:20  11    A.  No.

11:57:23  12    Q.  Did he force him to upload those in that conversation?

11:57:26  13    A.  No.  There's no indication of that at all.

11:57:30  14    Q.  Okay.  And continuing then on to the next day, Bozy11 then

11:57:37  15    says to the Defendant send me the second half of long vid, okay?

11:57:37  16    All right.

11:57:40  17             So now a couple days go by, and the next chat that you

11:57:45  18    saw in the Defendant's phone with the Irish co-conspirator was

11:57:52  19    on January 13th of 2018?  And how did that one begin?

11:57:58  20    A.  So on January 13, 2018 Bozy11 says get this, laugh out loud,

11:58:02  21    LOL, it's her mom's dildo.  And if you remember, there's a video

11:58:05  22    of her using a dildo in one of the videos.

11:58:07  23    Q.  When you say her, which one?

11:58:09  24    A.  I'm referring to A.C., victim.

11:58:15  25    Q.  So Bozy11 says get this, it's her mom's dildo, and MVLex

11:58:18  1    says nice, LOL?

11:58:18  2    A.  Yes.

11:58:21  3    Q.  Now, what does Bozy11 ask the Defendant?

11:58:24  4    A.  You here?  She's with a guy right now who wants a

11:58:30  5    relationship last year, but she won't so anything.  He's about

11:58:37  6    to be very happy.  And then lists the phone number of A.C.  And

11:58:42  7    the listed name is A.W.

11:58:45  8    Q.  Okay.  So that phone number that Bozy11 is listing there is

11:58:48  9    the phone number of victim A.C.

11:58:49  10   A.  Correct.

11:58:52  11   Q.  And did you find that phone number stored in the Defendant's

11:58:52  12   phone?

11:58:53  13   A.  I did.

11:58:56  14   Q.  And was she stored under a different name?

11:58:58  15   A.  She was stored under A.W.

11:59:04  16   Q.  Bozy11 says if you can, you should be here for this.  And

11:59:09  17   then MVLex asks him do you need me to text, right?

11:59:09  18   A.  Yes.

11:59:12  19   Q.  And what does Bozy11 respond back?

11:59:17  20   A.  No, she's doing right now.  Just think, you'll enjoy.

11:59:19  21   Requests?  Anything goes.

11:59:24  22   Q.  Okay.  So in that sentence, Bozy11 says to the Defendant no,

11:59:30  23   I don't need you to text.  Requests?  Anything goes.  Is he

11:59:35  24   asking MVLex3, the Defendant, if he wants to see A. do anything

11:59:36  25   in particular?

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED BY COMPUTER

| | | |
|---|---|---|
| 11:59:41 | 1 | A.  Right.  He's asking Joseph Woodson if he wants the victim to |
| 11:59:43 | 2 | do anything sexual. |
| 11:59:49 | 3 | Q.  Okay.  And when he asks that, does MVLex respond to him |
| 11:59:51 | 4 | rough anal to start? |
| 11:59:51 | 5 | A.  Yes. |
| 11:59:55 | 6 | Q.  He wants to see rough anal to start?  Is that what he |
| 11:59:55 | 7 | responds? |
| 11:59:55 | 8 | A.  Yes. |
| 12:00:00 | 9 | Q.  And then does he further respond that first vid in red black |
| 12:00:05 | 10 | bra never loaded for me.  I mean, the one from earlier where she |
| 12:00:09 | 11 | had the dildo.  And then later on he says, thanks, got it now? |
| 12:00:10 | 12 | A.  That's correct. |
| 12:00:13 | 13 | Q.  Okay.  So are videos being exchanged back and forth? |
| 12:00:15 | 14 | A.  Images and videos, yes. |
| 12:00:23 | 15 | Q.  Okay.  And does Bozy11 tell the Defendant delete SKME, some, |
| 12:00:28 | 16 | maybe, spare shit on DB, all vids go up. |
| 12:00:37 | 17 | A.  Yes.  MVLex3 responds got ya, I'll delete now and everything |
| 12:00:39 | 18 | at end. |
| 12:00:42 | 19 | Q.  And does Bozy11 tell the Defendant that I may need you to |
| 12:00:43 | 20 | continue at some stage? |
| 12:00:45 | 21 | A.  Yes. |
| 12:00:51 | 22 | Q.  Does he tell the Defendant I'm going to come and swat your |
| 12:00:53 | 23 | house if you don't continue? |
| 12:00:54 | 24 | A.  No. |
| 12:00:57 | 25 | Q.  Does he threaten him in any way? |

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED BY COMPUTER

12:01:02   1      A.   No.   They were working a partnership here.

12:01:06   2      Q.   In fact, after Bozy11 says that to the Defendant, does he

12:01:12   3      then go on to say PW is internet12099.   It's my anniversary,

12:01:15   4      LOL, GF in bed?

12:01:15   5      A.   Yes.

12:01:18   6      Q.   And the Defendant says got ya, just say when.

12:01:19   7      A.   I can't see that.

12:01:26   8      Q.   I'm sorry.   Got ya, just say when.   Bozy11 tells him about

12:01:27   9      40 minutes?

12:01:29  10      A.   Yes.

12:01:41  11      Q.   Then what does the Defendant say?   He'll be up for about two

12:01:42  12      hours?

12:01:45  13      A.   Yes.   He responds I'll be up for about two hours so I'll be

12:01:46  14      here.

12:01:49  15      Q.   And when Bozy11 tells the Defendant she's good, is he

12:01:51  16      talking about A.?

12:01:52  17      A.   Yes.

12:01:58  18      Q.   Okay.   And what does the Defendant say when Bozy11 tells the

12:02:01  19      Defendant that victim A.C. is good?

12:02:06  20      A.   MVLex3 responds indeed, this is quite a win.

12:02:07  21      Q.   Quite a win?

12:02:09  22      A.   Yes.

12:02:14  23      Q.   Okay.   And the conversation continues on for several days.

12:02:19  24      And on January 14th, MvLex and Bozy11, do they have a

12:02:22  25      conversation where they're speaking about whether or not videos

| | | |
|---|---|---|
| 12:02:25 | 1 | have been uploaded onto Dropbox? |
| 12:02:29 | 2 | A.  Yes.  MVLex3 says all uploaded. |
| 12:02:34 | 3 | Q.  And Bozy11 responds, little rape bitch her.  She said she |
| 12:02:39 | 4 | gets him fucking her.  She's been turning him down for years. |
| 12:02:39 | 5 | Hated. |
| 12:02:47 | 6 | A.  Yes, and MVLex3 responds laugh out loud, sucks for her. |
| 12:02:52 | 7 | Q.  And Bozy11 responds yeah, she's still owned, didn't run and |
| 12:02:57 | 8 | is terrified.  Talking to her about getting that dude to help |
| 12:03:00 | 9 | her fuck a dog. |
| 12:03:04 | 10 | A.  MVLex3 responds he would definitely agree to it. |
| 12:03:09 | 11 | Q.  And continuing the next day, it seems just to be |
| 12:03:13 | 12 | conversation with yes and no between the defendants. |
| 12:03:20 | 13 | And on 1-17 of 2018, did Bozy11 reach out to the |
| 12:03:23 | 14 | Defendant again and say Scott? |
| 12:03:26 | 15 | A.  Yes.  MVLex3 responds yo. |
| 12:03:30 | 16 | Q.  And does Bozy11 tell the Defendant I need you to text D. |
| 12:03:35 | 17 | right now.  She's been MIA a few days. |
| 12:03:36 | 18 | A.  Yes. |
| 12:03:41 | 19 | Q.  Bozy11 says text and say, quote, I don't care what you're |
| 12:03:43 | 20 | doing.  Get on Kik.  If you don't, I make a Facebook for your |
| 12:03:49 | 21 | slut side.  Get on now.  You have five minutes. |
| 12:03:54 | 22 | A.  MVLex3 responds, done.  Wait, who is that? |
| 12:03:59 | 23 | Q.  Bozy11 reminds him D.'s sister, LOL. |
| 12:04:04 | 24 | A.  MVLex3 responds laughing my ass off, LMAO.  Today was a good |
| 12:04:07 | 25 | day for her.  Wonder who she strangled. |

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

| | | |
|---|---|---|
| 12:04:13 | 1 | Q.  In this conversation, is Bozy11 suggesting to MVLex3 whom he |
| 12:04:15 | 2 | should specifically extort that day? |
| 12:04:15 | 3 | A.  Yes. |
| 12:04:21 | 4 | Q.  And does it appear to you from reading the text |
| 12:04:24 | 5 | communications you found in the phone that the Defendant had any |
| 12:04:24 | 6 | problem doing that? |
| 12:04:25 | 7 | A.  No. |
| 12:04:29 | 8 | Q.  Okay.  Did in fact he respond that he was laughing his ass |
| 12:04:30 | 9 | of? |
| 12:04:31 | 10 | A.  Yes. |
| 12:04:37 | 11 | Q.  Continuing on to January 18th, do they have a conversation |
| 12:04:41 | 12 | about a cellphone and money and what they were doing? |
| 12:04:43 | 13 | A.  Yes. |
| 12:04:47 | 14 | Q.  So this conversation on January 18th doesn't relate at all |
| 12:04:49 | 15 | to any sextortion, does it? |
| 12:04:50 | 16 | A.  No. |
| 12:04:55 | 17 | Q.  And do you see anywhere in that conversation where the |
| 12:04:57 | 18 | Defendant was being threatened or forced? |
| 12:04:58 | 19 | A.  No. |
| 12:05:06 | 20 | Q.  Okay.  So now, look on January 19th where they touch base |
| 12:05:10 | 21 | with each other again.  After saying yo, what does Bozy11 tell |
| 12:05:12 | 22 | the Defendant to do? |
| 12:05:14 | 23 | A.  Can you move that up please? |
| 12:05:16 | 24 | Q.  I'm sorry. |
| 12:05:22 | 25 | A.  Bozy11 says text D., say Kik now, don't make me force you. |

```
12:05:24   1    MVLex3 responds done.

12:05:25   2    Q.  Done.

12:05:26   3    A.  Yes.

12:05:32   4    Q.  Okay.  And that's text D. and tell D. don't make me force

12:05:33   5    D., right?

12:05:34   6    A.  That's correct.

12:05:42   7    Q.  So then on the 21st of January 2018, do they check in with

12:05:44   8    each other again and is the Defendant called Scott?

12:05:46   9    A.  Yes.

12:05:57  10    Q.  And was January 24th of 2018 the last date that you saw text

12:05:59  11    messages between those two user IDs?

12:06:01  12    A.  Yes.

12:06:04  13    Q.  And what happened on that date?

12:06:10  14    A.  So it was actually January 26, 2018 when they executed the

12:06:12  15    search warrant at the residence.

12:06:15  16    Q.  Okay.  But on January 24th, do they text back and forth

12:06:17  17    about G.?

12:06:17  18    A.  Yes.

12:06:20  19    Q.  And again, are they talking about extorting someone named

12:06:21  20    G.?

12:06:24  21    A.  Yes.  This whole communication is about extorting children

12:06:27  22    for CP.

12:06:31  23    Q.  And does the Bozy11 tell the Defendant I need you to text

12:06:34  24    D., and the Defendant responds KK.  Anything you want me to say?

12:06:41  25    A.  Bozy11 responds say get on Kik or Facebook gets made for you
```

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED BY COMPUTER

12:06:43  1    and G.'s nudes now.

12:06:50  2            MS. ANTON:  Okay.  Now I'd like to move into evidence

12:06:57  3    Government's 63 and 64, although 64 may already be in evidence.

12:06:58  4            THE COURT:  Both are.

12:06:58  5        BY MS. ANTON:

12:07:04  6    Q.  I just want to show you 63 and 64, Detective Bieber.  And 63

12:07:16  7    is up on the ELMO now, and 64 is on the ELMO.  Are 63 and 64 the

12:07:20  8    communications that you just summarized and how they actually

12:07:23  9    appear when you do your forensic analysis of the phone?

12:07:26  10   A.  Correct.  So this was exported from the extraction.  This is

12:07:27  11   the actual communications.

12:07:32  12   Q.  Okay.  So 63 and 64 are what you used to create Government's

12:07:35  13   Exhibit 60 which was the summary we just went over?

12:07:37  14   A.  Yes.

12:07:46  15           MS. ANTON:  I'd like to move into evidence Government's

12:07:49  16   65, without objection.

12:07:49  17           MR. NATALE:  No objection.

12:07:52  18           THE COURT:  Without objection, 65 is the admitted in

12:07:53  19   evidence.

12:07:54  20           (Government's Exhibit 65 in evidence)

12:07:54  21       BY MS. ANTON:

12:08:04  22   Q.  Detective Bieber, can you tell the jury what this is and

12:08:07  23   where you found it in Government's 65?

12:08:11  24   A.  So this is a screenshot that was found in the Galaxy Note 3,

12:08:19  25   and this is a communication with Don't Say Good-bye", this is a

```
12:08:22   1    Kik communication, Don't Say Good-bye is a display name for
12:08:25   2    Bozy11 which is shown in the contacts.
12:08:28   3    Q.  Okay.  So this is another communication between the
12:08:29   4    Defendant and Bozy11?
12:08:30   5    A.  Yes.
12:08:34   6    Q.  And what does this communication say?  Which one is which?
12:08:36   7    Who is speaking in what color?
12:08:40   8    A.  So the device owner is always to the right, and the person
12:08:43   9    he's communicating with would be to the left.
12:08:47  10    Q.  Okay.  So can you go ahead and read what it says?
12:08:55  11    A.  So the first text is, yo.  S---------9 is user name,
12:09:02  12    password is 90.  Need you to replace the number, PW, password
12:09:08  13    for some accounts, maybe 90, 100 or diamond 90 or diamond 90,
12:09:12  14    100 or 1,000.  The response is when you can give me the list of
12:09:18  15    all you took and I'll go one by one and change number.  Give me
12:09:22  16    two hours know, though, be right back.  BRB.
12:09:23  17    Q.  Who said that?
12:09:24  18    A.  That was the device owner.
12:09:25  19    Q.  And who is that?
12:09:27  20    A.  That would be Joseph Woodson.
12:09:31  21    Q.  Okay.  So what are they talking about in this text message?
12:09:36  22    A.  They're talking about accounts.  So the Snapchat accounts
12:09:40  23    they would take over, they create new passwords for.
12:09:43  24    Q.  Okay.  Are they sharing information in this text message?
12:09:45  25    A.  Yes.
```

12:09:58   1            MS. ANTON:  Government moves 87 into evidence without

12:09:59   2    objection.

12:10:01   3            MR. NATALE:  No objection.

12:10:03   4            THE COURT:  Without objection, 87 is admitted in

12:10:05   5    evidence.

12:10:05   6            (Government's Exhibit 87 in evidence)

12:10:05   7        BY MS. ANTON:

12:10:07   8    Q.  Publishing 87 on the ELMO.

12:10:10   9            Do you see that it's 87, Detective Bieber?

12:10:11  10    A.  I do, yes.

12:10:13  11    Q.  What is Government's 87?

12:10:18  12    A.  So this is a screenshot of a group Kik chat.

12:10:22  13    Q.  How do you know that this is a group Kik chat?

12:10:26  14    A.  If this was a direct messaging between two individuals,

12:10:30  15    under the status bar to the right, instead of seeing the two

12:10:35  16    bubbles, you would see like a symbol of a video to do like video

12:10:39  17    chatting.  That's not here.  Also, you see there's more than one

12:10:44  18    icon in the communications.  So there's possibly three people in

12:10:44  19    this communication.

12:10:47  20    Q.  Okay.  And who is Taylor Keenan?

12:10:51  21    A.  So going back to the Kik subpoena that we received earlier

12:10:55  22    for that pyro Kik account, it comes back to Joseph Woodson.

12:10:59  23    That's the display name with the emojis next to each of the

12:11:01  24    first name and the last name.

12:11:05  25    Q.  Okay.  So are you saying that the Taylor Keenan user name --

12:11:09   1    A.   Is the pyrokenesist account.

12:11:10   2    Q.   Okay.   Which is the Defendant's.

12:11:11   3    A.   Yes.

12:11:17   4    Q.   Okay.   And where did you get this screenshot from?

12:11:19   5    A.   This was from his Galaxy Note 3.

12:11:23   6    Q.   Okay.   And let's talk about what this screenshot says.

12:11:29   7    Okay?   First it says LOL, what is she doing for you right now.

12:11:34   8    If you get her to do requests for me right now, I will not

12:11:36   9    contact her again.

12:11:40   10   A.   He replies but you already agreed she's mine exclusively.

12:11:45   11   And in regards to trades for something bad yeah, sure that's

12:11:51   12   fine.   I doubt it would be any time soon though.

12:11:54   13   Q.   Okay.   So when you say he, the green boxes here are being

12:11:56   14   written by whom?

12:12:02   15   A.   That would be the user, which is the Taylor Keenan or Joseph

12:12:03   16   Woodson.

12:12:08   17   Q.   Okay.   And so Joseph Woodson says you agreed she's mine, and

12:12:12   18   in regard to trades for something bad yeah, sure, that's fine,

12:12:16   19   but I doubt it would be any time soon.   And then the other user

12:12:20   20   says what's stopping me posting her right now.   You're taking

12:12:24   21   her from me when we had a deal last night.

12:12:31   22        And what does the Defendant say back?   Can you read the

12:12:33   23   top?   Yeah, sorry?

12:12:37   24   A.   Yeah, sorry.   I can't read the other top three.   Yeah, sorry

12:12:38   25   something.

| | | |
|---|---|---|
| 12:12:42 | 1 | Q.  Yeah, sorry man, but don't be a dirty dude about it. |
| 12:12:45 | 2 | A.  Yes.  He says please don't post her though. |
| 12:12:50 | 3 | Q.  And the other party says too late.  And then there's an |
| 12:12:55 | 4 | emoji of some sort and he says 4chan tomorrow? |
| 12:12:56 | 5 | A.  Yes. |
| 12:12:58 | 6 | Q.  What is 4chan? |
| 12:13:05 | 7 | A.  So 8chan and 4chan are like slut shaming websites that are |
| 12:13:08 | 8 | used to post videos of different people, like revenge sites. |
| 12:13:14 | 9 | Q.  Okay.  And the Defendant responds seriously?  We truly never |
| 12:13:17 | 10 | were partners then.  You kept none of your words.  But that's |
| 12:13:23 | 11 | fine.  Even if you do, she's still mine.  Bye. |
| 12:13:29 | 12 | What is the other user -- the other person in this |
| 12:13:32 | 13 | conversation with the Defendant, what do they write back? |
| 12:13:36 | 14 | A.  Then there's no point in me not sharing last night's fun if |
| 12:13:40 | 15 | I get nothing from this, you having her exclusively. |
| 12:13:43 | 16 | Q.  And the Defendant says point is respecting your partner's |
| 12:13:47 | 17 | wishes and honoring your word. |
| 12:13:50 | 18 | Q.  And the other person responds you're not my partner if we |
| 12:13:54 | 19 | haven't got something to partner on, so no I won't keep it |
| 12:14:00 | 20 | private.  Do as you will with her in future.  If she won't do a |
| 12:14:03 | 21 | few now, IDC. |
| 12:14:05 | 22 | Q.  And does IDC mean I don't care? |
| 12:14:06 | 23 | A.  Yes. |
| 12:14:09 | 24 | Q.  And the Defendant says I'll ask, but if she says no, it's a |
| 12:14:12 | 25 | no and do what you will. |

```
12:14:13   1    A.  Yes.

12:14:20   2    Q.  The other user responds well, if she's yours, she should.

12:14:32   3         Now, in this conversation with the Defendant using the

12:14:38   4    Taylor Keenan through pyrokenesist on Kik, what is being

12:14:39   5    discussed here?

12:14:43   6    A.  It's an agreement or partnership that they have and they're

12:14:45   7    getting territorial about the girls.

12:14:48   8    Q.  Territorial about what with the girls?

12:14:52   9    A.  Having like exclusive rights for communication.

12:14:54   10   Q.  Having exclusive rights to posting them?

12:14:55   11   A.  Yes.

12:14:58   12   Q.  And when the Defendant doesn't agree to let somebody else

12:15:04   13   have his girl, does that person threaten to put that girl on a

12:15:05   14   slut shaming site?

12:15:05   15   A.  Yes.

12:15:10   16   Q.  So expose one of the girls that the Defendant is exposing?

12:15:12   17   A.  Yes.

12:15:31   18        MS. ANTON:  Putting Government's 43 on the ELMO, Page

12:15:34   19   43.

12:15:37   20        MR. NATALE:  No objection, Judge.

12:15:44   21        MS. ANTON:  It's already in evidence.

12:15:46   22        THE COURT:  Okay.  Still doesn't have any objection.

12:15:46   23   Go ahead.

12:15:47   24        MS. ANTON:  Thank you.

12:15:47   25        BY MS. ANTON:
```

12:15:55  1    Q.  So in Government's 43, we have a Kik messenger chat.  Are
12:15:58  2    you able to read that on your screen?
12:15:59  3    A.  Yes.
12:16:03  4    Q.  Did you observe this chat actually in the Defendant's phone?
12:16:03  5    A.  I did.
12:16:08  6    Q.  Okay.  And what does this chat say?
12:16:12  7    A.  Can you slide it down a little bit please?
12:16:13  8    Q.  Zoom it in?
12:16:18  9    A.  No, you're fine.  So this is in Kik messenger on his Samsung
12:16:24  10   Galaxy S8.  This is in his pyro -- Woodson's pyro account, Kik
12:16:29  11   account.  On the date of his arrest, which is 9-24-2018 the
12:16:34  12   account with display name Princess says hi, it's been a while.
12:16:38  13          On the 27th, yo, what's up man.  Are you still playing?
12:16:43  14   I tried to get back, but Kik is dead for nudes and I don't know
12:16:48  15   how else to get it that fast.  I miss that shit.
12:16:53  16   Q.  So on the day that the Defendant was arrested, this text
12:16:56  17   message came in on his phone from someone named Princess.
12:16:56  18   A.  Yes.
12:17:01  19   Q.  And was Princess asking the Defendant on the day he was
12:17:02  20   arrested if he still playing?
12:17:03  21   A.  Yes.
12:17:04  22   Q.  Was there ever a response back?
12:17:06  23   A.  No, he's already arrested.
12:17:22  24          MS. ANTON:  I have a few more questions for you,
12:17:24  25   Detective Bieber.

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

| | | |
|---|---|---|
| 12:17:31 | 1 | THE COURT:  A few is more than a couple and less than |
| 12:17:32 | 2 | several. |
| 12:17:35 | 3 | MS. ANTON:  I try to be general and vague.  Very |
| 12:17:36 | 4 | quickly. |
| 12:17:36 | 5 | BY MS. ANTON: |
| 12:17:40 | 6 | Q.  Detective Bieber, did you -- were you present at a hearing |
| 12:17:45 | 7 | where the Defendant testified back in April of this year? |
| 12:17:46 | 8 | A.  Yes, I was. |
| 12:17:50 | 9 | Q.  And did you hear the Defendant say that there was never a |
| 12:17:52 | 10 | direct threat? |
| 12:17:55 | 11 | A.  No, he said it was implied. |
| 12:17:57 | 12 | Q.  Implied.  The threat was implied. |
| 12:17:58 | 13 | A.  Yes. |
| 12:18:02 | 14 | Q.  And did you also hear the Defendant say that he was never |
| 12:18:03 | 15 | threatened to be swatted? |
| 12:18:05 | 16 | A.  That's correct. |
| 12:18:06 | 17 | Q.  Because that was implied? |
| 12:18:09 | 18 | A.  It was implied. |
| 12:18:16 | 19 | Q.  Did you also hear him during that hearing say that he didn't |
| 12:18:20 | 20 | want to talk to the police on the day that Detective Oksanen and |
| 12:18:23 | 21 | Bartechko did the search warrant? |
| 12:18:26 | 22 | A.  Correct, and he had also -- he had mentioned that he didn't |
| 12:18:29 | 23 | want to mention the Irish guy as well. |
| 12:18:30 | 24 | MS. ANTON:  Thank you.  I have no further questions |
| 12:18:32 | 25 | from Detective Bieber. |

| | | |
|---|---|---|
| 12:18:35 | 1 | THE COURT:  All right.  Why don't we take our lunch |
| 12:18:40 | 2 | break now.  We'll come back at quarter of 2. |
| 12:18:45 | 3 | Ladies and gentlemen, please continue to be careful, do |
| 12:18:49 | 4 | not talk to anybody about this case, do not look up anything |
| 12:18:54 | 5 | about the case, do not mingle with the attorneys if you see |
| 12:18:58 | 6 | them.  We'll see you at quarter of 2. |
| 12:19:00 | 7 | COURT SECURITY OFFICER:  All rise for the jury. |
| 12:19:03 | 8 | (Jury out at 12:19 p.m.) |
| 12:19:03 | 9 | (Lunch recess) |
| 13:49:45 | 10 | THE COURT:  While we're waiting for the jury, can we |
| 13:55:24 | 11 | have the witness come back up on the stand?  Bring them in. |
| 13:55:26 | 12 | COURT SECURITY OFFICER:  All rise for the jury. |
| 13:55:30 | 13 | (Jury in at 1:55 p.m.) |
| 13:56:21 | 14 | THE COURT:  Please be seated.  Please resume. |
| 13:56:29 | 15 | Yes, sir.  Cross-examination.  Isn't it time yet? |
| 13:56:32 | 16 | Isn't it your turn?  Did you rest?  You rested. |
| 13:56:35 | 17 | MS. ANTON:  Yes, Judge.  I tendered the witness. |
| 13:56:38 | 18 | THE COURT:  Yeah, that's what I thought. |
| 13:56:38 | 19 | CROSS-EXAMINATION |
| 13:56:41 | 20 | BY MR. NATALE: |
| 13:56:46 | 21 | Q.  Detective Bieber, I'd like to ask you some questions |
| 13:56:50 | 22 | basically about the totality of your investigation. |
| 13:56:51 | 23 | A.  Okay. |
| 13:56:57 | 24 | Q.  And if I ask you any question that you think is unfair, |
| 13:56:59 | 25 | please let me know.  Okay? |

```
13:57:00   1    A.  I will.
13:57:07   2    Q.  Now, there was a tremendous amount of police work that was
13:57:12   3    done and is still going on in investigating this case.
13:57:12   4    A.  That is correct.
13:57:21   5    Q.  And you would agree with me that the person that I have been
13:57:25   6    referring to as Irish guy, you have come to learn is Matthew
13:57:27   7    Johnstone.
13:57:27   8    A.  Yes.
13:57:31   9    Q.  And that he's being investigated in Ireland?
13:57:33  10    A.  That's correct.
13:57:39  11    Q.  And that he's being investigated in Ireland for doing sex
13:57:40  12    texting, correct?
13:57:42  13    A.  For extortion as well.
13:57:47  14    Q.  For extortion as well, and that he was also involved with
13:57:50  15    other people other than Joseph?
13:57:50  16    A.  He was.
13:57:51  17    Q.  In the United States?
13:57:52  18    A.  Yes.
13:57:58  19    Q.  And that he has yet to be arrested, right?
13:57:59  20    A.  That's correct.
13:58:04  21    Q.  And that at one point, you even testified that he was still
13:58:09  22    out there and we don't know whether he's still doing this.
13:58:12  23    A.  No, he's still doing it.  He's still active and the
13:58:16  24    investigation is still ongoing.
13:58:23  25    Q.  Okay.  Now, so that we're clear, we know that he actually
```

| | | |
|---|---|---|
| 13:58:27 | 1 | had contact with some of the young women in this case, correct? |
| 13:58:28 | 2 | A.   Yes, he did. |
| 13:58:32 | 3 | Q.   And that he requested them to do certain things, right? |
| 13:58:33 | 4 | A.   That's correct. |
| 13:58:38 | 5 | Q.   And that in some of the evidence that we went over, he |
| 13:58:46 | 6 | actually sent images to Joseph for Joseph to upload into the |
| 13:58:47 | 7 | Dropbox. |
| 13:58:51 | 8 | A.   Correct.  He transmitted child pornography to Joseph for |
| 13:58:53 | 9 | Joseph to upload into his Dropbox. |
| 13:59:01 | 10 | Q.   Now, as it relates to a couple of these exhibits, I believe |
| 13:59:07 | 11 | it was Government's 57 -- |
| 13:59:09 | 12 | MR. NATALE:  Your Honor, may I approach? |
| 13:59:11 | 13 | THE COURT:  You may. |
| 13:59:20 | 14 | BY MR. NATALE: |
| 13:59:23 | 15 | Q.   Detective, you may remember that the Government has already |
| 13:59:30 | 16 | put into evidence their Exhibit 57 which is a CD which was |
| 13:59:34 | 17 | containing all of the results from one of your searches; is that |
| 13:59:35 | 18 | correct? |
| 13:59:39 | 19 | A.   Which application are you referring to?  Which one? |
| 13:59:44 | 20 | Q.   Okay.  I think this was actually the Kik accounts for three |
| 13:59:45 | 21 | people or four people. |
| 13:59:49 | 22 | A.   Well, what you're showing me on the screen is Snapchat, not |
| 13:59:49 | 23 | Kik. |
| 13:59:51 | 24 | Q.   Okay then.  This is a snapshot? |
| 13:59:55 | 25 | A.   This is from Snapchat. |

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED BY COMPUTER

```
13:59:55   1    Q.  Snapchat?

13:59:56   2    A.  Yes.

14:00:00   3    Q.  All right.  And that you subpoenaed the accounts of four

14:00:03   4    people and that was all downloaded on the CD which is

14:00:05   5    Government's Exhibit 57.

14:00:06   6    A.  Yes.

14:00:12   7         MR. NATALE:  I'd like to admit into evidence Defense

14:00:17   8    Exhibit E without objection from the Government.

14:00:19   9         MS. ANTON:  No objection, Your Honor.

14:00:21  10         THE COURT:  Without objection, Exhibit E is admitted

14:00:22  11    into evidence.

14:00:22  12              (Defense Exhibit E in evidence)

14:00:22  13    BY MR. NATALE:

14:00:28  14    Q.  Now, during your direct testimony, excerpts were taken from

14:00:35  15    Government's Exhibit 57 and shown to you, right?

14:00:35  16    A.  Yes.

14:00:42  17    Q.  And those excerpts contain things that were taken out and

14:00:48  18    put together as it related to individuals involved in this case.

14:00:49  19    A.  Explain further.

14:00:58  20    Q.  Well, if we look at Defense Exhibit E, this is in

14:01:01  21    chronological order.

14:01:02  22    A.  Yes.

14:01:10  23    Q.  And it goes from a beginning date of November 1, 2017 to an

14:01:29  24    ending date of December -- no, it looks like it would be January

14:01:32  25    -- no, December 2018.
```

14:01:34   1    A.  Yes.

