```
 1                    UNITED STATES DISTRICT COURT
                      SOUTHERN DISTRICT OF FLORIDA
 2                          MIAMI DIVISION
                     CASE NO.  18-60256-CR-JEM
 3

 4     UNITED STATES OF AMERICA,

 5                    Plaintiff,

 6          vs.

 7                                        Miami, Florida
                                          September 27, 2019
 8     JOSEPH ISAIAH WOODSON, JR.,        Pages 1-82

 9                    Defendant.
       _____
10
                         TRANSCRIPT OF JURY TRIAL
11                               DAY 6
                   BEFORE THE HONORABLE JOSE E. MARTINEZ
12                    UNITED STATES DISTRICT JUDGE

13

       APPEARANCES:
14
       FOR THE PLAINTIFF:
15                         United States Attorney's Office
                           BY:  JODI ANTON,  A.U.S.A.
16                         BY:  FRANCIS VIAMONTES, A.U.S.A.
                           500 East Broward Boulevard
17                         Suite 700
                           Fort Lauderdale, Florida 33394
18
       FOR THE DEFENDANT:
19                         Federal Public Defender's Office
                           BY:  ANTHONY J. NATALE, A.F.P.D.
20                         BY:  CLEA D.T. WEISS, A.F.P.D.
                           BY:  KATHLEEN E. MOLLISON, A.F.P.D.
21                         150 West Flagler Street
                           Suite 1700
22                         Miami, Florida 33130

23     REPORTED BY:        DAWN M. SAVINO, RPR
                           Official Court Stenographer
24                         400 N. Miami Avenue, 10S03
                           Miami, Florida  33128
25                         Telephone:  305-523-5598
```

|            |    |                                                              |
|------------|----|--------------------------------------------------------------|
| 09:13:43   | 1  |                    P-R-O-C-E-E-D-I-N-G-S                     |
| 09:45:26   | 2  |           (Court called to order)                            |
| 09:49:35   | 3  |           COURTROOM DEPUTY:  Your Honor, all parties and counsel |
| 09:49:35   | 4  | are present.                                                 |
| 09:49:38   | 5  |           THE COURT:  All right.  Be seated please.          |
| 09:49:41   | 6  |           Comments on the Court's instructions?              |
| 09:49:43   | 7  |           MS. VIAMONTES:  I'm sorry, Your Honor.  I couldn't hear |
| 09:49:44   | 8  | you.                                                         |
| 09:49:46   | 9  |           THE COURT:  Comments on the Court's instructions?  |
| 09:49:47   | 10 |           MS. VIAMONTES:  None from the Government, Your Honor. |
| 09:49:48   | 11 | Thank you.                                                   |
| 09:49:49   | 12 |           THE COURT:  Okay.  Defense?                        |
| 09:49:51   | 13 |           MS. MOLLISON:  Your Honor, we would maintain our   |
| 09:49:55   | 14 | objection to anything beyond the pattern instruction on the |
| 09:49:58   | 15 | duress instruction.  We see that the Court added the additional |
| 09:50:02   | 16 | language.  We'd ask if the Court has the language that, you  |
| 09:50:05   | 17 | know, explains whether it's an objective or subjective standard, |
| 09:50:10   | 18 | that the Court use the language that was provided by the     |
| 09:50:12   | 19 | Government yesterday.  I think the difference is in the      |
| 09:50:17   | 20 | Government's instruction they had "and not have solely derived" |
| 09:50:20   | 21 | and the Court has just "not have derived".                   |
| 09:50:24   | 22 |           THE COURT:  Well, because the case that they cited |
| 09:50:29   | 23 | didn't have the word "solely" in it, so that's why I deleted it. |
| 09:50:31   | 24 |           MS. VIAMONTES:  That's correct, Judge.  "Solely"   |
| 09:50:33   | 25 | doesn't have to be in there, and I prefer the Court's        |

09:50:33  1    instruction.

09:50:35  2         THE COURT:  I mean, it's not in the case that's why I

09:50:38  3    didn't put it in there.  You want it in there?

09:50:39  4         MS. MOLLISON:  We would like to have it in there,

09:50:39  5    Judge.

09:50:42  6         THE COURT:  Well, I just don't see why I should start

09:50:46  7    reinventing the wheel and coming up with language that wasn't in

09:50:51  8    the case that they cited.  So I'm going to go with what the case

09:50:53  9    said.  All right?

09:50:55  10        MS. MOLLISON:  Okay.  Thanks, Judge.

09:50:58  11        THE COURT:  All right.  Then otherwise it's all right?

09:50:59  12        MS. MOLLISON:  Otherwise, no objection.

09:51:01  13        THE COURT:  Okay.  None that you haven't already

09:51:03  14    stated.  I know you're not waiving any.

09:51:07  15        All right.  Bring in the jury, I'll start reading.

09:51:09  16        COURT SECURITY OFFICER:  All rise for the jury.

09:51:13  17        (Jury in at 9:51 a.m.)

09:52:13  18        THE COURT:  Good morning, ladies and gentlemen.  I

09:52:18  19    trust you all had a good, restful evening?

09:52:22  20        At this point, we come to the part where I explain to

09:52:26  21    you that what the lawyers say to you is not evidence; however,

09:52:30  22    it can be very helpful to you in helping you remember what the

09:52:33  23    evidence was, and so it's very important that you listen to

09:52:36  24    them.  They're going to be doing their final arguments.

09:52:38  25        Since the Government has the burden, they have the

|          |    |                                                                      |
|----------|----|----------------------------------------------------------------------|
| 09:52:41 | 1  | opening and closing final argument and the defense has the           |
| 09:52:46 | 2  | middle, unless the Government happens to use up all their time       |
| 09:52:48 | 3  | on the opening.  That's their business.  I've given each of them     |
| 09:52:52 | 4  | an hour, and I'm going to read you the instructions first.           |
| 09:52:55 | 5  | You don't have to try to memorize them.  You'll get a                |
| 09:52:58 | 6  | copy of this when you go back to deliberate, but listen to it        |
| 09:53:04 | 7  | and then listen to what the lawyers say, and it might be helpful     |
| 09:53:08 | 8  | to you to have this before.  We can read these either before or      |
| 09:53:11 | 9  | after the arguments.  Usually I read them after, but in this         |
| 09:53:15 | 10 | case, they asked to do it before and that's fine with me.            |
| 09:53:18 | 11 | Members of the jury, it's my duty to instruct you on                 |
| 09:53:21 | 12 | the rules of law that you must use in deciding this case.  After     |
| 09:53:24 | 13 | I've completed these instructions, you'll go to the jury room        |
| 09:53:27 | 14 | and begin your discussions, what we call your deliberations.         |
| 09:53:31 | 15 | You must decide whether the Government has proved the specific       |
| 09:53:35 | 16 | facts necessary to find the Defendant guilty beyond a reasonable     |
| 09:53:35 | 17 | doubt.                                                               |
| 09:53:39 | 18 | Your decision must be based only on the evidence                    |
| 09:53:44 | 19 | presented here.  You must not be influenced in any way by either    |
| 09:53:48 | 20 | sympathy for or prejudice against the Defendant or the              |
| 09:53:48 | 21 | Government.                                                          |
| 09:53:51 | 22 | You must follow the law as I explain it, even if you do             |
| 09:53:54 | 23 | not agree with the law; and you must follow all of my               |
| 09:53:58 | 24 | instructions as a whole.  You must not single out or disregard      |
| 09:54:00 | 25 | any of the instructions on the law.                                 |

09:54:03  1        The indictment or formal charge against a Defendant is

09:54:07  2   not evidence of guilt.  The law presumes every Defendant is

09:54:08  3   innocent.

09:54:11  4        The Defendant does not have to prove their innocence or

09:54:14  5   produce any evidence at all.  The Government must prove guilt

09:54:18  6   beyond a reasonable doubt.  If it fails to do so, you must find

09:54:19  7   the Defendant not guilty.

09:54:23  8        Your decision must be based only on the evidence

09:54:26  9   presented during the trial.  You must not be influenced in any

09:54:30 10   way by either sympathy for or prejudice against the Defendant or

09:54:34 11   the Government.  You must follow the law as I explain it, even

09:54:38 12   if you do not agree with the law, and you must follow all of my

09:54:41 13   instructions as a whole.  You must not single out or disregard

09:54:45 14   any of the Court's instructions on the law.

09:54:47 15        The indictment or formal charge against the Defendant

09:54:51 16   is not evidence of guilt.  The law presumes every Defendant is

09:54:54 17   innocent.  The Defendant does not have to prove their innocence

09:54:56 18   or produce any evidence at all.

09:54:59 19        The Defendant does not have to testify and if a

09:55:01 20   Defendant chose not to testify, you cannot consider that in any

09:55:05 21   way.  The Government must prove guilt beyond a reasonable doubt.

09:55:09 22   If they fail to do so you must find the Defendant not guilty.

09:55:13 23   Obviously that part is not relevant because the Defendant did

09:55:17 24   testify.  So I will line that out.

09:55:25 25        The Government's burden of proof is heavy, but does not

09:55:30  1    have to prove a Defendant's guilt beyond all possible doubt.

09:55:34  2    The Defendant's *(sic)* proof only has to exclude any reasonable

09:55:36  3    doubt concerning the Defendant's guilt.

09:55:39  4            A reasonable doubt is a real doubt based on your reason

09:55:44  5    and common sense after you have carefully and impartially

09:55:46  6    considered all of the evidence in the case.  Proof beyond a

09:55:49  7    reasonable doubt is proof so convincing that you would be

09:55:53  8    willing to rely and act upon it without hesitation in the most

09:55:56  9    important of your own affairs.  If you are convinced that the

09:55:59  10   Defendant has been proved guilty beyond a reasonable doubt, say

09:56:02  11   so.  If you are not convinced, say so.

09:56:04  12           As I said before, you must consider only the evidence

09:56:07  13   that I have admitted in the case.  Evidence includes the

09:56:10  14   testimony of witnesses and the exhibits admitted, and any

09:56:14  15   stipulations entered into by the parties.  But anything the

09:56:17  16   lawyers say is not evidence and is not binding on you.

09:56:19  17           You should not assume from anything that I have said

09:56:22  18   that I have any opinion about any factual issue in this case.

09:56:25  19   Except for my instructions to you on the law, you should

09:56:28  20   disregard anything I may have said during the trial in arriving

09:56:32  21   at your own decision about the facts.  Your own recollection and

09:56:35  22   interpretation of the evidence is what matters.

09:56:37  23           In considering the evidence, you may use reasoning and

09:56:41  24   common sense to make deductions and reach conclusions.

09:56:44  25           You should not be concerned about whether the evidence

7

| | | |
|---|---|---|
| 09:56:48 | 1 | is direct or circumstantial.  Direct evidence is the testimony |
| 09:56:53 | 2 | of a person who asserts that he or she has actual knowledge of a |
| 09:56:56 | 3 | fact, such as an eyewitness.  Circumstantial evidence is proof |
| 09:56:59 | 4 | of a chain of facts and circumstances that tend to prove or |
| 09:57:03 | 5 | disprove a fact.  There is no legal difference in the weight you |
| 09:57:06 | 6 | may give to either direct or circumstantial evidence. |
| 09:57:12 | 7 | When I say you must consider all the evidence, I do not |
| 09:57:15 | 8 | mean that you must accept all the evidence as true or accurate. |
| 09:57:18 | 9 | You should decide whether you believe what each witness had to |
| 09:57:21 | 10 | say and how important that testimony was.  In making that |
| 09:57:25 | 11 | decision, you may believe or disbelieve any witness in whole, or |
| 09:57:28 | 12 | in part.  The number of witnesses testifying concerning a |
| 09:57:30 | 13 | particular point does not necessarily matter. |
| 09:57:34 | 14 | To decide whether you believe any witness, I suggest |
| 09:57:36 | 15 | you ask yourself a few questions: |
| 09:57:39 | 16 | Did the witness impress you as one who was telling the |
| 09:57:40 | 17 | truth? |
| 09:57:42 | 18 | Did the witness have any particular reason not to tell |
| 09:57:43 | 19 | the truth? |
| 09:57:46 | 20 | Did the witness have a personal interest in the outcome |
| 09:57:47 | 21 | of the case? |
| 09:57:50 | 22 | Did the witness seem to have a good memory? |
| 09:57:53 | 23 | Did the witness have the opportunity and ability to |
| 09:57:56 | 24 | accurately observe the things he or she testified about? |
| 09:57:58 | 25 | Did the witness appear to understand the questions |

09:58:00  1   clearly and answer them directly?

09:58:04  2           Did the witness's testimony differ from other testimony

09:58:06  3   or other evidence?

09:58:09  4           During the course of the trial, you heard some of the

09:58:12  5   witnesses and alleged victims in the case be referred to by

09:58:17  6   either initials or numbers.  This is common in this kind of

09:58:21  7   case, and you're not to allow this to sway your objective

09:58:23  8   judgment of the facts one way or the other:

09:58:25  9           Victim 1, M.K.

09:58:26 10           Victim 2, B.F.

09:58:32 11           Victim 3, B.O.  And I have these in the instructions.

09:58:34 12           Victim 4, A.K.

09:58:37 13           Victim 5, E.M.

09:58:42 14           Victim 6, S.M., also known as C.J.

09:58:44 15           Victim 7, A.C.

09:58:47 16           You also heard some of the witnesses or one of the

09:58:52 17   witnesses, an alleged victim in this case, testify via closed

09:58:56 18   circuit television from another room.  This is also common in

09:58:59 19   this kind of case, and you are not to allow this to sway your

09:59:01 20   objective judgment one way or the other.

09:59:06 21           For the record, on Page 7, third line from the bottom,

09:59:13 22   "of" is left -- the "F" was left off.  I've put an F there by

09:59:17 23   pen.  This is also common in this kind of case, and you are not

09:59:20 24   to allow this to sway your objective judgment one way or the

09:59:21 25   other.

|          |    |                                                                      |
|----------|----|----------------------------------------------------------------------|
| 09:59:24 | 1  | When scientific, technical or other specialized                      |
| 09:59:27 | 2  | knowledge might be helpful, a person who has special training or     |
| 09:59:30 | 3  | experience in that field is allowed to state an opinion about        |
| 09:59:34 | 4  | the matter.  But that doesn't mean you must accept the witness's     |
| 09:59:38 | 5  | opinion.  As with any other witness's testimony, you must decide     |
| 09:59:41 | 6  | for yourself whether to rely upon the opinion.                       |

Now, let me turn to the crimes charged in this case.  I
will not read the second superseding indictment to you at length
because you'll be given a copy of it for study during your
deliberations.  However, I will summarize the charges for you as
follows:

Count 1 charges the Defendant, Joseph Isaiah Woodson,
Junior, with production of child pornography of Victim 1.

Count 2 charges the Defendant with production of child
pornography of Victim 2.

Count 3 charges the Defendant with the production of
child pornography of Victim 3.

Count 4 charges the Defendant, Joseph Isaiah Woodson,
Junior, with distribution of child pornography.

Count 5 charges the Defendant with sending extortionate
interstate communications to Victim 1.

Count 6 charges the Defendant with conspiracy to send
extortionate interstate communications.

It is a federal crime for any person to employ, use,
persuade, induce, entice, or coerce a minor to engage in

| | | |
|---|---|---|
| 10:00:55 | 1 | sexually explicit conduct for the purpose of producing a visual |
| 10:00:59 | 2 | depiction of the conduct if the person knows or has reason to |
| 10:01:03 | 3 | know that the visual depiction will be transported in interstate |
| 10:01:06 | 4 | or foreign commerce or mailed, or the visual depiction was |
| 10:01:11 | 5 | produced using materials that have been mailed, shipped or |
| 10:01:15 | 6 | transported in interstate or foreign commerce by any means |
| 10:01:19 | 7 | including computer, or the visual depiction has been transported |
| 10:01:22 | 8 | in interstate or foreign commerce or mailed.  The Defendant can |
| 10:01:25 | 9 | be found guilty of this crime only if all the following facts |
| 10:01:27 | 10 | are proved beyond a reasonable doubt. |
| 10:01:32 | 11 | Element 1.  An actual minor, that is a real person who |
| 10:01:35 | 12 | was less than 18 years old, was depicted. |
| 10:01:39 | 13 | Two.  The Defendant employed, used, persuaded, induced, |
| 10:01:44 | 14 | enticed or coerced the minor to engage in sexually explicit |
| 10:01:50 | 15 | conduct for the purpose of producing a visual depiction, that is |
| 10:01:51 | 16 | a videotape of the conduct. |
| 10:01:56 | 17 | Three.  Either A, the Defendant knew or had reason to |
| 10:02:00 | 18 | know that the visual depiction would be mailed or transported in |
| 10:02:04 | 19 | interstate or foreign commerce; or B, the visual depiction |
| 10:02:07 | 20 | videotape was produced using materials that had been mailed, |
| 10:02:12 | 21 | shipped or transported in interstate or foreign commerce by any |
| 10:02:16 | 22 | means including by computer; or C, the visual depiction was |
| 10:02:21 | 23 | mailed or actually transported in interstate or foreign |
| 10:02:21 | 24 | commerce. |
| 10:02:24 | 25 | While the Government must prove that the purpose of the |

| | |
|---|---|
| 10:02:28 | 1 |
| 10:02:32 | 2 |
| 10:02:35 | 3 |
| 10:02:39 | 4 |
| 10:02:41 | 5 |
| 10:02:44 | 6 |
| 10:02:48 | 7 |
| 10:02:50 | 8 |
| 10:02:52 | 9 |
| 10:02:56 | 10 |
| 10:02:59 | 11 |
| 10:03:00 | 12 |
| 10:03:04 | 13 |
| 10:03:05 | 14 |
| 10:03:08 | 15 |
| 10:03:12 | 16 |
| 10:03:17 | 17 |
| 10:03:22 | 18 |
| 10:03:28 | 19 |
| 10:03:30 | 20 |
| 10:03:33 | 21 |
| 10:03:33 | 22 |
| 10:03:36 | 23 |
| 10:03:42 | 24 |
| 10:03:46 | 25 |

sexually explicit conduct was to produce a visual depiction, it need not be Defendant's only or dominate purpose.

