<pre>
14:12:03   1              UNITED STATES DISTRICT COURT
                          SOUTHERN DISTRICT OF FLORIDA
14:12:03   2                     MIAMI DIVISION
                          CASE NO.  18-60256-CR-JEM
14:12:03   3


14:12:03   4

           5    UNITED STATES OF AMERICA,
14:12:03
                              Plaintiff,
14:12:03   6

14:12:03   7         vs.

                                                  Miami, Florida
14:12:03   8                                      January 23, 2020
                JOSEPH ISAIAH WOODSON, JR.,       Pages 1-64
14:12:03   9
                              Defendant.
14:12:03  10    _____

14:12:03  11              TRANSCRIPT OF SENTENCING HEARING
                     BEFORE THE HONORABLE JOSE E. MARTINEZ
14:12:03  12               UNITED STATES DISTRICT JUDGE

14:12:03  13

14:12:03  14    APPEARANCES:

14:12:03  15    FOR THE PLAINTIFF:          United States Attorney's Office
                                            BY:  JODI ANTON,  A.U.S.A.
14:12:03  16                                BY:  FRANCIS VIAMONTES, A.U.S.A.
                                            500 East Broward Boulevard
14:12:03  17                                Suite 700
                                            Fort Lauderdale, Florida 33394
14:12:03  18
                FOR THE DEFENDANT:          Federal Public Defender's Office
14:12:03  19                                BY:  KATHLEEN E. MOLLISON, A.F.P.D.
14:12:03  20                                BY:  ELIZABETH BLAIR, A.F.P.D.
                                            150 West Flagler Street
14:12:03  21                                Suite 1700
                                            Miami, Florida 33130
14:12:03  22
                REPORTED BY:                DAWN M. SAVINO, RPR
14:12:03  23                                Official Court Stenographer
                                            400 N. Miami Avenue, 10S03
14:12:03  24                                Miami, Florida  33128
                                            Telephone:  305-523-5598
14:12:03  25

          26
</pre>

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED BY COMPUTER

|            |    |                                                        |
|------------|----|--------------------------------------------------------|
| 14:12:03   | 1  | P-R-O-C-E-E-D-I-N-G-S                                  |
| 14:14:16   | 2  | THE COURT:  Be seated please.                          |
| 14:14:22   | 3  | COURTROOM DEPUTY:  Case number 18-60256, United States |
| 14:14:25   | 4  | of America versus Joseph Isaiah Woodson.               |
| 14:14:30   | 5  | Counsel, please state your name for the record starting|
| 14:14:31   | 6  | with the Government.                                    |
| 14:14:35   | 7  | MS. ANTON:  Good afternoon, Your Honor.  Jodi Anton on |
| 14:14:36   | 8  | behalf of the United States.                           |
| 14:14:38   | 9  | THE COURT:  Ms. Anton.                                  |
| 14:14:38   | 10 | MS. VIAMONTES:  Good afternoon, Your Honor.  Francis   |
| 14:14:41   | 11 | Viamontes on behalf of the United States of America, and sitting |
| 14:14:46   | 12 | at counsel table are the two case agents on the case, Adam |
| 14:14:51   | 13 | Granit, Lee Bieber, and seated next to me is Dr. Michael Brannon |
| 14:14:55   | 14 | which will be assisting me, with the Court's permission, in |
| 14:14:58   | 15 | preparing my cross-examination of the defense witness, and we |
| 14:15:00   | 16 | may call him as a rebuttal witness.                    |
| 14:15:00   | 17 | THE COURT:  All right.                                 |
| 14:15:03   | 18 | MS. VIAMONTES:  Thank you.                             |
| 14:15:05   | 19 | THE COURT:  Good afternoon, Your Honor.  Kate Mollison |
| 14:15:09   | 20 | and Elizabeth Blair, Assistant Federal Public Defenders on |
| 14:15:11   | 21 | behalf of Mr. Joseph Woodson, who is present before the Court. |
| 14:15:12   | 22 | THE COURT:  Good afternoon, ladies.  All right.  We're |
| 14:15:13   | 23 | here on the sentencing.                                |
| 14:15:16   | 24 | Can I get an appearance from Probation.                |
| 14:15:17   | 25 | PROBATION OFFICER:  Good afternoon, Your Honor.        |

14:15:20  1   Danielle Sylvester-Pierre on behalf of US Probation.

14:15:22  2         THE COURT:  All right.  We're here on the sentencing on

14:15:27  3   Mr. Woodson.  I've reviewed the presentence investigation, the

14:15:30  4   jury verdict and the Government's sentencing memorandum, and I

14:15:35  5   remember the case quite well.  I'm ready to proceed at this

14:15:36  6   time.

14:15:39  7         I'll be happy to hear from both sides as to what your

14:15:43  8   position is.  I've read the Government's position and I'll be

14:15:50  9   happy to hear from you.  Go.  You can rest on it, but I just

14:15:52  10  want to give you the opportunity to articulate.

14:15:56  11        MS. ANTON:  No, no.  I appreciate that, Judge.  I would

14:15:59  12  like to advocate in this case, Judge, for a sentence at the

14:16:04  13  upper end of the guideline range.  As I indicated in my

14:16:05  14  sentencing memorandum which the Government understands is

14:16:09  15  probably tantamount to a life sentence for this Defendant.

14:16:11  16        THE COURT:  I would think anything over 40 years would

14:16:12  17  be, probably.

14:16:14  18        MS. ANTON:  I would probably agree with you.  The

14:16:21  19  Defendant is 30 years old.  The Government's position is that

14:16:26  20  the statutory maximum sentence on each of the three counts of

14:16:29  21  production of child pornography is 30 years.  Your Honor heard

14:16:33  22  from seven children who testified in this case.  Three of them

14:16:40  23  were the victims of the child pornography production charges and

14:16:43  24  because of that, the Government, on behalf of the victims, would

14:16:47  25  also ask the Court that you impose at least the statutory

14:16:52  1   maximum, which would be 90 years in this case, so that the

14:16:55  2   victims can see the benefit of the full effect of the law as it

14:16:58  3   relates to the conduct that the Defendant committed.

14:17:01  4          As I mentioned in my sentencing memorandum, this is not

14:17:06  5   just a case of mere possession, or a single production case of

14:17:10  6   child pornography.  Your Honor sat through the entire trial and

14:17:13  7   recalls undoubtedly the painstaking testimony of all of these

14:17:18  8   children who were victimized some over a period of years by the

14:17:22  9   Defendant.  Repeatedly they were tormented, their images were

14:17:27  10  not only created because of his exploitation, but they were

14:17:31  11  oftentimes disseminated.  And they weren't just disseminated to

14:17:35  12  like-minded pedophiles, which is bad in and of itself, but they

14:17:39  13  were disseminated oftentimes to their entire contact list which

14:17:42  14  was their schools.  These girls were in middle school and the

14:17:46  15  beginning of high school, and it damaged their reputation, it

14:17:49  16  damaged them emotionally.  One of the children, as Your Honor

14:17:53  17  recalls, testified via closed circuit TV because she couldn't

14:17:56  18  confront the Defendant in court.  Several of these children

14:18:01  19  attempted suicide.  All of these children had anxiety and have

14:18:07  20  been tormented emotionally based upon the Defendant's conduct.

14:18:11  21         You heard the Defendant's testimony in trial, and he

14:18:14  22  put forth a defense of I did it, but I was forced to do it,

14:18:20  23  which the jury disregarded.  He indicated on his direct

14:18:23  24  testimony that yeah, you know, I felt bad for causing them

14:18:29  25  misery, but he got good at doing it after about a year and it

14:18:32  1    became second nature, and he did it because he wanted to do it,

14:18:35  2    not because he was forced.  He had a collection of child

14:18:39  3    pornography that consisted of known images of child pornography

14:18:42  4    that were not done at the behest of the imaginary co-conspirator

14:18:46  5    that was forcing him to do it; they were done because he went

14:18:49  6    out and sought images of child pornography.

14:18:51  7         You heard throughout the trial how he systemically and

14:18:55  8    categorically saved those images of the children.  He saved them

14:18:58  9    in file folders, he saved them by name and he organized his

14:19:02  10   collection because this was something that was important to him.

14:19:05  11        Additionally, I think it was quite clear throughout the

14:19:08  12   course of the trial that this became a game to the Defendant.

14:19:11  13   There were text messages entered into evidence that illustrated

14:19:16  14   the Defendant and co-conspirators, some who were unknown and

14:19:20  15   another who we know is in Ireland, indicating they got more

14:19:24  16   satisfaction in seeing who could control which of the girls and

14:19:27  17   what they could get the girls to do.  And it seemed to be that

14:19:30  18   you would quote, unquote, win if you could get to the point

14:19:33  19   where you could control the girls to the point that they would

14:19:35  20   do anything.

14:19:39  21        You did hear that some of these girls were given the

14:19:43  22   unfortunate choice of molesting a sibling or urinating into a

14:19:47  23   glass and then drinking it on video while nude for the

14:19:50  24   Defendant.  These were horrific choices that amounted to no

14:19:54  25   choice at all, and something that these girls will live with

14:19:58   1   forever.  Those images are out there, they're on the internet
14:20:01   2   and I can't do anything, the Government can't do anything to get
14:20:04   3   them back.  We will track them and monitor them and we will
14:20:05   4   offer them services.
14:20:09   5          Some of the victims are present here in court today.
14:20:13   6   Victim B.F. is present in court, along with her mother, as well
14:20:18   7   as victim A.K., and I believe some of them will wish to speak
14:20:23   8   with Your Honor to let you know how it has impacted them.
14:20:28   9   Others have written letters and victim impact statements that I
14:20:31  10   would ask the Court for permission to read, I suppose, once the
14:20:34  11   defense has concluded their argument.
14:20:38  12          But in sum, the Government's position is that this was
14:20:42  13   a premeditated and diabolical act of sexual abuse that persisted
14:20:46  14   for years, and the Defendant preyed upon the most vulnerable
14:20:50  15   people on our society, the ones that deserve the very most
14:20:52  16   protection.  And the Government's position is that this
14:20:58  17   Defendant deserves a very high sentence commensurate with the
14:21:00  18   crimes he committed.
14:21:03  19          THE COURT:  All right.  Ms. Mollison?
14:21:05  20          MS. MOLLISON:  Yes, Your Honor.  We have Dr. Heather
14:21:08  21   Holmes here, and we would like to ask if she might be able to
14:21:11  22   testify before our argument because we'll be referencing --
14:21:17  23          THE COURT:  Sure.  Have her come forward please.  Watch
14:21:22  24   your step there.  There is a little ramp there, we have not
14:21:25  25   figured it out what it's for, but I've only been here ten years.

| | | |
|---|---|---|
| 14:21:27 | 1 | Some day I'll figure it out. |
| 14:21:34 | 2 | Please remain standing and raise your right hand. |
| 14:21:34 | 3 | HEATHER HOLMES, DEFENSE WITNESS, SWORN. |
| 14:21:37 | 4 | THE COURT:  Please be seated.  Get as close to the |
| 14:21:40 | 5 | microphone as you can, speak loudly, tell your us your name and |
| 14:21:42 | 6 | spell it please. |
| 14:21:44 | 7 | THE WITNESS:  So the first name is Heather, |
| 14:21:54 | 8 | H-E-A-T-H-E-R; last name Holmes, H-O-L-M as in Mary, E, S as in |
| 14:21:54 | 9 | Sam. |
| 14:21:56 | 10 | THE COURT:  You may proceed. |
| 14:21:57 | 11 | MS. BLAIR:  Thank you, Your Honor.  I have a copy of |
| 14:22:00 | 12 | Dr. Holmes' CV that I sent over to the Government.  Would you |
| 14:22:01 | 13 | like a copy? |
| 14:22:03 | 14 | THE COURT:  I don't think I need it. |
| 14:22:03 | 15 | DIRECT EXAMINATION |
| 14:22:03 | 16 | BY MS. BLAIR: |
| 14:22:04 | 17 | Q.  Good afternoon, Dr. Holmes. |
| 14:22:05 | 18 | A.  Good afternoon. |
| 14:22:08 | 19 | Q.  Can you tell the Court a little bit about your education and |
| 14:22:08 | 20 | experience? |
| 14:22:12 | 21 | A.  Sure.  I was born and raised down here.  I then attended |
| 14:22:15 | 22 | Marshall University in Huntington, West Virginia where I |
| 14:22:19 | 23 | graduated with a degree in English, writing and psychology.  I |
| 14:22:24 | 24 | then got my master's degree from Loyola College in Maryland in |
| 14:22:28 | 25 | psychology, and completed my doctoral program from George |

14:22:31  1    Washington University, that was in psychology as well.

14:22:35  2         Part and parcel to that is a one-year doctoral

14:22:40  3    internship which I did as a psychologist with the Florida

14:22:43  4    Department of Corrections.  That consisted of evaluation of

14:22:47  5    various levels of mental health functioning in terms of inmates.

14:22:52  6    And also, I conducted and ran sex offender treatment groups

14:22:54  7    while in the Department of Corrections in Florida.

14:22:58  8         Since that time, I have been working in private

14:23:02  9    practice either doing therapy and treatment or forensic

14:23:10  10   evaluations for pre-adjudicated individuals, as well as for

14:23:10  11   appellate reasons.

14:23:13  12   Q.  In your experience, have you been qualified as an expert in

14:23:14  13   court before?

14:23:14  14   A.  Yes.

14:23:17  15   Q.  And what courts are those?

