**UNITED STATES COURT OF APPEALS**
**FOR THE ELEVENTH CIRCUIT**

ELBERT PARR TUTTLE COURT OF APPEALS BUILDING
56 Forsyth Street, N.W.
Atlanta, Georgia 30303



David J. Smith
Clerk of Court

For rules and forms visit
www.ca11.uscourts.gov

June 16, 2022

Clerk - Southern District of Florida
U.S. District Court
400 N MIAMI AVE
MIAMI, FL 33128-1810

Appeal Number:  20-10443-DD
Case Style: USA v. Joseph Woodson, Jr.
District Court Docket No: 0:18-cr-60256-JEM-1

A copy of this letter, and the judgment form if noted above, but not a copy of the court's
decision, is also being forwarded to counsel and pro se parties. A copy of the court's decision
was previously forwarded to counsel and pro se parties on the date it was issued.

The enclosed copy of the judgment is hereby issued as mandate of the court. The court's opinion
was previously provided on the date of issuance.

Sincerely,

DAVID J. SMITH, Clerk of Court

Reply to:  Lois Tunstall
Phone #:  (404) 335-6191

Enclosure(s)

MDT-1 Letter Issuing Mandate

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 20-10443

_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

*versus*

JOSEPH ISAIAH WOODSON, JR.,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida
D.C. Docket No. 0:18-cr-60256-JEM-1

_____

JUDGMENT

2                                                          20-10443

It is hereby ordered, adjudged, and decreed that the opinion is-
sued on this date in this appeal is entered as the judgment of this
Court.

Entered: April 13, 2022

For the Court: DAVID J. SMITH, Clerk of Court

[PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 20-10443

_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

*versus*

JOSEPH ISAIAH WOODSON, JR.,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida
D.C. Docket No. 0:18-cr-60256-JEM-1

_____

Before BRANCH, GRANT, and BRASHER, Circuit Judges.

GRANT, Circuit Judge:

Joseph Woodson preyed on adolescent girls. He infiltrated their social media accounts one by one, using an account of a victim's friend to gain access to the victim's account, locking the victim out of her account, and then continuing the cycle to target new victims. He then demanded that the girls produce and send pornographic material to get their accounts back. But Woodson did not stop there; once he had the degrading images and sexual videos in hand, he threatened to post them on social media unless the girls complied with his progressively horrifying demands. He made good on those threats. And he did not act alone—with a team of other men, he brainstormed tactics, traded targets, and shared the pornographic fruits of their scheme. Together, they abused hundreds of girls.

Woodson was eventually charged with offenses relating to child pornography and extortionate interstate communications. A jury found him guilty on all counts, and the district court sentenced him to 50 years' imprisonment followed by a life term of supervised release. He now appeals, arguing that the district court should have suppressed statements he made to police without the benefit of *Miranda* warnings. He also says the court imposed an unreasonable sentence. But Woodson was not entitled to *Miranda* warnings because he was not in custody when he talked with police, and his sentence was reasonable, both procedurally and substantively. We therefore affirm.

## I.

### A.

Joseph Woodson first contacted 14-year-old Kendra through a social media application called Snapchat.[1]  One night in November 2017, Kendra received a message on the app from one of her friends asking for her password.  This was not uncommon, surprisingly enough; Kendra and her friends often traded Snapchat passwords so that they could message users from each other's accounts.  Kendra sent her friend the password, but when she tried to log back in to her own account, the password had been changed.  A text message from an unknown sender soon instructed her to create a new account on a messaging application called Kik if she wanted to access her Snapchat account again.  Kendra quickly realized that she had been communicating with a stranger, not a friend.  Though she did not know it at the time, that stranger was Joseph Woodson.

Kendra did as she was told, and Woodson's instructions continued over Kik.  He first demanded a picture of her bare breasts.  She complied, hoping that he would be satisfied with the one photo.  He was not.  In fact, he immediately threatened to distribute the picture unless she supplied more.  Kendra "felt stuck, like there was nowhere else to go but to keep sending everything."

---

[1] We have changed the victims' names to preserve their privacy.  In the second superseding indictment, Kendra is Victim 1, Faith is Victim 2, Olivia is Victim 3, Jamie is Victim 6, and Carmen is Victim 7.

Woodson's orders escalated—he instructed her to send explicit pictures of her body with vile writing on it, as well as videos of her performing sexual acts.  Over the course of a few hours, Kendra sent Woodson several videos and more than 50 pictures, hoping with each one she sent that the extortion would end.  When his demands finally stopped coming that night, she thought it was over.

It was not.  Less than two months later, Woodson or one of his partners in crime sent one of the photos to Kendra's close friend in an Instagram message.  Kendra realized in horror after her friend contacted her that "it was all happening again."  Sure enough, she soon received a message threatening to publicize her "worst pics."  Kendra's abuser greeted her hesitation with reminders of his leverage—he sent back humiliating photos and videos, along with a threat to distribute them to everyone she knew.  Kendra felt like she had "no escape."