14:01:42   2    Q.  Now, this would have reflected all of the Snapchat activity

14:01:46   3    for those four accounts, right?

14:01:51   4    A.  So this is the reflection for R------------1.  This is not

14:01:55   5    for all four accounts.  This is for only one account.

14:01:57   6    Q.  This is for only one account?

14:01:58   7    A.  Yes.

14:02:00   8    Q.  And that would be E. --

14:02:02   9    A.  E. is victim E.M.

14:02:03   10   Q.  Victim E.M?

14:02:04   11   A.  Four or five.

14:02:09   12   Q.  Okay.  And this is all that would be relating to her.

14:02:09   13   A.  Correct.

14:02:15   14   Q.  And have you subpoenaed the same information for everyone

14:02:17   15   else?

14:02:22   16   A.  No.  So what we did is we did a search warrant for all the

14:02:25   17   other accounts that we had, but we still have not received the

14:02:27   18   results back from it.

14:02:31   19   Q.  So this is the one account that you did receive the results

14:02:32   20   from?

14:02:37   21   A.  So -- yes.  So the search warrant was for four accounts from

14:02:39   22   victims from Plantation.

14:02:44   23   Q.  And but they only sent you the account of one person.

14:02:47   24   A.  No, they sent -- there's others in there for the other

14:02:48   25   accounts.

14:02:56  1    Q.  Oh.  Well, so Defense Exhibit E is all of those accounts

14:02:57  2    that you subpoenaed, right?

14:03:00  3    A.  Well, I mean, I have to look at the left-hand column and you

14:03:04  4    got to look at the user name in the columns.  So this one was --

14:03:05  5    Q.  Let me show it to you.

14:03:18  6    A.  Yeah, please.  Okay.  So you have the user names listed on

14:03:24  7    the side and that would be correct.

14:03:30  8    Q.  So was I correct when I said that this contained more than

14:03:33  9    one person's Snapchats?

14:03:38  10   A.  Yeah.  So we got the returns and were able to single it down

14:03:42  11   to one user, but we also got the returns for all of them.  So we

14:03:49  12   can -- by getting the files in CSP format, we're able to put

14:03:53  13   filters on the accounts so we can narrow it down to one

14:03:57  14   particular account.  And that's why when you look across, you're

14:04:01  15   able to see one account for X--------X.

14:04:07  16   Q.  Right.  And so this involves a number of people

14:04:14  17   communicating with a number of people in this Snapchat account.

14:04:17  18   A.  Correct.  Those are the people that the four accounts were

14:04:19  19   communicating with.

14:04:22  20   Q.  And those four people would be by initials?

14:04:25  21   A.  That would be E.M.

14:04:26  22   Q.  E.M.

14:04:27  23   A.  A.K.

14:04:28  24   Q.  A.K.

14:04:33  25   A.  That would be M.K., I believe.  And I think we did one other

14:04:37  1    account, I can't remember it offhand, but there was another

14:04:37  2    account.

14:05:04  3    Q.  Okay.  Thank you.  As it relates to the individuals in this

14:05:09  4    case, there were many different screenshots we saw; is that

14:05:09  5    correct?

14:05:14  6    A.  And when you reference screenshots, can you say which

14:05:16  7    screenshots you're referring to?

14:05:19  8    Q.  I'm just saying there were many of them in this case.

14:05:23  9    A.  Yes, there were many screenshots in his Note 3 if you want

14:05:24 10    to say that.

14:05:27 11    Q.  Right.  And some of the screenshots that have been entered

14:05:33 12    into evidence have on the head of it Meteor.

14:05:33 13    A.  Yes.

14:05:38 14    Q.  And you came to learn that Meteor was an Irish company.

14:05:41 15    A.  Yeah, it's a cellular service in Ireland, correct.

14:05:47 16    Q.  And that it has changed its name since, but back then it was

14:05:49 17    called Meteor, right?

14:05:49 18    A.  That's correct.

14:05:57 19    Q.  And that would correspond to the boyz11 and the other things

14:06:01 20    that we know about the person from Ireland, Matthew Johnstone?

14:06:04 21    A.  Well, we can't relate the two together, but we know they're

14:06:10 22    from Ireland.  So we know when we did the Kik return for boyz11,

14:06:14 23    we know that it resolved back to Ireland.  The Meteor, yes it

14:06:17 24    resolves back to Ireland, but we can't say for sure that the

14:06:20 25    screenshots are from Ireland.  It might be someone else.

| | | |
|---|---|---|
| 14:06:22 | 1 | Q.  Right.  That's why when you contacted the Irish authorities, |
| 14:06:25 | 2 | you learned that they were investigating this person and they |
| 14:06:31 | 3 | had done a search of his residence and have certain evidence of |
| 14:06:32 | 4 | his, right? |
| 14:06:36 | 5 | A.  Right.  We provided information to the Gardaí, and they were |
| 14:06:39 | 6 | able to do a search warrant on his residence with some of the |
| 14:06:40 | 7 | information that we provided. |
| 14:06:45 | 8 | Q.  And did they provide you the with the results of that search |
| 14:06:45 | 9 | warrant? |
| 14:06:49 | 10 | A.  No.  We put a mutual legal assistance request in and we're |
| 14:06:53 | 11 | waiting on the data returns for it. |
| 14:06:58 | 12 | Q.  And so at this point, we don't know what would be on the |
| 14:07:00 | 13 | records and the computers or cellphones for -- |
| 14:07:02 | 14 | A.  Not at this time, no. |
| 14:07:11 | 15 | Q.  Now, there was an indication that there was -- I believe it |
| 14:07:45 | 16 | was Exhibit 43.  I'm sorry.  This is Government's Exhibit 60. |
| 14:07:57 | 17 | This is an exhibit which the government went through line for |
| 14:07:59 | 18 | line.  Do you recall that? |
| 14:08:00 | 19 | A.  I do. |
| 14:08:06 | 20 | Q.  Now, this was a document that you created, right? |
| 14:08:10 | 21 | A.  Created based on the chats that were in the phone and we |
| 14:08:12 | 22 | showed the exported data. |
| 14:08:17 | 23 | Q.  Well, isn't it true that there were also images that |
| 14:08:26 | 24 | accompanied these chats in the sequence of these chats? |
| 14:08:27 | 25 | A.  Yes, there were. |

14:08:33  1    Q.   And that those images are not necessarily -- well, they're

14:08:37  2    not -- they're not contained to show us exactly who they were

14:08:39  3    talking about, right?

14:08:40  4    A.   I'm sorry?

14:08:45  5    Q.   In this Exhibit 60.  You put down that it's referring to

14:08:47  6    certain people, right?

14:08:49  7    A.   Right.  Because they were talking about those certain

14:08:51  8    people.

14:08:56  9    Q.   But what you have is that the images that would have related

14:08:58  10   to that are not on here.

14:09:01  11   A.   No.  But if you look at the exported version, it does show

14:09:05  12   that.  These are only -- this is only a chat summary.

14:09:09  13   Q.   Right.  Now, the summaries of the chats, there's, I believe,

14:09:18  14   mentioned someone about D. choking someone?  I believe Page 3.

14:09:24  15   Do you recall that?

14:09:26  16   A.   Show me which line?  I'm sorry.

14:09:36  17   Q.   Okay.  It is I think it's right here.

14:09:39  18   A.   Are we looking under January 18th?

14:09:49  19   Q.   Yes.  I think it begins in January 17th and then it goes on

14:09:57  20   where they're talking about her choking.  Maybe it's on the page

14:10:04  21   before that where she's -- they're talking about her choking

14:10:06  22   someone.  Do you recall that?

14:10:08  23   A.   I do recall that, yes.

14:10:16  24   Q.   And accompanying that was actually a report showing that

14:10:20  25   this person D. had been arrested for assaulting someone by

| | | |
|---|---|---|
| 14:10:23 | 1 | choking them at school, right? |
| 14:10:28 | 2 | A.   There was an image of someone's, I guess, picture from like |
| 14:10:32 | 3 | a jail photo, yes, that was included.  And that would be on the |
| 14:10:32 | 4 | extraction. |
| 14:10:36 | 5 | Q.   Right.  And that was sort of -- that's what was referring to |
| 14:10:40 | 6 | when they were talking about choking. |
| 14:10:43 | 7 | A.   If you bring up the other extraction, I'll show you, yes. |
| 14:10:53 | 8 | Q.   Okay.  Let's see the other extraction.  See if this |
| 14:10:57 | 9 | refreshes your recollection, sir. |
| 14:11:22 | 10 | A.   Yeah.  Screenshot like, yes.  Okay. |
| 14:11:27 | 11 | Q.   Okay.  Now, you would agree then that excerpt regarding |
| 14:11:34 | 12 | choking referred to this person D. or whoever being arrested for |
| 14:11:37 | 13 | assaulting someone? |
| 14:11:41 | 14 | A.   I didn't check into the arrest.  Those were -- and they |
| 14:11:44 | 15 | weren't child pornography images, so I did not check into the |
| 14:11:46 | 16 | arrest of why he was sending it. |
| 14:11:49 | 17 | Q.   But it was mentioned in here, the choking that was referred |
| 14:11:51 | 18 | to was connected to the images of this person D.? |
| 14:11:55 | 19 | A.   They were connected with the images, but they're not |
| 14:11:59 | 20 | involved with any type of extortion of children, those messages. |
| 14:12:02 | 21 | They're just images of someone with an arrest record. |
| 14:12:04 | 22 | Q.   Right.  What I was asking you though when it was brought out |
| 14:12:09 | 23 | that there was the mention of choking, it had nothing to do with |
| 14:12:11 | 24 | sextorting anyone, did it? |
| 14:12:12 | 25 | A.   No. |

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED BY COMPUTER

116

```
14:12:31   1    Q.   Okay.  Now sir, there was a number of people in this case,
14:12:38   2    number of these teenagers, they were threatened to lose access
14:12:42   3    of their Snapchat account, correct?
14:12:43   4    A.   That's correct.
14:12:50   5    Q.   And that the threat that was made was that they wouldn't get
14:12:55   6    their Snapchat back account unless they did certain things.
14:12:56   7    A.   That's correct.
14:13:03   8    Q.   And to get a Snapchat account, you can always just apply.
14:13:05   9    You can have more than one, right?
14:13:07   10   A.   Yeah, you can several Snapchat accounts.
14:13:12   11   Q.   And that there's some people who have more than one.
14:13:17   12   A.   They do.  Children are more comfortable with their one
14:13:21   13   account because they want to get their scores higher, so they
14:13:22   14   don't want to give it up.
14:13:25   15   Q.   Now, let's talk about these scores.  Do they get any
14:13:27   16   monetary reward for these scores?
14:13:31   17   A.   There's no monetary reward, no.  It's emojis that they get.
14:13:37   18   Q.   Okay.  An emoji is an image, like a picture or something?
14:13:41   19   A.   Right.  So for them it's a status symbol.  They get higher
14:13:45   20   counts, more points, and if they reach a certain level, then it
14:13:48   21   shows.  So it's a status symbol for the kids.
14:13:51   22            THE COURT:  It may be a status symbol, but it's also
14:13:54   23   physically a picture of something.
14:13:55   24            MR. NATALE:  Right.
14:13:55   25            THE COURT:  Okay.
```

```
14:13:55   1          BY MR. NATALE:
14:14:02   2     Q.   Now, and in that world, that has value to them.  Correct?
14:14:05   3     A.   That has value to the children, yes.
14:14:12   4     Q.   And it was the fear of that, of losing that, which was what
14:14:19   5     was used to coerce them into producing nude pictures of
14:14:21   6     themselves and then do other things, correct?
14:14:24   7     A.   That, and things that may have been in their accounts that
14:14:26   8     they did not want to lose.
14:14:28   9     Q.   Well then, there are some people who had things that were
14:14:34   10    already in their account which they felt were private and they
14:14:37   11    didn't want released.
14:14:37   12    A.   That's correct.
14:14:45   13    Q.   And for those individuals, it was not only did we take over
14:14:50   14    your account, we will show these other images that they already
14:14:51   15    had on their phone.
14:14:54   16    A.   Correct.  They were being used as leverage, correct.
14:15:01   17    Q.   And that it was from that point that they then went to do
14:15:05   18    more and more things with the hope that they were going to be
14:15:13   19    getting back their Snapchat account and that these images
14:15:17   20    wouldn't be sent out to the world.
14:15:21   21    A.   Yes.  The taking over the account was the initial leverage
14:15:24   22    that he used to get the children to start producing child
14:15:25   23    pornography, yes.
14:15:32   24    Q.   All right.  And there are some who had images on there that
14:15:36   25    he didn't even have to ask them to produce.  They already had,
```

```
14:15:37   1    right?

14:15:40   2    A.   There were some that had images in their accounts, yes.

14:15:47   3    Q.   And I believe one of the teenagers in this case, who I think

14:15:55   4    you interviewed, testified that she actually offered and

14:16:02   5    actually gave the images of other friends to Mr. Woodson, right?

14:16:05   6    A.   Right, in hopes to get her account back, yes.

14:16:12   7    Q.   Right.  And so she gave them to -- the nudes of other

14:16:15   8    people.  Do you recall if when she -- you were talking to her,

14:16:20   9    she said that she got their prior permission?

14:16:26  10    A.   No.  She had said in the interview that she had sent images

14:16:29  11    over to and try to get the account back.

14:16:32  12    Q.   Right.  But she didn't say that she had their prior

14:16:33  13    permission.

14:16:35  14             MS. ANTON:  I would object to hearsay.

14:16:40  15             MR. NATALE:  Your Honor, it's impeachment.

14:16:44  16             THE COURT:  I'll permit it.  Do you think he actually

14:16:49  17    answered that question?  Because I don't think he did.

14:16:52  18             THE WITNESS:  I'm sorry, sir.  Did you say go ahead

14:16:52  19    with it?

14:16:53  20             THE COURT:  Yes.

14:16:55  21             THE WITNESS:  Okay.  And just say the question again

14:16:57  22    please.

14:16:57  23        BY MR. NATALE:

14:17:03  24    Q.   She testified here in court that she called people and got

14:17:07  25    their permission to send these nudes of them out.
```

| | | |
|---|---|---|
| 14:17:09 | 1 | A.  Yeah, I don't recall her saying that. |
| 14:17:12 | 2 | Q.  She didn't say that in your interview. |
| 14:17:13 | 3 | A.  No. |
| 14:17:16 | 4 | Q.  Okay.  And the interview was recorded, correct? |
| 14:17:17 | 5 | A.  Yes, it was. |
| 14:17:21 | 6 | Q.  Okay. |
| 14:17:22 | 7 | THE COURT:  Are you saying that you didn't hear her say |
| 14:17:25 | 8 | that in court?  Or are you saying she didn't say that in your |
| 14:17:26 | 9 | interview? |
| 14:17:28 | 10 | THE WITNESS:  No.  I heard her say in court that she |
| 14:17:32 | 11 | got permission; I did not hear her say that in the interview.  I |
| 14:17:34 | 12 | don't recall her saying that in the interview. |
| 14:17:34 | 13 | THE COURT:  Okay. |
| 14:17:34 | 14 | BY MR. NATALE: |
| 14:17:37 | 15 | Q.  And when you looked -- we have the transcript here.  Do you |
| 14:17:44 | 16 | want to look at the transcript and see whether she did say that |
| 14:17:44 | 17 | to you? |
| 14:17:47 | 18 | A.  If you want to show it to me, sure. |
| 14:17:55 | 19 | THE COURT:  How long is this transcript? |
| 14:17:55 | 20 | MR. NATALE:  It's not very long. |
| 14:18:02 | 21 | What I'm asking you, Detective, is are you saying that |
| 14:18:09 | 22 | she -- when you interviewed her, that she actually said I got |
| 14:18:13 | 23 | their permission before I sent out their nudes? |
| 14:18:16 | 24 | THE WITNESS:  Like I said, if you let me look at the |
| 14:18:18 | 25 | transcript, I'll tell you directly.  I don't want to answer |

14:18:23  1   without seeing something to tell you an actual answer.

14:18:32  2       BY MR. NATALE:

14:18:38  3   Q.  Now, when you were talking to these young teenagers, you

14:18:41  4   certainly had other people there and you did everything you

14:18:45  5   could to make them feel comfortable.

14:18:46  6   A.  That's correct.

14:18:53  7   Q.  And you explained to them that they weren't in any trouble?

14:18:55  8   A.  That's right.  They were victims.

14:18:59  9   Q.  And that they were just witnesses, and that they should be

14:19:01  10  frank and candid with you?

14:19:02  11  A.  Yes.

14:19:05  12  Q.  And these weren't the first times you interviewed people

14:19:07  13  like that, was it?

14:19:10  14  A.  No.  When talking to children and we interview children,

14:19:13  15  especially if they're victims, we tell them that they're not in

14:19:15  16  trouble, especially when something happens over the internet.

14:19:24  17  Q.  Right.  So now -- but you also impress that it's important

14:19:26  18  to tell you everything that went on.

14:19:27  19  A.  Yes.

14:19:34  20  Q.  Now, when you first were interviewing people, you'd want to

14:19:38  21  know how much they knew about what happened and how things were

14:19:39  22  distributed.

14:20:00  23      MR. NATALE:  It would be Page 9.

14:20:02  24      BY MR. NATALE:

14:20:05  25  Q.  Detective, I'd like you to look at this and see if it

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED BY COMPUTER

14:20:08  1    refreshes your recollection regarding the statement that was

14:20:11  2    given to you by E.M.

14:20:14  3            THE COURT:  I didn't hear him say his memory was gone.

14:20:17  4    When did he say that?

14:20:19  5            MR. NATALE:  I think he said that he couldn't answer --

14:20:22  6    he couldn't remember unless he got a chance to see this.

14:20:24  7            THE COURT:  Okay.  Well, that's different than

14:20:29  8    refreshing memory.  Just look at it and look through it.

14:21:21  9            THE WITNESS:  Would you like me to read that or do you

14:21:23 10    want to bring it up?

14:21:25 11            THE COURT:  After you've read it, you put it down and

14:21:28 12    you answer the questions.

14:21:28 13            BY MR. NATALE:

14:21:32 14    Q.  Do you recall, having looked at this transcript, her saying

14:21:37 15    that she had prior permission before she went through her phone

14:21:40 16    and sent nudes of other people?

14:21:42 17    A.  No, she did not.

14:22:05 18    Q.  Now, the teenager A.G., you were able to locate her,

14:22:06 19    correct?

14:22:08 20    A.  Yes, she was located, correct.

14:22:12 21    Q.  You didn't have her IP address?

14:22:15 22    A.  No, we did not.

14:22:21 23    Q.  But you were, basically by using social media, able to

14:22:23 24    locate her.

14:22:27 25    A.  Yes.  With the assistance of the Louden County Sheriff's

14:22:33  1    Office, we were able to locate her with one of the detective's

14:22:33  2    help.

14:22:36  3    Q.  What you were able to do was find out certain information

14:22:40  4    and then follow-up on that information and found out that she

14:22:43  5    went to a particular high school.

14:22:44  6    A.  That's correct.

14:22:47  7    Q.  Okay.  Didn't require any court orders or subpoenas or

14:22:49  8    anything.

14:22:50  9    A.  No, it did not.

14:22:55  10   Q.  It was just sort of regular investigative work?

14:22:59  11   A.  It's -- what's the term, it's -- when anybody can look at

14:23:01  12   the information, it's for everybody.

14:23:08  13   Q.  It's for everybody.  Now, one of the things that came up was

14:23:11  14   the issue of swatting.  And you're familiar with swatting,

14:23:12  15   right?

14:23:13  16   A.  Yes.

14:23:16  17   Q.  And it's a real phenomenon, isn't it?

14:23:16  18   A.  It happens.

14:23:19  19   Q.  And it's happened rather frequently?

14:23:22  20   A.  I don't know about frequently, but it does happen.

14:23:26  21   Q.  Well, and people have been killed.

14:23:28  22   A.  In my jurisdiction, no.

14:23:31  23   Q.  I'm not asking in your jurisdiction.

14:23:34  24   A.  Has it happened?  I'm sure it has.

14:23:39  25   Q.  And sir, you're also familiar with certain internet gaming

14:23:46  1    communities and the relationship between that and swatting given

14:23:49  2    that you specialize in this internet area.

14:23:50  3    A.  Yes.

14:24:00  4    Q.  And that the people who have been swatted and the people who

14:24:04  5    are doing the swatting, are we to infer from your testimony that

14:24:07  6    the only way you can swat someone is if you get a court order to

14:24:13  7    find out their address?

14:24:18  8    A.  Well, they need the address of the person -- so a swat would

14:24:22  9    usually come in as a 911 call, and then they would give the

14:24:25  10   address of where it occurs and police respond to it.  But you

14:24:28  11   need to know the person's address to do that.

14:24:30  12   Q.  Right.  And there are other ways to learn someone's address

14:24:36  13   other than just by an subpoenaing IP addresses, right?

14:24:39  14   A.  Correct.  If it's put out there for public access, yes.

14:24:47  15   Q.  Exactly.  Just like you found teenager A.G., right?

14:24:51  16   A.  Well, teenager A.G., we actually contacted the school to

14:24:54  17   find out where she was.  So it was law enforcement to law

14:24:56  18   enforcement at the school.

14:25:06  19        MR. NATALE:  One moment.

14:25:16  20        BY MR. NATALE:

14:25:20  21   Q.  Now, one of the teenagers who was involved in this, A.C.?

14:25:22  22   A.  Yes.

14:25:32  23   Q.  She was contacted by someone in January of 2019.

14:25:33  24   A.  Yes.

14:25:37  25   Q.  Mr. Woodson had already been in custody.

14:25:42   1    A.   Yes.   Like I said, the person in Ireland is still active.

14:25:59   2    Q.   Okay.   And there was the user ID that she used or that was

14:26:01   3    used to contact her.   Do you remember what that was?

14:26:02   4    A.   I don't recall.

14:26:11   5    Q.   Okay.   It certainly wasn't a user ID that Joseph had at the

14:26:12   6    time.

14:26:15   7    A.   Okay.   And was it through Snapchat or Kik?   Because I don't

14:26:18   8    recall.   Because she had mentioned that she was contacted in

14:26:19   9    January, yes.

14:26:21   10   Q.   Right.   But he was in custody.

14:26:22   11   A.   Yes.

14:26:27   12   Q.   And he didn't have access to the computers and the internet

14:26:28   13   at that time.

14:26:33   14   A.   We established that he's still active and he does still

14:26:34   15   reach out to people.

14:26:35   16   Q.   That's the Irish person.

14:26:36   17   A.   Yes.

14:26:54   18   Q.   Okay.   Now, there's been a lot of questions about what was

14:27:00   19   found and what wasn't found on the devices that relate to

14:27:02   20   Joseph.

14:27:03   21   A.   Yes.

14:27:11   22   Q.   My question is there are other ways for people to have

14:27:20   23   communicated or other devices to have been used which were not

14:27:26   24   in Joseph's possession at the time of the search warrants?

14:27:32   25   A.   Okay.   And during his interview, he mentioned that the

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED BY COMPUTER

14:27:37  1    devices that he had was an S7 and a Note 3 and some other

14:27:39  2    devices that were taken from his residence.

14:27:46  3    Q.  Right.  But the inquiry into whether he was contacted and

14:27:56  4    what other contact he had by the Matt Johnstone, we don't have

14:28:01  5    anything other than what happened after a certain date.  We

14:28:05  6    don't know what records existed.

14:28:08  7    A.  Well, you're assuming they existed at all.  That's Number 1.

14:28:11  8    Q.  Well, I understand that.  But the way to find out would be

14:28:14  9    to subpoena -- be able to subpoena those records, right?

14:28:17  10   A.  But which are you referring to?

14:28:21  11   Q.  Well -- and what I'm asking you, sir, is only law

14:28:23  12   enforcement can get these records, right?

14:28:28  13   A.  Correct.  But which records are you referring to?