The term "interstate or foreign commerce" means the movement of a person or property from one state to another state or from one state to another country.

The term "state" includes a state of the United States, the District of Colombia and any commonwealth, territory or possession of the United States.

It is not necessary for the Government to prove that the Defendant knew that the visual depiction or materials used to produce the visual depiction had moved in interstate or foreign commerce.

The term "minor" means any person who is less than 18 years old.

The term "producing" means producing, directing, manufacturing, issuing, publishing or advertising.

The term "computer" means electronic, magnetic, optical, electrochemical or other high speed data processing device performing logical or arithematic or storage functions, and includes any data storage facility or communications facility directly related to or operating in conjunction with that device.

A cellular telephone is a computer.

The term "visual depiction" includes undeveloped film and videotape, and data stored on a computer disk or by any

10:03:50  1    other electronic means that can be converted into a visual

10:03:50  2    image.

10:03:54  3           The term "sexually explicit conduct" means actual or

10:04:00  4    simulated sexual intercourse including genital-genital,

10:04:07  5    oral-genital, anal-genital or oral-anal, whether between persons

10:04:11  6    of the same or opposite sex, beastiality, masturbation, sadistic

10:04:14  7    or masochistic abuse or lascivious exhibition of the genitals or

10:04:17  8    pubic area of any person.

10:04:21  9           "Lascivious exhibition" means indescent exposure of the

10:04:24  10   genitals or public area, usually to incite lust.  Not every

10:04:27  11   exposure is a lascivious exhibition.

10:04:31  12          To decide whether a visual depiction is a lascivious

10:04:35  13   exhibition, you must consider the context and setting in which

10:04:39  14   the genitalia or pubic area is being displayed.  Factors you may

10:04:39  15   consider include:

10:04:42  16          The overall content of the material.

10:04:47  17          Whether the focal point of the visual depiction is on

10:04:50  18   the minor's genitalia or pubic area.

10:04:52  19          Whether the setting of the depiction appears to be

10:04:57  20   sexually inviting or suggestive; for example, in a location or a

10:04:59  21   pose associated with sexual activity.

10:05:03  22          Whether the minor appears to be displayed in an

10:05:05  23   unnatural pose or inappropriate attire.

10:05:09  24          Whether the minor is partially clothed or nude.

10:05:14  25          Whether the depiction appears to convey sexual coyness

10:05:18  1    or an apparent willingness to engage in sexual activity, and

10:05:22  2    whether the depiction appears to have been designed to elicit a

10:05:23  3    sexual response in the viewer.

10:05:26  4            It is a federal crime to knowingly receive or

10:05:29  5    distribute any visual depiction that has been shipped or

10:05:33  6    transported in interstate or foreign commerce by any means,

10:05:37  7    including by computer, when the visual depiction was produced

10:05:42  8    using a minor engaging in sexually explicit conduct and depicts

10:05:43  9    that conduct.

10:05:45  10           The Defendant can be found guilty of this crime only if

10:05:48  11   all the following facts are proved beyond a reasonable doubt:

10:05:52  12           One, the Defendant knowingly distributed a visual

10:05:53  13   depiction.

10:05:56  14           Two, the depiction was shipped or transported in

10:06:00  15   interstate or foreign commerce by any means, including computer.

10:06:03  16           Three, producing the visual depiction involved using a

10:06:06  17   minor engaged in sexually explicit conduct.

10:06:11  18           Four, the depiction is a minor engaged in sexually

10:06:11  19   explicit conduct.

10:06:14  20           And five, the Defendant knew that at least one

10:06:18  21   performer in the visual depiction was a minor, and knew that the

10:06:22  22   depiction showed the minor engaged in sexually explicit conduct.

10:06:26  23           To distribute something simply means to deliver or

10:06:30  24   transfer possession of it to someone else with or without any

10:06:32  25   financial interest in the transaction.

| | | |
|---|---|---|
| 10:06:35 | 1 | "Minor" means any person younger than 18 years old. |
| 10:06:38 | 2 | Interstate or foreign commerce is the movement of |
| 10:06:41 | 3 | property between different states or between the United States |
| 10:06:44 | 4 | and any place outside the United States. |
| 10:06:47 | 5 | The term "state" means any state of the United States, |
| 10:06:51 | 6 | the District of Colombia and any commonwealth, territory or |
| 10:06:53 | 7 | possession of the United States. |
| 10:06:56 | 8 | The term "computer" includes any high speed data |
| 10:07:01 | 9 | processing device that can perform logical, arithmatic or |
| 10:07:04 | 10 | storage functions, including any data storage facility or |
| 10:07:08 | 11 | communications facility that is directly related to or operates |
| 10:07:12 | 12 | in conjunction with that device.  It doesn't include an |
| 10:07:17 | 13 | automated typewriter or typesetter, a portable handheld |
| 10:07:21 | 14 | calculator or similar devices which are limited in function to |
| 10:07:23 | 15 | word processing or mathematical calculations. |
| 10:07:25 | 16 | A cellular telephone is a computer. |
| 10:07:30 | 17 | The term "sexually explicit conduct" means actual or |
| 10:07:34 | 18 | simulated sexual intercourse, including genital-genital, |
| 10:07:39 | 19 | oral-genital, anal-genital or oral-anal contact, whether between |
| 10:07:43 | 20 | persons of the same or opposite sex.  Beastiality, masturbation, |
| 10:07:50 | 21 | sadistic or masochistic abuse or lascivious exhibition of the |
| 10:07:53 | 22 | genitals or pubic area of any person. |
| 10:07:54 | 23 | Lascivious exhibition means indecent exposure of the |
| 10:07:59 | 24 | genitals or pubic area usually to incite lust. |
| 10:08:03 | 25 | Not every exposure is a lascivious exhibition. |

|       |    |                                                                              |
|-------|----|------------------------------------------------------------------------------|
| 10:08:06 | 1  | To decide whether a visual depiction is a lascivious |
| 10:08:09 | 2  | exhibition, you must consider the context and setting in which |
| 10:08:14 | 3  | the genitalia or pubic area is being displayed.  Factors you may |
| 10:08:15 | 4  | consider include: |
| 10:08:19 | 5  | The over allcontent of the material. |
| 10:08:22 | 6  | Whether the focal point of the visual depiction is on |
| 10:08:25 | 7  | the minor's genitalia or pubic area. |
| 10:08:27 | 8  | Whether the setting of the depiction appears to be |
| 10:08:30 | 9  | sexually inviting or suggestive; for example, in a location or |
| 10:08:33 | 10 | in a pose associated with sexual activity. |
| 10:08:36 | 11 | Whether the minor appears to be displayed in an |
| 10:08:42 | 12 | unnatural pose or an inappropriate attire. |
| 10:08:44 | 13 | Whether the minor is partially clothed or nude. |
| 10:08:48 | 14 | Whether the depiction appears to convey sexual coyness |
| 10:08:51 | 15 | or an apparent willingness to engage in sexual activity, and |
| 10:08:55 | 16 | whether the depiction appears to have been designed to elicit a |
| 10:08:56 | 17 | sexual response in the viewer. |
| 10:08:59 | 18 | A visual depiction need not have all of these factors |
| 10:09:01 | 19 | to be a lascivious exhibition. |
| 10:09:06 | 20 | The term "visual depiction" includes undeveloped film |
| 10:09:11 | 21 | and videotape and data stored on a computer media by any other |
| 10:09:14 | 22 | electronic means that can be converted into a visual image. |
| 10:09:17 | 23 | It's a federal crime to knowingly send in interstate |
| 10:09:20 | 24 | commerce an extortionate communication.  The Defendant can be |
| 10:09:24 | 25 | found guilty of this crime only if all the following facts are |

10:09:26  1    proved beyond a reasonable doubt:

10:09:31  2          One.  The Defendant knowingly sent a message in

10:09:34  3    interstate commerce containing a true threat to damage the

10:09:35  4    reputation of another.

10:09:38  5          And two, the Defendant did so with the intent to extort

10:09:42  6    money or something else of value to the Defendant.

10:09:45  7          The Government doesn't have to prove the Defendant

10:09:49  8    intended to carry out the threat or succeeded in obtaining the

10:09:51  9    money or other thing of value.

10:09:53 10          To transmit something in interstate commerce means to

10:09:56 11    send it from a place in one state to a place in another state.

10:10:00 12          To transit something in foreign commerce means to send

10:10:03 13    it from a place in the United States to any place outside the

10:10:03 14    United States.

10:10:08 15          A true threat is a serious threat, not idle talk, a

10:10:12 16    careless remark or something said jokingly that is made under

10:10:15 17    circumstances that would place a reasonable person in fear of

10:10:18 18    damage to another person's reputation.

10:10:21 19          To act with intent to extort means to act with the

10:10:25 20    purpose of obtaining money or something of value from someone

10:10:28 21    who consents because of the true threat.

10:10:30 22          A thing of value is anything that has value to the

10:10:34 23    Defendant, whether it's tangible or not.

10:10:39 24          It is a separate federal crime for anyone to conspire

10:10:42 25    or agree with someone else to do something that would be another

10:10:45  1    federal crime if it was actually carried out.

10:10:49  2          A conspiracy is an agreement by two or more people to

10:10:52  3    commit and unlawful act.  In other words, it is a kind of

10:10:57  4    partnership for criminal purposes.  Every member of a conspiracy

10:11:01  5    becomes the agent or partner of every other member.

10:11:03  6          The Government does not have to prove that all of the

10:11:06  7    people named in the indictment were members of the plan or that

10:11:09  8    those who were members made any kind of formal agreement.  The

10:11:11  9    Government does not have to prove that the members planned

10:11:15  10   together all the details of the plan or the overt acts that the

10:11:18  11   indictment charges would be carried out in an effort to commit

10:11:22  12   the intended crime.  The heart of a conspiracy is the making of

10:11:26  13   the unlawful plan itself followed by the commission of any overt

10:11:30  14   act.  The Government does not have to prove that the

10:11:33  15   conspirators succeeded in carrying out the plan.

10:11:35  16         The Defendant can be found guilty of this crime only if

10:11:38  17   all of the facts are proved beyond a reasonable doubt:

10:11:42  18         One.  Two or more persons in some way agreed to try to

10:11:46  19   accomplish a shared and unlawful plan.

10:11:49  20         Two.  The Defendant knew the unlawful purpose of the

10:11:52  21   plan and willfully joined in it.

10:11:55  22         Three.  During the conspiracy, one of the conspirators

10:11:59  23   knowingly engaged in at least one overt act as described in the

10:11:59  24   indictment.

10:12:04  25         And four, the overt act was committed at or about the

10:12:06  1    time alleged, and with the purpose of carrying out or

10:12:08  2    accomplishing some object of the conspiracy.

10:12:13  3         An overt act is any transaction or event, even one that

10:12:16  4    may be entirely innocent when viewed alone, that a conspirator

10:12:19  5    commits to accomplish some object of the conspiracy.

10:12:23  6         A person may be a conspirator without knowing all the

10:12:25  7    details of the unlawful plan, or even the names and identities

10:12:28  8    of all of the other alleged co-conspirators.

10:12:34  9         If the Defendant played only a minor part in the plan

10:12:37  10   but had a general understanding of the unlawful purpose of the

10:12:40  11   plan and willfully joined in the plan on at least one occasion,

10:12:43  12   that is sufficient for you to find the Defendant guilty.  But

10:12:47  13   simply being present at the scene of an event, or merely

10:12:50  14   associating with certain people and discussing common goals and

10:12:53  15   interests does not necessarily establish proof of a conspiracy.

10:12:57  16   I'm sorry.  Let me read that over again.  I added a word by

10:13:02  17   mistake.  But simply being present at the scene of an event or

10:13:04  18   merely associating with certain people and discussing common

10:13:08  19   goals and interests doesn't establish proof of a conspiracy.  A

10:13:12  20   person who doesn't know about a conspiracy, but happens to act

10:13:15  21   in a way that advances some purpose of one, doesn't

10:13:18  22   automatically become a conspirator.

10:13:22  23        The Defendant, Joseph Isaiah Woodson, claims that if he

10:13:26  24   committed the act charged in the indictment, he did so only

10:13:31  25   because he was forced to commit the crime.  If you conclude that

the Government has proved beyond a reasonable doubt that the

Defendant committed the crime as charged, you must then consider

whether the Defendant should nevertheless be found not guilty

because his actions were justified by duress or coercion.

To excuse a criminal act, the Defendant must prove by a

preponderance of the evidence:

First, that there was an unlawful and present immediate

and impending threat of death or serious bodily harm to the

Defendant or another.

Second, that the Defendant's own negligent or reckless

conduct did not create a situation where the Defendant would be

forced to engage in a crime.

Third, that the Defendant had no reasonable legal

alternative to violating the law.

And fourth, that avoiding the threatened harm caused

the criminal action.

The threat of death or serious bodily harm to the

Defendant must be well-grounded.  In other words, the threat

must have objectively existed in reality and not have derived

from the Defendant's subjective belief that something

constituted a threat.

A preponderance of the evidence is enough evidence to

persuade you that the Defendant's claim is more likely true than

not true.  If you find the Defendant has proved each of these

elements by a preponderance of the evidence, you must find the

10:14:50   1    Defendant not guilty.

10:14:52   2         You should also ask yourself whether there was evidence

10:14:57   3    that a witness testified falsely about an important fact.  And

10:15:00   4    ask whether there was evidence that at some other time a witness

10:15:03   5    said or did something, or didn't say or do something that was

10:15:06   6    different from the testimony the witness gave during this trial.

10:15:10   7    But keep in mind that a simple mistake doesn't mean a witness

10:15:13   8    wasn't telling the truth as he or she remembers it.  People

10:15:16   9    naturally tend to forget some things or remember them

10:15:21   10   inaccurately.  So if a witness misstated something, you must

10:15:24   11   decide whether it was because of an innocent lapse in memory or

10:15:31   12   an intentional deception.  The significance of your decision may

10:15:35   13   depend on whether the misstatement is about an important fact or

10:15:36   14   about an unimportant detail.

10:15:40   15        A Defendant has a right not to testify, but since the

10:15:44   16   Defendant did testify, you should decide whether you believe the

10:15:48   17   Defendant's testimony in the same way as that of any other

10:15:48   18   witness.

10:15:51   19        If the Government offers evidence that a Defendant made

10:15:54   20   a statement or admission to someone after being arrested or

10:16:00   21   detained, you must consider that evidence with caution and great

10:16:03   22   care.  You must decide for yourself whether:  One, whether the

10:16:06   23   Defendant made the statement; and two, if so, how much weight to

10:16:10   24   give to it.  To make these decisions, you must consider all the

10:16:13   25   evidence about the statement, including the circumstances under

10:16:15  1    which it was made.

10:16:18  2          During the trial you heard evidence of acts allegedly

10:16:21  3    done by the Defendant on other occasions that may be similar to

10:16:24  4    acts with which the Defendant is currently charged.  You must

10:16:26  5    not consider any of this evidence to decide whether the

10:16:29  6    Defendant engaged in the activity alleged in this indictment.

10:16:32  7    The evidence is admitted and may be considered by you for the

10:16:35  8    limited purpose of assisting you in determining whether the

10:16:40  9    Defendant had the state of mind or intent necessary to commit

10:16:41  10   the crime charged in this indictment.

10:16:45  11         You will see the indictment charges a crime was

10:16:48  12   committed on or about a certain date.  The Defendant does not

10:16:51  13   have to prove that the offense occurred on an exact date.

10:16:54  14   Sorry.  The Government does not have to prove that the offense

10:16:59  15   occurred on an exact date.  The Government only has to prove

10:17:02  16   beyond a reasonable doubt that the crime was committed on a date

10:17:04  17   reasonably close to the date alleged.

10:17:07  18         The word "knowingly" means that an act was done

10:17:10  19   voluntarily and intentionally and not because of a mistake or by

10:17:12  20   accident.

10:17:14  21         Your verdict, whether guilty or not guilty, must be

10:17:20  22   unanimous.  In other words, you must all agree.  Your

10:17:22  23   deliberations are secret and you will never have to explain your

10:17:25  24   verdict to anyone.  Each of you must decide the case for

10:17:29  25   yourself, but only after fully considering the evidence with the

10:17:33   1     other jurors.  So you must discuss the case with one another and

10:17:36   2     try to reach an agreement.  While you are discussing the case,

10:17:40   3     do not hesitate to re-examine your own opinion and change your

10:17:43   4     mind if you become convinced that you were wrong.  But do not

10:17:46   5     give up honest beliefs just because others think differently or

10:17:49   6     because you simply want to get the case over with.  Remember,

10:17:55   7     that in a very real way you are the judges of the facts.  Your

10:17:58   8     only interest should be to seek the truth from the evidence in

10:17:58   9     the case.