14:23:19  16   A.  Several counties in Florida, as well as the Middle District

14:23:22  17   of Florida and the Southern District of Florida.  I think it's

14:23:25  18   probably been close to ten years since I was in this courtroom,

14:23:30  19   but -- so pretty much throughout Florida.  I've done work in

14:23:32  20   Washington, D.C. and New York, but I've never had to testify

14:23:33  21   there.

14:23:36  22   Q.  In what capacity were you qualified as an expert?

14:23:40  23   A.  I've been qualified under general forensic psychology and

14:23:44  24   also as an expert in sexual offenders.  Evaluation, not

14:23:46  25   treatment.  Let me be clear.

14:23:48  1    Q.  In this case, were you hired to do an evaluation of Mr.
14:23:48  2    Woodson?
14:23:49  3    A.  Yes.
14:23:50  4    Q.  And where did you meet with Mr. Woodson?
14:23:55  5    A.  I met him December 4, 2019 at the Federal Detention Center
14:23:57  6    here in Miami.
14:24:00  7    Q.  Did you meet him on a second occasion, I believe?
14:24:02  8    A.  I did.  And it was --
14:24:04  9    Q.  If you don't have the date, that's fine.
14:24:07  10   A.  I'm sorry.  I don't have it in front of me.  It was roughly
14:24:08  11   a week.
14:24:09  12        THE COURT:  Can you pull the microphones in front of
14:24:11  13   you so that we're --
14:24:12  14        MS. BLAIR:  Is this better?
14:24:13  15        THE COURT:  Much better.  There's another one you can
14:24:18  16   pull over too.  Isn't there two?  I've got more microphones than
14:24:23  17   porcupines got quills, and people still manage to speak around
14:24:25  18   them.  Go ahead.  Much better.
14:24:25  19        BY MS. BLAIR:
14:24:28  20   Q.  After you had a chance to meet with Mr. Woodson, did you
14:24:30  21   determine a diagnosis?
14:24:34  22   A.  Well, he told me he had been previously diagnosed and it was
14:24:39  23   very commensurate with my experience in just interviewing him.
14:24:44  24   And he had been diagnosed when he was six years old with mild
14:24:45  25   autism.

14:24:48  1    Q.  And was there evidence of this prior diagnosis that you were

14:24:49  2    able to see?

14:24:53  3    A.  Yes, so there was records provided, and there was also an

14:24:55  4    interview with his mom.

14:24:59  5    Q.  In situations where those are diagnosed with autism, is it

14:25:03  6    unusual to see more than one family member diagnosed?

14:25:07  7    A.  I mean, so very recently it was determined that something

14:25:12  8    goes on in utero.  So whether it's considered a genetic

14:25:15  9    predisposition or not, I really can't say.  But there is

14:25:19  10   research that talks about how there are typically, if one child

14:25:23  11   has it, there's a higher risk for the other children in that

14:25:26  12   sibling set to have it as well.

14:25:29  13   Q.  Can you explain to the Court more generally about autism?

14:25:34  14   A.  So like anything, and if you compare it to cancer, you can

14:25:39  15   -- it's on a continuum.  It's not, you know, a box you check.

14:25:43  16   So you can have stage one breast cancer or stage four breast

14:25:47  17   cancer.  It's both breast cancer, but there's a continuum and

14:25:50  18   there is a difference between those two individuals as to how

14:25:52  19   you would go about treating them.

14:25:57  20          So autism is very much the same.  That one -- when Mr.

14:25:59  21   Woodson would have been diagnosed, there was a standalone

14:26:01  22   diagnosis called Asperger's, which would be, you know, a very

14:26:06  23   mild, more functional form of autism.  And then autism was mild,

14:26:11  24   moderate and severe.  So a severely autistic person would have

14:26:18  25   difficulty being -- likely be incontinent.  Sometimes they have

14:26:22   1    no ability to speak.  You know, so that's on the very severe.

14:26:29   2    On the mild end of it, which was Asperger's, they just really

14:26:31   3    have problems with -- it's not cognitive at all, has nothing to

14:26:35   4    do with their IQ, it really has to do with your emotional

14:26:42   5    reciprocity and noticing social cues and emotions in others.

14:26:46   6    And so really, this is difficulty with connection.  They tend to

14:26:51   7    have to tend to have other symptoms such as they perseverate on

14:26:54   8    a particular subject, and that's the subject that they have

14:26:57   9    interest in and nothing else.  So really, it is a disconnect in

14:27:05   10   emotion, in feeling things.  They have less of a reaction to

14:27:11   11   things that might be either invoking joy from someone without

14:27:16   12   this disorder, or invoking pain and disgust.  They just don't

14:27:20   13   really connect well emotionally, and that's something, again,

14:27:23   14   that they're born with, as opposed to, like, antisocial

14:27:26   15   personality disorder which is developed.

14:27:28   16   Q.  After spending time with Mr. Woodson, where do you believe

14:27:30   17   he falls on that spectrum of autism?

14:27:33   18   A.  So I understand that back then, he was diagnosed as mild.

14:27:39   19   Now, it's more towards moderate simply because we've also housed

14:27:45   20   Asperger's in.  He was diagnosed at six, which is the first time

14:27:50   21   he went to school.  He had no contact with, you know, counseling

14:27:56   22   or preschool or daycare or anything.  Not even kindergarten.  So

14:28:00   23   he also is part of a sibling set where there's six of them.

14:28:05   24   He's the oldest, and two of his siblings are institutionalized.

14:28:10   25   They are nonverbal, both incontinent.  And he also has another

14:28:14   1   sibling that is somewhere on this autism spectrum that resides

14:28:16   2   as home at home.

14:28:20   3   Q.  Did we speak about how Mr. Woodson presented in court during

14:28:20   4   trial?

14:28:21   5   A.  Yes.

14:28:25   6   Q.  And you were able to observe Mr. Woodson when you met with

14:28:25   7   him?

14:28:26   8   A.  Yes.

14:28:28   9   Q.  Would you say that his emotional presentation with you was

14:28:31  10   similar to how I described him presenting in court?

14:28:34  11   A.  Yes.

14:28:37  12   Q.  And can you describe more thoroughly some of that emotional

14:28:40  13   presentation, or lack thereof?

14:28:44  14   A.  It's not unusual, individuals tend to coming across as

14:28:51  15   robotic.  And in part, they are not experiencing emotions to the

14:28:55  16   fullest and in not really connecting well with others, they're

14:28:58  17   very flat in their presentation emotionally.  So they come

14:29:03  18   across as, like I said, very robotic.  And he was very similar

14:29:07  19   with me, and that's not the word you used, but when I asked what

14:29:10  20   his presentation was, that's, you know, the description.  And

14:29:13  21   that's pretty typical for this population, particularly if

14:29:16  22   there's been no intervention.

14:29:19  23   Q.  We've discussed that Mr. Woodson, prior to his

14:29:25  24   incarceration, was working at a burger restaurant.  How would

14:29:28  25   someone with this level of autism be able to hold down that

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED BY COMPUTER

14:29:29  1   employment?

14:29:32  2   A.  So it doesn't affect, really, cognition.  They come across

14:29:37  3   as extremely socially awkward.  You know, the other jobs that

14:29:42  4   he's had are also kind of lower level, you know, more minimum

14:29:48  5   wage, not high job skilled.  So long as you are not insulting

14:29:52  6   people or violent or, you know, he was high functioning enough

14:29:58  7   on the continuum to where he could hold down simple employment

14:30:00  8   and can be taught to do certain things.

14:30:04  9   Q.  Did you see any evidence of him being able to do other high

14:30:09  10  functioning things like lease an apartment or pay his own bills

14:30:10  11  or anything like that?

14:30:14  12  A.  No.  From my understanding, his paychecks went to his mom.

14:30:18  13  He would navigate the bus sometimes to get to work or he would

14:30:22  14  walk.  He always has lived at home.  There's never been a time

14:30:26  15  when he's gone out on his own.  There's been, other than

14:30:32  16  employment, very little social interaction.  There's no friends

14:30:35  17  at the house.  He would online video game and that was the

14:30:40  18  totality of his social foray or foray into social activities.

14:30:43  19  So in terms of functionality, I don't know that he would have

14:30:48  20  the skills.  Whether he could be taught or not down the road,

14:30:53  21  I'm not sure.  But at the time and up until this time,

14:30:58  22  everything was taken care of by his mom; food, grocery shopping,

14:30:59  23  everything.

14:31:02  24  Q.  You spoke a bit about treatment.  What would be the role of

14:31:04  25  early intervention with someone who has autism?

14:31:07  1    A.  So unfortunately, his mom did not take him to school until

14:31:12  2    he was six years old.  With individuals that have developmental

14:31:16  3    disorders, early intervention is key and be it speech disorders

14:31:21  4    and delays, you know, problems with fine motor skills that

14:31:25  5    require occupational therapy, gross motor skills that require

14:31:27  6    physical therapy, anything that is developmental, the earlier

14:31:31  7    you can get the intervention, the better they do.  Again, we

14:31:35  8    can't get out of the category of having autism, but you can push

14:31:38  9    somebody into a more functional level with early intervention.

14:31:41  10            Unfortunately, he went to school for the first time at

14:31:45  11    six, so that whole preschool intervention time was lost.  He was

14:31:50  12    diagnosed, was placed in special ed, but the only services he

14:31:53  13    received were through school and what was available there.  So

14:31:56  14    most of the programs, if you're not meeting the criteria for

14:32:00  15    institutionalization, occur at the early developmental ages.

14:32:03  16    And he was in Virginia, but that's what we have here as well.

14:32:07  17    Q.  When you speak about early intervention, what age are you

14:32:08  18    really talking about?

14:32:14  19    A.  So if you're going to a pediatrician, hopefully with where

14:32:18  20    he's at on that spectrum, it would be noticed.  18 months to two

14:32:27  21    years.  There's no reciprocity with eye contact sometimes, and

14:32:31  22    that's a referral that's made to pediatricians or something that

14:32:37  23    pre-K teachers or daycare workers notice.  Difficulty in speech.

14:32:40  24    One of the hallmarks is delay in speech.  But, you know, in his

14:32:44  25    mother's defense, she's the oldest and she had five more kids

14:32:49  1    come very soon after him, and a lot of them had very difficult

14:32:52  2    problems and, again, ended up being institutionalized.  So there

14:32:54  3    was a lot going on.

14:32:57  4    Q.  Regarding the crime that we're here for, how would autism

14:32:59  5    play into that?

14:33:06  6    A.  So the knee-jerk reaction of disgust that the majority of us

14:33:13  7    hopefully would have, is not going to be as strong in somebody

14:33:17  8    with this disorder.  They have a high tolerance for things that

14:33:23  9    are not unconventional, that's not appropriate, but things that

14:33:27  10   would -- that knee-jerk recoil that we have, be it about

14:33:33  11   violence or about awful sexual content is going to be a lot less

14:33:36  12   in this population.  It's just part and parcel, unfortunately,

14:33:38  13   of the disorder.

14:33:42  14   Q.  What about understanding what someone else is feeling or

14:33:43  15   what they're going through?

14:33:48  16   A.  You know, again, without really having intervention, and

14:33:53  17   particularly in the fact that he his socialization is

14:34:02  18   exclusively through a computer, the ability to maybe cognitively

14:34:06  19   understand if somebody is showing something on their face or

14:34:11  20   somebody is crying, they internalize cognitively, but they don't

14:34:14  21   have an emotional attachment where it impacts them or they have

14:34:16  22   a reaction that somebody who is not with this disorder would

14:34:17  23   have.

14:34:20  24   Q.  Given that Mr. Woodson will be going into the Bureau of

14:34:23  25   Prisons, do you have any recommendations for him while in there?

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED BY COMPUTER

14:34:26   1    A.  So his mother is really not able to visit just due to

14:34:30   2    everything she has going on.  His two sisters that are

14:34:34   3    institutionalized, and they're only an hour away.  So I don't

14:34:38   4    think recommending a placement where he's next to her would be a

14:34:41   5    reasonable request for her to visit.  They do keep in touch on

14:34:45   6    the phone.  She is supportive of him and that can certainly

14:34:47   7    continue wherever he is placed.

14:34:50   8         Coleman has a program, and I'm sure other institutions

14:34:54   9    do as well, where you can have a mentor or a buddy.  So if you

14:34:57   10   are overseen by mental health, you can have a high functioning

14:35:03   11   inmate that is paired with you to help you navigate not just the

14:35:07   12   compound, but to ask for resources, to look for suicide --

14:35:10   13   that's not an issue here -- but, you know, that's kind of the

14:35:13   14   totality of what that program does.  And it's a wonderful

14:35:16   15   program, and it would be my recommendation because he has not

14:35:21   16   really engaged socially other than, you know, through the

14:35:26   17   internet or gaming, which is not going to be an option, clearly.

14:35:29   18        There's social nuances, obviously, to incarceration.

14:35:32   19   So in order for him to adjust to incarceration and given the

14:35:37   20   limitations that he has, I think he would do well in a program

14:35:41   21   that the Bureau has that would assign him somebody that's higher

14:35:41   22   functioning.

14:35:46   23   Q.  Are you aware of any reentry programs that exist now that

14:35:48   24   would be able to help a sex offender like Mr. Woodson?