Woodson escalated the conversation on Kik.  Kendra tried to satisfy his new demand for an oral sex video by telling him that she would make the video with her boyfriend when she was next with him.  Woodson was not pleased.  He demanded that she produce the video that day, and with a stranger, or else he would "start showing the good stuff."  Kendra's response was firm: she would rather kill herself than comply.  Woodson's reply?  "I win either way."

Kendra could no longer endure his demands.  When she refused to send more pictures, Woodson carried through with his

threat—he distributed pornographic images of her to her followers on Instagram.

Kendra, tragically, was not Woodson's only victim—among his other targets were two 12-year-olds, Olivia and Faith. After Olivia complied with his initial demands for nude images, she participated in a live video call under threat that he would post the photos. Crying, Olivia complied with his instructions to take off her clothes. Though she did not realize it at the time, Woodson took screenshots of the video call, leading to even more explicit images of her naked body.

When Woodson infiltrated Faith's account, she "felt forced" to send nude pictures—Woodson promised that he would give her access to her account again if she did so. The images showed Faith's naked body with degrading words written across her chest and face. He kept asking for more, and when Faith eventually refused, he punished her by posting the photos she had already sent.

Thirteen-year-old Jamie was yet another victim. Woodson, along with another man, compelled her to produce lewd images along with a video depicting her naked, urinating in a cup, drinking the urine, and vomiting. She made the video as an alternative after refusing to comply with even more outrageous demands to produce videos of herself molesting a sibling and of dogs licking food from her genitalia. The men also extorted pornography from 13-year-old Carmen, including videos of her having sex with a friend and inserting foreign objects into her body. Celebrating

Carmen's videos on Kik—"quite a win," read one message—the men bantered about which sexual acts they should force her to do next.

These children—Kendra, Olivia, Faith, Jamie, and Carmen—were among the victims who testified at Woodson's trial. But they make up only a small fraction of the victims targeted by Woodson and his co-conspirators. In fact, the investigation into Woodson and his team of extortionists has revealed more than 300 victims, including many who remained unidentified at the time of the trial.

## B.

Some of Woodson's victims eventually reported his crimes to the police. Once they did, law enforcement officials linked the IP address associated with the extortionate messages to a physical address in Ashburn, Virginia, where Woodson lived with his family. Early one morning, just days after Woodson started his second round of contact with Kendra, a team of approximately 15 officers executed a search warrant at his family's townhouse. Woodson's brother Brandon was getting ready for work, and he opened the front door for the officers, who were wearing tactical gear and had their firearms drawn. One officer placed Brandon in handcuffs and seated him on the ground outside, while several others entered the townhouse to secure the rest of the residents. Still more officers remained outside and formed a perimeter around the townhouse.

By the time three officers entered 28-year-old Woodson's bedroom, they had holstered their weapons. Their entry awakened him; his assigned shift at work did not start until later that morning. Woodson was handcuffed and escorted into the living area, where he was joined by Brandon, his mother, and his sister.

Roughly 20 minutes later, while officers were still executing the search warrant, a detective arrived to interview the suspects. Not knowing who was responsible for the messages from the traced IP address, the detective decided to interview the two male residents: first Brandon, and then Woodson.

The detective wanted to conduct the interviews outside the home to have some privacy while the search continued. Because the weather was cold, he proposed sitting in the police van parked in front of the residence. Brandon agreed, and his handcuffs were removed before he walked to the van. When Brandon said that he had never downloaded Snapchat and allowed an on-the-spot search of his phone, the detective quickly determined that he was unlikely to be the culprit. The interview only took about 15 minutes.

Woodson's turn was next. He agreed to talk with the detective and followed him to the police van, uncuffed and without protest. Woodson sat in the front passenger seat, with the interviewing detective in the driver's seat and a second detective in the back seat. The detective told Woodson right away that he was not under arrest, that he was not charged with a crime, and that

they were talking voluntarily.  He did not, however, read the *Miranda* warnings.

Their conversation started off with a cordial discussion of video games, but it soon became more confrontational.  The detective told Woodson that someone inside the townhouse had "done something a little shaky online"—and that he had "a very strong indication" that it was Woodson.  When asked if he knew why the officers were there, Woodson immediately conceded: "Because of the pictures that have been on my phone."  He initially hesitated to give up his cell phone password, but disclosed it after the detective stated that he was "not going to believe for a second" that he didn't know it.

From there, Woodson launched into an elaborate narrative—both detailing the operation and attempting to shift the blame for it.  His story was that a man from Ireland had threatened to have him and his family members killed by law enforcement if he refused to infiltrate girls' Snapchat accounts.  The detective was not impressed, calling Woodson's explanation "ridiculous" and indicating that he would tell his "bosses" that Woodson was lying.  Woodson held fast to his story, although he eventually conceded that the Irish man's threats were only "implied."