14:28:34  14   Q.  Well, any records; other Kik records, Snapchat records.

14:28:36  15   A.  Yes, you have to serve legal process.

14:28:41  16   Q.  Right.  So -- and that legal process can only be served by

14:28:42  17   law enforcement?

14:28:43  18   A.  Yes.

14:28:52  19           MR. NATALE:  No further questions.

14:28:55  20           THE COURT:  Redirect.

14:28:57  21                        REDIRECT EXAMINATION

14:28:59  22       BY MS. ANTON:

14:29:04  23   Q.  Defense counsel, Detective Bieber, had asked you about

14:29:08  24   finding someone with information that's out there on the

14:29:13  25   internet and was talking to you about victim A.G., A.G.  Do you

14:29:14  1   remember those questions?

14:29:16  2   A.  I do.

14:29:20  3   Q.  You reviewed all of the social media in this case and was

14:29:26  4   A.G. actually using her own real, true name in her social media?

14:29:30  5   A.  No, it wasn't but we had the picture of her and we

14:29:35  6   identified her by a sweatshirt that she had on with a school

14:29:38  7   logo on it, and that's how we were able to track her back to the

14:29:39  8   area.

14:29:42  9   Q.  And you didn't get her home address from that picture or

14:29:43  10  from her social media, did you?

14:29:47  11  A.  No.  We actually called the school up -- we found the

14:29:53  12  school, we called the school up, asked to speak to SRO and the

14:29:56  13  SRO was able to confirm --

14:29:58  14          THE COURT:  What's an SRO?  You're talking code.

14:30:00  15          THE WITNESS:  I'm sorry, school resource officer.

14:30:01  16          THE COURT:  Okay.

14:30:01  17          BY MS. ANTON:

14:30:05  18  Q.  So in order to find out who A.G. was, law enforcement had to

14:30:09  19  contact the school and use the help of law enforcement, the SRO

14:30:13  20  officer, school resource officer at the school.

14:30:14  21  A.  That's correct.

14:30:17  22  Q.  Okay.  So a normal person couldn't have called the school

14:30:19  23  and asked for A.G.?

14:30:23  24  A.  No, they're not going to give records out to anyone.

14:30:27  25  Q.  Now, defense counsel also asked you about the interview that

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED BY COMPUTER

14:30:28  1    you conducted with victim E.M.

14:30:29  2    A.  Yes.

14:30:33  3    Q.  Is that called a forensic interview?

14:30:38  4    A.  Yes.  I was a child abuse investigator prior to becoming

14:30:43  5    ICAC investigator.  So I had learned how to do forensic

14:30:45  6    interviews with children, and that's how we conducted the

14:30:48  7    interview.  It's a soft interview.

14:30:52  8    Q.  So you've been trained on how to interview children.

14:30:52  9    A.  Yes.

14:30:55  10   Q.  And in that interview with E.M., and you looked through the

14:30:58  11   transcript that defense counsel provided to you, did you ever

14:31:01  12   ask her the direct question of whether she had permission?

14:31:04  13   A.  No, I did it not.

14:31:06  14   Q.  Did it matter to you if she had permission or not?

14:31:11  15   A.  It mattered that she was a victim in this investigation.

14:31:14  16   Q.  Now, defense counsel also asked you about images that some

14:31:19  17   of these children may have already had on their Snapchat

14:31:22  18   accounts in the "for my eyes only" section.

14:31:23  19   A.  Yes.

14:31:25  20   Q.  Were these the types of images though that the Defendant

14:31:26  21   wanted?

14:31:30  22   A.  Yes.  He would like -- he wanted access to the "for my eyes

14:31:34  23   only" folder, and requested the code for that folder.

14:31:37  24   Q.  Right.  He wanted access to that folder.  But let's talk

14:31:40  25   specifically about the images.  What types of images from this

14:31:44  1    case did you learn that the Defendant specifically wanted the

14:31:46  2    victims to produce?

14:31:48  3           In other words, before you answer, let me clarify a

14:31:51  4    little bit.  Was there specific conduct or activities that the

14:31:52  5    Defendant wanted?

14:31:56  6    A.  He wanted any type of nude images.

14:32:02  7    Q.  How about images with writing, writing on their bodies?

14:32:03  8    A.  From the --

14:32:04  9    Q.  From the victims.

14:32:07  10   A.  From the "eyes only"?  The ones that are already produced?

14:32:10  11   Q.  No, no.  I'm not asking you from the victims' Snapchat

14:32:11  12   accounts.  Okay?

14:32:13  13          Let's start over with this area of questioning.  Okay.

14:32:16  14   Defense counsel was asking you about the image that's the girls

14:32:20  15   may have already had in their "for my eyes only", right?

14:32:20  16   A.  Right.

14:32:22  17   Q.  And you heard some of the girls testify that they did have

14:32:24  18   some naked pictures in there.

14:32:25  19   A.  Yes.

14:32:30  20   Q.  Okay.  My question to you is did the Defendant want specific

14:32:33  21   types of nude images from these girls that he was extorting?

14:32:36  22   A.  Yes.  He was very methodical in the way he asked for the

14:32:37  23   images.

14:32:40  24   Q.  And very specific in how he wanted the images.

14:32:41  25   A.  And in what order, yes.

14:32:45   1    Q.   Okay.   You also were talking about emojis and things of

14:32:51   2    value on cross-examination with the defense counsel.   Do images

14:32:54   3    of child pornography have a value?

14:32:57   4    A.   Like what, a monetary value?

14:32:59   5    Q.   Do they have a monetary value?

14:33:10   6    A.   To other pedophiles and sexual offenders, yes.

14:33:15   7    Q.   Now, let's talk briefly about the involvement of the Gardaí

14:33:18   8    Police in Ireland.   Defense counsel had asked you about that at

14:33:22   9    the beginning of the questioning.   Did Ireland reach out to the

14:33:27  10    FBI and say they needed help or did the FBI reach out to

14:33:27  11    Ireland?

14:33:30  12    A.   No, we reached out to the Gardaí.

14:33:33  13    Q.   So had you done some investigation and determine that there

14:33:36  14    was a co-conspirator in Ireland and then you notified Ireland?

14:33:39  15    A.   That's correct.   Once we established that there was somebody

14:33:45  16    from Ireland, we had gone through our liaison, FBI liaison in

14:33:51  17    Europe, to contact the authorities about what our findings were.

14:33:58  18              MS. ANTON:   Thank you.   I have no further questions.

14:33:59  19              THE COURT:   Thank you, sir.   Are you excused.

14:34:04  20              We're going to take our afternoon break at this point

14:34:08  21    because I have another hearing.   So as soon as I'm done, I'll

14:34:12  22    call you in.   So use the bathroom at the beginning of the break.

14:34:15  23    Thank you.

14:34:18  24              COURT SECURITY OFFICER:   All rise for the jury.

14:34:20  25              (Jury out at 2:34 p.m.)

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED BY COMPUTER

```
14:34:23   1              THE COURT:  We'll take about a 15 minute break and
14:34:27   2   we'll be back as soon as we're done.
14:34:27   3              (Recess in proceedings)
15:04:05   4              (Jury in at 3:04 p.m.)
15:04:57   5              (SIDEBAR CONFERENCE:
15:05:01   6              MS. ANTON:  You must have read our minds.
15:05:03   7              THE COURT:  You're reading correct.
15:05:05   8              MS. ANTON:  We just have a stipulation.
15:05:07   9              THE COURT:  And then after you do that, you're going to
15:05:07  10   rest.
15:05:10  11              You do have witnesses that you got to get done, right?
15:05:11  12              MR. NATALE:  Yes.
15:05:13  13              THE COURT:  Can we then reserve your motions?  Does
15:05:17  14   everybody agree that we can reserve the motions until afterwards
15:05:21  15   without waiving anything?
15:05:24  16              MR. NATALE:  Yes.  So what we'll do is it will be on
15:05:25  17   the record that we haven't waived them.
15:05:27  18              THE COURT:  This is the record.  You're not waiving
15:05:32  19   anything by waiting until the close -- at the end of the day or
15:05:35  20   the first thing in the morning to have that.
15:05:37  21              MS. VIAMONTES:  Judge, would it --
15:05:38  22              THE COURT:  Speak up.  They can't hear you.
15:05:40  23              MS. VIAMONTES:  The Government and the Defense agree
15:05:46  24   that the Court can instruct the jury on who Victim 1 is, Victim
15:05:49  25   2 through 7.  So before we rest, we just wanted to get that
```

15:05:50  1    agreement on the record.

15:05:52  2         THE COURT:  When are you going to do that?  When am I

15:05:53  3    going to know?

15:05:56  4         MS. VIAMONTES:  We'll give you a list.

15:05:57  5         THE COURT:  All right.  Because I don't know.  I can

15:06:01  6    instruct them like crazy, but I need to know it before I can do

15:06:01  7    that.

15:06:04  8         MR. NATALE:  What we agreed to is we'll take Count 1

15:06:09  9    and then it will say M.E., or whatever the initials are.

15:06:11  10         THE COURT:  Whatever it is, we'll work it out.

15:06:12  11         MS. VIAMONTES:  But the indictment, the indictment

15:06:16  12    refers to this one in Count 2 of the victims so --

15:06:20  13         THE COURT:  We'll work it out.  Okay.  Thank you.

15:06:21  14         (END OF SIDEBAR).

15:06:25  15         THE COURT:  Sorry.  We had more business to deal with.

15:06:26  16    You all can be seated, please.

15:06:35  17         All right.  Government, what else you got?

15:06:37  18         MS. ANTON:  Yes, Your Honor.  The Government moves

15:06:41  19    Government's 89 into evidence and seeks permission to publish.

15:06:43  20         THE COURT:  89.  Is there any objection?

15:06:43  21         MR. NATALE:  No objection.

15:06:46  22         THE COURT:  Without objection, 89, which doesn't exist,

15:06:54  23    will be admitted in evidence.

15:06:55  24         (Government's Exhibit 89 in evidence)

15:06:57  25         THE COURT:  Go.

15:06:58  1          MS. ANTON:  In the case of United States of America

15:07:03  2     versus Joseph Isaiah Woodson, the United States and the

15:07:07  3     Defendant, Joseph Isaiah Woodson, Junior, agree and stipulate to

15:07:11  4     the following facts which the jury shall accept as proven beyond

15:07:11  5     a reasonable doubt.

15:07:15  6          Victims 1, 2 and 3 are each actual minors; that is a

15:07:18  7     real person that was less than 18 years old at the time of the

15:07:19  8     offense.

15:07:24  9          Two:  The visual depictions of Victims 1, 2 and 3 were

15:07:26 10     transported in interstate commerce.

15:07:32 11          Three:  Messages sent using Kik, Snapchat, Instagram

15:07:36 12     and text are messages that travel in interstate commerce.

15:07:41 13          Four:  Government's Exhibit numbers 85 A through E are

15:07:44 14     the business records of Instagram and are admissible into

15:07:46 15     evidence.

15:07:49 16          Government's Exhibit 57 are the business records of

15:07:52 17     Snapchat and admissible in evidence.

15:07:54 18          Number 7:  The phone extractions offered into evidence

15:07:58 19     in Government's Exhibit 56 are authentic and accurate

15:08:03 20     extractions of the Defendant's Samsung Galaxy Note 3.

15:08:05 21          THE COURT:  Did you skip Number 6?

15:08:06 22          MS. ANTON:  Oh, did I?  I apologize.

15:08:08 23          THE COURT:  I thought you did.  I'm not sure.

15:08:08 24          MS. ANTON:  I can't count.

15:08:13 25          Government's Exhibits 86 A through B are the business

15:08:17  1     records of Dropbox and are also admissible in evidence.

15:08:20  2          I already did 7.  I'll skip to 8.

15:08:22  3          THE COURT:  Eight is next.

15:08:22  4          MS. ANTON:  Thank you, Judge.

15:08:26  5          The phone extractions offered into evidence in

15:08:31  6     Government's Exhibits 62 are authentic and accurate extractions

15:08:36  7     of the Defendant's Samsung Galaxy S8.

15:08:42  8          Government's Exhibits 1, 26, 33, and 88 are authentic

15:08:46  9     and accurate copies of e-mails sent via Snapchat to account

15:08:47 10     holders.

15:08:51 11          10:  Government's Exhibits Numbers 66 A through D are

15:08:55 12     authentic and accurate Verizon business records of the IP

15:08:58 13     addresses the Defendant used during the offenses charged.

15:09:03 14          11:  From October 2017 through September 24, 2018, the

15:09:11 15     Defendant resided at 21767 Ascot Court in Ashburn Virginia.

15:09:13 16          12:  Government's Exhibits Numbers 74 and 75 are

15:09:18 17     authentic and accurate business record from Kik showing the IP

15:09:21 18     address was used by an individual in Ireland.

15:09:25 19          Signed by the Government, Defense and the Defendant.

15:09:27 20          THE COURT:  All right.  A stipulation is just another

15:09:29 21     method of evidence.  You can have evidence coming from the stand

15:09:32 22     or from exhibits or from an agreement of the parties.  This is

15:09:36 23     not something that they're disputing.  They both agree that this

15:09:40 24     is evidence, so you have to accept it as having been proven.

15:09:42 25          All right?  Next?

15:09:43   1          MS. ANTON:  Judge, at this time the United States

15:09:44   2   rests.

15:09:45   3          THE COURT:  All right.  United States having rested,

15:09:52   4   Defense reserves?  What do you got?

15:09:55   5          MS. MOLLISON:  Your Honor, at this time the defense

15:09:57   6   calls Alain Gomez.

15:10:17   7          THE COURT:  All right.  Go for it.  When you reach the

15:10:25   8   chair, please remain standing and raise your right hand.

15:10:26   9          ALAIN GOMEZ, DEFENSE WITNESS, SWORN.

15:10:29  10          THE COURT:  All right.  Get as close to the microphone

15:10:33  11   as you can, speak loudly, tell us your name and spell it.

15:10:36  12          THE WITNESS:  Name is Alain Gomez.  A-L-A-I-N,

15:10:38  13   G-O-M-E-Z.

15:10:40  14          THE COURT:  All right.  You may proceed.

15:10:40  15                       DIRECT EXAMINATION

15:10:40  16      BY MS. MOLLISON:

15:10:43  17   Q.  Good afternoon, Mr. Gomez.

15:10:43  18   A.  Good afternoon.

15:10:46  19   Q.  Can you please introduce yourself to the jury?

15:10:50  20   A.  My name is Alain Gomez.  I'm an employee with the Federal

15:10:51  21   Defender's Office.

15:10:53  22   Q.  And what's your role at the Federal Defender's Office?

15:10:55  23   A.  I'm an investigator.

15:10:57  24   Q.  Okay.  How long have you been at our office doing that?

15:11:00  25   A.  It will be three years this January.

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED BY COMPUTER

15:11:03   1   Q.   And what did you do prior to be to being an investigator

15:11:04   2   with the Federal Defender's Office?

15:11:08   3   A.   I was a police officer for Miami-Dade Police Department.

15:11:10   4   Q.   How long were you there?

15:11:11   5   A.   12 years.

15:11:14   6   Q.   And what kind of cases did you work on in the police

15:11:14   7   department?

15:11:17   8   A.   A little bit of everything.  We did burglaries, robberies,

15:11:22   9   narcotics, firearms, fraud.

15:11:24   10   Q.   And what did you do prior to that?

15:11:30   11   A.   I was a surgical technologist at Miami Children's Hospital.

15:11:33   12   Q.   And today and since being at the Federal Defender's Office,

15:11:36   13   as part of your role as an investigator do you help us to work

15:11:38   14   on and investigate cases?

15:11:43   15   A.   Yes, I do.  They request things that they want looked into

15:11:45   16   and I report back to them the findings.

15:11:48   17   Q.   And were you asked to do some investigation work on this

15:11:48   18   case?

15:11:49   19   A.   Yes, I was.

15:11:53   20   Q.   Okay.  Were you asked by us to look into the Kik user name

15:11:59   21   MVLex3?  That's M-V-L-E-X 3?

15:11:59   22   A.   Yes.

15:12:02   23   Q.   And what did you learn about how long that account has been

15:12:04   24   in existence?

15:12:08   25   A.   I created a Kik account and on the profiles when you do the

15:12:13  1    searches, it shows how many days the account has been active.

15:12:18  2    With some math and an online calculation tool, I was able to get

15:12:21  3    the date that it was that the account was created.

15:12:22  4    Q.  And what was that date?

15:12:25  5    A.  December 16th of 2016.

15:12:28  6    Q.  Okay.

15:12:29  7            MS. MOLLISON:  That's all, Your Honor.

15:12:32  8            THE COURT:  Cross-examination.

15:12:34  9            MS. VIAMONTES:  Yes, Judge.

15:12:34  10                       CROSS-EXAMINATION

15:12:34  11       BY MS. VIAMONTES:

15:12:37  12   Q.  Good afternoon, sir.  How are you?

15:12:39  13   A.  Good afternoon.

15:12:44  14   Q.  Sir, did you have an opportunity to look at your client's

15:12:45  15   phone extractions?

15:12:48  16   A.  Briefly.

15:12:53  17   Q.  Just briefly?  You didn't look through his Note 3 phone in

15:12:56  18   detail?

15:12:56  19            MS. MOLLISON:  Objection, Your Honor.  The question I

15:12:58  20   think is beyond the scope.

15:13:00  21            THE COURT:  I think it is.

15:13:00  22       BY MS. VIAMONTES:

15:13:03  23   Q.  You mentioned that you looked at the Kik account, correct?

15:13:04  24   A.  The one I created.

15:13:07  25   Q.  But you did that in order to look at MVLex which was your

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED BY COMPUTER

15:13:10   1   client's Kik account, right?

15:13:15   2   A.   Correct.  But when you conduct a search for the user name,

15:13:18   3   the only thing that pops up is a profile page.

15:13:24   4   Q.   Okay.  And that profile page was Mr. Woodson's profile page,

15:13:25   5   correct?

15:13:32   6   A.   All it says on it is the letters M-V-L-E-X 3 with a count of

15:13:36   7   the days that the account has been active and a picture.

15:13:38   8   Q.   Okay.  And the reason you looked for that account is because

15:13:44   9   that MVLex account was on your client's phone at the time of the

15:13:46   10  search warrant, correct?

15:13:49   11  A.   I do not know the answer to that question.

15:13:53   12  Q.   So you have no idea why you were asked to look for MVLex's

15:13:54   13  Kik account.

15:13:57   14  A.   No.  They asked me to look for something, I search it and I

15:13:59   15  report the findings back to them.

15:14:05   16  Q.   Okay.  Based on your training and your experience as an

15:14:09   17  investigator and previously a law enforcement officer, you are

15:14:13   18  aware, right, that Kik does not retain the content of text

15:14:16   19  messages exchanged, correct?

15:14:17   20         MS. MOLLISON:  Again, objection, Your Honor.  I think

15:14:18   21  this is beyond the scope.

15:14:21   22         THE COURT:  I think it is.  I'll sustain the objection.

15:14:21   23         MS. VIAMONTES:  Your Honor --

15:14:25   24         THE COURT:  No, move on.  I may not always be right,

15:14:30   25  but I'm never in doubt.  Move on.

15:14:30   1          BY MS. VIAMONTES:

15:14:41   2     Q.   When you looked at MVLex online, you weren't able to see

15:14:43   3     content, correct?

15:14:44   4     A.   Correct.

15:14:47   5     Q.   You, as an investigator with the Public Defender's Office,

15:14:51   6     you have subpoena power?

15:14:52   7     A.   Yes, we do.

15:14:55   8     Q.   And can you also send subpoenas and get information from

15:14:56   9     Kik?

15:15:00  10     A.   The company is based out of Canada.

15:15:03  11     Q.   Right.  And you can get an MLAT, correct?

15:15:03  12     A.   No, ma'am.

15:15:05  13     Q.   You can't?

15:15:08  14     A.   We can't subpoena out of the country.

15:15:12  15     Q.   Do you know what an MLAT is?

15:15:14  16     A.   No, ma'am.

15:15:15  17          MS. VIAMONTES:  Nothing further, Judge.

15:15:18  18          THE COURT:  All right.  Redirect?

15:15:19  19          MS. MOLLISON:  No redirect, Your Honor.

15:15:21  20          THE COURT:  Thank you very much, sir.  You are excused.

15:15:23  21          THE WITNESS:  Thank you.

15:15:27  22          THE COURT:  Call your next witness.

15:15:29  23          MS. MOLLISON:  Your Honor, could we have just a moment

15:15:30  24     at sidebar?

15:15:33  25          THE COURT:  You know what, I'll feel better about it if

15:15:35  1    we talk about it in here, I'm tired of sidebar.

15:15:39  2             Would you all go back into the jury room for just a

15:15:43  3    second?  We've got a couple of matters we've got to deal with.

15:15:46  4    I'm sorry about that.  It will be clean if we do it that way,

15:15:49  5    but go to the bathroom quickly because we may be calling you

15:15:51  6    back very fast.

15:15:54  7             (Jury out at 3:15 p.m.)

15:16:30  8             THE COURT:  All right.  Please be seated.

15:16:34  9             The reason I asked them to step out is because I want

15:16:38  10   to make sure that if you are going to put your client on the

15:16:42  11   stand, I just want to advise him as to his rights.  And I

15:16:45  12   presume that you people have advised him of all of his rights

15:16:48  13   and everything else, but just in case; I just want to make sure

15:16:53  14   you understand this, Mr. Woodson, that you have a Constitutional

15:16:57  15   right to testify and no one can prevent you.  You can testify

15:17:03  16   notwithstanding the contrary of advice of counsel, but I

15:17:06  17   understand that you are going to.  If you do choose to testify,

15:17:08  18   the prosecution has the right to cross-examine you, and I have

15:17:12  19   no idea if you have any, but if you do you, they can bring up

15:17:13  20   prior felony convictions.

15:17:13  21            As a defendant, you also have a right not to testify

15:17:16  22   and if you do not testify, the jury will be instructed not to

15:17:18  23   consider this in any way during their deliberations.

15:17:21  24            Do you understand that you have the absolute right to

15:17:24  25   choose to either testify or not?

15:17:26  1          THE DEFENDANT:  Yes, I do, Your Honor.

15:17:27  2          THE COURT:  Have you discussed this matter with your

15:17:29  3   lawyers?

15:17:30  4          THE DEFENDANT:  Yes, I have, Your Honor.

15:17:32  5          THE COURT:  Have they explained the benefits and risks?

15:17:34  6          THE DEFENDANT:  Yes, they have, Your Honor.

15:17:35  7          THE COURT:  Do you think you understand the risks of

15:17:36  8   testifying?

15:17:38  9          THE DEFENDANT:  Yes, I do, Your Honor.

15:17:40  10         THE COURT:  All right.  I just wanted to make sure that

15:17:41  11  it was brought to your attention.

15:17:44  12         All right.  Yes, ma'am.  You had something you wanted

15:17:45  13  to bring up.

15:17:48  14         MS. MOLLISON:  We just wanted to have the jury excused

15:17:52  15  so Mr. Woodson could walk up without them being present.

15:17:55  16         THE COURT:  Okay.  Then we'll do that.  Bring

15:17:59  17  Mr. Woodson up so he can have a seat at the witness chair.  You

15:18:09  18  guys can -- going to have to give up your chair.  I know, but

15:18:14  19  that's why -- I don't care.  If he's sitting down, you can take

15:18:28  20  them off.  That's exactly right, yeah.  All right.  All right.

15:18:37  21  And we'll excuse the jury after his testimony so the irons can

15:18:39  22  be put back on.

15:18:41  23         MS. MOLLISON:  Thank you, Your Honor.

15:18:46  24         THE COURT:  Okay.  Have a seat while the jury comes in.

15:18:49  25  When they come in you stand up, okay?  All right.  Everybody

15:18:56  1    ready for the jury?  Bring the jury in please.  I bet they're

15:18:58  2    not finished, I bet they're in the bathroom.

15:19:01  3              COURT SECURITY OFFICER:  All rise for the jury.

15:19:04  4              (Jury in at 3:19 p.m.)

15:19:40  5              THE COURT:  Okay.  Please be seated.

15:19:51  6              Sir, please remain standing and raise your right hand.

15:19:51  7              JOSEPH ISAIAH WOODSON, JUNIOR, DEFENDANT, SWORN.

15:19:53  8              THE COURT:  Please be seated.  Get as close to the

15:19:56  9    microphone as you can, speak loudly and tell us your name and

15:19:57  10   spell it.

15:19:58  11             THE WITNESS:  All right.  My name is Joseph Woodson.

15:20:04  12   That is spelled J-O-S-E-P-H, W-O-O-D-S-O-N.

15:20:07  13             THE COURT:  You may proceed, counsel.

15:20:08  14             MS. WEISS:  Thank you, Your Honor.

15:20:08  15                          DIRECT EXAMINATION

15:20:08  16        BY MS. WEISS:

15:20:11  17   Q.  Joseph, you've been here through this whole trial, you've

15:20:16  18   heard testimony about how harmful this was to the teenagers who

15:20:19  19   testified.  And what do you think about all of that?

15:20:22  20   A.  I wish I'd never had any part in this.

15:20:25  21   Q.  And why.  Tell us why.

15:20:27  22   A.  Because I never wanted to hurt anybody.

15:20:31  23   Q.  If you could say something to those teenagers who testified

15:20:33  24   here in court, what would you say to them?

15:20:35  25             MS. ANTON:  Judge, I'm going to object.  This is

15:20:37  1    irrelevant.

15:20:40  2              THE COURT:  I'll permit it.

15:20:42  3              THE WITNESS:  Sorry.  Could you ask again?

15:20:42  4         BY MS. WEISS:

15:20:46  5    Q.  If you could say anything to these teenagers who you saw

15:20:47  6    testify, what would you say?

15:20:53  7    A.  I would say I'm sorry for my part in causing them so much

15:20:54  8    misery.

15:20:58  9    Q.  And Joseph, can you explain to the members of the jury why

15:20:59 10    you did that?

15:21:02 11    A.  I was worried about the potential of my family being

15:21:03 12    swatted.

15:21:06 13    Q.  Okay.  I want to talk more about what happened to you and

15:21:09 14    more about what happened to the teenagers, but I'm going to ask

15:21:11 15    you some questions about your background.  All right?

15:21:14 16    A.  That's fine.

15:21:16 17    Q.  Joseph, you're not from South Florida, are you?

15:21:20 18    A.  No.  I've never been here until they brought me here.

15:21:22 19    Q.  Where did you grow up?

15:21:24 20    A.  Basically just in Virginia.  Northern Virginia.

15:21:28 21    Q.  Okay.  And where in Northern Virginia?

15:21:31 22    A.  Woodbridge, mostly.

15:21:32 23    Q.  Also Ashburn?