10:18:01  10           When you get to the jury room, choose one of your

10:18:05  11     members to act as a foreperson.  The foreperson will direct your

10:18:08  12     deliberations and will speak for you in court.

10:18:11  13           A verdict form has been prepared for your convenience.

10:18:15  14     It will go back to the jury room with these instructions.  Very

10:18:20  15     simple.  United States District Court for the Southern District

10:18:25  16     of Florida, case number, United States of America versus Joseph

10:18:30  17     Isaiah Woodson, Junior, Defendant.  Verdict.  One.  We, the

10:18:33  18     jury, unanimously find the Defendant, Joseph Isaish Woodson as

10:18:35  19     to Count 1 of the indictment either guilty or not guilty.

10:18:38  20           Count 2, guilty or not guilty.

10:18:40  21           Count 3, guilty or not guilty.

10:18:43  22           Count 4, guilty or not guilty.

10:18:46  23           Count 5, guilty or not guilty.

10:18:48  24           Count 6, guilty or not guilty.

10:18:51  25           Then another reminder, so say we all, signed and dated

| | | |
|---|---|---|
| 10:18:55 | 1 | at the United States Courthouse, Miami, Florida, this blank day |
| 10:19:01 | 2 | of blank, 2019.  This is -- today happens to be the 27th day of |
| 10:19:05 | 3 | September, 2019.  A place for the foreperson's signature and the |
| 10:19:08 | 4 | foreperson's printed name. |
| 10:19:12 | 5 | Take the verdict form with you to the jury room.  When |
| 10:19:15 | 6 | you've all agreed on the verdict, your foreperson must fill in |
| 10:19:19 | 7 | the form, sign it, date it and carry it.  Then you'll return it |
| 10:19:19 | 8 | to the courtroom. |
| 10:19:21 | 9 | If you wish to communicate with me at any time, please |
| 10:19:25 | 10 | write down your message or question and give it to the marshal. |
| 10:19:28 | 11 | The marshal will bring it to me and I will respond as promptly |
| 10:19:31 | 12 | as possible, either in writing or by talking to you in the |
| 10:19:34 | 13 | courtroom.  But I caution you not to tell me how many jurors |
| 10:19:37 | 14 | have voted one way or the other at the time.  What happens in |
| 10:19:40 | 15 | the jury room is your business.  I don't need to know that |
| 10:19:44 | 16 | you're ten to X or whatever.  It doesn't matter.  You just tell |
| 10:19:49 | 17 | me what you need.  If you need to take a break, tell me you're |
| 10:19:50 | 18 | taking a break. |
| 10:19:53 | 19 | But one thing that's very important is you must all be |
| 10:19:57 | 20 | present whenever you are deliberating.  In other words, if 11 of |
| 10:20:01 | 21 | you gets up to go to the bathroom, the rest of you got to wait |
| 10:20:04 | 22 | for them because you cannot deliberate without them.  If you are |
| 10:20:08 | 23 | taking a break and somebody has to smoke and has to go outside |
| 10:20:12 | 24 | the building because we don't permit smoking in the building, |
| 10:20:16 | 25 | everybody's got to wait for that person to finish.  All right? |

10:20:19  1          Now, at this point I will recognize the lawyers in turn

10:20:23  2     for their final arguments.  Closing arguments.

10:20:26  3          MS. VIAMONTES:  Judge, a brief sidebar before the

10:20:27  4     closing arguments?

10:20:31  5          THE COURT:  Sure.  What did I screw up this time?

10:20:35  6          (SIDEBAR CONFERENCE:

10:20:40  7          THE COURT:  Did I skip something?  I don't know.  What

10:20:42  8     did I skip?

10:20:45  9          MS. VIAMONTES:  Your Honor, first the defense didn't

10:20:49 10     rest in front of the jury, so we want to rectify that and have

10:20:51 11     them rest their case in front of the jury.

10:20:53 12          THE COURT:  I guess that's right.

10:20:57 13          MS. VIAMONTES:  And then I'm sure they're going to want

10:20:59 14     to renew their motions, so we want to --

10:21:02 15          THE COURT:  I will -- that we can do here, and that is

10:21:06 16     that their motions will be renewed after we finish, and after

10:21:10 17     they go out and they are not waiving anything, and they're not

10:21:13 18     going to be punished for doing that because it was my fault for

10:21:17 19     not bringing it up.  Okay?  Everybody agree to that?

10:21:20 20          MR. NATALE:  Do you want me to stand up and say we

10:21:20 21     rest.

10:21:22 22          THE COURT:  I don't care if you do it or the other, I'd

10:21:25 23     rather they did it.  They're nicer looking than you are.  But

10:21:29 24     that's a different problem.

10:21:30 25          MS. VIAMONTES:  There's one more issue, Your Honor.

10:21:34  1    It's on Page 9 of the jury instructions, it's our mistake.  As
10:21:40  2    to Count 5, it should read Victim 4.  Count 5 charges that the
10:21:44  3    Defendant, Joseph Isaiah Woodson, Junior was sending --
10:21:45  4              THE COURT:  What page is that?
10:21:49  5              MS. VIAMONTES:  Page 9, Your Honor.  Sending.
10:21:54  6              THE COURT:  Do you all agree that's correct?
10:22:03  7              MS. MOLLISON:  Yes, Judge.  We're in agreement on that.
10:22:06  8              THE COURT:  And the chart that is there, is the chart
10:22:06  9    okay?
10:22:08  10             MS. VIAMONTES:  The chart is okay, Your Honor.
10:22:11  11             THE COURT:  So now tell me what you're saying.
10:22:13  12             MS. VIAMONTES:  It's Page 9 and it's the paragraph that
10:22:17  13   begins Count 5 charges the Defendant.  At the end of that
10:22:20  14   sentence it should read "Victim 4".
10:22:26  15             THE COURT:  All right.  Thank you.
10:22:27  16             MS. VIAMONTES:  Thank you, Your Honor.
10:22:28  17             (END OF SIDEBAR)
10:22:34  18             THE COURT:  It was my fault.  I forgot to ask the
10:22:38  19   defense if they rested at the end of their case.  And they
10:22:45  20   needed to do that formally.
10:22:46  21             MS. MOLLISON:  Your Honor, at this time the defense
10:22:47  22   rests its case.
10:22:48  23             THE COURT:  All right.  Thank you.
10:22:51  24             And another thing is I have a typo.  As you can well
10:22:58  25   imagine, typing 28 pages we're bound to have a typo.  On Page 9,

10:23:01   1    Count 5 charges the Defendant Joseph Isaiah Woodson, Junior with

10:23:06   2    sending extortionate interstate communications to Victim 4, not

10:23:10   3    Victim 1 as it says.  Now, I have changed the 1 to a 4 and I

10:23:13   4    have put my initials next to it in the copy of the instructions

10:23:15   5    that will be going back to you.

10:23:15   6             All right?

10:23:20   7             Government, go.

10:23:23   8             MS. ANTON:  Thank you, Judge.

10:23:42   9             For years the Defendant hid behind the covered camera

10:23:48   10   phone of his Samsung S3.  He hid in his room, secreting himself

10:23:54   11   while he managed to systemically, repeatedly and relentlessly

10:24:03   12   trick children, the most vulnerable people in our community, he

10:24:09   13   tricked them into giving him the passwords to their Snapchat

10:24:12   14   accounts so that he could take over those accounts, infiltrate

10:24:18   15   those accounts, and use it against them to extort them and force

10:24:25   16   them to produce sexually explicit, demeaning, sadomasochistic,

10:24:32   17   belittling, and embarrassing images and videos and send it back

10:24:38   18   to him.  With every click of an app, the Defendant Joseph

10:24:43   19   Woodson was one step closer to satisfying his perverse desires

10:24:48   20   to exploit children.

10:24:53   21             Using Snapchat, you heard all about that throughout the

10:24:57   22   course of this trial, right?  Kids love Snapchat.  It has great

10:25:01   23   filters on the camera.  They can take all sorts of great

10:25:05   24   pictures with dog ears and bunny faces, and they also use it to

10:25:07   25   keep in touch with their friends at school.  It's the way they

10:25:11   1   talk to each other.  No one picks up the phone anymore to make a

10:25:14   2   phone call.  They message each other and they get streaks when

10:25:19   3   they go back and forth.  And the streaks give them emojis.  And

10:25:23   4   emojis give them a score, and that gives them a good reputation.

10:25:26   5   They want that.  It's important to them.  All of their pictures,

10:25:30   6   and videos that they've accumulated over time, they told you

10:25:33   7   they keep them in their Snapchat account.  It's in their

10:25:40   8   memories.  It's on their story.  It's their version -- in 2019,

10:25:45   9   it's their version of the olden day photo albums that we all

10:25:48   10  used where we kept them, we held them close to us and when

10:25:52   11  something was happening like a hurricane was coming, we took

10:25:56   12  them from our house.  We gathered those photo albums because

10:26:01   13  those were our prized possessions.  Snapchat was that for these

10:26:03   14  children.  They came in here and told you how important it was.

10:26:06   15          But all these other apps came into play during this

10:26:10   16  trial.  You heard about Kik messaging, another anonymous way to

10:26:14   17  message people.  TextNow.  Instagram.  Social media.  Instagram

10:26:18   18  is great.  You keep in touch with your old friends from high

10:26:22   19  school, you keep in touch with that family member who moved far

10:26:26   20  away.  You see what they're doing every day.  It feels like

10:26:29   21  they're close to each other.  It's a great thing.  But behind

10:26:34   22  each and every one of these apps lurks an evil.  It's an evil

10:26:36   23  that you heard about throughout the course of this trial.  It's

10:26:42   24  an evil that preys on innocent children who use these apps in

10:26:46   25  their bedrooms at night, after their parents have tucked them in

10:26:47   1    and said good night.

10:26:50   2              You heard from the witnesses in this case who were 12

10:26:56   3    years old, 13 years odd.  Middle school and high school.  Their

10:26:59   4    parents didn't know that they were being abused right under

10:27:03   5    their noses with the phones that the parents most likely bought

10:27:09   6    them and let them download all of these apps.  That led us here

10:27:10   7    today to this case.

10:27:13   8              And what are the charges?  I'm summarized them here for

10:27:16   9    you, even though the Judge has already instructed you on them.

10:27:18   10   The first three counts are for production of child pornography

10:27:25   11   of Victims 1, 2 and 3.  Count 4 is the distribution, that means

10:27:28   12   sending out the child pornography.  The first three counts the

10:27:33   13   Defendant is accused, and has been proven I submit to you

10:27:35   14   throughout the course of this trial, to have forced these

10:27:39   15   children to produce and make the images that you saw here in

10:27:43   16   court.  Count 4 is the sending of the images, the posting them

10:27:47   17   on Instagram.  The sending them out to other users.  Count 5 is

10:27:51   18   sending the extortionate interstate communications to Victim 1.

10:27:56   19   Simply put, Count 5 is sending a threat over the internet.

10:28:02   20   That's all it is.  Count 6 was the conspiracy count.  And Count

10:28:05   21   6, we charged the Defendant and have proven after you've heard

10:28:08   22   all this evidence, that the Defendant did in fact conspire with

10:28:14   23   the guy in Ireland, who you now know is Matthew Johnstone, who

10:28:17   24   is still under investigation, and others.  He conspired with

10:28:18   25   them to extort children.

| | |
|---|---|
| 10:28:24 | 1 |
| 10:28:26 | 2 |
| 10:28:30 | 3 |
| 10:28:34 | 4 |
| 10:28:39 | 5 |
| 10:28:45 | 6 |
| 10:28:51 | 7 |
| 10:28:54 | 8 |
| 10:28:57 | 9 |
| 10:29:02 | 10 |
| 10:29:06 | 11 |
| 10:29:09 | 12 |
| 10:29:14 | 13 |
| 10:29:20 | 14 |
| 10:29:25 | 15 |
| 10:29:28 | 16 |
| 10:29:42 | 17 |
| 10:29:46 | 18 |
| 10:29:52 | 19 |
| 10:29:56 | 20 |
| 10:30:00 | 21 |
| 10:30:04 | 22 |
| 10:30:06 | 23 |
| 10:30:07 | 24 |
| 10:30:14 | 25 |

The Judge read to you a list of victims in the indictment, and you'll have the indictment to take back with you to the jury room.  The indictment charges by victim.  Victims 1, 2, 3.  You'll need to relate who Victim 1 is in order to understand who's contemplated in that charge.  So Victim 1 is M.K., who you heard from.  Victim 2 is B.F.  Victim 3 is B.O.  Four was victim A.K.  You probably remember her very well because she's the victim who came in here and said I didn't give him what he wanted.  I told him hell no, I'm not sending you those images, right?  You heard from E.M., Victim 5.  E.M. told you that she sent pictures of her friends that she already had in an effort to try to get him to not make her take the pictures.  Victim 6 who goes by C.J.  Her initials or his initials now, you heard that he's transitioning, are S.M.  And he told you about the repeated abuse that he had to endure at the hands of the Defendant.  How long that took.

C.J.  M.K.  B.F.  A.K.  B.O.  E.M.  You met all of these girls.  They came in here, they told you what happened to them.  They bravely confronted the very embarrassing images that they knew they had produced.  It's one thing, they told you, to have those in your own "for my eyes" only part of your Snapchat account where only you can see it.  But these children came in here, knowing that you were going to see the images, and told you what happened.

Now, this is a quick screen with a lot of words on it

| | |
|---|---|
| 10:30:17 | 1 |
| 10:30:19 | 2 |
| 10:30:23 | 3 |
| 10:30:26 | 4 |
| 10:30:29 | 5 |
| 10:30:31 | 6 |
| 10:30:35 | 7 |
| 10:30:38 | 8 |
| 10:30:43 | 9 |
| 10:30:47 | 10 |
| 10:30:52 | 11 |
| 10:30:56 | 12 |
| 10:31:00 | 13 |
| 10:31:05 | 14 |
| 10:31:09 | 15 |
| 10:31:12 | 16 |
| 10:31:15 | 17 |
| 10:31:20 | 18 |
| 10:31:23 | 19 |
| 10:31:27 | 20 |
| 10:31:31 | 21 |
| 10:31:36 | 22 |
| 10:31:40 | 23 |
| 10:31:44 | 24 |
| 10:31:49 | 25 |

that talks about the production of child pornography charge that
the Judge has already read to you.  What I want to highlight
here in the charges is sort of give you a roadmap for what you
should look for when you're deliberating.  We have to prove
three things in order to prove that the Defendant did, in fact,
produce child pornography.  First, that it was a real person and
it was a child.  And we proved that to you.  These were real
people and they were all children under the age of 18.

Second, that he employed, used, persuaded, induced,
enticed the minor to engage in this conduct.  Any of those
things.  Did he persuade them, induce them and entice them?  He
did that.  Right?  You saw the chat messages where he said you
have five minutes.  Five more pictures.  Give me that or else.

And that those images and videos traveled in interstate
commerce, that they used the computer and the internet and the
internet affects interstate commerce.  The term producing means
producing, directing, manufacturing, issuing, publishing or
advertising.  All of those words are producing.  So when we say
production of child pornography, we don't mean a Hollywood
production with actors and cameras.  This just means a person
who actually has those images created and makes them created.

The Judge instructed you on the definitions of sexually
explicit conduct, and those are pretty self-explanatory.  And if
you have a question as to whether those images you saw of hair
brushes being inserted vaginally and anally; of nipples being

twisted, of children forced to write words like cum and slut and
Matt's whore or their bodies, you shouldn't have any question
that those are sexually explicit conduct, that it's a lascivious
exhibition, and the factors that you can consider are all listed
there.  Look at those factors, because we've proven that these
are sexually explicit images.

         Let's talk about who you met throughout the course of
the trial.  Victim 1 was M.K.  M.K. told you that the Defendant
infiltrated her Snapchat account, pretending to be her friend
*******.  Same MO with all these girls, right?  It's a friend of
theirs on Snapchat who contacts them* so they think, and says
hey, do me a favor, I need you to change my password.  I need
you to let me use your password and your code.  Why did they do
this?  Okay.  All of these kids, they came in here and they told
you that's something commonplace that they do.  They share their
passwords.  They're not adults, they don't keep their PIN
numbers close at heart, they haven't learned these things yet.
They're vulnerable.  And to them, it's a Snapchat account, and
what's important is talking to the other kids at school and
getting to see who blocked you and what they put on their story
because they blocked you.  So they thought of a workaround and
the workaround is give me your password.  And in addition, when
I get grounded, right, because they're children and they
misbehave, and they all have parents, the first thing the
parents do is take the phone away.  That's it, you're done, I'm

10:33:26   1    taking your phone away.  You haven't done your homework, you

10:33:30   2    haven't done your chores, no more phone because everybody is

10:33:32   3    attached to their phone.  And when the phone is taken away, that

10:33:37   4    means Snapchat is gone.  And when Snapchat is gone, how are

10:33:41   5    M.K., E.M., B.F. and A.K., how are they going to keep their

10:33:44   6    streaks up?  How are they going to chat back and forth with

10:33:47   7    their friends?  The only way to do that is to give their

10:33:50   8    password to someone else who is not grounded that day so they

10:33:51   9    can help them.