14:35:52   25   A.  So part of the problem is finding one that will accept

14:35:55  1   anybody with a sexual offense.  There are a few in Florida, I

14:36:02  2   know most recently there's one in Pensacola, the REAP program,

14:36:05  3   R-E-A-P.  And I apologize to the Court, I don't know what the

14:36:08  4   acronym is for.  I don't know what they would have in Virginia

14:36:13  5   if -- you know, they are -- they have more programming in

14:36:17  6   Virginia in the district because they have higher taxes.  I

14:36:21  7   don't know how to put it politely.  So they have a little bit

14:36:24  8   more in terms of what's available.  I have done work in D.C., I

14:36:27  9   know in the district they have residential placement for

14:36:30  10  individuals that have these kind of charges.

14:36:32  11  Q.  And do you believe that would be helpful for someone like

14:36:32  12  Mr. Woodson?

14:36:38  13  A.  If he is getting the opportunity to enter society, I would

14:36:45  14  want it to be a requirement.  You know, even if he does the SOTP

14:36:48  15  program, even if he has a buddy that helps him through a long

14:36:51  16  prison sentence, if he is going to be released back into

14:36:56  17  society, I would want a reentry program as a requirement.  So

14:36:58  18  yes.

14:37:00  19          MS. BLAIR:  Just one moment, Your Honor.

14:37:33  20          Thank you very much, Dr. Holmes.

14:37:36  21          THE WITNESS:  Sure.

14:37:36  22          THE COURT:  Cross-examination.

14:37:38  23          MS. VIAMONTES:  Yes, Your Honor.

14:37:38  24                      CROSS-EXAMINATION

14:37:38  25      BY MS. VIAMONTES:

14:37:43   1    Q.  Good afternoon.

14:37:44   2    A.  Good afternoon.

14:37:51   3    Q.  Let's first talk about what you reviewed in order for you to

14:37:53   4    reach an opinion in this matter.

14:37:54   5    A.  Okay.

14:37:56   6    Q.  Did you review the discovery in this case?

14:37:57   7    A.  No.

14:38:03   8    Q.  Did you review the Defendant's statement to law enforcement,

14:38:04   9    recorded statement.

14:38:04   10   A.  No.

14:38:09   11   Q.  Did you review any of the evidence admitted in the trial?

14:38:12   12   For example, the chats between the Defendant and

14:38:12   13   co-conspirators?

14:38:14   14   A.  No.

14:38:17   15   Q.  Did you review the Defendant's school records?

14:38:18   16   A.  Yes.

14:38:20   17   Q.  And we'll get back to the school records in a second.

14:38:26   18        Did you review a report written by Dr. Spence after

14:38:28   19   meeting with the Defendant?

14:38:30   20   A.  Yes, I believe I did.

14:38:35   21   Q.  And in that report, Dr. Spence details that she evaluated

14:38:38   22   the Defendant and she was preparing to testify during the trial

14:38:39   23   in this case, correct?

14:38:40   24   A.  Yes.

14:38:45   25   Q.  In that report, she lists the Defendant or classifies the

14:38:52  1    Defendant as a high functioning autistic person, correct?

14:38:53  2    A.  Yes.

14:38:58  3    Q.  Not moderate like you're opining here today, correct?

14:39:02  4    A.  So he's mild to moderate.  Again, it's kind of subjective,

14:39:06  5    but I don't think what she wrote is incorrect.  I mean, he is

14:39:09  6    able to hold down a job.  He just would need, I think, more

14:39:12  7    assistance if he were to live independently.

14:39:14  8    Q.  So you said he was able to hold down a job, correct?

14:39:15  9    A.  Yes.

14:39:20  10   Q.  And in fact, he was a manager at a restaurant, correct?

14:39:20  11   A.  Yes.

14:39:23  12   Q.  And he held that job for years, right?

14:39:27  13   A.  I believe I want to say three years.

14:39:28  14   Q.  Okay.

14:39:29  15   A.  But, yes.

14:39:33  16   Q.  And he was responsible for supervising other individuals at

14:39:35  17   that restaurant, correct?

14:39:38  18   A.  I believe so.  I didn't go into detail nor did I speak with

14:39:41  19   his boss, but I would assume that's part of his duties.

14:39:48  20   Q.  Okay.  Now, Dr. Spence utilized or -- I'm not sure if that's

14:39:53  21   the correct word, but used the DSM-5 in order to diagnose the

14:39:56  22   Defendant with autism, correct?

14:39:57  23   A.  I believe so.  Again, I don't have the report in front of

14:39:59  24   me, but that sounds right.

14:40:00  25   Q.  Did you use a DSM-5?

14:40:02  1   A.  Yes.

14:40:10  2   Q.  Now, the DSM-5 is for clinical diagnosis, correct?  For a

14:40:11  3   clinical diagnosis and treatment, correct?

14:40:12  4   A.  Yes.

14:40:21  5   Q.  In fact, the DSM-5 itself has a warning that is not -- has a

14:40:25  6   cautionary statement stating that it's not for forensic use,

14:40:26  7   correct?

14:40:27  8   A.  Yes.

14:40:33  9   Q.  And the reason for that cautionary statement is because in a

14:40:36  10  forensic setting, when somebody is facing a lengthy prison

14:40:43  11  sentence, they may exaggerate their symptoms, correct?

14:40:43  12  A.  Sure.

14:40:47  13  Q.  And they present differently than if they're actually going

14:40:49  14  to get treatment, right?

14:40:52  15  A.  I'm not sure I understand you.  You're saying that are you

14:40:54  16  saying the difference between somebody in a forensic setting

14:40:57  17  versus somebody that's an individual patient on the street?

14:40:58  18  Q.  Correct.

14:41:02  19  A.  Yes, sometimes they present differently, of course.

14:41:05  20  Q.  So when someone presents out on the street, they're free,

14:41:09  21  they're going to a therapist or psychiatrist for treatment,

14:41:11  22  they're going because they want to get better, right?

14:41:12  23  A.  One would assume.

14:41:14  24  Q.  Right.  But here in this setting, an individual in

14:41:20  25  Mr. Woodson's position wants to get leniency, correct?

14:41:23   1    A.   I mean, I didn't ask him, but I assume anybody in this

14:41:25   2    position would want leniency.

14:41:28   3    Q.   And that may affect the way they present, correct?

14:41:28   4    A.   Sure it can, of course.

14:41:33   5    Q.   And that could affect them malingering, correct?

14:41:33   6    A.   Yes.

14:41:37   7    Q.   Now, did you use any instruments to determine whether Mr.

14:41:38   8    Woodson was malingering?

14:41:39   9    A.   No, I did not.

14:41:41   10   Q.   Did you write a report in this case?

14:41:41   11   A.   No.

14:41:42   12   Q.   Why not?

14:41:44   13   A.   I wasn't asked to.

14:41:50   14   Q.   And is that normal for you not to use an instrument to see

14:41:53   15   if the subject is malingering?

14:41:57   16   A.   Well, he had a documented history and diagnosis of autism

14:42:01   17   with testing that was already done, so it wasn't a matter of me

14:42:04   18   diagnosing him for the first time, this was something that he

14:42:08   19   had reported since he was six years old.

14:42:12   20   Q.   Did you see a report from when he was six years old

14:42:14   21   diagnosing him with autism?

14:42:18   22   A.   There was something in the record that suggested that it had

14:42:20   23   been going on since that time.

14:42:22   24   Q.   Other than self-reporting by the Defendant and his mother,

14:42:26   25   did you see any report that corroborates that he was in fact

14:42:28  1   diagnosed with autism at the age of six?

14:42:33  2   A.  It was in the school records.  He had been receiving special

14:42:36  3   ed for the diagnosis of autism.

14:42:39  4   Q.  You reviewed those school records you said, correct?

14:42:40  5   A.  Yes.

14:42:44  6   Q.  And can you point us to which school record clearly states

14:42:45  7   that he's autistic?

14:42:48  8   A.  I don't have them with me, but it was -- the diagnosis was

14:42:52  9   mild autism.  Well, autism and then mild was in parenthesis, but

14:42:56  10  I'm sorry, I can't remember what page it was on.

14:42:58  11  Q.  Someone that is in special ed doesn't necessarily mean

14:43:01  12  they're autistic, correct?

14:43:02  13  A.  Absolutely not.

14:43:03  14  Q.  Now, did you review the PSI in this case?

14:43:05  15  A.  I did not.

14:43:11  16  Q.  Do you know that at age 18 or 19, the Defendant voluntarily

14:43:14  17  chose to not continue treatment with his therapist and his

14:43:20  18  treatment for his psychological issues?

14:43:21  19  A.  Yes.

14:43:25  20  Q.  How does that affect, if at all, your opinion in this case?

14:43:30  21  A.  Well, that's one of the reasons why, if he was ever to be

14:43:34  22  released, I'm asking if the Court is doing that to make it

14:43:39  23  mandatory that he have some intermediary place to go.  You know,

14:43:44  24  you can't mandate treatment in a correctional facility unless

14:43:48  25  you're psychotic or in need of something civil, but I'm hoping

14:43:51  1    that he will utilize what is available in the Bureau of Prisons

14:43:52  2    certainly.

14:43:55  3    Q.  Right.  And you think he should be in a facility where if

14:43:58  4    he's ever released into the community, he is closely supervised

14:44:03  5    because he is a danger to the community, correct?

14:44:06  6    A.  At this moment, absolutely.  I would never argue at this

14:44:10  7    moment that he's low risk.  Again, risk cannot be determined

14:44:15  8    until you're closer to EOS or end of sentence date.  But no, at

14:44:19  9    this moment absolutely, he hasn't received treatment other than

14:44:20  10   some therapy and Zoloft.

14:44:24  11   Q.  Okay.  So you mentioned his risk level.  In your practice,

14:44:31  12   you regularly use the Static-99 R to determine a sex offender's

14:44:34  13   level of risk to recidivate, correct?

14:44:36  14   A.  It's one of the instruments, yes.

14:44:38  15   Q.  Did you use it in this case?

14:44:42  16   A.  No, it's not necessary.  That's only good for a short amount

14:44:45  17   of time.  He's not getting out of prison any time soon.

14:44:49  18   Q.  Okay.  So if he were to get out of prison right now, you

14:44:52  19   could evaluate him to know if right now he's a level -- what

14:44:54  20   risk level he is, correct?

14:44:56  21   A.  I mean, I could.  It's just not necessary.  It's not

14:44:59  22   reality.

14:45:05  23   Q.  And would you agree with me that some of the things taken

14:45:09  24   into consideration in doing the risk assessment are his age of

14:45:11  25   release, correct?

24

| | | |
|---|---|---|
| 14:45:13 | 1 | A.  Yes. |
| 14:45:21 | 2 | Q.  If he's ever lived with a significant other, correct? |
| 14:45:23 | 3 | A.  Yes. |
| 14:45:27 | 4 | Q.  What sex the victim is, whether it's only males or only |
| 14:45:29 | 5 | females, correct? |
| 14:45:33 | 6 | A.  Yes.  I'm sorry.  You mean in terms of victims? |
| 14:45:34 | 7 | Q.  Yes. |
| 14:45:35 | 8 | A.  Yes. |
| 14:45:37 | 9 | Q.  Whether the victims are related to him or not, correct? |
| 14:45:38 | 10 | A.  Correct. |
| 14:45:43 | 11 | Q.  All right.  Now, in this case, do you know that the |
| 14:45:47 | 12 | Defendant, although the majority of his 350 victims were |
| 14:45:52 | 13 | females, do you know that in fact he had male victims as well? |
| 14:45:55 | 14 | A.  I think that was relayed to me by defense counsel.  Again, I |
| 14:46:00 | 15 | didn't ask for a list, or I recognize that even though there was |
| 14:46:03 | 16 | 350 victims there was a limitation in terms of what was |
| 14:46:06 | 17 | presented and what he was charged with in terms of numerically |
| 14:46:10 | 18 | speaking.  But I was aware that yes, there was other pornography |
| 14:46:15 | 19 | on his computer and that some of it did have boys. |
| 14:46:19 | 20 | Q.  Well, I'm talking about the actual production of child |
| 14:46:22 | 21 | pornography.  Contact that's considered a contact offense, |
| 14:46:25 | 22 | correct?  It's not just collecting child pornography, it's |
| 14:46:28 | 23 | forcing children to create it.  There's a difference, right? |
| 14:46:31 | 24 | A.  Yes.  But it's not considered a contact offense unless you |
| 14:46:35 | 25 | are physically, from my understanding, physically engaged with a |

14:46:41  1    child.  That wouldn't matter, it's still production, so I want

14:46:44  2    to be clear, and maybe I have it wrong, but I do believe there's

14:46:47  3    distribution, production and possession.

14:46:49  4    Q.  And reaching out to a child online and communicating with

14:46:55  5    them and extorting them to create child pornography, you would

14:46:58  6    say that's not a contact offense?

14:47:02  7    A.  Again, it depends on how you define it.  If it's defined

14:47:05  8    legally, then I would need to know and have that spelled out.

14:47:09  9    What I've had has been contact offense in terms of physical

14:47:10  10   contact.

14:47:13  11   Q.  I'm saying in your area of expertise, not legally, in your

14:47:17  12   area of expertise, is there a distinction between somebody who

14:47:20  13   actually reaches out to a child online, engaging in

14:47:25  14   communications with them, as opposed to somebody who collects

14:47:28  15   images that are already in existence?

14:47:30  16   A.  Yes, there's a difference in terms of the severity when

14:47:35  17   somebody breaks the boundary and then reaches out.  So let me be

14:47:39  18   clear, because I didn't think it's a contact offense doesn't

14:47:43  19   mean that it's not more egregious.  It certainly is.