Woodson confessed that he had taken over the Snapchat accounts of about 20 girls, but claimed that his demands for pornography were made only at the other man's direction.  Still, he detailed how he established his network of girls, and admitted

without hesitation that he assumed many of his victims were underage.

After less than an hour, Woodson indicated that he had nothing else that he wished to disclose. The detective concluded the interview and escorted him back inside his townhouse. In the meantime, the officers conducting the search had found Woodson's cell phone hidden in his pillowcase. Subsequent forensic analyses of the phone revealed a vast collection of pornographic material, catalogued by his victims' names.

For reasons that are not clear, Woodson was not arrested until nearly eight months after his interview. And during that interval, Woodson continued contacting his victims—he had even sent a message demanding more graphic photos from Kendra on the day of his arrest.

## C.

Woodson was charged with three counts of producing child pornography under 18 U.S.C. § 2251(a); one count of distributing child pornography under 18 U.S.C. § 2252(a)(2); one count of sending extortionate interstate communications under 18 U.S.C. § 875(d); and one count of conspiring to send extortionate interstate communications under 18 U.S.C. § 371.

Before trial, he moved to suppress his statements from the interview, arguing that the discussion had been a custodial

interrogation that required *Miranda* warnings.[2]  The district court adopted a magistrate judge's recommendation to deny the motion, which reasoned that Woodson was not in custody under *Miranda* when he made the statements.  The case proceeded to trial, where the prosecution introduced the audio recording and transcript of the interview into evidence.

The jury convicted Woodson on all counts.  He was sentenced to 50 years' imprisonment followed by a life term of supervised release.  Woodson now appeals his convictions and his sentence, arguing that the district court should have granted his motion to suppress and that it imposed an unreasonable sentence.

## II.

We first address Woodson's claim that we must vacate his convictions because the district court failed to suppress his statements under *Miranda*.  In reviewing the denial of a motion to suppress, we uphold the district court's findings of fact unless they are clearly erroneous and review its application of law to those facts de novo.  *United States v. Muegge*, 225 F.3d 1267, 1269 (11th Cir. 2000).  We construe the facts in the light most favorable to the party that prevailed below—the government.  *See id.*  We also give substantial deference to the district court's credibility determinations.  *United States v. Holt*, 777 F.3d 1234, 1255–56 (11th

---

[2] Woodson also moved to suppress evidence obtained from his cell phone. That evidence was found admissible under the inevitable discovery doctrine, and Woodson does not challenge that conclusion on appeal.

Cir. 2015).  Woodson bears the burden of showing that he was in custody when he made the contested statements.  *See United States v. de la Fuente*, 548 F.2d 528, 533 (5th Cir. 1977) (Because "the burdens of production and persuasion generally rest upon the movant in a suppression hearing," a defendant must show "that a confession was obtained while he was under custodial interrogation.").  If the district court admitted evidence in violation of *Miranda*, we apply harmless error review.  *United States v. Street*, 472 F.3d 1298, 1314–15 (11th Cir. 2006).

## A.

In service of the Fifth Amendment right against self-incrimination, *Miranda v. Arizona* requires trial courts to "exclude from evidence any incriminating statements an individual makes before being warned of his rights to remain silent and to obtain counsel."  *United States v. Luna-Encinas*, 603 F.3d 876, 880 (11th Cir. 2010); *see Miranda v. Arizona*, 384 U.S. 436, 444 (1966). But an individual is entitled to *Miranda* warnings only if he is in custody during questioning.  *See Luna-Encinas*, 603 F.3d at 880.

Custody, however, has a specific meaning in the *Miranda* context, one that is different than the ordinary usage of the term. A person is "in custody" for these purposes if he finds himself in "circumstances that are thought generally to present a serious danger of coercion."  *See Howes v. Fields*, 565 U.S. 499, 508–09 (2012).  And that coercive environment exists, we have said, when a reasonable person would have understood that his freedom of

action was "curtailed to a degree associated with formal arrest." *Luna-Encinas*, 603 F.3d at 881 (quotation omitted).

Our evaluation of this coercion question proceeds in two steps. *Howes*, 565 U.S. at 508–09. The first goes more to nature and the second more to degree. We first ask whether "a reasonable person would have felt he or she was not at liberty to terminate the interrogation and leave." *Id.* at 509 (quotation and brackets omitted). To answer that question, we examine "all of the circumstances surrounding the interrogation," including the location and duration of the questioning, statements made during the interview, the presence or absence of physical restraints, and whether the person was released after the interview. *Id.* (quotation omitted).