15:21:37 24    A.  Well.  No, I've only been in Ashburn for like four or five

15:21:37 25    years.

| | | |
|---|---|---|
| 15:21:40 | 1 | Q.  Did you move a lot as a kid? |
| 15:21:42 | 2 | A.  Yeah, a lot. |
| 15:21:45 | 3 | Q.  What does a lot mean for you? |
| 15:21:47 | 4 | A.  More than ten times. |
| 15:21:50 | 5 | Q.  And why was your family moving so much? |
| 15:21:56 | 6 | A.  Well, a lot of the place we lived in were really crappy, had |
| 15:22:01 | 7 | bad landlords that didn't want to fix anything.  So like from |
| 15:22:05 | 8 | year to year, sometimes we would just move to different places. |
| 15:22:09 | 9 | Q.  And who did you grow up with? |
| 15:22:12 | 10 | A.  My mom, brothers and sisters. |
| 15:22:15 | 11 | Q.  All right.  And was your mom working when you were a kid? |
| 15:22:16 | 12 | A.  No. |
| 15:22:18 | 13 | Q.  Did she receive public assistance? |
| 15:22:20 | 14 | A.  Yeah. |
| 15:22:23 | 15 | Q.  Okay.  And how many siblings did you have? |
| 15:22:25 | 16 | A.  I have five in total. |
| 15:22:27 | 17 | Q.  What about your dad, Joseph? |
| 15:22:31 | 18 | A.  He lived in D.C. and worked in D.C. |
| 15:22:32 | 19 | Q.  Did you know him? |
| 15:22:36 | 20 | A.  Yeah.  He would come down from time to time. |
| 15:22:37 | 21 | Q.  What is time to time? |
| 15:22:40 | 22 | A.  Usually at least once a month.  He might stay for a couple |
| 15:22:41 | 23 | days. |
| 15:22:44 | 24 | Q.  Okay.  Is he still alive, Joseph? |
| 15:22:46 | 25 | A.  He's been dead for 12 years. |

| | | |
|---|---|---|
| 15:22:49 | 1 | Q.  Okay.  Is your mom still alive? |
| 15:22:50 | 2 | A.  Yes. |
| 15:22:52 | 3 | Q.  Are you close with her? |
| 15:22:57 | 4 | A.  Relatively.  We've been closer recently than when I was a |
| 15:22:57 | 5 | kid. |
| 15:23:01 | 6 | Q.  All right.  Where did you go to school?  Where did you start |
| 15:23:03 | 7 | school when you were young? |
| 15:23:06 | 8 | A.  Kilby Elementary School. |
| 15:23:08 | 9 | Q.  How old were you? |
| 15:23:09 | 10 | A.  Six. |
| 15:23:11 | 11 | Q.  Did you go to kindergarten? |
| 15:23:13 | 12 | A.  No. |
| 15:23:17 | 13 | Q.  How was first grade for you when you started at age six? |
| 15:23:20 | 14 | A.  Terrible because I didn't know anything.  How to read, |
| 15:23:21 | 15 | write. |
| 15:23:23 | 16 | Q.  Did they put you in special education? |
| 15:23:25 | 17 | A.  Yeah, they did. |
| 15:23:29 | 18 | Q.  How many years did you spend in special education? |
| 15:23:32 | 19 | A.  I think at least four. |
| 15:23:36 | 20 | Q.  Okay.  When you were in school, were you ever diagnosed with |
| 15:23:37 | 21 | anything? |
| 15:23:46 | 22 | A.  Autism. |
| 15:23:47 | 23 | Q.  Do you remember when? |
| 15:23:50 | 24 | A.  Probably the first year of school I started. |
| 15:23:54 | 25 | Q.  Were you ever given treatment for autism? |

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED BY COMPUTER

15:23:56  1      A.   No.

15:23:59  2      Q.   Did you ever have any behavioral therapy?

15:23:59  3      A.   I don't think so.

15:24:04  4      Q.   Okay.  Now, you said you had five siblings?

15:24:05  5      A.   Yes.

15:24:08  6      Q.   Did you baby-sit them when you were growing up?

15:24:12  7      A.   Yeah, I think starting when I was 11 I did.

15:24:13  8      Q.   Okay.  Did you like that?

15:24:15  9      A.   No, not really.

15:24:16  10     Q.   How come?

15:24:22  11     A.   Well, two of my sisters are very mentally disabled so they

15:24:25  12   would kind of be hard for me to deal with.

15:24:28  13     Q.   When you say hard for you to deal with, can you describe the

15:24:28  14   way they behaved?

15:24:34  15     A.   Sometimes they would try to run out of the house, break

15:24:36  16   things, that kind of thing.

15:24:41  17     Q.   Okay.  Of your five siblings, Joseph, are you the oldest?

15:24:42  18     A.   Yes.

15:24:47  19     Q.   Of your five siblings, do any of them have diagnoses of

15:24:49  20   autism?

15:24:52  21     A.   Well, I'm not sure exactly what they diagnosed my two

15:24:56  22   sisters as, but I assume it would be something very severe.

15:24:58  23            MS. ANTON:  I'll object.  That calls for speculation.

15:25:08  24            THE COURT:  Hold on a second.  I would sustain the

15:25:13  25   objection based on his response.  Jury will disregard the

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED BY COMPUTER

15:25:15  1    partial response.  Go ahead.

15:25:15  2        BY MS. WEISS:

15:25:19  3    Q.  All right.  Joseph, I want to talk about two of your

15:25:25  4    siblings, Christina and Tiffany.  Did they live with your family

15:25:27  5    the whole time when you were growing up?

15:25:32  6    A.  No.  Both of them eventually ended up in group homes or

15:25:33  7    whatever it's called.

15:25:35  8    Q.  And why is that?

15:25:41  9    A.  Because of their mental disabilities.

15:25:45  10   Q.  And can you describe what their mental disability was like?

15:25:47  11          MS. ANTON:  I'm going to object to relevance.

15:25:48  12          THE COURT:  What is the relevance?

15:25:50  13          MS. WEISS:  Judge, I think Mr. Woodson's background is

15:25:54  14   important to understanding the decisions he made.

15:25:57  15          THE COURT:  Have him testify about his background, but

15:26:04  16   I don't believe that that is his background.  Well, I'll permit

15:26:07  17   this question, but I don't think I'm going to let it go any

15:26:09  18   further than that.

15:26:11  19          THE WITNESS:  All right.  Could you repeat?

15:26:11  20       BY MS. WEISS:

15:26:17  21   Q.  Your siblings who were institutionalized, why were they

15:26:17  22   institutionalized.

15:26:20  23          THE COURT:  If you know.

15:26:22  24          THE WITNESS:  Eventually they got too violent and

15:26:27  25   basically destroyed too many things, so my mom felt like she

15:26:31  1    just couldn't handle it and eventually at different times sent

15:26:33  2    them to it.

15:26:33  3        BY MS. WEISS:

15:26:38  4    Q.  At that time, how did you feel about that happening?

15:26:42  5    A.  I felt bad to, you know, lose contact with my sisters, but I

15:26:46  6    thought the group home probably would help them more than any of

15:26:47  7    us could have.

15:26:50  8    Q.  Was it hard for your mom to see that happen?

15:26:53  9    A.  Extremely.  She was upset for a long time, especially after

15:26:57 10    the first sister.

15:27:01 11    Q.  And how did you feel seeing your mother go through that?

15:27:07 12    A.  I felt sad about it, but I truly didn't understand it that

15:27:09 13    much at the time.

15:27:12 14    Q.  Joseph, I want to talk about what you were doing before you

15:27:14 15    were arrested.

15:27:14 16    A.  Okay.

15:27:15 17    Q.  Were you working?

15:27:15 18    A.  Yes.

15:27:17 19    Q.  Where were you working?

15:27:19 20    A.  Jake's Wayback Burgers.

15:27:22 21    Q.  And what did you do at Jake's Wayback Burgers?

15:27:26 22    A.  I was the assistant manager, so a little bit of everything.

15:27:28 23    Q.  As the assistant manager, what were your duties?

15:27:33 24    A.  Making the schedules, making sure everyone stayed busy.

15:27:38 25    Doing ordering, checking inventory.

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED BY COMPUTER

| | | |
|---|---|---|
| 15:27:42 | 1 | Q.  Okay.  How long were you an assistant manager? |
| 15:27:43 | 2 | A.  Just over a year. |
| 15:27:48 | 3 | Q.  And did you have a position at Jake's Wayback Burgers before |
| 15:27:49 | 4 | that? |
| 15:27:50 | 5 | A.  Yeah, I was shift lead. |
| 15:27:53 | 6 | Q.  Okay.  Did you like working there? |
| 15:27:57 | 7 | A.  I did with the newest owners.  Before that it was whatever. |
| 15:28:01 | 8 | Q.  Okay.  Did you have a boss when you were working? |
| 15:28:02 | 9 | A.  Well yeah, the owners. |
| 15:28:04 | 10 | Q.  The owners.  Did you like them? |
| 15:28:08 | 11 | A.  The newest ones yes.  The previous ones, not so much. |
| 15:28:15 | 12 | Q.  Okay.  And in late 2017, early 2018 when you were living at |
| 15:28:18 | 13 | home, which family members lived at home? |
| 15:28:23 | 14 | A.  It was me, my mom, my youngest sister and a younger brother. |
| 15:28:26 | 15 | Q.  Okay.  Now, I want to talk about your youngest sister.  What |
| 15:28:28 | 16 | was her name? |
| 15:28:28 | 17 | A.  Tiesha. |
| 15:28:30 | 18 | Q.  And did she have any disabilities? |
| 15:28:32 | 19 | A.  She -- |
| 15:28:34 | 20 | MS. ANTON:  I'm going to object again to relevance. |
| 15:28:35 | 21 | MS. WEISS:  Your Honor, I think -- |
| 15:28:40 | 22 | THE COURT:  I'll sustain that objection.  We're getting |
| 15:28:41 | 23 | far afield here. |
| 15:28:43 | 24 | MS. WEISS:  Judge, I think the mental status of the |
| 15:28:46 | 25 | siblings and the people who were at home when Mr. Woodson was |

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED BY COMPUTER

| | | |
|---|---|---|
| 15:28:51 | 1 | afraid of being swatted is important for that. |
| 15:28:57 | 2 | THE COURT:  I don't believe it is.  Sustained.  I mean, |
| 15:29:00 | 3 | you've already painted a general picture.  I'm not going to let |
| 15:29:03 | 4 | you get into any more detail. |
| 15:29:03 | 5 | BY MS. WEISS: |
| 15:29:06 | 6 | Q.  Joseph, did you spend time with your siblings? |
| 15:29:11 | 7 | A.  When I was younger more than when we got older, yes. |
| 15:29:15 | 8 | Q.  And when you got older, in the time, say, in the year before |
| 15:29:18 | 9 | you were arrested, were you spending much time with them? |
| 15:29:18 | 10 | A.  No. |
| 15:29:21 | 11 | Q.  Did you spend time with your mom? |
| 15:29:23 | 12 | A.  A decent amount, yeah. |
| 15:29:27 | 13 | Q.  Did your family eat dinners together? |
| 15:29:31 | 14 | A.  Sometimes usually holidays we would. |
| 15:29:35 | 15 | Q.  I want to talk about your stepdad, Jerry.  How did he meet |
| 15:29:37 | 16 | your mom? |
| 15:29:41 | 17 | A.  I believe they met on a website called BlackPeopleMeet. |
| 15:29:51 | 18 | MS. ANTON:  Judge, objection.  Objection, relevance. |
| 15:29:53 | 19 | THE COURT:  Relevance?  Same thing you just told me. |
| 15:29:56 | 20 | MS. WEISS:  I think this has to do with Mr. Woodson's |
| 15:29:59 | 21 | prior contact with law enforcement and understanding. |
| 15:30:00 | 22 | THE COURT:  I don't know what you're talking about. |
| 15:30:01 | 23 | You're going to have to -- |
| 15:30:04 | 24 | MS. WEISS:  I think giving some background about his |
| 15:30:08 | 25 | stepfather will help understand Mr. Woodson's prior contact with |

15:30:08   1   law enforcement.

15:30:11   2           THE COURT:  No, I'll sustain the objection at this

15:30:13   3   time.

15:30:13   4       BY MS. WEISS:

15:30:17   5   Q.  Joseph, were the cops ever called to your home?

15:30:18   6   A.  Multiple times.

15:30:18   7   Q.  Why?

15:30:22   8   A.  Domestic disputes between my mom and Jerry.

15:30:28   9   Q.  Okay.  Did your mother and Jerry fight a lot?

15:30:30   10          MS. ANTON:  Objection, Judge.  Relevance to this line

15:30:31   11  of questioning.

15:30:33   12          THE COURT:  I'll permit this question.

15:30:36   13          THE WITNESS:  They would fight a lot.  Usually just be

15:30:40   14  verbal arguments, sometimes it got physical.

15:30:40   15      BY MS. WEISS:

15:30:42   16  Q.  Did Jerry own guns?

15:30:43   17  A.  Three of them, I think.

15:30:48   18  Q.  Okay.  Did police eventually take away the guns that Jerry

15:30:48   19  owned?

15:30:54   20  A.  The third time they came for domestic disputes, yeah.

15:30:56   21  Q.  Were you scared of Jerry?

15:30:59   22  A.  Not particularly, but I wouldn't be home that much.

15:31:06   23  Q.  Okay.  Joseph, what were your hobbies?

15:31:11   24  A.  Mostly just playing video games and watching anime.

15:31:14   25  Q.  Okay.  When did you start playing video games?

15:31:16   1     A.   When I was two years old.

15:31:19   2     Q.   And what kind of platforms did you tend to play on when you

15:31:21   3     were an adult?

15:31:26   4     A.   Usually I would play on computer, PS4 more than anything.

15:31:29   5     Q.   All right.  And in 2017 and early 2018, what kind of

15:31:30   6     computer did you have?

15:31:37   7     A.   I had a desktop computer that I built myself.

15:31:41   8     Q.   When you say built it, can you describe to the jury what you

15:31:42   9     were doing?

15:31:45   10    A.   Essentially just buying the parts and putting them all

15:31:47   11    together in a case.

15:31:51   12    Q.   How much money did it cost to buy all those parts?

15:31:55   13    A.   If I counted the monitor, 2,600 I believe.

15:31:59   14    Q.   And when you were working at Jake's Wayback Burger, how long

15:32:02   15    did it take you to save that money?

15:32:05   16    A.   Well, over a year because I was working also at Giant's at

15:32:06   17    the time.

15:32:11   18    Q.   Did you spend most of your money on computer gear?

15:32:12   19    A.   Yeah, pretty much.

15:32:18   20    Q.   Okay.  And in 2017 and early 2018, how often did you play

15:32:19   21    video games?

15:32:24   22    A.   Usually I'd say about eight hours a day.

15:32:28   23    Q.   Okay.  And what kind of games did you tend to play?

15:32:32   24    A.   MOBAs and ARPGs.

15:32:36   25    Q.   What is an ARPG?

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

| 15:32:42 | 1 | A.  It's an action RPG, usually just has a topdown viewpoint. |
| 15:32:44 | 2 | Q.  I don't know if that made sense to me, so I'm assuming some |
| 15:32:48 | 3 | of the jury doesn't know what that means.  What does it mean, an |
| 15:32:52 | 4 | action RPG with a topdown viewpoint? |
| 15:32:57 | 5 | A.  Well, essentially the camera falls slightly behind you at an |
| 15:33:00 | 6 | angle where it's like above you but looking somewhat forward. |
| 15:33:04 | 7 | And you're just kind of just killing things just to get new |
| 15:33:08 | 8 | abilities, gear and stuff like that, just so you can fight and |
| 15:33:09 | 9 | kill more things. |
| 15:33:13 | 10 | Q.  Do you have a favorite game that you would play? |
| 15:33:14 | 11 | A.  Path of Exile. |
| 15:33:19 | 12 | Q.  Can you describe briefly what the goal is in Path of Exile |
| 15:33:21 | 13 | and what you do in that game? |
| 15:33:24 | 14 | A.  Essentially what I just explained.  You start off with |
| 15:33:30 | 15 | whatever character you pick, it's basic weapon gear, killing |
| 15:33:34 | 16 | zombies.  Then you're upgrading to other exiles, gods, that kind |
| 15:33:36 | 17 | of thing. |
| 15:33:39 | 18 | Q.  And this Path of Exile or ARPGs, are these the kind of games |
| 15:33:40 | 19 | you're playing online? |
| 15:33:41 | 20 | A.  Yeah, exclusively. |
| 15:33:43 | 21 | Q.  Are there other players you play with? |
| 15:33:46 | 22 | A.  You can, but you don't have to.  You can do separate |
| 15:33:46 | 23 | instances. |
| 15:33:48 | 24 | Q.  Would you play with other people online? |
| 15:33:52 | 25 | A.  I would usually trade with them, but otherwise if I were |

15:33:55  1    leveling up, I would play alone.

15:33:58  2    Q.   Okay.   Did you have friends online who played video games

15:33:58  3    with you?

15:34:00  4    A.   A few, yes.

15:34:02  5    Q.   Would you talk with them?

15:34:07  6    A.   Using Discord or Vent, yeah.

15:34:09  7    Q.   What are Discord and Vent?

15:34:12  8    A.   Voice over the internet programs.   Just computer programs so

15:34:16  9    you can just talk through the mic to each other.

15:34:18  10   Q.   Is this the kind of things where you're talking while you're

15:34:19  11   playing the game?

15:34:20  12   A.   Yes.

15:34:22  13   Q.   Would you sometimes talk to people for hours?

15:34:25  14   A.   If I were playing games with them, yeah.

15:34:30  15   Q.   Okay.   And did you sometimes stream the games you played?

15:34:31  16   A.   On Twitch.

15:34:34  17   Q.   And can you describe for the jury what streaming on Twitch

15:34:36  18   is like?

15:34:43  19   A.   Basically using one program.   In my case, I was using -- I

15:34:47  20   forgot the name of the program, but you use the program just to

15:34:53  21   share your screen essentially, and then it's just streaming it

15:34:57  22   online so anyone who knows your profile can see it.

15:35:00  23   Q.   Would people watch you while you were playing and streaming

15:35:01  24   on Twitch?

15:35:04  25   A.   Yeah, most of the time.

| | | |
|---|---|---|
| 15:35:05 | 1 | Q.  Did you know who those people were? |
| 15:35:06 | 2 | A.  No. |
| 15:35:09 | 3 | Q.  How many people would be watching? |
| 15:35:13 | 4 | A.  I think the most at one time was probably 30. |
| 15:35:16 | 5 | Q.  And that's live, right? |
| 15:35:17 | 6 | A.  I'm sorry? |
| 15:35:19 | 7 | Q.  Like they were watching you live? |
| 15:35:20 | 8 | A.  Correct. |
| 15:35:23 | 9 | Q.  Did you also post videos of your game play? |
| 15:35:26 | 10 | A.  Yeah.  I usually would take clips from previous streams and |
| 15:35:30 | 11 | put them on You Tube. |
| 15:35:34 | 12 | Q.  What other kinds of videos did you have on You Tube? |
| 15:35:39 | 13 | A.  Not much.  It was usually just video games. |
| 15:35:46 | 14 | Q.  Did you sometimes record yourself singing and doing karaoke? |
| 15:35:49 | 15 | A.  Two or three videos doing that.  It was a website that got |
| 15:35:50 | 16 | blocked in this country. |
| 15:35:54 | 17 | Q.  Now, on Twitch and You Tube, did you use your own name |
| 15:35:55 | 18 | Joseph Woodson? |
| 15:35:56 | 19 | A.  No. |
| 15:35:56 | 20 | Q.  Why not? |
| 15:36:00 | 21 | A.  I don't want random people knowing my name. |
| 15:36:01 | 22 | Q.  How come? |
| 15:36:03 | 23 | A.  Just to be private. |
| 15:36:07 | 24 | Q.  Okay.  And did you use apps like Skype or Kik? |
| 15:36:09 | 25 | A.  Yes, I did. |

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED BY COMPUTER

15:36:11  1    Q.  Would you use your own name on those apps?

15:36:14  2    A.  No.  Well Skype, yeah.  One of them I did.

15:36:20  3    Q.  Okay.  And what were you using Kik for?

15:36:26  4    A.  I was -- originally when I was using it, I was just

15:36:30  5    messaging women I would meet on dating sites.

15:36:33  6    Q.  What kind of dating sites did you go on?

15:36:38  7    A.  MeetMe, OkCupid, and Pol.

15:36:38  8    Q.  And how come you wouldn't use Face Book Messenger or just

15:36:38  9    normal SMS?

15:36:42  10   A.  Well, because I just met them, so I didn't really feel

15:36:44  11   comfortable with them knowing my identity like that.

15:36:48  12   Q.  So you would use Kik or Skype with a different user name?

15:36:49  13   A.  Correct.

15:36:58  14   Q.  Okay.  Now, when you were playing computer games and

15:37:02  15   streaming on Twitch, what efforts did you make to hide your

15:37:02  16   identity online?

15:37:08  17   A.  I'm sorry.  Repeat that question again?

15:37:11  18   Q.  Did you do -- did you take any actions to hide your identity

15:37:11  19   online?

15:37:15  20   A.  Other than just not putting my real name out there, not

15:37:16  21   really.

15:37:21  22   Q.  Okay.  You had the Tor app and the Orbot app, right?

15:37:23  23   A.  Yeah, on my phone.

15:37:24  24   Q.  So why did you use those?

15:37:30  25   A.  Well, the Tor and Orbot are the same thing.  But just to

156

| | | |
|---|---|---|
| 15:37:33 | 1 | browse the web anonymously without being tracked with every |
| 15:37:35 | 2 | little thing I was doing. |
| 15:37:38 | 3 | Q.  And why was that important to you? |
| 15:37:42 | 4 | A.  I don't know.  I can't feel safe if I feel like every single |
| 15:37:45 | 5 | thing I'm doing is being watched by somebody. |
| 15:37:58 | 6 | Q.  All right.  All right.  I want to talk about when Matthew |
| 15:38:02 | 7 | Johnstone first contacted you.  All right? |
| 15:38:03 | 8 | A.  Okay. |
| 15:38:05 | 9 | Q.  Do you remember when he first contacted you? |
| 15:38:07 | 10 | A.  No, that was too long ago. |
| 15:38:11 | 11 | Q.  Okay.  How did Matthew Johnstone first contact you? |
| 15:38:13 | 12 | A.  I'm almost certain it was on Kik. |
| 15:38:19 | 13 | Q.  And describe what you remember of those first messages. |
| 15:38:23 | 14 | A.  I believe he said something about knowing my IP address and |
| 15:38:26 | 15 | me being in Ashburn, Virginia. |
| 15:38:28 | 16 | Q.  Did you know who Matt Johnstone was? |
| 15:38:32 | 17 | A.  No.  Until this trial, I didn't know his name. |
| 15:38:35 | 18 | Q.  Did he tell you anything about who he was? |
| 15:38:41 | 19 | A.  He told me he was a software engineer, but that's about all |
| 15:38:43 | 20 | I know.  And a hacker. |
| 15:38:45 | 21 | Q.  Did he tell you why he was reaching out and trying to talk |
| 15:38:45 | 22 | to you? |
| 15:38:47 | 23 | A.  No. |
| 15:38:52 | 24 | Q.  Okay.  And what was the first message he sent you? |
| 15:38:56 | 25 | A.  Just my IP address and he knew that I was in Ashburn, |

15:38:57   1    Virginia, I believe it was.

15:38:59   2    Q.  Did you write back to him?

15:39:01   3    A.  Originally I just ignored him.

15:39:03   4    Q.  How long did you ignore him?

15:39:06   5    A.  Three days, a week.  I'm not sure.

15:39:12   6    Q.  Okay.  I want to talk about swatting.

15:39:12   7    A.  Okay.

15:39:13   8    Q.  What is swatting?

15:39:20   9    A.  That's when you make an emergency call basically saying

15:39:25  10    someone is in really imminent danger just to try to elicit a

15:39:26  11    swat response.

15:39:30  12    Q.  When did you first learn about what swatting is?

15:39:36  13    A.  Probably three years ago when I saw a You Tube video of a

15:39:38  14    streamer getting swatted midstream.

15:39:44  15    Q.  So when Matthew Johnstone was messaging you, why did you

15:39:46  16    become afraid that he was going to swat you?

15:39:51  17    A.  I had been watching a lot of the You Tube videos on it, and

15:39:54  18    I heard it was just through their IP address they end up getting

15:39:58  19    found and then having that call put on them.  So I was worried

15:40:01  20    about the possibility of it happening to me.

15:40:06  21    Q.  Did Matthew Johnston come out and say Joseph, I'm going to

15:40:08  22    swat you if you don't help me?

15:40:08  23    A.  No.

15:40:12  24    Q.  And in your experience gaming and being online, are most

15:40:15  25    swatting victims warned before they're swatted?

```
15:40:18   1    A.  I would say almost never.

15:40:24   2    Q.  What did you think would happen if your house was swatted?

15:40:29   3    A.  That my mom and siblings would be killed.

15:40:31   4    Q.  Now, police had responded to your house before?

15:40:33   5    A.  Yes.

15:40:37   6    Q.  How does your sister, Tiesha, react when police come to the

15:40:38   7    house?

15:40:39   8    A.  It really depends --

15:40:42   9            MS. ANTON:  Objection.  Relevance to how his sister

15:40:44  10    reacts.

15:40:47  11            THE COURT:  I'll permit it.

15:40:49  12            THE WITNESS:  Okay.  Could you ask again.

15:40:51  13            THE COURT:  How did you sister react when the police

15:40:52  14    came.

15:40:54  15            THE WITNESS:  Thank you.  It really depends on the

15:40:58  16    situation.  I mean, whether it directly affected her like when

15:41:02  17    they did the first search warrant and they were threatening to

15:41:06  18    take all the cellphones, she got extremely upset about that.

15:41:06  19        BY MS. WEISS:

15:41:10  20    Q.  Okay.  Do you think that her reaction would have put her at

15:41:12  21    risk if the house was swatted?

15:41:14  22    A.  Almost definitely.

15:41:20  23    Q.  How many days went by when Matthew Johnstone was messaging

15:41:23  24    you, you were ignoring him, and you thought you would get

15:41:23  25    swatted?
```

| | | |
|---|---|---|
| 15:41:30 | 1 | A.   Three to a week. |
| 15:41:32 | 2 | Q.   Joseph, why didn't you call the police to tell them that you |
| 15:41:33 | 3 | were being harassed online? |
| 15:41:39 | 4 | A.   Well, at the time I really didn't trust they would do |
| 15:41:41 | 5 | anything, but I wish I had done that. |
| 15:41:47 | 6 | Q.   Okay.  And how come you didn't take screenshots of those |
| 15:41:48 | 7 | threatening messages? |
| 15:41:51 | 8 | A.   I didn't think about it at all at the time. |
| 15:41:55 | 9 | Q.   Did there come a time when you did respond to Matthew |
| 15:41:56 | 10 | Johnstone? |
| 15:41:57 | 11 | A.   Yeah. |
| 15:41:59 | 12 | Q.   What did you tell him? |
| 15:42:01 | 13 | A.   I asked him what did he want, I believe. |
| 15:42:05 | 14 | Q.   Okay.  And what did he say? |
| 15:42:10 | 15 | A.   I believe he told me to download an app called ChatLog to |
| 15:42:13 | 16 | find Kik accounts of females. |
| 15:42:14 | 17 | Q.   Did you do that? |
| 15:42:16 | 18 | A.   Yes. |
| 15:42:19 | 19 | Q.   And describe what he asked you to do with the ChatLog app. |
| 15:42:25 | 20 | A.   Well, just to message females' accounts and see if it's an |
| 15:42:28 | 21 | active account and then tell him about the account. |
| 15:42:30 | 22 | Q.   So you did that? |
| 15:42:30 | 23 | A.   Yes. |
| 15:42:32 | 24 | Q.   How many accounts do you think you found? |
| 15:42:34 | 25 | A.   No idea. |

15:42:39  1    Q.  How did that evolve into him asking you to do other things?