10:33:55   10            M.K. told you that it was Talia Sanchez on Kik, that's

10:33:58   11   the user name that was contacting her.  That user name you heard

10:34:01   12   plenty of evidence throughout the course of the trial, it

10:34:05   13   relates back to the Defendant.  That's one they took over.  She

10:34:10   14   was forced to produce numerous pictures and videos which you all

10:34:13   15   saw and which were also found in the Defendant's phone when

10:34:16   16   police went to his house and conducted a search warrant.  The

10:34:20   17   pictures and images that she made were similar to all the other

10:34:24   18   girls.  She was forced to write on herself, she wrote sex slave

10:34:28   19   across her chest, she inserted a hair brush and she called him

10:34:31   20   master.  Right?  You heard that some of these girls were forced

10:34:37   21   to call him master or daddy because he owned them.  He thought

10:34:41   22   he owned them.  They told you they didn't think they were free

10:34:46   23   and he texted them you're not free.  These children thought that

10:34:50   24   they were slaves to this unknown person on the internet who was

10:34:53   25   forcing them with leverage, right?  Because he had some pictures

10:34:57  1    of them, to keep up with this conduct.

10:35:01  2            M.K. told you her user names on Snapchat and on

10:35:08  3    Instagram ** ****** and *******, and you saw the physical

10:35:11  4    evidence that documents that the Defendant, in fact, took over

10:35:16  5    that account and communicated with that account.  But what's

10:35:21  6    important about M.K. is she had thought that this all stopped.

10:35:25  7    Right?  And for a little while, she thought that maybe her life

10:35:29  8    was hers again and that no one else would have to see these

10:35:32  9    horrible pictures because she told you he did send them out.

10:35:36  10   Right?  And you saw the evidence of his Instagram accounts.  He

10:35:40  11   sent them out.  He posted them online and all the world was able

10:35:46  12   to see all those sexually explicit images of M.K.  She thought

10:35:52  13   it was done, until that one day when he re-contacted her.  The

10:35:58  14   day that he was arrested.  Months later, he sent her a message

10:36:05  15   on Instagram with a picture of herself, this same picture saying

10:36:11  16   I expose now?  And what did the Defendant tell you about that?

10:36:15  17   Right?  You heard the Defendant testify in this case.  When he

10:36:20  18   testified, he admitted to extorting these girls, to forcing them

10:36:23  19   to produce all these sexually explicit images, to infiltrating

10:36:28  20   their Snapchat accounts.  To taking them over, right?  And he

10:36:36  21   told you that months had gone by where he hadn't done any kind

10:36:41  22   of extortion, he hadn't reached out to these girls after the

10:36:45  23   search warrant in January, all the way until his arrest.  Then

10:36:51  24   the day that he was arrested he reached out to M.K. again.  Why?

10:36:55  25   Why did he say that?  He testified, and he told you.  He wanted

10:37:00   1    to see the privacy settings on his Instagram account.  And no

10:37:04   2    better way to check your Instagram account privacy setting than

10:37:08   3    to send out an extortionate, sexually explicit image to a child

10:37:12   4    saying do you want me to expose this again?

10:37:17   5           Let's talk about B.F.  How did he get into B.F.'s

10:37:22   6    account?  He infiltrated her account too pretending to be her

10:37:26   7    friend ******* back in November 2017.  And she did the exact

10:37:29   8    same thing M.K. did.  She produced numerous pictures and videos

10:37:34   9    of sexually explicit conduct.  She wrote on her chest, she wrote

10:37:40   10   whore on her mouth.  He forced her, and what's worse is he

10:37:44   11   actually posted her on her friend's Snapchat story.  And what

10:37:48   12   does that mean to get posted on someone else's story, right?

10:37:51   13   You heard the evidence.  That means that that post is now going

10:37:56   14   out to all of that person's friends.  So all of those friends

10:38:03   15   will see that.  We found her images in the Defendant's phone.

10:38:07   16   Right?  He saved them.  You heard that about him, right?  The

10:38:10   17   testimony came out from the Defendant himself, from the expert

10:38:14   18   witness, from the case agent that he systemically categorized

10:38:20   19   these children in file folders in his phone by their names,

10:38:23   20   alphabetically, and stored all of their sexually explicit child

10:38:30   21   pornography inside those folders.  Why?  Because they were

10:38:33   22   important to him, those images.  He's a collector, and those

10:38:38   23   images have value.  They have a value.

10:38:45   24          Victim 3, B.O., she was 12 years old.  Now B.O. is the

10:38:48   25   only victim who came and told you that unlike the others, she

| | |
|---|---|
| 10:38:53 | 1 |
| 10:38:56 | 2 |
| 10:39:01 | 3 |
| 10:39:04 | 4 |
| 10:39:07 | 5 |
| 10:39:11 | 6 |
| 10:39:16 | 7 |
| 10:39:22 | 8 |
| 10:39:26 | 9 |
| 10:39:29 | 10 |
| 10:39:32 | 11 |
| 10:39:36 | 12 |
| 10:39:43 | 13 |
| 10:39:46 | 14 |
| 10:39:50 | 15 |
| 10:39:53 | 16 |
| 10:39:58 | 17 |
| 10:40:02 | 18 |
| 10:40:06 | 19 |
| 10:40:09 | 20 |
| 10:40:13 | 21 |
| 10:40:16 | 22 |
| 10:40:22 | 23 |
| 10:40:25 | 24 |
| 10:40:29 | 25 |

actually had a live Skype phone call with him.  A chat.  Phone
call, I guess, is dating myself.  No one uses the phone to call
anymore.  She chatted over Skype with him, but she told you she
couldn't see him, right?  She had her camera and you could see
her on the camera because we all saw her video, but she couldn't
see him.  Why?  Because he had the camera covered.  As you know,
when his phone was found, the Note 3, interestingly in his
pillow case in his room, right, with tape over the camera.  Why?
Blocking it.  Hiding.  Shielding himself so that no one could
see who he was.

She is on a live call with him and he's telling her
move the camera lower.  Aim it at your vagina.  I want to see a
closer picture.  Move those pants out of the way.  12-year-old
B.F. complies.  But what she doesn't know is that he's
screenshotting her images as she's disrobing in front of the
camera and creating that child pornography.

Like all of the other victims, he saved them and we
find them in the Defendant's phone.  These are the elements of
distribution of child pornography.  In order to prove that the
Defendant distributed these images, we just have to prove that
he knowingly distributed them, that it went through interstate
commerce, which is the computer, and that the picture involved a
minor engaged in sexually explicit conduct.  Okay?  We've proven
all of these elements to you, all five of them.

Sending extortionate interstate communications.  The

| | |
|---|---|
| 10:40:32 | 1 |
| 10:40:36 | 2 |
| 10:40:39 | 3 |
| 10:40:43 | 4 |
| 10:40:46 | 5 |
| 10:40:50 | 6 |
| 10:40:53 | 7 |
| 10:40:57 | 8 |
| 10:41:03 | 9 |
| 10:41:08 | 10 |
| 10:41:12 | 11 |
| 10:41:16 | 12 |
| 10:41:21 | 13 |
| 10:41:24 | 14 |
| 10:41:29 | 15 |
| 10:41:33 | 16 |
| 10:41:37 | 17 |
| 10:41:41 | 18 |
| 10:41:44 | 19 |
| 10:41:48 | 20 |
| 10:41:50 | 21 |
| 10:41:56 | 22 |
| 10:41:59 | 23 |
| 10:42:03 | 24 |
| 10:42:06 | 25 |

Defendant can be guilty of this if he knowingly sends a message in interstate commerce. So here we have in the internet. Did he knowingly send a message containing a true threat to damage the reputation of another? I submit to you you've heard several days of evidence. An overwhelming amount of evidence that he did this. And what was his intent? To extort money? No, he wasn't looking for money from these children or something else of value to the Defendant. We just talked about that. What's of value to him. He valued those pictures. He valued those images and videos, which is why he saved them not just on his phone, but off of his phone on Dropbox which, we heard, is the file sharing software that has many legitimate purposes, but the Defendant catalogued them there and uploaded everything. How he did this to save them, right? But he also did this because he wasn't working alone. He didn't extort all of these children alone, and the Government's position is that he didn't do that, he used co-defendants, like-minded people, co-conspirators who were helping him. The indictment charges with co-conspirators known and unknown.

User IDs. You saw in the chat messages, right, the Defendant going back and forth with someone in Ireland and on Kik with several other people. And how do we know that they had this kind of partnership and agreement? Because in the chat messages, they talk about it. Right? When criminals are going to commit a crime together, and go and rob a bank together or do

10:42:09  1    something, a kind of fraud, they don't execute a contract that

10:42:13  2    says here I agree, I'm going to do this and you're going to do

10:42:16  3    that, right?  You don't see that.  That's not realistic.  You

10:42:19  4    know that there's an agreement from their actions and from their

10:42:22  5    words, and here you have both.

10:42:31  6            Now, the extortionate threat is to expose Victim 4 and

10:42:35  7    Victim 4 is A.K.  Okay.  And you'll see in the charging document

10:42:41  8    that the extortionate threat was sent to A.K.  And the Defendant

10:42:44  9    told A.K. -- remember, she's the one who said I'm not giving you

10:42:47 10    any videos or images, and when he couldn't get anywhere with

10:42:50 11    her, he said okay, then what I'm going to do is your friend

10:42:55 12    M.K., which she said is my friend, I'm going to post her picture

10:42:58 13    on your story then.  And that it's going to make it look to the

10:43:01 14    world, to your classmates and everyone else, that you're putting

10:43:08 15    naked pictures, embarrassing, degrading, belittling, vile

10:43:12 16    pictures of your best friend up on your Snapchat story and

10:43:15 17    that's going to damage her reputation, right?  Everyone at

10:43:19 18    school that she knows is going to say why did you do that.  But

10:43:22 19    A.K., she took screenshots to document everything, and you heard

10:43:27 20    from several of these children they did that, right?  They took

10:43:30 21    screenshots.  They wanted to find out what's this IP address,

10:43:33 22    what's this login I got from Snapchat that says someone in

10:43:37 23    Ashburn, Virginia.  Someone in Ashburn, Virginia was accessing

10:43:42 24    their Snapchat account.  They knew at 12 years old, 13 years old

10:43:46 25    that this is something I should probably document.

| 10:43:51 | 1 | And then we have the conspiracy charge.  The conspiracy |
|---|---|---|

And then we have the conspiracy charge.  The conspiracy
charge is simple.  Don't let all of these words frighten you.
Okay.  A conspiracy is an agreement by two or more people to
commit an unlawful act.  In other words, it's a partnership for
criminal purposes, and every member of the conspiracy becomes
the agent or partner of the other.  I may be dating myself, but
it's the Three Muskateers.  All for one and one for all.  We're
in it together.  Okay.  We don't have to prove that all of the
people in the indictment were members of the plan or that there
was a formal agreement.  The heart of this conspiracy is the
making of the plan itself followed by the commission of any of
the overt acts.  And you'll see in the indictment the Government
laid out the overt acts and the manner and means.  This is just
a way of explaining to you all how this conspiracy was
committed.

What are the things that this Defendant and his
co-conspirators, what are the things that they did, what are
some of these overt acts.  And it's laid out.  You'll read them.
Two or more people agree to accomplish a shared and unlawful
plan; the Defendant knew the purpose of the plan, and during the
course of the conspiracy, they engaged in at least one of these
overt acts like uploading everything to Dropbox.  That's just an
example of one of them.

You'll see that an overt act is any transaction or
event, even one that's entirely innocent when viewed alone, that

a conspirator commits to accomplish some other object of the
conspiracy.  So in this case, uploading things to Dropbox.
Infiltrating the accounts on Snapchat.  Sending an extortionate
e-mail.  Those are all laid out in the overt acts of the
indictment.  And you'll see that we've proved all of them, even
though we don't have to prove all of them.

Now, how do we know that there was a partnership for
criminal purposes.  Well, you know that because you saw this
text message screenshotted in the Defendant's phone.  Right?
Taylor Keenan.  Who was that.  That was the Defendant.  One of
his personas.  And he's here, engaging in a text message with at
least two other people.  This is a group message on Kik, the Kik
application.  And in this group message, the Defendant is in
green and he's having an argument with the other people who are
on this chat about who's controlling which girl.  Who owns which
child.  Who has the right to extort which child.  And they're
arguing over it.  You hear -- you read here that the unknown
co-conspirator says if you get her to do requests for me right
now, I won't contact her again.  And the Defendant says but you
already agreed, she's mine exclusively so there is an agreement.
Is there a team?  Is this a game to the Defendant and his
co-conspirators?  Of who can extort and how they extort these
children?  And in regards to trades, the Defendant says yeah,
for something bad, yeah, I'll trade you sure, that's fine.  But
it's got to be real bad?  I'm not going to trade you for

| | |
|---|---|
| 10:47:16 | 1 |
| 10:47:18 | 2 |
| 10:47:22 | 3 |
| 10:47:27 | 4 |
| 10:47:30 | 5 |
| 10:47:35 | 6 |
| 10:47:39 | 7 |
| 10:47:43 | 8 |
| 10:47:48 | 9 |
| 10:47:53 | 10 |
| 10:47:57 | 11 |
| 10:48:02 | 12 |
| 10:48:07 | 13 |
| 10:48:12 | 14 |
| 10:48:15 | 15 |
| 10:48:19 | 16 |
| 10:48:23 | 17 |
| 10:48:26 | 18 |
| 10:48:31 | 19 |
| 10:48:35 | 20 |
| 10:48:37 | 21 |
| 10:48:42 | 22 |
| 10:48:45 | 23 |
| 10:48:50 | 24 |
| 10:48:55 | 25 |

something good.  His co-conspirator is not happy with him.
What's stopping me from posting her right now.  You're taking
her from me when we had a deal last night.  There was a deal
last night.  A deal that they had.  A message we don't have.
But there was a deal, and we know it because it's here in the
text messages.  And the deal was that he was going to post this
girl.  The Defendant says yeah, sorry man.  It's kind of hard to
read on the very top right there.  Don't be a dirty dude about
it.  Please don't post her though.  And his co-conspirator says
too late, 4chan tomorrow.  And you heard that 4chan is a website
predominantly used for quote, unquote, slut-shaming.  It's where
these pictures go to live on in infinity.

        And the Defendant says to him when he hears that this
co-conspirator is going to take one of his girls seriously, we
truly never were partners then.  You kept none of your word, but
that's fine.  Even if you do, she's still mine.  What's he
saying?  Go ahead and post her.  But I still own her, right?
There's clearly a conspiracy and an agreement.  The Defendant
goes on in this argument about girls to say the point is that
respecting your partner's wishes and honoring your word is what
this is all about.

        What evidence have you been shown throughout the course
of this trial that proves to you that there's a conspiracy.
Exhibit numbers 63 and 64 are communications between the
Defendant using his Kik user ID MVLex3.  That's the Defendant

| | |
|---|---|
| 10:48:59 | 1 |
| 10:49:03 | 2 |
| 10:49:06 | 3 |
| 10:49:12 | 4 |
| 10:49:16 | 5 |
| 10:49:23 | 6 |
| 10:49:29 | 7 |
| 10:49:39 | 8 |
| 10:49:40 | 9 |
| 10:49:55 | 10 |
| 10:49:59 | 11 |
| 10:50:03 | 12 |
| 10:50:09 | 13 |
| 10:50:14 | 14 |
| 10:50:18 | 15 |
| 10:50:23 | 16 |
| 10:50:30 | 17 |
| 10:50:35 | 18 |
| 10:50:39 | 19 |
| 10:50:42 | 20 |
| 10:50:45 | 21 |
| 10:50:49 | 22 |
| 10:50:51 | 23 |
| 10:50:59 | 24 |
| 10:51:03 | 25 |

and Bozy11 is the Irish guy.  And when they text back and forth to each other, look at the context of those text messages.  They are in agreement.  They are working together and sharing the load.  In the one that I have up on the screen here, the Irish co-conspirator says hey, what are you working on?  The Defendant says I just got home, going to try Snapchat again.  The Irish co-conspirator says what do you want ***** to do?  Joseph Woodson, what do you want ***** to do.  Make her deep throat something.  The Defendant's idea.

        And there were many other chats between them, chats showing you that they were working these girls together.  The Defendant says to the guy in Ireland hey, you remember *******?  Yep.  ** *********?  Why?  She made a new Kik.  So the Defendant is telling the guy, who we know is in Ireland hey, ** *********, the one we got all of those very sexually explicit images and videos from, the one who was forced, given the choice, she was given the choice molest your sibling or you can urinate in a cup on camera and drink it all and then force yourself to throw up.  That was her choice.  She chose not to molest her sibling and she urinated in a cup, and that video is in evidence and the Defendant is the one who gave her that choice.  That's why he's telling the Irish guy hey, she's back online.  We can get her to do some more.