14:47:46  20   Q.  And people with autism, they sometimes have difficulty

14:47:50  21   actually reaching out to others and making those connections,

14:47:51  22   correct?

14:47:54  23   A.  Usually in person, yes.

14:47:58  24   Q.  Did you learn that Mr. Woodson actually dated women in

14:48:00  25   person?

14:48:11   1    A.   Yes.   He had what he describes -- give me one second, I

14:48:20   2    don't want to misspeak.   I believe two girlfriends in the past.

14:48:29   3    One was during high school and one was some sort of date that he

14:48:33   4    had met through an online forum.   I don't know which one.

14:48:36   5    Q.   Right.   And the one he met through online, did you learn

14:48:40   6    from him that once she no longer wanted to date him, he started

14:48:42   7    extorting her as well?

14:48:44   8    A.   No, I didn't.

14:48:49   9    Q.   Now, the victims in this case are not related to him,

14:48:49   10   correct?

14:48:53   11   A.   Not that I'm aware of, no.

14:48:55   12   Q.   The victims were strangers, right?

14:48:57   13   A.   Yes, that's what I was told.

14:48:59   14   Q.   And that would make him a higher risk, correct?

14:49:04   15   A.   Yes.

14:49:14   16   Q.   Now, in reviewing his educational record, you learned that

14:49:16   17   he indeed graduated from high school, correct?

14:49:16   18   A.   He did.

14:49:20   19   Q.   And he also took some college level courses, right?

14:49:21   20   A.   Yes.

14:49:24   21   Q.   And although he didn't complete college, there were some

14:49:26   22   courses that he actually excelled in, right?

14:49:27   23   A.   Yes.

14:49:29   24   Q.   He was actually very good at computers.

14:49:32   25   A.   Yeah, no.   I think that's the one thing I remember, yes,

14:49:36  1    that he was very -- his scores were good in those subjects.

14:49:51  2    Q.  Now, aside from the DSM-5, what other instruments did you

14:49:55  3    use when evaluating the Defendant?

14:49:59  4    A.  That was it.  That and reliance on records, as well as

14:50:01  5    interviewing with mom.

14:50:09  6    Q.  Now, a recorded statement where the Defendant is speaking

14:50:14  7    with law enforcement where he's out in the community, not in

14:50:19  8    custody, wouldn't that be important in evaluating how the

14:50:23  9    Defendant actually interacts with people?

14:50:27  10   A.  I mean, it can shed light certainly, but like I said, you've

14:50:31  11   got a long-standing history of this diagnosis.  His presentation

14:50:37  12   is very similar with what was described.  I'm not sure that I

14:50:41  13   would see something that would go completely against him being

14:50:44  14   autistic by watching a video.  I mean, I would be happy to do

14:50:49  15   so.  And again, I'm not suggesting he's of low risk.  In fact,

14:50:52  16   at this moment, to be clear with the Court, he's certainly a

14:50:56  17   high risk.  But again, this is not somebody who's getting out

14:51:02  18   any time soon to where risk is even relevant to placement at

14:51:02  19   this point in time.

14:51:08  20   Q.  Now, people that have autism sometimes have problems

14:51:11  21   empathizing with others, correct?

14:51:12  22   A.  Yes.

14:51:19  23   Q.  Did the Defendant tell you that during his testimony during

14:51:24  24   trial, he stated that he was very apologetic for what he had put

14:51:25  25   the victims through?

14:51:26  1   A.  No.

14:51:32  2   Q.  Now, would that contradict his presentation as an autistic

14:51:34  3   person who can't empathize?

14:51:42  4   A.  No, it's not about -- it's the quality.  In other words,

14:51:45  5   somebody with intelligence, any intelligence at all, can mimic

14:51:49  6   behavior and that's what you do see when they are not

14:51:54  7   institutionalized or so far along the scale in terms of -- or

14:51:59  8   the spectrum in terms of autism.  There's an attempt to try and

14:52:02  9   come across and pass as higher functioning than you are.  So I

14:52:05  10  wouldn't be surprised.  But it's very similar to what he said to

14:52:09  11  me.  It's just the quality and how he said it was so flat, it

14:52:16  12  really lacked any sort of -- it didn't seem like there was an

14:52:20  13  internalization or just a full understanding of what that would

14:52:22  14  mean and what it meant to these victims.

14:52:25  15         THE COURT:  Are you saying that his comments that he

14:52:29  16  was sorry and that he empathized with them is not true?  Or is

14:52:32  17  not serious?  It's not sincere?

14:52:36  18         THE WITNESS:  What I think, these individuals

14:52:40  19  cognitively understand the concept but they don't feel it

14:52:44  20  because they're incapable of it.  So I don't think it was, you

14:52:48  21  know, a situation where he's lying; I think he truly thinks that

14:52:51  22  he is apologetic but there is a lack --

14:52:52  23         THE COURT:  But he's not.

14:52:54  24         THE WITNESS:  I think there's a lack of internalization

14:52:59  25  and understanding.  It's an ability as opposed to a volitional

| | |
|---|---|
| 14:53:03 | 1 |
| 14:53:03 | 2 |
| 14:53:06 | 3 |
| 14:53:06 | 4 |
| 14:53:15 | 5 |
| 14:53:21 | 6 |
| 14:53:23 | 7 |
| 14:53:28 | 8 |
| 14:53:37 | 9 |
| 14:53:43 | 10 |
| 14:53:47 | 11 |
| 14:53:51 | 12 |
| 14:53:57 | 13 |
| 14:54:00 | 14 |
| 14:54:05 | 15 |
| 14:54:09 | 16 |
| 14:54:13 | 17 |
| 14:54:15 | 18 |
| 14:54:19 | 19 |
| 14:54:23 | 20 |
| 14:54:26 | 21 |
| 14:54:31 | 22 |
| 14:54:36 | 23 |
| 14:54:40 | 24 |
| 14:54:44 | 25 |

choosing not to.  I don't know if that answers the Court's
question.

        THE COURT:  I'm fine.

    BY MS. VIAMONTES:

Q.  How long did you meet with the Defendant?

A.  Two and a half hours the first time; maybe an hour and a
half to two hours the second time.

Q.  Now, you testified on direct examination that the Defendant
did not receive early intervention for his issues.  Do you
remember that?  Now, how does that affect his prognosis going
forward?  His ability to get better?

A.  So obviously the earlier the intervention, the better the
prognosis across the board for anything developmental, anything
on the autism spectrum.  So certainly not having, you know,
concepts and things learned earlier leaves you with the lack of
practicing those skills throughout the life span.  Clearly in
the Bureau of Prisons they don't have, that I'm aware of, and if
they do please let me know, but I don't believe they have
specific programs designed for those that are on the autism
spectrum, which is why I recommended somebody to assist him on a
compound through social stuff.  There are things that can make
him much more functional which would be, you know, more social
skills kind of stuff which they do have in the Bureau in certain
prisons.  They'll do social skills groups, but that's not a
solid mandated program.  That's up to the individual

14:54:46   1    psychologist at each individual facility.

14:54:50   2              So yes, he has lost some ability just through the

14:54:56   3    nonexposure early on.  Can somebody recover?  I can't say.

14:55:00   4    Certainly along a cognitive day-to-day living, yes.  In terms of

14:55:04   5    the emotional, that's not something you can teach.  It's just

14:55:07   6    more when they're little, you can teach them some somebody looks

14:55:10   7    like this and this is what their expression is, this is what

14:55:14   8    this means.  You can't teach them to internalize something that

14:55:18   9    they innately don't have.  So yes, he's hindered because he

14:55:21   10   didn't have that early intervention and yes that will continue.

14:55:26   11   There can be interventions within the Bureau if he utilizes that

14:55:30   12   will help.  Will it bring him to where he could have been with

14:55:33   13   early intervention?  Nobody can say.  My opinion is probably

14:55:34   14   not.

14:55:38   15   Q.  Now, people -- sure, people with autism have difficulty

14:55:45   16   understanding nuances and subtleties and body language, correct?

14:55:46   17   A.  Yes.

14:55:47   18   Q.  Many times, right?

14:55:51   19   A.  Yes, anything social is definitely impacted.

14:55:55   20   Q.  However, when someone explicitly tells them how they're

14:56:00   21   feeling; for example, I think I'm going to have to kill myself,

14:56:04   22   that's something that someone with autism would understand,

14:56:05   23   correct?  Because it's explicit.

14:56:09   24   A.  Yeah, they could certainly understand intellectually and

14:56:12   25   cognitively, if they have that capability, and Mr. Woodson does,

14:56:16  1   what that means and what the ramifications are.  They just

14:56:21  2   wouldn't feel or be able to internalize any sort of, you know --

14:56:24  3   Q.  Any empathy, right?

14:56:27  4   A.  Any empathy for somebody, yes.

14:56:29  5   Q.  And that's why you might get the response well, either

14:56:32  6   produce the image or kill yourself.

14:56:36  7   A.  Yes.  Like I was saying before, it's a very robotic, it's

14:56:38  8   very black and white.

14:56:41  9   Q.  And that lack of empathy, the likelihood of that changing

14:56:47  10  over Mr. Woodson's life is slim to none, correct?

14:56:49  11  A.  I mean, it's like I said, it's unfortunately

14:56:54  12  neuro-developmental.  There's nothing that -- you can't teach

14:56:57  13  something that in your brain should innately be there.  It's the

14:57:02  14  compensatory strategies that can be taught earlier on that can

14:57:08  15  be helpful.  Can he improve?  I certainly believe so.  To the

14:57:13  16  extent what you're saying, can he internalize empathy in a

14:57:15  17  Bureau of Prisons setting with the right interventions, very

14:57:18  18  likely no.  It's more the social skills and the exposure to

14:57:24  19  social situations that I think would have some, albeit small,

14:57:26  20  benefit.

14:57:30  21  Q.  And that would require him voluntarily participating in that

14:57:32  22  treatment, right?

14:57:35  23  A.  Yes.  As far as I know, and please, if I'm incorrect let me

14:57:38  24  know, anything treatment-wise in the Bureau with the exception

14:57:44  25  of a GED, if you don't have a high school diploma when you

14:57:49  1    arrive, is volitional.  So even the SOTP program, even the

14:57:51  2    mentor program, he would have to agree.

14:57:54  3    Q.  And we know from his own self-reporting that he has chosen

14:57:57  4    to not participate in treatment in the past, correct?

14:58:04  5    A.  Yes.  He had therapy and he had a mild antidepressant.  He

14:58:06  6    didn't feel he was reaping any benefits, so he stopped.

14:58:11  7    Q.  And autism does not prevent someone from knowing the

14:58:13  8    difference between right and wrong, correct?

14:58:14  9    A.  Correct, it does not.

14:58:19  10   Q.  And autism doesn't cause someone to lure young children into

14:58:25  11   creating horrible pornographic images, correct?

14:58:28  12   A.  Absolutely not.  This is not causational in any way, shape,

14:58:32  13   or form.  So I do want to be clear with the Court.

14:58:41  14   Q.  Now, there's no validity testing for the DSM-5, correct?

14:58:44  15   A.  Not that I'm aware of, no.

14:58:47  16   Q.  Can you explain to the Court what that means, validity

14:58:47  17   testing?

14:58:53  18   A.  So I mean the DSM came about because we needed a way to

14:58:56  19   communicate between professionals, and between professionals and

14:59:00  20   insurance companies.  So we developed certain specific criteria

14:59:04  21   for each mental disorder that we know and, you know, through

14:59:11  22   revisions we have removed some disorders and brought some in.

14:59:15  23   It used to be diagnostically, you would get a diagnosis if you

14:59:19  24   were a homosexual.  That has been removed.  That's no longer

14:59:21  25   considered a pathology or mental illness.  So as -- and then

14:59:25   1   autism wasn't there in some of the earlier versions, we didn't

14:59:26   2   know it existed.

14:59:29   3           So what the DSM not having validity means, there's a

14:59:32   4   list of particular symptoms.  And so it is up to the clinicians,

14:59:36   5   based on experience and whatever tools they have available, you

14:59:40   6   know, experience in a particular population, you know, whatever

14:59:45   7   records to go through and look and see if somebody meets the

14:59:50   8   criteria.  So there's no test that you give that says I got it

14:59:56   9   right diagnostically.  You just -- honestly, the best tool you

14:59:59  10   can have is experience.

15:00:03  11   Q.  And you don't know who initially diagnosed Mr. Woodson back

15:00:07  12   when he was six years old, correct?

15:00:12  13   A.  No.  He was in Virginia in the public school system.

15:00:16  14   Q.  So you have no idea what that person's experience is,

15:00:16  15   correct?

15:00:21  16   A.  I don't recall if it was a school psychologist.  I know it

15:00:23  17   was referred to and there was different people that signed off,

15:00:26  18   but I don't know specifically who originally gave him that

15:00:27  19   diagnosis.

15:00:31  20   Q.  Right.  So you're relying on a diagnosis that you don't know

15:00:35  21   where it came from, from a person you don't know at all,

15:00:36  22   correct?