Freedom to depart ends the inquiry—no *Miranda* warnings are required. But "the freedom-of-movement test identifies only a necessary and not a sufficient condition for *Miranda* custody." *Maryland v. Shatzer*, 559 U.S. 98, 112 (2010). Restriction on movement is not always enough—even an inmate in prison may not be in custody for purposes of *Miranda* if the circumstances surrounding the interview do not exert "the coercive pressure that *Miranda* was designed to guard against." *Id.* As the Supreme Court explained in *Howes v. Fields*, the circumstances of an interview—whether in prison or elsewhere—can lack "the shock that very often accompanies arrest." 565 U.S. at 511. This kind of shock, which follows when a person is "cut off from his normal life and companions" and "abruptly transported from the street into a

20-10443            Opinion of the Court                    13

police-dominated atmosphere," can create pressure to speak, as one may "hope that, after doing so, he will be allowed to leave and go home." *Id.* (quotations omitted).  So even if we conclude that a reasonable person would not have felt at liberty to leave, we still must consider "whether the relevant environment presents the same inherently coercive pressures as the type of station house questioning at issue in *Miranda*." *Id.* at 509.

Our ultimate task, in sum, is to compare the interview environment at hand to "the paradigmatic *Miranda* situation"—where "a person is arrested in his home or on the street and whisked to a police station for questioning." *Id.* at 511.  Only if the environment presented "the same inherently coercive pressures" are the warnings required.  *Id.* at 509.

Before we begin our analysis, we offer a necessary clarification of its scope.  The determination of custody under *Miranda* depends entirely on "the objective circumstances of the interrogation." *Stansbury v. California*, 511 U.S. 318, 323 (1994). We assess the objective circumstances from the perspective of the "reasonable innocent person." *United States v. Moya*, 74 F.3d 1117, 1119 (11th Cir. 1996).  Certain considerations are therefore out of bounds: "the actual, subjective beliefs of the defendant and the interviewing officer on whether the defendant was free to leave are irrelevant." *Id.*

With this objective test in mind, we first note that the magistrate judge's reliance on the subjective beliefs of Woodson's brother Brandon was improper.  Brandon testified that he felt he

could have declined to talk with the detectives and that he did not feel pressured to stay in the van during his interview. The magistrate judge reasoned that because Brandon could be deemed a "reasonable innocent person," his testimony about his subjective beliefs could count against Woodson in the custody determination.

That is not correct. Because the custody test is objective, we do not consider subjective beliefs—even those of others who are interrogated. There are several reasons for this. To start, considering the beliefs of another interviewee invites the danger of conflating his interactions with those of the defendant. Even two interrogations conducted in the same location by the same officers can meaningfully differ. Here, for instance, the officers quickly concluded that Brandon was likely not a suspect and may have dealt with him less harshly as a result.

More to the point, considering the subjective views of others at the scene would risk turning the *Miranda* custody analysis into an opinion survey instead of an objective inquiry. We've resisted this type of opinion-seeking before. Indeed, we have long recognized that a police officer's subjective views about whether a suspect is free to leave an interview do not bear on our objective analysis unless those views are conveyed to the suspect. *Peoples v. Campbell*, 377 F.3d 1208, 1228 (11th Cir. 2004); *Stansbury*, 511 U.S. at 325. The internal perspectives of third parties are no different. Of course, though we decline to give weight to Brandon's subjective understandings about his own freedom to leave, we do

consider the parts of his testimony that bear on the objective conditions at play.

## B.

After analyzing the circumstances surrounding Woodson's interview, we conclude that a reasonable person in his position would have felt free to terminate the interview and leave. But even if not—and we recognize that the question may be close here—the interview environment did not present the serious danger of coercion that custody entails.

Most important is the explicit advice Woodson received at the beginning of the interview: that he was not under arrest, that he was not charged with a crime, and that the conversation was voluntary. Those words make a big difference. By way of comparison, we have held that when officers advise a defendant "that he is free to leave and is not in custody," we generally assume that he is not in custody absent restraints "so extensive that telling the suspect he was free to leave could not cure the custodial aspect of the interview." *United States v. Brown*, 441 F.3d 1330, 1347 (11th Cir. 2006) (quotation omitted). Here, Woodson and the government dispute whether he was specifically told that he was free to leave. But even assuming he was not, informing an individual that he is "not under arrest" and that the proposed conversation is voluntary is also "powerful evidence" that he is not in custody. *See id.* at 1347–48 (quotation omitted); *United States v. Acosta*, 363 F.3d 1141, 1150 (11th Cir. 2004). A reasonable person in Woodson's position would not feel compelled to stay after being

told that he was not under arrest, not being charged with a crime, and in a voluntary discussion.

What's more, Woodson was not handcuffed during the interview, and he sat in the front passenger seat—not in the back seat, where arrestees are typically placed. *See, e.g.*, *Arizona v. Gant*, 556 U.S. 332, 342 & n.2 (2009). Nothing indicates that the vehicle's doors were locked. And, as the magistrate judge noted, the van featured "none of the trappings of a typical police vehicle"—it had no insignia, radio, cage, bar, or visible switch to its lights.