15:42:41  2    A.  Well, I guess it was too many accounts for him to look

15:42:46  3    through personally, so he wanted me to be more active in it.

15:42:52  4    Q.  And after you started messaging Matthew Johnstone back, when

15:42:56  5    did you first become aware that he was getting nude images from

15:42:58  6    teenage girls?

15:43:00  7    A.  Probably a week or two in.

15:43:05  8    Q.  Okay.  And was that the same time when you actually saw

15:43:09  9    images of teenaged girls yourself?

15:43:11  10   A.  Yeah, that's when I would have been aware.

15:43:13  11   Q.  Did you like seeing those images, Joseph?

15:43:14  12   A.  No.

15:43:17  13   Q.  Did you ever get sexual pleasure from seeing the images of

15:43:20  14   teenage girls?

15:43:21  15   A.  No.

15:43:25  16   Q.  Joseph, did you watch normal, adult pornography?

15:43:26  17   A.  From time to time, yes.

15:43:27  18   Q.  Okay.  Would you do that online?

15:43:29  19   A.  Yeah.

15:43:36  20   Q.  I want to talk with you about when Matthew Johnstone

15:43:40  21   instructed you to speak with girls to get imagery.

15:43:42  22   A.  Okay.

15:43:48  23   Q.  How did you know what to ask the girls to do in pictures or

15:43:49  24   video?

15:43:53  25   A.  Well, I didn't until he told me specifics.

```
15:43:57   1    Q.  And what kind of specifics did he tell you?
15:44:00   2    A.  I believe he told me to start off with just something with
15:44:04   3    their face in it, and then try to get topless, I believe.
15:44:09   4    Q.  Okay.  Did you ever ask girls to do things that you wanted
15:44:10   5    to see?
15:44:11   6    A.  No.
15:44:12   7    Q.  How come?
15:44:16   8    A.  I wasn't interested in them.
15:45:05   9         MS. WEISS:  Judge, may I approach the ELMO?
15:45:08  10         THE COURT:  You may.
15:45:08  11    BY MS. WEISS:
15:45:14  12    Q.  Joseph, I'm going to show you what's already been admitted
15:45:22  13    in evidence as Government's Exhibit 63.  In Government's Exhibit
15:45:28  14    63, you're chatting with Matthew Johnstone and you say make her
15:45:31  15    deep throat something.  Why did you say that?
15:45:35  16    A.  It was just something that he was into.
15:45:38  17    Q.  Was that something that you wanted to see?
15:45:45  18    A.  Well, no.  I just wanted to distract him from asking me for
15:45:45  19    doing anything.
15:45:49  20    Q.  Were there other times where you had to play along with Matt
15:45:49  21    Johnstone?
15:45:51  22    A.  Any time we were talking, yeah.
15:45:54  23    Q.  Did you have to pretend to like what he was doing?
15:45:56  24    A.  Yeah.
15:46:01  25    Q.  What do you think would have happened if you didn't do that?
```

15:46:05   1    A.  Well, at the time, again, I was worried about being swatted.

15:46:16   2    Q.  What did you think about the things that Matthew Johnstone

15:46:19   3    was asking you to tell girls to do?

15:46:23   4    A.  I thought virtually all of them were disgusting.  I don't

15:46:27   5    know why you would even want something like that.

15:46:31   6    Q.  What about the request to one girl to drink her own urine?

15:46:33   7    A.  That would be one of the worst ones.

15:46:36   8    Q.  What about engaging in sexual acts with siblings?

15:46:44   9    A.  Again, he liked a lot of the really crazy stuff.

15:46:48   10   Q.  Now, how did you know what to say to convince these

15:46:50   11   teenagers to actually make imagery?

15:46:56   12   A.  Well, originally I didn't, and my kept messing up when he

15:47:00   13   told me to do things.  So he would copy and paste messages for

15:47:02   14   me to send.

15:47:04   15   Q.  Would you sometimes be talking with him simultaneously as

15:47:06   16   with girls?

15:47:10   17   A.  A lot of the time I would be, yeah.

15:47:20   18   Q.  I'm going to show you what's already been admitted in

15:47:25   19   evidence as Defense Exhibit D.  These are screenshots that came

15:47:26   20   off your Note 3 phone?

15:47:27   21   A.  Okay.

15:47:31   22   Q.  I'm going to ask you if you recognize these.  Do you

15:47:38   23   recognize this?

15:47:42   24   A.  Kind of.

15:47:47   25   Q.  Is this a screenshot that Matthew Johnstone sent you?

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

```
15:47:48   1    A.  Yeah.

15:47:51   2    Q.  And why did he this to you?

15:47:54   3    A.  I don't remember.

15:48:09   4    Q.  Do you recognize this one?

15:48:13   5    A.  Yeah.

15:48:17   6    Q.  Is this a screenshot that Matthew Johnstone sent you?

15:48:18   7    A.  Yeah.

15:48:22   8    Q.  Are these the kind of screenshots that he would send to

15:48:23   9    teach you how to message girls?

15:48:24  10         MS. ANTON:  Objection, leading.

15:48:26  11         THE COURT:  It is.  Sustained.

15:48:26  12    BY MS. WEISS:

15:48:30  13    Q.  Why did Matthew Johnstone send you screenshots?

15:48:35  14    A.  Basically just to show me how to talk for the most part.

15:48:36  15    Q.  Joseph, were you good at talking to girls and getting

15:48:38  16    images?

15:48:41  17    A.  No, not on my own.

15:48:44  18    Q.  How long did it take you to get the hang of it?

15:48:50  19    A.  Probably about a year.

15:48:56  20    Q.  Okay.  What about this one?  Is this a screenshot that

15:49:00  21    Matthew Johnstone sent you?

15:49:02  22    A.  Yeah.

15:49:12  23    Q.  I want to show you another screenshot.  Is this a screenshot

15:49:14  24    that he sent you?

15:49:16  25    A.  Many times, yes.
```

15:49:19    1   Q.  Can you explain what this is?

15:49:26    2   A.  That is -- well, a website by the name of 8chan and a

15:49:28    3   particular board for exposing women.

15:49:31    4   Q.  Okay.  Why did he send you this screenshot?

15:49:38    5   A.  He sent it to me to save and use it as part of the threats

15:49:39    6   to the girls.

15:49:55    7   Q.  Now, you said at first you weren't very good at talking to

15:49:58    8   girls and convincing them to give you imagery, right?

15:49:59    9   A.  Yes.

15:50:04   10   Q.  What did Matthew Johnstone say to you about that?

15:50:04   11           MS. ANTON:  Objection, hearsay.

15:50:06   12           THE COURT:  Sustained.

15:50:06   13       BY MS. WEISS:

15:50:16   14   Q.  Was Matthew Johnstone happy when you learned to finally get

15:50:17   15   images?

15:50:22   16   A.  Yeah.  Pretty much.  He said good job bro, stuff like that.

15:50:23   17   Q.  Were you happy about it?

15:50:28   18   A.  Well no, because I didn't want to do it.

15:50:31   19   Q.  At the time that you were saying things to girls and forcing

15:50:36   20   them to make images, did you feel bad about the things you were

15:50:36   21   saying to them?

15:50:40   22   A.  I did, but I tried not to think about it too much.

15:50:41   23   Q.  Do you feel bad about it now?

15:50:43   24   A.  Yes.

15:51:03   25   Q.  Joseph, I want to show you what's been admitted in evidence

15:51:09  1   as Government's Exhibit 51.  I want to talk to you about some of

15:51:13  2   the things that you said to some of the girls.

15:51:15  3   A.  Okay.

15:51:25  4   Q.  In this conversation, you said it won't end until you do

15:51:31  5   what I want or die, then you texted a smiley face.  How would

15:51:34  6   you feel if somebody said that to you, Joseph?

15:51:36  7            MS. ANTON:  Objection, relevance.

15:51:48  8            THE COURT:  Hold on.  I'll sustain that objection.

15:51:48  9        BY MS. WEISS:

15:51:52  10  Q.  Joseph, when you sent that message, did you know that it was

15:51:53  11  a hurtful thing to say?

15:51:55  12  A.  Yeah, I did.

15:51:57  13  Q.  Why did you send it?

15:52:01  14  A.  It was what he told me to do when someone threatens to kill

15:52:03  15  themselves.

15:52:08  16  Q.  Okay.  How would you feel if somebody said that to your

15:52:09  17  sister?

15:52:12  18            MS. ANTON:  Objection, relevance.

15:52:13  19            THE COURT:  Sustained.

15:52:13  20        BY MS. WEISS:

15:52:24  21  Q.  All right.  I want to show you part of a conversation that's

15:52:27  22  already been admitted in evidence as Government's Exhibit 37.

15:52:47  23  Joseph, in this chat, you said and it won't help you, meanwhile

15:52:49  24  I'll ruin your life.

15:52:53  25            What were you thinking when you wrote that?

15:52:57   1    A.  I wasn't really thinking much at all.  I, again, tried not

15:53:00   2    to think about what I was doing when I was doing it.

15:53:05   3    Q.  And now that you've seen Victim 1, M.K., who you were

15:53:09   4    chatting with in this chat in court, how do you feel now?

15:53:15   5    A.  I really wish I didn't do any of that to her.

15:55:22   6            MS. WEISS:  I apologize, Judge.  There's different

15:55:24   7    paginations in the Government's exhibit.

15:55:26   8            THE COURT:  If they take me to the emergency room and

15:55:30   9    they tell me I have 24 hours to live, I'm going to tell them

15:55:36   10   here's a list of six lawyers, they owe me at least a week of my

15:55:40   11   life.  Call them and get it back.

15:55:40   12           BY MS. WEISS:

15:55:45   13   Q.  Joseph, I'm going to show you what's already admitted as

15:55:55   14   Government's Exhibit 64.  You offered here to text message

15:55:58   15   somebody for Matthew Johnstone, right?

15:55:58   16   A.  Yes.

15:56:01   17   Q.  Why would you offer to help him?

15:56:05   18   A.  I believe in that specific situation, he had just given me

15:56:09   19   her name, so I thought that's what he wanted me to do.

15:56:17   20   Q.  By January 2018, how long was he making you do things for

15:56:18   21   him?

15:56:20   22   A.  Well over a year.

15:56:23   23   Q.  Did you stop putting up a fight at some point?

15:56:26   24   A.  A few months in.

15:56:33   25   Q.  When he would tell you what to do, did you ever say no?

15:56:36   1    A.   No, I don't believe I did.

15:56:41   2    Q.   Did you ever refuse to help him?

15:56:43   3    A.   No.

15:56:50   4    Q.   Okay.  Did you think that this would ever end for you?

15:56:52   5    A.   I thought at some point he would get bored and move on to

15:56:55   6    somebody else.

15:57:01   7    Q.   Okay.  I want to talk to you a little bit about Dropbox.

15:57:02   8    A.   Okay.

15:57:04   9    Q.   Do you remember when you first created the chaosdemise

15:57:07   10   Dropbox account?

15:57:12   11   A.   I don't actually.

15:57:16   12   Q.   When Matt Johnstone instructed you to store images, did you

15:57:18   13   use the account to do that?

15:57:19   14   A.   Yes.

15:57:23   15   Q.   All right.  Do you remember what folders you used to store

15:57:24   16   images that he sent you?

15:57:26   17   A.   Not at all.

15:57:30   18   Q.   All right.  Did you share a folder with him?

15:57:34   19   A.   Yeah, the "yep" folder they were talking about.

15:58:44   20   Q.   Joseph, I'm showing you what's already been admitted as

15:58:49   21   Government's Exhibit 51.  You say the website I sold you to

15:58:56   22   retard.  Did you ever make money off of doing this?

15:58:56   23   A.   No.

15:58:58   24   Q.   Did you ever sell images?

15:58:59   25   A.   No.

15:59:01   1    Q.  Why do you say that?

15:59:04   2    A.  It was just to intimidate.

15:59:08   3    Q.  Do you know if Matthew Johnstone ever made money?

15:59:11   4    A.  I wouldn't know what he does outside of what he asked me to

15:59:13   5    do.

15:59:26   6    Q.  When did you first talk to the police in this case?

15:59:31   7    A.  That was when they did the first search warrant back in

15:59:33   8    January of 2018.

15:59:36   9    Q.  Okay.  And tell the jury about what happened on the morning

15:59:39   10   the police came to your house.

15:59:44   11   A.  They busted into my room when I was sleeping, put me in

15:59:47   12   handcuffs; had me, my brother in handcuffs in the living room,

15:59:51   13   and had all of us waiting for 30 minutes while the detectives

15:59:52   14   got there.

15:59:55   15   Q.  And once the detectives got there, what happened?

16:00:00   16   A.  Well, I believe it was Oksanen that told them to take the

16:00:02   17   handcuffs off, and then they just said that they were going to

16:00:04   18   interview us individually.

16:00:07   19   Q.  Did you talk to the police on that day?

16:00:08   20   A.  Yes, I did.

16:00:10   21   Q.  Were you nervous?

16:00:12   22   A.  Very.

16:00:14   23   Q.  Did you admit to what was going on?

16:00:16   24   A.  A few minutes in, yeah.

16:00:19   25   Q.  And did you tell them about Matthew Johnstone?

| | | |
|---|---|---|
| 16:00:23 | 1 | A.  I didn't know his name, but vaguely, yes.  What I could |
| 16:00:24 | 2 | remember. |
| 16:00:28 | 3 | Q.  Now, you told them that your phone was hacked.  Was that |
| 16:00:28 | 4 | true, Joseph? |
| 16:00:30 | 5 | A.  No, it wasn't. |
| 16:00:34 | 6 | Q.  Did you believe at the time you'd been hacked? |
| 16:00:38 | 7 | A.  No, but I thought it was a possibility that he might do it, |
| 16:00:41 | 8 | so I kept the camera covered with tape. |
| 16:00:44 | 9 | Q.  Joseph, you also told them there were only 20 minors and |
| 16:00:48 | 10 | that wasn't true.  Why did you say that? |
| 16:00:52 | 11 | A.  At the time, I knew it was more than that, but I was really |
| 16:00:57 | 12 | ashamed about the whole thing so I just said 20. |
| 16:01:02 | 13 | Q.  Did the police take anything from your house that day? |
| 16:01:06 | 14 | A.  A lot of my electronics except for my consoles. |
| 16:01:09 | 15 | Q.  When you say a lot of your electronics, can you list some of |
| 16:01:11 | 16 | the things they took? |
| 16:01:19 | 17 | A.  A Kindle tablet, a Kindle Oasis which is an e-reader, an |
| 16:01:24 | 18 | iPod Touch, three cellphones.  I think that's about everything, |
| 16:01:26 | 19 | but I don't remember though. |
| 16:01:28 | 20 | Q.  When were you arrested, Joseph? |
| 16:01:33 | 21 | A.  In September of last year.  I don't remember what day. |
| 16:01:36 | 22 | Q.  Okay.  I want to talk about what happened between January |
| 16:01:38 | 23 | when the police came to your house, and September when you were |
| 16:01:39 | 24 | arrested. |
| 16:01:40 | 25 | A.  Okay. |

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

```
16:01:43   1    Q.  Did you buy a new computer?
16:01:45   2    A.  Yeah, about a month later.
16:01:46   3    Q.  Did you buy a new cellphone?
16:01:49   4    A.  Two or three weeks later, yeah.
16:01:52   5    Q.  Okay.  What applications did you put on your new cellphone?
16:01:57   6    A.  I think when I first got it I just left the defaults on
16:01:59   7    there, but I don't know.
16:02:03   8    Q.  Okay.  Did you access the dark web from the new phone?
16:02:07   9    A.  I did a little bit, yeah.
16:02:08  10    Q.  Why?
16:02:10  11    A.  I was curious.
16:02:16  12    Q.  Okay.  Did you download apps like Instagram, Snapchat or
16:02:18  13    Kik?
16:02:21  14    A.  Instagram I think was pre-installed.  Kik and Snapchat,
16:02:22  15    yeah.
16:02:25  16    Q.  And did you login to any of the accounts that you had been
16:02:27  17    using previously?
16:02:33  18    A.  Yeah.  In the case of all three of them, Snapchat, Kik and
16:02:34  19    the Instagram.
16:02:38  20    Q.  Okay.  And did you contact any of the teenagers again?
16:02:40  21    A.  I did on Instagram.
16:02:43  22    Q.  And why did you do that?
16:02:47  23    A.  Well, at the time I already knew I was going to be arrested,
16:02:50  24    so I was just kind of testing the security and seeing how
16:02:53  25    private Instagram was.
```

16:03:30   1   Q.   Joseph, you said you were trying to see how private

16:03:31   2   Instagram was?

16:03:32   3   A.   Yes.

16:03:34   4   Q.   Were you worried that you would be arrested?

16:03:39   5   A.   Well, I figured at some point I would be.

16:03:43   6   Q.   Were you worried about hurting these girls again?

16:03:47   7   A.   Well, at the time I don't think I really did much to do

16:03:48   8   that.

16:03:52   9   Q.   Were you still afraid of Matthew Johnstone at that time?

16:03:55  10   A.   I was worried about the possibility he might message me

16:03:59  11   again or find one of my accounts.

16:04:05  12   Q.   Okay.  And I know you said earlier you have autism.  Has

16:04:09  13   anybody ever told you that you speak in an unusual way?

16:04:14  14   A.   Virtually everywhere I go, any time anybody listens to me

16:04:18  15   talk for a good period of time somebody will.

16:04:21  16   Q.   Joseph, if you had to redo everything from the moment

16:04:25  17   Matthew Johnstone first contacted you, what would you do?

16:04:29  18   A.   I would have just called the police in the hope they would

16:04:32  19   actually listen to me.

16:04:45  20   Q.   Okay.  Did you ever think about just moving away from

16:04:48  21   Ashburn, Virginia where he knew you were?

16:04:51  22   A.   I didn't have the money to do that, so that wasn't really a

16:04:52  23   possibility.

16:04:57  24   Q.   Did you ever think of other ways to avoid -- change all of

16:05:01  25   your user names?  Get a new modem, change your IP address, did

| | | |
|---|---|---|
| 16:05:04 | 1 | you think of anyway to avoid Matthew Johnstone? |
| 16:05:09 | 2 | A.  As far as changing modem, I don't think that would have done |
| 16:05:12 | 3 | anything.  And I didn't know you could change your IP address |
| 16:05:14 | 4 | like that. |
| 16:05:15 | 5 | MS. WEISS:  No further questions. |
| 16:05:17 | 6 | THE COURT:  Cross-examination. |
| 16:05:17 | 7 | CROSS-EXAMINATION |
| 16:05:17 | 8 | BY MS. ANTON: |
| 16:05:37 | 9 | Q.  You're 30 years old, right? |
| 16:05:38 | 10 | A.  Correct. |
| 16:05:40 | 11 | Q.  You're a grown man. |
| 16:05:40 | 12 | A.  Yes. |
| 16:05:43 | 13 | Q.  You may have autism, but you graduated high school, didn't |
| 16:05:44 | 14 | you? |
| 16:05:44 | 15 | A.  Yes. |
| 16:05:47 | 16 | Q.  And you, in fact, even managed to get some good grades while |
| 16:05:50 | 17 | you were in school; isn't that true? |
| 16:05:53 | 18 | A.  Mediocre really, yeah. |
| 16:05:56 | 19 | Q.  Computer classes, anything having to do with technology, you |
| 16:05:59 | 20 | got good grades in those classes? |
| 16:06:00 | 21 | A.  Yes. |
| 16:06:03 | 22 | Q.  So you're pretty familiar with how computers work, right? |
| 16:06:05 | 23 | A.  On a basic level, yeah. |
| 16:06:08 | 24 | Q.  Didn't you just testify on direct examination that you built |
| 16:06:11 | 25 | your own computer that cost $2,600? |

| | | |
|---|---|---|
| 16:06:14 | 1 | A.  That doesn't take much skill technically. |
| 16:06:16 | 2 | Q.  Okay.  And you have a job? |
| 16:06:18 | 3 | A.  Yes. |
| 16:06:21 | 4 | Q.  A pretty good job.  You're an assistant manager at a burger |
| 16:06:21 | 5 | place? |
| 16:06:22 | 6 | A.  Yes. |
| 16:06:29 | 7 | Q.  And they're even talking about promoting you to manager? |
| 16:06:30 | 8 | A.  General manager, but yes. |
| 16:06:33 | 9 | Q.  So at your job, you talked to people and you interact with |
| 16:06:33 | 10 | them? |
| 16:06:36 | 11 | A.  Most of my coworkers, sometimes customers. |
| 16:06:38 | 12 | Q.  Okay.  It's customer service-based? |
| 16:06:39 | 13 | A.  Yeah. |
| 16:06:42 | 14 | Q.  Okay.  So you don't have a problem communicating with people |
| 16:06:44 | 15 | and understanding them. |
| 16:06:46 | 16 | A.  That really depends. |
| 16:06:49 | 17 | Q.  Like if they order two burgers, you give them five? |
| 16:06:54 | 18 | A.  Well, that's just simple math at that point.  I can clearly |
| 16:06:55 | 19 | understand that. |
| 16:06:56 | 20 | Q.  So simple math you can understand? |
| 16:06:57 | 21 | A.  Yeah. |
| 16:07:01 | 22 | Q.  Now, you said that you gamed eight hours a day. |
| 16:07:02 | 23 | A.  Roughly, yeah. |
| 16:07:04 | 24 | Q.  Okay.  And when you played those games, are you wearing |
| 16:07:06 | 25 | headsets? |

| | | |
|---|---|---|
| 16:07:07 | 1 | A.  Most of the time, yeah. |
| 16:07:10 | 2 | Q.  And using a controller and staring at a big TV? |
| 16:07:13 | 3 | A.  Mouse and keyboard if it was on the computer. |
| 16:07:15 | 4 | Q.  Okay.  And do you that in your bedroom? |
| 16:07:16 | 5 | A.  Yes. |
| 16:07:18 | 6 | Q.  And that's in Ashburn, Virginia where you live? |
| 16:07:19 | 7 | A.  Yes. |
| 16:07:23 | 8 | Q.  Okay.  And you play games that involve, I think you called |
| 16:07:28 | 9 | them action -- ARPG action games? |
| 16:07:30 | 10 | A.  Action RPGs, yes. |
| 16:07:33 | 11 | Q.  Some of those games are first person shooter games? |
| 16:07:36 | 12 | A.  Well, that's a different genre. |
| 16:07:38 | 13 | Q.  Do you play first person shooter games? |
| 16:07:40 | 14 | A.  I don't really like them too much. |
| 16:07:44 | 15 | Q.  Okay.  When you play these games for eight hours a day, |
| 16:07:47 | 16 | you're existing in a world that's not reality.  Is that fair to |
| 16:07:47 | 17 | say? |
| 16:07:49 | 18 | A.  I agree. |
| 16:07:53 | 19 | Q.  Okay.  So some of those games you play, Path of Exile, some |
| 16:07:57 | 20 | of those even involve fantasy characters and swords and |
| 16:07:58 | 21 | different things. |
| 16:07:59 | 22 | A.  Yeah. |
| 16:08:02 | 23 | Q.  But none of that is reality.  You know that, right? |
| 16:08:02 | 24 | A.  Yes. |
| 16:08:07 | 25 | Q.  Okay.  Now, you spend eight hours a day playing games and |

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED BY COMPUTER

| | | |
|---|---|---|
| 16:08:09 | 1 | you work full-time? |
| 16:08:10 | 2 | A.  Yep. |
| 16:08:15 | 3 | Q.  Okay.  And you have a cellphone that you use for work?  At |
| 16:08:18 | 4 | least you did back in the time period that we're talking about, |
| 16:08:18 | 5 | right? |
| 16:08:19 | 6 | A.  Yep. |
| 16:08:23 | 7 | Q.  And that was the Galaxy S7, right? |
| 16:08:25 | 8 | A.  Yeah.  S7 Edge. |
| 16:08:28 | 9 | Q.  You used that 7 edge to communicate with all of your |
| 16:08:30 | 10 | employees and people at work, right? |
| 16:08:31 | 11 | A.  Yeah. |
| 16:08:34 | 12 | Q.  You never communicated with anybody else regarding any |
| 16:08:37 | 13 | sextortion or any child pornography on that phone, right? |
| 16:08:38 | 14 | A.  Correct. |
| 16:08:41 | 15 | Q.  All of that occurred on your Galaxy Note 3 phone. |
| 16:08:42 | 16 | A.  Correct. |
| 16:08:48 | 17 | Q.  Okay.  And when you're in your gaming world and you |
| 16:08:54 | 18 | testified that you live stream your games on Twitch? |
| 16:08:54 | 19 | A.  Uh-huh. |
| 16:08:57 | 20 | Q.  That's something that you voluntarily chose to do is put |
| 16:08:59 | 21 | your image up there and live stream it, right? |
| 16:09:03 | 22 | A.  Well, it's not my image, it's just the screen.  You know, |
| 16:09:05 | 23 | whatever is on my computer, the game. |
| 16:09:08 | 24 | Q.  Okay.  But it's something you voluntarily chose to do. |
| 16:09:08 | 25 | A.  Yeah. |

| | | |
|---|---|---|
| 16:09:12 | 1 | Q.  Okay.  Nobody forced you to put your computer image up there |
| 16:09:13 | 2 | online. |
| 16:09:13 | 3 | A.  That's true. |
| 16:09:15 | 4 | Q.  Nobody made you do that? |
| 16:09:16 | 5 | A.  True. |
| 16:09:17 | 6 | Q.  You wanted to do that? |
| 16:09:17 | 7 | A.  Yes. |
| 16:09:20 | 8 | Q.  Okay.  And in fact, you wanted to do that us because you |
| 16:09:24 | 9 | wanted people to watch you and to comment about your ability to |
| 16:09:26 | 10 | play the game. |
| 16:09:29 | 11 | A.  Well, originally I just started streaming because I wanted |
| 16:09:33 | 12 | to show my friend games he was interested in playing so he knew |
| 16:09:36 | 13 | I was into the same type of games. |
| 16:09:43 | 14 | Q.  Now, your Kik user name was MVLex3, correct? |
| 16:09:43 | 15 | A.  Yes. |
| 16:09:48 | 16 | Q.  Okay.  And you had many different user names on all |
| 16:09:50 | 17 | different apps, correct? |
| 16:09:50 | 18 | A.  Yes. |
| 16:09:54 | 19 | Q.  Okay.  And you didn't want to use your own name because you |
| 16:09:57 | 20 | were afraid that someone might find you. |
| 16:09:57 | 21 | A.  Correct. |
| 16:10:01 | 22 | Q.  Okay.  So you wanted to be as secretive as you possibly |
| 16:10:01 | 23 | could. |
| 16:10:02 | 24 | A.  Yes. |
| 16:10:08 | 25 | Q.  Okay.  Now, in being secretive, you know that Tor and Orbot |

16:10:12    1   are both ways that you could connect into the dark web, right?

16:10:16    2   A.  Orbot is just a Tor app, it's the same thing.

16:10:18    3   Q.  Okay.  But you know that.  You know that you can get into

16:10:21    4   the dark web through that client, right?

16:10:24    5   A.  Not through that client directly, you need a companion web

16:10:25    6   browser for that.

16:10:28    7   Q.  Okay.  So you know how to get there.