        Then they talk again stay active, I'm going to get A.C. on Kik.  That's the guy in Ireland.  Who's A.C.?  A.C. is Victim

|          |    |                                                                      |
|----------|----|----------------------------------------------------------------------|
| 10:51:06 | 1  | 7, A.C.  You heard her.  She came in here and testified that her     |
| 10:51:11 | 2  | extortion went on for what seemed like forever.  The Defendant       |
| 10:51:18 | 3  | says -- the co-Defendant says she's coming.  Her user name is        |
| 10:51:22 | 4  | matt's whore A.C., but don't message her yet, right?  And then       |
| 10:51:26 | 5  | he sent a screenshot to the guy in Ireland proving like hey, I'm     |
| 10:51:30 | 6  | getting her online now.  The guy in Ireland says this is live        |
| 10:51:37 | 7  | right now if you want to sit tight and enjoy.  Think about that.     |
| 10:51:40 | 8  | The co-conspirator is telling him that he has A.C. live right        |
| 10:51:43 | 9  | now if you want to sit tight and enjoy.  Is he streaming this        |
| 10:51:48 | 10 | over the internet to him?  Is he Skyping him in a FaceTime call?     |
| 10:51:52 | 11 | But this guy in Ireland is telling the Defendant that I got this     |
| 10:51:55 | 12 | child right now in the heat of the moment, and she's doing this      |
| 10:51:59 | 13 | stuff that we're making her do.  Come watch.  The Defendant says     |
| 10:52:03 | 14 | I only got a few more before I head out.  Trying to save the         |
| 10:52:06 | 15 | stuff you sent last night so I can upload.  So the                   |
| 10:52:10 | 16 | co-conspirator sends him stuff and he uploads it.  All right.        |
| 10:52:19 | 17 | Well, A.C. is fucked here, so it's all good.  Then you see more      |
| 10:52:21 | 18 | chats with the guy in Ireland saying to the Defendant what do       |
| 10:52:25 | 19 | you think?  And the Defendant says yeah, A.C. is going to be a       |
| 10:52:30 | 20 | fun whore.  You're going to like what she's going to do right       |
| 10:52:34 | 21 | now, the co-Defendant says.  If you have a spare minute, you're     |
| 10:52:36 | 22 | really going to want to wait and watch what I'm going to have       |
| 10:52:40 | 23 | her do.  And the Defendant says I'm leaving, I'll be back in 12      |
| 10:52:48 | 24 | hours.  That's A.C.  Then what does the guy in Ireland ask him?     |
| 10:52:56 | 25 | He asks the Defendant do you have any requests.  Why would he        |

10:52:58   1   ask him that unless they were working together as partners and

10:53:03   2   sharing their information?  Anything goes.  Come on, he says to

10:53:07   3   him, a request?  Anything?  And the Defendant comes up with his

10:53:13   4   request.  What he wants to see.  What he wants this child to do.

10:53:19   5   Rough anal to start.  That's what the Defendant wanted.  Oh,

10:53:24   6   she's good, the guy in Ireland says.  And the Defendant responds

10:53:29   7   indeed.  This is quite a win.  Why is this a win?  Is this a

10:53:34   8   sick game that the Defendant is playing with these other

10:53:36   9   like-minded pedophiles to extort children?

10:53:43   10          You heard from E.M.  She's 14, she was 14 when it

10:53:46   11   happened.  Same MO.  The Defendant went into her Snapchat

10:53:49   12   account, pretended to be Taylor, she gives him the password.

10:53:54   13   She sends the photos, she creates nude photos of herself and she

10:53:59   14   says yes daddy.  She's told to address him as daddy.

10:54:09   15          S.M., C.J.  *** ********.  She was given detailed

10:54:13   16   instructions for pictures and videos.  Told to write cum, slut

10:54:20   17   and refer to the Defendant as master.  She spent one full night

10:54:25   18   making all of these images and videos.  She told you that, a

10:54:28   19   night that she's never, ever going to forgot, and the Defendant

10:54:36   20   sent out each and every one of those videos that she made to her

10:54:41   21   school, to her friends, everybody saw her urinating in that cup

10:54:45   22   and drinking it.  He left her alone for a few months, she told

10:54:50   23   you.  He told you, right?  Because now he's transitioning to

10:54:54   24   C.J.  For a few months she thought she was okay.  We've heard

10:54:56   25   this before.  And then all of a sudden, the Defendant

resurfaces.  He comes back in January of 2018.  And he says to her in the course of the conversations that you're sold now. Again, is this a sick game where these girls are being sold to different teams to talk about master, slave and wins?

A.C., she's Victim 7 in our indictment.  Same story. Defendant infiltrated, he tricked her.  When we say infiltrate, right?  He tricked a child.  A 30 year old man tricked a child into giving a Snapchat password.  He already had a picture of her because A.C. had taken a scandalous picture and given it to an ex-boyfriend, so he used that picture as leverage.  Hers began in February and lasted until 2019.  For four years he terrorized, taunted and tortured her.  Her videos and images were moved into evidence, and you saw that she also was forced to penetrate herself vaginally and anally with a hair brush, she was forced to have sex with a boy.  She put the writing all over her body just like the other girls.  She was forced to use a dildo and record it and send it to the Defendant.  You also see that there were chats back and forth that we just went over with the guy in Ireland about her.  That's A.C.  That's who they're talking about.  That's who the Defendant said get her to do rough anal.  A.C.  We know that she was contacted this January, and the Defendant was already arrested by January.  So what does that tell you?  That the guy in Ireland or somebody else is still extorting A.C., and worked together with the Defendant to extort her.

10:56:55   1          You heard from victim A.G., and when you look at the

10:56:58   2   indictment, you'll see that A.G. is not on the victim list,

10:57:01   3   because she is not a charged victim in this case.  That's

10:57:06   4   because her testimony was offered only to show you that prior to

10:57:10   5   joining forces, if you even believe that there was a threat ever

10:57:17   6   to the Defendant, that this Defendant extorted A.G.  He met her

10:57:21   7   on Kik, she sent him images and then it moved to Instagram.  And

10:57:26   8   this was back in 2015 A.G. told you, which was three years

10:57:29   9   before the Defendant was arrested.  She's the victim who lives

10:57:34  10   out in Texas, who was only identified when law enforcement got

10:57:38  11   the Defendant's phone after he was arrested, looked through the

10:57:45  12   phone and realized wow, there's a treasure trove in here of

10:57:49  13   unidentified children with only user names.  We have got to find

10:57:52  14   them and contact them and begin their investigation.

10:57:55  15          You heard that law enforcement here in South Florida,

10:57:59  16   the FBI, worked with law enforcement in Virginia so that they

10:58:02  17   could combine forces.  And now with law enforcement in Ireland,

10:58:07  18   La Garda, so that they can have a unified front to combat this

10:58:13  19   crime.  They found her in Texas because she had writing on her

10:58:16  20   shirt that said which high school she went to, and law

10:58:19  21   enforcement had to go to that high school and see if there was a

10:58:22  22   girl who looked like the girl in the images and do some

10:58:26  23   investigation to find her.  Right?  Law enforcement didn't just

10:58:30  24   have an IP address and then find her.  This testimony was

10:58:34  25   offered only to show you that there was no lack of mistake here,

it's the same MO, it's a common plan, and you know that the

Defendant was doing this well before he even met the Irish guy.

MS. VIAMONTES:  Five minutes.

MS. ANTON:  Remember the just logged in, you get an IP

address that related back to the Defendant's house in Ashburn,

that's how we did the search warrant.  Went to his house, got

the phone, the Note 3 with the camera covered, with the piece of

tape so that nobody could see the Defendant.

These are some of the threats that you saw in the

course of this case and you saw in opening statements, right?

What the Defendant said to M.K. I own you, you're not free.  To

B.F. do it for longer, I want a good look.  Take off your

clothes, throw them on the floor.  Don't play, I'll post them on

your story.  Do it in front of the camera.  Do it or I'll put

the story -- I'll put it on your story for everyone to see.  It

won't stop until you obey.  I'm sorry, master.  Should I send

all I got to everyone you know?  Five pics stop this.  All you

have to do is five pics and I won't send anymore.

Every girl came in here and told you that that was what

he said.  Just do one more, just do five more.  And they're

children.  They believed.  They were hopeful that if I do one

more, I'll get my Snapchat back.  Same MO, same writing,

inserting hair brushes, molesting siblings.

What we find on the Defendant's phones.  The victim's

contacts, the Kik accounts, the Kik messages, his Instagram.

11:00:44  1   Dropbox, Snapchat, evidence of the dark web.  Communications

11:00:47  2   with co-conspirators and him Googling looking for child

11:00:50  3   pornography.  It's not enough that he was having it made hot off

11:00:54  4   the presses for himself.  No.  He was looking for some that had

11:00:56  5   already been made so he could keep it.

11:01:00  6           What was not found on the Defendant's phone?  Any

11:01:04  7   threats whatsoever made to the Defendant.  Any signs of

11:01:07  8   coercion.  No malware, no hacking.

11:01:10  9           Let's talk about everything the Defendant lied to the

11:01:14  10  police about when they came to talk to him for that search

11:01:19  11  warrant.  I only use AOL.  That's what he had me use.  That's

11:01:23  12  not true, we know that's a lie, because the Defendant used

11:01:28  13  Snapchat, Instagram, TextNow, Dropbox.  My phone got hacked some

11:01:32  14  time ago and they've been on there and I keep deleting them is

11:01:36  15  what the Defendant said to the police.  Lies, because the expert

11:01:40  16  from the FBI up in Virginia came down here and testified to you

11:01:46  17  that that's what he does.  He's a cyber crimes guy.  He looks

11:01:49  18  for evidence of hacking and malware and threats.  He does

11:01:53  19  counterterrorism, he does child exploitation and even he didn't

11:01:54  20  find it.

11:01:56  21          But the Defendant himself admitted to you guys on the

11:02:00  22  stand I lied.  I lied to the police.  Right?  You heard that

11:02:06  23  come from his mouth.  That he lied to the police.  There's a guy

11:02:11  24  in England or Europe who is blackmailing me.  Not true.  No

11:02:14  25  evidence of blackmail threats or coercion.

11:02:20  1          I believe, I think I saved one video.  One video.  One

11:02:23  2     video is what he told the police.  There were thousands of

11:02:28  3     pictures and videos located on the Defendant's phones.

11:02:31  4          Snapchat.  I can't use Snapchat, yeah.  Thanks to that

11:02:34  5     guy, again I can't use Snapchat.  But that's a lie.  We know he

11:02:39  6     used Snapchat.  He even admitted in his own testimony that he

11:02:40  7     did this.

11:02:43  8          So basically, you know, the guy threatening me, he

11:02:51  9     said, you know, what is called swatting.  This was a lie.  There

11:02:54  10    is no evidence whatsoever to support this.  The Defendant

11:02:58  11    admitted to you on the stand that he was never actually

11:03:00  12    threatened.  Right?

11:03:01  13         The Defendant took the stand in this case, and you have

11:03:05  14    to evaluate his testimony like you do any other witness in this

11:03:08  15    case.  Does he have a motive to lie?  Does he have any interest

11:03:14  16    in the outcome of this case?  Right?  And what did he tell you?

11:03:18  17    I perceived there was an implied threat.

11:03:20  18         And when I asked him well, did someone have something

11:03:25  19    over you?  No.  Did this guy in Ireland know you?  No.  Never

11:03:28  20    spoken to him?  No.  Never met him?  No.  There's no beef

11:03:34  21    between you?  This is a total stranger, he says, who sends him a

11:03:40  22    text message saying that he knows his IP address and he knows he

11:03:45  23    lives in Ashburn, Virginia.  The testimony was from the IP

11:03:48  24    address you cannot get a physical address.  You cannot find the

11:03:53  25    person.  Okay.  But even if you want to assume that you could

11:03:56  1    find the person with just an IP address, the Defendant told you

11:04:01  2    that this co-conspirator he never threatened him.  He never

11:04:05  3    mentioned swatting.  He never said or else.  He never said I

11:04:09  4    need you to do this.  There was no threat.  No threat

11:04:09  5    whatsoever.

11:04:17  6        And his lies to the police go on and on.  What's

11:04:20  7    important is he says maybe I did it to 20 girls, but there's

11:04:23  8    over 350 that have been identified.  And the investigation is

11:04:33  9    still going.  Even if I delete them, he would just force them

11:04:36  10   back on.  So in the statement he's still going with the fact

11:04:39  11   that he was hacked, which is not what happened in this case.

11:04:44  12   Then he says he keeps paper over his phone so he can't get

11:04:47  13   pictures of me.  So now he wants the police to believe that that

11:04:52  14   tape or paper is over his phone so that this unidentified

11:04:56  15   co-conspirator in Ireland who is forcing him can't see him.

11:04:59  16   Okay.  But you know now throughout the course of this testimony

11:05:02  17   that that's not why the paper was on the phone.

11:05:11  18       And he said I wouldn't threaten them, but I would just

11:05:14  19   casually ask them.  That's what he told law enforcement.  I

11:05:19  20   didn't threaten these kids, I just casually asked him.  You

11:05:21  21   heard all these girls come in here and testify.  And most of

11:05:25  22   them had chats that you actually read.  Did he casually ask them

11:05:30  23   for anything?  No.  He forced and threatened them repeatedly,

11:05:34  24   incessantly.  They begged.  Some of them begged  why are you

11:05:35  25   doing this to me, why are you doing this to me.  I want to die

11:05:40   1   already.  I want to kill myself.  I have nowhere to run.  You've

11:05:43   2   exposed me.  Please stop.

11:05:49   3        Let's talk about the duress defense.  The Judge has

11:05:53   4   instructed you that the Defendant claims that if he committed

11:05:56   5   these crimes, he did so only because he was forced to.  This is

11:05:59   6   called an affirmative defense.  Okay.  If you conclude that the

11:06:02   7   Government has proven this case beyond a reasonable doubt and

11:06:06   8   the Defendant committed the crimes as charged, which I submit to

11:06:11   9   you we clearly have, we've shown you an abundance of evidence.

11:06:13  10   In addition, the Defendant has admitted on the stand to

11:06:15  11   committing the crimes, you have to then consider whether the

11:06:19  12   Defendant should nevertheless be found not guilty because his

11:06:23  13   actions were justified by duress or coercion.

11:06:28  14        The Judge told you to excuse a criminal act, he has to

11:06:31  15   prove okay -- I have to prove the elements of the case that he

11:06:35  16   committed the crimes charged.  But if he's going to say that I

11:06:38  17   should be found not guilty and there's an excuse for what I did,

11:06:42  18   then he has to prove by a preponderance of the evidence that

11:06:46  19   one, there was an unlawful, present, immediate and impending

11:06:50  20   threat of death or serious bodily harm.  What evidence did you

11:06:55  21   hear of that?  You heard no evidence of that.  In fact, what you

11:07:00  22   heard was exactly the opposite.  There was no threat.  There was

11:07:05  23   none.  It existed only in the mind of Joseph Woodson.  The mind

11:07:09  24   of a person who spends hours gaming on a console, living in a

11:07:14  25   fantasy world watching You Tube videos about swatting.  That's

11:07:16  1    where it existed.

11:07:18  2              Second, he has to show that his own conduct didn't

11:07:21  3    create a situation where he would be forced to do it.

11:07:26  4              And third, that he had no reasonable legal alternative.

11:07:33  5    No reasonable legal alternative.  Think about all the

11:07:37  6    alternatives the Defendant had.  If assuming you want to even

11:07:40  7    believe there was a threat, which I submit to you there wasn't.

11:07:42  8    But even if there was, how many things could he have done?

11:07:45  9    Could he have gone to the police?  Could he have gone to the

11:07:49  10   boss?  Could he have told somebody?  Could he have said no?  He

11:07:52  11   told you he never said no.  And it took some practice, but after

11:07:58  12   a year, he kind of got good at it.  He got good at extorting

11:08:01  13   these girls and could quickly get in and out of their accounts.

11:08:05  14   Of course there was a reasonable legal alternative to violating

11:08:05  15   the law.

11:08:08  16             And fourth, avoiding the harm that caused the criminal

11:08:13  17   action.  You know what this contemplates?  Someone holding a gun

11:08:16  18   to your head and saying go into that bank and ask them for

11:08:24  19   money.  That's not what happened here.  But most importantly,

11:08:27  20   the Judge is going to instruct you or has already instructed

11:08:31  21   you, right, this is very important, that the threat, the threat

11:08:35  22   of death or serious bodily harm to the Defendant must be

11:08:40  23   well-grounded, a well-grounded threat, and it explains to you

11:08:43  24   what does that mean, well-grounded?  In other words, it must

11:08:49  25   have objectively existed in reality and not have derived from

11:08:55   1   the Defendant's subjective belief.  That means what Joseph

11:09:00   2   Woodson thought that something constituted a threat.  So the

11:09:02   3   standard you're supposed to look at is what did a reasonable

11:09:07   4   person, what would they think?  Not what did Joseph Woodson

11:09:12   5   think, who lived in a world that clearly wasn't like the one we

11:09:18   6   live in.  A world where children are traded online to determine

11:09:24   7   who is their master, who's going to win at this game, who is

11:09:28   8   going to be a slave, who's going to post the girl, how often

11:09:32   9   they're going to post them, this is a good win.

11:09:34   10          Ladies and gentlemen, I submit to you that throughout

11:09:38   11   the course of this case, you've heard an overwhelming amount of

11:09:40   12   evidence that the Defendant committed the crimes that we've

11:09:44   13   charged, and I'm confident that when you all go back there into

11:09:47   14   the jury room to deliberate, you'll use the common sense that we

11:09:50   15   know you have which is why we chose you to be on this jury, and

11:09:53   16   you're going to come back and find that the only just verdict in

11:09:58   17   this case is guilty of all six counts.  Thank you.

11:10:00   18          THE COURT:  Thank you.  You have 15 minutes left for

11:10:01   19   your rebuttal.

11:10:07   20          Let's take a break because I need one.  And very

11:10:10   21   important, don't start talking about the case yet.  You don't

11:10:15   22   have everything yet.  Talk about apple pie, baseball, whatever

11:10:19   23   you want to, but not about the case.  Go into the jury room,

11:10:25   24   there will be a menu for you to pick for lunch and you can order

11:10:28   25   lunch and then after all the arguments, when you go back in

11:10:32  1   there, the lunch will be there, you can eat and talk at the same

11:10:32  2   time.