15:00:40  23   A.  I mean, well, I was a school psychologist in Virginia for a

15:00:43  24   year.  I know that in order diagnostically to have that in

15:00:47  25   Virginia, you have to have -- either be a school psychologist or

15:00:51  1   you have to be somebody that is able to diagnose it.  In other
15:00:54  2   words, it can't be recommendation from a teacher like an LD
15:01:00  3   testing.  It's a very specific diagnosis.  It tends to require a
15:01:05  4   504 Plan because it falls under medical instead of mental in
15:01:08  5   terms of accommodations.  Certainly, the fact that he was held
15:01:11  6   back two years, and it's not really a cognitive issue, you know,
15:01:15  7   is indicative there's something going on.  And the fact that he
15:01:17  8   has a totality of special education.
15:01:22  9   Q.  Now, being that he has such a lengthy history of special
15:01:27  10  education and these diagnoses, you would expect to see a
15:01:30  11  voluminous medical record, correct?
15:01:34  12  A.  Medical at school or medical -- you mean, like IEPs in
15:01:36  13  school or --
15:01:39  14  Q.  Both the school records, medical records, documenting over
15:01:43  15  and over this diagnosis of autism, correct?
15:01:48  16  A.  Depends.  I have a dickens of a time getting school records
15:01:53  17  when they're purged.  So sometimes they thin them out just due
15:01:53  18  to time.
15:01:55  19  Q.  The school records that defense counsel provided you were
15:01:57  20  not voluminous, correct?
15:01:58  21  A.  Correct.
15:02:02  22  Q.  And you can't point to one school record that, in fact,
15:02:05  23  states that Mr. Woodson was diagnosed with autism.
15:02:09  24  A.  I mean, like I said, I don't have them with me, but I do
15:02:12  25  recall seeing it on there.  And I don't know if it was referred

| | | |
|---|---|---|
| 15:02:16 | 1 | to. |
| 15:02:19 | 2 | Q.  It was referred to by his mother during her interview, |
| 15:02:20 | 3 | correct? |
| 15:02:21 | 4 | A.  Certainly. |
| 15:02:23 | 5 | Q.  She reported that he was diagnosed at age six, and the |
| 15:02:26 | 6 | Defendant himself stated that during his childhood he was |
| 15:02:27 | 7 | diagnosed with autism, right? |
| 15:02:28 | 8 | A.  Yes. |
| 15:02:30 | 9 | Q.  Could that be where you're getting that from? |
| 15:02:35 | 10 | A.  No.  I know I read it. |
| 15:02:53 | 11 | MS. VIAMONTES:  One second, Your Honor. |
| 15:02:56 | 12 | THE COURT:  I'm not going anywhere. |
| 15:03:02 | 13 | MS. VIAMONTES:  No further questions, Your Honor. |
| 15:03:05 | 14 | THE COURT:  Thank you.  Redirect. |
| 15:03:05 | 15 | REDIRECT EXAMINATION |
| 15:03:05 | 16 | BY MS. BLAIR: |
| 15:03:16 | 17 | Q.  Just a few questions, Dr. Holmes.  After spending time with |
| 15:03:20 | 18 | Mr. Woodson and reviewing the records, do you have a doubt as to |
| 15:03:22 | 19 | your diagnosis that he is indeed autistic? |
| 15:03:23 | 20 | A.  No. |
| 15:03:27 | 21 | Q.  Do you believe that this autism, though, excuses what he |
| 15:03:29 | 22 | did? |
| 15:03:30 | 23 | A.  Absolutely not. |
| 15:03:36 | 24 | Q.  In reviewing the records and talking to Mr. Woodson's |
| 15:03:40 | 25 | mother, did you get the sense that he did not stay at one school |

15:03:42  1    for very long?

15:03:50  2    A.  They moved, from my understanding, approximately ten or 11

15:03:55  3    times in his first few years of school.  So first they were in

15:03:58  4    the district, and then they moved all over Virginia just due to

15:04:02  5    financial constraints on his mom.  So there were multiple,

15:04:05  6    multiple different schools that he attended just even in

15:04:06  7    elementary.

15:04:09  8    Q.  Did that result in a lot of absences from school as well?

15:04:14  9    A.  Yes, and he also was tasked with assisting his mom at home.

15:04:18  10   There were a lot of children, what he described, and quite

15:04:24  11   frankly, the violence with the less functional autistic siblings

15:04:29  12   that are now institutionalized, he would be tasked with watching

15:04:34  13   them while she got diapers for them, or he would be sent to get

15:04:38  14   diapers for them.  So there was time that he missed school to

15:04:38  15   assist.

15:04:41  16   Q.  The risk assessment the Government was talking about that

15:04:45  17   you would not conduct now, does someone's risk change as they

15:04:46  18   age and have more experiences?

15:04:50  19   A.  I mean, your risk can change in a matter of months depending

15:04:55  20   upon, I mean, if you pick up a new charge, it changes your risk.

15:05:01  21   If you pick up a drug habit, it changes your risk.  If you

15:05:03  22   attend therapy and get a job and get some stabilizing factors,

15:05:07  23   that can change your risk.  So there's so many things can change

15:05:13  24   between now and any perceivable possible EOS date for Mr.

15:05:18  25   Woodson.  So, you know, at this moment, it wouldn't make any

15:05:21  1    sense clinically to even go through it.  But yes, what he is

15:05:25  2    today, I can't tell you and predict the future of what he will

15:05:29  3    be like in 20, 30, 40, 50 years.

15:05:31  4            MS. BLAIR:  Just one moment, Your Honor, please.

15:05:34  5            No further questions.  Thank you, Dr. Holmes.

15:05:38  6            THE COURT:  Thank you, Doctor.  You're excused.

15:05:40  7            MS. MOLLISON:  Yes, Your Honor.  We're asking the Court

15:05:44  8    today for a sentence in the lower end of the guidelines,

15:05:50  9    something within the range of 360 months to 420 months, so

15:05:54  10   that's 30 to 35 years in prison.  We're asking this with the

15:05:57  11   understanding that this is a guideline sentence, and that it is

15:06:04  12   also an extremely lengthy sentence.  It accounts for how serious

15:06:11  13   this crime is and for the incredible pain that was caused to the

15:06:14  14   victims in this case as a result of Mr. Woodson's actions.

15:06:19  15            What happened to the young women in this case was

15:06:24  16   horrific, and we do not intend in any way to minimize the trauma

15:06:31  17   that was caused by Mr. Woodson.  But this sentence is a sentence

15:06:37  18   that might allow him to live a life outside prison at some point

15:06:41  19   far, far in the future.  Mr. Woodson is 30 years old today, so

15:06:48  20   after another 30 or 35 years, he would be in his 60s; at that

15:06:53  21   point, a dramatically changed man, and one that I can only

15:06:56  22   imagine would have a much different perspective on his life and

15:06:59  23   his way of interacting with the world.  And I think it's also

15:07:03  24   very important to note, I imagine he would be on lifetime

15:07:06  25   supervision, we would have absolutely no objection to that.

| 15:07:10 | 1 | That would prevent him from ever using a computer again, ever |
|---|---|---|
| 15:07:15 | 2 | being close to the kinds of devices that he was able to use as |
| 15:07:18 | 3 | he got involved in the conduct in this case. |
| 15:07:24 | 4 | Now, we asked Dr. Holmes to come testify before the |
| 15:07:27 | 5 | Court today, because in some ways, and I think Dr. Holmes' |
| 15:07:30 | 6 | testimony spoke to this, his personal history and his background |
| 15:07:33 | 7 | is deceiving. You know, at the time of his arrest he was |
| 15:07:39 | 8 | working a full-time job, he had graduated high school, he was, |
| 15:07:43 | 9 | in some of the ways that we look for those markers, a pretty |
| 15:07:47 | 10 | functional-seeming adult. But there are profound deficits there |
| 15:07:52 | 11 | due to his autism, and we think it's important for the Court to |
| 15:07:55 | 12 | be aware of those deficits as it considers his sentence. He can |
| 15:08:01 | 13 | do rote and routine tasks, but he operates on the level of the |
| 15:08:08 | 14 | tangible and the literal. And he can take orders, he can |
| 15:08:12 | 15 | complete tasks, but he can't really engage in that higher level |
| 15:08:15 | 16 | social interaction. And social interactions, in general, are |
| 15:08:19 | 17 | just a complete and phenomenal struggle for him. We've had that |
| 15:08:23 | 18 | experience with him even as counsel. His autism truly does |
| 15:08:26 | 19 | prevent him from attaching to other people and from connecting |
| 15:08:30 | 20 | to other people in ways that we normally think are just natural |
| 15:08:34 | 21 | and integral to being a human. And we wanted to present Dr. |
| 15:08:37 | 22 | Holmes' testimony not in any way again to excuse his conduct, |
| 15:08:42 | 23 | but to try to contextualize how the conduct in this case came to |
| 15:08:42 | 24 | be. |
| 15:08:50 | 25 | Now, as Dr. Holmes noted, Mr. Woodson has had autism |

|           |    |                                                                        |
|-----------|----|------------------------------------------------------------------------|
| 15:08:52  | 1  | since a very young age.  He never got the kind of early                 |
| 15:08:52  | 2  | intervention that someone with his diagnosis would need.  And so        |
| 15:08:56  | 3  | he never really learned how to socialize with other people, and        |
| 15:09:00  | 4  | that is not something that's natural for people with autism, but       |
| 15:09:03  | 5  | it is, as Dr. Holmes' noted, something that can be taught.  And         |
| 15:09:07  | 6  | we think he could get some -- could learn some of those lessons         |
| 15:09:11  | 7  | basically within the BOP system.  Prison is, by definition, a          |
| 15:09:16  | 8  | very highly complex, social environment, one in which he is            |
| 15:09:21  | 9  | likely to struggle in because he has these deficits, but one           |
| 15:09:24  | 10 | where we think he could learn a lot.  He also could hopefully          |
| 15:09:29  | 11 | participate in some of these mentorship-type programs that Dr.          |
| 15:09:32  | 12 | Holmes spoke about, and that's one of the reasons we're going to       |
| 15:09:34  | 13 | be asking for him to be designated to South Florida so that he         |
| 15:09:37  | 14 | could take advantage of those programs, because we think that          |
| 15:09:41  | 15 | that could also assist him in learning how to socialize in             |
| 15:09:43  | 16 | functional ways and in healthy ways.                                    |
| 15:09:48  | 17 | And, you know, as Dr. Holmes also alluded to, the                       |
| 15:09:51  | 18 | reason why he didn't get those early interventions as a young          |
| 15:09:54  | 19 | child, the reason why he didn't even go to school or really see        |
| 15:09:57  | 20 | anyone outside of the home until the age of six was because of         |
| 15:10:03  | 21 | his family situation.  Now, we tried to capture kind of a              |
| 15:10:07  | 22 | glimpse for this for the Court in the video that we submitted,          |
| 15:10:15  | 23 | but it seems like it was true and basically profound chaos.  And       |
| 15:10:19  | 24 | I'd like to paint a little picture for the Court if I can.  Ms.         |
| 15:10:21  | 25 | Blair and I actually went up to Virginia during the course of          |

15:10:25  1    this case to speak to the family, to learn about where Mr.

15:10:30  2    Woodson came from and on the first day that we got there, we had

15:10:36  3    a plan to meet Mr. Woodson's mother.  And so we went to her

15:10:42  4    house, we went outside the house and we were told -- she spent a

15:10:45  5    long time before she came out to see us, and she told us we

15:10:49  6    actually couldn't go inside the house because her husband, who

15:10:54  7    is Mr. Woodson's stepfather, had lost his job, was drinking and

15:10:59  8    she seemed to think that he was potentially so violent that she

15:11:02  9    wasn't sure if we would be hurt if we stepped inside the house.

15:11:06  10   We, his lawyers, you know, wearing suits, coming on a business

15:11:11  11   trip essentially.  That was, it seemed to her, a real

15:11:15  12   possibility that we might not be safe in that home.  And I can

15:11:19  13   only imagine if we, as guests, visiting the house had that

15:11:23  14   potential threat, what it is like to grow up in that home or to

15:11:27  15   be there now.  This is the person who Mr. Woodson's mother

15:11:32  16   mentioned in the interview frequently, it seems like, threatens

15:11:35  17   to kill members of the family.  I think the language that she

15:11:40  18   used is he threatens to execute them.  So this was, you know,

15:11:43  19   just our glimpse in the past couple months of what we've seen of

15:11:44  20   this home.