Given all these facts, we conclude that a reasonable person in Woodson's position would feel free to terminate the interview and walk away.[3] But because we recognize that it is somewhat close, we also consider whether the interview environment presented the same risks of coercion as the interrogations considered in *Miranda*. Of course, as a practical matter, any police interview of a criminal suspect "will have coercive aspects to it, simply by virtue of the fact that the police officer is part of a law enforcement system which may ultimately cause the suspect to be charged with a crime." *California v. Beheler*, 463 U.S. 1121, 1124 (1983) (quotation omitted); *United States v. Phillips*, 812 F.2d 1355,

---

[3] Woodson also argued in his briefs that we should consider his race in our custody analysis, but the opinion he relied on to support this argument was vacated on rehearing. *See United States v. Knights*, 967 F.3d 1266 (11th Cir. 2020), *vacated*, 989 F.3d 1281 (11th Cir. 2021).

1361 (11th Cir. 1987).  Woodson's interview was no exception.  But the serious danger of coercion associated with a custodial interview did not exist here.

To start, we reject Woodson's primary argument that the display of "police control and authority" that occurred when officers searched his home was so coercive that it tainted his later interview.  Police officers executing a search warrant have the authority "to detain the occupants of the premises while a proper search is conducted" within the vicinity of the premises to be searched.  *Bailey v. United States*, 568 U.S. 186, 193, 201 (2013) (quotation omitted).  That's what happened here.  The record also shows that the restraint Woodson experienced—the brief handcuffing and detention in the living area of his home—was only "the minimal amount necessary" for the safe execution of the search warrant "or close to it."[4]  *See Acosta*, 363 F.3d at 1150.  And he was no longer restrained during his interview.

Woodson's argument also reflects a misunderstanding of the focus of our custody analysis.  To be sure, we sometimes consider the circumstances that led up to questioning in assessing whether an individual was exposed to a serious danger of coercion.

---

[4] We also reject Woodson's argument in support of his motion to suppress that the officers' confiscation of his cell phone favors custody.  The confiscation of a cell phone through a proper search warrant is not a significant source of coercive pressure, and nothing about the interview indicated that Woodson would be more likely to maintain possession of his cell phone if he answered the detective's questions.

*See Luna-Encinas*, 603 F.3d at 881–82. But the emphasis is rightly placed on the environment surrounding the interview itself. For this reason, neither the fact that Woodson was restrained before the interview nor the high number of officers involved in the search—yet uninvolved in questioning Woodson—rendered the interview custodial. *See United States v. Deason*, 965 F.3d 1252, 1261–62 (11th Cir. 2020) (finding no custody during an interview conducted after eight officers arrived at the defendant's home to execute a search warrant).

What's more, Woodson did not experience the "sharp and ominous change" of circumstances associated with custody under *Miranda*, "when a suspect is yanked from familiar surroundings in the outside world and subjected to interrogation in a police station" or another "police-dominated atmosphere." *See Howes*, 565 U.S. at 511 (quotation omitted). Courts are far less likely to find the circumstances custodial when an interview occurs in "familiar or at least neutral surroundings." *Brown*, 441 F.3d at 1348 (quotations omitted). Rather than being whisked away to a remote and unfamiliar location, Woodson remained right outside his home and only steps away from his family.

In fact, neighbors could observe from their windows that the brothers were being questioned by police. That kind of exposure to public view mitigates the risks that motivated *Miranda*—it "reduces the ability of an unscrupulous policeman to use illegitimate means to elicit self-incriminating statements" and decreases an individual's fear that "if he does not cooperate, he will

be subjected to abuse." *Berkemer v. McCarty*, 468 U.S. 420, 438 (1984); *see Acosta*, 363 F.3d at 1150.   A reasonable person in Woodson's position—in view of his onlooking neighbors and any passersby—"would not have believed that he was utterly at the mercy of the police, away from the protection of any public scrutiny, and had better confess or else." *See Acosta*, 363 F.3d at 1150.

And Woodson was not entirely "cut off from his normal life"—in fact, he quickly returned to it.  *See Howes*, 565 U.S. at 511 (quotation omitted).  As it turns out, because he was not arrested until eight months later, Woodson was free to continue living the same life—even engaging in the same abusive tactics—despite his detailed confessions.

No doubt, some of the circumstances surrounding Woodson's interview may have posed a danger of coercion.  The interviewing detective told Woodson that he suspected him of "shaky" online behavior and said that he would report to his "bosses" whether Woodson lied during the interview.   Such statements may raise a concern that a person in Woodson's position might "feel compelled to speak by the fear of reprisal for remaining silent or in the hope of more lenient treatment should he confess." *Illinois v. Perkins*, 496 U.S. 292, 296–97 (1990); *see Howes*, 565 U.S. at 512.  But construing the facts in the light most favorable to the government, as we must, we cannot say that these few statements exerted serious coercive pressure in light of the many circumstances pointing in the opposite direction.