16:10:30    8   A.  Yes, to a degree.

16:10:33    9   Q.  And you've been there before to the dark web?

16:10:35   10   A.  Yeah, a little bit.

16:10:37   11   Q.  And in fact, you've been sitting here throughout this whole

16:10:38   12   trial, right?

16:10:38   13   A.  Yes.

16:10:41   14   Q.  You've been listening to all the witnesses that came up and

16:10:41   15   testified?

16:10:42   16   A.  Correct.

16:10:46   17   Q.  And you know that there is evidence in your phone of

16:10:49   18   searches on the dark web for child pornography.

16:10:54   19   A.  That wasn't a dark web search.  That is just normal web,

16:10:56   20   Pastebin, anyone can access through anything.

16:10:58   21   Q.  Okay.  So you were searching for child pornography just on

16:11:00   22   the normal web?

16:11:04   23   A.  Dropbox is not specifically child pornography, but yes.

16:11:10   24   Q.  Now, when you're playing these games, your testimony is

16:11:13   25   that's how you come across this person who becomes known to you

| | | |
|---|---|---|
| 16:11:14 | 1 | as Matthew Johnstone? |
| 16:11:17 | 2 | A.  That wasn't while I was playing video games, that was on |
| 16:11:17 | 3 | Kik. |
| 16:11:21 | 4 | Q.  You're in a group chat on Kik and he just contacts you? |
| 16:11:26 | 5 | A.  I wasn't in a group chat.  He contacted me peer to peer; you |
| 16:11:27 | 6 | know, direct message. |
| 16:11:32 | 7 | Q.  When he contacts you on Kik, it's with the MVLex user ID? |
| 16:11:35 | 8 | A.  Actually no, it was something older. |
| 16:11:35 | 9 | Q.  I'm sorry.  It was something else? |
| 16:11:35 | 10 | A.  Something older, yeah. |
| 16:11:38 | 11 | Q.  What was your user ID when he contacted you originally? |
| 16:11:39 | 12 | A.  I don't remember. |
| 16:11:42 | 13 | Q.  And when he contacted you originally and you testified that |
| 16:11:47 | 14 | he sent you a picture, a screenshot, of your IP address that |
| 16:11:50 | 15 | said Ashburn, Virginia, you were afraid. |
| 16:11:54 | 16 | A.  It wasn't a screenshot.  He just typed a text. |
| 16:11:57 | 17 | Q.  All right.  He didn't tell you I'm going to come and get |
| 16:11:59 | 18 | you, did he? |
| 16:12:00 | 19 | A.  No. |
| 16:12:05 | 20 | Q.  He didn't text you and say I'm coming for you? |
| 16:12:07 | 21 | A.  No. |
| 16:12:11 | 22 | Q.  He didn't threaten you in any way when he sent you that, if |
| 16:12:12 | 23 | he sent it to you. |
| 16:12:15 | 24 | A.  He did send it to me, but yes, you are correct.  He didn't |
| 16:12:16 | 25 | threaten me directly. |

16:12:21   1   Q.  And he had no embarrassing photographs to hold over your
16:12:23   2   head, right?
16:12:24   3   A.  I didn't take any, so no.
16:12:27   4   Q.  Okay.  So he had no leverage whatsoever when he contacted
16:12:33   5   you saying I know you live in Ashburn, Virginia with this IP
16:12:34   6   address.
16:12:37   7   A.  Well, at the time, again, I thought I was going to be
16:12:42   8   swatted.  I don't know exactly how determined he could have been
16:12:43   9   to find my exact lotion.
16:12:47  10   Q.  Let's talk about this swatting.  He also never said I'm
16:12:49  11   going to swat you.
16:12:53  12   A.  I doubt most people who got swatted were told beforehand.
16:12:57  13   Q.  That wasn't my question though.  He never said I'm going to
16:12:58  14   swat you, did he?
16:12:58  15   A.  No.
16:13:01  16   Q.  He never implied that he was going to swat you, did he?
16:13:06  17   A.  Well, come after somebody saying their IP address and
16:13:09  18   general location kind of seems fishy, so...
16:13:12  19   Q.  So a general e-mail saying I know you live in Ashburn,
16:13:17  20   Virginia and I know your IP address, you implied that he would
16:13:18  21   come swat you.
16:13:19  22   A.  I thought he would, yes.
16:13:24  23   Q.  Okay.  And you had no issues with him before?
16:13:29  24   A.  I did not know who he was and I still, to a degree, don't.
16:13:33  25   Q.  So you had no idea who he was?  It was a total stranger?

16:13:33  1    A.  Yes.

16:13:37  2    Q.  And a total and complete stranger sent you this text message

16:13:41  3    with your IP address, and you implied from that that you would

16:13:41  4    be swatted?

16:13:44  5    A.  That is what I thought, yes.

16:13:47  6    Q.  Okay.  And based on what you thought that you would be

16:13:53  7    swatted from that text message, you began to engage in systemic

16:13:58  8    child exploitation?

16:14:02  9    A.  Well, it wasn't just children, but yes.

16:14:04  10   Q.  Exploitation of all different people then; adults and

16:14:04  11   children?

16:14:05  12   A.  Yes.

16:14:09  13   Q.  And you did this because someone had texted you your IP

16:14:09  14   address?

16:14:10  15   A.  Yes.

16:14:15  16   Q.  And you testified that you did this for quite some time.

16:14:16  17   A.  Yes, I did.

16:14:21  18   Q.  So not just a day, not just a week; in fact, you said it

16:14:25  19   took you about a year to get real good at it.

16:14:25  20   A.  Yes.

16:14:30  21   Q.  Okay.  And you had to get real good at getting children --

16:14:33  22   tricking them in to giving you their passwords?

16:14:35  23   A.  Well, anyone in general, but yes.

16:14:39  24   Q.  Okay.  So you got good at tricking them and they gave you

16:14:43  25   their passwords and you gave their passwords to Matthew

16:14:44  1   Johnstone?

16:14:48  2   A.  I would change the passwords and information and then give

16:14:49  3   it to him, yes.

16:14:53  4   Q.  Okay.  You would assist him in getting the pictures of the

16:14:55  5   girls.

16:14:58  6   A.  That is correct.

16:15:02  7   Q.  You would text the girls either on Snapchat or Kik and you

16:15:06  8   would tell them what you wanted them to do.

16:15:09  9   A.  At his behest, that is correct.

16:15:11  10  Q.  Okay.  Now, you're saying that this is at the behest of

16:15:15  11  Matthew Johnstone.  Now, you've seen all of the evidence in this

16:15:18  12  case and the evidence from your phone.  There are no screenshots

16:15:21  13  of you having any communication with Matthew Johnstone because

16:15:24  14  you didn't take them, right?

16:15:28  15  A.  You're saying there are no screenshots, but I'm pretty sure

16:15:29  16  there were two of them.

16:15:32  17  Q.  Okay.  Let me rephrase my question.  There are no

16:15:36  18  screenshots of this Matthew Johnstone person telling you what to

16:15:37  19  do.

16:15:41  20  A.  There are chat logs of him telling me what to do.

16:15:44  21  Q.  And because you're saying that happened on a different app

16:15:45  22  called ChatLog?

16:15:49  23  A.  No, I'm saying there are chat logs in the Kik application

16:15:51  24  that you presented as evidence.

16:15:54  25  Q.  You perceive those pieces of evidence -- let's go through

| | | |
|---|---|---|
| 16:15:56 | 1 | those since we're talking about them.  That's Government's |
| 16:16:07 | 2 | Exhibit 63 and 64. |
| 16:16:26 | 3 | MS. ANTON:  Permission to approach, Your Honor? |
| 16:16:32 | 4 | THE COURT:  You may approach. |
| 16:16:32 | 5 | MS. ANTON:  Thank you. |
| 16:16:32 | 6 | BY MS. ANTON: |
| 16:16:41 | 7 | Q.  I have on the ELMO Government's Exhibit 63 which is the |
| 16:16:46 | 8 | chats that you're talking about.  And in these chats, you're |
| 16:16:50 | 9 | having a conversation with the guy in Ireland who is bozy11, |
| 16:16:51 | 10 | right? |
| 16:16:51 | 11 | A.  Yes. |
| 16:16:54 | 12 | Q.  Okay.  And in those chats, you're going back and forth with |
| 16:17:00 | 13 | them and you're talking -- did I do that? |
| 16:17:02 | 14 | THE COURT:  No, I did it.  I'm trying to get that light |
| 16:17:08 | 15 | to get the shadow off.  Go ahead.  Just keep going. |
| 16:17:09 | 16 | MS. ANTON:  May I continue? |
| 16:17:09 | 17 | THE COURT:  Yes, you may. |
| 16:17:09 | 18 | BY MS. ANTON: |
| 16:17:14 | 19 | Q.  And you're talking to the guy in Ireland who's forcing you |
| 16:17:21 | 20 | about all these different girls, right?  ***** is gone, ****** |
| 16:17:27 | 21 | has dipped.  Talicha got banned, right?  These are different |
| 16:17:28 | 22 | girls that you were both extorting? |
| 16:17:32 | 23 | A.  In the case of Talicha, I was referring to the account. |
| 16:17:34 | 24 | Q.  Okay.  But the Talicha account is one that you had |
| 16:17:36 | 25 | infiltrated and taken over, correct? |

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED BY COMPUTER

16:17:39   1      A.  It was one that he gave to me, yes.

16:17:41   2      Q.  You had infiltrated it and taken over that account.

16:17:45   3      A.  He gave it to me, I didn't take it over myself.

16:17:48   4      Q.  Okay.  So the account was given to you and you continued

16:17:51   5      with the extortion.  After Matthew Johnstone gave you the

16:17:52   6      account, you continued with it?

16:17:56   7      A.  I used that account as part of it, yes.

16:18:14   8      Q.  You can read these text messages, right?

16:18:15   9      A.  Yes.

16:18:17  10      Q.  All right.  So you are texting him back and forth about all

16:18:26  11      these different girls, and you're saying that you just got home

16:18:30  12      and you're going to try Snapchat again.  Right?  Do you see that

16:18:31  13      in the middle of the page?

16:18:32  14      A.  Yes.

16:18:37  15      Q.  Just got home 7:23, going to try Snapchat again?

16:18:37  16      A.  Yes.

16:18:41  17      Q.  And do you see the text before it?  Says what are you

16:18:42  18      working on, right?

16:18:43  19      A.  Yes.

16:18:50  20      Q.  It doesn't say you better get working or else I'm going to

16:18:54  21      come swat you, or else I'm going to hurt you.  There's no threat

16:18:55  22      in there, right?

16:18:56  23      A.  No.

16:19:03  24      Q.  And you two discussed who it is that's going to be extorted

16:19:13  25      on that day.  Then he asks you about *****.  Do you see the

16:19:19  1    bottom of the page, Bozy11.  What do you want ***** to do.

16:19:23  2    That's him sending you a message saying what do you want *****

16:19:25  3    to do.  Right?

16:19:27  4    A.  Yeah.

16:19:36  5    Q.  And you tell him back make her deep throat something.  It's

16:19:38  6    your idea to tell her that, right?

16:19:41  7    A.  That's something he's interested in, and I just told him

16:19:42  8    that.

16:19:45  9    Q.  Okay.  So you're just acting as his puppet for three years

16:19:47  10   or so?

16:19:50  11   A.  It was more like a year and a half, I think.

16:19:54  12   Q.  Do you know that there's a police department in the town you

16:19:55  13   live in?

16:19:56  14   A.  Yes.

16:19:58  15   Q.  You do know that, right?  Because you said they come to the

16:19:59  16   house?

16:20:00  17   A.  Correct.

16:20:02  18   Q.  Right.  You could have called the police, right?

16:20:04  19   A.  That's true, and I wish I did.

16:20:08  20   Q.  All right.  You could have done actually a lot of things,

16:20:08  21   right?

16:20:09  22   A.  Yes.

16:20:13  23   Q.  You could have taken some screenshots of messages back and

16:20:16  24   forth of him saying these things to you, right?

16:20:18  25   A.  That's true, and I wish I did.

16:20:20  1    Q.  But you didn't do that.

16:20:21  2    A.  That is true.

16:20:24  3    Q.  Instead, what you did is infiltrate another child's Snapchat

16:20:30  4    account and trick them and get them to take these horribly

16:20:33  5    degrading pornographic images, right?

16:20:33  6    A.  Yes.

16:20:35  7    Q.  And then you categorized those images.

16:20:37  8    A.  Yes, by name.

16:20:42  9    Q.  By name.  Alphabetically.  On Dropbox even.  Right?

16:20:43  10   A.  Yeah.

16:20:45  11   Q.  In your Dropbox account,

16:20:46  12   A.  Yeah.

16:20:48  13   Q.  Right?  You're the administrator of that account?

16:20:49  14   A.  The owner, yeah.

16:20:52  15   Q.  Okay.  So you set that account up and you put all of those

16:20:55  16   horrible images into that Dropbox account.

16:20:56  17   A.  Yeah.

16:21:02  18   Q.  And you did that because some stranger, who hadn't ever had

16:21:07  19   a problem with you before, messaged you saying I have your IP

16:21:08  20   address.

16:21:12  21   A.  Yes, that was how it started.

16:21:16  22   Q.  It didn't actually ever get any worse than that, right?

16:21:21  23   Because he never threatened you in any other way.  Right?

16:21:22  24   A.  True.

16:21:42  25   Q.  Okay.  Now, I know that you said that you don't trust the

16:21:45  1    police because of all the prior activities that you've had going

16:21:46  2    on in your life, right?

16:21:47  3    A.  Yes.

16:21:51  4    Q.  But you know that you could have had your mother reach out

16:21:55  5    to the police or your sisters reach out to the police or anybody

16:21:57  6    else reach out, right?  You could reach out to anybody and you

16:21:58  7    didn't.

16:22:04  8    A.  That's true.  I did not want to talk about it to them.

16:22:15  9    Q.  Now, your testimony was even Matthew Johnstone told you to

16:22:19 10    save the screenshots so that you would know what to do with the

16:22:23 11    girls.  Those are the screenshots your defense attorney just put

16:22:25 12    up on the ELMO and went over with you, right?

16:22:26 13    A.  Correct.

16:22:29 14    Q.  So he was sending you screenshots and telling you to save it

16:22:31 15    so you knew what to do with the girls, but you never thought you

16:22:35 16    should save what he was sending you to document anything?

16:22:36 17    A.  No, I did not.

16:22:38 18    Q.  Did you know how to take a screenshot?

16:22:40 19    A.  Yes.

16:22:47 20    Q.  You never put up a fight.

16:22:50 21    A.  No.  For the most part, I didn't.

16:22:52 22    Q.  You never told him no.

16:22:53 23    A.  No.

16:22:57 24    Q.  You never said I am not going to abuse children and do this

16:22:58 25    for you.

| | | |
|---|---|---|
| 16:23:01 | 1 | A.  That is true, I did not. |
| 16:23:04 | 2 | Q.  You never refused to help him. |
| 16:23:06 | 3 | A.  I did not. |
| 16:23:09 | 4 | Q.  You saw those girls who came in here and testified. |
| 16:23:11 | 5 | A.  Yes. |
| 16:23:18 | 6 | Q.  You know that they came in to testify because of what you |
| 16:23:20 | 7 | did to them. |
| 16:23:21 | 8 | A.  Yes. |
| 16:23:24 | 9 | Q.  You know that those images that they were forced to take and |
| 16:23:26 | 10 | will have to live with forever are because of actions that you |
| 16:23:28 | 11 | did. |
| 16:23:31 | 12 | A.  That's true, and I'm sorry for doing it. |
| 16:23:34 | 13 | Q.  You're sorry for doing that. |
| 16:23:35 | 14 | A.  Yes. |
| 16:23:41 | 15 | Q.  Those images are online and will stay online forever. |
| 16:23:43 | 16 | A.  Yes, I think so. |
| 16:23:53 | 17 | Q.  Now, let's talk about when the police did come to your |
| 16:23:53 | 18 | house. |
| 16:23:54 | 19 | A.  Okay. |
| 16:23:57 | 20 | Q.  They didn't come to your house because you called them, |
| 16:23:57 | 21 | right? |
| 16:23:58 | 22 | A.  Yes. |
| 16:24:01 | 23 | Q.  No.  They didn't come to your house because of that.  They |
| 16:24:03 | 24 | came because they had a search warrant, right? |
| 16:24:04 | 25 | A.  Yes. |

16:24:08    1      Q.   And they woke you up that morning and they gathered all of

16:24:10    2      your devices from your bedroom and they took you outside and you

16:24:12    3      talked to them, right?

16:24:13    4      A.   Yes.

16:24:15    5      Q.   And when you talked to them that day, they recorded what you

16:24:17    6      were saying to them.

16:24:18    7      A.   Yes.

16:24:22    8      Q.   And you didn't say to them thank goodness that you're here,

16:24:25    9      this has been going on for so long, I have got to show you

16:24:28   10      what's in my phone.  You didn't say that, right?

16:24:31   11      A.   No, I was just extremely nervous at the time.

16:24:35   12      Q.   Okay.  The interview lasted for about an hour with them,

16:24:35   13      remember?

16:24:36   14      A.   Yes.

16:24:39   15      Q.   And throughout that hour, you weren't even honest with them,

16:24:40   16      right?

16:24:43   17      A.   I was dishonest a few times, yes.

16:24:47   18      Q.   When you say you were dishonest, let's be more specific.

16:24:51   19      You lied to the police about many different things that day,

16:24:52   20      didn't you?

16:24:54   21      A.   I think at least three, yeah.

16:24:57   22      Q.   At least three things.  Well, let's talk about the at least

16:25:00   23      three things that you think you lied to them about.  You told

16:25:04   24      them there's probably only 20 girls or so, right?

16:25:04   25      A.   That's true.

16:25:07  1    Q.  When you knew well and good that there had been hundreds

16:25:11  2    that you had been extorting and systemically categorizing in

16:25:12  3    your phone?

16:25:16  4    A.  Well, I didn't know the exact number.  I just knew it was

16:25:17  5    more than 20.

16:25:21  6    Q.  You lied to them about the e-mail address that was

16:25:24  7    associated with your Dropbox account, right?

16:25:27  8    A.  That wasn't a lie so much as me not remembering which

16:25:28  9    e-mail.

16:25:34  10   Q.  You didn't tell them about Instagram, did you?

16:25:35  11   A.  No.

16:25:38  12   Q.  No.

16:25:45  13           MS. ANTON:  Permission to approach, Your Honor?

16:25:46  14           THE COURT:  You may.

16:25:46  15       BY MS. ANTON:

16:25:49  16   Q.  You didn't tell them about the extortion that happened on

16:25:54  17   your tuylin20 account because you used that account to extort

16:25:55  18   these girls, didn't you?

16:25:57  19   A.  No.

16:26:12  20   Q.  Government's Exhibit 85 E.  Government's Exhibit 85 C, your

16:26:29  21   Instagram account.  85 B, your Instagram account.  85 E, your

16:26:36  22   Instagram account.  85 A, your Instagram account.  You didn't

16:26:39  23   mention any of this to the police that you had been using

16:26:41  24   Instagram to extort these girls?

16:26:57  25   A.  No.  I only talked about Snapchat for the most part.

16:26:59   1   Q.  You told the police that you had been hacked.

16:27:02   2   A.  Yes, that was lie.

16:27:04   3   Q.  That was a lie.  You hadn't been hacked, right?

16:27:05   4   A.  Correct.

16:27:09   5   Q.  You told them that some guy in Ireland had sent you a link

16:27:12   6   and you clicked on the link and the pictures just kept coming on

16:27:13   7   to your phone, right?

16:27:16   8   A.  I'm pretty sure I said that I clicked on the link and I

16:27:21   9   think that's how he got my IP address in the first place in that

16:27:21  10   interview.

16:27:24  11   Q.  You told him that you clicked on a link and you never

16:27:26  12   clicked on a link?

16:27:28  13   A.  At this point, I truly don't remember, so I can't say.

16:27:30  14   Q.  You don't remember because you have done so much in the way

16:27:33  15   of extortion over this period of time that you can't remember

16:27:36  16   anymore what you've done?

16:27:39  17   A.  Well specifics, yeah, it's true.

16:27:47  18   Q.  There was no one putting pictures on your phone, correct?

16:27:50  19   A.  Well, no.  That was just me downloading the one he would

16:27:54  20   send me or that got sent directly to me.

16:27:57  21   Q.  Right.  You were the one putting the pictures on your phone.

16:27:58  22   A.  Yes.

16:28:08  23   Q.  Now, after the search warrant happened in January of 2018,

16:28:11  24   you knew then that the police were on to you.

16:28:12  25   A.  Yes.

```
16:28:16   1    Q.  You knew it because you spent an hour talking to them and
16:28:19   2    lying to them about what had been going on, right?
16:28:19   3    A.  Yeah.
16:28:22   4    Q.  Okay.  So you knew at that point that you were probably
16:28:24   5    going to be in trouble.
16:28:25   6    A.  Correct.
16:28:28   7    Q.  And for the next couple of months, there was no extortion
16:28:30   8    that took place, correct?
16:28:31   9    A.  Yes.
16:28:35  10    Q.  You didn't reach out to any girls via Snapchat and trick
16:28:39  11    them into giving you their passwords?
16:28:40  12    A.  Yes.
16:28:43  13    Q.  You didn't re-contact any of the older girls who you had
16:28:44  14    contacted previously?
16:28:45  15    A.  Yes.
16:28:48  16    Q.  You had stopped completely.
16:28:49  17    A.  Yes.
16:28:55  18    Q.  So Matthew Johnstone wasn't threatening you for those couple
16:28:56  19    of months?
16:28:59  20    A.  No, he did not get in contact with me to my knowledge.
16:29:02  21    Q.  So you knew then that it was safe for you to stop because
16:29:05  22    you weren't going to be swatted, right?
16:29:08  23    A.  At that point I thought I might not be, yes.
16:29:15  24    Q.  And even then you went and got a new phone.
16:29:16  25    A.  Yes.
```

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

| | | |
|---|---|---|
| 16:29:19 | 1 | Q.  You got that S8 that we heard about. |
| 16:29:19 | 2 | A.  Yes. |
| 16:29:22 | 3 | Q.  Okay.  And on that phone, you again downloaded some of the |
| 16:29:25 | 4 | very same apps that you had before? |
| 16:29:25 | 5 | A.  Yes. |
| 16:29:29 | 6 | Q.  And in fact, those pictures of the children transferred over |
| 16:29:31 | 7 | into that phone. |
| 16:29:35 | 8 | A.  They were on the Instagram already, if that's what you're |
| 16:29:35 | 9 | referring to. |
| 16:29:37 | 10 | Q.  Well, they were on your Instagram account and when you |
| 16:29:40 | 11 | logged back in to the same Instagram account, they appeared on |
| 16:29:43 | 12 | your S8 phone right? |
| 16:29:43 | 13 | A.  Yes. |
| 16:29:45 | 14 | Q.  They don't go away. |
| 16:29:46 | 15 | A.  That's correct. |
| 16:29:50 | 16 | Q.  Those five binders don't go away. |
| 16:29:51 | 17 | A.  Yes. |
| 16:29:57 | 18 | Q.  And you said that at that point, you just wanted to test out |
| 16:30:03 | 19 | and see how private is Instagram.  Is that what you just said on |
| 16:30:04 | 20 | direct testimony? |
| 16:30:04 | 21 | A.  That is correct. |
| 16:30:08 | 22 | Q.  How private Instagram really was.  Now, you're worried about |
| 16:30:09 | 23 | your privacy, right? |
| 16:30:10 | 24 | A.  Correct. |
| 16:30:16 | 25 | Q.  And there's no better way than to test out your privacy on |

| | | |
|---|---|---|
| 16:30:30 | 1 | Instagram, Government's 81, than sending another extortionate |
| 16:30:39 | 2 | text to victim M.K. saying okay, I show friends with her |
| 16:30:40 | 3 | picture? |
| 16:30:44 | 4 | A.   That is the picture that was shown in the chat that's just |
| 16:30:44 | 5 | re-sent. |
| 16:30:45 | 6 | Q.   You re-sent that? |
| 16:30:45 | 7 | A.   Yeah. |
| 16:30:48 | 8 | Q.   And you re-sent that to her because you knew you had |
| 16:30:49 | 9 | previously extorted her. |
| 16:30:52 | 10 | A.   Yeah, I figured I would probably get arrested for something |
| 16:30:53 | 11 | I did with her. |
| 16:30:55 | 12 | Q.   And at that time when you sent this, even by your own |
| 16:30:59 | 13 | admission, this Matthew Johnstone hadn't even been texting you |
| 16:31:02 | 14 | or bothering you. |
| 16:31:04 | 15 | A.   That's true. |
| 16:31:20 | 16 | Q.   Let's talk about Dropbox. |
| 16:31:22 | 17 | A.   Okay. |
| 16:31:41 | 18 | Q.   Government's Exhibit 90.  That's how your Dropbox was set |
| 16:31:42 | 19 | up, right?  Into these folders? |
| 16:31:46 | 20 | A.   Yes, I believe that was one of them. |
| 16:31:51 | 21 | Q.   The L.C. folder in which you had lots of adult porn with |
| 16:31:54 | 22 | celebrities, right? |
| 16:31:56 | 23 | A.   Yes. |
| 16:32:02 | 24 | Q.   But then you had a file called "trade vids", right? |
| 16:32:03 | 25 | A.   Yes. |

| | | |
|---|---|---|
| 16:32:07 | 1 | Q.  And in the "trade vids", you had three other files. |
| 16:32:08 | 2 | A.  Yes. |
| 16:32:12 | 3 | Q.  And you've seen them listed here, two dad and daughter and |
| 16:32:13 | 4 | kitten, right? |
| 16:32:13 | 5 | A.  Yes. |
| 16:32:17 | 6 | Q.  And in that folder, you had images and videos of child |
| 16:32:19 | 7 | pornography, right? |
| 16:32:21 | 8 | A.  Yes, I believe that was from a Dropbox pull. |
| 16:32:22 | 9 | Q.  That was from your Dropbox? |
| 16:32:25 | 10 | A.  A Dropbox link that I pulled. |
| 16:32:29 | 11 | Q.  Okay.  So these images and videos that you had there of |
| 16:32:32 | 12 | child pornography, these aren't ones that you had these girls |
| 16:32:33 | 13 | make, right? |
| 16:32:35 | 14 | A.  No, they were pre-existing. |
| 16:32:38 | 15 | Q.  Right.  Pre-existing child pornography that you went on the |
| 16:32:41 | 16 | internet and sought out to save in your Dropbox. |
| 16:32:42 | 17 | A.  Yes. |
| 16:32:54 | 18 | Q.  In the dad and daughter file, you also had all of these |
| 16:32:56 | 19 | images and videos of child pornography, right? |
| 16:33:00 | 20 | A.  Yes.  That was probably pulled from the same Dropbox link. |
| 16:33:04 | 21 | Q.  So you're saying probably pulled from the same Dropbox link, |
| 16:33:08 | 22 | but what you really mean is you had to go online and search for |
| 16:33:09 | 23 | it and download it, right? |
| 16:33:10 | 24 | A.  Yes. |
| 16:33:13 | 25 | Q.  Because your phone doesn't pull things by itself? |

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED BY COMPUTER

16:33:15   1   A.  That is correct.