11:10:37  3           So go on in and if we don't have the menu yet, we'll

11:10:39  4   have it shortly.  Go on into the jury room, probably 10 or 15

11:10:42  5   minutes.  All right?

11:10:44  6           COURT SECURITY OFFICER:  All rise for the jury.

11:10:48  7           (Jury out at 11:10 a.m.)

11:11:18  8           THE COURT:  Wanda is giving you a redacted version of

11:11:21  9   the indictment that will be going back to the jury so you can

11:11:29  10  take a look at it.  One per side.  The only thing I did other

11:11:34  11  than we don't ordinarily do is I deleted second superseding

11:11:37  12  indictment.  I think that's surplusage.  And we removed the

11:11:42  13  foreperson's signature on the last page.  But take a look at it

11:11:45  14  and if you have any problems, otherwise that's what's going

11:11:48  15  back.  All right?  We'll take ten minutes.

11:12:05  16          (Brief recess)

11:29:39  17          (Court called to order)

11:29:52  18          (Jury in at 11:29 a.m.)

11:30:25  19          THE COURT:  Be seated please.

11:30:35  20          You may proceed, Mr. Natale.

11:30:49  21          MR. NATALE:  This case is horrible.  What happened is

11:30:53  22  absolutely horrible and is terrible.

11:30:55  23          THE COURT:  Can you back up to use the microphone

11:30:56  24  please?

11:30:58  25          MR. NATALE:  Was absolutely terrible, and we all know

11:31:03  1    it.  Some of you may be looking at me like saying I hate this
11:31:11  2    guy.  Not only him, but me, us.  I can understand that.  How did
11:31:19  3    these people do it?  Well, you know from the very beginning,
11:31:25  4    Joseph admitted to what happened.  The prosecutor wants to say
11:31:30  5    that he didn't tell you that it was 400 or whatever.  But he
11:31:35  6    admitted to it.  He admitted to everything.
11:31:38  7            There were some things did he not have everything 100%,
11:31:43  8    correct?  Of course he didn't.  His house has been raided, but
11:31:48  9    did he talk about the Irish guy?  Yeah.  And what did they say?
11:31:53  10   They didn't believe him.  But yet he was telling the truth.  You
11:32:07  11   know, we admit that everything that was in all of those binders,
11:32:17  12   we never confronted anyone about what happened in this case.
11:32:21  13   And you know why?  Because it happened.
11:32:41  14           You know, this case is about fear and what happens when
11:32:50  15   people are afraid.  Now, the Government has said well, there's
11:32:56  16   no chat, there's no message where this Irish guy Matthew
11:33:00  17   Johnstone is saying I'm going to swat you, I'm going to kill you
11:33:05  18   or any of that.  And therefore, they want you to think that that
11:33:09  19   was an unreasonable assumption, that it would have been kept, it
11:33:13  20   should have been kept.  How many things could have been done or
11:33:16  21   should have been done throughout this whole case with these
11:33:25  22   people that wasn't done?  But that doesn't mean that there
11:33:29  23   wasn't a threat.  That doesn't mean that someone telling you
11:33:36  24   they know your IP address, they know where you live, isn't a
11:33:38  25   threat.

11:33:42  1          Maybe it's me because of the neighborhood I grew up in,
11:33:46  2     all right.  It was the sort of neighborhood where if someone
11:33:52  3     said to you we're going to talk after school, you weren't going
11:33:57  4     to talk after school.  If someone said I'm going to have -- I
11:34:06  5     want to fight you, that wasn't going to happen.  In different
11:34:11  6     worlds, different things mean different things.  I could say to
11:34:15  7     somebody -- how many people have got these calls?  I'm calling
11:34:20  8     from social security, I'm calling from someplace, there's
11:34:23  9     something wrong with your account.  If you don't do this, we're
11:34:26  10    going to sue you or this is going to happen, right?  Most of the
11:34:30  11    time we hang up.  What do you think happens if you went to one
11:34:33  12    of those people?  You say really?  Good.  Here's what I want you
11:34:37  13    to do.  Pauly, get the money together and I want you to come to
11:34:41  14    my house so I can give it to you personally.  Do you think that
11:34:46  15    person is going to come to your house and get the money?  No.
11:34:54  16    Because the words you say didn't convey what they really meant.
11:34:59  17    They know and you know because that's the reasonable way that we
11:35:05  18    look at life because that's how we have to go through it.
11:35:13  19          You know, Joseph, this was horrible.  But let's look at
11:35:20  20    this now because all of these people went along because they
11:35:28  21    were afraid.  We also went into a world which, I could be wrong
11:35:34  22    but I think we don't know nothing about.  We don't know nothing
11:35:43  23    about this world.  It's not our world.  You know, there is --
11:35:48  24    science fiction used to talk about parallel universes and all
11:35:53  25    that other stuff.  Do you realize in what we learned, there's

|   |   |
|---|---|
| 11:35:58 | 1 |
| 11:36:05 | 2 |
| 11:36:10 | 3 |
| 11:36:16 | 4 |
| 11:36:27 | 5 |
| 11:36:35 | 6 |
| 11:36:43 | 7 |
| 11:36:48 | 8 |
| 11:37:01 | 9 |
| 11:37:14 | 10 |
| 11:37:26 | 11 |
| 11:37:40 | 12 |
| 11:37:45 | 13 |
| 11:37:51 | 14 |
| 11:37:56 | 15 |
| 11:38:02 | 16 |
| 11:38:14 | 17 |
| 11:38:28 | 18 |
| 11:38:36 | 19 |
| 11:38:38 | 20 |
| 11:38:45 | 21 |
| 11:38:51 | 22 |
| 11:38:59 | 23 |
| 11:39:08 | 24 |
| 11:39:14 | 25 |

two words.  There's a physical world, this is our physical world and we have an identity, you know, names, and people specific. You know, you can see that I'm a short, kind of chunky guy, I'm not like 6'6".  For a lot of people, their identity is in here. Their value is in here.  Because in here, they can be something that they're not.  They don't have to be made fun of in school and say you're stupid, you're ignorant, you act like a robot. Because in here, it's different.

Think about what we heard.  We heard about the threats, we heard about this cyber world in which -- think about it.  The fear for all of these teenagers was initially to lose an emoji. And there was other information on there, but we know that some of them contacted their friends through other means.  They had been hacked, but of all, I mean, we even learned that, you know, if your phone's taken away from you, you have your friend's login for you so you can keep getting these.  So you can keep your streak going.  And that world for these young teenagers, losing these was enough to subject themselves to some really horrible things.  And why was that.  Because of fear.  Fear of losing this.

Now, some also had photographs of themselves which they were concerned about, but they were photographs that they kept or that they actually sent to other people.  But it all stems around the fear of losing your streak, losing your emoji, losing that sense that you were this person.  And then yes, there's no

11:39:19  1   doubt that once they made one, it escalated.  No doubt about it.

11:39:26  2   No one is denying it.  And it was like you had one thing, no one

11:39:31  3   said well, it's only going to get worse, why would I give more.

11:39:36  4   But we know one of the young women she -- you know, she actually

11:39:38  5   did that.

11:39:51  6         Now for Joseph, what was the fear.  You heard about

11:39:56  7   Joseph's family.  You heard some about his life, how he grew up.

11:40:03  8   You learned about the mental issues that he has and that his

11:40:13  9   family has.  And you learned that he would escape for eight

11:40:22  10  hours or more a day into the cyber world.  Now, he would go to

11:40:29  11  work and, you know, I guess because he was good enough with the

11:40:35  12  -- at the hamburger place he could have got a promotion, because

11:40:41  13  he was regular, he went to work, he did what he was told, he

11:40:44  14  followed what he was supposed to do and he did it.  Then he came

11:40:49  15  home and he saved his money so he could have the way to get into

11:40:55  16  the world in which nobody knew, nobody was making fun of him

11:40:56  17  anymore.

11:41:00  18        Now, in that world, the problem is that there are

11:41:06  19  people like the Irish guy.  And there's a lot other people.  And

11:41:10  20  one of the things that when Joseph first talked to the police,

11:41:18  21  he told them he was concerned about swatting.  Every police

11:41:23  22  officer, every one of them admitting that swatting exists.  They

11:41:29  23  all admitted that people have been killed by it.  And that's not

11:41:33  24  something someone tells you in advance they're going to do, it's

11:41:42  25  something that is implied.  Sort of like when I was growing up,

11:41:46  1    we're going to talk.  It's implied.  I know where you live.
11:41:53  2    That's what was being said.  And any reasonable person who
11:41:57  3    understood that language, any reasonable person would understand
11:42:01  4    that reasonably that's a problem because in that gaming world,
11:42:10  5    people are swatted.  People have died all over this country.
11:42:18  6    Please know that.  Sometimes when they catch someone, they've
11:42:22  7    been sentenced to 20 years in prison for calling in the swat.
11:42:28  8    And it puts the police in a real awful situation, doesn't it?
11:42:36  9    Because they have to react assuming the worst, and to explain it
11:42:40  10   later oftentimes is too late.

11:42:47  11         Swatting is real and that's what Joseph was afraid of.
11:42:55  12   See, the confrontations that his family have said, not Joseph by
11:43:04  13   the way, boyfriend, the violence in the home, the two sisters
11:43:09  14   who police and other people would have to come to because of
11:43:17  15   their emotional problems.  And how were they treated by the
11:43:25  16   police.  Were they believed?  Was something done?

11:43:30  17         You know, I can tell you this.  The neighborhood I live
11:43:35  18   in now, I call the police, they're there.  If I say something
11:43:38  19   happens, they're going to believe it.  They're not just going to
11:43:43  20   walk away.  You probably know that too.  Not true for everybody
11:43:57  21   though.  So going to the police really wasn't an option.

11:44:03  22         But you know what's interesting is Joseph had a lot of
11:44:14  23   time to think about all that went on.  Talked to the police in
11:44:18  24   the beginning, he took the stand.  Cross-examined as long as
11:44:26  25   they wanted by experienced prosecutors.  Now, if he was a person

| | |
|---|---|
| 11:44:33 | 1 |
| 11:44:38 | 2 |
| 11:44:45 | 3 |
| 11:44:48 | 4 |
| 11:44:54 | 5 |
| 11:44:59 | 6 |
| 11:45:05 | 7 |
| 11:45:12 | 8 |
| 11:45:16 | 9 |
| 11:45:20 | 10 |
| 11:45:23 | 11 |
| 11:45:28 | 12 |
| 11:45:38 | 13 |
| 11:45:41 | 14 |
| 11:45:44 | 15 |
| 11:45:48 | 16 |
| 11:45:56 | 17 |
| 11:46:07 | 18 |
| 11:46:15 | 19 |
| 11:46:28 | 20 |
| 11:46:34 | 21 |
| 11:46:43 | 22 |
| 11:46:52 | 23 |
| 11:47:05 | 24 |
| 11:47:17 | 25 |

who wanted to lie, he would say oh yes, there was one message that I got and it expressly said this, this and this, but it's gone now.  Right?  And then we would have said well, we didn't get all of the messages so how did he know.  Did he say that? No.  He told the truth, the whole truth to you when he was on that stand.  Because they could have asked him whatever they wanted, show them whatever they wanted.  And did he at any time deny that he did what he did?  No.  He was honest and he told the truth and he admitted that he was wrong and he said he wishes he did things differently.  And he explained to you why. And we know why.  We can see it.

In the beginning no one wanted to believe about Matthew Johnstone.  Right.  He's lying, he's making it up.  You can look at the transcript, listen to it.  But they found out he was telling the truth.  And what do we know about Matthew Johnstone from their very evidence that they presented to you.  That regarding minor Number 1, it was Matt's name written on her body.  Minor Number 3, Matt logged into her Snapchat account. Number 5, Matt logs into her Snapchat account.  Minor Number 6, has Matt's name.  Number 7, still being coerced after he's been arrested and in jail for how many months, four, five months?  By Matt.  And A.G., she told you that she also had conversations with somebody else other than the person that she believed was Joseph as MVLex3, And that this began sometime in early 2015 she said.  And she probably was contacted in early 2015.  But we

60

11:47:25  1      brought in testimony that that account wasn't set up by Joseph

11:47:33  2      until much later than that.  She may have been contacted by

11:47:39  3      somebody, she may have made a mistake.  Is she lying?  No.  Is

11:47:48  4      she making a mistake?  Yes.  But we know when they tell you that

11:47:54  5      oh, he made contact with someone before the contact with the

11:47:59  6      Irish guy and they want to rely on that, that isn't supported by

11:48:02  7      the evidence.  It's definitely not.

11:48:08  8              You notice they never contested, they never said

11:48:13  9      Mr. Gomez you're lying about what the records show about that

11:48:19 10      MVLex3 account.  It was started long before that.  With all of

11:48:24 11      the resources they have, if that wasn't true, they would have

11:48:28 12      got it.  But yes, he's our investigator and you heard where he

11:48:32 13      worked, he worked as a police officer for a long time.  He

11:48:38 14      worked in the operating room at children's hospital.  Was he

11:48:42 15      honest and frank?  Yeah, he said exactly what happened.  So we

11:48:50 16      know that someone contacted A.G. before Joseph even had that

11:48:53 17      account.

11:49:02 18              Matthew Johnstone.  Kik user IDs:  Bozy11, Scottish

11:49:07 19      Style 100, who knows what else.  Who knows what else he's

11:49:09 20      operating under.

11:49:19 21              IP addresses.  And Government never contested this at

11:49:23 22      the trial.  Prior to this was one of the things they wanted to

11:49:29 23      say that Joseph was lying about.  Did Joseph ever say that he

11:49:34 24      didn't do any of this?  No.  All of those images, all of those

11:49:40 25      images that they piled up here and the prosecutor is saying

11:49:46  1    you're my slave, I own you, that's horrible stuff.  How many
11:49:58  2    ever say Joseph, had to write Joseph on them or Joey on them, or
11:50:08  3    Joe Joe or Woody.  If he truly was the monster that they said
11:50:16  4    and he did horrible stuff, don't get me wrong, really and I hope
11:50:20  5    you realize that.  And I think you do.  But it was horrible
11:50:25  6    stuff, but they want you to say he's part of this whole thing.
11:50:32  7    Well, why is no one being branded with that name?  Or is he
11:50:36  8    doing the bidding of someone else because he's operating out of
11:50:38  9    fear.

11:50:45  10          Who instructed the creation of the Dropbox.  Matthew
11:50:52  11   Johnstone.  Who instructed Joseph how to construct it, organize
11:51:01  12   it?  Matthew Johnstone.  Now, why would Joseph do this?  Because
11:51:06  13   he was constantly in fear.  Just like a lot of these young
11:51:14  14   teenagers, they didn't know when they were going to be
11:51:18  15   re-contacted and when they were going to be reminded how's
11:51:28  16   everything in Virginia doing.  And so you go along and protect
11:51:35  17   yourself.  And in Joe's case, protect his family.  And we've
11:51:42  18   already brought out that even after Joseph was arrested, people
11:51:52  19   are being contacted.  And we know Matthew, whatever Ireland is
11:51:57  20   who knows, but we learned they evidently did a search warrant,
11:52:00  21   they found stuff, we can't get any of that.