15:11:47  21        So when we first met the family, we absolutely had the

15:11:51  22   sense that we were stepping into chaos, and that was a word that

15:11:55  23   the mother kept using and I think it's a word that really rang

15:12:01  24   true to us of what this home was like growing up.  As Dr. Holmes

15:12:05  25   testified, Mr. Woodson has five siblings so there's six of them

| | | |
|---|---|---|
| 15:12:09 | 1 | and all six of them, they're pretty close in age, have some type |
| 15:12:17 | 2 | of either autism or intellectual disability.  Two of them, as |
| 15:12:21 | 3 | she also mentioned, are so profoundly autistic that they're |
| 15:12:22 | 4 | nonverbal and they're institutionalized.  And that's now, they |
| 15:12:22 | 5 | weren't growing up. |
| 15:12:27 | 6 | THE COURT:  Yet more kids are coming.  More kids keep |
| 15:12:27 | 7 | having kids. |
| 15:12:30 | 8 | MS. MOLLISON:  It was a large family.  And I think it's |
| 15:12:33 | 9 | worth noting it was a large family with a single mom who |
| 15:12:37 | 10 | absolutely, I think, was not able to meet the challenges of |
| 15:12:42 | 11 | these kids.  And I say this not at all to place blame on Mr. |
| 15:12:45 | 12 | Woodson's mother, because she also is disabled herself |
| 15:12:50 | 13 | physically.  The sense I got in speaking with her and, you know, |
| 15:12:53 | 14 | might be clear from the interview as well, is that she might |
| 15:12:56 | 15 | have some of the same deficits herself.  She is not even able to |
| 15:13:03 | 16 | drive a car.  So all these kids needed special attention. |
| 15:13:06 | 17 | THE COURT:  Can't drive a car but you can have kids and |
| 15:13:08 | 18 | send them off to foster homes. |
| 15:13:10 | 19 | MS. MOLLISON:  Yes, she had this large family and they |
| 15:13:14 | 20 | all needed the special attention that they weren't getting.  She |
| 15:13:17 | 21 | just didn't have the wherewithal, I think, to get the kids |
| 15:13:20 | 22 | outside help.  And so what that meant was that because Mr. |
| 15:13:25 | 23 | Woodson was one of the relatively more self-sufficient kids in |
| 15:13:28 | 24 | the family, he basically got left to himself.  He started school |
| 15:13:33 | 25 | late, he didn't go to daycare, go to kindergarten.  He didn't |

15:13:37   1   get the kind of supports that someone with his diagnosis would

15:13:41   2   need.  There was just too much chaos.  Too much going on in the

15:13:44   3   home for Mr. Woodson to really get noticed.  And I think it's

15:13:48   4   worth noting he also didn't seem to get barely noticed at

15:13:51   5   school.  I mean the reason why his school records are so thin

15:13:55   6   and flimsy is because he was pulled out of school all the time.

15:13:58   7   He was switching between schools, switching between school

15:14:01   8   districts frequently, and that is because it seems like, again,

15:14:05   9   in speaking with his mother, they were evicted often, they were

15:14:08   10  homeless often, they were moving between shelters often.  And

15:14:12   11  what this meant is that Mr. Woodson was entering the world as a

15:14:19   12  young person with these severe deficits, but the world was also

15:14:24   13  not a very hospitable place to him, and it didn't provide that

15:14:27   14  support that he would need to make up for those deficits.

15:14:31   15         And I do think it's worth noting about those two

15:14:35   16  sisters who are institutionalized, because Ms. Blair and I also

15:14:41   17  went to the group home where they live now.  His family --

15:14:44   18  they're about an hour outside of where the family lives, and his

15:14:48   19  family had never been there in the years that they've lived

15:14:51   20  there, and I think that that should give the Court a sense of

15:14:57   21  really, again, what's going on in that family.  The young women

15:15:02   22  are not able to speak, they're in diapers.  One of them has

15:15:06   23  scars on her face from scratching it.  It just seemed like in

15:15:10   24  the short time that we were there, they were agitated and

15:15:15   25  distressed, and I think that we both got the sense in meeting

15:15:19    1    with them of what it would be like to grow up, even in those

15:15:23    2    short minutes that we were there in that home, in that kind of

15:15:27    3    chaos, and what it felt like to grow up in a family where it

15:15:30    4    seems like everyone needed help.

15:15:32    5          THE COURT:  You think you would be doing him a favor by

15:15:35    6    getting him out of prison back to that?

15:15:37    7          MS. MOLLISON:  So I don't think he would go back to

15:15:38    8    that.

15:15:41    9          THE COURT:  I don't know why not.  What else does he

15:15:45   10    know?  He doesn't know anything else.

15:15:47   11          MS. MOLLISON:  We've spoken with Dr. Holmes about what

15:15:50   12    could be possible for him if he were released.  There's actually

15:15:56   13    a halfway house in Pensacola which specializes in working with

15:16:00   14    sex offenders.  We think that would be a great place for him,

15:16:03   15    even for a long-term placement.  I absolutely don't think he

15:16:05   16    should live with his mother again, I think that is too much for

15:16:11   17    his mother.  But I would say, you know, 30, 35 more years from

15:16:15   18    now, I don't know if his mother will still be at home.  I think

15:16:19   19    it's possible that, you know, he might not even ever see his

15:16:22   20    mother again because she's really not able to travel.  So even

15:16:27   21    if he were in an institution closer to home, he might never see

15:16:28   22    her again.  We're aware of that --

15:16:30   23          THE COURT:  Which is not necessarily a bad thing.

15:16:32   24          MS. MOLLISON:  Well, we do think there are places for

15:16:36   25    him to go where he could live a stable life and a supportive

15:16:46  1    life not in that home.  But I describe the home because I think

15:16:48  2    it's important for the Court to really -- to consider really

15:16:57  3    where he was coming from and how he got to this place.  It felt,

15:17:00  4    to us, almost nightmarish.

15:17:05  5          I don't want to belabor the point, but I do think it's

15:17:10  6    worth noting just one other story that disturbed us, and I think

15:17:13  7    should give the Court a sense of what was happening.  So the

15:17:16  8    mother described this to us when we were there, it's on the

15:17:18  9    video that we submitted, but at some point when the children

15:17:21  10   were very young, one of the girls who is now institutionalized,

15:17:28  11   threw a dresser on her sister's head.  The baby sister started

15:17:32  12   seizing.  The mother had her hands so full with the other kids

15:17:36  13   that she couldn't even take the sister to the hospital, so an

15:17:40  14   ambulance took away the baby.  That girl is now grown up, she's

15:17:43  15   intellectually disabled, she still has seizures.  Again, that's

15:17:45  16   the kind of home that Mr. Woodson came from.  That's the kind of

15:17:50  17   environment that he came from.  It was violent.  It was one that

15:17:54  18   did not address even the basic need of having a roof over your

15:17:58  19   head, much less these kinds of higher order needs of getting

15:18:03  20   the, you know, neurological treatments that Mr. Woodson needed.

15:18:06  21         THE COURT:  Well Ms. Mollison, I take a lot of this

15:18:09  22   into consideration.  Obviously, I don't have the details that

15:18:14  23   you've given me, but I'm well aware of the fact that this is a

15:18:17  24   horrible situation that he has at home; that a lot of this is

15:18:24  25   not of his doing.  But at the same time, I've already taken that

15:18:27  1   into consideration when I have not applied obstruction of

15:18:30  2   justice when he came up with this preposterous story that he

15:18:33  3   told the jury that they didn't buy at all.  I think that

15:18:38  4   obstruction of justice could have been appropriate, which would

15:18:47  5   have boosted his guidelines even higher.  And I can't say I

15:18:50  6   don't care how this happened, but there is nothing I can do

15:18:53  7   about how this happened.  There is nothing you can do about how

15:18:56  8   this happened.  I commend you and your colleague for the

15:19:01  9   extraordinary lengths that you go to to represent your clients

15:19:03  10  properly.  I do know that this must have been a very distressing

15:19:08  11  trip and experience for you, both of you.  You should have sent

15:19:16  12  Natale because he's already goofy.  But, no, seriously.  I

15:19:19  13  understand that.  But I think I've taken that into consideration

15:19:26  14  when I don't look for things to increase the guidelines for him.

15:19:36  15       On the other hand, what he did to these young women is

15:19:40  16  horrible and is not excusable in any way, and I have no real

15:19:43  17  strong feelings as to whether he would do it again tomorrow

15:19:47  18  because I don't think that it was sexual in nature, I think it

15:19:49  19  was controlling in nature.  I think what he wanted was to

15:19:54  20  control people.  He just chose the worst possible way to do it.

15:20:01  21  Making these people do horrible things.  Horrible, disgusting

15:20:04  22  things that they're going to have to live with the rest of their

15:20:11  23  lives.  Because he's autistic?  I don't know.  I mean, I guess

15:20:20  24  autism is the disorder du jour.  Everybody is autistic.  His

15:20:23  25  entire family is autistic and they go off into these -- I don't

15:20:28   1   know.  I'm beside myself in this.  I probably ought to just shut

15:20:29   2   up and listen.

15:20:30   3          What else do you have, ma'am?

15:20:32   4          MS. MOLLISON:  Judge, I just want to be clear, we're

15:20:35   5   not trying to say in any way he did this because he was

15:20:35   6   autistic.

15:20:37   7          THE COURT:  I know that.  If I said that I didn't mean

15:20:39   8   it.  Go ahead.  I understand that.

15:20:41   9          MS. MOLLISON:  And we also -- we absolutely recognize

15:20:45   10  that what he did, what Mr. Woodson did, what happened to the

15:20:51   11  young ladies in this case is truly painful and truly tragic.

15:20:57   12  But I don't know if what was going on was some kind of power

15:21:00   13  play.  I think in our discussions with Dr. Holmes, what we

15:21:03   14  learned about autism is someone like Mr. Woodson doesn't really

15:21:09   15  -- someone with autism doesn't get an emotional high off of

15:21:13   16  social interaction.  So it's not as if the kind of manipulation

15:21:16   17  was somehow satisfying him.

15:21:19   18         THE COURT:  It was a computer game.  He was playing

15:21:23   19  games with his friend to see who could control the people and

15:21:27   20  make them do the most ridiculous things, and he won and this is

15:21:28   21  the prize.

15:21:31   22         MS. MOLLISON:  And to that point, if he is ever

15:21:34   23  released from prison, he will be on supervision, I'm sure, for

15:21:36   24  the rest of his life and that --

15:21:39   25         THE COURT:  He will if I have anything to do it, yes.

| | | |
|---|---|---|
| 15:21:41 | 1 | MS. MOLLISON:  And that absolutely prohibits any |
| 15:21:45 | 2 | computer use at all.  And so again, the tool that he was able to |
| 15:21:49 | 3 | use to communicate in this -- with the people, the victims in |
| 15:21:52 | 4 | this case and the people he spoke with in this case, just will |
| 15:21:54 | 5 | not be available to him. |
| 15:21:56 | 6 | THE COURT:  By the time he gets out, his eyeglasses |
| 15:22:01 | 7 | will have more computing power than a phone which has more |
| 15:22:06 | 8 | computing power than the Apollo rocket missions to the moon.  I |
| 15:22:10 | 9 | mean, that doesn't work.  He's going to have ability to do it. |
| 15:22:15 | 10 | Maybe not legally, but he'll have the ability to do it.  I want |
| 15:22:16 | 11 | to make sure that he doesn't do it. |
| 15:22:22 | 12 | I'm sorry, but I'm far more concerned about the young |
| 15:22:26 | 13 | ladies, and I guess men, I hadn't heard about the men, but the |
| 15:22:33 | 14 | people that he has really done serious permanent damage to. |
| 15:22:36 | 15 | That's what I am most concerned about in this case.  I |
| 15:22:39 | 16 | understand him, I understand -- I can't say I understand him, |
| 15:22:43 | 17 | but I understand his situation.  I understand that it is not all |
| 15:22:47 | 18 | of his doing.  I understand that he had a horrible home life. |
| 15:22:51 | 19 | That his mother is responsible for a great deal of this, not |
| 15:22:55 | 20 | only for him, but for all of the institutionalized siblings. |
| 15:23:00 | 21 | The fact that you couldn't even go in and see his mother at the |
| 15:23:04 | 22 | home because the stepfather is a violent man, that can't be |
| 15:23:04 | 23 | good. |
| 15:23:08 | 24 | But the bottom line is, what do I do now?  I'm looking |
| 15:23:17 | 25 | at the guidelines which go up to 100 some years.  You know, he's |

15:23:22   1   not a tortoise from the Galapagos, he can't do the 120 years,

15:23:26   2   but he's going to have to do a substantial amount of time

15:23:30   3   because this behavior cannot be tolerated, period, new

15:23:31   4   paragraph.

15:23:34   5           I am happy to hear what you're saying.  You have done a

15:23:40   6   wonderful job trying to humanize him.  I feel for you.  You did

15:23:45   7   a really good job, both of you, and Mr. Natale did a good job in

15:23:48   8   the trial.  I appreciate it.  I'm glad you're there.  I'm glad

15:23:52   9   you're available to do this for people, and I wish that people

15:23:55   10   understood the quality of the legal representation that they get

15:23:58   11   when they get the Federal Public Defender's office.  I can

15:24:02   12   assure you that if I were in trouble, I would not hesitate to

15:24:07   13   accept the services of the Federal Public Defender.  I would

15:24:10   14   give away all my money so that I could get you, because I

15:24:13   15   couldn't get a better lawyer.  I couldn't get -- nobody that I

15:24:16   16   could afford would do a better job than you guys.

15:24:20   17           Continue.  Give me what you got.  Let me know so that

15:24:22   18   -- I will be happy to take into consideration everything you

15:24:28   19   say, but I know that this has been put on him, but what he did

15:24:34   20   was just horrible.  I'm sorry to interrupt you, but I just want

15:24:36   21   you to know that I do appreciate what you're saying.  I'm not

15:24:40   22   taking this out on you.  Natale, I might have.  But I'm not

15:24:43   23   going to take it out on you two because you've done a really

15:24:45   24   good job.  I appreciate it.

15:24:48   25           MS. MOLLISON:  We recognize that, Judge.  And, you

15:24:52  1    know, we're not at all requesting a sentence that's not a

15:24:56  2    substantial sentence and that's not a lengthy sentence.  Our

15:24:59  3    only request is that Mr. Woodson receive a sentence where he has

15:25:04  4    some chance, even if it's a slim chance, of living in the

15:25:08  5    outside world at some point in his life again.  And I do think

15:25:12  6    he absolutely needs to learn a lot about how to live in a social

15:25:18  7    world.  I think he will receive that kind of training.