Nor does the duration of the interview tip the balance in favor of custody.  To be sure, the hour-long interview falls along the spectrum between questioning that lasts "only a few minutes" and the prolonged station house interrogations "in which the detainee often is aware that questioning will continue until he provides his interrogators the answers they seek."  *See Berkemer*, 468 U.S. at 437–38.  But "there is no fixed limit to the length of questioning" after which an interrogation is necessarily custodial. *United States v. McDowell*, 250 F.3d 1354, 1363 (11th Cir. 2001). And even if there were, Woodson's interview would not fall on the wrong side of that line; this Court has already decided that interviews longer than this one were non-custodial.  *See, e.g.*, *id.* (approximately four hours); *Muegge*, 225 F.3d at 1269, 1271 (approximately two and a half hours).

In short, we conclude that a reasonable person in Woodson's position would not have felt that he lacked the "liberty to terminate the interrogation and leave."  *Howes*, 565 U.S. at 509 (quotation omitted).  But even if that conclusion were less certain, the facts do not show that Woodson was subjected to coercive pressures fitting the archetype of *Miranda* questioning.  This secondary point reinforces the important distinction between custodial interrogations and the "traditional investigatory functions of police where the compulsive atmosphere triggering *Miranda* is absent."  *See Peoples*, 377 F.3d at 1229 (quotation omitted).  Because Woodson was not in custody, the district court correctly denied his motion to suppress.

## III.

We turn now to Woodson's challenges to his sentence.  The applicable sentencing range under the Sentencing Guidelines was 360 to 1,404 months' imprisonment—or 30 to 117 years.  The district court sentenced Woodson to 50 years' imprisonment followed by a life term of supervised release.  Woodson contends that his sentence is procedurally unreasonable because the district court failed to properly explain why it was imposing a sentence at a particular point within the sentencing range.  *See* 18 U.S.C. § 3553(c)(1).  He also claims that his sentence is substantively unreasonable because the district court did not properly apply the sentencing factors under 18 U.S.C. § 3553(a).  Both arguments fail.

## A.

We first address Woodson's procedural challenge.  We review the district court's compliance with 18 U.S.C. § 3553(c)(1) de novo.  *United States v. Bonilla*, 463 F.3d 1176, 1181 (11th Cir. 2006).  If a sentencing range exceeds 24 months, the district court must state "the reason for imposing a sentence at a particular point within the range." 18 U.S.C. § 3553(c)(1).  Still, we have explained that this provision does not require a sentencing court to "incant the specific language used in the guidelines" or to "state that a particular factor is not applicable in a particular case." *Bonilla*, 463 F.3d at 1182 (quotation omitted).  Rather, the § 3553(c)(1) requirement is satisfied where the record reflects that the district court considered many of the § 3553(a) factors.  *Id.*; *see also United States v. Ghertler*, 605 F.3d 1256, 1262 (11th Cir. 2010).

Case 0:18-cr-60256-JEM   Document 191   Entered on FLSD Docket 06/17/2022   Page 25 of 34
USCA11 Case: 20-10443   Date filed: 04/13/2022   Page: 22 of 29
(22 of 34)

22                    Opinion of the Court                    20-10443

The district court met that requirement. For starters, Woodson's procedural challenge misconstrues the record. He contends that the "only reason" the district court gave at the sentencing hearing was offered immediately before pronouncing the sentence, when the district court summarily stated that it had "considered the statements of all the parties, the presentence report which contains the advisory guidelines, and the statutory factors as set forth in 18 U.S.C. § 3553(a)."

Not so. The district court's earlier comments show that it specifically considered and applied many of the § 3553(a) factors. The court discussed the nature and circumstances of Woodson's offenses, explaining that Woodson did "horrible" and "disgusting" acts that the victims will suffer from for the rest of their lives. It also considered Woodson's personal characteristics—that he suffered from mild to moderate autism and had experienced a troubled home life since childhood—but explained that these circumstances did not outweigh the seriousness of his conduct.

The district court also explicitly contemplated several of the statutory purposes of sentencing under § 3553(a)(2). It described that the severity of Woodson's offenses required a substantial sentence, one that would reflect the serious and permanent damage that he inflicted on his victims. The court explained that Woodson could receive social training while in prison. And it looked to the applicable sentencing guidelines, which established an upward boundary of over 100 years, and reasoned that a moderate sentence within the sentencing range would be

appropriate. The district court, in short, more than adequately explained the reasoning behind Woodson's sentence.

**B.**

Woodson's substantive challenge is also insufficient. We review the substantive reasonableness of a sentence for abuse of discretion. *United States v. Early*, 686 F.3d 1219, 1221 (11th Cir. 2012). A district court abuses its sentencing discretion if it does not consider relevant factors that were due significant weight, gives significant weight to improper or irrelevant factors, or balances the proper factors unreasonably. *United States v. Irey*, 612 F.3d 1160, 1189 (11th Cir. 2010) (en banc). We will vacate a sentence as substantively unreasonable only if "we are left with the definite and firm conviction that the district court committed a clear error of judgment in weighing the § 3553(a) factors by arriving at a sentence that lies outside the range of reasonable sentences dictated by the facts of the case." *Id.* at 1190 (quotation omitted). We have no such conviction.