16:33:18   2   Q.  So you, Joseph Woodson, went online and searched for this

16:33:23   3   child pornography and then saved it into your Dropbox?

16:33:23   4   A.  Yes, I did.

16:33:26   5   Q.  And you saved it into Dropbox because that's someplace where

16:33:29   6   you know that you can share it, right?

16:33:32   7   A.  Well, just to save it in case he wanted it, yeah.

16:33:36   8   Q.  Just to save it in case Matthew Johnstone wanted it?

16:33:36   9   A.  Correct.

16:33:38   10  Q.  Oh, so you were going online to find pre-existing child

16:33:44   11  pornography just to have in case perhaps maybe the co-defendant

16:33:49   12  or your co-conspirator Johnstone wanted it?

16:33:52   13  A.  Correct.  He told me what searches to do.

16:33:55   14  Q.  Oh, so he told you what to search for as well?

16:33:56   15  A.  Yeah.

16:34:06   16  Q.  And in this Dropbox account, you had all of these folders

16:34:09   17  listed here, right?

16:34:09   18  A.  Yes.

16:34:13   19  Q.  Of *****, yes?

16:34:13   20  A.  Yes.

16:34:15   21  Q.  ******?

16:34:16   22  A.  Yes.

16:34:23   23  Q.  ****** ******* ******* ******* ***** ******** ********

16:34:28   24  *****.  All of those folders contained child pornography that

16:34:31   25  you had made, right?

16:34:33  1     A.  Downloaded and made, yeah.

16:34:37  2     Q.  Well, when you say downloaded, you extorted these children

16:34:40  3     to make these images, right?

16:34:44  4     A.  Some of them I've never talked to, so he did and I just

16:34:46  5     downloaded, but yeah.

16:34:49  6     Q.  So you and he were sharing the Dropbox account and what was

16:34:50  7     going into it?

16:34:53  8     A.  Well, everything that's in there was just things he told me

16:34:56  9     to organize and save so he could just have a specific link to

16:34:57  10    it.

16:35:03  11    Q.  So you organized these files containing all of this child

16:35:09  12    pornography and all of these images because he told you to.

16:35:10  13    A.  Yes.

16:35:16  14    Q.  And you did it because you were afraid that this stranger,

16:35:19  15    who you never had a problem with or interacted with, just had

16:35:21  16    your IP address.

16:35:22  17    A.  Yes.

16:35:32  18    Q.  And then you had some snap list in that Dropbox too.  Do you

16:35:38  19    remember the snap list that you made?  Do you see it?

16:35:43  20    A.  Yeah, I see it, but I don't remember.  But it's in there so

16:35:45  21    probably had to have been me.

16:35:49  22    Q.  Well, you're the only one who had access to be the

16:35:50  23    administrator of that Dropbox, right?

16:35:51  24    A.  As far as I know, yes.

16:35:54  25    Q.  So that means that you, Joseph Woodson, are the only person

16:35:57  1    who could have put that document in there, right?

16:35:58  2    A.  Yeah.

16:36:02  3    Q.  Okay.  And that document says a list of girls' user names

16:36:07  4    and then says passwords are either fuck slut 90 or 100, unless

16:36:12  5    you changed it, or account was taken over and deleted, right?

16:36:12  6    A.  Yeah.

16:36:15  7    Q.  So this is the way that you were going to communicate with

16:36:18  8    him so that he could know which accounts were which, right?

16:36:19  9    A.  Well, yeah.

16:36:22  10   Q.  Because you needed to be organized in the way that you were

16:36:27  11   going to systemically extort these children.

16:36:29  12   A.  Well, in that case those are accounts that are already taken

16:36:32  13   over, but yeah.

16:36:49  14   Q.  Government's 87.  Taylor Keenan.  That's you, right?

16:36:53  15   A.  That is an account I took over at some point, yeah.

16:36:58  16   Q.  Okay.  That's attached to your Kik account with the

16:37:00  17   pyrokenesist name?

16:37:01  18   A.  Yes.

16:37:04  19   Q.  Okay.  So what we're looking at here is a group chat between

16:37:07  20   you and several other people, correct?

16:37:11  21   A.  That I'm not so sure of.  It's been a long time.

16:37:15  22   Q.  Okay.  Well, how many different people do you see there in

16:37:17  23   Government's 87 talking?  You're in the green, right?

16:37:18  24   A.  Yes.

16:37:21  25   Q.  And there's at least two other people on the left-hand side,

198

```
16:37:24   1    right?
16:37:28   2    A.  One is a Facebook Messenger icon.
16:37:31   3    Q.  Right, but there's two separate ones.  This is one and this
16:37:33   4    is two and this is you?
16:37:36   5    A.  See, the second one you just pointed at is the Facebook
16:37:38   6    Messenger icon.
16:37:40   7    Q.  Let's talk about what you guys are talking about in this
16:37:44   8    screenshot.  Okay?  You're in the green, right?
16:37:46   9    A.  Yeah.
16:37:51  10    Q.  So these unidentified people say to you "what's she doing
16:37:55  11    for you right now, if you get her to do requests for me right
16:38:00  12    now, I'll not contact her again.  And you reply "but you already
16:38:05  13    agreed she's mine exclusively.  And in regards to trades for
16:38:10  14    something bad, yeah sure, that's fine.  I doubt it would be any
16:38:11  15    time soon though".
16:38:13  16           Right?  You're having this conversation with other
16:38:19  17    people about posting and extorting children, right?
16:38:21  18    A.  Well, I have no idea who I was referring to in that
16:38:23  19    conversation, so I can't say.
16:38:25  20    Q.  Well, I'm not asking you who the people are, let's just talk
16:38:28  21    about the words.  Let's talk about what words are on this page.
16:38:35  22    Right?  The words say "what's stopping me from posting her right
16:38:38  23    now?  You're taking her from me when we had a deal last night".
16:38:44  24    That person is saying to you "we had a deal last night", and
16:38:49  25    you're saying back "yeah, sorry man, but don't be a dirty dude
```

16:38:52  1    about it.  Please don't post her though".  And the other guy

16:38:55  2    says "too late, 4chan tomorrow".

16:38:58  3              And you know, Joseph Woodson, that 4chan is a slut

16:39:00  4    shaming website, right?

16:39:03  5    A.  4chan has many different boards you can post different

16:39:06  6    things on.  It's not just slut shaming.

16:39:11  7    Q.  Okay.  So he was going to post this extortionate, sexually

16:39:17  8    explicit video of a girl on 4chan in some other forum?

16:39:21  9    A.  On a specific board, not sure which one.

16:39:23  10   Q.  Probably not to buy furniture?

16:39:24  11   A.  No.

16:39:30  12   Q.  And you say "seriously, we were never truly partners then.

16:39:34  13   You kept none of your words.  But that's fine, even if you do

16:39:36  14   she's still mine.  Bye".

16:39:39  15             This is you texting that, right?

16:39:41  16   A.  I'm pretty sure, yeah.

16:39:43  17   Q.  Well, let's not be pretty sure.  It is you because it's

16:39:46  18   Taylor Keenan, that's your account and this is a screenshot that

16:39:50  19   was in your phone.

16:39:52  20   A.  Again, Taylor Keenan was an account I took over.  I'm not

16:39:55  21   sure if at that time I'm the one that owns that account.

16:40:00  22   Q.  What does the guy say back to you or the person?  "Then

16:40:03  23   there's no point in not sharing last night's fun.  If I get

16:40:07  24   nothing from this, you having her exclusively".  You're arguing

16:40:10  25   back and forth.  You tell him "the point is respecting your

16:40:15  1   partner's wishes and honoring your word", and he says "you're

16:40:20  2   not my partner.  If we haven't got something to partner on so

16:40:22  3   no, I'm not going to keep it private.  Do as you will with her

16:40:24  4   in the future.  If she won't deal with you now, I don't care",

16:40:29  5   right?  And he tells "if you she's yours then she should".

16:40:41  6            This was a game to you.

16:40:42  7   A.  No.

16:40:44  8   Q.  You thought that you owned these girls.

16:40:46  9   A.  No.

16:40:59  10  Q.  You made them address you as daddy.

16:41:04  11  A.  I think that was from the screenshot that he sent me, not

16:41:05  12  what I did.

16:41:08  13  Q.  You made them write sex slave on their bodies?

16:41:09  14  A.  Yes, I did.

16:41:12  15  Q.  You made them write other people's names on their bodies?

16:41:17  16  A.  I think only Michael in the case of what I did.

16:41:24  17  Q.  These girls were so affected that they told you in some of

16:41:28  18  these chats that they were going to commit suicide.

16:41:29  19  A.  Yeah.

16:41:31  20  Q.  But you didn't care.

16:41:36  21  A.  I was told to ignore that and not to take it seriously.

16:41:40  22  Q.  You were told to ignore that and not take it seriously?

16:41:40  23  A.  Yeah.

16:41:43  24  Q.  And you were told that by this person who just had your IP

16:41:46  25  address?

| | | |
|---|---|---|
| 16:41:47 | 1 | A.  Yeah, the unindicted co-conspirator. |
| 16:41:52 | 2 | Q.  The unidentified co-conspirator?  Is that what you just |
| 16:41:52 | 3 | said? |
| 16:41:55 | 4 | A.  Unindicted co-conspirator. |
| 16:42:27 | 5 | Q.  When you got these images from these children, you didn't |
| 16:42:31 | 6 | just keep them and categorize them in your Dropbox account, |
| 16:42:33 | 7 | right? |
| 16:42:37 | 8 | A.  I'm sorry.  Can you rephrase that? |
| 16:42:40 | 9 | Q.  When you got the pictures that you made these children take, |
| 16:42:44 | 10 | the sexually explicit pictures, you didn't just hang on to them, |
| 16:42:47 | 11 | keep them in your phone and keep them on your Dropbox, right? |
| 16:42:49 | 12 | A.  Well yeah, that's basically what I did. |
| 16:42:52 | 13 | Q.  Well, you also sent these pictures out to other people, |
| 16:42:53 | 14 | didn't you? |
| 16:42:56 | 15 | A.  A few of them, but rarely. |
| 16:42:59 | 16 | Q.  Rarely.  You rarely sent out these pictures to other people? |
| 16:43:01 | 17 | A.  Yeah.  As far as I remember. |
| 16:43:05 | 18 | Q.  Okay.  That Instagram account tuylin20, that's yours, right? |
| 16:43:07 | 19 | A.  Yes. |
| 16:43:36 | 20 | Q.  Publishing Government's 85 A.  You don't remember sending |
| 16:43:37 | 21 | this picture out? |
| 16:43:38 | 22 | A.  No. |
| 16:43:52 | 23 | Q.  You don't remember sending this picture out in your |
| 16:43:53 | 24 | tuylin20? |
| 16:43:55 | 25 | A.  No. |

16:43:57   1   Q.   Tuylin20 is your Instagram account, right?

16:43:58   2   A.   Correct.

16:44:01   3   Q.   And Instagram is a social media app in which you can reach

16:44:04   4   out to other people and send messages and pictures, right?

16:44:06   5   A.   Correct.

16:44:14   6   Q.   You don't remember sending this picture out on your

16:44:14   7   tuylin20?

16:44:16   8   A.   No.

16:44:21   9   Q.   How about this picture?  Do you remember sending that one

16:44:22  10   out?

16:44:23  11   A.   No.

16:44:29  12   Q.   How about this picture?

16:44:30  13   A.   No.

16:44:51  14   Q.   How about this picture?

16:44:52  15   A.   Still no.

16:44:56  16   Q.   Don't remember any of that?  Do you remember having an

16:44:58  17   Instagram account with tuylin20 on it?

16:45:00  18   A.   That much I remember, yes.

16:45:09  19   Q.   Do you remember sending this picture out on your tuylin20

16:45:11  20   account?

16:45:15  21   A.   I'm not sure what that is, so definitely not.

16:45:17  22   Q.   I guess there's a shadow on it still.

16:45:19  23        THE COURT:  Isn't there like a little switch to put the

16:45:22  24   light on, on the ELMO?

16:45:28  25        MS. ANTON:  There is a switch that says light white.

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

```
16:45:30   1       There we go.
16:45:30   2           BY MS. ANTON:
16:45:32   3       Q.  Remember sending this picture out?
16:45:33   4       A.  No.
16:45:38   5       Q.  How about this picture?
16:45:40   6       A.  No.
16:45:44   7       Q.  How about this picture?
16:45:45   8       A.  No.
16:46:07   9       Q.  The truth is, Mr. Woodson, that you've sent out so many
16:46:11  10       images of so many children, that you don't remember anymore who
16:46:13  11       you sent out and where you sent it, right?
16:46:15  12       A.  No, I don't remember.
16:46:18  13       Q.  Right.  So you don't remember that you've sent all these
16:46:21  14       images all over the internet and on Instagram, right?
16:46:24  15       A.  That's true, I don't remember that.
16:46:51  16       Q.  ********  You remember *******?
16:46:52  17       A.  Yeah.
16:46:55  18       Q.  You told the police you remembered *******.
16:46:57  19       A.  Yeah.
16:47:00  20       Q.  ******.  Do you remember ******?
16:47:01  21       A.  Yeah.
16:47:07  22       Q.  You sent ******'s pictures out on Instagram.  Yes?
16:47:11  23       A.  Well, yeah, I guess that's what you just showed right there.
16:47:17  24       Q.  How about *******?  You remember C.J.?
16:47:18  25       A.  Yeah.
```

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

| | | |
|---|---|---|
| 16:47:23 | 1 | Q.  You sent her pictures out.  Yes? |
| 16:47:24 | 2 | A.  That wasn't a question, but yeah. |
| 16:47:27 | 3 | Q.  Did you send her pictures out? |
| 16:47:27 | 4 | A.  Yeah. |
| 16:47:31 | 5 | Q.  In fact, you sent her pictures out over and over and over |
| 16:47:32 | 6 | again on Instagram. |
| 16:47:43 | 7 | How about *******.  Do you remember making ******* take |
| 16:47:44 | 8 | these photos? |
| 16:47:46 | 9 | A.  No, not really. |
| 16:47:50 | 10 | Q.  This was in a live Skype chat with you.  This was actually a |
| 16:47:56 | 11 | live chat and not through a social media texting app.  She was |
| 16:47:59 | 12 | in front of a camera on her phone.  Do you remember that? |
| 16:48:00 | 13 | A.  Well, no. |
| 16:48:04 | 14 | Q.  You told her to disrobe and take off all of her clothes. |
| 16:48:06 | 15 | You don't remember that on your Skype account? |
| 16:48:08 | 16 | A.  No. |
| 16:48:22 | 17 | Q.  How about *****?  A.C.?  You and the co-conspirator in |
| 16:48:28 | 18 | Ireland had some conversations about *****, remember her? |
| 16:48:30 | 19 | A.  No, not really. |
| 16:48:32 | 20 | Q.  You don't remember talking about her and he referred to her |
| 16:48:35 | 21 | as *****, Matt's whore? |
| 16:48:40 | 22 | A.  Only from what I've seen in discovery, but otherwise, no. |
| 16:48:51 | 23 | Q.  How about ****** **** and forcing her to have oral sex with |
| 16:48:54 | 24 | her brother? |
| 16:48:57 | 25 | A.  Yeah.  I kind of remember that. |

```
16:48:59   1    Q.  Kind of remember that?
16:49:23   2            Every day when you left your house and you went to work
16:49:28   3    at the burger joint, you passed many people, maybe even police
16:49:31   4    stations, someone you could have told, right?
16:49:33   5    A.  A lot of strangers and then, you know, coworkers and stuff
16:49:36   6    when I was actually at the store, yeah.
16:49:38   7    Q.  You could have told one of your coworkers.
16:49:42   8    A.  I wouldn't have trusted to talk to them about that.  Also
16:49:44   9    it's a real shameful thing.
16:49:47  10    Q.  You could have reached out for help in some way, but you
16:49:51  11    chose not to reach out in any way.  Instead you just carried on,
16:49:51  12    right?
16:49:53  13    A.  That's true.
16:49:56  14    Q.  And years went by.
16:49:59  15    A.  At least over one, yeah.
16:50:03  16    Q.  And these victims, they pleaded with you to stop, right?
16:50:05  17    A.  I think some did, yeah.
16:50:09  18    Q.  They begged you to stop, right?
16:50:13  19    A.  Same thing.  I'm pretty sure it was some, yeah.
16:50:17  20    Q.  They didn't want to do what you asked them to do.  And you
16:50:26  21    sent pictures for all their friends to see?
16:50:29  22    A.  Yeah, some of them.
16:50:32  23    Q.  But you're sorry now.
16:50:33  24    A.  Yes, I am.
16:50:40  25    Q.  Hmm-hmm.  And you wish that you could take it all back.
```

| | | |
|---|---|---|
| 16:50:42 | 1 | A.  Yes, I do. |
| 16:50:47 | 2 | Q.  Well, you've heard the saying "too little too late", right? |
| 16:50:48 | 3 | A.  I'm not familiar with it. |
| 16:50:53 | 4 | Q.  Well Mr. Woodson, for those couple of months after you had |
| 16:50:57 | 5 | met with the police until you were arrested, absolutely no |
| 16:51:01 | 6 | swatting happened and no threats came through your phone and you |
| 16:51:04 | 7 | didn't reach out to any of those girls, right? |
| 16:51:06 | 8 | A.  Yeah. |
| 16:51:09 | 9 | Q.  So you could have stopped. |
| 16:51:10 | 10 | A.  Yeah. |
| 16:51:14 | 11 | Q.  But you chose, you chose to keep going. |
| 16:51:18 | 12 | A.  Yes.  Thinking I would be swatted at the time. |
| 16:51:23 | 13 | Q.  You chose to keep going because in your mind and your mind |
| 16:51:29 | 14 | alone, you created this worry or threat about being swatted. |
| 16:51:32 | 15 | A.  Could you rephrase that? |
| 16:51:36 | 16 | Q.  In your mind, you created this threat that was never made to |
| 16:51:39 | 17 | you about being swatted. |
| 16:51:42 | 18 | A.  Well yes, I did think it was a possibility. |
| 16:51:44 | 19 | Q.  And so for this little, tiny possibility that you thought |
| 16:51:49 | 20 | existed, you then spent a year and a half extorting children |
| 16:51:53 | 21 | over and over again. |
| 16:51:56 | 22 | A.  Well, to me I wouldn't have said it was a little tiny |
| 16:51:58 | 23 | possibility.  But, yeah. |
| 16:51:59 | 24 | Q.  Okay. |
| 16:52:00 | 25 |         MS. ANTON:  No further questions. |

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED BY COMPUTER

16:52:03   1          THE COURT:  Redirect.

16:52:09   2                     REDIRECT EXAMINATION

16:52:09   3      BY MS. WEISS:

16:52:22   4   Q.  Joseph, on cross, there were a lot of things you didn't

16:52:23   5   remember.

16:52:24   6   A.  Yeah.

16:52:28   7   Q.  Are you denying being involved in this in any way?

16:52:31   8   A.  Well no, I just don't remember everything.

16:52:35   9   Q.  Okay.  Joseph, did you have child pornography in your

16:52:37   10  Dropbox account?

16:52:38   11  A.  Yes.

16:52:41   12  Q.  Okay.  And did you do searches for child pornography on

16:52:43   13  PasteBin?

16:52:44   14  A.  Yes, I did.

16:52:46   15  Q.  Why did you do that?

16:52:50   16  A.  It was what the Irish guy told me to do, or Michael whatever

16:52:52   17  his name is, Matthew.  Excuse me.

16:52:53   18  Q.  Why did he tell you to do that?

16:52:57   19  A.  I didn't ask him why, I just did it.

16:53:28   20          THE COURT:  Let's go.  You guys have been playing nice.

16:53:33   21  Let's see what we can get done.

16:53:33   22          BY MS. WEISS:

16:53:58   23  Q.  Joseph, you were asked on cross about this screenshot.  What

16:54:02   24  is this name here at the top?

16:54:08   25  A.  That is just, I guess you just call it a screen name.

| | | |
|---|---|---|
| 16:54:10 | 1 | Q.  And do you know in the Kik application if that's your name |
| 16:54:13 | 2 | or the name of the person you're chatting with? |
| 16:54:17 | 3 | A.  In that situation, I'm not 100%.  It might be the person I'm |
| 16:54:17 | 4 | chatting with. |
| 16:54:21 | 5 | Q.  Okay.  On cross you said that you didn't remember this |
| 16:54:22 | 6 | conversation? |
| 16:54:23 | 7 | A.  Yes. |
| 16:54:27 | 8 | Q.  Is this a screenshot that Matthew Johnstone sent you? |
| 16:54:28 | 9 | A.  I don't know exactly. |
| 16:54:50 | 10 | Q.  Okay.  Joseph, on cross you acknowledge there were a lot of |
| 16:54:54 | 11 | opportunities for you to talk to the police or talk to a |
| 16:54:57 | 12 | coworker or talk to even a stranger.  Why didn't you ask anybody |
| 16:54:59 | 13 | for help? |
| 16:55:02 | 14 | A.  I was ashamed about the whole thing, and I really didn't |
| 16:55:07 | 15 | want people who directly knew me like even hearing about it. |
| 16:55:11 | 16 | Q.  Do you think people would have believed you? |
| 16:55:14 | 17 | MS. ANTON:  Objection, calls for speculation if he |
| 16:55:16 | 18 | thought people would believe him. |
| 16:55:17 | 19 | THE COURT:  I'll sustain that objection.  It's also |
| 16:55:19 | 20 | leading. |
| 16:55:19 | 21 | BY MS. WEISS: |
| 16:55:22 | 22 | Q.  When Detective Oksanen interviewed you and you told him |
| 16:55:25 | 23 | about the Irish guy, what was his reaction? |
| 16:55:29 | 24 | A.  He called me a liar for that, and said he didn't believe me |
| 16:55:31 | 25 | on multiple different occasions. |

| | | |
|---|---|---|
| 16:55:34 | 1 | Q.   Okay.  By the way, in that interview, did they ask you about |
| 16:55:35 | 2 | Instagram? |
| 16:55:37 | 3 | A.   No. |
| 16:55:45 | 4 | Q.   On that Instagram account tuylin20, did people send you |
| 16:55:46 | 5 | images? |
| 16:55:48 | 6 | A.   Quite a few, yeah. |
| 16:55:51 | 7 | Q.   Did Matthew Johnstone send you images on tuylin20. |
| 16:55:54 | 8 | THE COURT:  I'm sorry.  Could you be more precise?  I |
| 16:55:57 | 9 | couldn't understand what you said.  Slow down a little bit. |
| 16:55:57 | 10 | BY MS. WEISS: |
| 16:56:01 | 11 | Q.   Did Matthew Johnstone send you images over Instagram to your |
| 16:56:03 | 12 | account tuylin20? |
| 16:56:08 | 13 | A.   Yeah, some through some snaps I guess he made. |
| 16:56:12 | 14 | Q.   Sorry.  Were some of the images that you were sent on |
| 16:56:14 | 15 | Instagram child pornography? |
| 16:56:17 | 16 | A.   Yes. |
| 16:56:57 | 17 | Q.   Joseph, I'm going to show you some things from Government's |
| 16:57:03 | 18 | Exhibit 64.  These are chats between you and Matthew Johnstone. |
| 16:57:09 | 19 | What are these here?  What is he sending you? |
| 16:57:12 | 20 | A.   I believe those are pictures or might be multiple pictures. |
| 16:57:17 | 21 | Q.   Did he often send you pictures? |
| 16:57:20 | 22 | A.   Yeah, to save. |
| 16:57:22 | 23 | Q.   Did you send him many pictures? |
| 16:57:27 | 24 | A.   The ones he would specifically ask for that I had previously |
| 16:57:28 | 25 | saved, yeah. |

210

| | | |
|---|---|---|
| 16:57:29 | 1 | Q.  So he sent you all of these pictures. |
| 16:57:31 | 2 | MS. ANTON:  Objection, leading. |
| 16:57:31 | 3 | BY MS. WEISS: |
| 16:57:37 | 4 | Q.  Did he send you all of these pictures to save in the |
| 16:57:37 | 5 | Dropbox? |
| 16:57:41 | 6 | A.  To save, and then if he specifically wanted them, he would |
| 16:57:45 | 7 | tell me to make a Dropbox with the name. |
| 16:57:48 | 8 | Q.  In January did you send him any images? |
| 16:57:52 | 9 | A.  Maybe?  I'm not sure. |
| 16:57:59 | 10 | Q.  Is this an image you sent him? |
| 16:58:04 | 11 | A.  I think that was one he sent to me already.  Yeah.  He's |
| 16:58:06 | 12 | asking for it right there. |
| 16:58:13 | 13 | Q.  And what you were doing when Matthew Johnstone, were most of |
| 16:58:16 | 14 | the images sent to him from girls? |
| 16:58:18 | 15 | A.  I'm sorry.  Say it again? |
| 16:58:21 | 16 | Q.  Did most of the images go from girls to Matthew Johnstone? |
| 16:58:24 | 17 | A.  When you're saying like he was directly talking to them, |
| 16:58:25 | 18 | well yeah. |
| 16:58:28 | 19 | Q.  And then he would send them to you? |
| 16:58:28 | 20 | A.  Yeah. |
| 16:58:31 | 21 | Q.  And then you'd save them in a Dropbox account? |
| 16:58:32 | 22 | MS. ANTON:  Objection, leading. |
| 16:58:35 | 23 | THE COURT:  Sustained. |
| 16:58:35 | 24 | BY MS. WEISS: |
| 16:58:57 | 25 | Q.  Joseph, you testified earlier that you were an assistant |

| | | |
|---|---|---|
| 16:58:59 | 1 | manager at Jake's Wayback Burger? |
| 16:59:00 | 2 | A.  Yes. |
| 16:59:02 | 3 | Q.  Were you being considered for a promotion? |
| 16:59:03 | 4 | A.  Yes, I was. |
| 16:59:05 | 5 | Q.  Why were you being considered for promotion? |
| 16:59:08 | 6 | A.  The owners really like me. |
| 16:59:10 | 7 | Q.  Did you always do what they told you to do? |
| 16:59:11 | 8 | A.  Yeah, for the most part. |
| 16:59:14 | 9 | Q.  Is that why you were a good employee? |
| 16:59:18 | 10 | A.  Well yeah, and because I knew more than everyone else there. |
| 16:59:20 | 11 | Q.  Okay. |
| 16:59:21 | 12 | MS. WEISS:  No further questions. |
| 16:59:22 | 13 | THE COURT:  Thank you, sir. |
| 16:59:29 | 14 | Let's break for the day.  Sorry to keep you late. |
| 16:59:32 | 15 | We're going to try to finish this trial up first thing in the |
| 16:59:38 | 16 | morning and we'll see how fast we can get going tomorrow. |
| 16:59:41 | 17 | You're reminded you're not to discuss the case with |
| 16:59:44 | 18 | anyone or permit anyone to discuss the case with you.  Don't |
| 16:59:47 | 19 | read or listen to anything touching on this case in any way. |
| 16:59:50 | 20 | Don't do any research or make any investigation about the case |
| 16:59:52 | 21 | on your own.  Remember you must not have any contact with the |
| 16:59:55 | 22 | attorneys, parties or witnesses. |
| 16:59:57 | 23 | When I excuse you, please leave the floor as soon as |
| 17:00:00 | 24 | you can so that the lawyers can get out in a few minutes. |
| 17:00:03 | 25 | Finally, remember you must not form any opinion about |

212

```
17:00:06   1    this case until all the evidence is in.
17:00:10   2              Good night, and we'll see you tomorrow morning at 9:30
17:00:13   3              COURT SECURITY OFFICER:  All rise for the jury.
17:00:17   4              (Jury out at 5 p.m.)
17:00:49   5              THE COURT:  You all sit down for just a couple minutes,
17:00:50   6    please.
17:00:59   7              Okay.  How many more witnesses do you believe you'll
17:01:01   8    have?
17:01:02   9              MS. MOLLISON:  Your Honor, we don't have any more
17:01:03  10    witnesses.
17:01:04  11              THE COURT:  Okay.
17:01:06  12              MS. MOLLISON:  We're ready to rest.
17:01:15  13              THE COURT:  Then we need to have a charge conference.
17:01:17  14    Do you want to do it now?
17:01:18  15              MS. ANTON:  Yes, Judge.
17:01:21  16              THE COURT:  How long will you want for closing
17:01:22  17    arguments?
17:01:22  18              MS. ANTON:  An hour.
17:01:24  19              THE COURT:  An hour?
17:01:27  20              MS. ANTON:  Yes.
17:01:28  21              THE COURT:  An hour?
17:01:28  22              MS. ANTON:  More?
17:01:31  23              THE COURT:  Boy, I'm going to be telling that guy to
17:01:36  24    call you guys really early, the emergency room physician, be
17:01:38  25    calling you guys for a lot of time.
```

213

| | | |
|---|---|---|
| 17:01:49 | 1 | Yes, you may.  Okay.  An hour each side? |
| 17:01:49 | 2 | MR. NATALE:  Yes. |
| 17:01:52 | 3 | MS. MOLLISON:  Judge, we also need to make our Rule 29 |
| 17:01:52 | 4 | motion. |
| 17:01:54 | 5 | THE COURT:  I know.  We got time.  Well, go ahead and |
| 17:01:57 | 6 | do that now while we're getting the other material set up. |
| 17:01:59 | 7 | Who is going to do that argument? |
| 17:02:02 | 8 | MS. MOLLISON:  Clea will.  Ms. Weiss. |
| 17:02:06 | 9 | THE COURT:  Come on Clea, let's talk. |
| 17:02:10 | 10 | MS. WEISS:  Your Honor, we have a written motion |
| 17:02:13 | 11 | pursuant to Rule 29.  I've got copies for the Government. |
| 17:02:15 | 12 | THE COURT:  All right.  Let me see it. |
| 17:02:20 | 13 | Katie, can you get that written -- oh, hold on. |
| 17:02:39 | 14 | MS. WEISS:  Judge, I'll file this on CM/ECF tonight. |
| 17:03:26 | 15 | THE COURT:  All right. |
| 17:03:32 | 16 | I've read the written motion for judgment of acquittal |
| 17:03:39 | 17 | at the close of the Government's case, I will deny the motion at |
| 17:03:39 | 18 | this point. |
| 17:03:42 | 19 | MS. WEISS:  Judge, as to all of the counts in the |
| 17:03:44 | 20 | indictment, I think that there was insufficient evidence to go |
| 17:03:47 | 21 | to the jury.  With regards to Count 1 in particular, I don't |
| 17:03:51 | 22 | think there was any evidence to connect Joseph and any chats he |
| 17:03:55 | 23 | had with the imagery that Victim 1 produced. |
| 17:03:55 | 24 | THE COURT:  All right. |
| 17:03:57 | 25 | MS. WEISS:  As to Count 2. |

17:03:57   1          THE COURT:  Yeah.