11:52:02  22          Remember, the officers told you that they have to get
11:52:06  23   subpoenas and go to court.  But remember what he also said on
11:52:09  24   cross-examination?  That only law enforcement.  I can't go
11:52:13  25   Judge, hey, how about doing us a favor here, issue a subpoena

| | | |
|---|---|---|
| 11:52:18 | 1 | for this.  Can't happen.  The law doesn't provide that.  And he |
| 11:52:21 | 2 | honestly told you that, they all honestly told you that. |
| 11:52:23 | 3 | They're the only ones who can get that. |
| 11:52:39 | 4 | Now, there was coercion of Joseph and Joseph certainly |
| 11:52:45 | 5 | did coerce these young teenagers.  No doubt about it. |
| 11:52:49 | 6 | Absolutely no doubt about it.  And there's one thing that our |
| 11:52:54 | 7 | law provides for is there are certain things that people can do |
| 11:53:01 | 8 | and yes, they're a crime and yes, they're wrong.  But there can |
| 11:53:12 | 9 | be a reason which excuses what they did.  Someone saying people |
| 11:53:17 | 10 | think nothing is going to cause me to excuse anything that he |
| 11:53:20 | 11 | did.  People could feel that way, right?  This is such a |
| 11:53:25 | 12 | horrible thing.  And if you do, there's nothing I can do about |
| 11:53:30 | 13 | it.  I won't even know about it.  Only you will.  But didn't |
| 11:53:34 | 14 | everyone take an oath to follow the law whether they like it or |
| 11:53:42 | 15 | not?  Really?  Only you will know. |
| 11:53:51 | 16 | But let's now look about, you know, hindsight is always |
| 11:53:59 | 17 | 20/20.  I wish, I could have, I should have.  But in the moment |
| 11:54:08 | 18 | what was -- was it the best thing he could do?  No.  Was it the |
| 11:54:17 | 19 | only thing to do?  No  What is it a reasonable thing to do?  Oh |
| 11:54:20 | 20 | well, now that's where people are going to say well, I wouldn't |
| 11:54:24 | 21 | have done that.  I would never do this, I would never do that. |
| 11:54:28 | 22 | You know, it's just like people can say I would never commit a |
| 11:54:32 | 23 | crime.  I would never do anything that's wrong like that.  But |
| 11:54:38 | 24 | can anyone promise that they will never be accused?  And if you |
| 11:54:41 | 25 | are, wouldn't you want to be listened to. |

| | | |
|---|---|---|
| 11:54:45 | 1 | Now, this case is going to be extremely difficult for |
| 11:54:49 | 2 | you, and the reason why it's going to be extremely difficult is |
| 11:54:58 | 3 | because if you follow the law, then you understand what happened |
| 11:55:07 | 4 | in this case.  Some of you are going to say listen, I think he |
| 11:55:16 | 5 | was coerced but there's no way I'm going to let him get out of |
| 11:55:27 | 6 | here.  I can't do anything about that.  And that's why the Judge |
| 11:55:36 | 7 | instructs you on more than one occasion to say your bias, your |
| 11:55:40 | 8 | prejudice, your sympathies can't enter into that decision. |
| 11:55:43 | 9 | Now we're all human.  We're going to have feelings like |
| 11:55:48 | 10 | that.  Feelings of vengence, of revenge, wanting to get back, |
| 11:55:53 | 11 | it's natural.  And that's why the Judge says that what happens |
| 11:55:59 | 12 | to Joseph after this case, regardless of your verdict, |
| 11:56:07 | 13 | regardless of it, it's not your concern.  Because I wish it was, |
| 11:56:11 | 14 | but it isn't.  You've got to follow the law.  And there's no |
| 11:56:16 | 15 | reason for anyone to think that he's -- that he's just going to |
| 11:56:21 | 16 | walk out of here and go home to Virginia.  But you know, when |
| 11:56:27 | 17 | people are deliberating, sometimes someone could say look, I |
| 11:56:38 | 18 | could not go home and tell people afterwards what I saw, but yet |
| 11:56:44 | 19 | I found the person not guilty.  And the Judge is going to say |
| 11:56:47 | 20 | well, you don't have to explain your verdict to anybody.  And |
| 11:56:54 | 21 | this is one of the cases that it's going to be real hard to do |
| 11:57:04 | 22 | the right thing.  To do the right thing.  It's going to be real |
| 11:57:11 | 23 | hard.  You know it and I know it.  And you know, there are |
| 11:57:17 | 24 | people that are going to say well, he didn't tell the police |
| 11:57:20 | 25 | this, he could have.  He should have. |

11:57:31  1          You know, I don't think he really seemed -- there was
11:57:34  2     something weird about him.  He was sort of very flat and
11:57:40  3     unemotional.  I don't think he's really sorry when he says it.
11:57:48  4     I don't think he was really afraid.  You know, one of the young
11:57:51  5     women said that sometimes when they get nervous or scared, they
11:57:57  6     laugh.  There's some people like Joseph who it's not something
11:58:04  7     they choose, their ability to connect in ways that you and I can
11:58:12  8     connect nonverbally, and to understand what they mean.  He
11:58:23  9     doesn't have that.  He said yes, yes, yes to everything that was
11:58:27 10     asked.  Except one time there was, I think, something that was
11:58:32 11     incorrect and he corrected it, and then prosecutor said okay,
11:58:42 12     yeah, you're right on that.  So judging him and the
11:58:51 13     reasonableness of some person in his situation, this is what --
11:58:58 14     when we talk about a reasonable person, we all know that things
11:59:03 15     are reasonable given the context in which they're in.
11:59:11 16          If somebody is highly allergic to a bee, getting stung
11:59:15 17     and they see a bee, they can run bursting through a room.  You
11:59:20 18     know, I would be not so much.  But they realize that that could
11:59:29 19     be death for them.  Were they acting unreasonable?  Is that what
11:59:33 20     a reasonable person would do?
11:59:44 21          It's so hard sometimes to do the right thing because
11:59:51 22     you may be afraid.  God, this person needs to be punished.  This
11:59:57 23     is horrible.  You know, I mean, probably shouldn't even say it,
12:00:01 24     in my neighborhood someone would have come beat the -- I mean,
12:00:05 25     you know, he wouldn't be walking real well.  I'm not saying

```
12:00:18  1    that's right, but in here, we have to do something more.  And
12:00:25  2    the reason why the horror, the parade of horribles was brought
12:00:30  3    out to you over and over again, even though we agreed to it,
12:00:34  4    even though we stipulated to all of that, why was a detail
12:00:38  5    presented to you like that?  Was it because they had to prove it
12:00:44  6    to you?  We agreed that it happened.  No one contested.  Why did
12:00:51  7    they have to show it and do all of that.  Really.  We agreed to
12:00:58  8    it.  To inflame you, and boy it did.  And it should.  All of it.
12:01:08  9         But what this case is about is about whether Joseph was
12:01:25 10    coerced.  Whether death or imminent harm was apparent.  And I'm
12:01:29 11    sure -- I only get to talk to you once, they're going to come up
12:01:33 12    and they're going to say well, how do they know it was just
12:01:37 13    going to happen?  It has to be really -- like a gun has to be at
12:01:42 14    your head.  But when you're talking about swatting, they don't
12:01:47 15    tell you it's coming and it doesn't have to be to your head.  Do
12:01:50 16    you think the people who have been swatted and the people who
12:01:55 17    have been killed said so oh golly, I had an inclination it's
12:01:58 18    going to happen.  No, it just happens.
12:02:11 19         In his mind, and in the mind of reasonable people,
12:02:17 20    given all that you know about the circumstances in here, he did
12:02:26 21    what he did out of fear and coercion.  And when he was
12:02:35 22    repeatedly asked you didn't do this, you didn't do this, what
12:02:40 23    did Joseph tell you?  I wish I had.  You're right.  I didn't do
12:02:52 24    it.  I wish I had.  Did he keep repeating over and over again
12:02:54 25    well, but you got to remember, the way my family has been
```

12:02:58  1    treated, the way things have been, no.  He didn't keep repeating

12:03:04  2    that over like he was somehow coached.  Joseph can't be coached.

12:03:15  3    He tells it what it is, very concrete, no emotion, just

12:03:25  4    straightforward.  And there was a reasonable fear that at any

12:03:30  5    moment, this could happen.  And did he play along?  Did he go

12:03:46  6    along?  Yes, he did.  The production counts, Counts 1, 2 and 3,

12:03:56  7    the production was clearly without a doubt because of the

12:04:01  8    intervention and the threats of the Irish guy.

12:04:06  9            And that's why it was so important that our

12:04:16  10   investigator found out when that MVLex3 was created because if

12:04:29  11   that was created after the contact with A.G., the young women

12:04:39  12   who lives in Texas, then she wasn't contacted by Joseph.  And

12:04:48  13   that is their whole hook, that they're trying to get you to say

12:04:52  14   oh, Irish guy doesn't mean anything.  Even if he was coerced he

12:04:54  15   was doing this before.  No, he wasn't.

12:04:59  16           And they want to say well, you know, he's also got some

12:05:03  17   -- you know, he also got other child pornography, he was looking

12:05:06  18   for other child pornography.  Yeah, it was on his phone, he was

12:05:13  19   doing it.  Didn't one of these young women send nudes of other

12:05:19  20   people, her friends so she didn't have to do that?  Didn't that

12:05:25  21   happen?  Didn't she say she went through all of her stuff and

12:05:32  22   rather than do it herself, she sent her friends to get it.  Sent

12:05:37  23   it out to them.  And it wasn't that big of a deal because they

12:05:43  24   had already been exposed before.  And in court she said well, I

12:05:48  25   called them in advance and they gave me permission.  Well,

| | | |
|---|---|---|
| 12:05:55 | 1 | Detective Bieber, Bieber actually, when he looked at and |
| 12:05:59 | 2 | reviewed the transcript, she never told them that before.  And |
| 12:06:03 | 3 | do you really think hi, how are you doing, you know, those nude |
| 12:06:07 | 4 | shots of you that you thought I got rid of, yeah, I got to use |
| 12:06:09 | 5 | them.  You got any problem with that?  No, and I'm just saying |
| 12:06:15 | 6 | that that's because she was ashamed and had to come up with an |
| 12:06:18 | 7 | explanation for it.  And I'm not necessarily faulting her for |
| 12:06:23 | 8 | that.  But that's an example of someone doing something to avoid |
| 12:06:30 | 9 | from having to continue and do more.  Trying to get child |
| 12:06:35 | 10 | pornography could be something that was in that Dropbox which we |
| 12:06:43 | 11 | know Mr. Johnstone had access to, that he could go in there and |
| 12:06:49 | 12 | get it.  Would be a way to maybe placate him to sort of back off |
| 12:06:51 | 13 | on all of this. |
| 12:07:05 | 14 | In so many ways this is the last time that I'm going to |
| 12:07:15 | 15 | get to talk to you.  If there ever was a jury who I was going to |
| 12:07:20 | 16 | be faced with the toughest decision, because to follow the law |
| 12:07:24 | 17 | means he's certainly not guilty of the production Counts 1, 2 |
| 12:07:34 | 18 | and 3, no doubt about it.  But that's a decision that you're |
| 12:07:37 | 19 | going to have to make and have the courage to make that decision |
| 12:07:46 | 20 | regarding Counts 1, 2 and 3.  That's going to be hard.  It would |
| 12:07:48 | 21 | be the correct verdict. |
| 12:07:59 | 22 | Fear, more than any other emotion, robs the mind of its |
| 12:08:08 | 23 | ability to reason and to act accordingly.  This guy said this in |
| 12:08:24 | 24 | actually 1890 to 1958.  But sometimes the wisdom that people say |
| 12:08:30 | 25 | doesn't change.  The first quote I showed you was, I don't know, |

| | |
|---|---|
| 12:08:39 | 1 |
| 12:08:44 | 2 |
| 12:09:00 | 3 |
| 12:09:10 | 4 |
| 12:09:13 | 5 |
| 12:09:22 | 6 |
| 12:09:29 | 7 |
| 12:09:40 | 8 |
| 12:09:58 | 9 |
| 12:10:01 | 10 |
| 12:10:15 | 11 |
| 12:10:26 | 12 |
| 12:10:42 | 13 |
| 12:10:43 | 14 |
| 12:11:04 | 15 |
| 12:11:08 | 16 |
| 12:11:14 | 17 |
| 12:11:19 | 18 |
| 12:11:26 | 19 |
| 12:11:33 | 20 |
| 12:11:34 | 21 |
| 12:11:40 | 22 |
| 12:11:43 | 23 |
| 12:11:46 | 24 |
| 12:11:51 | 25 |

back in 1600 or something.  Because humans haven't changed.  Our emotions haven't changed.  What becomes valuable and our identity certainly has.  You use reason and act accordingly. You'll understand that Joseph is certainly not guilty of Counts 1, 2 and 3 and that will be your verdict.

People have told me that, you know, sometimes when I talk to the jury, you know, I -- or when I'm in court, I get a little emotional.  Sometimes maybe sarcastic.  Maybe I do.  But we have someone's life at stake, and it's in our hands and we now give it over to you.  And the only thing we can ask is for you to follow all of the instructions.  I know you can and I hope you will.  But it's now in your hands.

THE COURT:  All right.  You have about 16 minutes left.

MS. ANTON:  Thank you, Judge.

You know, I agree with only one thing that the defense attorney got up here and told you.  He told you that what you saw was a parade of horribles.  And it was.  And it wasn't a parade which I willingly invited you to.  It was a parade which that Defendant masterminded and orchestrated.  A parade of abuse, a parade of extortion, a parade of sadomasochistic images with small children.

Now, the defense said that I brought and the Government brought all of this evidence into court, all of those binders and everything you've seen here in court this week just to inflame you.  That's not at all true.  The Government bears the

| | |
|---|---|
| 12:11:55 | 1 |
| 12:11:59 | 2 |
| 12:12:03 | 3 |
| 12:12:08 | 4 |
| 12:12:13 | 5 |
| 12:12:19 | 6 |
| 12:12:23 | 7 |
| 12:12:26 | 8 |
| 12:12:30 | 9 |
| 12:12:34 | 10 |
| 12:12:40 | 11 |
| 12:12:46 | 12 |
| 12:12:52 | 13 |
| 12:12:57 | 14 |
| 12:13:03 | 15 |
| 12:13:07 | 16 |
| 12:13:10 | 17 |
| 12:13:14 | 18 |
| 12:13:17 | 19 |
| 12:13:22 | 20 |
| 12:13:24 | 21 |
| 12:13:28 | 22 |
| 12:13:33 | 23 |
| 12:13:38 | 24 |
| 12:13:42 | 25 |

burden of proof.  The Judge has told you that.  We have to prove
this case beyond a reasonable doubt.  And the way you prove a
case is with evidence, and that's why you were shown all of
those exhibits and images.  And I submit to you when you go back
there, you'll see that entered into evidence were numerous CDs
of videos portraying degrading, sadomasochistic videos of these
girls that weren't all shown to you in court.  They weren't all
published.  They were put into evidence, but they were not
published and they were not published precisely because the goal
here is not to inflame you.  The goal here is for you to follow
the law and do what the judge instructs and not base your
decision on sympathy.  The Defendant is asking you for sympathy.
Do not base your verdict on punishment.  Your job here is not to
decide punishment, and it's not to be based on sympathy.  It's
to be based on the law.  We've all agreed to follow it.

          Defense counsel told you that you saw the Defendant
testify, and that he was very agreeable and he agreed with
everything that I said.  Is that what you saw?  Did you see
someone agreeing with everything that I said?  He corrected me
at times.  He told me I was wrong.  He wasn't agreeable, and he
wasn't agreeable with the police.  You heard that interview,
right?  He didn't just agree with them, he corrected them.  He
told them what they were getting wrong.  And in that interview,
he left out a huge amount of detail and he fed them wrong
information.  Now, that's important.  Why?  Because at that

12:13:45  1    moment in time, he locked himself into that statement and

12:13:49  2    because he said that and it was recorded and you all heard it,

12:13:54  3    he knew that he didn't have much wiggle room when he got on that

12:13:58  4    stand to create a different story.  So to some extent, he was

12:14:01  5    boxed in.  Okay.  This Defendant chose to purposefully

12:14:04  6    manipulate the police officers.

12:14:06  7         The police officers told you they have their

12:14:09  8    strategies, right?  When they go and talk to these subjects.

12:14:14  9    They sometimes employ strategies like hey, I don't think you're

12:14:18  10   the biggest, most horrible person in the world, and you did

12:14:22  11   some, you know, hinky stuff because they want the suspect to

12:14:25  12   talk to them.  Those are the same strategies the Defendant has

12:14:27  13   employed throughout this case and throughout the extortion of

12:14:31  14   these girls.  You saw him, he did what he had to do in order to

12:14:35  15   get those girls to give him what he wanted.

12:14:41  16        Now, the defense talk to you about swatting.  We're not

12:14:44  17   disputing swatting is a crime.  It is a violent crime.  So is

12:14:49  18   murder, so is rape, so is bank robbery.  A lot of things are a

12:14:52  19   crime.  Okay.  But just because something is a crime, it doesn't

12:14:57  20   mean that you should infer that the Defendant's unreasonable,

12:15:01  21   right, inference, that he would be swatted from one contact from

12:15:06  22   a stranger with an IP address is a justification or an excuse

12:15:10  23   for committing this crime.  Because that's what they're asking

12:15:11  24   you for.

12:15:14  25        The defense got up here and told you hey, my guy

12:15:17  1    admitted to everything.  Mr. Woodson he said he did it, Counts
12:15:21  2    1, 2, 3, 4, he did it, but he did it because he was forced.
12:15:26  3    Okay.  So when the defense says that now the burden shifts to
12:15:32  4    him to show by a preponderance of the evidence that that was
12:15:36  5    reasonable, because the law does allow some people to be excused
12:15:40  6    from committing crimes if there is, in fact, no reasonable
12:15:45  7    alternative for you to having had commit the crime.
12:15:54  8          The jury instructions that the Judge read to you,
12:15:56  9    defense counsel had up on the ELMO and I put up for you to see
12:16:00 10    also, it talks about an objective standard, not a subjective
12:16:03 11    standard.  And that's important for duress or coercion.  Because
12:16:07 12    the law doesn't contemplate what was in the mind of the accused.
12:16:12 13    Okay.  It's not what subjectively Joseph Woodson thought.  It's
12:16:16 14    not what subjectly Joseph Woodson, who played video games for
12:16:20 15    eight hours a day and lived in this virtual world of make
12:16:24 16    believe, it's not what he thought.  He told you he listened to
12:16:30 17    You Tube on swatting and he listened to it a lot and he became
12:16:32 18    concerned about it.  The law doesn't contemplate that because
12:16:35 19    think about it, use your common sense, right?  If the law did,
12:16:39 20    then couldn't anybody come forward and say well I thought, I
12:16:43 21    thought this was what was going to happen to me if I didn't rob
12:16:46 22    that bank?  I thought that telemarketer that sent me something
12:16:50 23    in my mailbox that said I know your address, I would like to
12:16:53 24    paint your house, I thought he could come and do something to
12:16:56 25    me, therefore I went and I robbed a bank or I did whatever.  It

12:16:58   1       doesn't work that way, right?  You don't get to just say oh,

12:17:02   2       this is what I thought and then therefore, there's no criminal

12:17:05   3       liability attached.  Read the instructions carefully and

12:17:10   4       honestly use your common sense.

12:17:14   5            And think about what the Defendant said when he was on

12:17:19   6       the stand.  I'm sorry, I'm sorry that I did this.  If I had to

12:17:25   7       do it again, I would do it differently.  What does that tell

12:17:30   8       you?  If he had to do it again, and there was actually a threat

12:17:36   9       and he actually had no choice but to commit these extortionary

12:17:40   10      crimes, then his testimony would have been if I had to do it

12:17:43   11      again, I would do it the exact same way because I didn't have an

12:17:46   12      option.  There was nothing else I could have done.  There were

12:17:49   13      no reasonable alternatives for me to do.  I had to do it this

12:17:52   14      way.  But he didn't say that, right?  He said that because

12:17:57   15      hindsight is 20/20.  He's sorry he got caught.  That's what he's

12:17:59   16      telling you.  I'm sorry I got caught.