15:25:19  8         THE COURT:  Well, he can receive that kind of training

15:25:22  9    in the Bureau of Prisons.  He can certainly receive that kind of

15:25:26  10   training when he comes out under the auspices of the US

15:25:28  11   Probation Office.  They work really hard with these things and

15:25:36  12   they do a really good job, but he has to be receptive to it too,

15:25:39  13   and he has to be willing to go along with it.  And I have not

15:25:44  14   been convinced that he fully appreciates what he's done and that

15:25:50  15   he fully appreciates how harmful it was to the people that he

15:25:54  16   was doing it to.  I do think he considered it a computer game.

15:25:55  17   I really do.

15:25:57  18        MS. MOLLISON:  Well Your Honor, to that I would just

15:26:02  19   say, you know, 30, 35 more years is a long time away.  It's more

15:26:10  20   years than he's ever been alive in his life.

15:26:11  21        THE COURT:  He's 30 years old now, right?

15:26:13  22        MS. MOLLISON:  30 years old now, and he will be a

15:26:16  23   different person decades from now, and he will be a person who

15:26:19  24   has had much time to reflect, again, on the pain that he has

15:26:20  25   caused.

15:26:22   1          THE COURT:  As artificial a world as it is, he will be

15:26:27   2     in a world where he has to get along in the prison.  Fortunately

15:26:31   3     for him, he is not going into the state prison system where

15:26:34   4     there really sometimes is nothing for them.  There is a great

15:26:36   5     deal for them and I hope he takes advantage of it.

15:26:38   6          What else do you have, ma'am?

15:26:40   7          MS. MOLLISON:  That's all, Judge.  Thank you.

15:26:43   8          THE COURT:  Mr. Woodson, do you wish to address me?  If

15:26:46   9     you do, please do so while you're seated, it's easier to speak

15:26:48   10    into the microphone.

15:26:49   11         THE DEFENDANT:  No, Your Honor.

15:26:50   12         THE COURT:  All right.  Ladies?

15:26:52   13         MS. ANTON:  Yes, Your Honor.  I have several victim

15:26:56   14    impact statements that I would like to read to the Court.

15:26:58   15         THE COURT:  Whatever you want, but just remember that

15:27:01   16    the longer you talk, the lower the sentence.

15:27:03   17         MS. ANTON:  I have nothing else to say, Judge.

15:27:08   18         Judge, the first thing I'd like to read to the Court is

15:27:13   19    a poem that was written by the victim whose initials are C.J.

15:27:16   20    She testified here in trial.  It's called Blackmail.

15:27:20   21         I hid except for the follow request.  I was asking them

15:27:25   22    questions like it was a test.  They sent the pics that made my

15:27:29   23    nightmare just begin, I signed myself for me to lose and for

15:27:32   24    them to win.  They asked for more and they threatened me.  I

15:27:37   25    said what for, and to let me be free.  With tears dripping from

15:27:43  1    my eyes, I'm scared to do anything but say my good-byes.  My

15:27:46  2    heart and my soul were breaking with each picture that was sent.

15:27:49  3    As I was crying and shaking, I was asking for forgiveness for

15:27:52  4    the sins I couldn't repent.  Asking for help I was ashamed to

15:27:57  5    do, I was falling apart and hating myself too.  I couldn't

15:28:01  6    believe what was going on.  I wanted the person behind the

15:28:05  7    screen to be gone.  The whole night I was numb and sad.  I

15:28:08  8    thought I couldn't get through the rest of my life.  My suicidal

15:28:12  9    thoughts were the only thing that I had.  All I wanted to do was

15:28:17  10   end it with a razor and not a knife.

15:28:21  11        The next is from C.J.'s, that same victim's, mother.

15:28:25  12   She too wrote a poem that she wanted to share with the Court.

15:28:28  13   My child, my child, you stole my child.  The beautiful smile,

15:28:33  14   the spirited heart, the dreams, the hope, the confidence, the

15:28:38  15   ambition, you stole my child.  You stole my child.  You turned

15:28:42  16   her bitter.  You made her cold.  Afraid.  Untrusting and

15:28:45  17   self-conscious.  The anxiety, the fear, the nightmares and the

15:28:50  18   depression.  The loss of friends, the rumors, the relentless

15:28:55  19   torment.  The cutting, the trying, the hiding under the bed and

15:28:59  20   wishing for their own death.  Isolation, despair and the

15:29:04  21   complete loss of self.  Weekly therapy, inpatient stays, the

15:29:09  22   drugs to numb the pain.  My child is gone.  She is gone.

15:29:16  23        The next statement is from victim B.F. who testified

15:29:19  24   before Your Honor.  When I was asked to make a victim statement,

15:29:24  25   I was scared.  Scared about what would happen to me.  I

apologize, it's B.O.  Victim B.F. is present in court.  This was

victim B.O. who testified via closed circuit TV.

        When I was asked to make a victim statement, I was

scared; scared about what would happen to me and what this man

might again do to me at some point in time.  What Mr. Woodson

did to me when I was only 12 years old took away part of my

childhood, and has made it difficult for me to function in

school and my other activities.  I'm scared and still have

nightmares and often sleep with my lights on.  The things he did

to me and the threats he made terrified me to this day.  During

the trial, I learned that I wasn't the only girl he did this to,

and it shocks me to think that he could get out some day and do

this again.  I do hope and pray that Mr. Woodson serves the

maximum sentence and also hope he never, ever comes out to prey

on any other young girls like me ever again.  I also hope that

his sentencing serves as a notice to others that these kinds of

terrible acts and threats and abusive conduct are unacceptable

in today's society.  His sentencing should also send a clear

message to anyone else that might consider doing this so that

they too know that this is a serious offense, and there are

serious consequences.  I do hope, Your Honor, that you take my

concerns and those of the other girls in our society seriously,

and that Mr. Woodson is sentenced and put in prison for the

longest period possible so he can no longer terrorize or abuse

anyone again.

15:31:03   1          The next letter from the grandmother of victim M.K. who

15:31:07   2   testified here in court.  She's her legal guardian.  Hello,

15:31:12   3   Joseph Woodson.  I'm the grandmother and the guardian of one of

15:31:13   4   your victims.  You've caused so much pain and anguish not only

15:31:15   5   to your victims, but also to their families and to your own

15:31:18   6   family as well.  I can only guess your parents had better hopes

15:31:23   7   and aspirations for you.  They gave you a Biblical name and most

15:31:27   8   likely taught you right from wrong.  I'm sure they never

15:31:27   9   imagined you would turn out to be a cruel and cowardly pedophile

15:31:32  10   who extorts children.  Their pain and shame will go on for as

15:31:35  11   many years as it will take for them to learn to forget you.

15:31:39  12   Because they will forget you, or at the very least care less

15:31:43  13   about you, because they now need to find a way to stop feeling

15:31:46  14   the pain of losing you to the system.  You will now start living

15:31:49  15   a life of torment, which I hope reminds of all the fragile minds

15:31:52  16   you tormented and blackmailed into doing humiliating things

15:31:57  17   against their will for your sick pleasure and financial exploit.

15:32:01  18   What you did to my granddaughter marked her in so many ways.

15:32:06  19   She isolated herself, she lost all of her childhood friends, she

15:32:07  20   lost her moral compass for a while, because she lost her ability

15:32:11  21   to know how to say no, and nothing mattered to her anymore.  She

15:32:14  22   started cutting herself and tried to kill herself three times.

15:32:19  23   Her grades dropped down from A's to F's for the entire year.  We

15:32:22  24   were lucky to find wonderful therapy for her, but that put a

15:32:26  25   very heavy strain on our finances.  My granddaughter is strong

| | | |
|---|---|---|
| 15:32:30 | 1 | and resilient and so is our little family unit.  We have all |
| 15:32:33 | 2 | pulled out of the abyss your actions threw us in and come out of |
| 15:32:38 | 3 | it stronger than before.  She is now in honors classes again and |
| 15:32:40 | 4 | getting straight A's.  She has plans for a bright and promising |
| 15:32:43 | 5 | future.  She's come through this pain you inflected on her and |
| 15:32:47 | 6 | turned into a strong, compassionate and focused beautiful young |
| 15:32:49 | 7 | women.  We will all thrive and move forward in our lives, while |
| 15:32:51 | 8 | you suffer through your new life in prison which should begin |
| 15:32:55 | 9 | today.  I truly hope your sentence is severe because you need to |
| 15:32:57 | 10 | be accountable for the damage and the pain that you've |
| 15:33:02 | 11 | inflicted.  Today marks the culmination of many wrong choices |
| 15:33:06 | 12 | you've made motivated by what I can only guess are your envy, |
| 15:33:10 | 13 | anger and unrestrained cruelty.  You do have no one to blame but |
| 15:33:13 | 14 | yourself.  If you do have a mental illness, that shouldn't even |
| 15:33:16 | 15 | be an excuse, because your actions were so calculated and |
| 15:33:20 | 16 | premeditated and you took it upon yourself to systemically |
| 15:33:25 | 17 | terrorize and humiliate young vulnerable children at a very |
| 15:33:30 | 18 | fragile age.  For that, you must face the consequences.  Having |
| 15:33:31 | 19 | said all that, I hope you use the days you have to left to live |
| 15:33:34 | 20 | to try to become a better person.  To get back in touch with |
| 15:33:36 | 21 | your Judeo Christian roots and to seek and atone for the things |
| 15:33:41 | 22 | you have done.  Seek Christ; he's kind, loving and merciful and |
| 15:33:46 | 23 | he forgives the unforgivable.  You can take shelter in him and |
| 15:33:47 | 24 | seek forgiveness.  I follow Christ's teachings, so it's my duty |
| 15:33:51 | 25 | and desire to forgive you.  So I forgive you.  I pray you can be |

15:33:54  1    redeemed from everything you've done by following a different

15:33:58  2    path.  I pray your new way of life compels you into becoming a

15:34:02  3    better person who helps others through their hardship and sorrow

15:34:05  4    instead of being their cause.  I pray that one day you bring

15:34:10  5    joy, compassion and comfort to others; to atone for all the pain

15:34:14  6    you inflicted.  May God bless you in your darkest days.

15:34:19  7            And the very last victim impact statement is from the

15:34:22  8    legal guardian, the grandfather of victim M.K.

15:34:25  9            Mr. Woodson, I'm the grandfather of a teenage girl who

15:34:28  10   was the victim of your disgusting extortion scheme.  It's

15:34:31  11   difficult for me to find words that can be read aloud in a court

15:34:35  12   of law.  My granddaughter was manipulated by your scheming and

15:34:39  13   threats into doing things no young girl should ever have to

15:34:44  14   think about.  I have no sense of diplomacy for you.  Honestly,

15:34:48  15   I'm hoping the Court gives you the full 117 years without hope

15:34:53  16   of parole.  I've heard what happens to pedophiles in federal

15:34:54  17   prison.  My granddaughter's life for a time was wretched.  She

15:34:58  18   was cutting.  Her grades suffered.  She lost all her friends.

15:35:00  19   Only through therapy and psychiatric care she's finally coming

15:35:05  20   back to what we now know and love her to be.  A sharp student, a

15:35:08  21   fun kid, in a stable relationship with good friends.  I hope the

15:35:11  22   same is true of all the other young children whose lives you

15:35:15  23   infected.  You have many years of your own to look forward to.

15:35:18  24   I hope you take time to reflect upon what your actions have done

15:35:23  25   to so many children.  Maybe you'll see psychiatrists too.  Maybe

15:35:27   1    they can help you.  As for me, I hope this is the last time I

15:35:31   2    must ever think about you.

15:35:35   3         Insofar as victim impact statements, Your Honor, that's

15:35:39   4    all I have.  There are some victims present in court who I don't

15:35:41   5    believe wish to address the Court at this time.

15:35:45   6         THE COURT:  All right.  Anything else by either side?

15:35:51   7         MS. ANTON:  I would just add that in the defense

15:35:55   8    argument, you know, they requested that the Defendant might be

15:35:58   9    allowed to live outside in his 60s, and he came from a

15:36:05   10   nightmarish home life.  What was nightmarish was the life that

15:36:09   11   he put these children through.  We have spoken a lot about the

15:36:14   12   Defendant's background and his autism and to what effect that

15:36:18   13   has on him, but at trial the victims told Your Honor what they

15:36:23   14   had suffered in terms of facts.  And in terms of emotions and

15:36:27   15   their mental well-being, you've heard some in the victim impact

15:36:30   16   statement letters, but to truly understand what this Defendant

15:36:36   17   has done to the seven girls that testified in trial, there were

15:36:39   18   also two boys if Your Honor recalls, the 404(b) witness

15:36:44   19   testified she was required by the Defendant, forced to molest

15:36:48   20   her own sibling by performing oral sex on him.  Additionally,

15:36:52   21   there was another victim, A.C., who testified that she was

15:36:57   22   forced to have sex with a boy and record it for the Defendant.

15:37:01   23   So in that sense, those boys were victims of the Defendant's

15:37:02   24   crime.

15:37:06   25         But there are over 300 other victims in this case who

15:37:11   1   are still being identified and who are still being contacted

15:37:14   2   regarding what the Defendant and his co-conspirators have done.

15:37:19   3   His impact upon these children's lives is vast and will never

15:37:20   4   end for them.

15:37:23   5        I think you've heard that no part of the Defendant's

15:37:28   6   autism diagnosis caused him to exploit children.  He did this of

15:37:32   7   his own free will, his own choice.  He has five other siblings,

15:37:35   8   none of them exploited children in the way that he did.  There

15:37:39   9   are many autistic people.  If in fact Your Honor wants to

15:37:42   10  believe in fact that he is autistic, I would argue it's not in

15:37:47   11  his school records, it was self-reported and you heard from Dr.