District courts have substantial discretion as to how much weight to accord each § 3553(a) factor when fashioning a sentence. *See United States v. Rosales-Bruno*, 789 F.3d 1249, 1254–55 (11th Cir. 2015). We ordinarily expect that a sentence falling within the guideline range will be reasonable, and a "sentence imposed well below the statutory maximum penalty" indicates reasonableness. *See United States v. Hunt*, 526 F.3d 739, 746 (11th Cir. 2008); *United States v. Dougherty*, 754 F.3d 1353, 1362 (11th Cir. 2014).

Woodson argues that his sentence should have been reduced because of his history and characteristics—particularly his lack of criminal history, his autism, and his chaotic home life. But as we have already described, the district court considered these circumstances and found them outweighed by the seriousness of the offense and the need to serve the purposes of sentencing.

Woodson also contends that his offenses were not all that serious—that because he acted remotely and did not target "prepubescent children," he deserves a sentence at or near the bottom of the applicable sentencing range. That argument is shocking. Through technology, Woodson and his team tapped into the vulnerabilities of hundreds of girls, and then degraded, humiliated, and threatened them. We cannot discern how his methods diminish the seriousness—indeed, the depravity—of his offenses. We see no abuse of discretion in the district court's decision to find a sentence above the minimum appropriate for Woodson's crimes—one that is well within the applicable sentencing range and less than half of the maximum sentence he could have received. Woodson's sentence is substantively reasonable.

⋆     ⋆     ⋆

Woodson committed his crimes as a faceless username lurking behind a cell phone screen to impose horrors on young girls for his own pleasure. He and his team victimized hundreds of children by hijacking their social media accounts and extorting them for pornography. His attempts to hide from the

20-10443               Opinion of the Court                    25

consequences of his actions—by challenging both the admission of his confessions and the reasonableness of his sentence—fail.  We **AFFIRM** Woodson's convictions and his sentence.

20-10443                BRASHER, J., Concurring                    1

BRASHER, Circuit Judge, concurring in the judgment:

I concur in the Court's disposition of Woodson's appeal, but I write separately to explain that, in my view, the magistrate judge did not err in considering the testimony of Woodson's brother, Brandon, who was also questioned by the officers on the scene and testified that he felt free to terminate his interview.

A *Miranda* custody determination is an objective test based on the totality of the circumstances. To determine whether a person is in custody, "we look at the totality of the circumstances and ask whether 'a reasonable man in [the defendant's] position would feel a restraint on his freedom of movement to such extent that he would not feel free to leave.'" *United States v. Deason*, 965 F.3d 1252, 1259 (11th Cir. 2020) (quoting *United States v. Brown*, 441 F.3d 1330, 1347 (11th Cir. 2006)). Because the test is not subjective, we do not inquire into whether the specific officer intended to place a person in custody or whether the suspect subjectively felt like he or she was in custody: "the actual, subjective beliefs of the defendant and the interviewing officer on whether the defendant was free to leave are irrelevant." *United States v. Moya*, 74 F.3d 1117, 1119 (11th Cir. 1996).

Brandon, however, is neither the suspect nor the police; he is an innocent bystander who witnessed and experienced the suspect's interaction with the police. I believe the magistrate judge appropriately considered Brandon's testimony as part of the "totality of the circumstances." This is so for three reasons.

First, the Court's opinion does not cite, nor can I locate, any authority for the proposition that when an innocent third party testifies about his impression of the scene, a court may not consider that impression when making a custody determination. Instead, the only subjective impressions that are off-limits are those of the suspect and interviewing officers. *See, e.g.*, *Deason*, 965 F.3d at 1259; *Moya*, 74 F.3d at 1119 (same); *see also Berkemer v. McCarty*, 468 U.S. 420, 442, (1984) (a "policeman's unarticulated plan has no bearing on the question whether a suspect was 'in custody' at a particular time"). So it seems that we revert to the default rule. Here, the legal question is whether a reasonable innocent person would have felt free to leave during the interaction with the police. In answering that question, we are required to consider the "totality of the circumstances." Brandon's first-hand experience in the situation is one of those circumstances. So it may be considered.

The Court's opinion cautions that an innocent third-party often won't be subject to the same pressures that the suspect would be, explaining that "[e]ven two interrogations conducted in the same location by the same officers can meaningfully differ." But that is no reason to declare this piece of evidence off-limits in its entirety. Courts must consider and weigh witnesses' impressions and opinions all the time. I see little difference between a witness like Brandon testifying about his impressions of the scene—that an officer's voice was loud, a room was cold, or a wait was long—and testifying that the officers did not make him feel like he was not

free to leave. As with any other type of relevant evidence, district courts can decide how much weight to give it.