17:04:00   2          MS. WEISS:  Besides the written motion, I also think

17:04:03   3     that there is no evidence, we didn't see any evidence that he

17:04:06   4     infiltrated that victim's Snapchat account.  We don't see any

17:04:09   5     evidence of chats between him and that victim, and I don't think

17:04:12   6     there is sufficient evidence to go to the jury to show that he

17:04:17   7     coerced or enticed that minor to produce that imagery.

17:04:23   8          As to Counts 3, 4, 5 and 6, I think we've also seen

17:04:24   9     insufficient evidence.

17:04:27  10          THE COURT:  All right.  I'll deny that motion.  I

17:04:29  11     believe there is sufficient evidence to go to the jury on each

17:04:31  12     of the counts.  All right?

17:04:37  13          So tomorrow -- well, let's talk about the instructions

17:04:40  14     if I can find mine.

17:04:48  15          As you well know, the matters in bold print will not go

17:04:53  16     to the jury.  Just explains where it came from for your purposes

17:04:54  17     so you know.

17:04:59  18          Page 1 is standard introduction without any change.

17:05:02  19          And Page 2 is the standard duty to follow instructions

17:05:05  20     and presumption of innocence with no change.

17:05:10  21          Hearing no objection, I go to Page 3 which is the

17:05:13  22     standard basic 2.2 with no change.

17:05:16  23          Hearing no objection, I go to Page 4, defining

17:05:22  24     reasonable doubt.  Again, it's basic three with no change.

17:05:27  25          Basic four is the Eleventh Circuit pattern jury

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED BY COMPUTER

17:05:30  1    instruction, consideration of direct and circumstantial evidence

17:05:36  2    and I will make one addition, evidence includes the testimony of

17:05:40  3    witnesses, the exhibits admitted and any stipulations entered

17:05:43  4    into by the parties because there were stipulations in this

17:05:47  5    case.  But anything the lawyers say is not evidence.  I want to

17:05:51  6    put that in there because I want to make clear that they do need

17:05:55  7    to consider stipulations.  Other than that, it's the standard

17:05:58  8    pattern jury instruction.  Any objection?

17:05:59  9            MS. ANTON:  Not from the Government.

17:06:00  10           MS. MOLLISON:  No objection, Your Honor.

17:06:03  11           THE COURT:  All right.  Page 6 is just a continuation

17:06:05  12   of that.

17:06:09  13           Page 7 is the credibility of witnesses which is the

17:06:11  14   basic five with no changes.

17:06:17  15           Page 8 is the limiting instruction on CC, you know,

17:06:26  16   closed circuit television and pseudonyms.  I included it, I

17:06:27  17   think that it's appropriate.

17:06:29  18           Anybody have any objection at this point?

17:06:30  19           MS. VIAMONTES:  No objection from the Government, Your

17:06:31  20   Honor.

17:06:32  21           MS. MOLLISON:  No objection, Your Honor.

17:06:35  22           THE COURT:  All right.  We'll move to Page 9, expert

17:06:42  23   witness.  That is the standard pattern jury instruction with no

17:06:44  24   change.  Any objection?

17:06:45  25           MS. MOLLISON:  No objection.

17:06:45  1              MS. VIAMONTES:  No, Your Honor.

17:06:48  2              THE COURT:  We didn't give Page 10 because I don't let

17:06:49  3      them take notes.

17:06:55  4              The next Page 11 is the joint submission of the

17:06:55  5      parties.

17:07:10  6              Page 12 this is the -- I changed the offense

17:07:19  7      instruction 82 to omit Italics and footnotes.  I think that the

17:07:24  8      Italicized paragraph is accepted as in line with the Eleventh

17:07:27  9      Circuit pattern jury instructions.  Is there any objection to

17:07:37 10      pages 12 -- my hands are so dry in here -- 13, 14, and 15?

17:07:40 11              MS. VIAMONTES:  None from the Government, Your Honor.

17:07:42 12              THE COURT:  If you come up with something, don't -- you

17:07:44 13      know, if you come up with something and you tell me in the

17:07:45 14      morning, I'll deal with it at that point.

17:07:49 15              MS. MOLLISON:  Okay.  We'll check this against what we

17:07:51 16      originally had, but for now no objection.

17:07:57 17              THE COURT:  Okay.  Page 17 is the offense instruction

17:08:02 18      83.2, and there was a separate submission to reflect a

17:08:05 19      particular statute that was charged.  I think this is what you

17:08:07 20      all wanted, but if you find that it isn't, let me know and I'll

17:08:12 21      be glad to consider your recommendations.  But I think this

17:08:20 22      covers it which would covers pages 17, 18, 19 and the top part

17:08:22 23      of 20.

17:08:28 24              Hearing no objection, I go to Page 21 which is

17:08:36 25      interstate transportation of extortionate communication, and

17:08:38  1  that is the pattern jury instruction with no change from offense

17:08:39  2  instruction 30.4, pages 21 and 22.

17:08:46  3      Page 23 is offense instruction 13.1, a 371 conspiracy

17:08:51  4  charge with no basic change that I'm aware of.  Looks like it's

17:08:54  5  pretty normal.  If you come up with something that I did, typo

17:08:56  6  or anything, let me know in the morning and I'll deal with it.

17:09:01  7      Hearing no objection, I go to 26.  It just says that

17:09:04  8  you have to consider whether it was -- whether they actually did

17:09:07  9  the statement and how much weight to give it, and I believe that

17:09:10  10  it is the pattern jury instruction on confession or statement of

17:09:14  11  a single defendant, and I think there was a statement of a

17:09:15  12  single defendant in this case.

17:09:20  13      Hearing no objection, I go to 27.  What are we talking

17:09:28  14  about here?  I don't know.  This was submitted as one of the

17:09:32  15  instructions, but I don't know.  What are you talking about, a

17:09:32  16  similar act?  I don't know.

17:09:34  17      MS. VIAMONTES:  It's the 404(b), Your Honor.  It's

17:09:37  18  A.G.'s testimony.  She was a 404(b).

17:09:39  19      THE COURT:  Okay.  All right.  Now I remember.  I

17:09:43  20  didn't realize that was separate.  All right.  Is there any

17:09:44  21  objection?

17:09:45  22      MS. MOLLISON:  No objection, Your Honor.

17:09:49  23      THE COURT:  All right.  Then we'll give that on Page

17:09:50  24  27.

17:09:55  25      Page 28 is on or about and knowingly.  That is pattern

17:09:59   1   jury, Eleventh Circuit jury instruction.

17:10:03   2          Page 29 is duty to deliberate which is the pattern jury

17:10:05   3   instruction.

17:10:08   4          And from then on we're talking about the verdict form

17:10:15   5   which basically is the simplest verdict form known to man.  As

17:10:19   6   to Count 1, not guilty or -- both of them are not guilty.  I

17:10:21   7   don't know how we're going to do that.

17:10:24   8          MS. ANTON:  We object.

17:10:26   9          LAW CLERK:  That's what they submitted.

17:10:28  10          THE COURT:  We thought maybe that was some trick you

17:10:29  11   guys had.

17:10:31  12          MS. VIAMONTES:  Pardon me, Judge.  We were fighting

17:10:33  13   over who goes first and because we have the burden of proof,

17:10:37  14   Your Honor, we argue that guilty goes first and not guilty goes

17:10:38  15   second.

17:10:41  16          THE COURT:  I don't really care.

17:10:43  17          MS. MOLLISON:  And you know, for an alternate reason,

17:10:48  18   Your Honor, because Mr. Woodson has the presumption of innocence

17:10:48  19   and  --

17:10:50  20          THE COURT:  I think the verdict form is almost always

17:10:54  21   with guilty first and not guilty second, and that's the way I'm

17:10:57  22   going to do it.  I'm not reinventing the wheel for this, but

17:11:00  23   other than that, is there any objection to the verdict form?

17:11:01  24          MS. MOLLISON:  Not to the verdict form, Your Honor.

17:11:04  25          We do have two additional instructions we'd ask that

17:11:05  1      the Court --

17:11:06  2              THE COURT:  Tell me about them.

17:11:08  3              MS. MOLLISON:  -- give to the jury.  They're both

17:11:12  4      pattern instructions.  One is the duress and coercion

17:11:15  5      instruction, again just the standard Eleventh Circuit

17:11:23  6      instruction on that.

17:11:25  7              THE COURT:  Let me see what it says.  You know, you're

17:11:28  8      making me miss my workout this afternoon and I cancelled my

17:11:32  9      physical therapy in the morning.  You guys are going to be

17:11:35 10      responsible when I start falling down in pain.

17:11:37 11              MS. VIAMONTES:  We'll get to the emergency room early,

17:11:37 12      Your Honor.

17:11:40 13              THE COURT:  Get me there quickly.  All right.  Defense

17:12:17 14      instruction, duress and coercion.  All right.  Government, do

17:12:18 15      you have a position on these?

17:12:19 16              MS. VIAMONTES:  I do, Your Honor.  In reference to

17:12:24 17      duress, we would ask the Court to instruct the jury that it is

17:12:27 18      not based on a subjective standard but rather an objective one,

17:12:31 19      and that's supported by Eleventh Circuit case law, Your Honor.

17:12:35 20              THE COURT:  Do you have that in the form of an

17:12:36 21      instruction?

17:12:38 22              MS. VIAMONTES:  Yes, Your Honor.  I can -- the defense

17:12:42 23      hadn't asked for the instruction until now, but I can submit

17:12:45 24      one.  But I would ask that the Court instruct this.

17:12:47 25              THE COURT:  All right.  Submit it tonight.  Make sure

17:12:50   1   it gets in CM/ECF tonight.  I will give the instruction, but I

17:12:54   2   do think that that's a legitimate argument that the Eleventh

17:12:59   3   Circuit does require that it's objective rather than subjective.

17:13:01   4           MS. MOLLISON:  Your Honor, what we're asking for is

17:13:03   5   just the straightforward pattern instruction.

17:13:05   6           THE COURT:  I understand, and they're asking that the

17:13:09   7   case law, and if I find that it is sufficient, I'll look at it

17:13:12   8   tonight and I'll decide and I'll tell you in the morning.  I'll

17:13:13   9   decide that then.

17:13:15   10           MS. MOLLISON:  Okay.  We'll see what they submit also.

17:13:17   11           THE COURT:  Which means that Katie will be bothering me

17:13:22   12   tonight.  That's okay.  Not you.  That's okay.  This Katie.  I

17:13:24   13   have a Katie too.

17:13:25   14           Okay.  The next one is possessing child pornography,

17:13:29   15   visual depiction of an actual minor.  What is this one?

17:13:30   16           MS. MOLLISON:  So this would be a lesser included for

17:13:35   17   Counts 1 through 4.  We acknowledge absolutely, that in general,

17:13:36   18   the generic possession of child pornography is not a lesser

17:13:39   19   included of either distribution or production.  However, under

17:13:43   20   the facts of this case, Mr. Woodson is -- it is alleged that

17:13:47   21   Mr. Woodson possessed as he possessed or -- excuse me, as he

17:13:50   22   distributed and as he produced this child pornography.  So I

17:13:52   23   think under the facts of this case, possession is a lesser

17:13:53   24   included.

17:13:55   25           THE COURT:  That means we'd have to change the verdict

17:14:02  1    form too for two things.  First of all, for the coercion aspect

17:14:05  2    and secondly for this lesser included offense.

17:14:07  3         MS. VIAMONTES:  Well actually, Judge, you don't have to

17:14:09  4    change it for the lesser included offense because here it's not

17:14:11  5    a lesser included offense.

17:14:13  6         THE COURT:  No, I'm saying if I gave this I would have

17:14:15  7    to include that.

17:14:16  8         MS. VIAMONTES:  Your Honor, the Defendant was living in

17:14:21  9    Virginia.  His possession occurred in Virginia, not in our

17:14:24  10   jurisdiction, and that's why we didn't charge him with

17:14:30  11   possession of child pornography.  The counts we charged him with

17:14:33  12   did touch our jurisdiction, and that's why we charged him with

17:14:35  13   those counts, but it's legally impossible for him to be charged

17:14:38  14   with possession when he wasn't within our jurisdiction and

17:14:40  15   didn't possess it in our jurisdiction.

17:14:43  16        THE COURT:  Yeah, I'll deny your inclusion of this and

17:14:48  17   I think that reasoning is accurate.  All right.  Is there more?

17:14:49  18        MS. MOLLISON:  That's it.  Thanks, Judge.

17:14:50  19        THE COURT:  Okay.  Then I will --

17:14:52  20        MS. VIAMONTES:  I think you have to add, Your Honor, I

17:14:54  21   apologize, the Defendant testifying.

17:14:57  22        THE COURT:  Yeah.  We'll have to include that.  There

17:15:00  23   is a pattern jury instruction with the Defendant testifying.

17:15:04  24   We'll work on that and get it to you tonight if you give me what

17:15:07  25   you're going to try to give me, so I can consider including that

17:15:11  1   and then we can talk about that tomorrow morning at 9:30 since

17:15:16  2   I'm not going to physical therapy.  And we can make a

17:15:17  3   determination then.

17:15:19  4           MS. VIAMONTES:  And Your Honor, we will also submit

17:15:22  5   what we would like you to instruct the jury as to which victim

17:15:24  6   is which.

17:15:25  7           THE COURT:  Yeah, you're going to have to do that,

17:15:27  8   because I think it is going to be difficult for them to keep

17:15:32  9   track.  Can you try to get together and see if you can play nice

17:15:37 10   again?  You did for most of the trial.

17:15:39 11           MR. NATALE:  We already agree on how it should be done.

17:15:42 12           THE COURT:  Okay.  That's good.  Then get it in as soon

17:15:44 13   as you can.

17:15:44 14           MS. VIAMONTES:  Yes, Judge.

17:15:47 15           THE COURT:  You can work on it from home.  If you have

17:15:50 16   internet now.

17:15:53 17           LAW CLERK:  Oh yeah, it came today.

17:15:56 18           THE COURT:  Comcast came today so she's got internet.

17:16:02 19   All right.  And so you owe me the Defendant's testifying and the

17:16:07 20   additional comments that you want included with this duress and

17:16:12 21   coercion instruction.  Where does the duress and coercion

17:16:14 22   instruction go?  It would have to be after the elements of the

17:16:17 23   offense, wouldn't it?

17:16:18 24           MR. NATALE:  Yes, Your Honor.

17:16:18 25           MS. VIAMONTES:  Yes, Your Honor.

17:16:31  1          THE COURT:  So I would say -- I would say it would have

17:16:34  2    to come after --

17:16:36  3          MS. MOLLISON:  After 20.

17:16:40  4          THE COURT:  I think after 21, after 23, after 24, after

17:16:41  5    25, I think.

17:16:43  6          MS. MOLLISON:  I think you're right, Judge.

17:16:46  7          THE COURT:  After -- yeah, after the -- and then right

17:16:53  8    after this is where the testimony by Defendant goes too.  So

17:17:00  9    this would go right after -- before 26 and also before 26 after

17:17:07  10   this would be the Defendant testifying.  Okay?

17:17:15  11         Here you go, Katie.  My Katie, not you.

17:17:16  12         MS. VIAMONTES:  Your Honor, does the Court send a

17:17:20  13   redacted copy of the superseding indictment back to the jury?

17:17:21  14         THE COURT:  Yes.

17:17:24  15         MS. VIAMONTES:  And does the Court send the witness and

17:17:25  16   exhibit list back to the jury?

17:17:29  17         THE COURT:  No.  But they look -- Wanda looks at it,

17:17:34  18   when I say Wanda, I mean Wanda and Diane.  Diane is in training

17:17:37  19   to be Wanda because Wanda is retiring at the end of the year.

17:17:40  20   So they'll look at it and they'll gather everything together and

17:17:43  21   have it all ready so you can send it back there.

17:17:45  22         I don't know what we're going to do with the video

17:17:48  23   clips.  You better have a computer that is totally clean in case

17:17:53  24   they ask to play that.  Last time we had a problem because it's

17:17:58  25   hard to clean a computer in, you know, in a hurry.  So you

| 17:18:04 | 1 | better have a computer ready that can go back there if they |
| 17:18:08 | 2 | asked for it. |
| 17:18:10 | 3 | MR. NATALE:  Judge, in the past I know the US |
| 17:18:13 | 4 | Attorney's Office has clean computers they only use for this |
| 17:18:13 | 5 | purpose. |
| 17:18:14 | 6 | THE COURT:  Well, I'm sure they do, that's why I just |
| 17:18:16 | 7 | told them find it.  Go see who's got it now and who's watching |
| 17:18:20 | 8 | whatever it is they're watching, Sling box, so they can watch a |
| 17:18:24 | 9 | TV show or something.  Okay?  Get it away from them and bring it |
| 17:18:27 | 10 | in.  But we don't send that back unless they ask for it because |
| 17:18:30 | 11 | I don't think they particularly want to see some of these |
| 17:18:30 | 12 | pictures. |
| 17:18:33 | 13 | All right?  Anything else? |
| 17:18:34 | 14 | MS. VIAMONTES:  No, Your Honor. |
| 17:18:35 | 15 | MS. MOLLISON:  Nothing from the defense, Your Honor. |
| 17:18:38 | 16 | THE COURT:  Okay.  Good night.  Thank you. |
| 17:18:45 | 17 | MS. ANTON:  Judge, I'm sorry.  Really quickly, do you |
| 17:18:48 | 18 | instruct them before or after closing arguments? |
| 17:18:50 | 19 | THE COURT:  I instruct them after unless somebody wants |
| 17:18:52 | 20 | me to do it before, then I'll think about it. |
| 17:18:56 | 21 | MR. NATALE:  I would like you to do it before.  I like |
| 17:18:58 | 22 | before because this way they know what the elements are in |
| 17:19:00 | 23 | advance rather than us saying. |
| 17:19:02 | 24 | THE COURT:  I don't care.  It's just that by the time |
| 17:19:07 | 25 | they go in, it's going to be two hours or more.  That's the only |

| | |
|---|---|
| 17:19:11 | 1 |
| 17:19:14 | 2 |
| 17:19:15 | 3 |
| 17:19:18 | 4 |
| 17:19:21 | 5 |
| 17:19:22 | 6 |
| 17:19:28 | 7 |
| 17:19:35 | 8 |
| 17:19:38 | 9 |
| 17:19:43 | 10 |
| 17:19:45 | 11 |
| 17:19:48 | 12 |
| 17:19:52 | 13 |
| 17:19:56 | 14 |
| 17:20:01 | 15 |
| 17:20:07 | 16 |
| 17:20:10 | 17 |
| 17:20:12 | 18 |
| 17:20:14 | 19 |
| 17:20:17 | 20 |
| 17:20:19 | 21 |
| 17:20:20 | 22 |
| 17:20:21 | 23 |
| 17:20:22 | 24 |
| 17:20:25 | 25 |

thing.  I don't feel strongly about it one way or the other.

MS. ANTON:  I agree with beforehand if, Your Honor.

THE COURT:  Okay.  I'll do it before.  All right. We'll just have to have it ready.  So we'll have to have a mini charge conference first thing, and then I'll instruct them and then you will start.

And remember that that light goes on over there.  See it?  There and here.  And the light stays on and it starts flashing green when there are two minutes to go, and it starts flashing yellow with one minute to go, and when the red comes on, you turn into a pumpkin and go away.

And I want to make sure you understand you can put that timer on if you want to.  If Tony didn't break it, you can put that on to be able to see where you stand relative to the time left.  But this is the one that counts.  And if you give me -- what do you want first?  How much time do you want first?  I get an hour whole.  If you want to use all of it up in the initial argument, I don't care.  That's fine.

MS. ANTON:  40-20.

THE COURT:  40-20 is fine.  But when you get to 40, I'm not going to stop you.  You go over it, you keep going, that's coming off the 20.

MS. ANTON:  Okay.  Deal.

MS. VIAMONTES:  I'll pull her with a cane.

THE COURT:  Okay.  That's your problem.  You guys,

17:20:30  1   okay?  So I will put -- I got 40 minutes on there.  All I got to

17:20:31  2   do is push the button.  All right?

17:20:35  3         And if you want to use that one to keep a better idea.

17:20:38  4   And again, I don't want you wandering in front of the jury to

17:20:41  5   make your arguments.  You have to be either there or if you're

17:20:45  6   using the ELMO, up here, and make sure you have the microphone

17:20:48  7   where you can be heard.  There are two microphones up there.  If

17:20:51  8   you're one of the people that has a tendency to go to the side,

17:20:54  9   push the microphone to the side so you're using the microphone.

17:20:55  10  All right?

17:20:59  11        We'll be ready, 9:30.  We'll have our mini conference

17:21:02  12  and then we'll bring them in.  I doubt that they'll all be here

17:21:05  13  at 9:30.  In fact, I doubt that I'll -- no, I'll be here at

17:21:10  14  9:30.  You guys have ruined my day.  Good night.

17:21:21  15        MS. ANTON:  Thank you, Judge.

17:21:24  16        THE COURT:  Thank you.  I told you it wasn't a week and

17:21:25  17  a half trial.

17:21:25  18        (See Day 6 for continuation)

17:21:25  19                    C E R T I F I C A T E
17:21:25  20  I certify that the foregoing is a correct transcript from the
         record of proceedings in the above-entitled matter.

17:21:25  21  3/13/2020              /s/ Dawn M. Savino
         Date                   DAWN M. SAVINO, RPR
17:21:25  22

17:21:25  23                    I N D E X

17:21:25  24                    WITNESSES

17:21:25  25  ALL WITNESSES:                              PAGE:

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED BY COMPUTER

```
17:21:25   1      For Defense:

17:21:25   2         Alain Gomez:

17:21:25   3           Direct Examination by Ms. Mollison        134:15
                       Cross-Examination by Ms. Viamontes        136:10
17:21:25   4
                      Joseph Isaiah Woodson:
17:21:25   5           Direct Examination by Ms. Weiss           141:15
                       Cross-Examination by Ms. Anton            172:7
17:21:25   6           Redirect Examination by Ms. Weiss         207:2

17:21:25   7      For Government:

17:21:25   8         Lee Bieber:
                       Direct Examination by Ms. Anton            3:12
17:21:25   9           Cross-Examination by Mr. Natale           106:19
                       Redirect Examination by Ms. Anton         125:21
17:21:25  10
                                          EXHIBITS
17:21:25  11

17:21:25  12      NO.:      DESCRIPTION:                         PAGE:

17:21:25  13      For Defense:

17:21:25  14      E         :
                            In Evidence                          109:12
17:21:25  15
                  For Government:
17:21:25  16
                  61, 62 &  :
17:21:25  17      56 A-B
                            In Evidence                          40:9
17:21:25  18
                  57        :
17:21:25  19                In Evidence                          46:13

17:21:25  20      31 & 35   :
                            In Evidence                          47:17
17:21:25  21
                  39        :
17:21:25  22                In Evidence                          52:9

17:21:25  23      71 & 72   :
                            In Evidence                          53:8
17:21:25  24
                  49, 50 &  :
17:21:25  25      67
                            In Evidence                          55:9
```

```
17:21:25   1
17:21:25   2    82          :
                            In Evidence                              64:19
17:21:25   3    68, 74,     :
                75
17:21:25   4                In Evidence                              66:24
17:21:25   5    86 A & B    :
                            In Evidence                              67:5
17:21:25   6
                66 A-D      :
17:21:25   7                In Evidence                              72:25
17:21:25   8    58          :
                            In Evidence                              75:2
17:21:25   9
                90          :
17:21:25  10                In Evidence                              75:23
17:21:25  11    70 & 77     :
                            In Evidence                              82:20
17:21:25  12
                60          :
17:21:25  13                In Evidence                              84:5
17:21:25  14    65          :
                            In Evidence                              98:20
17:21:25  15
                87          :
17:21:25  16                In Evidence                              100:6
17:21:25  17    89          :
                            In Evidence                              131:24
17:21:25  18

17:21:25  19

          20

          21

          22

          23

          24

          25
```

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**