12:18:11   17           And defense counsel talked to you about the victim you

12:18:15   18      heard from, E.M., who said that she sent the pictures of her

12:18:18   19      friend.  She told you she sent the pictures of her friend and

12:18:21   20      she told you she asked permission.  Now, what you heard is in

12:18:24   21      the interview that happened beforehand, she was never asked if

12:18:29   22      she had permission.  This whole case doesn't hinge upon whether

12:18:34   23      E.M. had permission to send out her friend's nude pictures that

12:18:38   24      had already been exposed.  E.M. is not on trial, right?  The

12:18:41   25      Defendant is on trial for committing a crime that spanned a long

12:18:45  1    period of time with seven victims charged in our indictment.

12:18:49  2    Right?  That's what we're here for.

12:19:00  3        When you start your deliberations, I submit to you that

12:19:03  4    in order to determine what was going on between the Defendant

12:19:07  5    and his co-conspirator, look to the chat messages.  Look to the

12:19:10  6    evidence in this case.  And what you'll see in that evidence is

12:19:15  7    nothing other than a shear partnership in crime.  All for one

12:19:18  8    and one for all.  Yes, there's a guy in Ireland.  We don't

12:19:21  9    dispute there's a guy in Ireland.  He is the target of an

12:19:25 10    investigation and you heard that.  The guy in Ireland is working

12:19:30 11    with the Defendant.  With the Defendant.  He's not extorting the

12:19:33 12    Defendant, he's not forcing the Defendant.  They're partners,

12:19:36 13    they're sharing the information.

12:19:38 14        Remember Dropbox, the Defendant, he's the administrator

12:19:43 15    of the Dropbox, he keeps everything.  The other guy only has the

12:19:46 16    rights to go in and look at it.  He can't make any changes to

12:19:50 17    it.  It's the Defendant's Dropbox account.  He also looked for

12:19:53 18    child pornography.  And why did we elicit that testimony?  That

12:19:54 19    in addition to all the child pornography that he was extorting

12:19:58 20    from these girls, he also went online and Google'd child

12:20:01 21    pornography.  That was child pornography that's already in

12:20:06 22    existence, right?  He got that and he saved it.  Why?  Because

12:20:11 23    he wants to satisfy his own perverse desires.  He likes

12:20:15 24    children.  He likes to look at those images.  He likes those

12:20:24 25    videos.  He lives in an altered universe.  He lives in a world

12:20:27  1    where he's with his headsets and his controllers and playing

12:20:31  2    games and he's concocted for himself some kind of reality where

12:20:35  3    this is acceptable.  That's not where we live.  We live here,

12:20:39  4    all of us, in the United States of America where we agree to

12:20:40  5    abide by the laws.

12:20:49  6         The last chat I'm going to talk to you about is one

12:20:53  7    that was received on the Defendant's phone.  Remember this chat?

12:20:57  8    From princess?  A series of text messages that came into the

12:21:01  9    Defendant's phone.  September 27th of 2018 when the Defendant

12:21:09  10   was arrested.  And what is princess asking the Defendant?

12:21:17  11   What's up man.  Are you still playing?  I tried to get back, but

12:21:20  12   Kik is dead for nudes and I don't know how else to get it that

12:21:27  13   fast.  The Defendant brought his gaming into this world, and he

12:21:31  14   made this exploitation of children part of his gaming fantasy.

12:21:36  15   He controlled these girls.  Behind the computer, he felt

12:21:40  16   empowered.  He worked at the burger place by day, but at night

12:21:44  17   he had some power behind that phone.  He could control them and

12:21:49  18   make them do what he wanted them to do.  He could be somebody

12:21:54  19   else.  But today, he's not somebody else.  That tape has been

12:21:58  20   ripped off that phone camera.  In front of you sits the man

12:22:03  21   behind that phone exposed.  He's not hiding anymore.  He's here

12:22:05  22   in this courtroom.

12:22:08  23        I submit to you that when you go back into that jury

12:22:12  24   room and you deliberate, and you look at the evidence in this

12:22:20  25   case and you follow the law, you are going to come back with the

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED BY COMPUTER

```
12:22:27   1    only just verdict -- one moment, Judge.
12:22:36   2           After you pick the foreperson, you're going to go back
12:22:39   3    and talk about the evidence in this case.  You'll have the jury
12:22:43   4    instructions with you, you'll have the indictment.  Mirror those
12:22:46   5    up together, see which victim is which, which applies to which
12:22:50   6    count, and then talk about the evidence in this case.  Unlike
12:22:52   7    the defense, I don't think this is going to be an extremely
12:22:56   8    difficult decision for you.  The evidence in this case is
12:23:01   9    overwhelming, it's significant, and it should tell you that the
12:23:04  10    Defendant committed this crime and there is no justification for
12:23:09  11    committing this crime.  When you do that, and you follow the
12:23:13  12    law, I'm confident that you guys will come to the only just
12:23:17  13    verdict in this case which is, as to Count 1 production of child
12:23:19  14    pornography, guilty.
12:23:24  15           As to Count 2, production of child pornography, guilty.
12:23:29  16           As to Count 3, production of child pornography, guilty.
12:23:32  17           As to Count 4, distributing child pornography and
12:23:36  18    sending it all over the place?  Guilty.
12:23:43  19           As to Count 5, sending extortionate threats through the
12:23:47  20    internet over and over and over again extorting these girls?
12:23:48  21    Guilty.
12:23:56  22           And as to Count 6, conspiring with the co-conspirator
12:24:03  23    in Ireland and others, you will find the Defendant is guilty.
12:24:06  24           Thank you very much.
12:24:15  25           THE COURT:  All right, ladies and gentlemen.  As I told
```

12:24:18   1   you before, you're now to go back to the jury room and find and

12:24:23   2   vote one of your members to be the foreperson and take the

12:24:26   3   verdict form with you.  When you've all agreed on the verdict,

12:24:29   4   the foreperson must fill in the form, date it and carry it and

12:24:33   5   then you will return to the courtroom.  Very important.  If you

12:24:36   6   want to communicate with me, don't talk.  Don't open the door

12:24:40   7   and tell the court security officer.  Wanda will give you a form

12:24:46   8   that will have, you know, different things on it that you can

12:24:50   9   check off, but basically you can just write in there what you

12:24:51   10  need and send it to me.

12:24:57   11          Now, Arturo Garcia and Rodney Joseph, you are the

12:25:01   12  alternates in the case.  So you need to go into the jury room

12:25:04   13  and get whatever you have in there that is yours and then go on

12:25:08   14  into my chambers so I can personally thank you for your service,

12:25:11   15  and we'll talk when we're in there.  And then as soon as you've

12:25:15   16  cleared the jury room, I will let the jury go into the jury room

12:25:19   17  to begin their deliberations.  You should have a sandwich in

12:25:22   18  there.  If you don't, they should be here shortly.  Are the

12:25:26   19  sandwiches -- not yet.  Okay.  By the time we finish talking in

12:25:29   20  my office, I hope they're back and if so, you can take them

12:25:29   21  home.  All right?

12:25:33   22          So please go on into the jury room, pick up all of your

12:25:38   23  stuff and move on.  Yes.  Please.

12:25:41   24          COURT SECURITY OFFICER:  All rise.

12:25:43   25          THE COURT:  Not yet.  Wait until they've cleared the

12:25:44  1    jury room.

12:25:49  2              (Alternate jurors excused)

12:26:06  3              THE COURT:  Can you please hold on to that until the

12:26:09  4    jury room is cleared and then you can hand it to the first

12:26:12  5    person.  We're not electing a foreperson by handing you that,

12:26:16  6    we're just handing it to just put it on the end, one of them

12:26:20  7    will pick it up.  There are the jury instructions, the

12:26:26  8    indictment and the verdict form.  We need to just wait and make

12:26:30  9    sure we know when they're done.

12:26:36  10             I'll thank you all afterward, but I do want to thank

12:26:42  11   you in advance for your service to the community.  It's never

12:26:45  12   pleasant to do jury duty, it takes you out of your busy day but

12:26:49  13   it's important.  It's important that we have people that are

12:26:52  14   willing to do it and we thank you for it.

12:27:02  15             Clear?  Please adjourn to the jury room.

12:27:09  16             (Jury out at 12:27 p.m.)

12:27:17  17             THE COURT:  Grab the papers when you go by.

12:27:32  18             We'll be in attendance on the jury.  I need you all to

12:27:37  19   stay here for half an hour anyway.  And then we'll need you to

12:27:41  20   give your cellphone numbers to Wanda so we can reach you so you

12:27:44  21   can be here -- don't go anywhere that it's going to take you

12:27:48  22   more than 15 minutes to get back.  Okay?

12:27:51  23             (Brief recess)

13:53:57  24             THE COURT:  Everyone present?

13:54:00  25             MS. ANTON:  Yes, Your Honor.

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED BY COMPUTER

| | | |
|---|---|---|
| 13:54:01 | 1 | MS. WEISS:  Yes, Your Honor. |
| 13:54:03 | 2 | THE COURT:  All right.  Any reason -- all right.  Go |
| 13:54:13 | 3 | back on the record.  We received a note from the jury, I've |
| 13:54:16 | 4 | given you each a copy.  Is there any reason we should not get |
| 13:54:19 | 5 | the verdict?  And receive it? |
| 13:54:19 | 6 | MR. NATALE:  No, Your Honor. |
| 13:54:20 | 7 | MS. ANTON:  No. |
| 13:54:22 | 8 | THE COURT:  Okay.  Please bring in the jury. |
| 13:54:26 | 9 | COURT SECURITY OFFICER:  All rise for the jury. |
| 13:54:28 | 10 | (Jury in at 1:54 p.m.) |
| 13:55:44 | 11 | THE COURT:  Be seated please. |
| 13:55:46 | 12 | Mr. Harvey, it's my understanding you've reached a |
| 13:55:49 | 13 | verdict; is that correct? |
| 13:55:52 | 14 | JUROR: Yes, Your Honor. |
| 13:55:53 | 15 | THE COURT:  All right.  Please hand it to the court |
| 13:56:03 | 16 | security officer.  Thank you. |
| 13:56:15 | 17 | Madame courtroom deputy, please publish the verdict. |
| 13:56:25 | 18 | COURTROOM DEPUTY:  Verdict.  We, the jury, unanimously |
| 13:56:28 | 19 | find the Defendant, Joseph Isaiah Woodson, Junior, as to Count 1 |
| 13:56:31 | 20 | of the indictment, guilty. |
| 13:56:36 | 21 | We, the jury, unanimously find the Defendant, Joseph |
| 13:56:40 | 22 | Isaiah Woodson, Junior, as to Count 2 of the indictment, guilty. |
| 13:56:45 | 23 | We, the jury, unanimously find the Defendant, Joseph |
| 13:56:50 | 24 | Isaiah Woodson, Junior, as to Count 3 of the indictment, guilty. |
| 13:56:53 | 25 | We, the jury, unanimously find the Defendant, Joseph |

| | | |
|---|---|---|
| 13:56:59 | 1 | Isaiah Woodson, Junior, as to Count 4 of the indictment, guilty. |
| 13:57:02 | 2 | We, the jury, unanimously find the Defendant, Joseph |
| 13:57:08 | 3 | Isaiah Woodson, Junior, as to Count 5 of the indictment, guilty. |
| 13:57:12 | 4 | We, the jury, unanimously, find the Defendant, Joseph |
| 13:57:17 | 5 | Isaiah Woodson, Junior, as to Count 6 of the indictment, guilty. |
| 13:57:20 | 6 | So say we all, signed and dated at the United States |
| 13:57:26 | 7 | Courthouse, Miami, Florida, this 27th day of September, 2019, |
| 13:57:30 | 8 | Kerry Harvey, foreperson. |
| 13:57:30 | 9 | THE COURT:  All right. |
| 13:57:38 | 10 | Madame courtroom deputy, please poll the jury |
| 13:57:41 | 11 | COURTROOM DEPUTY:  Ladies and gentlemen of the jury, as |
| 13:57:44 | 12 | I call your name, please answer this question yes or no. |
| 13:57:48 | 13 | Rafael Cavalcante, is the verdict as read your verdict? |
| 13:57:51 | 14 | JUROR: Yes. |
| 13:57:52 | 15 | COURTROOM DEPUTY:  Mayda Greer, is the verdict as read |
| 13:57:53 | 16 | your verdict? |
| 13:57:55 | 17 | JUROR: Yes. |
| 13:57:58 | 18 | COURTROOM DEPUTY:  Itsa Osejo, is the verdict as read |
| 13:57:58 | 19 | your verdict? |
| 13:58:00 | 20 | JUROR: Yes. |
| 13:58:02 | 21 | COURTROOM DEPUTY:  Katie Campos, is the verdict as read |
| 13:58:02 | 22 | your verdict? |
| 13:58:04 | 23 | JUROR: Yes. |
| 13:58:05 | 24 | COURTROOM DEPUTY:  Anne Marie Powers, is the verdict as |
| 13:58:06 | 25 | read your verdict? |

```
13:58:08   1              JUROR: Yes.

13:58:11   2              COURTROOM DEPUTY:  Dexter Wooten is the verdict as read

13:58:11   3      your verdict?

13:58:14   4              JUROR: Yes.

13:58:15   5              COURTROOM DEPUTY:  Kerry Harvey, is the verdict as read

13:58:15   6      your verdict?

13:58:17   7              JUROR: Yes.

13:58:19   8              COURTROOM DEPUTY:  Manuel Prieguez, is the verdict as

13:58:19   9      read your verdict?

13:58:24  10              JUROR:  Yes.

13:58:27  11              COURTROOM DEPUTY:  Jennifer Taylor-Rolle, is the

13:58:27  12      verdict as read your verdict?

13:58:29  13              JUROR: Yes.

13:58:31  14              COURTROOM DEPUTY:  Phillip Aman, is the verdict as read

13:58:31  15      your verdict?

13:58:32  16              JUROR: Yes.

13:58:33  17              COURTROOM DEPUTY:  Pierre Gonzalez, is the verdict as

13:58:34  18      read your verdict?

13:58:37  19              JUROR: Yes.

13:58:39  20              COURTROOM DEPUTY:  Ariel Ramirez, is the verdict as

13:58:39  21      read your verdict?

13:58:42  22              JUROR: Yes.

13:58:44  23              COURTROOM DEPUTY:  The jurors ascede in the verdict,

13:58:44  24      Your Honor.

13:58:46  25              THE COURT:  All right.  I want to thank you very much
```

13:58:49   1    for your service.  If you'll go into the jury room, I will be in

13:58:52   2    there within two minutes to personally thank you.  Please wait

13:58:56   3    for me, I'll be in.

13:58:59   4                COURT SECURITY OFFICER:  All rise for the jury.

13:59:18   5                (Jury excused at 1:59 p.m.)

13:59:30   6                THE COURT:  Joseph Isaiah Woodson, Junior, a jury of

13:59:34   7    your peers having found you guilty of Counts 1 through 6 of the

13:59:39   8    superseding indictment pending against you, I hereby adjudicate

13:59:44   9    you guilty of Counts 1, 2, 3, 4, 5 and 6.

13:59:47   10               A written presentence report will be prepared by the

13:59:50   11   Probation Office to assist me in sentencing you.  You will be

13:59:52   12   asked to give information for the report and your attorney may

13:59:55   13   be present if you so desire.  I will permit you and your counsel

13:59:59   14   to read the presentence report before the sentencing hearing

14:00:03   15   which I'm hereby scheduling for Monday, December 2, 2019 at 1:30

14:00:04   16   p.m. in this courtroom.

14:00:08   17               I advise counsel to comply with administrative orders

14:00:11   18   regarding implementation of sentencing procedures, particularly

14:00:15   19   time periods within those orders.

14:00:17   20               Any requests for educational opportunities, medical

14:00:20   21   care, drug treatment, et cetera, should be included in the

14:00:23   22   Defendant's PSI statement.  If those requests are not done

14:00:27   23   before the time of the sentencing, I will not consider them if

14:00:29   24   they're brought up for the first time at the time of sentencing.

14:00:32   25               We'll be in recess.  Is there anything else we need to

```
14:00:34    1    deal with right now?

14:00:34    2            MS. VIAMONTES:  No, Your Honor.

14:00:36    3            MS. MOLLISON:  No, Your Honor.

14:00:39    4            MR. NATALE:  We have to sign the receipt for the

14:00:40    5    exhibits?

14:00:46    6            COURTROOM DEPUTY:  No, I have to take them downstairs.

14:00:49    7            THE COURT:  All right.  We'll be in recess.  Thank you

14:00:52    8    all for a very nice, clean trial.

14:00:52    9            (PROCEEDINGS CONCLUDED)

14:00:52   10                    C E R T I F I C A T E
                 I certify that the foregoing is a correct transcript from the
14:00:52   11    record of proceedings in the above-entitled matter.

14:00:52   12    _____        /s/ Dawn M. Savino
                 Date                    DAWN M. SAVINO, RPR
14:00:52   13

14:00:52   14

           15

           16

           17

           18

           19

           20

           21

           22

           23

           24

           25
```

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED BY COMPUTER