15:37:51   12  Holmes that there were some tests that were not performed.

15:37:55   13       He was very proficient in his computer use.  He took

15:37:59   14  college classes.  He testified on his cross-examination that he

15:38:03   15  even built his own computer.  He managed a burger place, he

15:38:07   16  interacted with workers, he made their schedule.  He was put in

15:38:10   17  a position of power in that job.

15:38:18   18       I don't think that a sentence of 30 to 35 years is a

15:38:21   19  just sentence in this case.  The Defendant would then have the

15:38:26   20  possibility of becoming a member of society again in his 60s or

15:38:33   21  earlier with gain time or good time.  I think that a sentence in

15:38:36   22  the upper end of the guideline range as the Government is asking

15:38:41   23  for is one that's not disparate with the other sentences that

15:38:44   24  I've included in my sentencing memorandum that have been given

15:38:50   25  in very similar cases.  Most specifically in the case in the

15:38:55  1   Middle District that I cited to, a very similar fact pattern of

15:38:59  2   sextortion with 300 victims.  The difference was the age of the

15:39:03  3   Defendant, he was slightly younger, and he pled guilty and on

15:39:05  4   the guilty plea he got 105 years.

15:39:08  5        Another case, Killian, in our district here, a

15:39:13  6   Defendant was sentenced to 50 years on a very similar type of

15:39:18  7   sextortion scheme with fewer victims and he was only 19 when the

15:39:18  8   crime happened.

15:39:22  9        I think this Defendant was 30 years old.  He had an

15:39:26  10  inordinate amount of child pornography in addition to the child

15:39:30  11  pornography that he had created.  A sentence in the high end of

15:39:34  12  the guideline range is within the heartland of all the other

15:39:39  13  sentences given out in similar cases, and would send a message,

15:39:44  14  quite frankly, to other similarly situated people to not commit

15:39:47  15  crimes that are seemingly so easy to commit from your own

15:39:50  16  bedroom in a house that he arguably escaped to to avoid the

15:39:54  17  violence that he was seeing behind closed doors with a

15:39:58  18  cellphone.  A cellphone with a Post-It note over the camera.

15:40:03  19  That was the instrumentality.  That's the tool of the trade.

15:40:07  20  One cellphone, And the Defendant managed to damage over 300

15:40:07  21  children's lives.

15:40:13  22       So I'd ask Your Honor to impose a very stiff sentence,

15:40:15  23  near the high end of the guidelines, of course with the

15:40:18  24  supervised release term of life.  The Government fully would

15:40:23  25  hope that there would be no supervised release to follow the

15:40:24  1   lengthy term.

15:40:25  2            THE COURT:  All right.  Anything further?

15:40:26  3            MS. ANTON:  Not from the Government, Your Honor.

15:40:28  4            MS. MOLLISON:  No.  Thank you, Your Honor.

15:40:39  5            THE COURT:  The Court has considered the statements of

15:40:41  6   all the parties, the presentence report which contains the

15:40:44  7   advisory guidelines, and the statutory factors as set forth in

15:40:47  8   18 USC Section 3553(a).

15:40:51  9            It is the finding of the Court the Defendant is not

15:40:59  10  able to pay a fine or the AVAA Assessment under 18 USC Section

15:41:06  11  2259(a)(a).  However, restitution in the JVTA Assessment under

15:41:10  12  18 USC Section 3014 will be ordered.

15:41:12  13           It is the judgment of the Court that the Defendant,

15:41:15  14  Joseph Isaiah Woodson, is committed to the Bureau of Prisons to

15:41:20  15  be imprisoned for 600 months.  This term consists of 360 months

15:41:25  16  as to each of Counts 1 through 3 to be served -- all right.  24

15:41:30  17  months as to Count 5, 60 months as to Count 6, all to be served

15:41:35  18  concurrently.  Also 240 months as to Count 4 which will be

15:41:38  19  served consecutively to those other counts.

15:41:41  20           It is further ordered that pursuant to 18 USC Section

15:41:45  21  3664(d)(5), the victims' losses have are not yet ascertainable,

15:41:48  22  therefore the Court shall set a date for the final determination

15:41:51  23  of the victims' losses not to exceed 90 days after entering.

15:41:55  24  I'll send a notice out, but I would hope that you all could work

15:41:58  25  something out, because you really, I would suspect, would want

15:42:01  1      the Defendant to be gone to a place where he's going to be

15:42:05  2      getting treatment rather than simply being warehoused.  If you

15:42:08  3      come up with an agreement as to the amount, I'll be happy to

15:42:10  4      enter an order.

15:42:13  5            Once restitution is ordered -- determined and ordered

15:42:17  6      by this Court, the Defendant shall pay restitution in the

15:42:18  7      following manner:

15:42:20  8            During the period of incarceration payment shall be

15:42:20  9      made as follows:

15:42:23  10           If the Defendant earns wages in a Federal Prison

15:42:27  11     Industries UNICOR job, then the Defendant must pay 50% of wages

15:42:30  12     earned toward the financial obligations imposed by this judgment

15:42:35  13     in a criminal case.  If the Defendant does not work in a UNICOR

15:42:38  14     job, then the Defendant must pay a minimum of $25 per quarter

15:42:42  15     toward the financial obligations imposed in this order.

15:42:44  16           Upon release from incarceration, the Defendant shall

15:42:48  17     pay restitution at the rate of 10% of monthly gross earnings

15:42:52  18     until such time as the Court may alter that payment schedule in

15:42:55  19     the interests of justice.  The US Bureau of Prisons, the US

15:42:58  20     Probation Office and the US Attorney's Office shall monitor the

15:43:01  21     payment of restitution and report to the Court any material

15:43:04  22     change in the Defendant's ability to pay.  These payments do not

15:43:08  23     preclude the Government from using any other anticipated or

15:43:12  24     unexpected financial gains, assets or income of the Defendant to

15:43:16  25     satisfy the restitution obligations.  The restitution shall be

15:43:18   1   made payable to Clerk, United States Courts, and forwarded to US

15:43:22   2   Clerk's Office, attention Financial Section, 400 North Miami

15:43:28   3   Avenue, Room 8N09, Miami, Florida, 33128.  The restitution will

15:43:30   4   be forwarded by the Clerk of the Court to the victims identified

15:43:36   5   by this Court.  The US Bureau of Prisons, US Probation Office

15:43:39   6   and US Attorney's Office are responsible for the enforcement of

15:43:40   7   this order.

15:43:42   8         Upon release from imprisonment, the Defendant shall be

15:43:44   9   placed on supervised release for a term of life.  This term

15:43:48   10  consists of life as to Counts 1 through 4, one year as to Count

15:43:52   11  5 and three years as to Count 6, all terms to run concurrently.

15:43:55   12        Within 72 hours of release, the Defendant shall report

15:43:57   13  in person to the Probation Office in the district where

15:44:01   14  released.  While on supervised release, the Defendant shall not

15:44:04   15  commit any crimes, shall be prohibited from possessing a firearm

15:44:06   16  or other dangerous device, shall not possess a controlled

15:44:12   17  substance, shall cooperate in the collection of DNA, and shall

15:44:14   18  comply with the standard conditions of supervised release

15:44:15   19  including the following special conditions:

15:44:19   20        Self-employment restriction, no new debt restriction,

15:44:23   21  unpaid restitution fines or special assessments, data encryption

15:44:27   22  restriction, computer possession restriction, employer computer

15:44:31   23  restriction disclosure, no contact with minors, no contact with

15:44:35   24  minors in employment, no involvement in youth organizations, sex

15:44:38   25  offender treatment, restricted from possession of sexual

| | | |
|---|---|---|
| 15:44:44 | 1 | materials, Adam Walsh Act search condition, and sex offender |
| 15:44:47 | 2 | registration as noted in Part F of the presentence report. |
| 15:44:49 | 3 | It is further ordered the Defendant shall pay |
| 15:44:52 | 4 | immediately to the United States a special assessment of $100 as |
| 15:44:56 | 5 | to each of Counts 1 through 6 pursuant to 18 USC Section 3013, |
| 15:44:59 | 6 | for a total of $600. |
| 15:45:03 | 7 | In addition, the Defendant is also ordered to pay the |
| 15:45:07 | 8 | JVTA Assessment in the amount of $5,000 as to each of Counts 1 |
| 15:45:12 | 9 | through 4 for a total of $20,000, pursuant to 18 USC Section |
| 15:45:14 | 10 | 3014(a)(1). |
| 15:45:18 | 11 | The total sentence: 600 months imprisonment, 15 years |
| 15:45:20 | 12 | -- life supervised release, excuse me.  Restitution to be |
| 15:45:23 | 13 | determined and a $600 special assessment. |
| 15:45:27 | 14 | I'll repeat that.  600 months imprisonment, life |
| 15:45:30 | 15 | supervised release, restitution to be determined and a $600 |
| 15:45:32 | 16 | special assessment. |
| 15:45:36 | 17 | The Defendant's right, title and interest -- I think I |
| 15:45:43 | 18 | also have to repeat $600 special assessment and $20,000 JVTA |
| 15:45:43 | 19 | Assessment. |
| 15:45:47 | 20 | The Defendant's right, title and interest in the |
| 15:45:49 | 21 | property identified in the preliminary order of forfeiture which |
| 15:45:51 | 22 | has been entered by the Court is incorporated by reference |
| 15:45:53 | 23 | herein and is hereby forfeited. |
| 15:45:56 | 24 | Now that sentence has been imposed, does the Defendant |
| 15:46:00 | 25 | or his counsel object to the Court's findings of fact or to the |

63

| | | |
|---|---|---|
| 15:46:00 | 1 | manner in which sentence was pronounced? |
| 15:46:02 | 2 | MS. MOLLISON:  Just to preserve the issue, Judge, we do |
| 15:46:05 | 3 | object to the procedural and substantive reasonableness of the |
| 15:46:06 | 4 | sentence. |
| 15:46:10 | 5 | We also ask -- the Court might have mentioned this, but |
| 15:46:12 | 6 | if the Court could designate him to a facility in South Florida |
| 15:46:16 | 7 | and if possible, Coleman so he could take advantage of that |
| 15:46:17 | 8 | mentorship program. |
| 15:46:19 | 9 | THE COURT:  I will recommend that he be screened by the |
| 15:46:21 | 10 | Bureau of Prisons for whatever institution would be the best in |
| 15:46:27 | 11 | order to assist him with whatever his problems are, but barring |
| 15:46:32 | 12 | that -- after that or in lieu of that, if they can't do it, to |
| 15:46:35 | 13 | be as close to South Florida as is possible, commensurate with |
| 15:46:38 | 14 | his background and the offense of which he stands convicted. |
| 15:46:40 | 15 | MS. MOLLISON:  Thank you, Judge. |
| 15:46:42 | 16 | MS. ANTON:  Your Honor, I apologize -- |
| 15:46:43 | 17 | THE COURT:  Wait.  I haven't finished. |
| 15:46:46 | 18 | You have the right to appeal the sentence imposed.  Any |
| 15:46:48 | 19 | notice of appeal must be filed within 14 days after the entry of |
| 15:46:51 | 20 | the judgment.  If you're unable to pay the cost of an appeal, |
| 15:46:53 | 21 | you may apply for leave to appeal in forma pauperis. |
| 15:46:55 | 22 | Yes, Ms. Anton. |
| 15:46:59 | 23 | MS. ANTON:  Judge, I heard defense objection to just |
| 15:47:02 | 24 | preserve the record for an objectively reasonable sentence.  I |
| 15:47:06 | 25 | just wanted to make sure that I didn't miss it, but Your Honor |

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED BY COMPUTER

15:47:08  1   sentence that you imposed was after you considered the 3553(a)

15:47:09  2   factors.

15:47:12  3            THE COURT:  I did say that, and if I didn't, I will say

15:47:18  4   it again.  I would like to make sure that he is -- I want to

15:47:21  5   make sure that it's clear that I did consider all of the factors

15:47:28  6   under 18 USC Section 3553(a) -- what is it?  I'll go through and

15:47:34  7   make -- say it again, 18 USC Section 3553(a).  All right?  I've

15:47:38  8   now said it four times, so I think I really considered it.

15:47:40  9            Anything else we need to do before then?

15:47:41  10           MS. ANTON:  No, Your Honor.

15:47:41  11           MS. MOLLISON:  No, Your Honor.

15:47:45  12           THE COURT:  Good luck to you, sir.

15:47:50  13           COURT SECURITY OFFICER:  All rise.

15:47:53  14           THE COURT:  I'm not going anywhere.  I got to log out.

15:47:53  15           (PROCEEDINGS CONCLUDED)

15:47:53  16                     C E R T I F I C A T E
          17   I certify that the foregoing is a correct transcript from the
15:47:53       record of proceedings in the above-entitled matter.

15:47:53  18   3/17/2020              /s/ Dawn M. Savino
          19   Date                   DAWN M. SAVINO, RPR
15:47:53

15:47:53  20                        I N D E X

15:47:53  21                        WITNESSES

15:47:53  22   ALL WITNESSES:                              PAGE:

15:47:53  23   For Defense:
             Dr. Heather Holmes:
15:47:53  24       Direct Examination by Ms. Blair          7:15
                   Cross-Examination by Ms. Viamontes      17:24
                   Redirect Examination by Ms. Blair       35:15
          25