Second, weighing third-party testimony like Brandon's does not raise the same practical concerns as weighing testimony from the suspect or interviewing officers. Unlike an innocent third party, the suspect and the officers have obvious incentives to distort their impression of the scene. *United States v. Phillips*, 812 F.2d 1355, 1359–60 (11th Cir. 1987) (explaining that the Court adopted an "objective, reasonable man standard" because "unlike a subjective test, it is not solely dependent either on the self-serving declarations of the police officers or the defendant") (quoting *Berkemer,* 468 U.S. at 442 n.35). But Brandon is not a party in this case. Instead, he approximates the "reasonable innocent person" whose perspective we adopt in making a custody determination. *Moya*, 74 F.3d at 1119. Because he lacks the same incentive to distort his impression of the scene, his testimony does not present the same problems as the testimony of the officers or suspect.

Third, and finally, considering the sense impressions of third parties would not turn the *Miranda* custody test into an "opinion survey" as the Court fears. That is because our precedent already limits the weight that may be properly assigned to third-party impressions by requiring us to consider the totality of the circumstances. In weighing the totality of the circumstances, third-party impressions *alone* would never control the Court's inquiry. *United States v. Johnson*, 921 F.3d 991, 998 (11th Cir. 2019) (In

weighing the totality of the circumstances, "the whole picture . . . must be taken into account") (quoting *United States v. Cortez*, 449 U.S. 411, 417 (1981)). But nothing prevents a court from considering third-party impressions as one factor among many in its analysis. It is not the third party's subjective impression that is important—it is the objective fact that people situated similarly (though perhaps not identically) to the suspect felt free to leave at the time.

For these reasons, I disagree with the Court's conclusion that Brandon's sense impressions are "no different" from those of Woodson or the interviewing officers. Third parties like Brandon lack the same incentive to misremember their impressions, and their impressions may assist the court's inquiry into whether a reasonable innocent person in the suspect's position would have felt free to terminate the interview. *Deason*, 965 F.3d at 1259 (quoting *Brown*, 441 F.3d at 1347). Though not determinative, Brandon's sense impressions were probative, and the magistrate judge did not err in considering them.

# UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

ELBERT PARR TUTTLE COURT OF APPEALS BUILDING
56 Forsyth Street, N.W.
Atlanta, Georgia 30303

David J. Smith
Clerk of Court

For rules and forms visit
www.ca11.uscourts.gov

April 13, 2022

MEMORANDUM TO COUNSEL OR PARTIES

Appeal Number:  20-10443-DD
Case Style:  USA v. Joseph Woodson, Jr.
District Court Docket No:  0:18-cr-60256-JEM-1

Electronic Filing
All counsel must file documents electronically using the Electronic Case Files ("ECF") system,
unless exempted for good cause. Although not required, non-incarcerated pro se parties are
permitted to use the ECF system by registering for an account at www.pacer.gov. Information
and training materials related to electronic filing are available on the Court's website. Enclosed
is a copy of the court's decision filed today in this appeal. Judgment has this day been entered
pursuant to FRAP 36. The court's mandate will issue at a later date in accordance with FRAP
41(b).

The time for filing a petition for rehearing is governed by 11th Cir. R. 40-3, and the time for
filing a petition for rehearing en banc is governed by 11th Cir. R. 35-2. Except as otherwise
provided by FRAP 25(a) for inmate filings, a petition for rehearing or for rehearing en banc is
timely only if received in the clerk's office within the time specified in the rules. Costs are
governed by FRAP 39 and 11th Cir.R. 39-1. The timing, format, and content of a motion for
attorney's fees and an objection thereto is governed by 11th Cir. R. 39-2 and 39-3.

Please note that a petition for rehearing en banc must include in the Certificate of Interested
Persons a complete list of all persons and entities listed on all certificates previously filed by
any party in the appeal. See 11th Cir. R. 26.1-1. In addition, a copy of the opinion sought to be
reheard must be included in any petition for rehearing or petition for rehearing en banc. See
11th Cir. R. 35-5(k) and 40-1 .

Counsel appointed under the Criminal Justice Act (CJA) must submit a voucher claiming
compensation for time spent on the appeal no later than 60 days after either issuance of mandate
or filing with the U.S. Supreme Court of a petition for writ of certiorari (whichever is later) via
the eVoucher system. Please contact the CJA Team at (404) 335-6167 or
cja_evoucher@ca11.uscourts.gov for questions regarding CJA vouchers or the eVoucher
system.

For questions concerning the issuance of the decision of this court, please call the number referenced in the signature block below. For all other questions, please call <u>Bradly Wallace Holland, DD</u> at <u>404-335-6181</u>.

Sincerely,

DAVID J. SMITH, Clerk of Court

Reply to: Jeff R. Patch
Phone #: 404-335-6151

OPIN-1 Ntc of Issuance of Opinion